https://research.txcourts.gov/CourtRecordsSearch/ui/casePrintView/e99fb6ea608c40fcba3ccdc582fe6d4f

## Case Information

WARREN BELLOWS,PATRICIA BELLOWS,BLAKE BONNER vs. EDWARD EASTLAND,CAMP MYSTIC, LLC,...

D-1-GN-25-009963

Location

Travis County - District Clerk

Case Category

Civil - Other Civil

Case Type

Other Injury or Damage

Case Filed Date

11/10/2025

Judge

DISTRICT COURT 459TH

Case Status

Open

## Parties 45

| Type | Name | Nickname/Alias | Attorneys |
|---|---|---|---|
| Plaintiff | WARREN BELLOWS REPRESENTATIVE OF THE ESTATE OF ANNA MARGARET BELLOWS | | McDaniel, Alyssa , MITHOFF, RICHARD W. , Post, Russell Stanley , Post, Russell Stanley , Yetter, R. Paul |
| Plaintiff | PATRICIA BELLOWS REPRESENTATIVE OF THE ESTATE OF ANNA MARGARET BELLOWS | | McDaniel, Alyssa , MITHOFF, RICHARD W. , Post, Russell Stanley , Yetter, R. Paul |
| Plaintiff | BLAKE BONNER REPRESENTATIVE OF THE ESTATE OF LILA BONNER | | McDaniel, Alyssa , MITHOFF, RICHARD W. , Post, Russell Stanley , Yetter, R. Paul |
| Plaintiff | CAITLIN BONNER REPRESENTATIVE OF THE ESTATE OF LILA BONNER | | McDaniel, Alyssa , MITHOFF, RICHARD W. , Post, Russell Stanley , Yetter, R. Paul |
| Plaintiff | MATTHEW CHILDRESS REPRESENTATIVE OF THE ESTATE OF CHLOE CHILDRESS | | McDaniel, Alyssa , MITHOFF, RICHARD W. , Post, Russell Stanley , Yetter, R. Paul |
| Plaintiff | WENDIE CHILDRESS REPRESENTATIVE OF THE ESTATE OF CHLOE CHILDRESS | | McDaniel, Alyssa , MITHOFF, RICHARD W. , Post, Russell Stanley , Yetter, R. Paul |
| Plaintiff | RYAN DEWITT REPRESENTATIVE OF THE ESTATE OF MOLLY DEWITT | | McDaniel, Alyssa , MITHOFF, RICHARD W. , Post, Russell Stanley , Yetter, R. Paul |
| Plaintiff | ELIZABETH DEWITT REPRESENTATIVE OF THE ESTATE OF MOLLY DEWITT | | MITHOFF, RICHARD W. , Post, Russell Stanley , Yetter, R. Paul |
| Plaintiff | JOHN FERRUZZO REPRESENTATIVE OF THE ESTATE OF KATHERINE FERRUZZO | | |
| Plaintiff | ANDREA FERRUZZO REPRESENTATIVE OF THE ESTATE OF KATHERINE FERRUZZO | | |
| Plaintiff | BEN LANDRY REPRESENTATIVE OF THE ESTATE OF LAINEY LANDRY | | |
| Plaintiff | NATALIE LANDRY REPRESENTATIVE OF THE ESTATE OF NATALIE LANDRY | | |
| Plaintiff | LINDSEY MCCRORY REPRESENTATIVE OF THE ESTATE OF BLAKELY MCCRORY | | |
| Plaintiff | BELLOWS, PATRICIA | | McDaniel, Alyssa , MITHOFF, RICHARD W. , Post, Russell Stanley , Yetter, R. Paul |
| Plaintiff | BELLOWS, WARREN | | McDaniel, Alyssa , MITHOFF, RICHARD W. , Post, Russell Stanley , Yetter, R. Paul |
| Plaintiff | BONNER, BLAKE | | McDaniel, Alyssa , McDaniel, Alyssa , MITHOFF, RICHARD W. , Post, Russell Stanley , Yetter, R. Paul |
| Plaintiff | BONNER, CAITLIN | | McDaniel, Alyssa , MITHOFF, RICHARD W. , Post, Russell Stanley , Yetter, R. Paul |
| Plaintiff | CHILDRESS, MATTHEW | | McDaniel, Alyssa , MITHOFF, RICHARD W. , Post, Russell Stanley , Yetter, R. Paul |
| Plaintiff | CHILDRESS, WENDIE | | McDaniel, Alyssa , MITHOFF, RICHARD W. , Post, Russell Stanley , Yetter, R. Paul |

| Type | Name | Nickname/Alias | Attorneys |
|---|---|---|---|
| Plaintiff | DEWITT, ELIZABETH | | McDaniel, Alyssa , MITHOFF, RICHARD W. , Post, Russell Stanley , Yetter, R. Paul |
| Plaintiff | DEWITT, RYAN | | McDaniel, Alyssa , MITHOFF, RICHARD W. , Post, Russell Stanley , Yetter, R. Paul |
| Plaintiff | FERRUZZO, ANDREA | | McDaniel, Alyssa , MITHOFF, RICHARD W. , Post, Russell Stanley , Yetter, R. Paul |
| Plaintiff | FERRUZZO, JOHN | | McDaniel, Alyssa , MITHOFF, RICHARD W. , Post, Russell Stanley , Yetter, R. Paul |
| Plaintiff | LANDRY, BEN | | |
| Plaintiff | LANDRY, NATALIE | | McDaniel, Alyssa , MITHOFF, RICHARD W. , Post, Russell Stanley , Yetter, R. Paul |
| Plaintiff | MCCRORY, LINDSEY | | McDaniel, Alyssa , MITHOFF, RICHARD W. , Post, Russell Stanley , Yetter, R. Paul |
| Defendant | CAMP MYSTIC, LLC | | BALIDO, CARLOS A. , FAIR, KENNETH JASON , Ray, Jeffry H |
| Defendant | MYSTIC CAMPS FAMILY PARTNERSHIP, LTD. | | Watts, Mikal |
| Defendant | MYSTIC CAMPS MANAGEMENT, LLC | | Watts, Mikal |
| Defendant | GEORGE ALBRITTON EASTLAND REPRESENTATIVE OF THE ESTATE RICHARD EASTLAND | | BALIDO, CARLOS A. , Ray, Jeffry H |
| Defendant | NATURAL FOUNTAINS PROPERTIES, INC. | | ASPY, P. CLARK , MAYFIELD, JORDAN ALEXANDER , O'DELL, MICHAEL SHANE , Watts, Mikal |
| Defendant | EASTLAND, EDWARD | | BALIDO, CARLOS A. , CASTAGNA, LYNN S. |
| Defendant | EASTLAND, MARY LIZ | | BALIDO, CARLOS A. , CASTAGNA, LYNN S. |
| Defendant | EASTLAND, WILLETTA | | ASPY, P. CLARK , MAYFIELD, JORDAN ALEXANDER , O'DELL, MICHAEL SHANE , Watts, Mikal |
| Intervener | CHRISTOPHE JACOBE, PERSONAL REPRESENTATIVE OF THE ESTATE OF MARY KATHRYN | | |
| Intervener | JACOBE, CHRISTOPHER | | |
| Intervener | JORDAN, SAMANTHA | | |
| Intervenor Defendant | CAMP MYSTIC, LLC | | |
| Intervenor Defendant | MYSTIC CAMPS FAMILY PARTNERSHIP, LTD. | | |
| Intervenor Defendant | MYSTIC CAMPS MANAGEMENT, LLC | | |
| Intervenor Defendant | GEORGE ALBRITTON EASTLAND REPRESENTATIVE OF THE ESTATE RICHARD EASTLAND | | |
| Intervenor Defendant | NATURAL FOUNTAINS PROPERTIES, INC. | | |
| Intervenor Defendant | EASTLAND, EDWARD | | |
| Intervenor Defendant | EASTLAND, MARY LIZ | | |
| Intervenor Defendant | EASTLAND, WILLETTA | | |

## Hearings 2

| Date/Time | Hearing Type | Judge | Location | Result |
|---|---|---|---|---|
| 5/13/2026 09:00 AM | Setting Date | | | |
| 8/9/2027 09:01 AM | Setting Date | | | |

## Events 39

| Date | Event | Type | Comments | Documents |
|---|---|---|---|---|
| 8/9/2027 | Hearing | Setting Date | - | |
| 6/24/2026 | Filing | 5436DC | SUGGESTION OF BANKRUPTCY | SUGGESTION OF BANKRUPTCY.pdf |
| 6/15/2026 | Filing | 5415DC | NOTICE OF CHANGE OF ADDRESS | NOTICE OF CHANGE OF ADDRESS.pdf |
| 6/9/2026 | Filing | 5415DC | NOTICE OF APPEARANCE AND DESIGNATION OF LEAD COUNSEL | NOTICE OF APPEARANCE AND DESIGNATION OF LEAD COUNSEL.pdf |
| 6/9/2026 | Filing | 5415DC | DEFENDANTS NOTICE OF APPEARANCE OF COUNSEL | DEFENDANTS NOTICE OF APPEARANCE OF COUNSEL.pdf |
| 6/8/2026 | Filing | 5415DC | GETTEN AND BELLOWS PLAINTIFFS REPLY IN SUPPORT OF THEIR MOTION TO STRIKE DEFENDANTS AMENDED MOTIONS TO COMPEL ARBITRATION AND STAY PROCEEDINGS | GETTEN AND BELLOWS PLAINTIFFS REPLY IN SUPPORT OF THEIR MOTION TO STRIKE DEFENDANTS AMENDED MOTIONS.pdf |
| 6/5/2026 | Filing | 5415DC | GETTEN AND BELLOWS PLAINTIFFS NOTICE OF FILING OF EXHIBITS 6 & 10 TO PLAINTIFFS MOTION TO STRIKE DEFENDANTS AMENDED MOTIONS TO COMPEL ARBITRATION | GETTEN AND BELLOWS PLAINTIFFS NOTICE OF FILING OF EXHIBITS 6 & 10 TO PLAINTIFFS MOTION TO STRIKE.pdf |
| 6/3/2026 | Filing | 5153DC | GETTEN AND BELLOWS PLAINTIFFS RESPONSE TO DEFENDANTS AMENDED | GETTEN AND BELLOWS PLAINTIFFS RESPONSE TO DEFENDANTS AMENDED MOTIONS TO COMPEL |

| Date | Event | Type | Comments | Documents |
|---|---|---|---|---|
| | | | MOTIONS TO COMPEL ARBITRATION AND STAY PROCEEDINGS | ARBITRATION.pdf |
| 6/3/2026 | Filing | 5153DC | DEFENDANTS RESPONSE TO THE PLAINTIFFS MOTION TO STRIKE | DEFENDANTS RESPONSE TO THE PLAINTIFFS MOTION TO STRIKE.pdf |
| 6/3/2026 | Filing | 5153DC | INTERVENORS JOINDER IN GETTEN AND BELLOWS PLAINTIFFS RESPONSE TO AMENDED MOTIONS TO COMPEL ARBITRATION AND STAY PROCEEDINGS | INTERVENORS JOINDER IN GETTEN AND BELLOWS PLAINTIFFS RESPONSE TO AMENDED MOTIONS TO COMPEL.pdf |
| 6/1/2026 | Filing | 5415DC | INTERVENORS JOINDER IN GETTEN AND BELLOWS PLAINTIFFS' MOTION TO STRIKE | INTERVENORS JOINDER IN GETTEN AND BELLOWS PLAINTIFFS' MOTION TO STRIKE.pdf |
| 5/27/2026 | Filing | 5265DC | GETTEN AND BELLOWS PLAINTIFFS' MOTION TO STRIKE DEFENDANTS' AMENDED MOTIONS TO COMPEL ARBITRATION AND STAY PROCEEDINGS | GETTEN AND BELLOWS PLAINTIFFS' MOTION TO STRIKE DEFENDANTS' AMENDED MOTIONS TO COMPEL ARBITRATION.pdf |
| 5/13/2026 | Hearing | Setting Date | - | |
| 5/12/2026 | Filing | 5415DC | DEFENDANTS NOTICE OF WITHDRAWAL OF MOTIONS FILED MARCH 24, 2026 TO COMPEL ARBITRATION AND MOTIONS TO STAY PROCEEDINGS | DEFENDANTS NOTICE OF WITHDRAWAL OF MOTIONS FILED MARCH 24, 2026 TO COMPEL ARBITRATIOIN AND MOTIONS.pdf |
| 5/12/2026 | Filing | 5153DC | DEFENDANTS CONSOLIDATED REPLY IN SUPPORT OF THEIR MOTIONS TO COMPEL ARBITRATION AND STAY PROCEEDINGS | DEFENDANTS CONSOLIDATED REPLY IN SUPPORT OF THEIR MOTIONS TO COMPEL ARBITRATION AND STAY.pdf |
| 5/12/2026 | Filing | 5265DC | DEFENDANTS' AMENDED MOTIONS TO COMPEL ARBITRATION AND STAY PROCEEDINGS | DEFENDANTS' AMENDED MOTIONS TO COMPEL ARBITRATION AND STAY PROCEEDINGS.pdf |
| 5/6/2026 | Filing | 5153DC | INTERVENORS' RESPONSE TO DEFENDANTS' MOTION TO COMPEL ARBITRATION AND MOTION TO STAY | INTERVENORS' RESPONSE TO DEFENDANTS' MOTION TO COMPEL ARBITRATION AND MOTION TO STAY.pdf |
| 5/6/2026 | Filing | 5153DC | INTERVENORS JOINDER IN GETTEN AND BELLOWS RESPONSE TO DEFENDANTS MOTION TO COMPEL ARBITRATION AND MOTION TO STAY | INTERVENORS JOINDER IN GETTEN AND BELLOWS RESPONSE TO DEFENDANTS MOTION TO COMPEL ARBITRATION AND.pdf |
| 5/6/2026 | Filing | 5153DC | GETTEN AND BELLOWS PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO COMPEL ARBITRATION AND MOTION TO STAY | GETTEN AND BELLOWS PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO COMPEL ARBITRATION AND MOTION TO.pdf |
| 5/6/2026 | Filing | 5415DC | NOTICE OF FILING OF AFFIDAVITS IN SUPPORT OF MOTIONS TO COMPEL ARBITRATION Please take note that Defendants in the above-styled cases are filing the attac | NOTICE OF FILING OF AFFIDAVITS IN SUPPORT OF MOTIONS TO COMPEL ARBITRATION.pdf |
| 5/6/2026 | Filing | 5415DC | PLAINTIFFS NOTICE OF APPEARANCE OF ADDITIONAL COUNSEL | PLAINTIFFS NOTICE OF APPEARANCE OF ADDITIONAL COUNSEL.pdf |
| 4/13/2026 | Filing | 8225DC | ORDER ALLOWING RECORDING OF COURT PROCEEDINGS | ORDER ALLOWING RECORDING OF COURT PROCEEDINGS_AU.pdf |
| 4/13/2026 | Filing | 8225DC | ORDER ALLOWING RECORDING OF COURT PROCEEDINGS | ORDER ALLOWING RECORDING OF COURT PROCEEDINGS_AU.pdf |
| 4/9/2026 | Filing | 8225DC | ORDER ALLOWING STILL PHOTOGRAPHY OF COURT PROCEEDINGS | ORDER ALLOWING STILL PHOTOGRAPHY OF COURT PROCEEDINGS _AU.pdf |
| 4/9/2026 | Filing | 8225DC | ORDER ALLOWING RECORDING OF COURT PROCEEDING | ORDER ALLOWING RECORDING OF COURT PROCEEDING _AU.pdf |
| 4/9/2026 | Filing | 8225DC | ORDER ALLOWING AUDIO RECORDINGS OF COURT PROCEEDINGS | ORDER ALLOWING AUDIO RECORDINGS OF COURT PROCEEDINGS_AU.pdf |
| 4/3/2026 | Filing | 6515DC | ORDER TRANSFERRING CASE | ORDER TRANSFERRING CASE.pdf |
| 4/1/2026 | Filing | 5442DC | LETTER TO COUNSEL FROM JUDGE GAMBLE | LETTER TO COUNSEL FROM JUDGE GAMBLE_AU.pdf |
| 3/24/2026 | Filing | 5265DC | DEFENDANTS' MOTION TO COMPEL ARBITRATION AND MOTION TO STAY | DEFENDANTS' MOTION TO COMPEL ARBITRATION AND MOTION TO STAY.pdf |
| 3/23/2026 | Filing | 5265DC | PLAINTIFFS FIRST MOTION TO COMPEL | PLAINTIFFS FIRST MOTION TO COMPEL.pdf |
| 3/13/2026 | Filing | 5442DC | LETTER TO COUNSEL FROM JUDGE GAMBLE | LETTER TO COUNSEL FROM JUDGE GAMBLE_AU.pdf |
| 3/4/2026 | Filing | 5423DC | ASSIGNMENT LETTER - JUDGE AMY CLARK MEACHUM REGARDING JUDGE MAYA GUERRA GAMBLE | ASSIGNMENT LETTER - JUDGE AMY CLARK MEACHUM REGARDING JUDGE MAYA GUERRA GAMBLE_AU.pdf |
| 2/23/2026 | Filing | 5415DC | PLAINTIFFS NOTICE OF APPEARANCE OF CO-LEAD COUNSEL | PLAINTIFFS NOTICE OF APPEARANCE OF CO-LEAD COUNSEL.pdf |
| 2/6/2026 | Filing | 5150DC | CAMP MYSTIC DEFENDANTS ORIGINAL ANSWER SUBJECT TO MOTION TO TRANSFER VENUE | CAMP MYSTIC DEFENDANTS ORIGINAL ANSWER SUBJECT TO MOTION TO TRANSFER VENUE.pdf |

| Date | Event | Type | Comments | Documents |
|---|---|---|---|---|
| 2/6/2026 | Filing | 5265DC | CAMP MYSTIC DEFENDANTS' MOTION TO TRANSFER VENUE | CAMP MYSTIC DEFENDANTS' MOTION TO TRANSFER VENUE.pdf |
| 1/16/2026 | Filing | 5054DC | INTERVENORS ORIGINAL PETITION | INTERVENORS ORIGINAL PETITION.pdf |
| 12/12/2025 | Filing | 5265DC | CAMP MYSTIC DEFENDANTS' MOTION TO TRANSFER VENUE | CAMP MYSTIC DEFENDANTS' MOTION TO TRANSFER VENUE.pdf |
| 12/12/2025 | Filing | 5150DC | CAMP MYSTIC DEFENDANTS ORIGINAL ANSWER SUBJECT TO MOTION TO TRANSFER VENUE | CAMP MYSTIC DEFENDANTS ORIGINAL ANSWER SUBJECT TO MOTION TO TRANSFER VENUE.pdf |
| 11/10/2025 | Filing | 5050DC | ORIGINAL PETITION | ORIGINAL PETITION.pdf |

Terms of use | Frequently asked questions | Support Center |

© 2026 Tyler Technologies, Inc. | All Rights Reserved | Version: 2026.5.4.2291

11/10/2025 12:29 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009963
Ruben Tamez

D-1-GN-25-009963

No. ___________

| | | |
|---|---|---|
| WARREN and PATRICIA BELLOWS, Individually and as Representatives of ANNA MARGARET BELLOWS, Deceased; BLAKE and CAITLIN BONNER, Individually and as Representatives of LILA BONNER, Deceased; MATTHEW and WENDIE CHILDRESS, Individually and as Representatives of CHLOE CHILDRESS, Deceased; RYAN and ELIZABETH DEWITT, Individually and as Representatives of MOLLY DEWITT, Deceased; JOHN and ANDREA FERRUZZO, Individually and as Representatives of KATHERINE FERRUZZO, Deceased; BEN and NATALIE LANDRY, Individually and as Representatives of LAINEY LANDRY, Deceased; LINDSEY MCCRORY, Individually and as a Representative of BLAKELY MCCRORY, Deceased, | § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| CAMP MYSTIC, LLC; NATURAL FOUNTAINS PROPERTIES, INC.; MYSTIC CAMPS FAMILY PARTNERSHIP, LTD.; MYSTIC CAMPS MANAGEMENT, LLC; GEORGE ALBRITTON EASTLAND, as Representative of the Estate of RICHARD EASTLAND, Deceased; WILLETTA EASTLAND; EDWARD EASTLAND; and MARY LIZ EASTLAND, | § | 455TH, DISTRICT COURT |
| Defendants. | § | ____ JUDICIAL DISTRICT |

**ORIGINAL PETITION**

Plaintiffs Warren and Patricia Bellows, Individually and as Representatives of Anna Margaret Bellows; Blake and Caitlin Bonner, Individually and as Representatives of Lila Bonner; Matthew and Wendie Childress, Individually and as Representatives of Chloe Childress; Ryan and Elizabeth DeWitt, Individually and as Representatives of Molly DeWitt; John and Andrea

Copy from re:SearchTX

Ferruzzo, Individually and as Representatives of Katherine Ferruzzo; Ben and Natalie Landry, Individually and as Representatives of Lainey Landry; and Lindsey McCrory, Individually and as Representative of Blakely McCrory, bring this action against defendants Camp Mystic, LLC; Natural Fountains Properties, Inc.; Mystic Camps Family Partnership, Ltd.; Mystic Camps Management, LLC; George Albritton ("Britt") Eastland, as Representative of the Estate of Richard Eastland, Deceased; Willetta Eastland; Edward Eastland; and Mary Liz Eastland. Based on actual knowledge as to themselves and their own acts and omissions, and on information and belief as to all other persons and matters, plaintiffs respectfully allege as follows:

## **INTRODUCTION**

Youth camps are a long-cherished tradition across our State. These camps can provide an invaluable experience for young people to make lifelong friendships, safely enjoy the beauty of nature, and simply spend time free from everyday worries. But this ideal exists *only* when youth camp operators take reasonable and required precautions to ensure the safety of children and counselors invited to their camps. When they fail to do so, tragedy is sure to follow.

Just such a tragedy hit our State on July 4, 2025, when 25 campers and two camp counselors needlessly and tragically died in the flood waters at Camp Mystic.

These young girls died because a for-profit camp put profit over safety. The Camp chose to house young girls in cabins sitting in flood-prone areas, despite the risk, to avoid the cost of relocating the cabins. The Camp chose not to make plans to safely evacuate its campers and counselors from those cabins, despite state rules requiring evacuation plans, and not to spend time and money on safety training and tools. Instead, the Camp chose to assure its campers and counselors that these cabins are built on "high, safe locations." And the Camp chose to order its campers and counselors, as a matter of policy, to stay in these flood-plain cabins regardless of life-threatening floods.



Copy from re:SearchTX

On July 4, the Camp chose to take no steps to protect its campers and counselors while it knew a storm and “life threatening flash flooding” were approaching. Instead, with the river rising, the Camp chose to direct its groundskeepers to spend over an hour evacuating camp equipment, not its campers and counselors. The Camp chose not to evacuate its campers and counselors, even as floodwater reached the cabins, until counselors demanded it. Even then, the Camp chose *not* to evacuate the Bubble Inn and Twins cabins when other campers and counselors had been moved to safe, higher ground just 300 feet away. Instead, the Camp chose to order its campers and counselors to *remain* in the Bubble Inn and Twins cabins while the flood waters overwhelmed the camp. Finally, when it was too late, the Camp made a hopeless “rescue” effort from its self-created disaster in which 25 campers, two counselors, and the Camp director died.

Richard Eastland told the *Austin-American Statesman* 35 years ago, “I’m sure there will be other drownings. People don’t heed the warnings.” His words were about another camp tragedy, but they proved true about Camp Mystic. The Camp ignored warnings about the risky location of its cabins. It ignored warnings about the approaching July 4 storm and life-threatening flood risks. It ignored the obvious and rising flood risks that morning as the hours passed. It ignored warnings from its own counselors to evacuate the cabins. It simply ignored the unmistakable safety threat to its campers and counselors until this tragedy was unavoidable. And 27 young girls lost their lives.

Today, campers Margaret, Lila, Molly, Lainey, and Blakely should be third graders, and counselors Chloe and Katherine should be freshmen at the University of Texas. They all are gone. And while their families struggle with their loss, the Camp’s actions since the tragedy have only deepened the pain. From the Camp’s initial false notices that girls were “unaccounted for” to its recent announcements about reopening for business as usual while a camper is still missing, the Camp has caused further trauma to these distraught families. And through it all, the Camp refuses



Copy from re:SearchTX

to accept any responsibility for its actions and failures to act, defiantly blaming this tragedy on "an act of God" that no responsible steps could have avoided.

Forced to grieve the needless deaths of 25 campers and two counselors – now Heaven's 27 – plaintiffs bring this suit to ensure that the full truth will be revealed, all responsible parties will be held accountable, and yet more preventable youth camp tragedies involving other innocent children in the future may be averted.

## DISCOVERY LEVEL

1. Based on the relief sought, discovery should be conducted under a Level 3 plan pursuant to TEX. R. CIV. P. 190.4.

## PARTIES

2. Plaintiff Warren Bellows is an individual residing in Harris County.

3. Plaintiff Patricia Bellows is an individual residing in Harris County.

4. Plaintiffs Warren and Patricia Bellows, as Representatives of the Estate of Anna Margaret Bellows, Deceased, are individuals that reside in Harris County. At the time of her death, Anna Margaret Bellows resided in Harris County. No administration of her estate is pending, and none is necessary.

5. Plaintiff Blake Bonner is an individual residing in Dallas County.

6. Plaintiff Caitlin Bonner is an individual residing in Dallas County.

7. Plaintiffs Blake and Caitlin Bonner, as Representatives of the Estate of Lila Bonner, Deceased, are individuals that reside in Dallas County. At the time of her death, Lila Bonner resided in Dallas County. No administration of her estate is pending, and none is necessary.

8. Plaintiff Matthew Childress is an individual residing in Harris County.

9. Plaintiff Wendie Childress is an individual residing in Harris County.



Copy from re:SearchTX

10. Plaintiffs Matthew and Wendie Childress, as Representatives of the Estate of Chloe Childress, Deceased, are individuals that reside in Harris County. At the time of her death, Chole Childress resided in Harris County. No administration of her estate is pending, and none is necessary.

11. Plaintiff Ryan DeWitt is an individual residing in Harris County.

12. Plaintiff Elizabeth DeWitt is an individual residing in Harris County.

13. Plaintiffs Ryan and Elizabeth DeWitt, as Representatives of the Estate of Molly DeWitt, Deceased, are individuals that reside in Harris County. At the time of her death, Molly DeWitt resided in Harris County. No administration of her estate is pending, and none is necessary.

14. Plaintiff John Ferruzzo is an individual residing in Harris County.

15. Plaintiff Andrea Ferruzzo is an individual residing in Harris County.

16. Plaintiffs John and Andrea Ferruzzo, as Representatives of the Estate of Katherine Ferruzzo, Deceased, are individuals that reside in Harris County. At the time of her death, Katherine Ferruzzo resided in Harris County. No administration of her estate is pending, and none is necessary.

17. Plaintiff Ben Landry is an individual residing in Harris County.

18. Plaintiff Natalie Landry is an individual residing in Harris County.

19. Plaintiffs Ben and Natalie Landry, as Representatives of the Estate of Lainey Landry, Deceased, are individuals that reside in Harris County. At the time of her death, Lainey Landry resided in Harris County. No administration of her estate is pending, and none is necessary.

20. Plaintiff Lindsey McCrory is an individual residing in Harris County.

21. Plaintiff Lindsey McCrory, as Representative of the Estate of Blakely McCrory, Deceased, is an individual residing in Harris County. At the time of her death, Blakely McCrory resided in Harris County. No administration of her estate is pending, and none is necessary.



Copy from re:SearchTX

22. Plaintiffs Margaret Bellows, Lila Bonner, Molly DeWitt, and Lainey Landry were campers in Bubble Inn. They are pictured here with their counselors, plaintiffs Chloe Childress and Katherine Ferruzzo.




23. Plaintiff Blakely McCrory was a camper in the Twins cabins.



24. Defendant Camp Mystic, LLC is a Texas limited liability company. Because its registered agent for service of process, Richard Eastland, is deceased, it may be served with process by serving the Texas Secretary of State at 1019 Brazos Street, Room 105, Austin, Texas 78701.



Copy from re:SearchTX

25. Defendant Natural Fountains Properties, Inc. is a Texas corporation with its principal place of business in Kerr County. Because its registered agent is deceased, service may be made on the Texas Secretary of State at 1019 Brazos Street, Room 105, Austin, Texas 78701.

26. Defendant Mystic Camps Family Partnership, Ltd. is a Texas limited partnership with its principal place of business in Travis County. Because its registered agent is deceased, service may be made on the Texas Secretary of State at 1019 Brazos Street, Room 105, Austin, Texas 78701.

27. Defendant Mystic Camps Management, LLC is a Texas limited liability with its principal place of business in Travis County. Because its registered agent is deceased, service may be made on the Texas Secretary of State at 1019 Brazos Street, Room 105, Austin, Texas 78701.

28. George Albritton ("Britt") Eastland, as Representative of the Estate of Richard Eastland, Deceased, is in individual that resides in Kerr County. At the time of his death, Richard Eastland resided in Travis County. This defendant may be served with process at 401 West Main Street, Kerrville, Texas 78028, or wherever he may be found.

29. Defendant Willetta Eastland is an individual that resides in Travis County. She may be served with process at 2404 Scenic Drive, Austin, TX 78703, or wherever she may be found.

30. Defendant Edward Eastland is an individual that resides in Kerr County. He may be served with process at 2689 Hwy 39, Hunt TX 78024-3412, or wherever he may be found.

31. Defendant Mary Liz Eastland is an individual that resides in Kerr County. She may be served with process at 2689 Hwy 39, Hunt TX 78024-3412, or wherever she may be found.

32. Camp Mystic, LLC, Natural Fountains Properties, Inc., Mystic Camps Family Partnership, Ltd., and Mystic Camps Management, LLC are alter egos of one another and referred to below together as the Camp. Unless otherwise indicated, the acts and omissions of the Camp were accomplished and directed by Richard and Willetta Eastland.



Copy from re:SearchTX

## JURISDICTION AND VENUE

33. This Court has subject matter jurisdiction. Plaintiffs seek monetary relief in excess of $1 million. The damages sought are within the jurisdictional limits of this Court.

34. This Court has personal jurisdiction over defendants. All defendants are residents of this State or have their principal places of business in the State.

35. Venue is proper here under TEX. CIV. PRAC. & REM CODE §15.002. Defendants Mystic Camps Family Partnership, Ltd., Mystic Camps Management, LLC, and Willetta Eastland reside in Travis County. At the time of his death, Richard Eastland resided in Travis County.

## FACTS GIVING RISE TO THIS ACTION

### A. The Camp's History of Flooding

36. The Camp sits on 725 acres in the Texas Hill Country on the Guadalupe River. It was founded in 1926 and purchased by the grandparents of Richard Eastland in 1939. The camp, and its sprawling land, have been in the Eastland family ever since.

37. The part of the Guadalupe River on which the Camp sits has always been prone to deadly flash flooding. In fact, flash floods happen so frequently that the area has become known as "Flash Flood Alley." The Kerr County Judge recently described it as "the most dangerous river valley in the United States."

38. This risk of flash floods exists because of the combination of rocky, hilly terrain and shallow, non-absorbent soils. The landscape causes rain quickly to run off hills into the river, resulting in sudden rises in water levels. This is a known risk by those in the area when it rains.

39. Given its location, flooding has become a defining part of the Camp's history. The "Great Flood" of 1932 is memorialized in the Camp's materials given to campers. During that disaster, several cabins at the Camp were swept away, and campers were forced to evacuate across the river in canoes. Other nearby camps flooded as well, with one camp owner surviving by taking



Copy from re:SearchTX

refuge in a tree. Pilots surveying the scene the next day reported that some buildings were "flattened as though they had been stepped on by a giant foot." Survivors recounted that lives would almost certainly have been lost had the flood struck at night. This event is something that campers are asked about during the Camp's trivia nights nearly 100 years later.

40. The dangers did not end with the 1932 Great Flood. In 1978, only four years after Richard and Willetta Eastland began working at the Camp, another catastrophic flood struck. Remnants of a tropical storm stalled over the Hill Country, dropping 20 inches of rain overnight and causing the Guadalupe River to rise over 35 feet in nearby Comfort. Dozens of people lost their lives in the area, and children had to be evacuated from summer camps by the National Guard and other first responders. The Camp was reported to be "the most severely damaged" of all the youth camps. Hundreds of homes in the area were damaged or destroyed.

41. In 1985, floods created havoc at the Camp again. While Willetta Eastland was pregnant with their fourth child, flood waters cut off access to the nearby hospital. She had to be airlifted from the Camp to give birth. This event, occurring eleven years into the Eastland's tenure, demonstrates the persistent threat flooding posed whether the Camp was in session or not.

42. In 1987, flash flooding again turned deadly, when ten children were killed at another summer camp while trying to escape rising waters. In just three hours, up to 15 inches of rain fell near Hunt, causing the Guadalupe River to surge more than 30 feet. Hundreds of people along the river, including those at the Camp, were evacuated. Campers in Bubble Inn, one of the cabins at the center of the 2025 tragedy, were among those taken to higher ground.

43. The notions that Bubble Inn and Twins cabins at the Camp were not in harms' way, or that the July 4th flood was an unprecedented event, are fantasy. The Camp's history is riddled with floods, and this area has experienced a number of deadly flash floods in recent years.



Copy from re:SearchTX

**B. Defendants Knew About the Danger.**

44. Richard and Willetta Eastland worked at the Camp since 1974 and became co-directors in 1987. Their son Edward has served as director of the Camp since 2007. He and his wife Mary Liz live at the Camp year-round. Given their lengthy history at the Camp and the direct impact of many of these events, the Eastland family was well aware of the risks of flooding.

45. Richard served on the board of directors for the Upper Guadalupe River Authority in the 1980s and again from 2022 to 2025. The River Authority is a state agency that oversees the Guadalupe River in Kerr County.

46. As a director of the River Authority, Richard championed flood warning systems in the late 1980s and early 1990s. As a result of these efforts, the River Authority installed new warning systems after the deadly 1987 floods. But these systems became antiquated and unreliable by the late 1990s and were ultimately decommissioned.

47. Regardless of the technology that delivers it, Richard Eastland knew the importance of listening to warnings. When advocating for these systems, he cautioned, "The river is beautiful, but you have to respect it." And he knew that failing to take flash flood warnings seriously could be deadly. In 1990, he prophetically told the *Austin-American Statesman*, "I'm sure there will be other drownings. People don't heed the warnings."

48. This understanding of the dangers is underscored by materials put out by the River Authority that were designed to educate the public. A River Authority video called "Be Flood Aware" explains that just 3-4 inches of rain in this area can cause serious problems, as the land causes water to rush rapidly during floods. Just a foot of water like this can sweep away most vehicles. For that reason, the River Authority on which Richard Eastland sat told Kerr County residents that the "best advice" it could "give is to never drive through flood waters."



Copy from re:SearchTX

49. The River Authority also explained the importance of flash flood warnings issued by the National Weather Service. A warning "means the event is occurring or imminent, and you should take immediate steps to protect you and your family."

50. Given his time at Mystic and service on the River Authority, Richard Eastland knew what he was supposed to do when a flash flood warning was issued: "take immediate steps to protect" the campers and counselors under his care. And he knew that driving should not be one of those steps. Tragically, he and his son Edward failed to follow these critical rules when it mattered most.

**C. Defendants Focused on Profits Over Safety.**

51. Under Richard and Willetta Eastland's leadership, the Camp made decisions that made this tragedy inevitable. Each was part of a priority to focus on profits and protecting the family's land over other goals, even the safety of campers and counselors.

52. First, the Eastland family changed the structure of the Camp's ownership with the goal of protecting the family's land while still distributing large sums of money to themselves. In 1998, 11 years after Richard and Willetta become co-directors, they created a web of corporate entities that sought to separate the ownership of the land from the company running the Camp. In short, the Camp was placed in one company (Camp Mystic, LLC) and the land placed in another (Natural Fountains Properties, Inc.), and the Camp leased the land to operate. The lease payments distributed the Camp's profits to the land company, which were then distributed to its primary shareholders—the Eastland family. The idea was that the family could still get paid for the Camp's lucrative summers but protect the land if the Camp made bad decisions resulting in a lawsuit.

53. The flaw in their strategy was that the Eastlands insisted on maintaining control. Richard and Willetta made sure in the Camp's lease that important decisions like cabin location and the Camp's layout could not be changed without the approval of Natural Fountains Properties, Inc.



Copy from re:SearchTX

This gave the Eastlands and the entities they created full control over the property and its buildings, no matter who operated the Camp. They also made sure that all entities, including the Camp, landowner, and companies that own those entities (Mystic Camps Family Partnership, Ltd. and Mystic Camps Management, LLC), were controlled almost exclusively by Richard and Willetta Eastland at every level. Their desire for control over the land, the Camp, and its profits mean they cannot be legally separated.

54. Second, the Eastlands made catastrophic decisions concerning the cabin locations. Prior to 2013, most of the girls' cabins at the Guadalupe River site were in FEMA's 100-year "Special Flood Hazard Area," including Bubble Inn and Twins cabins (5 and 41 on the map):




55. FEMA considers structures in a Special Flood Hazard Area as "high risk." They are subject to flood insurance requirements and must adhere to certain floodplain management regulations. Some of the Camp cabins, including Twins and others that flooded on July 4, also are located in the regulatory floodway. FEMA defines this as "the channel of a river . . . and the adjacent lands that must be reserved in order to discharge the base flood."

56. In 2013, the Camp filed requests for cabins to be removed from FEMA's floodplain maps. FEMA approved most of these requests, including as to Bubble Inn and Twins. Some



Copy from re:SearchTX

structures, including the Bug House cabin that flooded on July 4, remained in the 100-year floodplain on FEMA's maps.

57. This did not change whether any of the cabins were prone to flooding or their relation to the river. The only effect was for the Eastlands to save money. While in the floodplain, owners must pay expensive insurance premiums, and renovations require certifications and other costly measures. Removing the cabins from FEMA's flood maps eliminated these expensive requirements for the Camp, but it did not make the cabins safer. Moreover, obtaining amendments to FEMA's flood maps is an expensive and burdensome process. The Camp chose to spend capital on that effort rather than move the cabins to safer locations.

58. Finally, the Camp implemented dangerous policies designed to save money at the expense of safety. Most significantly, despite knowing that some of its cabins were in flood zones and regulatory floodways, and despite experiencing major flood events at the camp firsthand, the Camp gave the counselors the following orders in the event of a flood:

> In case of flood, all campers on Senior Hill must stay in their cabins. . . . Those on the flats must also stay in their cabins unless told otherwise by the office. All cabins are constructed on high, safe locations.

59. In truth, the cabins are not "on high, safe locations." And defendants knew that they were not safe, both because of the FEMA classification that they fought in 2013 and also because of their experience managing the Camp for five decades and superior knowledge of the area. Parents, campers, and counselors did not know what defendants knew. Defendants gave these orders to counselors—and, since they were posted in cabins, to campers and parents as well—to conceal the dangers that defendants knew about but their invitees did not.

60. The Camp's "never evacuate" order was also profit-motivated in other respects. It ensured that counselors felt safe enough to work there for minimal compensation. And it ensured that parents kept sending their girls and money to the Camp. If campers and counselors knew the



Copy from re:SearchTX

cabins were located in dangerous flood zones, and evacuations were necessary but prohibited, parents would not send their children to sleep in those cabins. It also allowed the Camp to avoid implementing safety measures that would cost money, like lighted pathways, properly maintained routes to higher ground, and new structures on accessible higher ground.

61. The Camp's other policies exacerbated the risks created by the "never evacuate" order. The Camp invested no time or money in training counselors on how to evacuate should they be told to do so. Instead, counselors flipped through their manuals with Edward and Mary Liz Eastland and were told a flood was not going to happen. The Camp also prohibited cell phones, even for counselors, who were given no walkie talkies or other means of communicating in the event of an emergency. Walkie talkies and working intercoms with backup power were costs that the Camp chose not to bear, despite the obvious need. The Camp chose not to spend money on these and other basic safety measures.

62. These decisions allowed defendants to make large sums of money. In recent years, the Camp brought in millions in revenue every summer. Its costs are low, with a staff of mostly migrant workers and 18-year-old girls getting minimal pay, and many of its buildings are 50-100 years old. The river of profits were distributed annually to the Eastlands. And it allowed them to have houses on the property and other lakefront homes elsewhere. Their decision to put profits over safety has created true generational wealth from a very dangerous Camp. And these years of poor decision making culminated in the tragedy that ensued on July 4, 2025.

**D. On July 3 and July 4, Critical Warnings Were Issued.**

63. Starting on July 3, the Camp began getting alerts from the National Weather Service about the potential for significant rain and floods. As early as 1:18 p.m., the Weather Service issued a Flood Watch that was in effect through the following morning. These types of alerts have real



Copy from re:SearchTX

meaning to people like the Eastlands, who have seen what floods in the area can do in their roughly 50 years at the Camp.

64. By the early hours of July 4, the Camp was aware of the increasing danger. At midnight, nightwatchman Glenn Juenke was monitoring rain gauges. And when several counselors returned from their night off around 1 a.m., they told senior camp staff that the rain was so bad they were scared to drive back to camp. Yet as those counselors went back to their cabins, defendants took their phones and did not give them any emergency communication devices.

65. At 1:14 a.m., the Weather Service issued a warning of "life threatening flash flooding." The expected "flash flood damage threat" was "considerable." It warned, "Turn around, don't drown. . . . Most flood deaths occur in vehicles."

66. The Camp got this warning. Its spokesman told reporters that Richard Eastland got the warning. It later said there is "some question" about who got it but admitted Camp leadership was aware of the warning and monitoring the situation "within minutes" of the warning going out.

67. The 1:14 a.m. flash flood warning was the time to begin saving lives. The River Authority on which Richard Eastland served says a warning like this means "the event is occurring or imminent, and you should take immediate steps to protect you and your family." And, as he admitted, people drown when they don't heed warnings. But tragically, the Camp took no steps to protect the lives of its campers or counselors for more than an hour after receiving the 1:14 a.m. flash flood warning. Instead, Richard and Edward Eastland spent the next hour and fifteen minutes working to keep Camp equipment dry while they watched the river swell with flood waters.

**E. The Camp Ignored the Warnings and Protected Equipment, Not Girls.**

68. Richard and Edward met in the main office around 1:45 a.m., some 30 minutes after the warning. Rather than turning to the cabins, they convened the grounds crew and started securing



Copy from re:SearchTX

equipment. The Camp reports it has a picture of Richard Eastland with the grounds crew at 2:13 a.m. still working on this task. By that point, 59 critical minutes had passed since defendants were warned by the weather service of "life threatening flash flooding" impacting their camp.

69. Warnings continued to pour in and be ignored. By 2:00 a.m., Edward Eastland realized the water was high enough at a creek crossing that he would not be able to get back to his home on the other side of the property. When he and Richard tried to send home nightwatchman Juenke, one of the few other adults on the property, they realized he could not leave because of the rising waters. And by 2:14 a.m., Juenke took a video of what is normally a calm creek on the property that had turned into a rushing river. Still, Richard and Edward did not check on their campers or counselors. They just continued to watch the flood waters move toward the cabins.

**F. As Counselors Begged for Help, the Camp Told Them to "Stay Put."**

70. The first contact between counselors and Richard and Edward came at roughly 2:20 a.m., when counselors decided, on their own, to run across the camp to ask for help. Counselors from Bug House and Look Inn ran through the rain to report that water was coming into Bug House, the cabin closest to the river.

71. Richard and Edward went to the cabin to investigate. They told the girls to put down towels, and they returned to the office. Per nightwatchman Juenke, the Camp's response was for the girls to "stay put 'because that's the plan.'" Even when they knew creeks were becoming rivers and water was coming into cabins, defendants stuck with the official plan for girls to never evacuate.

72. A last warning came after Richard and Edward returned from Bug House to the office. Around that time, Edward received a call from the front gatekeeper that water was rushing into her building. The gatekeeper told Edward she could not open the door to escape, and the call



Copy from re:SearchTX

cut out. The gatekeeper was washed away. She survived by hanging onto a tree for the rest of the night. Only at this point did Richard and Edward agree they should begin evacuating campers.

**G. With the Danger Obvious, Only Some Cabins Were Evacuated.**

73. Starting at roughly 2:30 a.m., campers and counselors from five cabins began evacuating to the Rec Hall located by the office. This was an older, two-story structure on higher ground than the lower lying cabins. This map of the flats area, which was posted outside the cabins, shows Rec Hall on the left in green, and the cabins on the bottom and the right in blue.




74. Richard, Edward, and Glenn took girls to Rec Hall in their cars, while many others walked or ran across the lawn to Rec Hall. From Bug House, the furthest cabin, Rec Hall is less than 1000 feet away. A car drive from Bug House to Rec Hall takes 40 seconds. The walk takes just over 3 minutes for an adult at a normal pace.

75. Between 2:30 and 3:30 a.m., and despite the short distance, Richard and Edward only managed to evacuate five cabins to Rec Hall – Bug House, Look Inn, Hang Out, Tumble Inn,



Copy from re:SearchTX

and Jumble House. Defendants never evacuated the remaining six cabins – Nut Hut, Chatter Box, Wiggle Inn, Giggle Box, Twins, and Bubble Inn – to Rec Hall or anywhere.

**H. Chaos Ensued, As Other Counselors and Campers Ran for their Lives.**

76. While the first five cabins were evacuated, counselors in the remaining cabins were told by camp staff *not* to evacuate. Thus, even as defendants watched flood waters rise and knew evacuations were vital, the Camp continued to order campers and counselors to stay in the cabins.

77. Many counselors in the remaining cabins watched the evacuations of their fellow counselors and campers. The route to Rec Hall from the first five cabins runs directly past the other cabins, including Twins and Bubble Inn. Counselors from Nut Hut, directly across the road from Bubble Inn, talked to the girls being evacuated as they went. Those Nut Hut counselors were told to stay in their cabins by the Camp. Counselors from Giggle Box and Twins were similarly told by the Camp to stay in their cabins during or after the evacuations of the first five cabins.

78. As flood waters continued to rise, counselors from the remaining cabins looked for help from the Camp, but none arrived. Counselors from Nut Hut tried to walk to get help, but they could not get there. Rather than wait it out, as they were told, they returned to their cabin and decided to evacuate on their own. When they could not open the door because of rising waters, they broke windows to escape and ran up a nearby hill. Counselors in two other cabins near the hill also decided to evacuate, pulling young girls through their windows and climbing to safety on their own. They ran through pouring rain and lightning to the top of a hill where they waited for hours. While doing so, they could hear screams for help from other cabins that housed their friends and fellow campers.

79. These hours for the girls taken to Rec Hall were just as harrowing and chaotic. None of the defendants came to assist them or give instructions until much later in the morning, even though they knew the flood water was rising and that evacuation was necessary. Mary Liz Eastland



Copy from re:SearchTX

and Willetta Eastland were nowhere to be found despite knowing the flooding was occurring, as they found their own safe, high ground. As flood waters rose inside, counselors took their campers to the second floor. From there they could see staff known as the "Big 3" stranded on a roof across the pavilion and others struggling for their lives to climb up. They could also see counselors from nearby cabins, including Twins, flashing SOS on their flashlights, begging the Camp for help.

**I. Defendants Made Fatal Decisions for the Bubble Inn and Twins Cabins.**

80. According to the Camp, Richard and Edward's final trip to the cabins occurred before 3:35 a.m., more than two hours after the Camp got the life-threatening flash flood warning.

81. Richard drove to Bubble Inn in a Tahoe, and Edward went to Twins on foot. This picture, taken at 3:26 a.m., shows girls safely walking to Rec Hall just minutes before.



The Camp has no explanation for why it failed to tell the Bubble Inn and Twins girls to walk to Rec Hall at that same time. It would have saved the lives of 27 young girls.

82. According to the Camp, Richard Eastland was swept away from Bubble Inn in his car and submerged by 3:51 a.m. He was found the next day not far from the Camp with campers inside the car. The car appears to have smashed against a tree. All inside were killed. A counselor that witnessed Richard's car being lifted and swept away reported seeing many campers in the car.



Copy from re:SearchTX

She believes he had loaded all cabin occupants in his Tahoe. All 13 campers and 2 counselors from Bubble Inn were killed, with some being swept miles downstream.

83. According to Edward, Richard parked at Bubble Inn with water at the top of his wheels. The Camp described this as waist-deep water that became neck-deep. Richard Eastland tried to load the girls in his car in these conditions. He and the Camp knew better than anyone the dangers of driving through even a foot of flood waters, much less neck-deep water. Defendants' conduct on July 4 and the years before was grossly negligent, and they knew it was substantially certain to result in the death of campers and counselors in Bubble Inn, including Margaret Bellows, Lila Bonner, Molly DeWitt, Lainey Landry, Chloe Childress, and Katherine Ferruzzo.

84. When Richard went to Bubble Inn, Edward went to the Twins cabins. Girls there had been woken by thunder earlier, but they were told to stay put. They watched as other campers walked past them to Rec Hall. When Edward finally arrived close to 3:35 a.m., the girls pleaded with him to evacuate, but he told them they had to stay because the water would go back down.

85. The flood waters did not recede. The girls got on their top bunks, as the water pressed them against the cabin ceiling. Several girls decided to swim out to avoid drowning in the cabin, and others were swept out by rushing waters. Some girls never made it out of the cabin.

86. Edward was swept through the door of Twins II and submerged at 4:09 a.m. He and several girls were swept to a tree near Bug House, where they held on until morning. Some campers tried to hold onto the tree and were pulled away, while others floated by and were unable to grab it. Girls in the tree watched in horror as their friends floated by begging for help. Eleven campers from Twins I and II were killed, including Blakely McCrory.



Copy from re:SearchTX

87. This tragedy was entirely preventable. Bubble Inn and Twins are only 300 feet from Rec Hall and 70 feet from a nearby hill, as these pictures taken from outside the cabins show:

**View of Rec Hall from Bubble Inn Cabin**



**View of Rec Hall from Twins Cabins**





Copy from re:SearchTX

88. This aerial photo captured after the floods shows the short path from Twins and Bubble Inn to Rec Hall:




89. It takes 60 seconds for an adult to walk from the cabins to Rec Hall and 40 seconds to walk to the hill. If defendants had not ordered the girls to stay in their cabins, they had *hours* to safely walk to either of these safer locations at any time from 1:14 a.m. to at least 3:26 a.m., when pictures show it was still safe to walk. Instead, defendants spent an hour moving camp equipment, did nothing more until counselors demanded action, and then evacuated only five of the cabins. Some of the remaining girls were able to run for their lives up the nearby hill. Defendants ordered the girls in Bubble Inn and Twins to stay put. Finally, Richard loaded the Bubble Inn girls into his car, and Edward joined the girls in Twins, with neither man having any way to keep the girls safe.

90. Defendants knew that if they ordered counselors and campers to stay in their cabins, even watching the rising flood waters and knowing the area's history of catastrophic flooding, it was substantially certain the girls would sustain grave or fatal injuries. Despite that, they ordered the campers and counselors in Twins and Bubble Inn to stay in their cabins when they easily could have



Copy from re:SearchTX

walked to safety in a matter of minutes. These decisions caused the preventable deaths of 27 campers and counselors despite having ample time to get them to higher, safe ground.

**J. The Camp's Post-Flood Actions Inflicted Further Pain.**

91. Defendants' behavior and decisions, starting later in the morning of July 4, has only made this unimaginable tragedy worse.

92. When the water receded, it was clear that several girls had died. Some campers were found in Richard Eastland's car and at least one inside a cabin. Yet when defendants reached out to families at 11:30 a.m., they told all of them their daughters were "unaccounted for." Mary Liz Eastland texted parents throughout the day, saying nothing about the known deaths until some of the families learned the truth from authorities late in the evening. For several families, this provided false hope their daughters could be alive – when defendants knew they were dead. In the coming days, as more bodies were found, defendants did not tell the girls' families, again providing them with false hope and prolonging the suffering of waiting to know the truth.

93. Defendants' communications since the flood have made this tragic situation even worse. For example, defendants have sent letters invoking an image of Richard Eastland singing in a heavenly choir with their deceased daughters, and reached out to older siblings of those that died with veiled references to forgiveness. They have even used the names of counselors killed in Bubble Inn while trying to recruit next summer's counselors.

94. Most recently, defendants enthusiastically announced the Camp would reopen next summer. Yet a camper, Cile Steward, remains missing. Again, defendants used the deceased girls as a recruiting tool, touting a "memorial" they would build in their honor – without ever asking the parents of the girls. Defendants' rush to reopen their for-profit campsite, while parents still grieve



Copy from re:SearchTX

their lost daughters, is only the latest example of the Camp putting profits over all else. The Camp is ready to move on, but these girls and their parents first deserve transparency and justice.

## CAUSES OF ACTION

### COUNT 1 – NEGLIGENCE

95. All prior material fact allegations are incorporated.

96. Defendants owed a duty of reasonable care to protect campers and counselors at the Camp.

97. Through their acts and omissions, Defendants breached that duty.

98. Defendants' breach proximately caused injuries and deaths of Margaret Bellows, Lila Bonner, Molly DeWitt, Lainey Landry, Blakely McCrory, Chloe Childress, and Katherine Ferruzzo and survival and wrongful death damages sought by their estates and parents.

99. Defendants were substantially certain that their acts and omissions in breaching their duty of care would result in deaths or grave injury, including injuries to and deaths of Margaret Bellows, Lila Bonner, Molly DeWitt, Lainey Landry, Blakely McCrory, Chloe Childress, and Katherine Ferruzzo. Defendants' acts and omissions did in fact cause their deaths and survival and wrongful death damages sought by their estates and parents.

### COUNT 2 – NEGLIGENCE PER SE

100. All prior material fact allegations are incorporated.

101. Under Tex. Admin. Code §265.15(k), defendants were required to have "A written plan of procedures to be implemented in case of a disaster," which had to include plans for "evacuation of each occupied building and the facility." Defendants were required to post the Camp's evacuation plan in its "administrative on-site office and in each permanent and semi-permanent occupied building" and to train the Camp's employees concerning this plan.



Copy from re:SearchTX

102. Defendants did none of these things. Instead, they implemented a plan that *prohibited* evacuation and required counselors to follow that plan no matter the circumstances:

> <u>Floods</u>
> In case of flood, all campers on Senior Hill must stay in their cabins. They will be given instructions through the loud speaker. If the electricity is off, a walkie-talkie will be used. Food and other supplies will be delivered to Senior Hill by boat or truck. Campers and counselors NEVER wander away from your cabin. Those on the flats must also stay in their cabins unless told otherwise by the office. All cabins are constructed on high, safe locations.

103. Defendants provided no training as to how and when evacuation should occur, much less training specific to the evacuation plan that the Camp was required to have.

104. Tex. Admin. Code §265.15(k) is designed to protect campers and counselors from serious injury or death in the event of a disaster such as flooding. Plaintiffs belong to the class of persons that the statute was designed to protect, and their injuries are the type of injuries that the statute was designed to prevent.

105. Tex. Admin. Code §265.15(k) is a statute for which tort liability may be imposed. Imposing tort liability is consistent with its legislative intent; the statute defines a mandatory standard of conduct; and imposing tort liability for its violation is fair, workable, and wise.

106. Defendants' acts and omissions violated Tex. Admin. Code §265.15(k), without excuse, and proximately caused injuries and deaths of Margaret Bellows, Lila Bonner, Molly DeWitt, Lainey Landry, Blakely McCrory, Chloe Childress, and Katherine Ferruzzo and survival and wrongful death damages sought by their estates and parents.

107. Defendants were substantially certain that their violation of Tex. Admin. Code §265.15(k) would result in deaths or grave injury, including injuries to and deaths of Margaret Bellows, Lila Bonner, Molly DeWitt, Lainey Landry, Blakely McCrory, Chloe Childress, and Katherine Ferruzzo. Defendants' violation did in fact cause their deaths and survival and wrongful death damages sought by their estates and parents.



Copy from re:SearchTX

## COUNT 3 – NEGLIGENT UNDERTAKING

108. All prior material fact allegations are incorporated.

109. While defendants did not have an evacuation plan, they negligently undertook an unplanned and poorly executed ad hoc evacuation on July 4.

110. When defendants tried to evacuate the cabins, they undertook to perform services that they knew, or should have known, were necessary for the protection of Margaret Bellows, Lila Bonner, Molly DeWitt, Lainey Landry, Blakely McCrory, Chloe Childress, and Katherine Ferruzzo.

111. Through their acts and omissions, defendants failed to exercise reasonable care in performing those services.

112. Margaret Bellows, Lila Bonner, Molly DeWitt, Lainey Landry, Blakely McCrory, Chloe Childress, and Katherine Ferruzzo relied on defendants' undertaking, believing that defendants knew what they were doing when they did not and were woefully unprepared for the situation. Defendants' undertaking increased the risk of harm to Margaret Bellows, Lila Bonner, Molly DeWitt, Lainey Landry, Blakely McCrory, Chloe Childress, and Katherine Ferruzzo and the other campers.

113. Defendants' negligent undertaking proximately caused the injuries and deaths of Margaret Bellows, Lila Bonner, Molly DeWitt, Lainey Landry, Blakely McCrory, Chloe Childress, and Katherine Ferruzzo and survival and wrongful death damages sought by their estates and parents.

114. Defendants were substantially certain that the acts and omissions in their negligent undertaking would result in deaths or grave injury, including injuries to and deaths of Margaret Bellows, Lila Bonner, Molly DeWitt, Lainey Landry, Blakely McCrory, Chloe Childress, and



Copy from re:SearchTX

Katherine Ferruzzo. Defendants acts and omissions did in fact cause their deaths and survival and wrongful death damages sought by their estates and parents.

**COUNT 4 – PREMISES LIABILITY**

115. All prior material fact allegations are incorporated.

116. Defendants owned and controlled the Camp premises before and as of the time of this tragedy and owed a duty of reasonable care to Margaret Bellows, Lila Bonner, Molly DeWitt, Lainey Landry, Blakely McCrory, Chloe Childress, and Katherine Ferruzzo, who were invitees.

117. The Bubble Inn and Twins cabins were unreasonably dangerous. They were in an area prone to flooding, and none was equipped to keep occupants safe in the event of a flood.

118. Defendants knew or reasonably should have known of this danger based on their knowledge of extreme flooding risks in the area, considering the locations of the cabins and past flood events that had hit the Camp.

119. Defendants breached their duty of care by failing to adequately warn of the dangerous condition and make the condition reasonably safe. In so doing, defendants concealed the unreasonably dangerous condition of the Bubble Inn and Twins cabins from campers and counselors. And because defendants refused to move the cabins to locations that were safe, they failed to make the condition reasonably safe for campers and counselors.

120. Defendants' breach of duty proximately caused the injuries and deaths of Margaret Bellows, Lila Bonner, Molly DeWitt, Lainey Landry, Blakely McCrory, Chloe Childress, and Katherine Ferruzzo and survival and wrongful death damages sought by their estates and parents.

121. Defendants were substantially certain that the breach of their duty would result in deaths or grave injury, including injuries to and deaths of Margaret Bellows, Lila Bonner, Molly DeWitt, Lainey Landry, Blakely McCrory, Chloe Childress, and Katherine Ferruzzo. Defendants



Copy from re:SearchTX

acts and omissions did in fact cause their deaths and survival and wrongful death damages sought by their estates and parents

**COUNT 5 – GROSS NEGLIGENCE**

122. All prior material fact allegations are incorporated.

123. Defendants' acts and omissions, viewed objectively from their standpoints when their conduct occurred, involved and posed an extreme degree of risk to Margaret Bellows, Lila Bonner, Molly DeWitt, Lainey Landry, Blakely McCrory, Chloe Childress, and Katherine Ferruzzo, considering the probability and magnitude of the potential harm to them and others. Defendants had actual, subjective awareness of the risk but proceeded with conscious indifference to the rights, safety, and welfare of Margaret Bellows, Lila Bonner, Molly DeWitt, Lainey Landry, Blakely McCrory, Chloe Childress, and Katherine Ferruzzo as well as other campers and counselors. Defendants' acts and omissions proximately caused their injuries and death.

124. Defendants' acts and omissions constitute gross negligence under Tex. Civ. Prac. & Rem. Code §41.003(a)(3).

125. This misconduct entitles plaintiffs to recover exemplary damages from defendants. Plaintiffs seek such damages from each defendant in the full amount allowable by law.

**COUNT 6 – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

126. All prior material fact allegations are incorporated.

127. Plaintiffs Warren and Patricia Bellows, Blake and Caitlin Bonner, Matthew and Wendie Childress, Ryan and Elizabeth DeWitt, John and Andrea Ferruzzo, Ben and Natalie Landry, and Lindsey McCrory are individual parents of their deceased daughters.



Copy from re:SearchTX

128. Defendants' conduct after the deaths of their daughters Margaret Bellows, Lila Bonner, Molly DeWitt, Lainey Landry, Blakely McCrory, Chloe Childress, and Katherine Ferruzzo was extreme and outrageous.

129. Defendants acted intentionally or recklessly, and their conduct proximately caused Warren and Patricia Bellows, Blake and Caitlin Bonner, Matthew and Wendie Childress, Ryan and Elizabeth DeWitt, John and Andrea Ferruzzo, Ben and Natalie Landry, and Lindsey McCrory to suffer severe emotional distress, for which they seek damages.

130. No alternate cause of action would provide a remedy for the severe emotional distress caused by defendants' conduct.

## WRONGFUL DEATH AND SURVIVAL ACTIONS

131. Plaintiffs bring these actions pursuant to the Texas Wrongful Death Act, Texas Civil Practice & Remedies Code § 71.001 *et seq*, and the Texas Survival Statute, Texas Civil Practice and Remedies Code § 71.021.

## EXEMPLARY DAMAGES

132. Plaintiffs seek exemplary damages against defendants for their gross negligence and intentional infliction of emotional distress.

## ALTER EGO – SINGLE BUSINESS ENTERPRISE –VEIL PIERCING

133. Camp Mystic, LLC owns and operates the Camp. The only two officers identified in public filings are Richard Eastland and Willetta Eastland. Natural Fountains Properties, Inc. owns the land on which the Camp is located. Richard Eastland is its Chief Executive Officer, and Willetta Eastland is its Secretary. Mystic Camps Family Partnership, Ltd. is a family limited partnership that is the 100% owner of Natural Fountains Properties, Inc. and Camp Mystic, LLC. Mystic Camps Management, LLC is the general partner of Mystic Camps Family Partnership, Ltd. Its two members identified in public filings are Richard and Willetta Eastland.



Copy from re:SearchTX

134. These various entities should be disregarded and their corporate forms deemed not separate. Allowing them to maintain the legal fiction of separate entities would promote injustice and evade duties and accountability. These entities also were and are operated as a single business enterprise.

135. Alternatively, Mystic Camps Family Partnership Ltd. has used its subsidiaries, including Camp Mystic, LLC and Natural Fountains Properties, Inc., to perpetrate an actual fraud primarily for the benefit of their parent entities.

## RESPONDEAT SUPERIOR

136. The individual Camp employees acted in the course and scope of their employment. The Camp is liable for their acts and omissions under the doctrine of respondeat superior.

## JURY DEMAND

137. Under Tex. R. Civ. P. 216, plaintiffs demand a trial by jury on all issues so triable. Plaintiffs have paid the required jury fee.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that defendants be cited to appear and answer, and after trial or final hearing, the Court enter judgment for plaintiffs for their full actual damages, including conscious pain and suffering before death, conscious mental anguish suffered before death, funeral expenses, past and future mental anguish, past and future counseling expenses, past and future loss of companionship and society, loss of services, and past and future lost earning capacity. Plaintiffs also seek exemplary damages, prejudgment and post-judgment interest, all costs of suit, and all other relief to which they are entitled at law or in equity.



Copy from re:SearchTX

Dated: November 10, 2025

Respectfully submitted,

*/s/ R. Paul Yetter*
R. Paul Yetter
State Bar No. 22154200
pyetter@yettercoleman.com
Justin P. Tschoepe
State Bar No. 24079480
jtschoepe@yettercoleman.com
J. Reid Simpson
State Bar No. 24072343
jrsimpson@yettercoleman.com
Shannon N. Smith
State Bar No. 24110378
ssmith@yettercoleman.com
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000

ATTORNEYS FOR PLAINTIFFS



Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Lisa Prince on behalf of R. Yetter
Bar No. 22154200
lprince@yettercoleman.com
Envelope ID: 107861588
Filing Code Description: Petition
Filing Description: ORIGINAL PETITION
Status as of 11/10/2025 3:40 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| R. PaulYetter | | pyetter@yettercoleman.com | 11/10/2025 12:29:34 PM | SENT |
| Justin P.Tschoepe | | jtschoepe@yettercoleman.com | 11/10/2025 12:29:34 PM | SENT |
| Shannon Smith | | ssmith@yettercoleman.com | 11/10/2025 12:29:34 PM | SENT |
| J. ReidSimpson | | jrsimpson@yettercoleman.com | 11/10/2025 12:29:34 PM | SENT |
| Jane Ray | | jray@yettercoleman.com | 11/10/2025 12:29:34 PM | SENT |
| Sue Csizmadia | | scsizmadia@yettercoleman.com | 11/10/2025 12:29:34 PM | SENT |
| Yetter Coleman | | efile@yettercoleman.com | 11/10/2025 12:29:34 PM | SENT |
| Lisa Prince | | lprince@yettercoleman.com | 11/10/2025 12:29:34 PM | SENT |

Copy from re:SearchTX

12/12/2025 9:51 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009963
Candy Schmidt

CAUSE NO. D-1-GN-25-009963

| | | |
|---|---|---|
| WARREN and PATRICIA BELLOWS, Individually and as Representatives of ANNA MARGARET BELLOWS, Deceased; BLAKE and CAITLIN BONNER, Individually and as Representatives of LILA BONNER, Deceased; MATTHEW and WENDIE CHILDRESS, Individually and as Representatives of CHLOE CHILDRESS, Deceased; RYAN and ELIZABETH DEWITT, Individually and as Representatives of MOLLY DEWITT, Deceased; JOHN and ANDREA FERRUZZO, Individually and as Representatives of KATHERINE FERRUZZO, Deceased; BEN and NATALIE LANDRY, Individually and as Representatives of LAINEY LANDRY, Deceased; LINDSEY MCCRORY, Individually and as Representative of BLAKELY MCCRORY, Deceased. | § | IN THE DISTRICT COURT OF |
| *Plaintiffs* | § | TRAVIS COUNTY, TEXAS |
| v. | § | |
| CAMP MYSTIC, LLC; NATURAL FOUNTAINS PROPERTIES, INC.; MYSTIC CAMPS FAMILY PARTNERSHIP, LTD., MYSTIC CAMPS MANAGEMENT, LLC; GEORGE ALBRITTON EASTLAND, as Representative of the Estate of RICHARD EASTLAND, Deceased; WILLETTA EASTLAND; EDWARD EASTLAND; and MARY LIZ EASTLAND, | § | |
| *Defendants.* | § | 455TH DISTRICT COURT |

**CAMP MYSTIC DEFENDANTS' MOTION TO TRANSFER VENUE**

TO THE HONORABLE JUDGE OF SAID COURT:

Come now CAMP MYSTIC, LLC; NATURAL FOUNTAINS PROPERTIES, INC.; MYSTIC CAMPS FAMILY PARTNERSHIP, LTD., MYSTIC CAMPS MANAGEMENT, LLC; GEORGE ALBRITTON EASTLAND, as Representative of the Estate of RICHARD



Copy from re:SearchTX

EASTLAND, Deceased; WILLETTA EASTLAND; EDWARD EASTLAND; and MARY LIZ EASTLAND, hereinafter referred to as CAMP MYSTIC DEFENDANTS and files this Motion to Transfer Venue and would respectfully show the Court as follows:

## I. INTRODUCTION

1. This lawsuit arises out of the July 4, 2025, historic catastrophic flood in Hunt, Kerr County, Texas. Travis County is not the proper venue for this case. None of the acts out of which this lawsuit arose occurred in Travis County. Plaintiff has no viable claims against Defendants Mystic Camps Family Partnership, Ltd. and Mystic Camps Management, LLC. At the time of the July 4, 2025, flood Defendant, Willetta "Tweety" Eastland, was residing at Camp Mystic in Kerr County, Texas. As for Defendant Richard "Dick" Eastland, deceased, an estate administration is pending in Kerr County. Plaintiffs have not named Richard "Dick" Eastland, deceased, as a Defendant. Plaintiffs have named as a Defendant in this suit George Albritton Eastland as Representative of the Estate of Richard Eastland, Deceased. An administration of the Estate of Richard Eastland is pending in Kerr County. George Albritton Eastland, Edward Eastland, and Mary Liz Eastland are all residents of Kerr County, Texas.

2. To sustain venue in Travis County, there must be a valid cause of action against a Travis County resident defendant. In this case there is not. If this case goes to trial in Travis County, it will be tried in a county of improper venue. Trial in an improper venue is automatically harmful and reversible error. For these reasons, the case must be transferred to Kerr County, the only proper venue for this matter to be tried.

3. Defendants specifically deny the venue facts as alleged by Plaintiffs. Defendants specifically deny that Mystic Camps Family Partnership, Ltd. is a proper party to this litigation. Defendants specifically deny that Mystic Camps Family Partnership, Ltd. had any employee, much



Copy from re:SearchTX

less employees with decision making authority, in Travis County on July 4, 2025, the date of the catastrophic flooding giving rise to this lawsuit.

4. Defendants specifically deny that Mystic Camps Management, LLC is a proper party to this litigation. Defendants specifically deny that Mystic Camps Management, LLC had any employee, much less employees with decision making authority, in Travis County on July 4, 2025, the date of the catastrophic flooding giving rise to this lawsuit.

5. Defendants specifically deny the cause of action against Mystic Camps Family Partnership, Ltd. and Mystic Camps Management, LLC arises from the same transaction or occurrence as Plaintiffs' cause of action against the proper Defendants, Camp Mystic, LLC and Natural Fountains Properties, Inc.

6. The case should also be transferred to Kerr County for the convenience of the parties and, in particular, the third-party witnesses. All relevant events in this lawsuit took place in Kerr County. Potential witnesses include camp staff members who reside in Kerr County and local Kerr County officials. Furthermore, a site visit may be necessary so that the factfinder can see and appreciate the layout of the property and its elevations and the extent of the flood's damage. In contrast, there is no particular relevance of Travis County to this case; substantially all of the events or occurrences that give rise to the Plaintiffs' suit took place in Kerr County.

7. Defendants specifically deny that Willeta Eastland was physically residing in Travis County on July 4, 2025, the date of the catastrophic flooding giving rise to this lawsuit. Willetta Eastland was living in Kerr County at the time of this horrific flood.

8. Defendants specifically deny that Richard "Dick" Eastland was physically residing in Travis County on July 4, 2025, the date of the catastrophic flooding giving rise to this lawsuit.



Copy from re:SearchTX

## II. BACKGROUND

9. Plaintiffs allege causes of action against Defendants including negligence, gross negligence, and premises liability, among others as a result of the catastrophic flooding that occurred on July 4, 2025, in Hunt, Kerr County, Texas. The historic flood resulted in the loss of more than one hundred lives, and is the subject of a separately filed lawsuit pending in Kerr County in Cause Number 25476A, *Christie Floyd et. al v. Davis Investment Ventures, LLC d/b/a The Davis Companies*.

10. Plaintiffs correctly assert that Camp Mystic ("the Camp") was operated by Camp Mystic, LLC, which leased the property upon which the Camp operates from Natural Fountain Properties, Inc. These are the only two entities which had any role in ownership, possession, or control over Camp Mystic.

11. Mystic Camps Family Partnership, Ltd. is a holding company that has no role in ownership, possession or control over Camp Mystic. It does not have any employees or agents with decision making authority. It does not have any role in camp operations.

12. Mystic Camps Management, LLC is a holding company that has no role in ownership, possession or control over Camp Mystic. It does not have any employees or agents with decision making authority. It does not have any role in camp operations.

~~13.~~ Willetta Eastland is the widow of Richard "Dick" Eastland, who also perished in the flood. Willetta Eastland was a resident of Hunt, Kerr County, Texas at the time of the incident. Willetta Eastland was not residing in Travis County at the time of the incident. Willetta Eastland is a resident of Kerr County at the time of the filing of this Motion to Transfer Venue.



Copy from re:SearchTX

14. Richard "Dick" Eastland is not a named party to the suit. Richard "Dick" Eastland is deceased, and an administration of his estate is pending in Kerr County. Plaintiffs have sued George Albritton Eastland as Representative of the Estate of Richard Eastland.

15. Plaintiffs filed this suit in Travis County. Their venue choice rests on their incorrect allegation that Mystic Camps Family Partnership, Ltd and Mystic Camps Management, LLC are proper parties to this lawsuit. These entities are not proper parties to the suit. Neither entity has any role in ownership, possession, or control over Camp Mystic. Neither entity has any employees. These entities exist purely for estate planning purposes of Willetta Eastland and Richard Eastland as a means of passing on the legacy of their life's work to their children. In that regard, the facts giving rise to Plaintiffs' claims have no connection to Travis County. The catastrophic flood event giving rise to Plaintiffs' claims occurred in Kerr County. The principal office of the Camp operates in Kerr County. All of the Eastlands resided at Camp Mystic, Kerr County, Texas, at the time of the July 4, 2025 flood. Accordingly, and as set forth more fully below, Defendants respectfully request the Court grant their Motion to Transfer Venue and Order this matter transferred to the District Court in Kerr County.

## III. ARGUMENT & AUTHORITIES

### A. Motion to Transfer Venue Standard

16. Plaintiffs have the initial right to choose venue. However, an improper choice waives that right and gives a defendant the right to have the suit transferred to a proper venue. *Wilson v. Tex. Parks & Wildlife Dep't*, 886 S.W.2d 259, 260 & n.1 (Tex. 1994); *Union Carbide Corp. v. Loftin*, 256 S.W.3d 869, 874 (Tex. App.—Beaumont 2008, pet. dism'd). "Proper" venue is defined by statute as: "(1) the venue required by the mandatory provisions of Subchapter B ['Mandatory Venue'] or another statute prescribing mandatory venue; or (2) if Subdivision (1) does



Copy from re:SearchTX

not apply, the venue provided by [the general venue rule] or Subchapter C ['Permissive Venue']." TEX. CIV. PRAC. & REM. CODE § 15.001(b).

17. A defendant challenges a plaintiff's improper venue choice through a motion to transfer venue. TEX. R. CIV. P. 86. Once challenged, the burden then shifts to the plaintiff to prove that venue is maintainable in the county of suit. TEX. R. CIV. P. 87(3)(a). If the plaintiff fails to meet this burden, the trial court must transfer the lawsuit to another specified county of proper venue. *See* TEX. CIV. PRAC. & REM. CODE § 15.063; *Wilson*, 886 S.W.2d at 260.

**B. Travis is an Improper County of Venue Because None of the Proper Defendants are Situated in Travis County.**

18. Plaintiffs' choice of venue is improper because none of the proper defendants in this suit have a principal office in Travis County. Specifically, Plaintiffs' venue allegations are that Mystic Camps Family Partnership, Ltd. and Mystic Camps Management, LLC's principal place of business are in Travis County, and that Willetta Eastland resides in Travis County. They also claim that at the time of his death, Richard Eastland resided in Travis County. Defendants expressly deny these allegations. Tex. R. Civ. P. 87(3)(a).

19. Venue is improper in Travis County because the venue defendant must be a material defendant for venue, based on that defendant's residence, to be proper. *See, e.g., T.S. Lankford & Sons, Inc. v. Harry Eldridge Co., Inc.,* 359 S.W.2d 663 (Tex. Civ. App. Texarkana 1962, writ dism'd) (there must be proof of a valid cause of action against the resident defendant to sustain venue against residents and nonresidents); *Union Pacific Railroad Co. v. Cezar*, 293 S.W.3d 800 (Tex. App. - Beaumont 2009, no pet.) (the sole defendant who was alleged to reside in the venue county was not a proper venue defendant, thus, because "trial in a county of improper venue is never harmless error," the court concluded that the case should be reversed and transferred to a proper county for a new trial) *Pines of Westbury, Ltd. v. Paul Michael Const., Inc.*, 993 S.W.2d



Copy from re:SearchTX

291 (Tex. App. Eastland 1999, no writ) (summary judgment in favor of only venue defendant destroyed proper venue and made denial of another defendant's earlier motion to transfer improper). As these cases demonstrate, if there is no valid claim against the alleged venue defendants, venue is improper in the county of suit, and on appeal, the case must be reversed and remanded for a new trial in the proper county of venue.

**i. Mystic Camps Family Partnership, Ltd. and Mystic Camps Management, LLC, are not proper parties and cannot serve as a basis to establish venue.**

20. The principal offices of Mystic Camps Family Partnership, Ltd. and Mystic Camps Management, LLC should not be used to establish venue in Travis County because they are improper parties in this lawsuit. Neither of these entities has any employees. They do not own, operate, or control Camp Mystic, nor do they have any other connection to the facts underlying this lawsuit.

21. The county of a defendant's principal office in the state, if the defendant is not a natural person, is a permissible county of venue. TEX. CIV. PRAC. & REM. CODE §15.002(a)(3). A "principal office" is defined as a principal office of a corporation in which the decision makers for the organization within this state conduct the daily affairs of the organization. The mere presence of an agency or a representative does not establish a principal office. TEX. CIV. PRAC. & REM. CODE §15.001(a). The Texas Supreme Court has concluded that a corporation may have more than one principal office. *In re Missouri Pacific Railroad Co.*, 998 S.W.2d 212, 217 (Tex. 1999). Specifically, to establish venue based upon a principal office, a plaintiff must show: (1) the employees in the county where the lawsuit was filed are "decision makers" for the company and (2) the employees in the county where the lawsuit was filed have "substantially equal responsibility and authority" relative to other company officials within the state. *Id.*



Copy from re:SearchTX

22. The case law makes it clear that there must be evidence that corporate decision makers exist to establish venue against the corporation. Here, there are no such corporate decision makers and no principal place of business for Mystic Camps Family Partnership, Ltd. and Mystic Camps Management, LLC because there is no business for either entity to conduct. Mystic Camps Family Partnership, Ltd. is a holding company that has no employees, that owns no real property, and has no role in Camp operations. Mystic Camps Management, LLC is a holding company that has no employees, that owns no real property, and has no role in Camp operations. Plaintiffs' strategic decision to include these entities in the suit was purely for venue purposes based on the mailing address of these holding companies.

**ii. Plaintiffs' claims against the Estate of Richard Eastland do not support venue in Travis County.**

23. Although Plaintiff asserts that at the time of his death, Richard Eastland was a resident of Travis County, this claim cannot serve as a basis for establishing venue in Travis County. Plaintiffs have not and cannot sue Richard Eastland in his individual capacity. Richard Eastland is deceased. Plaintiffs have sued George Albritton Eastland as the Representative of the Estate of Richard Eastland for the alleged acts and omissions of Richard Eastland prior to his death. A suit against an executor, administrator or guardian to establish a money demand against the estate may be brought in the county in which the estate is administered, or if the suit is brought against the person whose estate the executor, administrator, or guardian represents, the suit may be brought in the county in which the negligent act or omission of the person whose estate the executor, administrator, or guardian represents occurred. TEX. CIV. PRAC. & REM. CODE §15.031

24. There is no dispute that the alleged negligent act(s) or omission(s) occurred in Kerr County and that Plaintiffs have filed suit against George Albritton Eastland as the Representative of the Estate of Richard Eastland for the alleged negligent acts or omissions of Richard Eastland.



Copy from re:SearchTX

Accordingly, Plaintiffs' only venue option with respect to their claims against Eastland's estate is Kerr County. TEX. CIV. PRAC. & REM. CODE §15.031.

**iii. Plaintiffs' live pleading establishes venue is improper in Travis County.**

25. There is no dispute that the events which brought about this litigation occurred in Hunt, Kerr County, Texas. Plaintiffs' pleadings correctly assert that the Camp is operated by Camp Mystic, LLC and the property is owned by Natural Fountains Properties, Inc. Both of these entities operate their place of business in Kerr County, where the Camp is located. Plaintiffs assert no facts which demonstrate Mystic Camps Family Partnership, Ltd. or Mystic Camps Management, LLC had a role in Camp operations or in the alleged acts or omissions giving rise to Plaintiffs' causes of actions.

26. Despite conceding that the Eastland family have controlled the operations of Camp Mystic, located in Kerr County, Texas, for generations, and alleging Willetta Eastland was involved in acts or omissions that occurred in Kerr County, Texas, Plaintiffs improperly seek to establish venue in Travis County. It is clear from the facts that the only proper venue for this case is in Kerr County, where the two entities responsible for Camp Mystic operations and control of Camp Mystic property maintain their principal place of business, and where administration of the estate of Richard Eastland is pending.

**C. In the alternative, this case should be transferred to Kerr County for the convenience of the parties and witnesses.**

27. Under Texas Civil Practice and Remedies Code Section 15.002, a court may transfer venue to another county of proper venue for the convenience of the parties and the witnesses and in the interests of justice. As discussed above, substantially all of the relevant events that make up the basis of this suit took place in Kerr County, Texas. The flooding took place there and the relevant acts of the proper Defendants took place there.



Copy from re:SearchTX

28. Beyond the Eastland family members, many of whom have minor children and cannot be away from home for long periods of time, other relevant non-party witnesses also reside and work in Kerr County. Potential witnesses include camp staff that live in Kerr County, who might be called upon to testify about camp conditions and procedures. They also include local Kerr County officials, who might be called upon to testify about conditions on July 4th, emergency responses, systems for notification and warning, and the causes and effects of the July 4th flood. None of them have any particular relation to Travis County.

29. It may also be necessary or advisable for the factfinder to make a site visit in order to truly understand the camp layout and elevation, to see the relationships between the Guadalupe River and various camp buildings, and to understand the effects of the flooding, in a way that maps and two-dimensional representations cannot convey. Such a visit will only be possible if the case is transferred to Kerr County.

30. Finally, there is no prejudice to the Plaintiffs for the case to be transferred to Kerr County. The Plaintiffs reside in numerous places around the state, and there is no particular connection between Travis County and the events of July 4th. The Court should therefore transfer the case to Kerr County for the convenience of the parties and witnesses and in the interests of justice.

## IV. SUMMARY AND CONCLUSION

31. Plaintiffs improperly seek to fix venue in Travis County based on the joinder of two corporate entities who have no employees, no principal place of business, no decision making employees, and no connection to the facts underlying this lawsuit.. None of the acts out of which this lawsuit arose occurred in Travis County. Accordingly, venue in Travis County is improper and maintenance of this suit in Travis County constitutes harmful and reversible error. Even if this



Copy from re:SearchTX

case were properly in Travis County, it should be transferred to Kerr County, as substantially all of the witnesses reside there and substantially all of the events took place there. For these reasons, this matter must be transferred to Kerr County.

**WHEREFORE, PREMISES CONSIDERED,** Defendants request that this matter be set for hearing with notice to all parties, and that after such hearing, that the Court grant Defendants' Motion to Transfer Venue, and transfer the above styled and numbered cause to Kerr County, Texas. Defendants further pray that any costs of court incurred before the transfer be taxed against Plaintiff and for such other and further relief, at law or in equity, to which Defendants may show themselves justly entitled.

Respectfully submitted,

**RAY | PEÑA | MCCHRISTIAN, P.C.**
9601 McAllister Freeway, Suite 901
San Antonio, Texas 78216
P: (210) 341-3554
F: (210) 341-3557

By: */s/ Jeff Ray*
JEFF RAY
State Bar No. 16604400
jray@raylaw.com
*Attorney for Camp Mystic, LLC and George Albritton Eastland, as Representative of the Estate of Richard Eastland, Deceased*

**WATTS LAW FIRM LLP**
110 Tributary Ranch Road
Mountain Home, Texas 78058
P: (512) 479-0500

*/s/Mikal Watts*
MIKAL WATTS
State Bar No. 20981820
mikal@wattsllp.com
*Attorney for Natural Fountains Properties, Inc.; Willetta Eastland, Mystic Camps*



Copy from re:SearchTX

*Family Partnership, Ltd., and Mystic Camps Management, LLC*

**CASTAGNA SCOTT LLP**
1120 S. Capital of Texas Highway
Building 2, Suite 300
Austin, Texas 78746
512/329-3290
888/255-0132 fax

*/s/ Lynn S. Castagna*
LYNN S. CASTAGNA
State Bar No. 03980520
Lynn@texasdefense.com
*Attorney for Edward Eastland and Mary Liz Eastland*

**WRIGHT CLOSE BARGER & GUZMAN, LLP**
One Riverway, Suite 2200
Houston, Texas 77056
Telephone: (713) 572-4321
Facsimile: (713) 572-4320

*/s/Thomas C. Wright*
Thomas C. Wright
State Bar No. 22059400
wright@wrightclosebarger.com
Jessica Z. Barger
State Bar No. 24032706
barger@wrightclosebarger.com
Kenneth J. Fair
State Bar No. 24007171
fair@wrightclosebarger.com
*Attorneys for Camp Mystic, LLC*



Copy from re:SearchTX

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing instrument has been served to all counsel of record in accordance with Texas Rule of Civil Procedure 21 on December 12, 2025.

*/s/ Jeff Ray*
**JEFF RAY**



Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Linda Gonzales on behalf of Jeff Ray
Bar No. 16604400
lgonzales@raylaw.com
Envelope ID: 109065795
Filing Code Description: Motion (No Fee)
Filing Description: CAMP MYSTIC DEFENDANTS' MOTION TO TRANSFER VENUE
Status as of 12/14/2025 3:12 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| R. PaulYetter | | pyetter@yettercoleman.com | 12/12/2025 9:51:29 PM | SENT |
| Lisa Prince | | lprince@yettercoleman.com | 12/12/2025 9:51:29 PM | SENT |
| Yetter Coleman | | efile@yettercoleman.com | 12/12/2025 9:51:29 PM | SENT |
| Jane Ray | | jray@yettercoleman.com | 12/12/2025 9:51:29 PM | SENT |
| Justin P.Tschoepe | | jtschoepe@yettercoleman.com | 12/12/2025 9:51:29 PM | SENT |
| J. ReidSimpson | | jrsimpson@yettercoleman.com | 12/12/2025 9:51:29 PM | SENT |
| Shannon Smith | | ssmith@yettercoleman.com | 12/12/2025 9:51:29 PM | SENT |
| Sue Csizmadia | | scsizmadia@yettercoleman.com | 12/12/2025 9:51:29 PM | SENT |
| Jeff Ray | | jray@raylaw.com | 12/12/2025 9:51:29 PM | SENT |
| Linda Gonzales | | lgonzales@raylaw.com | 12/12/2025 9:51:29 PM | SENT |
| Katherine Estrada | | kestrada@raylaw.com | 12/12/2025 9:51:29 PM | SENT |
| Laura Rua | | lrua@raylaw.com | 12/12/2025 9:51:29 PM | SENT |
| Larry Matthys | | lmatthys@raylaw.com | 12/12/2025 9:51:29 PM | SENT |
| Mikal Watts | | mikal@wattsllp.com | 12/12/2025 9:51:29 PM | SENT |
| Kenneth Fair | | fair@wrightclosebarger.com | 12/12/2025 9:51:29 PM | SENT |
| Tom Wright | | wright@wrightclosebarger.com | 12/12/2025 9:51:29 PM | SENT |
| Jessica Barger | | barger@wrightclosebarger.com | 12/12/2025 9:51:29 PM | SENT |
| Lynn Castagna | | lynn@texasdefense.com | 12/12/2025 9:51:29 PM | SENT |
| Suzanne Goss | | goss@wrightclosebarger.com | 12/12/2025 9:51:29 PM | SENT |

Copy from re:SearchTX

12/12/2025 10:15 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009963
Susan Poodiack

CAUSE NO. D-1-GN-25-009963

| | | |
|---|---|---|
| WARREN and PATRICIA BELLOWS, Individually and as Representatives of ANNA MARGARET BELLOWS, Deceased; BLAKE and CAITLIN BONNER, Individually and as Representatives of LILA BONNER, Deceased; MATTHEW and WENDIE CHILDRESS, Individually and as Representatives of CHLOE CHILDRESS, Deceased; RYAN and ELIZABETH DEWITT, Individually and as Representatives of MOLLY DEWITT, Deceased; JOHN and ANDREA FERRUZZO, Individually and as Representatives of KATHERINE FERRUZZO, Deceased; BEN and NATALIE LANDRY, Individually and as Representatives of LAINEY LANDRY, Deceased; LINDSEY MCCRORY, Individually and as Representative of BLAKELY MCCRORY, Deceased. | § | IN THE DISTRICT COURT OF |
| *Plaintiffs* | § | TRAVIS COUNTY, TEXAS |
| v. | § | |
| CAMP MYSTIC, LLC; NATURAL FOUNTAINS PROPERTIES, INC.; MYSTIC CAMPS FAMILY PARTNERSHIP, LTD., MYSTIC CAMPS MANAGEMENT, LLC; GEORGE ALBRITTON EASTLAND, as Representative of the Estate of RICHARD EASTLAND, Deceased; WILLETTA EASTLAND; EDWARD EASTLAND; and MARY LIZ EASTLAND, | § | |
| *Defendants.* | § | 455TH DISTRICT COURT |

**CAMP MYSTIC DEFENDANTS' ORIGINAL ANSWER SUBJECT TO MOTION TO TRANSFER VENUE**

To the Honorable District Court Judge:

Come now, CAMP MYSTIC, LLC; NATURAL FOUNTAINS PROPERTIES, INC.; MYSTIC CAMPS FAMILY PARTNERSHIP, LTD., MYSTIC CAMPS MANAGEMENT, LLC; GEORGE ALBRITTON EASTLAND, as Representative of the Estate of RICHARD



Copy from re:SearchTX

EASTLAND, Deceased; WILLETTA EASTLAND; EDWARD EASTLAND; and MARY LIZ EASTLAND, hereinafter referred to as CAMP MYSTIC DEFENDANTS, and file their Original Answer to Plaintiffs' Original Petition filed subject to their Motions to Transfer Venue, and would respectfully state the following:

## I. TRCP 92 DEFENSES

1. Camp Mystic defendants, pursuant to Texas Rule of Civil Procedure 92, invoke the protections available to them under Texas Law and demand legally sufficient proof of the accusations asserted against them by a preponderance of the legal evidence or clear and convincing evidence where required by Texas law, as opposed to speculation or conjecture. Camp Mystic defendants respectfully request that the Court hold Plaintiffs to the burden required by the laws and the constitution of the State of Texas.

## II. BACKGROUND AND AFFIRMATIVE DEFENSES

Camp Mystic defendants answer and provide background information and affirmative defenses in response to Plaintiffs' pleadings.

2. On the morning of July 4, 2025, the most devasting flood known in the history of Kerr County, TX occurred. Extreme rainfall and massive surges of rapidly moving floodwaters devastated Kerr County, and the communities of Hunt, Ingram, and Kerrville, Texas. At least 135 people lost their lives, including 28 lives lost at Camp Mystic. Weather data from multiple scientific sources confirmed and determined that a convergence of severe weather systems, rather than continuing to move through the area (as was anticipated by weather and radar information), literally stopped and sat upstream and over Camp Mystic and surrounding areas, pouring over 100 billion gallons of water in the Kerr County area within hours.



Copy from re:SearchTX




USGS Stage Data






Copy from re:SearchTX

3. Notably, over 10 billion gallons of water fell in less than 3 hours in the South Fork of the Guadalupe River, upstream from Camp Mystic. This volume of water that fell in the South Fork is more than the amount of water that flows over Niagara Falls during the same time period.

USGS Flow Data




4. The Guadalupe River rose dramatically to more than 26 feet in less than 45 minutes. Kerrville recorded a rise in the Guadalupe River at over 32 feet in 1.5 hours. Camp Mystic, as well as other residences, experienced catastrophic and sudden flooding, combined with rapidly moving water that overwhelmed the camp, residences, and communities. As the chart below reveals, the gallons per second of rainfall was negligible at midnight. The gallons of rainfall per second at 3:00 AM had increased in intensity but would not have been expected to come near or reach any structures at Camp Mystic. Dramatically, and unexpectedly, according to weather



Copy from re:SearchTX

data, shortly before 3:30 AM, the rainfall became catastrophic, unprecedented, and quickly overwhelmed the Kerr County area. The graphic below charts the unprecedented sudden rainfall event.




| | |
|---|---|
| 12:00 AM | 53 |
| 3:00 AM | 264 |
| 3:30 AM | 125,000 |

5. The graphic below is provided by the National Oceanic and Atmospheric Administration (NOAA). A NOAA National Water Protection Service Gauge data visibly demonstrates the sudden and dramatic rise in the surge of water that overwhelmed Camp Mystic, residences and communities within its destructive path. During the critical times of evacuating all campers, Camp Mystic was hit with a sudden and overwhelming surge of water that engulfed the camp. Within a matter of moments, water levels at the Guadalupe River rose from less than 5 feet to over 20 feet. Further, the flood waters continued to violently rise to higher and higher levels, cresting at over 34 feet.



Copy from re:SearchTX







6. Scientific data further confirmed that this catastrophic flooding far exceeded any prior flood recorded in the Camp Mystic area by significant magnitudes. The historical data demonstrates that prior flood history, including the floods of 1932, 1978, and 1984 and 1987, were all below the elevations of Camp Mystic's Twins and Bubble Inn cabins, and below the 100-year



Copy from re:SearchTX

floodplain. Twins Cabin has been in existence since at least 1927. Neither of these cabins had experienced previous flooding. On July 4, 2025, flood waters suddenly rose not only to the floor elevations of these cabins, but to the ceilings and beyond. Kerr County Engineers and officials documented and confirmed that the devasting flood is clearly beyond a 1,000-year flood event, completely off the charts, and never anticipated.




7. Camp Mystic defendants therefore deny Plaintiffs' allegations that the cabins where the children, counselors and camp director perished had experienced prior flooding. These allegations are false.

8. Camp Mystic was not provided with an evacuation notification until well after the sudden swell and surge of water had already engulfed the camp and lives were lost. Emergency personnel requested Code Red alerts at 4:22 AM; however, the authorization for such alert was not issued until 40 minutes later, at approximately 5:02 AM. Regardless, Camp Mystic had suffered catastrophic flooding and loss of lives long before the evacuation alert.

9. Camp Mystic and surrounding residences were not provided with sirens, flood warning systems, or floodwater monitoring systems that could have provided warnings of the surging waters moving toward Camp Mystic. Despite recommendations and proposals for state-



Copy from re:SearchTX

of-the-art warning systems, warning systems along the waterways were not provided. Along with other camp directors in the area, Dick Eastland—who died while trying to rescue campers from the raging floodwaters, —advocated for such systems to be put in place.

Gmail Dick Eastland [redacted]

**Old Kerr County Flood system map**
4 messages

**Dick Eastland** [redacted] Thu, Aug 23, 2018 at 11:22 AM
To: [redacted]
Cc: [redacted]

Dear Matt,

Enjoyed visiting with you yesterday. I hope you got my text but the quality of the map picture was poor. Attached is a better copy of the old Flood System while on the UGRA board in the late 1980s and early 90s. So glad GBRA took over this system and the real time rain gages are fantastic. The only limitations are the river level sensors upstream. During major flood events that info can be crucial to buy precious time before if hits downstream. Back in the old days there was a level sensor at location #9 (South Fork Ranch) but it was removed years ago. To me that is the most critical as it will buy us about 30 minutes during an event. Location #13 at West Perkins would be good as well. We have been here for some critical big floods including 1978, 1984, 2000 and many others.

I am also attaching an old 1988 UGRA report we had commissioned years ago for your info.

Hope this info is useful. Thanks, Dick [redacted]

10. Weather alerts that were provided were issued after 1:14 AM. The notification was flash flood warning alerts for Highway 39. Highway 39 is located adjacent to the Guadalupe River around Camp Mystic, other camps, residences, and Hunt, TX.

Fri, Jul 4 at 1:14 AM

CodeRED Weather Warning: The NWS has issued a Flash Flood Warning for your HIGHWAY 39 location from 1:14 AM July 4 until 4:15 AM July 4.



Copy from re:SearchTX

11. The flash flood warning of 1:14 AM was not an evacuation notice or evacuation alert. It was not a life-threatening situation notice. There were no alerts to evacuate or leave the area before the sudden and unexpected rush of floodwater occurred.

12. While Camp Mystic was already engulfed by the surging waters at 3:35 AM, the National Weather Service issued a warning at 3:35 AM, noting an Emergency Alert flash flood warning that was a dangerous and life-threatening situation. The Emergency Alert continued to warn people not to attempt to travel.




13. Camp Mystic had already begun evacuations from the cabins near 3:00 AM and prior to the 3:35 A.M. warning. Over 150 campers and counselors had been evacuated before the sudden surge and rise of rapid floodwaters came through the camp. As images demonstrate below, by the time the 3:35 AM flash flood life-threatening warning was issued, Camp Mystic was already experiencing the sudden surge and rise of rapid floodwaters that went from ground level to levels that reached ceilings and beyond in several cabins.

14. The photograph below was taken at 3:23 AM and shows campers continuing to evacuate to the Rec Center.



Copy from re:SearchTX




The photograph below demonstrates that within a few minutes, the water level rose rapidly during the evacuations.





Copy from re:SearchTX

15. Plaintiffs' accusations that Camp Mystic defendants were warned to evacuate and did virtually nothing, is false.

16. Plaintiffs' accusations that Dick Eastland, deceased, Edward Eastland, and other Camp Mystic personnel failed to monitor weather conditions is also false. On the contrary, camp personnel monitored the weather. Dick Eastland and others monitored weather information multiple times from a camp weather station, through the internet, and through other communications. Some cell phone data shown below from Dick Eastland's cell phone is just one example of ongoing monitoring of the weather by the camp.

| | |
|---|---|
| com.chaney.MyAcuRite | **Start time:** 7/4/2025 1:00:23 AM(UTC-5)<br><br>**End time:** 7/4/2025 1:01:41 AM(UTC-5) |
| com.geoterrestrial.noaaradar | **Start time:** 7/4/2025 12:56:36 AM(UTC-5)<br><br>**End time:** 7/4/2025 1:00:22 AM(UTC-5) |
| com.chaney.MyAcuRite | **Start time:** 7/4/2025 12:55:15 AM(UTC-5)<br><br>**End time:** 7/4/2025 12:56:08 AM(UTC-5) |
| com.geoterrestrial.noaaradar | **Start time:** 7/4/2025 12:53:06 AM(UTC-5)<br><br>**End time:** 7/4/2025 12:55:10 AM(UTC-5) |
| com.chaney.MyAcuRite | **Start time:** 7/4/2025 12:42:38 AM(UTC-5)<br><br>**End time:** 7/4/2025 12:45:18 AM(UTC-5) |

| | |
|---|---|
| com.chaney.MyAcuRite | **Start time:** 7/4/2025 1:15:44 AM(UTC-5)<br><br>**End time:** 7/4/2025 1:16:25 AM(UTC-5) |
| com.apple.weather | **Start time:** 7/4/2025 1:13:44 AM(UTC-5)<br><br>**End time:** 7/4/2025 1:15:11 AM(UTC-5) |
| com.geoterrestrial.noaaradar | **Start time:** 7/4/2025 1:13:08 AM(UTC-5)<br><br>**End time:** 7/4/2025 1:13:40 AM(UTC-5) |



Copy from re:SearchTX

| | | | |
|---|---|---|---|
| com.chaney.MyAcuRite | **Start time:** 7/4/2025 2:06:10 AM(UTC-5)<br><br>**End time:** 7/4/2025 2:06:18 AM(UTC-5) | com.chaney.MyAcuRite | **Start time:** 7/4/2025 2:26:54 AM(UTC-5)<br><br>**End time:** 7/4/2025 2:26:56 AM(UTC-5) |
| com.chaney.MyAcuRite | **Start time:** 7/4/2025 2:06:05 AM(UTC-5)<br><br>**End time:** 7/4/2025 2:06:07 AM(UTC-5) | com.chaney.MyAcuRite | **Start time:** 7/4/2025 2:13:01 AM(UTC-5)<br><br>**End time:** 7/4/2025 2:14:59 AM(UTC-5) |
| com.chaney.MyAcuRite | **Start time:** 7/4/2025 2:03:55 AM(UTC-5)<br><br>**End time:** 7/4/2025 2:06:05 AM(UTC-5) | com.geoterrestrial.noaaradar | **Start time:** 7/4/2025 2:12:21 AM(UTC-5)<br><br>**End time:** 7/4/2025 2:13:01 AM(UTC-5) |

17. No weather service, no radar, and no governmental agency anticipated, forecasted nor expected the more than 1,000 year unprecedented and historic flood of July 4, 2025. The weather data demonstrates that the July 4, 2025 sudden flooding far exceeded any previous flood in the area.

18. Camp Mystic is regulated by the State of Texas through inspections of its facility, policies, and procedures. Two days prior to July 4, 2025, state inspections by DSHS were again conducted, and no deficiencies or violations were cited or noted.

TEXAS DEPARTMENT OF STATE HEALTH SERVICES
Consumer Protection Division
PO Box 149347, Austin, TX 78714
(512) 834-6660

| | | | |
|---|---|---|---|
| Facility Name | CAMP MYSTIC INC | License Type | Youth Camp License |
| Facility Address | 2689 HWY 39 HUNT TX 78024 | License Number | 133010 |
| Inspection Type | Discretionary/Special | Inspection Number | 15818 |
| Inspector | ZAMARRIPA, MARICELA | Inspection Date | 07/02/2025 |

This notice is to acknowledge that the Texas Department of State Health Services (DSHS) conducted an inspection of or visited your business on the date listed above. The information that has been gathered is subject to further department review, and you may receive additional correspondence as a result.

There is no deficiency/violation cited or noted within the scope of this inspection/visit.



Copy from re:SearchTX

19. Plaintiffs' accusation that the Twins and Bubble Inn cabins are within the 100-year FEMA determined flood zone is false. Engineering surveys confirm that all cabin floor elevations are above the FEMA determined elevations, including the Twins and Bubble Inn cabins.

Below is an illustration of the FEMA base flood elevation levels shaded in green.




FEMA BASE FLOOD ELEVATION
100-YEAR (1% AEP)

The illustrations below show the contrast between the FEMA base flood elevations and the historic flood levels of July 4, 2025, shaded in green.



Copy from re:SearchTX




The illustration below further shows the historic flooding level of July 4, 2025 compared to the FEMA base flood elevation.






Copy from re:SearchTX

The accusation that Camp Mystic somehow changed or altered the FEMA determined 100-year floodplain elevation is false. 100-year Floodplain elevation altitudes are set and determined by FEMA. These elevations have not changed. Any engineering or surveying professional who has performed such a survey confirms that elevations of structures are above the 100-year floodplain. FEMA confirmed that the surveys were correct. Plaintiffs were offered the opportunity to conduct surveys and inspections to confirm these elevations and findings that FEMA has also confirmed.

**DETERMINATION**

| LOT | BLOCK/ SECTION | SUBDIVISION | STREET | OUTCOME WHAT IS REMOVED FROM THE SFHA | FLOOD ZONE | 1% ANNUAL CHANCE FLOOD ELEVATION (NAVD 88) | LOWEST ADJACENT GRADE ELEVATION (NAVD 88) | LOWEST LOT ELEVATION (NAVD 88) |
|---|---|---|---|---|---|---|---|---|
| -- | -- | -- | 2689 Highway 39 | Structure (Building 13) | X (shaded) | 1838.5 feet | 1843.5 feet | -- |

**Special Flood Hazard Area (SFHA)** - The SFHA is an area that would be inundated by the flood having a 1-percent chance of being equaled or exceeded in any given year (base flood).

ADDITIONAL CONSIDERATIONS (Please refer to the appropriate section on Attachment 1 for the additional considerations listed below.)

DETERMINATION TABLE (CONTINUED)
PORTIONS REMAIN IN THE FLOODWAY

This document provides the Federal Emergency Management Agency's determination regarding a request for a Letter of Map Amendment for the property described above. Using the information submitted and the effective National Flood Insurance Program (NFIP) map, we have determined that the structure(s) on the property(ies) is/are not located in the SFHA, an area inundated by the flood having a 1-percent chance of being equaled or exceeded in any given year (base flood). This document amends the effective NFIP map to remove the subject property from the SFHA located on the effective NFIP map; therefore, the Federal mandatory flood insurance requirement does not apply. However, the lender has the option to continue the flood insurance requirement to protect its financial risk on the loan.

This determination is based on the flood data presently available. The enclosed documents provide additional information regarding this determination. If you have any questions about this document, please contact the FEMA Mapping and Insurance eXchange (FMIX) toll free at (877) 336-2627 (877-FEMA MAP) or by letter addressed to the Federal Emergency Management Agency, LOMC Clearinghouse, 3601 Eisenhower Avenue, Suite 500, Alexandria, VA 22304-6426.

Luis V. Rodriguez, P.E., Director
Engineering and Modeling Division
Federal Insurance and Mitigation Administration

20. Unlike Camp Mystic, according to the Texas Water Development Board, there are millions of people in Texas who live near or within a 100-year floodplain map. These structures



Copy from re:SearchTX

include houses, dormitories, living quarters and related housing. These structures have been deemed to be reasonably safe and adequate for housing.






Copy from re:SearchTX




21. Plaintiffs' accusations that Camp Mystic has experienced floods similar to the magnitude of July 4, 2025, are false. As previously noted, scientific data clearly demonstrates that prior floods, including the floods of 1932, 1978, and 1985, were well below the elevations of Camp Mystic's Twins and Bubble Inn cabins, and well below the 100-year floodplain. Twins Cabin, in existence since at least 1927, has no flooding history. Bubble Inn, adjacent to Twins, likewise has no flooding history. Plaintiffs' accusation that the cabins where the children, counselors, and Dick Eastland perished had experienced prior flooding is false.

22. Pleading further, Plaintiffs' damages were caused directly and exclusively by the violence of nature, without human intervention or cause, and could not have been prevented by reasonable foresight or care. Specifically, the damages for which Plaintiffs seek recovery were caused by a more than 1,000-year flood event which occurred on July 4, 2025.



Copy from re:SearchTX

23. The flood event underlying this lawsuit was an event not proximately caused by the negligence of any party to the occurrence.

24. Plaintiffs' damages were the result of independent, intervening, superseding, or supervening factors, occurrences, or conditions that were not caused by Camp Mystic, LLC.

25. Camp Mystic Defendants plead and rely upon the legislative limitations on damages under Texas law as set forth in all applicable provisions of the Texas Civil Practice and Remedies Code, including but not limited to Section 41.0105.

26. Camp Mystic defendants plead and rely upon the legislative limitations of liability and damages available under Chapter 75 of the Texas Civil Practice and Remedies Code.

27. Camp Mystic defendants plead and rely upon the provisions of Civil Practice and Remedies Code Sec. 171 applicable to this matter and assert all defenses available under these sections.

28. Camp Mystic defendants plead their compliance with FEMA's Letter of Map Amendment (LOMA), and as such, are excluded from FEMA's "floodplain," as defined in Section 762.001(4) of the Texas Health & Safety Code. Any allegation alleging Camp Mystic's role concerning FEMA's Letter of Map Amendment is therefore preempted by the Supremacy Clause of Article VI, Clause 2 of the United States Constitution.

29. Camp Mystic defendants hereby invoke the doctrine of comparative fault under applicable law, and request a determination of percentage of any responsibility among responsible third parties, any settling persons, and parties. Camp Mystic defendants plead any and all provisions of Chapters 32 and 33 of the Texas Civil Practice and Remedies Code applicable to this action.



Copy from re:SearchTX

30. Under Texas law, any award of prejudgment interest must be governed and limited by the provisions of Chapter 304, Subchapter B of the Texas Finance Code.

31. Camp Mystic defendants assert the affirmative defenses of waiver and release.

32. Camp Mystic defendants assert, where applicable, the exclusive remedy under Section 408.001 of the Texas Labor Code.

33. Defendants assert that Mystic Camps Family Partnership, Ltd. and Mystic Camps Management, LLC, are not liable in the capacity in which they have been sued.

34. Camp Mystic defendants reserve the right to assert such other defenses as continuing investigation and discovery may reveal, and the right to amend or supplement this Answer at any time.

35. Camp Mystic defendants further plead that any exemplary damages, if plead and found, must be capped under applicable Texas law, and the Due Process Clause of the United States and Texas Constitutions.

WHEREFORE, PREMISES CONSIDERED, Defendant Camp Mystic defendants pray for judgment in their favor, that Defendants recover costs, and for such other and further relief to which they may show themselves justly entitled.

Respectfully submitted,

**WATTS LAW FIRM LLP**
110 Tributary Ranch Road
Mountain Home, Texas 78058
P: (512) 479-0500

*/s/Mikal Watts*
MIKAL WATTS
State Bar No. 20981820
mikal@wattsllp.com
*Attorney for Natural Fountains Properties, Inc.; Willetta Eastland, Mystic Camps*



Copy from re:SearchTX

*Family Partnership, Ltd., and Mystic Camps Management, LLC*

**RAY | PEÑA, P.C.**
9601 McAllister Freeway, Suite 901
San Antonio, Texas 78216
P: (210) 341-3554
F: (210) 341-3557

*/s/ Jeff Ray*
JEFF RAY
State Bar No. 16604400
jray@raylaw.com
*Attorney for Camp Mystic, LLC and George Albritton Eastland, as Representative of the Estate of Richard Eastland, Deceased*

**CASTAGNA SCOTT LLP**
1120 S. Capital of Texas Highway
Building 2, Suite 300
Austin, Texas 78746
512/329-3290
888/255-0132 fax

*/s/ Lynn S. Castagna*
LYNN S. CASTAGNA
State Bar No. 03980520
Lynn@texasdefense.com
*Attorney for Edward Eastland and Mary Liz Eastland*

**WRIGHT CLOSE BARGER & GUZMAN, LLP**
One Riverway, Suite 2200
Houston, Texas 77056
Telephone: (713) 572-4321
Facsimile: (713) 572-4320

*/s/Thomas C. Wright*
Thomas C. Wright
State Bar No. 22059400



Copy from re:SearchTX

wright@wrightclosebarger.com
Jessica Z. Barger
State Bar No. 24032706
barger@wrightclosebarger.com
Kenneth J. Fair
State Bar No. 24007171
fair@wrightclosebarger.com
*Attorneys for Camp Mystic, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing instrument has been served to all counsel of record in accordance with Texas Rule of Civil Procedure 21 on December 12, 2025.

*/s/ Jeff Ray*
**JEFF RAY**



Copy from re:SearchTX

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Linda Gonzales on behalf of Jeff Ray
Bar No. 16604400
lgonzales@raylaw.com
Envelope ID: 109065920
Filing Code Description: Answer/Response
Filing Description: CAMP MYSTIC DEFENDANTS ORIGINAL ANSWER SUBJECT TO MOTION TO TRANSFER VENUE
Status as of 12/15/2025 9:39 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| R. PaulYetter | | pyetter@yettercoleman.com | 12/12/2025 10:15:25 PM | SENT |
| Lisa Prince | | lprince@yettercoleman.com | 12/12/2025 10:15:25 PM | SENT |
| Yetter Coleman | | efile@yettercoleman.com | 12/12/2025 10:15:25 PM | SENT |
| Jane Ray | | jray@yettercoleman.com | 12/12/2025 10:15:25 PM | SENT |
| Justin P.Tschoepe | | jtschoepe@yettercoleman.com | 12/12/2025 10:15:25 PM | SENT |
| Jeff Ray | | jray@raylaw.com | 12/12/2025 10:15:25 PM | SENT |
| Linda Gonzales | | lgonzales@raylaw.com | 12/12/2025 10:15:25 PM | SENT |
| Katherine Estrada | | kestrada@raylaw.com | 12/12/2025 10:15:25 PM | SENT |
| Laura Rua | | lrua@raylaw.com | 12/12/2025 10:15:25 PM | SENT |
| Larry Matthys | | lmatthys@raylaw.com | 12/12/2025 10:15:25 PM | SENT |
| Mikal Watts | | mikal@wattsllp.com | 12/12/2025 10:15:25 PM | SENT |
| Kenneth Fair | | fair@wrightclosebarger.com | 12/12/2025 10:15:25 PM | SENT |
| J. ReidSimpson | | jrsimpson@yettercoleman.com | 12/12/2025 10:15:25 PM | SENT |
| Shannon Smith | | ssmith@yettercoleman.com | 12/12/2025 10:15:25 PM | SENT |
| Sue Csizmadia | | scsizmadia@yettercoleman.com | 12/12/2025 10:15:25 PM | SENT |
| Tom Wright | | wright@wrightclosebarger.com | 12/12/2025 10:15:25 PM | SENT |
| Jessica Barger | | barger@wrightclosebarger.com | 12/12/2025 10:15:25 PM | SENT |
| Lynn Castagna | | lynn@texasdefense.com | 12/12/2025 10:15:25 PM | SENT |
| Suzanne Goss | | goss@wrightclosebarger.com | 12/12/2025 10:15:25 PM | SENT |

Copy from re:SearchTX

1/16/2026 10:59 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009963
Stephanie Garza

**CAUSE NO. D-1-GN-25-009963**

| | | |
|---|---|---|
| **CHRISTOPHER JACOBE, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF MARY KATHRYN JACOBE, DECEASED, AND SAMANTHA JORDAN** | § | **IN THE DISTRICT COURT OF** |
| **VS.** | § | |
| **CAMP MYSTIC, LLC, MYSTIC CAMPS FAMILY PARTNERSHIP, LTD, NATURAL FOUNTAINS PROPERTIES, INC., WILLETTA EASTLAND, MYSTIC CAMPS MANAGEMENT, LLC, EDWARD EASTLAND, MARY LIZ. EASTLAND, AND THE ESTATE OF RICHARD G. EASTLAND** | § | **TRAVIS COUNTY, TEXAS** <br> **455TH JUDICIAL DISTRICT** |

**INTERVENORS' ORIGINAL PETITION**

COME NOW, CHRISTOPHER JACOBE, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF MARY KATHRYN ("MARY KATE") JACOBE, DECEASED AND SAMANTHA JORDAN, Intervenors herein, complaining of and against CAMP MYSTIC, LLC, MYSTIC CAMPS FAMILY PARTNERSHIP, LTD, NATURAL FOUNTAINS PROPERTIES, INC., WILLETTA EASTLAND, MYSTIC CAMPS MANAGEMENT, LCC, EDWARD EASTLAND, MARY LIZ EASTLAND, AND THE ESTATE OF RICHARD G. EASTLAND, and for cause of action would respectfully show unto the Court as follows:



Copy from re:SearchTX

## I. DISCOVERY CONTROL PLAN

1. In accordance with Rule 190.4 of the Texas Rules of Civil Procedure, discovery in this matter is intended to be conducted under Level III.

## II. PARTIES

2. Intervenors, Christopher Jacobe, Individually and as Personal Representative of the Estate of Mary Kathryn Jacobe "Mary Kate", Deceased, and Samantha Jordan are individuals residing in Harris County, Texas. Mary Kate Jacobe resided in Harris County, Texas at the time of her death. Christopher Jacobe and Samantha Jordan are the sole surviving heirs of Mary Kate Jacobe. No administration of Mary Kate Jacobe's estate is pending and none is necessary.



*Figure 1 Mary Kate Jacobe*



Copy from re:SearchTX

3. Defendant, Camp Mystic, LLC, is a Texas limited liability company duly licensed to do business in the State of Texas for the purpose of accumulating monetary profit. Camp Mystic, LLC has answered and made an appearance herein and therefore is being served with this petition pursuant to Rules 21 & 21a.

4. Defendant, Mystic Camps Family Partnership, Ltd., is Texas limited partnership duly licensed to do business in the State of Texas for the purpose of accumulating monetary profit. Mystic Camps Family Partnership, Ltd. has answered and made an appearance herein and therefore is being served with this petition pursuant to Rules 21 & 21a.

5. Defendant, Natural Fountains Properties, Inc. is a Texas corporation duly licensed to do business in the State of Texas for the purpose of accumulating monetary profit. Natural Fountains Properties, Inc. has answered and made an appearance herein and therefore is being served with this petition pursuant to Rules 21 & 21a.

6. Defendant, Mystic Camps Management, LLC, is a Texas limited liability company duly licensed to do business in the State of Texas for the purpose of accumulating monetary profit. Mystic Camps Management, LLC has answered and made an appearance herein and therefore is being served with this petition pursuant to Rules 21 & 21a.

7. Defendant, Willetta Eastland is an individual residing in Travis County, Texas, at 2404 Scenic Drive, Austin, Texas 78703. Defendant, Willetta Eastland has answered and made an appearance herein and therefore is being served with this petition pursuant to Rules 21 & 21a.



Copy from re:SearchTX

8. Defendant, Edward Eastland is an individual residing in the State of Texas. Edward Eastland has answered and made an appearance herein and therefore is being served with this petition pursuant to Rules 21 & 21a.

9. Defendant, Mary Liz Eastland is an individual residing in the State of Texas. Mary Liz Eastland has answered and made an appearance herein and therefore is being served with this petition pursuant to Rules 21 & 21a.

10. Defendant, George Albritton Eastland, as representative of the Estate of Richard G. Eastland, is an individual residing in the State of Texas. At the time of his death, Richard Eastland was a resident of Travis County, Texas, residing at 2404 Scenic Drive, Austin, Texas 78703. This Defendant has answered and made an appearance herein and therefore is being served with this petition pursuant to Rules 21 & 21a.

## III. JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction of this cause as the amount in controversy is in excess of the minimum jurisdictional limits of this Court. This Court has personal jurisdiction over the Defendants because Defendants reside and/or conduct substantial business within the State of Texas. Venue is proper in Travis County, Texas pursuant to the Texas Civil Practice and Remedies Code, Section 15.002(a)(2) because one or more Defendants are residents of Travis County, Texas. Specifically, Defendants Willetta Eastland and her late husband, Richard "Dick" Eastland are residents of Travis County, Texas. Additionally, Defendants Mystic Camps Family Partnership, Ltd and Mystic Camps Management, LLC maintain their principal offices in Travis County, Texas.



Copy from re:SearchTX

## IV. AGENCY/RESPONDEAT SUPERIOR

12. Whenever it is alleged in the Petition that the Defendants did any act or thing, it is meant that the Defendants' agents, servants, employees, parents, ostensible agents, agents by estoppel, and/or representatives did such act or thing, and at all times such act or thing was done with the full authorization of the Defendants or was done in the normal routine and course of the agency and/or employment of the Defendants.

## IV. ALTER EGO/JOINT ENTERPRISE

13. On information and belief, Defendants act as the alter ego of one another and/or operate as a single business enterprise such that their fictitious separateness should be disregarded. For this reason, Intervenors refer to "Defendants" herein as if each allegation is made against each Defendant individually and severally.

14. On information and belief, Defendants Camp Mystic, LLC and Natural Fountains Properties, Inc. are beneficially owned and managed by Mystic Camps Family Partnership LTD, and subsidiaries, and Richard G. Eastland, Willetta Eastland and the other individually named Eastland Defendants.

15. On information and belief, Intervenors allege that the Camp Mystic corporate entities (including Camp Mystic, LLC) are not separately capitalized, incorporated or maintained from the other Camp Mystic entities (Natural Fountains Properties, Inc.; Mystic Camps Family Partnership, Ltd.; Mystic Camps Management, LLC) or the individual Eastland Defendants (including Richard G. Eastland, Willetta Eastland, Edward Eastland, and Mary Liz Eastland). There are no formal barriers between the management of these



Copy from re:SearchTX

Camp Mystic entities and these individual Defendants. All corporate Defendants herein share common officers, directors, and business departments.

16. On information and belief, Mystic Camps Family Partnership, Ltd. or Mystic Camps Management, LLC is the ultimate parent company of all named Defendants herein and controls the internal business operations of each of its subsidiaries. Each one of the above companies is subject to the complete direction and control of the Individual Eastland Defendants such that this group of entities operates as a single business enterprise. The general public, vendors, and employees are not apprised of these entities' separateness to the extent they are even separate entities. On information and belief, these entities share books, accounts, and payroll services and are not independently capitalized units.

17. Furthermore, on information and belief, Richard G. Eastland and Willetta Eastland are the owners and executive directors of Camp Mystic Corporate Defendants. Edward and Mary Liz Eastland are the directors of Camp Mystic, Guadalupe branch where the flooding occurred. The Camp Mystic corporate entities are mere shams, organized and operated by the individual Eastland Defendants, in their individual capacities, to perpetuate a fraud upon Intervenors, other claimants, potential claimants, and other unsuspecting persons.

18. On information and belief, the Individual Eastland Defendants (Richard G., Willetta, Edward, and Mary Liz Eastland) are the alter ego of the Camp Mystic Corporate Defendants (Camp Mystic, LLC, Mystic Camps Family Partnership, Ltd., Mystic Camps Management, LLC, and Natural Fountains Properties, Inc.). The Individual Eastland Defendants organized the Camp Mystic Corporate Defendants in a way to limit their



Copy from re:SearchTX

potential liability and maximize their personal gains from the operation of those entities. The Individual Eastland Defendants commingle with the property of the Camp Mystic Corporate Defendants and use Camp Mystic Corporate Defendants (their property and other resources) for personal purposes.

19. The Individual Eastland Defendants so dominated and controlled the day-to-day operations of Camp Mystic Corporate Defendants that they are essentially one and the same as far as responsibility is concerned with regard to Intervenors' claims. To this end, Intervenors aver and allege that, upon information and belief, the Individual Eastland Defendants use the Camp Mystic Corporate Defendants and their corporate fictions as a means of evading existing, future, and past civil liabilities, namely civil liability for the negligence and gross negligence that lead to the death of Mary Kate Jacobe and many other young children at Camp Mystic on July 4, 2025. The Corporate Camp Mystic Defendant entities are intentionally operated by the Individual Eastland Defendants with inadequate capitalization. The corporate entities are undercapitalized to limit potential liability and avoid financial responsibility for the death of Mary Kate Jacobe and other deceased campers as result of the events of July 4, 2025. As a result, holding only the Camp Mystic Corporate Defendants responsible would result in injustice.

## V. FACTS

20. Drowning and near-drowning events are preventable tragic incidents, especially when they involve young children. Most drowning incidents can be prevented, but property owners and operators must take responsibility for the development and



Copy from re:SearchTX

implementation of drowning prevention strategies, evacuation plans, and life-saving procedures. Defendants failed to take appropriate action to avoid this foreseeable tragedy and as a result set the scene resulting in the tragic death of many, including Intervenors' 8-year-old child, Mary Kate.

21. Founded in 1926, Camp Mystic is a private nondenominational Christian all-girls summer camp in Hunt, Texas for girls aged 7 to 17. Spanning over 700 acres, Camp Mystic is located at the confluence of the South Fork Guadalupe River and Cypress Creek where flood waters converge and are known to many, including Defendants, as flash flood alley.

22. Since 1939, the camp has been operated by generations of the same family. Richard Eastland and his wife, Willetta Eastland, have run the camp since 1974 and were the executive directors of Camp Mystic.

23. Although Defendants were familiar with destructive floods that had struck the area repeatedly over the years, [1] the Defendants failed to develop and implement appropriate and safe evacuation plans in the event of a flood.

24. On July 3 and July 4, 2025, torrential rains pummeled the camp and surrounding areas. The deluge caused the Guadalupe River to rise, as was foreseeable to Camp Mystic's

---

[1] In July of 1932, rains swept away six Camp Mystic cabins and damaged the dining hall and other buildings due to floods; In August of 1978, flooding forced the camp to suspend activities for several days; In 1984, Willetta Eastland, who was about to give birth, had to be airlifted from the site in an Army helicopter because roads in the area were flooded; After a record storm in July of 1987 which caused massive flooding on the Guadalupe, 10 teenagers attending the Pot O' Gold Christian summer camp in Comfort, Texas drowned trying to escape and other 33 were injured.



Copy from re:SearchTX

owners and operators, devastating the camp, destroying cabins, washing away infrastructure, and claiming the lives of 25 campers and two (2) counselors from Camp Mystic, including Mary Kate Jacobe.

25. Intervenors submitted an application for Mary Kate to attend Camp Mystic for the summer of 2025. The application included a preference of "ranked choice" on which dates and which branch of Camp Mystic their daughter wished to attend. Mary Kate was initially placed at 6th Term in the Cypress Lake branch of Camp Mystic. Later, Intervenors were informed by Defendants that a spot was available for 2nd term at the Guadalupe branch of Camp Mystic. Ultimately, Intervenors agreed to send Mary Kate to 2nd term at the Guadalupe branch.

26. Mary Kate attended the 2nd term session, arriving at Camp Mystic on Sunday, June 29, 2025. At Camp Mystic, the girls are distributed according to age across 23 cabins in two areas. The cabins housing some of the camp's youngest girls, including Mary Kate, were referred to as "The Flats" because they were on low-lying, flat land near the Guadalupe River and vulnerable to flash flooding.

27. If Defendants were paying adequate attention to the development of potential flooding, a danger that they knew or should have known to be life threatening, they could have evacuated young campers like Mary Kate to safety. Instead, Defendants failed to take appropriate precautions, ignoring the following warnings:

- **Wednesday, July 2 @ 5:47 p.m.:** Texas Division of Emergency Management (TDEM) announced the agency activated state emergency response resources in anticipation of flooding in West and Central Texas.



Copy from re:SearchTX

- **Morning of Thursday, July 3:** National Water Center issued Flood Hazard Outlook, identifying flash flood potential for Kerrville and surrounding areas, according to the Department of Homeland Security.
- **Thursday, July 3 approximately 1:18 p.m.:** a flood watch was issued for Kerr County.
- **Thursday, July 3 @ 6:22 p.m.:** National Water Center warns of considerable flooding risks north and west of San Antonio, including Kerrville, according to the Department of Homeland Security.
- **Thursday, July 3 approximately 8:12 p.m**.: the flood watch was extended.
- **Friday, July 4, 2025 @ 1:14 a.m**.: flash flood warning with "considerable" tag was issued for Bandera and Kerr Counties, warning of "life threatening flash flooding," triggering wireless emergency alters and NOAA weather radio notifications, according to the Department of Homeland Security.

28. On information and belief, Defendants individually received advanced warnings about the extensive flooding, as well as warnings from others by text messages, phone application messaging services (such as WhatsApp) and/or cell phone alerts, that extensive flooding was occurring and substantial water was coming down river. Defendants received these warnings on their respective cell phones yet, failed to heed these warnings. Defendants' failure to heed these warnings sent to their respective cell phones was a proximate cause of the incident and Mary Kate Jacobe's fatal injuries.

29. The camp's facilities, including cabins built many decades ago, were not designed to withstand extreme flooding and despite awareness of the risk of flooding, including catastrophic flooding, Defendants never updated the cabins, ensured campers had easy ways to escape from rising flood waters, or that each cabin had multiple exits.

30. Defendants waited until approximately 2:30 a.m. on the morning of July 4, 2025, to start evacuating cabins closest to the river even though they received the flash flood warning at 1:14 a.m. Defendants official policy during a flood was for all campers and



Copy from re:SearchTX

counselors to stay in their cabins. But on the morning of July 4, Defendants concocted an ad hoc emergency plan (if it can be called that) to evacuate some cabins along the flats, one at a time, by car and take campers to the Rec Hall. And even while they evacuated some cabins, the camp directors including Dick Eastland and Edward Eastland, told counselors and campers in other cabins to "shelter in place" in their cabins despite the fact that they had actual knowledge that the river was rising rapidly and had started to flood cabins nearest the river, such as Bug House. Camp Mystic's directors failed to evacuate campers or tell counselors to evacuate campers to higher ground even though they had knowledge of their impending peril and doom.

31. Defendants began evacuating cabins, one at a time, starting with Bug House nearest the river. Defendants ordered other cabins and their counselors, including Twins I where Mary Kate was assigned, to stay in place. This was despite the fact that Twins I is located less than 100 yards away from the Rec Hall where the evacuated campers were congregating and ultimately survived. These young campers in Twins I could have easily walked to safety, before substantial flooding occurred, if the Defendants had acted as reasonably prudent camp owners and operators.

32. Inside the camp, with water rising rapidly, especially in the flats where most of the younger campers were sleeping, many of the teenage counselors in charge of the campers were left to make instant life-or-death decisions on their own, having no contact with adult supervisors. Over the course of approximately one hour, Defendants only managed to



Copy from re:SearchTX

evacuate five cabins on the flats using their ill-advised, improvised, and woefully inadequate evacuation plan.

33. As the flood waters rose, the youngest campers in Twins I, II, and Bubble Inn were trapped in their cabins due to the orders, actions, and inactions of Defendants. As the flood waters kept rising inside the cabins, the girls in Twins I first got onto the top bunks. Then some made desperate escapes—swimming through the door or windows of the cabin. Others were rushed out by swirling flood waters. Some girls never made it out of the cabin and drowned there. Ultimately, eleven girls from Twins I and II drowned, including Mary Kate Jacobe.

34. Defendants, singularly and/or in combination, failed to take reasonable precautions to ensure the safety of all campers and counselors. This tragedy was entirely preventable by Defendants. Instead, Defendants caused the senseless death of 27 young girls, including Mary Kate Jacobe.

## CAUSES OF ACTION

### A. NEGLIGENCE

35. Mary Kate Jacobe's death was the result of Defendants' negligence. Defendants owed a legal duty to Mary Kate Jacobe, to exercise ordinary care in its ownership, possession, management, control and use of the camp premises. Chris Jacobe and Samantha Jordan entrusted the care of their daughter, Mary Kate, to Defendants. Defendants owed a duty of reasonable care to protect campers like Mary Kate. Defendants failed to reduce or eliminate the risk of harm created by the conditions of their



Copy from re:SearchTX

premises and failed to keep campers safe. Defendants singularly and/or in combination failed to heed the severity of the flash flood warnings and emergency alerts that were issued beginning on July 2, 2025.

36. Defendants acting through their agents, servants, and employees, failed to use that degree of care which a reasonable person of ordinary prudence would have used under the same or similar circumstances in the following particulars:

a. Failing to establish proper storm and flood monitoring policies and procedures:
b. Failing to provide proper equipment and training for their employees, counselors, staff and/or agents to monitor the potential for catastrophic flooding;
c. Failing to establish proper emergency response policies and procedures;
d. Failing to establish proper evacuation policies and procedures;
e. Failing to train employees/counselors of emergency evacuation plans;
f. Failing to properly supervise employees/agents/counselors regarding emergency evacuations;
g. Failing to warn the campers and counselors of the risk of flooding and/or of the actual flooding that occurred;
h. Failing to properly, safely, and timely begin evacuations;
i. Failing to remove campers/counselors from structures not designed to withstand flooding conditions;
j. Failing to have an emergency plan that accounted for communication breakdowns;
k. Failing to provide lifesaving equipment.
l. Placing the youngest campers in cabins that flood first and are the most dangerous;
m. Allowing the camp to operate and expand in a known flood risk area;
n. Failing to correct the unreasonably dangerous conditions prior to July 4, 2025;
o. Failing to follow industry standards, rules, and regulations for camps, including risk management, emergency evacuations, and lifesaving procedures;
p. Any violations of applicable local, state, and federal laws and/or regulations; and



Copy from re:SearchTX

q. Other negligent acts or omissions identified throughout the course of this lawsuit.

37. The above acts, errors, and omissions of Defendants, and those of their agents, servants, and employees constituted negligence. At all relevant times, Defendants' agents, servants, and employees were acting in the course and scope of their employment with Defendants. Defendants' breaches proximately caused injury and death to Mary Kate Jacobe. Because of this, Intervenors have suffered, and will continue to suffer damages, including mental anguish, pain, suffering and loss of consortium.

38. Defendants failed to exercise reasonable care to eliminate the danger or otherwise protect children such as Mary Kate Jacobe. Defendants had a duty to exercise ordinary care and diligence to provide and maintain a reasonably safe place and to prevent a dangerous condition on their premises, or to exercise ordinary care to correct such a condition after Defendants knew or should have known of the danger.

**GROSS NEGLIGENCE**

39. Defendants acted with flagrant and malicious disregard of Mary Kate Jacobe's health and safety. The acts and omissions of Defendants were committed with complete and reckless disregard for, and with willful, wanton and actual conscious indifference to the rights, safety, and welfare of Mary Kate Jacobe. Such conduct was reckless and/or done intentionally. Defendants were objectively aware of the extreme risks at play, the inadequacies of their evacuation plan, unpreparedness for flash floodings and the unreasonable dangers posed by the conditions of Defendants' premises which caused



Copy from re:SearchTX

Intervenors' injuries and the death of Mary Kate Jacobe. Defendants had actual, subjective awareness of the risk, and consciously disregarded the risk. Defendants are therefore guilty of negligence and gross neglect which was the proximate cause of Mary Kathe Jacobe's death. Accordingly, Intervenors are entitled to and seek exemplary damages.

40. Defendants aforementioned acts of negligence and gross negligence were committed knowingly or intentionally that resulted in serious bodily harm/death to a child, Mary Kate Jacobe.

**B. PREMISES LIABLITY**

41. Defendants owned, occupied, possessed, and/or controlled the premises where Mary Kate Jacobe sustained her fatal injuries. The premises and cabin where Mary Kate stayed (Twins I) posed an unreasonable risk of harm, and Defendants had actual knowledge or should have known of the unreasonably dangerous condition. Specifically, the Twins 1 cabin was situated in an area known to be a substantial flood risk and the cabin itself was unreasonably dangerous as there was only one entry/exit door and there was no easy way to escape the cabin.

42. Mary Kate Jacobe was an invitee who entered Defendants' premises with their knowledge, consent, and their benefit. Defendants had a duty to make these unreasonably dangerous conditions safe or adequately warn of the danger. Defendants breached these duties by failing to make this unreasonably dangerous condition safe and/or failing to warn



Copy from re:SearchTX

Intervenors and Mary Kate Jacobe of the danger. Defendants' breaches proximately caused the death of Mary Kate Jacobe and Intervenors damages.

**WRONGFUL DEATH DAMAGES**

43. This action is brought pursuant to §71.001-71.011 of the Texas Civil Practice and Remedies Code. Christopher Jacobe and Samantha Jordan, as the surviving natural parents of Mary Kate Jacobe, are the statutory beneficiaries who may bring action for the wrongful death of Mary Kate Jacobe, decedent.

44. Christopher Jacobe and Samantha Jordan, as surviving natural parents of the Decedent, under the Texas Wrongful Death Act are entitled to recover damages for:

A. Pecuniary Loss resulting from the death of Mary Kate Jacobe including, but not limited to Decedent's loss of earning capacity, care, services, maintenance, support, services, advice, and counsel.

B. Termination of the parent-daughter relationship. The positive benefits flowing from the love, affection, solace, comfort, companionship, support, and a relationship that Christopher Jacobe and Samantha Jordan as surviving natural parents would, in reasonable probability, have received from Mary Kate Jacobe, had she lived. Thus, Intervenors pray for an award for the past and future loss of companionship and society stemming from the death of their daughter, Mary Kate Jacobe.

C. Past and Future mental anguish suffered by Christopher Jacobe and Samantha Jordan, as natural parents, as a result of the tragic death of Mary Kate Jacobe,



Copy from re:SearchTX

including but not limited to the emotional pain, torment, and suffering experienced from the death of Mary Kate Jacobe.

**SURVIVAL ACTION DAMAGES**

45. Additionally, Intervenor, Christopher Jacobe, as Representative of the Estate of Mary Kate Jacobe, deceased, brings action pursuant to §71.021 of the Texas Civil Practice and Remedies Code. Intervenor, Christopher Jacobe, as Representative of the Estate of Mary Kate Jacobe, may bring action on behalf of the Estate of Mary Kate Jacobe to recover damages sustained by Mary Kate Jacobe prior to her death.

46. The Estate of Mary Kate Jacobe is entitled to recover for:

A. Pre-death physical pain and suffering of Mary Kate Jacobe;

B. Pre-death mental anguish of Mary Kate Jacobe;

C. Funeral and burial expenses of Mary Kate Jacobe, decedent.

47. Intervenors seek damages in excess of $1,000,000.

**JOINT AND SEVERAL LIABILITY**

48. By engaging in the aforementioned conduct, and where applicable under Texas law, all Defendants are jointly and severally liable for Christopher Jacobe and Samantha Jordan's injuries and damages and the death of Mary Kate Jacobe.

**RECOVERY OF INTEREST**

49. Intervenors seek the recovery of pre-judgment interest, if applicable, and post-judgment interest. Intervenors, therefore, request that they recover pre-judgment interest and post-judgment interest as provided by law.



Copy from re:SearchTX

**JURY DEMAND**

50. Intervenors demand a trial by jury.

**CONCLUSION AND PRAYER**

WHEREFORE, PREMISES CONDIERED, Intervenors, Christopher Jacobe, Individually and as Representative of the Estate of Mary Kate Jacobe, and Samantha Jordan pray that Defendants, Camp Mystic, LLC, Camp Mystic Family Partnership, LTD., Natural Fountains Properties, Inc., Willetta Eastland, Edward Eastland, Mary Liz Eastland, and the Estate of Richard G. Eastland, be cited to appear and answer this Petition and that upon final hearing, Intervenors recover judgment against Defendants for damages both actual and punitive, together with costs of court, pre-judgment and post-judgment interest, and for all such other and further relief to which Intervenors may be entitled.

Respectfully submitted,

**STEVENSON & MURRAY**

/s/ W. Robert Hand

JOHN W. STEVENSON, JR.
State Bar No. 19196050
W. ROBERT HAND
State Bar No. 24078622
24 Greenway Plaza, Suite 750
Houston, Texas 77046
Telephone: (713) 622-3223
Facsimile: (713) 622-3224
Email: jstevenson@stevensonmurray.com
Email: rhand@stevensonmurray.com

**ATTORNEYS FOR INTERVENORS**



Copy from re:SearchTX

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above document was forwarded to all known counsel of record by electronic case filing on this 16th day of January, 2026.

R. Paul Yetter
Justin P. Tschoepe
J. Reid Simpson
Shannon N. Smith
Yetter Coleman LLP
811 Main Street, Suite 4100
Houston, Texas 77002 *E-File*
*ATTORNEYS FOR PLAINTIFFS*

Jeff Ray
Ray Pena McChristian, P.C.
9601 Mcallister Freeway, Suite 901
San Antonio, Texas 78216 *E-File*

Thomas C. Wright
Jessica Z. Barger
Kenneth J. Fair
Wright, Close, Barger & Guzman, LLP
One Riverway, Suite 2200
Houston, Texas 77056 *E-File*
*ATTORNEYS FOR CAMP MYSTIC, LLC &*
*THE ESTATE OF RICHARD ESATLAND*

Mikal Watts
Watts Law Firm LLP
811 Barton Springs Road, #725
Austin, Texas 78704 *E-File*
*ATTORNEYS FOR NATURAL FOUNTAINS PROPERTIES, INC.,*
*WILLETTA EASTLAND, MYSRIC CAMPS FAMILY PARTNERSHIP, LTD., &*
*MYSTIC CAMPS MANAGEMENT, LLC*



Copy from re:SearchTX

Lynn Castagna
Castagna Scott LLP
1120 S. Capital of Texas Highway
Building 2, Suite 300
Austin, Texas 78746
*ATTORNEYS FOR EDWARD EASTLAND &
MARY LIZ EASTLAND*

/s/ W. Robert Hand
**WILLIAM ROBERT HAND**



Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Laurie Nichols on behalf of William Hand
Bar No. 24078622
lnichols@stevensonmurray.com
Envelope ID: 110302872
Filing Code Description: Pleading (Intervention)
Filing Description: INTERVENORS' ORIGINAL PETITION
Status as of 1/22/2026 3:51 PM CST

Associated Case Party: WARREN BELLOWS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| R. PaulYetter | | pyetter@yettercoleman.com | 1/21/2026 1:39:47 PM | SENT |
| Yetter Coleman | | efile@yettercoleman.com | 1/21/2026 1:39:47 PM | SENT |
| Jane Ray | | jray@yettercoleman.com | 1/21/2026 1:39:47 PM | SENT |
| Justin P.Tschoepe | | jtschoepe@yettercoleman.com | 1/21/2026 1:39:47 PM | SENT |
| J. ReidSimpson | | jrsimpson@yettercoleman.com | 1/21/2026 1:39:47 PM | SENT |
| Shannon Smith | | ssmith@yettercoleman.com | 1/21/2026 1:39:47 PM | SENT |
| Sue Csizmadia | | scsizmadia@yettercoleman.com | 1/21/2026 1:39:47 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| John W.Stevenson | | jstevenson@stevensonmurray.com | 1/21/2026 1:39:47 PM | SENT |
| Laurie Nichols | | lnichols@stevensonmurray.com | 1/21/2026 1:39:47 PM | SENT |
| William RobertHand | | rhand@stevensonmurray.com | 1/21/2026 1:39:47 PM | SENT |
| A. Arnold | | arnold@arnoldfreemanlaw.com | 1/21/2026 1:39:47 PM | SENT |
| Abby Heath | | aheath@arnoldfreemanlaw.com | 1/21/2026 1:39:47 PM | SENT |
| Christopher Freeman | | cfreeman@arnoldfreemanlaw.com | 1/21/2026 1:39:47 PM | SENT |

Associated Case Party: CAMP MYSTIC, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jeff Ray | | jray@raylaw.com | 1/21/2026 1:39:47 PM | SENT |
| Linda Gonzales | | lgonzales@raylaw.com | 1/21/2026 1:39:47 PM | SENT |

Copy from re:SearchTX

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Laurie Nichols on behalf of William Hand
Bar No. 24078622
lnichols@stevensonmurray.com
Envelope ID: 110302872
Filing Code Description: Pleading (Intervention)
Filing Description: INTERVENORS' ORIGINAL PETITION
Status as of 1/22/2026 3:51 PM CST

Associated Case Party: CAMP MYSTIC, LLC

| | | | | |
|---|---|---|---|---|
| Linda Gonzales | | lgonzales@raylaw.com | 1/21/2026 1:39:47 PM | SENT |
| Katherine Estrada | | kestrada@raylaw.com | 1/21/2026 1:39:47 PM | SENT |
| Laura Rua | | lrua@raylaw.com | 1/21/2026 1:39:47 PM | SENT |
| Larry Matthys | | lmatthys@raylaw.com | 1/21/2026 1:39:47 PM | SENT |
| Mikal Watts | | mikal@wattsllp.com | 1/21/2026 1:39:47 PM | SENT |
| Kenneth Fair | | fair@wrightclosebarger.com | 1/21/2026 1:39:47 PM | SENT |
| Tom Wright | | wright@wrightclosebarger.com | 1/21/2026 1:39:47 PM | SENT |
| Jessica Barger | | barger@wrightclosebarger.com | 1/21/2026 1:39:47 PM | SENT |
| Lynn Castagna | | lynn@texasdefense.com | 1/21/2026 1:39:47 PM | SENT |
| Suzanne Goss | | goss@wrightclosebarger.com | 1/21/2026 1:39:47 PM | SENT |

Copy from re:SearchTX

2/6/2026 3:10 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009963
Candy Schmidt

CAUSE NO. D-1-GN-25-009963

| | | |
|---|---|---|
| CHRISTOPHER JACOBE, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF MARY KATHRYN JACOBE, DECEASED, AND SAMANTHA JORDAN | § | IN THE DISTRICT COURT OF |
| VS. | § | TRAVIS COUNTY, TEXAS |
| CAMP MYSTIC, LLC, MYSTIC CAMPS FAMILY PARTNERSHIP, LTD, NATURAL FOUNTAINS PROPERTIES, INC., WILLETTA EASTLAND, MYSTIC CAMPS MANAGEMENT, LLC, EDWARD EASTLAND, MARY LIZ. EASTLAND, AND THE ESTATE OF RICHARD G. EASTLAND | § | 455TH DISTRICT COURT |

**CAMP MYSTIC DEFENDANTS' MOTION TO TRANSFER VENUE**

TO THE HONORABLE JUDGE OF SAID COURT:

Come now CAMP MYSTIC, LLC; NATURAL FOUNTAINS PROPERTIES, INC.; MYSTIC CAMPS FAMILY PARTNERSHIP, LTD., MYSTIC CAMPS MANAGEMENT, LLC; GEORGE ALBRITTON EASTLAND, as Representative of the Estate of RICHARD EASTLAND, Deceased; WILLETTA EASTLAND; EDWARD EASTLAND; and MARY LIZ EASTLAND, hereinafter referred to as CAMP MYSTIC DEFENDANTS and files this Motion to Transfer Venue and would respectfully show the Court as follows:

## I. INTRODUCTION

1. This lawsuit arises out of the July 4, 2025, historic catastrophic flood in Hunt, Kerr County, Texas. Travis County is not the proper venue for this case. None of the acts out of which this lawsuit arose occurred in Travis County. Plaintiff has no viable claims against Defendants Mystic Camps Family Partnership, Ltd. and Mystic Camps Management, LLC. At the time of the July 4, 2025, flood Defendant, Willetta "Tweety" Eastland, was residing at Camp Mystic in Kerr



Copy from re:SearchTX

County, Texas. As for Defendant Richard "Dick" Eastland, deceased, an estate administration is pending in Kerr County. Plaintiffs have not named Richard "Dick" Eastland, deceased, as a Defendant. Plaintiffs have named as a Defendant in this suit George Albritton Eastland as Representative of the Estate of Richard Eastland, Deceased. An administration of the Estate of Richard Eastland is pending in Kerr County. George Albritton Eastland, Edward Eastland, and Mary Liz Eastland are all residents of Kerr County, Texas.

2. To sustain venue in Travis County, there must be a valid cause of action against a Travis County resident defendant. In this case there is not. If this case goes to trial in Travis County, it will be tried in a county of improper venue. Trial in an improper venue is automatically harmful and reversible error. For these reasons, the case must be transferred to Kerr County, the only proper venue for this matter to be tried.

3. Defendants specifically deny the venue facts as alleged by Intervenors. Defendants specifically deny that Mystic Camps Family Partnership, Ltd. is a proper party to this litigation. Defendants specifically deny that Mystic Camps Family Partnership, Ltd. had any employee, much less employees with decision making authority, in Travis County on July 4, 2025, the date of the catastrophic flooding giving rise to this lawsuit.

4. Defendants specifically deny that Mystic Camps Management, LLC is a proper party to this litigation. Defendants specifically deny that Mystic Camps Management, LLC had any employee, much less employees with decision making authority, in Travis County on July 4, 2025, the date of the catastrophic flooding giving rise to this lawsuit.

5. Defendants specifically deny the cause of action against Mystic Camps Family Partnership, Ltd. and Mystic Camps Management, LLC arises from the same transaction or



Copy from re:SearchTX

occurrence as Plaintiffs' cause of action against the proper Defendants, Camp Mystic, LLC and Natural Fountains Properties, Inc.

6. The case should also be transferred to Kerr County for the convenience of the parties and, in particular, the third-party witnesses. All relevant events in this lawsuit took place in Kerr County. Potential witnesses include camp staff members who reside in Kerr County and local Kerr County officials. Furthermore, a site visit may be necessary so that the factfinder can see and appreciate the layout of the property and its elevations and the extent of the flood's damage. In contrast, there is no particular relevance of Travis County to this case; substantially all of the events or occurrences that give rise to the suit took place in Kerr County.

7. Defendants specifically deny that Willeta Eastland was physically residing in Travis County on July 4, 2025, the date of the catastrophic flooding giving rise to this lawsuit. Willetta Eastland was living in Kerr County at the time of this horrific flood.

8. Defendants specifically deny that Richard "Dick" Eastland was physically residing in Travis County on July 4, 2025, the date of the catastrophic flooding giving rise to this lawsuit.

## II. BACKGROUND

9. Intervenors allege causes of action against Defendants including negligence, gross negligence, and premises liability, among others as a result of the catastrophic flooding that occurred on July 4, 2025, in Hunt, Kerr County, Texas. The historic flood resulted in the loss of more than one hundred lives, and is the subject of a separately filed lawsuit pending in Kerr County in Cause Number 25476A, *Christie Floyd et. al v. Davis Investment Ventures, LLC d/b/a The Davis Companies*.

10. Intervenors correctly assert that Camp Mystic ("the Camp") was operated by Camp Mystic, LLC, which leased the property upon which the Camp operates from Natural Fountain



Copy from re:SearchTX

Properties, Inc. These are the only two entities which had any role in ownership, possession, or control over Camp Mystic.

11. Mystic Camps Family Partnership, Ltd. is a holding company that has no role in ownership, possession or control over Camp Mystic. It does not have any employees or agents with decision making authority. It does not have any role in camp operations.

12. Mystic Camps Management, LLC is a holding company that has no role in ownership, possession or control over Camp Mystic. It does not have any employees or agents with decision making authority. It does not have any role in camp operations.

~~13.~~ Willetta Eastland is the widow of Richard "Dick" Eastland, who also perished in the flood. Willetta Eastland was a resident of Hunt, Kerr County, Texas at the time of the incident. Willetta Eastland was not residing in Travis County at the time of the incident. Willetta Eastland is a resident of Kerr County at the time of the filing of this Motion to Transfer Venue.

14. Richard "Dick" Eastland is not a named party to the suit. Richard "Dick" Eastland is deceased, and an administration of his estate is pending in Kerr County. Plaintiffs have sued George Albritton Eastland as Representative of the Estate of Richard Eastland.

15. Intervenors filed this suit in Travis County. Their venue choice rests on their incorrect allegation that Mystic Camps Family Partnership, Ltd and Mystic Camps Management, LLC are proper parties to this lawsuit. These entities are not proper parties to the suit. Neither entity has any role in ownership, possession, or control over Camp Mystic. Neither entity has any employees. These entities exist purely for estate planning purposes of Willetta Eastland and Richard Eastland as a means of passing on the legacy of their life's work to their children. In that regard, the facts giving rise to Intervenors' claims have no connection to Travis County. The catastrophic flood event giving rise to Intervenors' claims occurred in Kerr County. The principal



Copy from re:SearchTX

office of the Camp operates in Kerr County. All of the Eastlands resided at Camp Mystic, Kerr County, Texas, at the time of the July 4, 2025 flood. Accordingly, and as set forth more fully below, Defendants respectfully request the Court grant their Motion to Transfer Venue and Order this matter transferred to the District Court in Kerr County.

## III. ARGUMENT & AUTHORITIES

### A. Motion to Transfer Venue Standard

16. Intervenors have the initial right to choose venue. However, an improper choice waives that right and gives a defendant the right to have the suit transferred to a proper venue. *Wilson v. Tex. Parks & Wildlife Dep't*, 886 S.W.2d 259, 260 & n.1 (Tex. 1994); *Union Carbide Corp. v. Loftin*, 256 S.W.3d 869, 874 (Tex. App.—Beaumont 2008, pet. dism'd). "Proper" venue is defined by statute as: "(1) the venue required by the mandatory provisions of Subchapter B ['Mandatory Venue'] or another statute prescribing mandatory venue; or (2) if Subdivision (1) does not apply, the venue provided by [the general venue rule] or Subchapter C ['Permissive Venue']." TEX. CIV. PRAC. & REM. CODE § 15.001(b).

17. A defendant challenges a plaintiff's improper venue choice through a motion to transfer venue. TEX. R. CIV. P. 86. Once challenged, the burden then shifts to the plaintiff to prove that venue is maintainable in the county of suit. TEX. R. CIV. P. 87(3)(a). If the plaintiff fails to meet this burden, the trial court must transfer the lawsuit to another specified county of proper venue. *See* TEX. CIV. PRAC. & REM. CODE § 15.063; *Wilson*, 886 S.W.2d at 260.

### B. Travis is an Improper County of Venue Because None of the Proper Defendants are Situated in Travis County.

18. Intervenors' choice of venue is improper because none of the proper defendants in this suit have a principal office in Travis County. Specifically, Intervenors' venue allegations are that Mystic Camps Family Partnership, Ltd. and Mystic Camps Management, LLC's principal



Copy from re:SearchTX

place of business are in Travis County, and that Willetta Eastland resides in Travis County. They also claim that at the time of his death, Richard Eastland resided in Travis County. Defendants expressly deny these allegations. Tex. R. Civ. P. 87(3)(a).

19. Venue is improper in Travis County because the venue defendant must be a material defendant for venue, based on that defendant's residence, to be proper. *See, e.g., T.S. Lankford & Sons, Inc. v. Harry Eldridge Co., Inc.*, 359 S.W.2d 663 (Tex. Civ. App. Texarkana 1962, writ dism'd) (there must be proof of a valid cause of action against the resident defendant to sustain venue against residents and nonresidents); *Union Pacific Railroad Co. v. Cezar*, 293 S.W.3d 800 (Tex. App. - Beaumont 2009, no pet.) (the sole defendant who was alleged to reside in the venue county was not a proper venue defendant, thus, because "trial in a county of improper venue is never harmless error," the court concluded that the case should be reversed and transferred to a proper county for a new trial) *Pines of Westbury, Ltd. v. Paul Michael Const., Inc.*, 993 S.W.2d 291 (Tex. App. Eastland 1999, no writ) (summary judgment in favor of only venue defendant destroyed proper venue and made denial of another defendant's earlier motion to transfer improper). As these cases demonstrate, if there is no valid claim against the alleged venue defendants, venue is improper in the county of suit, and on appeal, the case must be reversed and remanded for a new trial in the proper county of venue.

**i. Mystic Camps Family Partnership, Ltd. and Mystic Camps Management, LLC, are not proper parties and cannot serve as a basis to establish venue.**

20. The principal offices of Mystic Camps Family Partnership, Ltd. and Mystic Camps Management, LLC should not be used to establish venue in Travis County because they are improper parties in this lawsuit. Neither of these entities has any employees. They do not own, operate, or control Camp Mystic, nor do they have any other connection to the facts underlying this lawsuit.



Copy from re:SearchTX

21. The county of a defendant's principal office in the state, if the defendant is not a natural person, is a permissible county of venue. TEX. CIV. PRAC. & REM. CODE §15.002(a)(3). A "principal office" is defined as a principal office of a corporation in which the decision makers for the organization within this state conduct the daily affairs of the organization. The mere presence of an agency or a representative does not establish a principal office. TEX. CIV. PRAC. & REM. CODE §15.001(a). The Texas Supreme Court has concluded that a corporation may have more than one principal office. *In re Missouri Pacific Railroad Co.*, 998 S.W.2d 212, 217 (Tex. 1999). Specifically, to establish venue based upon a principal office, a plaintiff must show: (1) the employees in the county where the lawsuit was filed are "decision makers" for the company and (2) the employees in the county where the lawsuit was filed have "substantially equal responsibility and authority" relative to other company officials within the state. *Id*.

22. The case law makes it clear that there must be evidence that corporate decision makers exist to establish venue against the corporation. Here, there are no such corporate decision makers and no principal place of business for Mystic Camps Family Partnership, Ltd. and Mystic Camps Management, LLC because there is no business for either entity to conduct. Mystic Camps Family Partnership, Ltd. is a holding company that has no employees, that owns no real property, and has no role in Camp operations. Mystic Camps Management, LLC is a holding company that has no employees, that owns no real property, and has no role in Camp operations. Plaintiffs' strategic decision to include these entities in the suit was purely for venue purposes based on the mailing address of these holding companies.

**ii. Intervenors' claims against the Estate of Richard Eastland do not support venue in Travis County.**

23. Although Intervenors assert that at the time of his death, Richard Eastland was a resident of Travis County, this claim cannot serve as a basis for establishing venue in Travis



Copy from re:SearchTX

County. Intervenors have not and cannot sue Richard Eastland in his individual capacity. Richard Eastland is deceased. Intervenors have sued George Albritton Eastland as the Representative of the Estate of Richard Eastland for the alleged acts and omissions of Richard Eastland prior to his death. A suit against an executor, administrator or guardian to establish a money demand against the estate may be brought in the county in which the estate is administered, or if the suit is brought against the person whose estate the executor, administrator, or guardian represents, the suit may be brought in the county in which the negligent act or omission of the person whose estate the executor, administrator, or guardian represents occurred. TEX. CIV. PRAC. & REM. CODE §15.031

24. There is no dispute that the alleged negligent act(s) or omission(s) occurred in Kerr County and that Plaintiffs have filed suit against George Albritton Eastland as the Representative of the Estate of Richard Eastland for the alleged negligent acts or omissions of Richard Eastland. Accordingly, Plaintiffs' only venue option with respect to their claims against Eastland's estate is Kerr County. TEX. CIV. PRAC. & REM. CODE §15.031.

**iii. Intervenors' live pleading establishes venue is improper in Travis County.**

25. There is no dispute that the events which brought about this litigation occurred in Hunt, Kerr County, Texas. Intervenors' pleadings correctly assert that the Camp is operated by Camp Mystic, LLC and the property is owned by Natural Fountains Properties, Inc. Both of these entities operate their place of business in Kerr County, where the Camp is located. Intervenors assert no facts which demonstrate Mystic Camps Family Partnership, Ltd. or Mystic Camps Management, LLC had a role in Camp operations or in the alleged acts or omissions giving rise to Plaintiffs' causes of actions.

26. Despite conceding that the Eastland family have controlled the operations of Camp Mystic, located in Kerr County, Texas, for generations, and alleging Willetta Eastland was



Copy from re:SearchTX

involved in acts or omissions that occurred in Kerr County, Texas, Intervenors improperly seek to establish venue in Travis County. It is clear from the facts that the only proper venue for this case is in Kerr County, where the two entities responsible for Camp Mystic operations and control of Camp Mystic property maintain their principal place of business, and where administration of the estate of Richard Eastland is pending.

**C. In the alternative, this case should be transferred to Kerr County for the convenience of the parties and witnesses.**

27. Under Texas Civil Practice and Remedies Code Section 15.002, a court may transfer venue to another county of proper venue for the convenience of the parties and the witnesses and in the interests of justice. As discussed above, substantially all of the relevant events that make up the basis of this suit took place in Kerr County, Texas. The flooding took place there and the relevant acts of the proper Defendants took place there.

28. Beyond the Eastland family members, many of whom have minor children and cannot be away from home for long periods of time, other relevant non-party witnesses also reside and work in Kerr County. Potential witnesses include camp staff that live in Kerr County, who might be called upon to testify about camp conditions and procedures. They also include local Kerr County officials, who might be called upon to testify about conditions on July 4th, emergency responses, systems for notification and warning, and the causes and effects of the July 4th flood. None of them have any particular relation to Travis County.

29. It may also be necessary or advisable for the factfinder to make a site visit in order to truly understand the camp layout and elevation, to see the relationships between the Guadalupe River and various camp buildings, and to understand the effects of the flooding, in a way that maps and two-dimensional representations cannot convey. Such a visit will only be possible if the case is transferred to Kerr County.



Copy from re:SearchTX

30. Finally, there is no prejudice to the Plaintiffs for the case to be transferred to Kerr County. The Plaintiffs reside in numerous places around the state, and there is no particular connection between Travis County and the events of July 4th. The Court should therefore transfer the case to Kerr County for the convenience of the parties and witnesses and in the interests of justice.

## IV. SUMMARY AND CONCLUSION

31. Intervenors improperly seek to fix venue in Travis County based on the joinder of two corporate entities who have no employees, no principal place of business, no decision making employees, and no connection to the facts underlying this lawsuit.. None of the acts out of which this lawsuit arose occurred in Travis County. Accordingly, venue in Travis County is improper and maintenance of this suit in Travis County constitutes harmful and reversible error. Even if this case were properly in Travis County, it should be transferred to Kerr County, as substantially all of the witnesses reside there and substantially all of the events took place there. For these reasons, this matter must be transferred to Kerr County.

**WHEREFORE, PREMISES CONSIDERED,** Defendants request that this matter be set for hearing with notice to all parties, and that after such hearing, that the Court grant Defendants' Motion to Transfer Venue, and transfer the above styled and numbered cause to Kerr County, Texas. Defendants further pray that any costs of court incurred before the transfer be taxed against Intervenors and for such other and further relief, at law or in equity, to which Defendants may show themselves justly entitled.

Respectfully submitted,

**WATTS LAW FIRM LLP**
110 Tributary Ranch Road
Mountain Home, Texas 78058
P: (512) 479-0500



Copy from re:SearchTX

*/s/Mikal Watts*
MIKAL WATTS
State Bar No. 20981820
mikal@wattsllp.com
*Attorney for Natural Fountains Properties, Inc.; Willetta Eastland, Mystic Camps Family Partnership, Ltd., and Mystic Camps Management, LLC*

**RAY | PEÑA, P.C.**
9601 McAllister Freeway, Suite 901
San Antonio, Texas 78216
P: (210) 341-3554
F: (210) 341-3557

*/s/ Jeff Ray*
JEFF RAY
State Bar No. 16604400
jray@raylaw.com
*Attorney for Camp Mystic, LLC and George Albritton Eastland, as Representative of the Estate of Richard Eastland, Deceased*

**CASTAGNA SCOTT LLP**
1120 S. Capital of Texas Highway
Building 2, Suite 300
Austin, Texas 78746
512/329-3290
888/255-0132 fax

*/s/ Lynn S. Castagna*
LYNN S. CASTAGNA
State Bar No. 03980520
Lynn@texasdefense.com
*Attorney for Edward Eastland and Mary Liz Eastland*



Copy from re:SearchTX

**WRIGHT CLOSE BARGER & GUZMAN, LLP**
One Riverway, Suite 2200
Houston, Texas 77056
Telephone: (713) 572-4321
Facsimile: (713) 572-4320

*/s/Thomas C. Wright*
Thomas C. Wright
State Bar No. 22059400
wright@wrightclosebarger.com
Jessica Z. Barger
State Bar No. 24032706
barger@wrightclosebarger.com
Kenneth J. Fair
State Bar No. 24007171
fair@wrightclosebarger.com
*Attorneys for Camp Mystic, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been served to all counsel of record in accordance with Texas Rule of Civil Procedure 21 on February 6, 2026.

*/s/ Jeff Ray*
**JEFF RAY**



Copy from re:SearchTX

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Linda Gonzales on behalf of Jeff Ray
Bar No. 16604400
lgonzales@raylaw.com
Envelope ID: 110966311
Filing Code Description: Motion (No Fee)
Filing Description: CAMP MYSTIC DEFENDANTS' MOTION TO TRANSFER VENUE
Status as of 2/10/2026 2:28 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| R. PaulYetter | | pyetter@yettercoleman.com | 2/6/2026 3:10:22 PM | SENT |
| Yetter Coleman | | efile@yettercoleman.com | 2/6/2026 3:10:22 PM | SENT |
| John W.Stevenson | | jstevenson@stevensonmurray.com | 2/6/2026 3:10:22 PM | SENT |
| Laurie Nichols | | lnichols@stevensonmurray.com | 2/6/2026 3:10:22 PM | SENT |
| William RobertHand | | rhand@stevensonmurray.com | 2/6/2026 3:10:22 PM | SENT |
| Jeff Ray | | jray@raylaw.com | 2/6/2026 3:10:22 PM | SENT |
| Linda Gonzales | | lgonzales@raylaw.com | 2/6/2026 3:10:22 PM | SENT |
| Jane Ray | | jray@yettercoleman.com | 2/6/2026 3:10:22 PM | SENT |
| Justin P.Tschoepe | | jtschoepe@yettercoleman.com | 2/6/2026 3:10:22 PM | SENT |
| Christopher Freeman | | cfreeman@arnoldfreemanlaw.com | 2/6/2026 3:10:22 PM | SENT |
| J. ReidSimpson | | jrsimpson@yettercoleman.com | 2/6/2026 3:10:22 PM | SENT |
| Shannon Smith | | ssmith@yettercoleman.com | 2/6/2026 3:10:22 PM | SENT |
| A. Arnold | | arnold@arnoldfreemanlaw.com | 2/6/2026 3:10:22 PM | SENT |
| Sue Csizmadia | | scsizmadia@yettercoleman.com | 2/6/2026 3:10:22 PM | SENT |
| Abby Heath | | aheath@arnoldfreemanlaw.com | 2/6/2026 3:10:22 PM | SENT |
| Katherine Estrada | | kestrada@raylaw.com | 2/6/2026 3:10:22 PM | SENT |
| Laura Rua | | lrua@raylaw.com | 2/6/2026 3:10:22 PM | SENT |
| Larry Matthys | | lmatthys@raylaw.com | 2/6/2026 3:10:22 PM | SENT |
| Mikal Watts | | mikal@wattsllp.com | 2/6/2026 3:10:22 PM | SENT |
| Kenneth Fair | | fair@wrightclosebarger.com | 2/6/2026 3:10:22 PM | SENT |
| Tom Wright | | wright@wrightclosebarger.com | 2/6/2026 3:10:22 PM | SENT |
| Jessica Barger | | barger@wrightclosebarger.com | 2/6/2026 3:10:22 PM | SENT |

Copy from re:SearchTX

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Linda Gonzales on behalf of Jeff Ray
Bar No. 16604400
lgonzales@raylaw.com
Envelope ID: 110966311
Filing Code Description: Motion (No Fee)
Filing Description: CAMP MYSTIC DEFENDANTS' MOTION TO TRANSFER VENUE
Status as of 2/10/2026 2:28 PM CST

Case Contacts

| | | | | |
|---|---|---|---|---|
| Jessica Barger | | barger@wrightclosebarger.com | 2/6/2026 3:10:22 PM | SENT |
| Lynn Castagna | | lynn@texasdefense.com | 2/6/2026 3:10:22 PM | SENT |
| Suzanne Goss | | goss@wrightclosebarger.com | 2/6/2026 3:10:22 PM | SENT |
| John Stevenson, Jr. | | jstevenson@stevensonmurray.com | 2/6/2026 3:10:22 PM | SENT |
| Robert Hand | | rhand@stevensonmurray.com | 2/6/2026 3:10:22 PM | SENT |

Copy from re:SearchTX

2/6/2026 4:33 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009963
Stephanie Garza

CAUSE NO. D-1-GN-25-009963

| | | |
|---|---|---|
| CHRISTOPHER JACOBE, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF MARY KATHRYN JACOBE, DECEASED, AND SAMANTHA JORDAN | § | IN THE DISTRICT COURT OF |
| VS. | § | TRAVIS COUNTY, TEXAS |
| CAMP MYSTIC, LLC, MYSTIC CAMPS FAMILY PARTNERSHIP, LTD, NATURAL FOUNTAINS PROPERTIES, INC., WILLETTA EASTLAND, MYSTIC CAMPS MANAGEMENT, LLC, EDWARD EASTLAND, MARY LIZ. EASTLAND, AND THE ESTATE OF RICHARD G. EASTLAND | § | 455TH DISTRICT COURT |

**CAMP MYSTIC DEFENDANTS' ORIGINAL ANSWER SUBJECT TO MOTION TO TRANSFER VENUE**

To the Honorable District Court Judge:

Come now, CAMP MYSTIC, LLC; NATURAL FOUNTAINS PROPERTIES, INC.; MYSTIC CAMPS FAMILY PARTNERSHIP, LTD., MYSTIC CAMPS MANAGEMENT, LLC; GEORGE ALBRITTON EASTLAND, as Representative of the Estate of RICHARD EASTLAND, Deceased; WILLETTA EASTLAND; EDWARD EASTLAND; and MARY LIZ EASTLAND, hereinafter referred to as CAMP MYSTIC DEFENDANTS, and file their Original Answer to Intervenors' Original Petition filed subject to their Motions to Transfer Venue, and would respectfully state the following:

## I. TRCP 92 DEFENSES

1. Camp Mystic defendants, pursuant to Texas Rule of Civil Procedure 92, invoke the protections available to them under Texas Law and demand legally sufficient proof of the accusations asserted against them by a preponderance of the legal evidence or clear and convincing



Copy from re:SearchTX

evidence where required by Texas law, as opposed to speculation or conjecture. Camp Mystic defendants respectfully request that the Court hold Intervenors to the burden required by the laws and the constitution of the State of Texas.

## II. BACKGROUND AND AFFIRMATIVE DEFENSES

Camp Mystic defendants answer and provide background information and affirmative defenses in response to Intervenors' pleadings.

2. On the morning of July 4, 2025, the most devasting flood known in the history of Kerr County, TX occurred. Extreme rainfall and massive surges of rapidly moving floodwaters devastated Kerr County, and the communities of Hunt, Ingram, and Kerrville, Texas. At least 135 people lost their lives, including 28 lives lost at Camp Mystic. Weather data from multiple scientific sources confirmed and determined that a convergence of severe weather systems, rather than continuing to move through the area (as was anticipated by weather and radar information), literally stopped and sat upstream and over Camp Mystic and surrounding areas, pouring over 100 billion gallons of water in the Kerr County area within hours.






Copy from re:SearchTX

**USGS Stage Data**




3. Notably, over 10 billion gallons of water fell in less than 3 hours in the South Fork of the Guadalupe River, upstream from Camp Mystic. This volume of water that fell in the South Fork is more than the amount of water that flows over Niagara Falls during the same time period.



Copy from re:SearchTX

USGS Flow Data




4. The Guadalupe River rose dramatically to more than 26 feet in less than 45 minutes. Kerrville recorded a rise in the Guadalupe River at over 32 feet in 1.5 hours. Camp Mystic, as well as other residences, experienced catastrophic and sudden flooding, combined with rapidly moving water that overwhelmed the camp, residences, and communities. As the chart below reveals, the gallons per second of rainfall was negligible at midnight. The gallons of rainfall per second at 3:00 AM had increased in intensity but would not have been expected to come near or reach any structures at Camp Mystic. Dramatically, and unexpectedly, according to weather data, shortly before 3:30 AM, the rainfall became catastrophic, unprecedented, and quickly overwhelmed the Kerr County area. The graphic below charts the unprecedented sudden rainfall event.



Copy from re:SearchTX




| | |
|---|---|
| 12:00 AM | 53 |
| 3:00 AM | 264 |
| 3:30 AM | 125,000 |

5. The graphic below is provided by the National Oceanic and Atmospheric Administration (NOAA). A NOAA National Water Protection Service Gauge data visibly demonstrates the sudden and dramatic rise in the surge of water that overwhelmed Camp Mystic, residences and communities within its destructive path. During the critical times of evacuating all campers, Camp Mystic was hit with a sudden and overwhelming surge of water that engulfed the camp. Within a matter of moments, water levels at the Guadalupe River rose from less than 5 feet to over 20 feet. Further, the flood waters continued to violently rise to higher and higher levels, cresting at over 34 feet.



Copy from re:SearchTX







6. Scientific data further confirmed that this catastrophic flooding far exceeded any prior flood recorded in the Camp Mystic area by significant magnitudes. The historical data demonstrates that prior flood history, including the floods of 1932, 1978, and 1984 and 1987, were all below the elevations of Camp Mystic's Twins and Bubble Inn cabins, and below the 100-year



Copy from re:SearchTX

floodplain. Twins Cabin has been in existence since at least 1927. Neither of these cabins had experienced previous flooding. On July 4, 2025, flood waters suddenly rose not only to the floor elevations of these cabins, but to the ceilings and beyond. Kerr County Engineers and officials documented and confirmed that the devasting flood is clearly beyond a 1,000-year flood event, completely off the charts, and never anticipated.




7. Camp Mystic defendants therefore deny Plaintiffs' allegations that the cabins where the children, counselors and camp director perished had experienced prior flooding. These allegations are false.

8. Camp Mystic was not provided with an evacuation notification until well after the sudden swell and surge of water had already engulfed the camp and lives were lost. Emergency personnel requested Code Red alerts at 4:22 AM; however, the authorization for such alert was not issued until 40 minutes later, at approximately 5:02 AM. Regardless, Camp Mystic had suffered catastrophic flooding and loss of lives long before the evacuation alert.

9. Camp Mystic and surrounding residences were not provided with sirens, flood warning systems, or floodwater monitoring systems that could have provided warnings of the surging waters moving toward Camp Mystic. Despite recommendations and proposals for state-



Copy from re:SearchTX

of-the-art warning systems, warning systems along the waterways were not provided. Along with other camp directors in the area, Dick Eastland—who died while trying to rescue campers from the raging floodwaters, —advocated for such systems to be put in place.

Gmail Dick Eastland [redacted]

**Old Kerr County Flood system map**
4 messages

**Dick Eastland** [redacted] Thu, Aug 23, 2018 at 11:22 AM
To: [redacted]
Cc: [redacted]

Dear Matt,

Enjoyed visiting with you yesterday. I hope you got my text but the quality of the map picture was poor. Attached is a better copy of the old Flood System while on the UGRA board in the late 1980s and early 90s. So glad GBRA took over this system and the real time rain gages are fantastic. The only limitations are the river level sensors upstream. During major flood events that info can be crucial to buy precious time before if hits downstream. Back in the old days there was a level sensor at location #9 (South Fork Ranch) but it was removed years ago. To me that is the most critical as it will buy us about 30 minutes during an event. Location #13 at West Perkins would be good as well. We have been here for some critical big floods including 1978, 1984, 2000 and many others.

I am also attaching an old 1988 UGRA report we had commissioned years ago for your info.

Hope this info is useful. Thanks, Dick [redacted]

10. Weather alerts that were provided were issued after 1:14 AM. The notification was flash flood warning alerts for Highway 39. Highway 39 is located adjacent to the Guadalupe River around Camp Mystic, other camps, residences, and Hunt, TX.

Fri, Jul 4 at 1:14 AM

CodeRED Weather Warning: The NWS has issued a Flash Flood Warning for your HIGHWAY 39 location from 1:14 AM July 4 until 4:15 AM July 4.



Copy from re:SearchTX

11. The flash flood warning of 1:14 AM was not an evacuation notice or evacuation alert. It was not a life-threatening situation notice. There were no alerts to evacuate or leave the area before the sudden and unexpected rush of floodwater occurred.

12. While Camp Mystic was already engulfed by the surging waters at 3:35 AM, the National Weather Service issued a warning at 3:35 AM, noting an Emergency Alert flash flood warning that was a dangerous and life-threatening situation. The Emergency Alert continued to warn people not to attempt to travel.




13. Camp Mystic had already begun evacuations from the cabins near 3:00 AM and prior to the 3:35 A.M. warning. Over 150 campers and counselors had been evacuated before the sudden surge and rise of rapid floodwaters came through the camp. As images demonstrate below, by the time the 3:35 AM flash flood life-threatening warning was issued, Camp Mystic was already experiencing the sudden surge and rise of rapid floodwaters that went from ground level to levels that reached ceilings and beyond in several cabins.

14. The photograph below was taken at 3:23 AM and shows campers continuing to evacuate to the Rec Center.



Copy from re:SearchTX




The photograph below demonstrates that within a few minutes, the water level rose rapidly during the evacuations.





Copy from re:SearchTX

15. Plaintiffs' accusations that Camp Mystic defendants were warned to evacuate and did virtually nothing, is false.

16. Plaintiffs' accusations that Dick Eastland, deceased, Edward Eastland, and other Camp Mystic personnel failed to monitor weather conditions is also false. On the contrary, camp personnel monitored the weather. Dick Eastland and others monitored weather information multiple times from a camp weather station, through the internet, and through other communications. Some cell phone data shown below from Dick Eastland's cell phone is just one example of ongoing monitoring of the weather by the camp.

| | |
|---|---|
| com.chaney.MyAcuRit e | **Start time:** 7/4/2025 1:00:23 AM(UTC-5)<br><br>**End time:** 7/4/2025 1:01:41 AM(UTC-5) |
| com.geoterrestrial.noa aradar | **Start time:** 7/4/2025 12:56:36 AM(UTC-5)<br><br>**End time:** 7/4/2025 1:00:22 AM(UTC-5) |
| com.chaney.MyAcuRit e | **Start time:** 7/4/2025 12:55:15 AM(UTC-5)<br><br>**End time:** 7/4/2025 12:56:08 AM(UTC-5) |
| com.geoterrestrial.noa aradar | **Start time:** 7/4/2025 12:53:06 AM(UTC-5)<br><br>**End time:** 7/4/2025 12:55:10 AM(UTC-5) |
| com.chaney.MyAcuRit e | **Start time:** 7/4/2025 12:42:38 AM(UTC-5)<br><br>**End time:** 7/4/2025 12:45:18 AM(UTC-5) |

| | |
|---|---|
| com.chaney.MyAcuRit e | **Start time:** 7/4/2025 1:15:44 AM(UTC-5)<br><br>**End time:** 7/4/2025 1:16:25 AM(UTC-5) |
| com.apple.weather | **Start time:** 7/4/2025 1:13:44 AM(UTC-5)<br><br>**End time:** 7/4/2025 1:15:11 AM(UTC-5) |
| com.geoterrestrial.noa aradar | **Start time:** 7/4/2025 1:13:08 AM(UTC-5)<br><br>**End time:** 7/4/2025 1:13:40 AM(UTC-5) |



Copy from re:SearchTX

| | | | |
|---|---|---|---|
| com.chaney.MyAcuRite | **Start time:**<br>7/4/2025 2:06:10 AM(UTC-5)<br><br>**End time:**<br>7/4/2025 2:06:18 AM(UTC-5) | com.chaney.MyAcuRite | **Start time:**<br>7/4/2025 2:26:54 AM(UTC-5)<br><br>**End time:**<br>7/4/2025 2:26:56 AM(UTC-5) |
| com.chaney.MyAcuRite | **Start time:**<br>7/4/2025 2:06:05 AM(UTC-5)<br><br>**End time:**<br>7/4/2025 2:06:07 AM(UTC-5) | com.chaney.MyAcuRite | **Start time:**<br>7/4/2025 2:13:01 AM(UTC-5)<br><br>**End time:**<br>7/4/2025 2:14:59 AM(UTC-5) |
| com.chaney.MyAcuRite | **Start time:**<br>7/4/2025 2:03:55 AM(UTC-5)<br><br>**End time:**<br>7/4/2025 2:06:05 AM(UTC-5) | com.geoterrestrial.noaaradar | **Start time:**<br>7/4/2025 2:12:21 AM(UTC-5)<br><br>**End time:**<br>7/4/2025 2:13:01 AM(UTC-5) |

17. No weather service, no radar, and no governmental agency anticipated, forecasted nor expected the more than 1,000 year unprecedented and historic flood of July 4, 2025. The weather data demonstrates that the July 4, 2025 sudden flooding far exceeded any previous flood in the area.

18. Camp Mystic is regulated by the State of Texas through inspections of its facility, policies, and procedures. Two days prior to July 4, 2025, state inspections by DSHS were again conducted, and no deficiencies or violations were cited or noted.

TEXAS DEPARTMENT OF STATE HEALTH SERVICES
Consumer Protection Division
PO Box 149347, Austin, TX 78714
(512) 834-6660

| | | | |
|---|---|---|---|
| Facility Name | CAMP MYSTIC INC | License Type | Youth Camp License |
| Facility Address | 2689 HWY 39 HUNT TX 78024 | License Number | 133010 |
| Inspection Type | Discretionary/Special | Inspection Number | 15818 |
| Inspector | ZAMARRIPA, MARICELA | Inspection Date | 07/02/2025 |

This notice is to acknowledge that the Texas Department of State Health Services (DSHS) conducted an inspection of or visited your business on the date listed above. The information that has been gathered is subject to further department review, and you may receive additional correspondence as a result.

There is no deficiency/violation cited or noted within the scope of this inspection/visit.



Copy from re:SearchTX

19. Plaintiffs' accusation that the Twins and Bubble Inn cabins are within the 100-year FEMA determined flood zone is false. Engineering surveys confirm that all cabin floor elevations are above the FEMA determined elevations, including the Twins and Bubble Inn cabins.

Below is an illustration of the FEMA base flood elevation levels shaded in green.




FEMA BASE FLOOD ELEVATION
100-YEAR (1% AEP)

**CAMP MYSTIC**
**HUNT, TEXAS**

The illustrations below show the contrast between the FEMA base flood elevations and the historic flood levels of July 4, 2025, shaded in green.



Copy from re:SearchTX




The illustration below further shows the historic flooding level of July 4, 2025 compared to the FEMA base flood elevation.






Copy from re:SearchTX

The accusation that Camp Mystic somehow changed or altered the FEMA determined 100-year floodplain elevation is false. 100-year Floodplain elevation altitudes are set and determined by FEMA. These elevations have not changed. Any engineering or surveying professional who has performed such a survey confirms that elevations of structures are above the 100-year floodplain. FEMA confirmed that the surveys were correct. Plaintiffs were offered the opportunity to conduct surveys and inspections to confirm these elevations and findings that FEMA has also confirmed.

**DETERMINATION**

| LOT | BLOCK/ SECTION | SUBDIVISION | STREET | **OUTCOME** WHAT IS REMOVED FROM THE SFHA | FLOOD ZONE | 1% ANNUAL CHANCE FLOOD ELEVATION (NAVD 88) | LOWEST ADJACENT GRADE ELEVATION (NAVD 88) | LOWEST LOT ELEVATION (NAVD 88) |
|---|---|---|---|---|---|---|---|---|
| -- | -- | -- | 2689 Highway 39 | Structure (Building 13) | X (shaded) | 1838.5 feet | 1843.5 feet | -- |

**Special Flood Hazard Area (SFHA)** - The SFHA is an area that would be inundated by the flood having a 1-percent chance of being equaled or exceeded in any given year (base flood).

ADDITIONAL CONSIDERATIONS (Please refer to the appropriate section on Attachment 1 for the additional considerations listed below.)

DETERMINATION TABLE (CONTINUED)
PORTIONS REMAIN IN THE FLOODWAY

This document provides the Federal Emergency Management Agency's determination regarding a request for a Letter of Map Amendment for the property described above. Using the information submitted and the effective National Flood Insurance Program (NFIP) map, we have determined that the structure(s) on the property(ies) is/are not located in the SFHA, an area inundated by the flood having a 1-percent chance of being equaled or exceeded in any given year (base flood). This document amends the effective NFIP map to remove the subject property from the SFHA located on the effective NFIP map; therefore, the Federal mandatory flood insurance requirement does not apply. However, the lender has the option to continue the flood insurance requirement to protect its financial risk on the loan.

This determination is based on the flood data presently available. The enclosed documents provide additional information regarding this determination. If you have any questions about this document, please contact the FEMA Mapping and Insurance eXchange (FMIX) toll free at (877) 336-2627 (877-FEMA MAP) or by letter addressed to the Federal Emergency Management Agency, LOMC Clearinghouse, 3601 Eisenhower Avenue, Suite 500, Alexandria, VA 22304-6426.

Luis V. Rodriguez, P.E., Director
Engineering and Modeling Division
Federal Insurance and Mitigation Administration

20. Unlike Camp Mystic, according to the Texas Water Development Board, there are millions of people in Texas who live near or within a 100-year floodplain map. These structures



Copy from re:SearchTX

include houses, dormitories, living quarters and related housing. These structures have been deemed to be reasonably safe and adequate for housing.






Copy from re:SearchTX




21. Plaintiffs' accusations that Camp Mystic has experienced floods similar to the magnitude of July 4, 2025, are false. As previously noted, scientific data clearly demonstrates that prior floods, including the floods of 1932, 1978, and 1985, were well below the elevations of Camp Mystic's Twins and Bubble Inn cabins, and well below the 100-year floodplain. Twins Cabin, in existence since at least 1927, has no flooding history. Bubble Inn, adjacent to Twins, likewise has no flooding history. Plaintiffs' accusation that the cabins where the children, counselors, and Dick Eastland perished had experienced prior flooding is false.

22. Pleading further, Plaintiffs' damages were caused directly and exclusively by the violence of nature, without human intervention or cause, and could not have been prevented by reasonable foresight or care. Specifically, the damages for which Plaintiffs seek recovery were caused by a more than 1,000-year flood event which occurred on July 4, 2025.



Copy from re:SearchTX

23. The flood event underlying this lawsuit was an event not proximately caused by the negligence of any party to the occurrence.

24. Plaintiffs' damages were the result of independent, intervening, superseding, or supervening factors, occurrences, or conditions that were not caused by Camp Mystic, LLC.

25. Camp Mystic Defendants plead and rely upon the legislative limitations on damages under Texas law as set forth in all applicable provisions of the Texas Civil Practice and Remedies Code, including but not limited to Section 41.0105.

26. Camp Mystic defendants plead and rely upon the legislative limitations of liability and damages available under Chapter 75 of the Texas Civil Practice and Remedies Code.

27. Camp Mystic defendants plead and rely upon the provisions of Civil Practice and Remedies Code Sec. 171 applicable to this matter and assert all defenses available under these sections.

28. Camp Mystic defendants plead their compliance with FEMA's Letter of Map Amendment (LOMA), and as such, are excluded from FEMA's "floodplain," as defined in Section 762.001(4) of the Texas Health & Safety Code. Any allegation alleging Camp Mystic's role concerning FEMA's Letter of Map Amendment is therefore preempted by the Supremacy Clause of Article VI, Clause 2 of the United States Constitution.

29. Camp Mystic defendants hereby invoke the doctrine of comparative fault under applicable law, and request a determination of percentage of any responsibility among responsible third parties, any settling persons, and parties. Camp Mystic defendants plead any and all provisions of Chapters 32 and 33 of the Texas Civil Practice and Remedies Code applicable to this action.



Copy from re:SearchTX

30. Under Texas law, any award of prejudgment interest must be governed and limited by the provisions of Chapter 304, Subchapter B of the Texas Finance Code.

31. Camp Mystic defendants assert the affirmative defenses of waiver and release.

32. Camp Mystic defendants assert, where applicable, the exclusive remedy under Section 408.001 of the Texas Labor Code.

33. Defendants assert that Mystic Camps Family Partnership, Ltd. and Mystic Camps Management, LLC, are not liable in the capacity in which they have been sued.

34. Camp Mystic defendants reserve the right to assert such other defenses as continuing investigation and discovery may reveal, and the right to amend or supplement this Answer at any time.

35. Camp Mystic defendants further plead that any exemplary damages, if plead and found, must be capped under applicable Texas law, and the Due Process Clause of the United States and Texas Constitutions.

WHEREFORE, PREMISES CONSIDERED, Defendant Camp Mystic defendants pray for judgment in their favor, that Defendants recover costs, and for such other and further relief to which they may show themselves justly entitled.

Respectfully submitted,

**WATTS LAW FIRM LLP**
110 Tributary Ranch Road
Mountain Home, Texas 78058
P: (512) 479-0500

*/s/Mikal Watts*
MIKAL WATTS
State Bar No. 20981820
mikal@wattsllp.com
*Attorney for Natural Fountains Properties, Inc.; Willetta Eastland, Mystic Camps*



Copy from re:SearchTX

*Family Partnership, Ltd., and Mystic Camps Management, LLC*

**RAY | PEÑA, P.C.**
9601 McAllister Freeway, Suite 901
San Antonio, Texas 78216
P: (210) 341-3554
F: (210) 341-3557

*/s/ Jeff Ray*
JEFF RAY
State Bar No. 16604400
jray@raylaw.com
*Attorney for Camp Mystic, LLC and George Albritton Eastland, as Representative of the Estate of Richard Eastland, Deceased*

**CASTAGNA SCOTT LLP**
1120 S. Capital of Texas Highway
Building 2, Suite 300
Austin, Texas 78746
512/329-3290
888/255-0132 fax

*/s/ Lynn S. Castagna*
LYNN S. CASTAGNA
State Bar No. 03980520
Lynn@texasdefense.com
*Attorney for Edward Eastland and Mary Liz Eastland*

**WRIGHT CLOSE BARGER & GUZMAN, LLP**
One Riverway, Suite 2200
Houston, Texas 77056
Telephone: (713) 572-4321
Facsimile: (713) 572-4320

*/s/Thomas C. Wright*
Thomas C. Wright
State Bar No. 22059400



Copy from re:SearchTX

wright@wrightclosebarger.com
Jessica Z. Barger
State Bar No. 24032706
barger@wrightclosebarger.com
Kenneth J. Fair
State Bar No. 24007171
fair@wrightclosebarger.com
*Attorneys for Camp Mystic, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing instrument has been served to all counsel of record in accordance with Texas Rule of Civil Procedure 21 on February 6, 2026.

*/s/ Jeff Ray*
**JEFF RAY**



Copy from re:SearchTX

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Linda Gonzales on behalf of Jeff Ray
Bar No. 16604400
lgonzales@raylaw.com
Envelope ID: 110974512
Filing Code Description: Answer/Response
Filing Description: CAMP MYSTIC DEFENDANTS' ORIGINAL ANSWER SUBJECT TO MOTION TO TRANSFER VENUE
Status as of 2/9/2026 2:50 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| R. PaulYetter | | pyetter@yettercoleman.com | 2/6/2026 4:33:17 PM | SENT |
| Yetter Coleman | | efile@yettercoleman.com | 2/6/2026 4:33:17 PM | SENT |
| John W.Stevenson | | jstevenson@stevensonmurray.com | 2/6/2026 4:33:17 PM | SENT |
| Laurie Nichols | | lnichols@stevensonmurray.com | 2/6/2026 4:33:17 PM | SENT |
| William RobertHand | | rhand@stevensonmurray.com | 2/6/2026 4:33:17 PM | SENT |
| Jeff Ray | | jray@raylaw.com | 2/6/2026 4:33:17 PM | SENT |
| Linda Gonzales | | lgonzales@raylaw.com | 2/6/2026 4:33:17 PM | SENT |
| Jane Ray | | jray@yettercoleman.com | 2/6/2026 4:33:17 PM | SENT |
| Justin P.Tschoepe | | jtschoepe@yettercoleman.com | 2/6/2026 4:33:17 PM | SENT |
| Christopher Freeman | | cfreeman@arnoldfreemanlaw.com | 2/6/2026 4:33:17 PM | SENT |
| J. ReidSimpson | | jrsimpson@yettercoleman.com | 2/6/2026 4:33:17 PM | SENT |
| Shannon Smith | | ssmith@yettercoleman.com | 2/6/2026 4:33:17 PM | SENT |
| A. Arnold | | arnold@arnoldfreemanlaw.com | 2/6/2026 4:33:17 PM | SENT |
| Sue Csizmadia | | scsizmadia@yettercoleman.com | 2/6/2026 4:33:17 PM | SENT |
| Abby Heath | | aheath@arnoldfreemanlaw.com | 2/6/2026 4:33:17 PM | SENT |
| Katherine Estrada | | kestrada@raylaw.com | 2/6/2026 4:33:17 PM | SENT |
| Laura Rua | | lrua@raylaw.com | 2/6/2026 4:33:17 PM | SENT |
| Larry Matthys | | lmatthys@raylaw.com | 2/6/2026 4:33:17 PM | SENT |
| Mikal Watts | | mikal@wattsllp.com | 2/6/2026 4:33:17 PM | SENT |
| Kenneth Fair | | fair@wrightclosebarger.com | 2/6/2026 4:33:17 PM | SENT |
| Tom Wright | | wright@wrightclosebarger.com | 2/6/2026 4:33:17 PM | SENT |
| Jessica Barger | | barger@wrightclosebarger.com | 2/6/2026 4:33:17 PM | SENT |

Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Linda Gonzales on behalf of Jeff Ray
Bar No. 16604400
lgonzales@raylaw.com
Envelope ID: 110974512
Filing Code Description: Answer/Response
Filing Description: CAMP MYSTIC DEFENDANTS' ORIGINAL ANSWER SUBJECT TO MOTION TO TRANSFER VENUE
Status as of 2/9/2026 2:50 PM CST

Case Contacts

| | | | | |
|---|---|---|---|---|
| Jessica Barger | | barger@wrightclosebarger.com | 2/6/2026 4:33:17 PM | SENT |
| Lynn Castagna | | lynn@texasdefense.com | 2/6/2026 4:33:17 PM | SENT |
| Suzanne Goss | | goss@wrightclosebarger.com | 2/6/2026 4:33:17 PM | SENT |
| John Stevenson, Jr. | | jstevenson@stevensonmurray.com | 2/6/2026 4:33:17 PM | SENT |
| Robert Hand | | rhand@stevensonmurray.com | 2/6/2026 4:33:17 PM | SENT |

Copy from re:SearchTX

2/23/2026 2:28 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009963
Eva Fairchild

No. D-1-GN-25-009963

| | | |
|---|---|---|
| WARREN and PATRICIA BELLOWS, Individually and as Representatives of ANNA MARGARET BELLOWS, Deceased, et al., | § § § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| CAMP MYSTIC, LLC, et al., | § § § | |
| Defendants. | § § | 455TH JUDICIAL DISTRICT |

**PLAINTIFFS' NOTICE OF APPEARANCE OF CO-LEAD COUNSEL**

Plaintiffs give notice designating Richard Warren Mithoff as co-lead counsel for Plaintiffs Warren and Patricia Bellows, individually and as representatives of Anna Margaret Bellows; Blake and Caitlin Bonner, individually and as representatives of Lila Bonner; Matthew and Wendie Childress, individually and as representatives of Chloe Childress; Ryan and Elizabeth DeWitt, individually and as representatives of Molly DeWitt; John and Andrea Ferruzzo, individually and as representatives of Katherine Ferruzzo; Ben and Natalie Landry, individually and as representatives of Lainey Landry; and Lindsey McCrory, individually and as representative of Blakely McCrory.

Plaintiffs respectfully request that all notices, pleadings, and other documents filed in this matter be forwarded to their undersigned counsel.

Copy from re:SearchTX

Dated: February 23, 2026

Respectfully submitted,

/s/ Richard Warren Mithoff
Richard Warren Mithoff
State Bar No. 14228500
rmithoff@mithofflaw.com
Warner V. Hocker, *Of Counsel*
whocker@mithofflaw.com
State Bar No. 24074422
MITHOFF LAW
500 Dallas Street, Suite 3450
Houston, Texas 77002
(713) 654-1122

/s/ R. Paul Yetter
R. Paul Yetter
State Bar No. 22154200
pyetter@yettercoleman.com
Justin P. Tschoepe
State Bar No. 24079480
jtschoepe@yettercoleman.com
J. Reid Simpson
State Bar No. 24072343
jrsimpson@yettercoleman.com
Shannon N. Smith
State Bar No. 24110378
ssmith@yettercoleman.com
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000

ATTORNEYS FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

I certify that on this 23rd day of February, 2026 this notice was served by email and electronic filing service on all counsel of record.

*/s/ R. Paul Yetter*
R. Paul Yetter



Copy from re:SearchTX

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Sue Csizmadia on behalf of R. Yetter
Bar No. 22154200
scsizmadia@yettercoleman.com
Envelope ID: 111596095
Filing Code Description: Notice
Filing Description: PLAINTIFFS' NOTICE OF APPEARANCE OF CO-LEAD COUNSEL
Status as of 2/26/2026 4:54 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| R. PaulYetter | | pyetter@yettercoleman.com | 2/23/2026 2:28:23 PM | SENT |
| Yetter Coleman | | efile@yettercoleman.com | 2/23/2026 2:28:23 PM | SENT |
| John W.Stevenson | | jstevenson@stevensonmurray.com | 2/23/2026 2:28:23 PM | SENT |
| Laurie Nichols | | lnichols@stevensonmurray.com | 2/23/2026 2:28:23 PM | SENT |
| William RobertHand | | rhand@stevensonmurray.com | 2/23/2026 2:28:23 PM | SENT |
| Jeff Ray | | jray@raylaw.com | 2/23/2026 2:28:23 PM | SENT |
| Linda Gonzales | | lgonzales@raylaw.com | 2/23/2026 2:28:23 PM | SENT |
| Jane Ray | | jray@yettercoleman.com | 2/23/2026 2:28:23 PM | SENT |
| Justin P.Tschoepe | | jtschoepe@yettercoleman.com | 2/23/2026 2:28:23 PM | SENT |
| Christopher Freeman | | cfreeman@arnoldfreemanlaw.com | 2/23/2026 2:28:23 PM | SENT |
| J. ReidSimpson | | jrsimpson@yettercoleman.com | 2/23/2026 2:28:23 PM | SENT |
| Shannon Smith | | ssmith@yettercoleman.com | 2/23/2026 2:28:23 PM | SENT |
| A. Arnold | | arnold@arnoldfreemanlaw.com | 2/23/2026 2:28:23 PM | SENT |
| Sue Csizmadia | | scsizmadia@yettercoleman.com | 2/23/2026 2:28:23 PM | SENT |
| Abby Heath | | aheath@arnoldfreemanlaw.com | 2/23/2026 2:28:23 PM | SENT |
| Katherine Estrada | | kestrada@raylaw.com | 2/23/2026 2:28:23 PM | SENT |
| Laura Rua | | lrua@raylaw.com | 2/23/2026 2:28:23 PM | SENT |
| Larry Matthys | | lmatthys@raylaw.com | 2/23/2026 2:28:23 PM | SENT |
| Mikal Watts | | mikal@wattsllp.com | 2/23/2026 2:28:23 PM | SENT |
| Kenneth Fair | | fair@wrightclosebarger.com | 2/23/2026 2:28:23 PM | SENT |
| Tom Wright | | wright@wrightclosebarger.com | 2/23/2026 2:28:23 PM | SENT |
| Jessica Barger | | barger@wrightclosebarger.com | 2/23/2026 2:28:23 PM | SENT |

Copy from re:SearchTX

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Sue Csizmadia on behalf of R. Yetter
Bar No. 22154200
scsizmadia@yettercoleman.com
Envelope ID: 111596095
Filing Code Description: Notice
Filing Description: PLAINTIFFS' NOTICE OF APPEARANCE OF CO-LEAD COUNSEL
Status as of 2/26/2026 4:54 PM CST

Case Contacts

| | | | | |
|---|---|---|---|---|
| Jessica Barger | | barger@wrightclosebarger.com | 2/23/2026 2:28:23 PM | SENT |
| Lynn Castagna | | lynn@texasdefense.com | 2/23/2026 2:28:23 PM | SENT |
| Suzanne Goss | | goss@wrightclosebarger.com | 2/23/2026 2:28:23 PM | SENT |
| John Stevenson, Jr. | | jstevenson@stevensonmurray.com | 2/23/2026 2:28:23 PM | SENT |
| Robert Hand | | rhand@stevensonmurray.com | 2/23/2026 2:28:23 PM | SENT |
| Richard WarrenMithoff | | rmithoff@mithofflaw.com | 2/23/2026 2:28:23 PM | SENT |
| Warner V.Hocker | | whocker@mithofflaw.com | 2/23/2026 2:28:23 PM | SENT |
| Teresa Demetriou | | TDemetriou@mithofflaw.com | 2/23/2026 2:28:23 PM | SENT |

Copy from re:SearchTX

03/04/2026 04:40:33 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009963

Civil and Family Courts Facility
P. O. Box 1748
Austin, TX 78767

**AMY CLARK MEACHUM**
**Local Administrative Judge**
**DISTRICT COURTS**

(512) 854-9305
FAX (512) 854-9332

March 4, 2026

R. Paul Yetter
Justin P. Tschoepe
J. Reid Simpson
Shannon N. Smith
YETTER COLEMAN LLP
811 Main St., Suite 4100
Houston, TX 77002
*Via email:* pyetter@yettercoleman.com
*Via email:* jtschoepe@yettercoleman.com
*Via email:* jrsimpson@yettercoleman.com
*Via email:* ssmith@yettercoleman.com

Thomas C. Wright
Jessica Z. Barger
Kenneth J. Fair
WRIGHT CLOSE BARGER & GUZMAN, LLP
1 Riverway, Suite 2200
Houston, TX 77056
*Via email:* wright@wrightclosebarger.com
*Via email:* barger@wrightclosebarger.com
*Via email:* fair@wrightclosebarger.com

Mikal Watts
WATTS LAW FIRM LLP
110 Tributary Ranch Rd.
Mountain Home, TX 78058
*Via email:* mikal@wattsllp.com

Jeff Ray
RAY PENA P.C.
9601 McAllister Fwy., Suite 901
San Antonio, TX 78216
*Via email:* jray@raylaw.com

Lynn S. Castagna
CASTAGNA SCOTT LLP
1120 S. Capital of TX Hwy, Bldg. 2, Suite 300
Austin, TX78746
*Via email:* lynn@texasdefense.com

John W. Stevenson, Jr.
W. Robert Hand
STEVENSON & MURRAY
24 Greenway Plaza, Suite 750
Houston, TX 77046
*Via email:* jstevenson@stevensonmurray.com
*Via email:* rhand@stevensonmurray.com

Re: Cause No. D-1-GN-25-009963; Warren Bellows, et al v. Camp Mystic, Inc., et al. *in the 455th Judicial District, Travis County, Texas*

Dear Counsel:

The above case will be assigned to JUDGE MAYA GUERRA GAMBLE according to Chapters 2.6 of our Local Rules. Please refer to Chapter 2.6 of our Local Rules for the proper method of proceeding from this point.

Thank you.

Sincerely,

AMY CLARK MEACHUM
Local Administrative Judge
Travis County, Texas

ACM/ral
xc: Ms. Velva Price, District Clerk

Copy from re:SearchTX

03/13/2026 04:40:09 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009963

**MAYA GUERRA GAMBLE**
**Judge, 459th District Court**
**Travis County Civil and Family Courts Facility, P.O. Box 1748**
**Austin, Texas 78767**
**512-854-9384**

March 12, 2026

R. Paul Yetter
Justin P. Tschoepe
J. Reid Simpson
Shannon N. Smith
YETTER COLEMAN LLP
811 Main St., Suite 4100
Houston, TX 77002
*Via email:* *pyetter@yettercoleman.com*
*Via email:* *jtschoepe@yettercoleman.com*
*Via email:* *jrsimpson@yettercoleman.com*
*Via email:* *ssmith@yettercoleman.com*

Mikal Watts
Watts Law Firm LLP
110 Tributary Ranch Rd. Mountain Home, TX 78058
*Via email:* *mikal@wattsllp.com*

Jeff Ray
Ray Pena P.C.
9601 McAllister Fwy., Suite 901 San Antonio, TX 78216
*Via email:* *jray@raylaw.com*

Thomas C. Wright
Jessica Z. Barger
Kenneth J. Fair
Wright Close Barger & Guzman, LLP
1 Riverway, Suite 2200
Houston, TX 77056
*Via email:* *wright@wrightclosebarger.com*
*Via email:* *barger@wrightclosebarger.com*
*Via email:* *fair@wrightclosebarger.com*

Lynn S. Castagna
CASTAGNA SCOTT LLP
1120 S. Capital of TX Hwy, Bldg. 2, Suite 300
Austin, TX 78746
*Via email:* *lynn@texasdefense.com*

John W. Stevenson, Jr.
W. Robert Hand
STEVENSON & MURRAY
24 Greenway Plaza, Suite 750
Houston, TX 77046
*Via email:* *jstevenson@stevensonmurray.com*
*Via email:* *rhand@stevensonmurray.com*

**RE: Cause No. D-1-GN-25-009963; Warren Bellows, et al v. Camp Mystic, Inc., et al.** *in the 455th Judicial District, Travis County, Texas*

Dear Counsel:

This case has been assigned to the 459th District Court pursuant to Travis County Local Rule 2.6. All matters, including agreed motions and orders, as well as any final proceedings, shall be heard and

Copy from re:SearchTX

considered **by this Court only**. Please note that simply filing a document with the District Clerk does not bring it to the court's attention as I do not receive these documents automatically. You must file pleadings with the District Clerk, then deliver them directly to the 459th District Court. You may deliver documents by email if their combined length is less than 15 pages; otherwise, they must be delivered in printed-out form to the District Judges' Office on the 4th floor, Attn: 459th District Court. All hearings are in-person unless a virtual setting is requested and approved in advance. Note that, while this case is assigned to the 459th District Court, filings should still be captioned with the 455th designation.

Our Judicial Executive Assistant, Shannon Matusek-Steele, is the primary point of contact for this Court. Contact her with any questions, for coordinating dates and times of any hearings, and to provide copies of filings. She may be reached by telephone at (512) 854-9384 or by email at shannon.matusek-steele@traviscountytx.gov. Specifically, please coordinate with Ms. Matusek-Steele for dates and times of any hearings that you may need to set. Please do not use the 459 submission email as that may cause a delay.

Counsel must attempt to agree on a briefing schedule, including a trial date, which should be provided to the Court **within 60 days** of the date of this letter. The trial date must be obtained from Ms. Matusek-Steele.

For any setting, you must announce in compliance with Chapter 3 of the Local Rules of the District Courts of Travis County. I look forward to working with you on this case.

Very Truly Yours,

Maya Guerra Gamble
Judge, 459th District Court

MGG/sms
cc: Velva Price, District Clerk

Copy from re:SearchTX

3/23/2026 11:51 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009963
Stephanie Garza

No. D-1-GN-25-009963

| | | |
|---|---|---|
| WARREN and PATRICIA BELLOWS, Individually and as Representatives of ANNA MARGARET BELLOWS, Deceased; et al., | § § § § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| CAMP MYSTIC, LLC; et al., | § § | |
| Defendants. | § | 455TH JUDICIAL DISTRICT |

**PLAINTIFFS' FIRST MOTION TO COMPEL**

At a recent hearing before this Court, defense counsel made a point to emphasize the great need for transparency about the tragic circumstances behind the deaths of 27 girls at Camp Mystic last July 4th. In fact, he said, defendants would make no effort to "hide" the truth:

> It is time for this story to get out . . . . We don't hide behind privilege, we don't hide behind what happened out there, we get the facts out.

*Steward v. Camp Mystic*, Tr. at 89:11-12, 90:14-16 (Mar. 4, 2026). Plaintiffs couldn't agree more. *It's time for this story to get out*. But despite their words, defendants' actions have been entirely to the contrary.

Defendants are refusing to produce the bulk of the relevant, discoverable documents and information requested by plaintiffs based on a litany of bogus objections. Out of 89 requests for production, they objected to all or part of 77 of them. They objected to producing communications about the flood because they contain "trade secrets." They objected that a request for texts between camp employees at the time "constitutes an impermissible fishing expedition," seeking "tenuous" and "immaterial" information. They objected to communications with law enforcement about the flood as "irrelevant." And they objected that they didn't know what "safety equipment" means.

Copy from re:SearchTX

Playing games with discovery in a case involving one of our nation's largest mass-deaths of children is beyond the pale. Plaintiffs ask the Court to order defendants to stop these games, comply with their discovery duties, and produce the requested documents and information.

## ARGUMENT AND AUTHORITIES

On January 12, 2026, Plaintiffs served requests for production to all defendants (**Ex. A**) and the Bellows plaintiffs' interrogatories to all defendants (**Ex. B**). This discovery seeks critical information related both to the merits and a pending motion to transfer venue.

Given the many media statements about defendants' intent to be open and cooperative, plaintiffs were surprised to get objections to nearly all of what they requested. (**Ex. C**, Defendants' Interrog. Resp.[1]; **Ex. D**, Defendants' Request for Prod. Resp.[2]). The objections are a hodgepodge of boilerplate assertions of irrelevance, vagueness, and overbreadth, as well as odd reasons to refuse to comply like the information is "private."

### I. Defendants' objections are baseless and should be overruled.

The responses speak for themselves, but here are examples of defendants' clear intent to avoid discovery of any relevant information that's bad for them:

- Defendants refuse to produce their communications about the flood, internally and with third parties and law enforcement:

[1] Plaintiffs attach the Responses of Defendant George Albritton Eastland, as Representative of the Estate of Richard G. Eastland, to Bellows' First Interrogatories to All Defendants as Exhibit C, which are substantially similar to and representative of the responses of all defendants. Plaintiffs will provide the responses of all eight defendants should the Court wish to see all responses.

[2] Plaintiffs attach the Responses of Camp Mystic, LLC to Plaintiffs' First Requests for Production to All Defendants as Exhibit D, which are substantially similar to and representative of the responses of all defendants. Plaintiffs will provide the responses of all eight defendants should the Court wish to see all responses.



Copy from re:SearchTX

30. All communications between any of you regarding the July 4, 2025 flood.

**RESPONSE: Defendants object to this request as overbroad and seeks information that is exempt from discovery by virtue of the work product doctrine and attorney client privilege. Defendants object to this request as not narrowly tailored to avoid including tenuous information, is not proportional to the needs of this case, and constitutes an impermissible fishing expedition rejected by the Texas Supreme Court.**

31. All communications between any of you and any third party regarding the July 4, 2025 flood.

**RESPONSE: Defendant objects as this request exceeds the scope of permissible discovery under Texas Rule of Civil Procedure 192.**

**Defendant objects to this discovery request as being overly broad and vague in that it fails to describe the information requested with reasonable particularity. This request is not reasonably limited in time or scope. Defendant objects to this discovery request for the reason that it is seeking information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence**

**Defendant objects to this discovery request for the reason that it inquires as to communications between attorney and client made in confidence for the purpose of facilitating the rendition of professional legal services, all of which communications are protected from discovery by the attorney/client privilege pursuant to Texas Rules of Civil Procedure 192.3(e) and Texas Rules of Civil Evidence 503.**

**Defendant objects to this request to the extent it seeks the disclosure of materials that contain confidential and proprietary information, including trade secrets, which are privileged from discovery pursuant to Rule 507, TRE.**

43. All documents and communications between any of you and law enforcement regarding the July 4, 2025 flood or any Camp Mystic camper or counselor who died in the flood.

**RESPONSE: Defendants object to this request as overly broad, vague and seeks information that is irrelevant, immaterial, and not reasonably calculated to lead to the discovery of admissible evidence. This request fails to provide sufficient specificity regarding the information or materials sought.**

- Defendants refuse to produce communications among camp employees and agents leading up to and during the flood:



Copy from re:SearchTX

> 38. All communications between or with any employee or agent of Camp Mystic, including seasonal or temporary workers, from noon on July 2, 2025, to midnight on July 5, 2025.
>
> **RESPONSE: Defendants object to this request as overly broad and seeks information that is irrelevant, immaterial, and not reasonably calculated to lead to the discovery of admissible evidence. Defendants further object to the extent this request seeks documents protected by the attorney-client privilege and work product doctrine. Defendants object to this request as not narrowly tailored to avoid including tenuous information, is not proportional to the needs of this case, and constitutes an impermissible fishing expedition rejected by the Texas Supreme Court.**

- Defendants refuse to produce documents and information regarding prior floods at the camp. Ironically, defendants used documents recounting prior floods as exhibits in the recent hearing: "we've got a lot of them. We'll disclose that in discovery and the like." Tr. at 114:23-24 (Mar. 4, 2026). Yet now they object to producing them to plaintiffs:

> 88. All documents and communications regarding floods at Camp Mystic before July 4, 2025.
>
> **RESPONSE: Defendant objects to this discovery request as being overly broad and vague in that it fails to describe the information requested with reasonable particularity. This request is not reasonably limited in time or scope.**
>
> **Subject to the objections previously filed and without waiving the same, Defendant answers as follows:**
>
> **Documents responsive to this request are equally accessible to all parties.**

> 89. All documents and communications regarding efforts to mitigate flood risk at Camp Mystic, whether implemented or not.
>
> **RESPONSE: Defendant objects to this discovery request for the reason that it seeks disclosure of the mental impressions, conclusions, opinions, or legal theories of Defendant's attorney or other representatives of Defendant working solely to assist in trial preparations,**

> **which are protected from discovery by the work product privilege pursuant to Texas Rules of Civil Procedure 192.5.**

(**Ex. C**, Defendants' Interrog. Resp.; **Ex. D**, Defendants' Request for Prod. Resp.).

The other responses are more of the same, littered with vague objections and refusals to provide relevant information. *See, e.g.*, RFPs 8-9, 15-18, 20-21, 28-36, 38, 42-43, 46, 50-51, 54, 56-61, 65-66, 76-81, 87-89; Interrog. 3-7, 11, 13, 16. The relevance of the information is beyond dispute, and the requests are not unduly burdensome given the magnitude of this case. Most of the



Copy from re:SearchTX

requests are limited in scope to the events before, in, and around July 4th and what has transpired since. Those that refer to prior years target critically relevant information about the camp's history, structure, and past practices, bearing on defendants' knowledge of flood risk, their venue motion, and plaintiffs' allegations of alter ego.

The vastness and vagueness of the objections make it impossible to know what is being withheld and what will be produced. Defendants lodge boilerplate objections to overbreadth and vagueness and then refer to documents produced. They do not state whether they are withholding documents pursuant to their objections or whether they object to all or only part of the request. *See, e.g.*, RFPs 1-7, 10-13, 19, 23-27, 37, 39-40, 44-45, 47-48, 53, 55, 62-63, 69-74, 84-85. The rules prohibit this approach. Under Tex. R. Civ. P. 193.2(a), (b), parties must "comply with as much of the request to which the party had made no objection" and to "state specifically . . . the extent to which the party is refusing to comply with the request." Defendants' refusal to follow the rules results in a waiver of their objections. Tex. R. Civ. P. 193.2(e); *Reynolds v. Murphy*, 188 S.W.3d 252, 260 (Tex. App.—Fort Worth 2006, pet. denied).

The Court should order defendants to produce all responsive documents to the requests for production and provide complete answers to each of the interrogatories.

## II. Attempts to confer have been fruitless.

When plaintiffs conferred about these responses, it quickly became clear that defendants had no intention of satisfying their discovery obligations. For nearly every request for production, they said they would decide whether to produce the requested documents or maintain an objection after reviewing the documents and seeing what they say. Defendants only agreed to supplement responses on a handful of requests, but even then they would not withdraw their objections.

Texas law does not permit a party to decide unilaterally which responsive documents to produce based on whether they are helpful or harmful. Rather, "the ultimate purpose of discovery



Copy from re:SearchTX

is to seek the truth, so that disputes may be decided by what the facts reveal, not by what facts are concealed." *In re Colonial Pipeline Co.*, 968 S.W.2d 938, 941 (Tex. 1998). Defendants must object or not to producing requested documents, and they must do a thorough search for responsive materials. They cannot object to everything and then find a handful of documents they want to produce while obscuring what they withhold.

## CONCLUSION

The significance of this case to Plaintiffs and the public at large cannot be understated. The information sought is squarely relevant to the claims and defenses, not unduly burdensome, and narrowly tailored to achieve what should be a shared goal between the parties: *getting out the truth*. As such, the Court should order all defendants to produce all information responsive to plaintiffs' requests for production and the Bellows plaintiffs' interrogatories.



Copy from re:SearchTX

Dated: March 23, 2026

Respectfully submitted,

*/s/ R. Paul Yetter*
R. Paul Yetter
State Bar No. 22154200
pyetter@yettercoleman.com
Justin P. Tschoepe
State Bar No. 24079480
jtschoepe@yettercoleman.com
J. Reid Simpson
State Bar No. 24072343
jrsimpson@yettercoleman.com
Shannon N. Smith
State Bar No. 24110378
ssmith@yettercoleman.com
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000

*/s/ Richard Warren Mithoff*
Richard Warren Mithoff
State Bar No. 14228500
rmithoff@mithofflaw.com
Warner V. Hocker, *Of Counsel*
whocker@mithofflaw.com
State Bar No. 24074422
MITHOFF LAW
500 Dallas Street, Suite 3450
Houston, Texas 77002
(713) 654-1122

ATTORNEYS FOR PLAINTIFFS



Copy from re:SearchTX

## CERTIFICATE OF CONFERENCE

I hereby certify that plaintiffs made reasonable efforts to resolve this dispute without court intervention but were unable to do so. I emailed counsel for all defendants on March 6 and again on March 9 seeking to schedule a conference. Counsel for all defendants were then invited to a conference on March 16. Counsel for all defendants accepted the calendar invite, but only counsel for defendants Camp Mystic LLC, the Estate of Richard Eastland, Edward Eastland, and Mary Liz Eastland attended. My colleague and I conferred with counsel for these defendants by videoconference for nearly two hours on March 16, 2026, but were unable to reach a resolution on the issues in this motion. Defendants' counsel ended the call before we could finish discussing each request for production at issue and asked that we follow up in writing to attempt to resolve remaining issues. I emailed counsel for all defendants twice on March 19 and 20. Counsel for defendants have not responded as of the time of this filing.

*/s/ Justin P. Tschoepe*
Justin P. Tschoepe

## CERTIFICATE OF SERVICE

I certify that on this 23rd day of March, 2026, the foregoing was served by email and/or by electronic filing service on all counsel of record.

*/s/ Shannon N. Smith*
Shannon N. Smith



Copy from re:SearchTX

# EXHIBIT A

Copy from re:SearchTX

No. D-1-GN-25-009963

| | | |
|---|---|---|
| WARREN and PATRICIA BELLOWS, et al., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiffs, | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| CAMP MYSTIC, LLC et al., | § | |
| | § | |
| Defendants. | § | 455TH JUDICIAL DISTRICT |

**PLAINTIFFS' FIRST REQUESTS FOR PRODUCTION TO ALL DEFENDANTS**

To: All defendants through their counsel of record, Jeff Ray, Ray Pena McChristian, P.C.; Mikal Watts, Watts Law Firm; Lynn S. Castagna, Castagna Scott LLP; and Thomas C. Wright, Jessica Z. Barger, Kenneth J. Fair, Wright Close Barger & Guzman, LLP.

Pursuant to Tex. R. Civ. P. 196, plaintiffs request that all defendants produce for inspection and copying the documents and things described below within 30 days after service of this request. The requested documents are to be made available for inspection and copying at the offices of Yetter Coleman LLP, 811 Main, Suite 4100, Houston, Texas 77002. Documents shall be produced either as they are kept in the ordinary course of business or organized and labeled to correspond with the categories set forth in these requests, as required by Rule 196.

**DEFINITIONS**

1. "Plaintiffs" means Warren and Patricia Bellows, Individually and as Representatives of Anna Margaret Bellows; Blake and Caitlin Bonner, Individually and as Representatives of Lila Bonner; Matthew and Wendie Childress, Individually and as Representatives of Chloe Childress; Ryan and Elizabeth DeWitt, Individually and as Representatives of Molly DeWitt; John and Andrea Ferruzzo, Individually and as Representatives of Katherine Ferruzzo; Ben and Natalie Landry, Individually and as Representatives of Lainey Landry; and Lindsey McCrory, Individually and as Representative of Blakely McCrory.

2. "Defendants" or "you" means Camp Mystic, LLC; Natural Fountains Properties, Inc.; Mystic Camps Family Partnership, Ltd.; Mystic Camps Management, LLC; George Albritton Eastland, as Representative of the Estate of Richard Eastland, Deceased; Willetta Eastland; Edward Eastland; and Mary Liz Eastland, as well as any of their employees, representatives, agents, consultants, experts, and contractors, collectively or separately, as context may require. For avoidance of doubt, this includes any temporary or seasonal workers employed by any of the Camp Mystic Companies.

Copy from re:SearchTX

3. "Camp Mystic Companies" means Camp Mystic, LLC; Natural Fountains Properties, Inc.; Mystic Camps Family Partnership, Ltd.; and Mystic Camps Management, LLC.

4. "Camp Mystic" means the summer camp for girls operated by you in Hunt, Texas. For avoidance of doubt, this includes both of the facilities referred to as "Camp Mystic Guadalupe River" and "Camp Mystic Cypress Lake."

5. "FEMA" is the Federal Emergency Management Association.

6. "DSHS" is the Texas Department of State Health Services.

7. "Lawsuit" refers to this case.

8. "And" and "or" mean and/or.

9. "Any" means any and all.

10. "Person" means any natural person, firm, corporation, partnership, proprietorship, estate, trust, trust estate, joint venture, association, group, or organization, or any agent thereof.

11. "Individual" means any natural person.

12. "Relate" or "relating," in addition to their customary meaning, includes referring to, mentioning, reflecting, containing, commenting, concerning, alluding, pertaining to, evidencing, involving, describing, discussing, analyzing, evaluating, identifying, responding to, supporting, opposing, constituting, in connection with, in respect of, in respect to, about, regarding, embodying, explaining, referencing, assessing, dealing with, or being a draft, copy, or summary of in whole or in part.

13. "Including" or "includes" means including but not limited to.

14. "Communication" encompasses emails, text messages, chats, meetings, telephone calls and audio recordings of the same, conversations, discussions, letters, memoranda, notes, and all other forms of oral, written, visual, and electronic communication (including communications by software applications such as Messages, WhatsApp, or GroupMe), including any transmission or transfer of other documents.

15. "Document" includes any written, printed, typed, photographed, recorded, or otherwise reproduced communication or representation, including letters, words, numbers, pictures, sounds, or symbols, or combinations thereof (or any copies bearing notations or marks not found on the original), including correspondence, notes, records, letters, envelopes, speeches, telegrams, emails, messages (including reports, notes, and memoranda of personal or telephone conversations and conferences), chats, text messages, diaries, reports, calendars, drawings, diagrams, charts, graphs, photographs, phonographs, transcripts, x-rays, tape or other recordings, computer-readable media, punch cards, magnetic tapes, audio recordings, video recordings, discs, data cells, drums, printouts, and all other data compilations from which information can be obtained. "Documents" specifically includes drafts.



Copy from re:SearchTX

16. "Residence" shall mean any location a person occupies as a home or where they live for any amount of time with the intent to return.

## INSTRUCTIONS

1. If you object to any Request or any part thereof, produce all documents to which your objection does not apply. For each objection, state whether you are aware of documents that may not have been gathered or produced as a result of the objection.

2. If in answering these Requests you claim any ambiguity in either the Request or a definition or instruction applicable to it, identify in your response the language you consider ambiguous and state the interpretation you are using in responding.

3. If you or your attorneys know of the existence, past or present, of any document described in a Request, but such document is not presently in the possession, custody, or control of you or your agents, representatives, or attorneys, you shall so state in response to the Request, identify such document in response to the Request, and identify the individual in whose possession, custody, or control the document was last known to reside. If such document no longer exists, state when, how, and why such document ceased to exist.

4. The Requests are intended to cover any documents in your possession or that are subject to your custody or control, either directly or through your agents, representatives, affiliates, or partners. This includes constructive possession where you have the right to compel production of the document from a third party, including any agent, employer, partner, attorney, accountant, or other representative.

5. These Requests are directed to the time period of January 1, 2010 to the present, unless otherwise stated in a particular Request.

6. The singular form of a word shall be interpreted as plural, and the plural form of a word shall be interpreted as singular whenever appropriate, in order to bring within the scope of this Request any document which might otherwise be considered beyond its scope.

7. The documents produced in response to these Requests shall be organized and designated to correspond to the categories in these Requests or, if not, produced as they are maintained in the normal course of business.

8. These Requests require production of electronically stored information. It should be produced in its native format with all available metadata included, or in another reasonably usable form agreed to between the parties.

9. These Requests are continuing. You are to supplement your responses in a reasonable time if you obtain or become aware of further documents responsive to these Requests.

10. If you claim that information requested is protected from disclosure by the attorney-client or other privilege, specify the nature of the privilege and your grounds for claiming it.



Copy from re:SearchTX

11. If you object or otherwise decline to provide any of the information requested, set forth the grounds upon which you rely with specificity, and provide the most responsive information you are willing to provide without a court order.

12. You are requested to furnish information that is available to you. This includes what has been obtained by or in the possession of your attorneys, employees, agents, and other representatives, and not merely the information known by you of your own knowledge.

## REQUESTS FOR PRODUCTION

1. All entity formation documents, including articles of incorporation, certificates of formation, and amendments, related to the Camp Mystic Companies since their inception.

2. All entity governance documents, including partnership or LLC agreements, bylaws, and operating agreements, related to the Camp Mystic Companies since their inception.

3. All leases between or among the Camp Mystic Companies since their inception regarding the land on which Camp Mystic is located.

4. All documents submitted to or filed with the State of Texas and its agencies or offices, including the Secretary of State, Comptroller of Public Accounts, Department of State Health Services, and Department of Insurance, related to the Camp Mystic Companies.

5. All documents received from State of Texas and its agencies or offices, including the Secretary of State, Comptroller of Public Accounts, Department of State Health Services, and Department of Insurance, related to the Camp Mystic Companies.

6. All documents submitted to or filed with Kerr County, Texas and its agencies or offices related to or on behalf of the Camp Mystic Companies.

7. All documents received from Kerr County, Texas and its agencies or offices related to the Camp Mystic Companies.

8. All documents submitted to or filed with the federal government and its agencies or offices, including the Federal Emergency Management Agency, Department of Labor, and Internal Revenue Service, related to or on behalf of the Camp Mystic Companies.

9. All documents received from the federal government and its agencies or offices, including the Federal Emergency Management Agency, Department of Labor, and Internal Revenue Service, related to the Camp Mystic Companies.

10. All documents identifying any principal office of the Camp Mystic Companies.

11. All documents reflecting the business address, headquarters, or principal place of business of the Camp Mystic Companies.

12. Documents sufficient to show all owners, officers, directors, members, managers, and partners of the Camp Mystic Companies.



Copy from re:SearchTX

13. All meeting minutes, written consents, or other documents reflecting actions or decisions of shareholders, members, or partners of the Camp Mystic Companies.

14. Documents sufficient to show all employees of Mystic Camps Family Partnership, Ltd. and Mystic Camps Management, LLC.

15. All agreements between or among any or all of defendants, regardless of time period.

16. All documents, including organization charts, reflecting the relationship between or among the Camp Mystic Companies.

17. All documents reflecting the flow of money or other assets between or among any of defendants, George Albritton Eastland, Catie Eastland, Richard Eastland, Jr., or Leslie Eastland since January 1, 2020, including salaries, dividends, distributions, housing, transportation, and bonuses.

18. All communications between or among defendants regarding the relationship between the Camp Mystic Companies from January 1, 2020, to present.

19. All documents showing the residence of Richard Eastland Sr. or Willetta Eastland, including driver's license, will or testamentary documents, powers of attorney, declarations or affidavits, vehicle registration, voter registration, property records, homestead exemption filings, insurance documents, tax returns, and utility bills.

20. All documents associated with any transfer of ownership of the residence at 2404 Scenic Drive, Austin, Texas 78703.

21. All documents forming and governing Richard G Eastland 2023 Family Trust or Willetta A Eastland 2023 Exemption Trust.

22. All documents related to any homestead exemption filed or in effect for 2404 Scenic Drive, Austin, Texas 78703 in this county.

23. All documents related to any request for Letter of Map Amendment or Revision to any federal agency concerning land or structures owned or operated by Camp Mystic Companies.

24. All documents submitted by any of you to FEMA regarding Camp Mystic.

25. All documents received from any of you by FEMA regarding Camp Mystic.

26. All FEMA floodplain, floodway, Letter of Map Amendment (LOMA), Letter of Map Revision (LOMR), Letter of Map Change (LOMC), or other requests, submissions, approvals, or denials received by Camp Mystic,

27. All documents and communications with Kerr County, including any Kerr County Floodplain Administrator, regarding FEMA floodplain, floodway, Letter of Map Amendment



Copy from re:SearchTX

(LOMA), Letter of Map Revision (LOMR), Letter of Map Change (LOMC), or other flood related requests, submissions, approvals, or denials related to Camp Mystic.

28. All agreements with any person related to, and communications regarding the scope of services provided for, operation of Camp Mystic, including vendors, consultants, engineers, contractors, and insurers.

29. Documents sufficient to identify all bank accounts used by defendants relating to Camp Mystic and the authorized signatories of each account.

30. All communications between any of you regarding the July 4, 2025 flood.

31. All communications between any of you and any third party regarding the July 4, 2025 flood.

32. All communications between any of you regarding any of the Camp Mystic campers or counselors who died during the July 4, 2025 flood.

33. All communications between any of you and any third party regarding any of the Camp Mystic campers or counselors who died during the July 4, 2025 flood.

34. All communications between any of you regarding your decision as to whether to reopen or continue to operate Camp Mystic after July 4, 2025.

35. All communications between any of you and/or between any of you and any third party regarding whether Camp Mystic will be open or operational after July 4, 2025.

36. All communications between any of you and any family member of any Camp Mystic campers or counselors who died during the July 4, 2025 flood.

37. All communications between any of you and any camper or counselor from 10:00 P.M. on July, 3, 2025, to 12:00 P.M. on July 4, 2025.

38. All communications between or with any employee or agent of Camp Mystic, including seasonal or temporary workers, from noon on July 2, 2025, to midnight on July 5, 2025.

39. All documents relating to your knowledge that any Camp Mystic camper or counselor had died after the July 4, 2025 flood.

40. All documents relating to the whereabouts of any Camp Mystic camper or counselor who died during the July 4, 2025 flood from July 4, 2025, to present.

41. All documents relating to the discovery of the remains of any Camp Mystic camper or counselor, including the location of the remains, from July 4, 2025, to present.

42. All documents relating to Camp Mystic campers or counselors missing after the July 4, 2025 flood.



Copy from re:SearchTX

43. All documents and communications between any of you and law enforcement regarding the July 4, 2025 flood or any Camp Mystic camper or counselor who died in the flood.

44. All documents and communications relating to evacuation of any camper or counselor at Camp Mystic on July 4, 2025.

45. All documents relating to warnings any of you or any of your employees received regarding flooding or the potential for flooding in Kerr County from July 1, 2025 to July 4, 2025.

46. All documents relating to any analysis of flood risk to Camp Mystic performed by you or any third party, regardless of time period.

47. All risk assessments or safety audits performed by you or any third party regarding Camp Mystic from 2000 to present.

48. All documents reflecting emergency, disaster, or crisis management plans, including evacuation plans, for Camp Mystic from 2013 to present.

49. All manuals, handbooks, training materials, counselor guides, orientation materials, and the like provided to counselors at Camp Mystic who served during the session including July 4, 2025, regardless of time period.

50. All documents reflecting what safety equipment, if any, was present in the Bubble Inn and Twins I/II Cabins on July 4, 2025, regardless of time period.

51. All "lessons learned" documents, postmortems, debriefs, and the like discussing any flood at Camp Mystic, regardless of time period.

52. All documents reflecting river gauge, rain gauge, or other hydrological data for the time period from July 3, 2025, to July 5, 2025.

53. All documents received from any law enforcement agency related to the July 4, 2025 flood or the death of any Camp Mystic camper or counselor.

54. Any witness statements or interviews related to the July 4, 2025 flood.

55. All documents relating to your decision making on July 4, 2025, to evacuate certain cabins and not others.

56. All documents relating to maintenance, repair, alteration, renovation, or improvement made to the Bubble Inn or Twins I/II Cabins from 2000 to present.

57. Documents sufficient to identify all campers present at Camp Mystic during the session including July 4, 2025.

58. Documents sufficient to identify all counselors employed by Camp Mystic for the session including July 4, 2025.



Copy from re:SearchTX

59. Documents sufficient to identify which campers and counselors resided in which cabins for the session including July 4, 2025.

60. Documents sufficient to identify all non-counselor employees of Camp Mystic, including seasonal or temporary workers, employed during the session including July 4, 2025, and their roles.

61. All public statements, press releases, social media posts, website updates, or email list-serv messages from any of you regarding the July 4, 2025 flood, the campers or counselors who died during the July 4, 2025 flood, or Camp Mystic's plans to reopen in 2026.

62. All communications between any of you and any person regarding serving as a counselor at Camp Mystic after July 4, 2025.

63. All communications with Chloe Childress and Katherine Ferruzzo related to their service as counselors at Camp Mystic.

64. All documents provided to or received by Chloe Childress and Katherine Ferruzzo related to their service as counselors at Camp Mystic.

65. All records of any inspection of Camp Mystic from 2020 to present.

66. All documents relating to reports or analysis of any consultant, engineer, or other vendor regarding Camp Mystic.

67. All documents and communications with Hewitt Engineering Inc. or John Hewitt regarding Camp Mystic.

68. Camp Mystic's license to operate in effect on July 4, 2025.

69. All documents any of you received from DSHS from 2020 to present.

70. All documents and communications regarding any inspection or licensure of Camp Mystic from 2020 to present.

71. All documents submitted by Camp Mystic to DSHS or any other entity regarding its youth camp license renewal, including your emergency plan, from 2020 to present.

72. All communications between any of you or between any of you and DSHS concerning the renewal of Camp Mystic's youth camp license.

73. All communications between any of you or with any third party discussing whether to relocate any cabin in "the Flats" portion of Camp Mystic from 2013 to present.

74. All documents relating to the operationality of the loudspeaker at Camp Mystic prior to and during the July 4, 2025 flood.



Copy from re:SearchTX

75. Documents sufficient to show the precise locations, elevations, and site grades for Bubble Inn, Twins I/II, Rec Hall, the commissary, the kitchen, the nearby hill, and principal routes between them at the time of the July 4, 2025 flood, regardless of time period.

76. Any GPS or other saved location data reflecting the movements of Richard Eastland Sr., Edward Eastland, Glenn Juenke, Willetta Eastland, Mary Liz Eastland, Craig Althaus, Betsy Althaus, and Richard Eastland, Jr. on July 4, 2025.

77. All data and communications on Richard Eastland Sr.'s watch and cell phone, including from any weather monitoring applications, fitness applications, GPS or location services, text messages, chats, emails, and the like, from July 3, 2025, to July 4, 2025.

78. All data and communications on Edward Eastland's watch and cell phone, including from any weather monitoring applications, fitness applications, GPS or location services, text messages, chats, emails, and the like, from July 3, 2025, to July 4, 2025.

79. All data tracking the movements of any vehicle driven by Richard Eastland Sr. or Edward Eastland from noon on July 3, 2025 to 8:00 A.M. on July 4, 2025.

80. All telephone records reflecting the date, time, and phone number of any calls or text messages sent or received by you from 10:00 P.M. on July 3, 2025, to 11:59 P.M. on July 4, 2025.

81. All iCloud or other cloud-stored data reflecting communications sent or received by you from 10:00 P.M. on July 3, 2025, to July 4, 2025.

82. All documents relating to your participation in the search for Cile Steward.

83. All photographs and videos taken of Anna Margaret Bellows, Lila Bonner, Chloe Childress, Molly DeWitt, Katherine Ferruzzo, Lainey Landry, or Blakely McCrory during the session including July 4, 2025.

84. All photographs and videos taken of or at Camp Mystic from July 3, 2025 at 10:00 P.M. to July 31, 2025.

85. All communications between you and Nancy Clement regarding Camp Mystic from July 3, 2025 to present.

86. The August, 23, 2018 email from Richard Eastland Sr. to "Matt" regarding "Old Kerr County Flood system map," as referenced in Defendants' Answer in this litigation, including attachments, and any related replies from "Matt" related to same.

87. All documents sent or received relating to a post by Richard Eastland in a Facebook group called "Byrd Chatter" asking for information about prior flooding at Camp Mystic.

88. All documents and communications regarding floods at Camp Mystic before July 4, 2025.



Copy from re:SearchTX

89. All documents and communications regarding efforts to mitigate flood risk at Camp Mystic, whether implemented or not.

Dated: January 12, 2026

Respectfully submitted,

*/s/ R. Paul Yetter*
R. Paul Yetter
State Bar No. 22154200
pyetter@yettercoleman.com
Justin P. Tschoepe
State Bar No. 24079480
jtschoepe@yettercoleman.com
J. Reid Simpson
State Bar No. 24072343
jrsimpson@yettercoleman.com
Shannon N. Smith
State Bar No. 24110378
ssmith@yettercoleman.com
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000

ATTORNEYS FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

I certify that on January 12, 2026, a copy of this document was served by email on all counsel of record.

*/s/ Shannon N. Smith*
Shannon N. Smith



Copy from re:SearchTX

# EXHIBIT B

Copy from re:SearchTX

No. D-1-GN-25-009963

| | | |
|---|---|---|
| WARREN and PATRICIA BELLOWS, et al., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiffs, | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| CAMP MYSTIC, LLC et al., | § | |
| | § | |
| Defendants. | § | 455TH JUDICIAL DISTRICT |

**PLAINTIFFS WARREN AND PATRICIA BELLOWS' FIRST INTERROGATORIES TO ALL DEFENDANTS**

To: All defendants through their counsel of record, Jeff Ray, Ray Pena McChristian, P.C.; Mikal Watts, Watts Law Firm; Lynn S. Castagna, Castagna Scott LLP; and Thomas C. Wright, Jessica Z. Barger, Kenneth J. Fair, Wright Close Barger & Guzman, LLP.

Pursuant to Tex. R. Civ. P. 197, Plaintiffs Warren and Patricia Bellows serve this first set of interrogatories to Defendants Camp Mystic, LLC; Natural Fountains Properties, Inc.; Mystic Camps Family Partnership, Ltd.; Mystic Camps Management, LLC; George Albritton Eastland, as Representative of the Estate of Richard Eastland, Deceased; Willetta Eastland; Edward Eastland; and Mary Liz Eastland (collectively, "Defendants"). Defendants are required to serve written responses to these Interrogatories within 30 days after the date these requests are served upon Defendants' counsel of record.

Copy from re:SearchTX

## DEFINITIONS

1. "Plaintiffs" means Warren and Patricia Bellows, Individually and as Representatives of Anna Margaret Bellows; Blake and Caitlin Bonner, Individually and as Representatives of Lila Bonner; Matthew and Wendie Childress, Individually and as Representatives of Chloe Childress; Ryan and Elizabeth DeWitt, Individually and as Representatives of Molly DeWitt; John and Andrea Ferruzzo, Individually and as Representatives of Katherine Ferruzzo; Ben and Natalie Landry, Individually and as Representatives of Lainey Landry; and Lindsey McCrory, Individually and as Representative of Blakely McCrory.

2. "Defendants" or "you" means Camp Mystic, LLC; Natural Fountains Properties, Inc.; Mystic Camps Family Partnership, Ltd.; Mystic Camps Management, LLC; George Albritton Eastland, as Representative of the Estate of Richard Eastland, Deceased; Willetta Eastland; Edward Eastland; and Mary Liz Eastland, as well as any of their employees, representatives, agents, consultants, experts, and contractors, collectively or separately, as context may require. For avoidance of doubt, "employees" includes any temporary or seasonal workers employed by any of the Camp Mystic Companies.

3. "Camp Mystic Companies" means Camp Mystic, LLC; Natural Fountains Properties, Inc.; Mystic Camps Family Partnership, Ltd.; and Mystic Camps Management, LLC.

4. "Camp Mystic" means the summer camp for girls operated by you in Hunt, Texas. For avoidance of doubt, this includes both of the facilities referred to as "Camp Mystic Guadalupe River" and "Camp Mystic Cypress Lake."

5. "Lawsuit" refers to this case.

6. "And" and "or" mean and/or.

7. "Any" means any and all.

8. "Person" means any natural person, firm, corporation, partnership, proprietorship, estate, trust, trust estate, joint venture, association, group, or organization, or any agent thereof.

9. "Individual" means any natural person.

10. "Relate" or "relating," in addition to their customary meaning, includes referring to, mentioning, reflecting, containing, commenting, concerning, alluding, pertaining to, evidencing, involving, describing, discussing, analyzing, evaluating, identifying, responding to, supporting, opposing, constituting, in connection with, in respect of, in respect to, about, regarding, embodying, explaining, referencing, assessing, dealing with, or being a draft, copy, or summary of in whole or in part.

11. "Including" or "includes" means including but not limited to.



Copy from re:SearchTX

## INSTRUCTIONS

1. These interrogatories are directed to all Defendants. If only one answer is provided, Plaintiffs Warren and Patricia Bellows will interpret your response as being on behalf of all Defendants. If your answer to an interrogatory is different for different Defendants, specify that in your response and provide separate answers for each Defendant, identifying which response is associated with which Defendant.

2. If you object to any interrogatory or any part thereof, answer all portions to which your objection does not apply, and identify any information that is being withheld pursuant to your objection.

   a. If you claim an interrogatory is overly broad, you must respond to the portion of the interrogatory that is unobjectionable and specifically identify the respect in which the interrogatory is allegedly overbroad.

   b. If you claim that an interrogatory is unduly burdensome, you must respond to that portion of the interrogatory that is unobjectionable and specifically identify the respect in which the interrogatory is allegedly unduly burdensome.

3. If in answering these interrogatories you claim any ambiguity in either an interrogatory or a definition or instruction applicable to it, identify in your response the language you consider ambiguous and state the interpretation you are using in responding.

4. The singular form of a word shall be interpreted as plural, and the plural form of a word shall be interpreted as singular whenever appropriate, in order to bring within the scope of these requests any information which might otherwise be considered beyond their scope.

5. These interrogatories are continuing. You are to supplement your responses in a reasonable time if you obtain or become aware of further information.

6. If you claim that information requested is protected from disclosure by the attorney-client or other privilege, specify the nature of the privilege and your grounds for claiming it.

7. If you object or otherwise decline to provide any of the information requested, set forth the grounds upon which you rely with specificity, and provide the most responsive information you are willing to provide without a court order.

8. You are requested to furnish information that is available to you. This includes information obtained by your attorneys, employees, agents, and other representatives, and not merely the information known by you of your own knowledge.

9. The relevant time period for these interrogatories is included in each interrogatory.



Copy from re:SearchTX

**PLAINTIFFS WARREN AND PATRICIA BELLOWS' FIRST INTERROGATORIES**

1. Identify every camper and counselor who attended Camp Mystic during the session including July 4, 2025, including what cabin or building each camper or counselor was assigned to or resided in.

2. Identify every independent contractor or non-counselor employee, including any temporary or seasonal workers, of Camp Mystic during the session including July 4, 2025, and state their roles or responsibilities.

3. Identify the precise location(s) and movements of every independent contractor or non-counselor employee, including any temporary or seasonal workers, of Camp Mystic during the session including July 4, 2025, from midnight to noon on July 4, 2025. This identification should include Richard Eastland, Sr., Edward Eastland, Richard Eastland, Jr., Mary Liz Eastland, Willetta Eastland, Craig Althaus, Betsy Althaus, George Eastland, Catie Eastland, Leslie Eastland, and Glenn Juenke.

4. Describe in detail the precise timeline and specific locations of Richard Eastland, Sr.'s actions and movements from noon on July 3, 2025, to the time of his death on July 4, 2025.

5. Describe in detail the precise timeline and specific locations of Edward Eastland's actions and movements from noon on July 3, 2025, to noon on July 4, 2025.

6. Describe in detail any communications between any employee or agent of Camp Mystic with any camper or counselor in the Bubble Inn Cabin from 10:00 PM on July 3, 2025, to noon on July 4, 2025, including the name of the camper or counselor and time and substance of the communication.

7. Describe in detail any communications between any employee or agent of Camp Mystic with any camper or counselor in the Twins I or II Cabins from 10:00 PM on July 3, 2025, to noon on July 4, 2025, including the name of the camper or counselor and time and substance of the communication.

8. Describe in detail the process every independent contractor or non-counselor employee, including any temporary or seasonal workers, of Camp Mystic undertook to secure or remove equipment near the Guadalupe River on Camp Mystic premises from midnight to 3:00 AM on July 4, 2025, and identify all persons involved.

9. Describe how and when any employee or agent of Camp Mystic used or attempted to use loudspeakers or other announcement systems to instruct campers and counselors to evacuate their cabins on July 4, 2025, including the substance of the communication.

10. Identify the officers, directors, managers, partners, and owners from 2013 to today of the Camp Mystic Companies.

11. Describe in detail the flow of profits generated by Camp Mystic from 2013 to present among the Camp Mystic Companies and any member of the Eastland family.



Copy from re:SearchTX

12. Identify any repair, modification, or change to Camp Mystic since July 4, 2025, including the identity of any vendor or contractor that participated in the repair, modification, or change.

13. Identify all outside vendors providing services to Camp Mystic during the session including July 4, 2025.

14. Identify each engineer or other consultants used from 2010 to today in connection with Letter of Map Change or Letter of Map Amendment requests submitted to any state or federal government agency, including the amounts paid for such services.

15. Identify any weather or flood watch or warning notice received by any employee or agent of Camp Mystic from July 1-4, 2025, including the identity of the recipient of the notice, device on which the notice was received, substance or text of the notice, and the time the notice was received.

16. Describe all flooding events at Camp Mystic since its creation, including the impact on the property, location of water as to specific structures and damage to specific structures, and structures from which any person was evacuated.



Copy from re:SearchTX

Dated: January 12, 2026

Respectfully submitted,

*/s/ R. Paul Yetter*

R. Paul Yetter
State Bar No. 22154200
pyetter@yettercoleman.com
Justin P. Tschoepe
State Bar No. 24079480
jtschoepe@yettercoleman.com
J. Reid Simpson
State Bar No. 24072343
jrsimpson@yettercoleman.com
Shannon N. Smith
State Bar No. 24110378
ssmith@yettercoleman.com
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000

ATTORNEYS FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

I certify that on January 12, 2026, a copy of this document was served by email on all counsel of record.

*/s/ Shannon N. Smith*

Shannon N. Smith



Copy from re:SearchTX

# EXHIBIT C

Copy from re:SearchTX

No. D-1-GN-25-009963

| | | |
|---|---|---|
| WARREN and PATRICIA BELLOWS, et al., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiffs, | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| CAMP MYSTIC, LLC et al., | § | |
| | § | |
| Defendants. | § | 455TH JUDICIAL DISTRICT |

**DEFENDANT GEORGE ALBRITTON EASTLAND, AS REPRESENTATIVE OF THE ESTATE OF RICHARD G. EASTLAND'S OBJECTIONS AND ANSWERS TO PLAINTIFFS WARREN AND PATRICIA BELLOWS' FIRST INTERROGATORIES**

To: Plaintiffs Warren and Patricia Bellows, by and through their counsel of record: Paul Yetter, Justin P. Tschoepe, J. Reid Simpson, Shannon N. Smith; Yetter Coleman LLP; 811 Main Street, Suite 4100, Houston, Texas 77002.

Pursuant to Tex. R. Civ. P. 197 and subject to his Motion to Transfer Venue, Defendant George Albritton Eastland, as Representative of the Estate of Richard G. Eastland, makes the following Objections and Answers to Plaintiffs' First Set of Interrogatories.

All the responses contained herein are based only upon such information and documents as are presently available to and specifically known to Defendant and/or counsel. Defendant reserves the right to change and/or supplement any and all responses.

Respectfully submitted,

**RAY | PEÑA, P.C.**
9601 McAllister Freeway, Suite 901
San Antonio, Texas 78216
P: (210) 341-3554
F: (210) 341-3557

*/s/ Jeff Ray*
JEFF RAY
State Bar No. 16604400
jray@raylaw.com



Copy from re:SearchTX

*Attorney for George Albritton Eastland, as Representative of the Estate of Richard G. Eastland, Deceased*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing instrument has been served to all counsel of record in accordance with Texas Rule of Civil Procedure 21 on February 27, 2026.

*/s/ Jeff Ray*
**JEFF RAY**



Copy from re:SearchTX

**OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS**

Defendant objects to Plaintiffs' Definitions and Instructions to Plaintiffs Warren and Patricia Bellows' First Interrogatories as vague, overbroad, unnecessary and beyond the scope of the Texas Rules of Civil Procedure. Subject to and without waiving any objection, Defendant will response to Plaintiffs Warren and Patricia Bellows' First Interrogatories pursuant to the Texas Rules of Civil Procedure.

Defendant objects to Plaintiffs' definition of "Camp Mystic Companies" as misleading and overly broad. Natural Fountains Properties, Inc. has no role in operation of Camp Mystic other than holding title over the property on which the camp operates. Mystic Camps Family Partnership, Ltd. and Mystic Camps Management, LLC, are holding companies with no employees and have no role in the operation of Camp Mystic.

Defendant objects to Plaintiffs' definition of "Person" as overly broad and contrary to the ordinary and customary meaning of such term. Defendant will apply the ordinary and customary meaning of the term "Person" in responding to these requests.

Defendant objects to Instruction #1 as contrary to and beyond the scope of the Texas Rules of Civil Procedure.

Defendant objects to Instruction #2 as contrary to and beyond the scope of the Texas Rules of Civil Procedure.

Defendant objects to Instruction #3 as contrary to and beyond the scope of the Texas Rules of Civil Procedure.

Defendant objects to Instruction #6 as contrary to the express requirements of the Texas Rules of Civil Procedure as they pertain to claims of privilege.

Defendant objects to Instruction #7 as contrary to and beyond the scope of the Texas Rules of Civil Procedure.



Copy from re:SearchTX

## OBJECTIONS AND ANSWERS TO INTERROGATORIES

1. Identify every camper and counselor who attended Camp Mystic during the session including July 4, 2025, including what cabin or building each camper or counselor was assigned to or resided in.

**RESPONSE: Objection. This Interrogatory is vague, overly broad, harassing, and constitutes an impermissible fishing expedition. Further objecting, the Interrogatory seeks sensitive information regarding identity of minors and constitutes an invasion of the rights of privacy of third parties who are not a party to the subject litigation. Defendant requires the entry of a protective order prior to disclosing information regarding campers or camp counselors who were present the morning of July 4, 2025.**

**Subject to and without waiving objections, Defendant answers as follows:**

> **Plaintiffs are referred to Camp Mystic, LLC's Initial Disclosures for identification of witnesses with knowledge of relevant facts. Defendant is willing to provide further responsive information after entry of a suitable protective order.**

2. Identify every independent contractor or non-counselor employee, including any temporary or seasonal workers, of Camp Mystic during the session including July 4, 2025, and state their roles or responsibilities.

**RESPONSE: Objection. This Interrogatory is vague, overly broad, harassing, and constitutes an impermissible fishing expedition for information that is irrelevant, immaterial, and not reasonably calculated to lead to the discovery of admissible evidence.**

**Subject to and without waiving objections. Defendant answers as follows:**

> **Plaintiffs are referred to Camp Mystic, LLC's Initial Disclosures for identification of witnesses with knowledge of relevant facts.**

3. Identify the precise location(s) and movements of every independent contractor or non-counselor employee, including any temporary or seasonal workers, of Camp Mystic during the session including July 4, 2025, from midnight to noon on July 4, 2025. This identification should include Richard Eastland, Sr., Edward Eastland, Richard Eastland, Jr., Mary Liz Eastland, Willetta Eastland, Craig Althaus, Betsy Althaus, George Eastland, Catie Eastland, Leslie Eastland, and Glenn Juenke.

**RESPONSE: Objection. This Interrogatory is overly broad, unduly burdensome, and attempts to require Defendant to marshal all of its available proof. A party is not required to marshal its evidence in response to a written discovery request. Further objecting, this Interrogatory constitutes an impermissible fishing expedition for information that is irrelevant, immaterial, and not reasonably calculated to lead to the discovery of admissible evidence. Further objecting, this Interrogatory is harassing in that it seeks "precise" location information and movements of more than 11 different individuals over a period of 12 hours. This request calls for a narrative response that is better suited for deposition.**



Copy from re:SearchTX

**Subject to and without waiving the foregoing objections, Defendant answers as follows:**

> **Plaintiffs are referred to the interrogatory responses of all Defendants and the deposition testimony of witnesses to be taken in this matter.**

4. Describe in detail the precise timeline and specific locations of Richard Eastland, Sr.'s actions and movements from noon on July 3, 2025, to the time of his death on July 4, 2025.

**RESPONSE: Objection. This Interrogatory is overly broad, unduly burdensome, and attempts to require Defendant to marshal all of its available proof. A party is not required to marshal its evidence in response to a written discovery request. Further objecting, this Interrogatory is harassing in that it seeks a detailed and "precise" timeline of "specific locations" of Richard (Dick) Eastland over a period of more than 12 hours. This request calls for a narrative response that is better suited for deposition.**

**Defendant further objects to the language "in detail" for the reason that an Interrogatory question is an inappropriate means for asking for a detailed description. Defendant reserves its right to require Plaintiff's Counsel to conduct his examination by question and answer.**

**Subject to and without waiving the foregoing objections, Defendant answers as follows:**

> **Plaintiffs are referred to the interrogatory responses of all Defendants and the deposition testimony of witnesses to be taken in this matter.**

5. Describe in detail the precise timeline and specific locations of Edward Eastland's actions and movements from noon on July 3, 2025, to noon on July 4, 2025.

**RESPONSE: Objection. This Interrogatory is overly broad, unduly burdensome, and attempts to require Defendant to marshal all of its available proof. A party is not required to marshal its evidence in response to a written discovery request. Further objecting, this Interrogatory is harassing in that it seeks a detailed and "precise" timeline of "specific locations" of Edward Eastland over a period of 24 hours. This request calls for a narrative response that is better suited for deposition.**

**Defendant further objects to the language "in detail" for the reason that an Interrogatory question is an inappropriate means for asking for a detailed description. Defendant reserves its right to require Plaintiff's Counsel to conduct his examination by question and answer.**

**Subject to and without waiving the foregoing objections, Defendant answers as follows:**

> **Plaintiffs are referred to the interrogatory responses of all Defendants and the deposition testimony of witnesses to be taken in this matter.**

6. Describe in detail any communications between any employee or agent of Camp Mystic with any camper or counselor in the Bubble Inn Cabin from 10:00 PM on July 3, 2025, to noon on July 4, 2025, including the name of the camper or counselor and time and substance of the communication.



Copy from re:SearchTX

**RESPONSE: Objection. This Interrogatory is overly broad, unduly burdensome, harassing, and attempts to require Defendant to marshal all of its available proof. A party is not required to marshal its evidence in response to a written discovery request. Further objecting, this Interrogatory is harassing in that it calls for a detailed description of all communications involving numerous parties over a period of more than 12 hours. This request calls for a narrative response that is better suited for deposition.**

**Defendant further objects to the language "in detail" for the reason that an Interrogatory question is an inappropriate means for asking for a detailed description. Defendant reserves its right to require Plaintiff's Counsel to conduct his examination by question and answer.**

**Subject to and without waiving the foregoing objections, Defendant answers as follows:**

> **Plaintiffs are referred to the interrogatory responses of all Defendants and the deposition testimony of witnesses to be taken in this matter.**

7. Describe in detail any communications between any employee or agent of Camp Mystic with any camper or counselor in the Twins I or II Cabins from 10:00 PM on July 3, 2025, to noon on July 4, 2025, including the name of the camper or counselor and time and substance of the communication.

**RESPONSE: Objection. This Interrogatory is overly broad, unduly burdensome, harassing, and attempts to require Defendant to marshal all of its available proof. A party is not required to marshal its evidence in response to a written discovery request. Further objecting, this Interrogatory is harassing in that it calls for a detailed description of all communications involving numerous parties over a period of more than 12 hours. This request calls for a narrative response that is better suited for deposition.**

**Defendant further objects to the language "in detail" for the reason that an Interrogatory question is an inappropriate means for asking for a detailed description. Defendant reserves its right to require Plaintiff's Counsel to conduct his examination by question and answer.**

**Subject to and without waiving the foregoing objections, Defendant answers as follows:**

> **Plaintiffs are referred to the interrogatory responses of all Defendants and the deposition testimony of witnesses to be taken in this matter.**

8. Describe in detail the process every independent contractor or non-counselor employee, including any temporary or seasonal workers, of Camp Mystic undertook to secure or remove equipment near the Guadalupe River on Camp Mystic premises from midnight to 3:00 AM on July 4, 2025, and identify all persons involved.

**RESPONSE: Objection. This Interrogatory is overly broad, unduly burdensome, harassing, and attempts to require Defendant to marshal all of its available proof. A party is not required to marshal its evidence in response to a written discovery request. Further objecting, this Interrogatory is harassing in that it calls for a detailed description of all communications involving numerous parties over a period of more than 12 hours. This request is better suited for deposition.**



Copy from re:SearchTX

**Defendant further objects to the language "in detail" for the reason that an Interrogatory question is an inappropriate means for asking for a detailed description. Defendant reserves its right to require Plaintiff's Counsel to conduct his examination by question and answer.**

**Subject to and without waiving objections, Defendant answers as follows: Plaintiffs are referred to Camp Mystic, LLC's interrogatory answers.**

9. Describe how and when any employee or agent of Camp Mystic used or attempted to use loudspeakers or other announcement systems to instruct campers and counselors to evacuate their cabins on July 4, 2025, including the substance of the communication.

**RESPONSE: Objection. This Interrogatory assumes facts not established and is misleading**

**Subject to and without waiving objections, Defendant answers as follows: Not applicable.**

10. Identify the officers, directors, managers, partners, and owners from 2013 to today of the Camp Mystic Companies.

**RESPONSE: Objection. This Interrogatory is vague, overly broad, and not sufficiently limited in time or scope. This request seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Further objecting, this Interrogatory is misleading with respect to Camp Mystic Companies. Camp Mystic, LLC is the only operating entity for Camp Mystic Guadalupe River and leases the property on which the camp sits from Natural Fountains Properties, Inc.**

**Subject to and without waiving objections, Defendant answers as follows:**

**Willetta and Richard (Dick) Eastland were the executive directors of Camp Mystic, LLC on July 4, 2025. Richard ( Dick) Eastland was also the Chairman of the Board and President of Camp Mystic Inc.**

**Willetta was also the Secretary of Camp Mystic Inc.**

**Edward was vice president and, Edward and Mary Liz were the directors of Camp Mystic Guadalupe River on July 4, 2025.**

11. Describe in detail the flow of profits generated by Camp Mystic from 2013 to present among the Camp Mystic Companies and any member of the Eastland family.

**RESPONSE: Objection. This request exceeds the scope of permissible discovery under Texas Rules of Civil Procedure 192. Defendant objects to this request to the extent it seeks the disclosure of materials that contain confidential and proprietary information, including trade secrets, which are privileged from discovery pursuant to Rule 507, TRE.**

**Defendant objects to this discovery request as being overly broad and vague in that it fails to describe the information requested with reasonable particularity. This request is not reasonably limited in time or scope. Defendant objects to this discovery request for the**



Copy from re:SearchTX

**reason that it is seeking information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.**

**Defendant further objects to the language "in detail" for the reason that an Interrogatory question is an inappropriate means for asking for a detailed description. Defendant reserves its right to require Plaintiff's Counsel to conduct his examination by question and answer.**

**Defendant objects to this discovery request because the request, as worded, constitutes an invasion of the right to privacy of this defendant.**

12. Identify any repair, modification, or change to Camp Mystic since July 4, 2025, including the identity of any vendor or contractor that participated in the repair, modification, or change.

**RESPONSE: Objection. This Interrogatory is overly broad, vague, misleading, and seeks information regarding subsequent remedial measures that is irrelevant, immaterial, and not reasonably calculated to lead to the discovery of admissible evidence.**

**Subject to and without waiving objections, Defendant answers as follows:**

> **Remedial work was conducted related to camp structures to address significant health and safety hazards posed by the destruction caused by the flood. State and government officials and volunteers were involved in clean up and mold remediation efforts. In addition, personal property belonging to campers and counselors was removed from the cabins and collected by the owners.**

13. Identify all outside vendors providing services to Camp Mystic during the session including July 4, 2025.

**RESPONSE: Objection. This Interrogatory is vague and seeks information that is irrelevant, immaterial, and is not reasonably calculated to lead to the discovery of admissible evidence. Defendants further object to this interrogatory because it is not narrowly tailored to avoid including tenuous information and it constitutes an impermissible fishing expedition for information that is confidential, private, and proprietary in nature.**

14. Identify each engineer or other consultants used from 2010 to today in connection with Letter of Map Change or Letter of Map Amendment requests submitted to any state or federal government agency, including the amounts paid for such services.

**RESPONSE: Objection. This Interrogatory constitutes an impermissible fishing expedition for information that is confidential, private, or proprietary in nature.**

**Subject to and without waiving objections, Defendant answers as follows: Plaintiffs are referred to Camp Mystic, LLC's interrogatory answers.**

15. Identify any weather or flood watch or warning notice received by any employee or agent of Camp Mystic from July 1-4, 2025, including the identity of the recipient of the



Copy from re:SearchTX

notice, device on which the notice was received, substance or text of the notice, and the time the notice was received.

**RESPONSE: Objection. This Interrogatory is overly broad and seeks documents that is irrelevant, immaterial, and is not reasonably calculated to lead to the discovery of admissible evidence.**

**Subject to and without waiving objections, Defendant answers as follows:**

**There was a CodeRED weather alert for a flash flood warning for Highway 39 issued at 1:14 AM. That was not an evacuation notice or evacuation alert. That was not seen until the afternoon of July 4, 2025. There was National Weather Service Flash Flood Warning issued at 3:35 AM, after evacuation efforts had already begun at Camp Mystic.**

16. Describe all flooding events at Camp Mystic since its creation, including the impact on the property, location of water as to specific structures and damage to specific structures, and structures from which any person was evacuated.

**RESPONSE: Objection. This Interrogatory is vague, overly broad, and seeks information that is irrelevant, immaterial, and is not reasonably calculated to lead to the discovery of admissible evidence. Further objecting, the information requested is equally available to Plaintiffs through publicly accessible sources.**



Copy from re:SearchTX

## VERIFICATION

STATE OF TEXAS §
§
COUNTY OF BEXAR §

Before me, the undersigned Notary Public, on this day personally appeared **GEORGE ALBRITTON EASTLAND, as Representative of the Estate of Richard G. Eastland**, who, being by me duly sworn on oath deposed and said that he has read the foregoing *Defendant George Albritton Eastland, as Representative of the Estate of Richard G. Eastland's Objections and Answers to Plaintiffs' First Set of Interrogatories*, and, with respect to all answers, excepting those regarding persons with knowledge of relevant facts, trial witnesses, and legal contentions to which there is no verification requirement (TEX. R. CIV. P. 197.2), the answers are based on his/her personal knowledge and are true and correct, and are hereby signed under oath pursuant to the applicable rules of civil procedure (*see* TEX. R. CIV. P. 197.2).

George A. Eastland

**GEORGE ALBRITTON EASTLAND, as Representative of the Estate of Richard G. Eastland**

**SWORN AND SUBSCRIBED TO** before me on this 24th day of February, 2026, to certify which witness my hand and official seal.

Veronica N Sullivan
My Commission Expires 11/7/2029
Notary ID 11033954

**Notary Public in and for the State of Texas**

My commission expires: ____________

Copy from re:SearchTX

# EXHIBIT D

Copy from re:SearchTX

No. D-1-GN-25-009963

| | | |
|---|---|---|
| WARREN and PATRICIA BELLOWS, et al., | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiffs, | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| CAMP MYSTIC, LLC et al., | § | |
| | § | |
| Defendants. | § | 455TH JUDICIAL DISTRICT |

**DEFENDANT CAMP MYSTIC, LLC'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST REQUESTS FOR PRODUCTION**

To: Plaintiffs Warren and Patricia Bellows, by and through their counsel of record: Paul Yetter, Justin P. Tschoepe, J. Reid Simpson, Shannon N. Smith; Yetter Coleman LLP; 811 Main Street, Suite 4100, Houston, Texas 77002.

Pursuant to Tex. R. Civ. P. 197 and subject to its Motion to Transfer Venue, Defendant Camp Mystic, LLC, makes the following Objections and Responses to Plaintiffs' First Requests for Production.

All the responses contained herein are based only upon such information and documents as are presently available to and specifically known to Defendant and/or counsel. Defendant reserves the right to change and/or supplement any and all responses.

Respectfully submitted,

**RAY | PEÑA, P.C.**
9601 McAllister Freeway, Suite 901
San Antonio, Texas 78216
P: (210) 341-3554
F: (210) 341-3557

*/s/ Jeff Ray*
JEFF RAY
State Bar No. 16604400
jray@raylaw.com
*Attorney for Camp Mystic, LLC*



Copy from re:SearchTX

**WRIGHT CLOSE BARGER & GUZMAN, LLP**
One Riverway, Suite 2200
Houston, Texas 77056
Telephone: (713) 572-4321
Facsimile: (713) 572-4320

*/s/Thomas C. Wright*
Thomas C. Wright
State Bar No. 22059400
wright@wrightclosebarger.com
Jessica Z. Barger
State Bar No. 24032706
barger@wrightclosebarger.com
Kenneth J. Fair
State Bar No. 24007171
fair@wrightclosebarger.com
*Attorneys for Camp Mystic, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing instrument has been served to all counsel of record in accordance with Texas Rule of Civil Procedure 21 on February 27, 2026.

*/s/ Jeff Ray*
**JEFF RAY**



Copy from re:SearchTX

**OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS**

Defendant objects to Plaintiffs' Definitions and Instructions to Plaintiffs Warren and Patricia Bellows' First Requests for Production as vague, overbroad, unnecessary and beyond the scope of the Texas Rules of Civil Procedure. Subject to and without waiving any objection, Defendant will response to Plaintiffs Warren and Patricia Bellows' First Requests for Production pursuant to the Texas Rules of Civil Procedure.

Defendant objects to Plaintiffs' definition of "Defendants" as misleading and overly broad.

Defendant objects to Plaintiffs' definition of "Camp Mystic Companies" as misleading. Natural Fountains Properties, Inc. is merely the landowner of the property leased to Camp Mystic LLC for camp operations. Natural Fountains Properties, Inc., Mystic Camps Family Partnership, Ltd., and Mystic Camps Management, LLC have no employees and no role in camp operations.

Defendant objects to Plaintiffs' definition of "Person" as overly broad and contrary to the ordinary and customary meaning of such term. Defendant will apply the ordinary and customary meaning of the term "Person" in responding to these requests.

Defendant objects to Plaintiffs' definition of the term "Document" as overly broad, seeking information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, and to the extent it seeks information protected from discovery by the attorney-client privilege and work-product doctrine.

Defendant objects to Instruction #1 as contrary to and beyond the scope of the Texas Rules of Civil Procedure.

Defendant objects to Instruction #3 as contrary to and beyond the scope of the Texas Rules of Civil Procedure.

Defendant objects to Instruction #5 as overly broad in time. Defendants will respond and produce documents and information from the time period of January 1, 2020 to present.

Defendant objects to Instruction #10 as contrary to and beyond the scope of the Texas Rules of Civil Procedure.

Defendant objects to Instruction #12 to the extent the information responsive to any particular request is privileged or available in the public forum and/or equally accessible to Plaintiffs.



Copy from re:SearchTX

**OBJECTIONS AND RESPONSES TO REQUESTS FOR PRODUCTION**

1. All entity formation documents, including articles of incorporation, certificates of formation, and amendments, related to the Camp Mystic Companies since their inception.

**RESPONSE: Defendants object to this request as overbroad and not sufficiently limited in time or scope. Further objecting, this Request seeks information that is irrelevant, immaterial and is not reasonably calculated to lead to the discovery of admissible evidence.**

**Subject to and without waiving the foregoing objections, Plaintiffs are referred to documents produced.**

2. All entity governance documents, including partnership or LLC agreements, bylaws, and operating agreements, related to the Camp Mystic Companies since their inception.

**RESPONSE: Defendants object to this request as overbroad and not sufficiently limited in time or scope. Further objecting, this Request seeks information that is irrelevant, immaterial and is not reasonably calculated to lead to the discovery of admissible evidence.**

**Subject to and without waiving the foregoing objections, Plaintiffs are referred to documents produced.**

3. All leases between or among the Camp Mystic Companies since their inception regarding the land on which Camp Mystic is located.

**RESPONSE: This request is overbroad and not sufficiently limited in time or scope. This request seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.**

**Subject to and without waiving the foregoing objections, Plaintiffs are referred to documents produced regarding any active leases.**

4. All documents submitted to or filed with the State of Texas and its agencies or offices, including the Secretary of State, Comptroller of Public Accounts, Department of State Health Services, and Department of Insurance, related to the Camp Mystic Companies.

**RESPONSE: Defendants object to this request as overly broad and vague in that it fails to describe the information requested with reasonable particularity. Defendants also object to this request as it seeks information that is not relevant to the resolution of any issue, fact, or claim in the pending action and is not reasonably calculated to lead to the discovery of admissible evidence. Defendants further object to this request is not narrowly tailored to avoid including tenuous information, is not proportional to the needs of this case, and constitutes an impermissible fishing expedition.**

**Subject to and without waiving the foregoing objections, Plaintiffs are referred to documents produced.**



Copy from re:SearchTX

5. All documents received from State of Texas and its agencies or offices, including the Secretary of State, Comptroller of Public Accounts, Department of State Health Services, and Department of Insurance, related to the Camp Mystic Companies.

**RESPONSE: Defendants object to this request as overly broad and vague in that it fails to describe the information requested with reasonable particularity. Defendants also object on the basis that the request is not sufficiently limited in time or scope.**

**Defendants also object to this request as it seeks information that is not relevant to the resolution of any issue, fact, or claim in the pending action and is not reasonably calculated to lead to the discovery of admissible evidence. Defendants further object to this request is not narrowly tailored to avoid including tenuous information, is not proportional to the needs of this case, and constitutes an impermissible fishing expedition.**

**Subject to and without waiving the foregoing objections, Plaintiffs are referred to documents produced.**

6. All documents submitted to or filed with Kerr County, Texas and its agencies or offices related to or on behalf of the Camp Mystic Companies.

**RESPONSE: Defendants object to this request as overly broad and vague in that it fails to describe the information requested with reasonable particularity. Defendants also object on the basis that the request is not sufficiently limited in time or scope.**

**Defendants also object to this request as it seeks information that is not relevant to the resolution of any issue, fact, or claim in the pending action and is not reasonably calculated to lead to the discovery of admissible evidence. Defendants further object to this request is not narrowly tailored to avoid including tenuous information, is not proportional to the needs of this case, and constitutes an impermissible fishing expedition.**

**Subject to and without waiving the foregoing objections, none.**

7. All documents received from Kerr County, Texas and its agencies or offices related to the Camp Mystic Companies.

**RESPONSE: Defendants object to this request as overly broad and vague in that it fails to describe the information requested with reasonable particularity. Defendants also object on the basis that the request is not sufficiently limited in time or scope.**

**Defendants also object to this request as it seeks information that is not relevant to the resolution of any issue, fact, or claim in the pending action and is not reasonably calculated to lead to the discovery of admissible evidence. Defendants further object to this request is not narrowly tailored to avoid including tenuous information, is not proportional to the needs of this case, and constitutes an impermissible fishing expedition.**

**Subject to and without waiving the foregoing objections, none.**



Copy from re:SearchTX

8. All documents submitted to or filed with the federal government and its agencies or offices, including the Federal Emergency Management Agency, Department of Labor, and Internal Revenue Service, related to or on behalf of the Camp Mystic Companies.

**RESPONSE: Defendants object to this request as vague, ambiguous, and overbroad in time, scope, and subject matter. The request lacks sufficient specificity of the information and materials sought. Defendants also object to this request as it seeks information that is not relevant to the resolution of any issue, fact, or claim in the pending action and is not reasonably calculated to lead to the discovery of admissible evidence.**

**Defendants further object to this request is not narrowly tailored to avoid including tenuous information, is not proportional to the needs of this case, and constitutes an impermissible fishing expedition. Defendant objects to this discovery request as calling for information equally accessible to all parties.**

9. All documents received from the federal government and its agencies or offices, including the Federal Emergency Management Agency, Department of Labor, and Internal Revenue Service, related to the Camp Mystic Companies.

**RESPONSE: Defendants object to this request as vague, ambiguous, and overbroad in time, scope, and subject matter. The request lacks sufficient specificity of the information and materials sought. Defendants also object to this request as it seeks information that is not relevant to the resolution of any issue, fact, or claim in the pending action and is not reasonably calculated to lead to the discovery of admissible evidence.**

**Defendant objects to this discovery request because the request, as worded, constitutes an invasion of the right to privacy of this defendant, and seeks the disclosure of documents that are irrelevant to any issue in this lawsuit and not reasonably calculated to lead to the discovery of admissible evidence.**

**Defendants further object to this request is not narrowly tailored to avoid including tenuous information, is not proportional to the needs of this case, and constitutes an impermissible fishing expedition.**

10. All documents identifying any principal office of the Camp Mystic Companies.

**RESPONSE: Defendants object to this request as vague and overly broad. Further objecting, this request seeks information that is irrelevant and immaterial as Mystic Camps Family Partnership, Ltd. and Mystic Camps Management, LLC are holding companies that have no employees and no role in operations of Camp Mystic.**

**Subject to and without waiving the foregoing objections, Plaintiffs are referred to documents produced.**

11. All documents reflecting the business address, headquarters, or principal place of business of the Camp Mystic Companies.



Copy from re:SearchTX

**RESPONSE: Defendants object to this request as vague and overly broad. Further objecting, this request seeks information that is irrelevant and immaterial as Mystic Camps Family Partnership, Ltd. and Mystic Camps Management, LLC are holding companies that have no employees and no role in operations of Camp Mystic.**

**Subject to and without waiving the foregoing objections, Plaintiffs are referred to documents produced.**

12. Documents sufficient to show all owners, officers, directors, members, managers, and partners of the Camp Mystic Companies.

**RESPONSE: Defendants object to this request as vague, overly broad, and not reasonably limited in time or scope. Further objecting, this request seeks information that is irrelevant and immaterial as Mystic Camps Family Partnership, Ltd. and Mystic Camps Management, LLC are holding companies that have no employees and no role in operations of Camp Mystic. Defendants also object to this request to the extent it seeks information that is not relevant to the resolution of any issues, claims, or facts of the pending action and is not reasonably calculated to lead to the discovery of admissible evidence.**

**Subject to and without waiving the foregoing objections, Plaintiffs are referred to documents produced.**

13. All meeting minutes, written consents, or other documents reflecting actions or decisions of shareholders, members, or partners of the Camp Mystic Companies.

**RESPONSE: Defendants object to this request as vague, overly broad, and not reasonably limited in time or scope. Mystic Camps Family Partnership, Ltd. and Mystic Camps Management, LLC are holding companies that have no employees and no role in operations of Camp Mystic. Defendants also object to this request to the extent it seeks information that is not relevant to the resolution of any issues, claims, or facts of the pending action and is not reasonably calculated to lead to the discovery of admissible evidence. Defendants further object to the extent this request seeks documents protected by attorney-client privilege and/or exempt from discovery by virtue of the work product doctrine.**

**Subject to and without waiving the foregoing objections, Plaintiffs are referred to documents produced.**

14. Documents sufficient to show all employees of Mystic Camps Family Partnership, Ltd. and Mystic Camps Management, LLC.

**RESPONSE: None.**

15. All agreements between or among any or all of defendants, regardless of time period.

**RESPONSE: Defendant objects as this request exceeds the scope of permissible discovery under Texas Rule of Civil Procedure 192.**



Copy from re:SearchTX

**Defendant objects to this discovery request as being overly broad and vague in that it fails to describe the information requested with reasonable particularity. This request is not reasonably limited in time or scope. Defendant objects to this discovery request for the reason that it is seeking information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.**

16. All documents, including organization charts, reflecting the relationship between or among the Camp Mystic Companies.

**RESPONSE: Defendants object to this request as vague, overly broad, and not reasonably limited in time or scope. Defendant also objects to this request to the extent it seeks information that is not relevant to the resolution of any issues, claims, or facts of the pending action and is not reasonably calculated to lead to the discovery of admissible evidence. Mystic Camps Family Partnership, Ltd. and Mystic Camps Management, LLC are holding companies that have no employees and no role in operations of Camp Mystic.**

**Defendants further object to the extent it seeks documents protected by attorney-client privilege and work product doctrine.**

17. All documents reflecting the flow of money or other assets between or among any of defendants, George Albritton Eastland, Catie Eastland, Richard Eastland, Jr., or Leslie Eastland since January 1, 2020, including salaries, dividends, distributions, housing, transportation, and bonuses.

**RESPONSE: Defendants object to this request as harassing, abusive, and seeking information that is irrelevant, immaterial, and not reasonably calculated to lead to the discovery of admissible evidence. Defendants further object to this request in that constitutes an impermissible fishing expedition.**

**Defendant objects to this request to the extent it seeks the disclosure of materials that contain confidential and sensitive personal information, including trade secrets, which are privileged from discovery pursuant to Rule 507, TRE.**

**Defendant objects to this discovery request because the request, as worded, constitutes an invasion of the right to privacy of this defendant, and seeks the disclosure of documents that are irrelevant to any issue in this lawsuit and not reasonably calculated to lead to the discovery of admissible evidence.**

**Defendant objects to this discovery request because the request, as worded, constitutes an invasion of the right to privacy to third parties who are not a party to the subject litigation.**

18. All communications between or among defendants regarding the relationship between the Camp Mystic Companies from January 1, 2020, to present.

**RESPONSE: Defendants object to this request as vague, overbroad, and not reasonably limited in time or scope. The request lacks sufficient specificity of the information and**



Copy from re:SearchTX

**materials sought. Defendant also objects to this request to the extent it seeks information that is not relevant to the resolution of any issues, claims, or facts of the pending action and is not reasonably calculated to lead to the discovery of admissible evidence. Defendants further object to the extent it seeks documents protected by attorney-client privilege and work product doctrine.**

19. All documents showing the residence of Richard Eastland Sr. or Willetta Eastland, including driver's license, will or testamentary documents, powers of attorney, declarations or affidavits, vehicle registration, voter registration, property records, homestead exemption filings, insurance documents, tax returns, and utility bills.

**RESPONSE: Defendants object to this request as overly broad, and not reasonably calculated to lead to the discovery of admissible evidence.**

**Defendant objects to this discovery request because the request, as worded, constitutes an invasion of the right to privacy of this defendant, and seeks the disclosure of documents that are irrelevant to any issue in this lawsuit and not reasonably calculated to lead to the discovery of admissible evidence.**

**Subject to and without waiving the foregoing objections, Plaintiffs are referred to documents produced.**

20. All documents associated with any transfer of ownership of the residence at 2404 Scenic Drive, Austin, Texas 78703.

**RESPONSE: Defendants object to this request as vague, overbroad, and not reasonably calculated to lead to the discovery of admissible evidence.**

21. All documents forming and governing Richard G Eastland 2023 Family Trust or Willetta A Eastland 2023 Exemption Trust.

**RESPONSE: Defendants object to this request to the extent it seeks material that is irrelevant, immaterial, and not reasonably calculated to lead to the discovery of admissible evidence.**

22. All documents related to any homestead exemption filed or in effect for 2404 Scenic Drive, Austin, Texas 78703 in this county.

**RESPONSE: Plaintiffs are referred to documents produced.**

23. All documents related to any request for Letter of Map Amendment or Revision to any federal agency concerning land or structures owned or operated by Camp Mystic Companies.

**RESPONSE: Defendants object to this request as vague and overly broad.**



Copy from re:SearchTX

**Subject to and without waiving the foregoing objections, Plaintiffs are referred to documents produced.**

24. All documents submitted by any of you to FEMA regarding Camp Mystic.

**RESPONSE: Defendants object to this request as vague and overly broad. Defendants also object on the basis that the request is not sufficiently limited in time or scope. Defendants further object to this request to the extent it seeks information that is publicly available.**

**Subject to and without waiving the foregoing objections, Plaintiffs are referred to documents produced.**

25. All documents received from any of you by FEMA regarding Camp Mystic.

**RESPONSE: Defendants object to this request as overly broad and vague in that it fails to describe the information requested with reasonable particularity. Defendants also object on the basis that the request is not sufficiently limited in time or scope.**

**Subject to and without waiving the foregoing objections, Plaintiffs are referred to documents produced.**

26. All FEMA floodplain, floodway, Letter of Map Amendment (LOMA), Letter of Map Revision (LOMR), Letter of Map Change (LOMC), or other requests, submissions, approvals, or denials received by Camp Mystic,

**RESPONSE: Defendants object to this request as overly broad and vague in that it fails to describe the information requested with reasonable particularity. Defendants also object on the basis that the request is not sufficiently limited in time or scope.**

**Subject to and without waiving the foregoing objections, Plaintiffs are referred to documents produced.**

27. All documents and communications with Kerr County, including any Kerr County Floodplain Administrator, regarding FEMA floodplain, floodway, Letter of Map Amendment(LOMA), Letter of Map Revision (LOMR), Letter of Map Change (LOMC), or other flood related requests, submissions, approvals, or denials related to Camp Mystic.

**RESPONSE: Defendants object to this request as overly broad and vague in that it fails to describe the information requested with reasonable particularity. Defendants also object on the basis that the request is not sufficiently limited in time or scope.**

**Subject to and without waiving the foregoing objections, Plaintiffs are referred to documents produced.**

28. All agreements with any person related to, and communications regarding the scope of services provided for, operation of Camp Mystic, including vendors, consultants, engineers, contractors, and insurers.



Copy from re:SearchTX

**RESPONSE: Defendants object to this request as overly broad and seeks information that is not relevant to the resolution of any issue, fact, or claim in the pending action and is not reasonably calculated to lead to the discovery of admissible evidence. Defendants also object on the basis that the request is not sufficiently limited in time or scope.**

**Defendants further object to this request is not narrowly tailored to avoid including tenuous information, is not proportional to the needs of this case, constitutes an impermissible fishing expedition, and seeks information that is confidential, private, and proprietary in nature.**

**Defendant objects to this request to the extent it seeks the disclosure of materials that contain confidential and sensitive personal information, including trade secrets, which are privileged from discovery pursuant to Rule 507, TRE.**

29. Documents sufficient to identify all bank accounts used by defendants relating to Camp Mystic and the authorized signatories of each account.

**RESPONSE: Defendant objects as this request exceeds the scope of permissible discovery under Texas Rule of Civil Procedure 192.**

**Defendant objects to this discovery request as being overly broad and vague in that it fails to describe the information requested with reasonable particularity. This request is not reasonably limited in time or scope. Defendant objects to this discovery request for the reason that it is seeking information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence**

**Defendant objects to this request to the extent it seeks the disclosure of materials that contain confidential and proprietary information, including trade secrets, which are privileged from discovery pursuant to Rule 507, TRE.**

30. All communications between any of you regarding the July 4, 2025 flood.

**RESPONSE: Defendants object to this request as overbroad and seeks information that is exempt from discovery by virtue of the work product doctrine and attorney client privilege. Defendants object to this request as not narrowly tailored to avoid including tenuous information, is not proportional to the needs of this case, and constitutes an impermissible fishing expedition rejected by the Texas Supreme Court.**

31. All communications between any of you and any third party regarding the July 4, 2025 flood.

**RESPONSE: Defendant objects as this request exceeds the scope of permissible discovery under Texas Rule of Civil Procedure 192.**



Copy from re:SearchTX

**Defendant objects to this discovery request as being overly broad and vague in that it fails to describe the information requested with reasonable particularity. This request is not reasonably limited in time or scope. Defendant objects to this discovery request for the reason that it is seeking information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence**

**Defendant objects to this discovery request for the reason that it inquires as to communications between attorney and client made in confidence for the purpose of facilitating the rendition of professional legal services, all of which communications are protected from discovery by the attorney/client privilege pursuant to Texas Rules of Civil Procedure 192.3(e) and Texas Rules of Civil Evidence 503.**

**Defendant objects to this request to the extent it seeks the disclosure of materials that contain confidential and proprietary information, including trade secrets, which are privileged from discovery pursuant to Rule 507, TRE.**

32. All communications between any of you regarding any of the Camp Mystic campers or counselors who died during the July 4, 2025 flood.

**RESPONSE: Defendant objects as this request exceeds the scope of permissible discovery under Texas Rule of Civil Procedure 192.**

**Defendant objects to this discovery request as being overly broad and vague in that it fails to describe the information requested with reasonable particularity.**

**Defendant objects to this discovery request for the reason that it inquires as to communications between attorney and client made in confidence for the purpose of facilitating the rendition of professional legal services, all of which communications are protected from discovery by the attorney/client privilege pursuant to Texas Rules of Civil Procedure 192.3(e) and Texas Rules of Civil Evidence 503.**

**Defendants object to this request as not narrowly tailored to avoid including tenuous information, is not proportional to the needs of this case, and constitutes an impermissible fishing expedition rejected by the Texas Supreme Court.**

33. All communications between any of you and any third party regarding any of the Camp Mystic campers or counselors who died during the July 4, 2025 flood.

**RESPONSE: Defendants object to this request as overly broad and seeks information that is irrelevant, immaterial, and not reasonably calculated to lead to the discovery of admissible evidence. Defendants object to this request as not narrowly tailored to avoid including tenuous information, is not proportional to the needs of this case, and constitutes an impermissible fishing expedition rejected by the Texas Supreme Court.**



Copy from re:SearchTX

**Defendant objects to this discovery request for the reason that it inquires as to communications between attorney and client made in confidence for the purpose of facilitating the rendition of professional legal services, all of which communications are protected from discovery by the attorney/client privilege pursuant to Texas Rules of Civil Procedure 192.3(e) and Texas Rules of Civil Evidence 503.**

34. All communications between any of you regarding your decision as to whether to reopen or continue to operate Camp Mystic after July 4, 2025.

**RESPONSE: Defendants object to this request as seeking information that is irrelevant, immaterial, and not reasonably calculated to lead to the discovery of admissible evidence. Defendants object to this request as not narrowly tailored to avoid including tenuous information, is not proportional to the needs of this case, and constitutes an impermissible fishing expedition rejected by the Texas Supreme Court.**

**Defendant objects to this discovery request for the reason that it inquires as to communications between attorney and client made in confidence for the purpose of facilitating the rendition of professional legal services, all of which communications are protected from discovery by the attorney/client privilege pursuant to Texas Rules of Civil Procedure 192.3(e) and Texas Rules of Civil Evidence 503.**

35. All communications between any of you and/or between any of you and any third party regarding whether Camp Mystic will be open or operational after July 4, 2025.

**RESPONSE: Defendants object to this request as seeking information that is irrelevant, immaterial, and not reasonably calculated to lead to the discovery of admissible evidence. Defendants object to this request as not narrowly tailored to avoid including tenuous information, is not proportional to the needs of this case, and constitutes an impermissible fishing expedition rejected by the Texas Supreme Court. Further objecting, this request seeks information that is publicly available and equally accessible to Plaintiffs.**

**Defendant objects to this discovery request for the reason that it inquires as to communications between attorney and client made in confidence for the purpose of facilitating the rendition of professional legal services, all of which communications are protected from discovery by the attorney/client privilege pursuant to Texas Rules of Civil Procedure 192.3(e) and Texas Rules of Civil Evidence 503.**

36. All communications between any of you and any family member of any Camp Mystic campers or counselors who died during the July 4, 2025 flood.

**RESPONSE: Defendants object to this request as seeking information that is irrelevant, immaterial, and not reasonably calculated to lead to the discovery of admissible evidence. Defendants object to this request as not narrowly tailored to avoid including tenuous information, is not proportional to the needs of this case, and constitutes an impermissible fishing expedition rejected by the Texas Supreme Court.**



Copy from re:SearchTX

**Defendants object to the extent this request seeks communications that are equally accessible to Plaintiffs.**

37. All communications between any of you and any camper or counselor from 10:00 P.M. on July, 3, 2025, to 12:00 P.M. on July 4, 2025.

**RESPONSE: Defendant objects to this request as overly broad and seeks information that is irrelevant, immaterial, and not reasonably calculated to lead to the discovery of admissible evidence. Defendants object to this request as not narrowly tailored to avoid including tenuous information, is not proportional to the needs of this case, and constitutes an impermissible fishing expedition rejected by the Texas Supreme Court**

**Subject to and without waiving the foregoing objections, documents responsive to this request will be produced to the extent they exist.**

38. All communications between or with any employee or agent of Camp Mystic, including seasonal or temporary workers, from noon on July 2, 2025, to midnight on July 5, 2025.

**RESPONSE: Defendants object to this request as overly broad and seeks information that is irrelevant, immaterial, and not reasonably calculated to lead to the discovery of admissible evidence. Defendants further object to the extent this request seeks documents protected by the attorney-client privilege and work product doctrine. Defendants object to this request as not narrowly tailored to avoid including tenuous information, is not proportional to the needs of this case, and constitutes an impermissible fishing expedition rejected by the Texas Supreme Court.**

39. All documents relating to your knowledge that any Camp Mystic camper or counselor had died after the July 4, 2025 flood.

**RESPONSE: Defendant objects to this request as overly broad and vague in that it fails to describe the information requested with reasonable particularity**

**Subject to and without waiving the foregoing objections, none.**

40. All documents relating to the whereabouts of any Camp Mystic camper or counselor who died during the July 4, 2025 flood from July 4, 2025, to present.

**RESPONSE: Defendants object to this request as vague and fails to provide sufficient specificity regarding the information or materials sought.**

**Subject to and without waiving the foregoing objections, none.**

41. All documents relating to the discovery of the remains of any Camp Mystic camper or counselor, including the location of the remains, from July 4, 2025, to present.

**RESPONSE: None.**



Copy from re:SearchTX

42. All documents relating to Camp Mystic campers or counselors missing after the July 4, 2025 flood.

**RESPONSE: Defendants object to this request as vague and fails to provide sufficient specificity regarding the information or materials sought. Further objecting, this request seeks information that is publicly available and accessible to all parties.**

43. All documents and communications between any of you and law enforcement regarding the July 4, 2025 flood or any Camp Mystic camper or counselor who died in the flood.

**RESPONSE: Defendants object to this request as overly broad, vague and seeks information that is irrelevant, immaterial, and not reasonably calculated to lead to the discovery of admissible evidence. This request fails to provide sufficient specificity regarding the information or materials sought.**

44. All documents and communications relating to evacuation of any camper or counselor at Camp Mystic on July 4, 2025.

**RESPONSE: Defendants object to this request as overly broad and to the extent it seeks documents protected by the attorney-client privilege and work product doctrine.**

**Subject to and without waiving the foregoing objections, Plaintiffs are referred to documents produced.**

45. All documents relating to warnings any of you or any of your employees received regarding flooding or the potential for flooding in Kerr County from July 1, 2025 to July 4, 2025.

**RESPONSE: Defendant objects to this discovery request as being overly broad and vague in that it fails to describe the information requested with reasonable particularity. This request is not reasonably limited in time or scope.**

**Subject to the objections previously filed and without waiving the same, Plaintiffs are referred to documents produced.**

46. All documents relating to any analysis of flood risk to Camp Mystic performed by you or any third party, regardless of time period.

**RESPONSE: Defendants object to this request as overbroad, vague, and not reasonably limited in time or scope. Defendants further object to the extent this request seeks documents prepared in anticipation of litigation protected by the attorney-client privilege and work product doctrine.**

47. All risk assessments or safety audits performed by you or any third party regarding Camp Mystic from 2000 to present.



Copy from re:SearchTX

**RESPONSE: Defendants object to this request as overbroad, vague, and not reasonably limited in time and scope. Defendants also object to the extent this request seeks documents not relevant to claims or defenses in this case. Defendants further object to the extent this request seeks documents prepared in anticipation of litigation protected by the attorney-client privilege and work product doctrine.**

**Subject to the objections previously filed, and without waiving same, there are no responsive documents addressing flood risks on the property.**

48. All documents reflecting emergency, disaster, or crisis management plans, including evacuation plans, for Camp Mystic from 2013 to present.

**RESPONSE: Defendants object to this request as overbroad, vague, and not reasonably limited in time and scope.**

**Subject to and without waiving the foregoing objections, Plaintiffs are referred to documents produced.**

49. All manuals, handbooks, training materials, counselor guides, orientation materials, and the like provided to counselors at Camp Mystic who served during the session including July 4, 2025, regardless of time period.

**RESPONSE: Plaintiffs are referred to documents produced.**

50. All documents reflecting what safety equipment, if any, was present in the Bubble Inn and Twins I&II Cabins on July 4, 2025, regardless of time period.

**RESPONSE: Defendants object to this request as vague as "safety equipment" is not defined. Defendants also object on the basis that the request is not sufficiently limited in time or scope.**

**Defendants object to this request as overly broad, vague and seeks information that is irrelevant, immaterial, and not reasonably calculated to lead to the discovery of admissible evidence. This request fails to provide sufficient specificity regarding the information or materials sought.**

51. All "lessons learned" documents, postmortems, debriefs, and the like discussing any flood at Camp Mystic, regardless of time period.

**RESPONSE: Defendants object to this request as overly broad and not reasonably limited in time and scope. Defendants also object to the extent this request seeks documents that are irrelevant, immaterial, and not reasonably calculated to lead to the discovery of admissible evidence. Defendants further object to the extent this request seeks documents prepared in anticipation of litigation protected by the attorney-client privilege and work product doctrine.**

52. All documents reflecting river gauge, rain gauge, or other hydrological data for the time period from July 3, 2025, to July 5, 2025.



Copy from re:SearchTX

**RESPONSE: Defendants object to this request as seeking publicly available information.**

**Subject to and without waiving the foregoing objections, Plaintiffs are referred to documents produced.**

53. All documents received from any law enforcement agency related to the July 4, 2025 flood or the death of any Camp Mystic camper or counselor.

**RESPONSE: Defendants object to this request as duplicative of RFP No. 43, overbroad, vague, and not reasonably limited in time and scope.**

**Subject to and without waiving the foregoing objections, none.**

54. Any witness statements or interviews related to the July 4, 2025 flood.

**RESPONSE: Defendants object to this request to the extent it seeks documents and information that is equally available to Plaintiffs through publicly accessible sources.**

**Subject to and without waiving the foregoing objections, see Defendants' Initial Disclosures.**

55. All documents relating to your decision making on July 4, 2025, to evacuate certain cabins and not others.

**RESPONSE: Defendants object to this request as vague and misleading.**

**Subject to and without waiving the foregoing objections, Plaintiffs are referred to documents produced.**

56. All documents relating to maintenance, repair, alteration, renovation, or improvement made to the Bubble Inn or Twins I&II Cabins from 2000 to present.

**RESPONSE: Defendants object to this request as overly broad, vague, not sufficiently limited in time or scope and seeks information that is irrelevant, immaterial, and not reasonably calculated to lead to the discovery of admissible evidence.**

57. Documents sufficient to identify all campers present at Camp Mystic during the session including July 4, 2025.

**RESPONSE: Defendant objects to this request to the extent it seeks sensitive information regarding identity of minors and constitutes an invasion of the rights to privacy of third parties who are not a party to the subject litigation. Defendant requires the entry or a protective order prior to disclosing information regarding campers or camp counselors.**

58. Documents sufficient to identify all counselors employed by Camp Mystic for the session including July 4, 2025.



Copy from re:SearchTX

**RESPONSE: Defendant objects to this request as overly broad and seeks information that is irrelevant, immaterial, and not reasonably calculated to lead to the discovery of admissible evidence.**

**Defendant objects to the extent this request seeks sensitive information regarding identity of minors and constitutes an invasion of the rights to privacy of third parties who are not a party to the subject litigation. Defendant requires the entry or a protective order prior to disclosing information regarding campers or camp counselors.**

59. Documents sufficient to identify which campers and counselors resided in which cabins for the session including July 4, 2025.

**RESPONSE: Defendant objects to this request as overly broad and seeks information that is irrelevant, immaterial, and not reasonably calculated to lead to the discovery of admissible evidence.**

**Defendant objects to this request to the extent it seeks sensitive information regarding identity of minors and constitutes an invasion of the rights to privacy of third parties who are not a party to the subject litigation. Defendant requires the entry or a protective order prior to disclosing information regarding campers or camp counselors.**

60. Documents sufficient to identify all non-counselor employees of Camp Mystic, including seasonal or temporary workers, employed during the session including July 4, 2025, and their roles.

**RESPONSE: Defendants object to this request as overly broad and seeks information that is irrelevant, immaterial, and not reasonably calculated to lead to the discovery of admissible evidence.**

**Subject to and without waiving the foregoing objections, Plaintiffs are referred to Defendants disclosure responses regarding identification of persons with knowledge of relevant facts.**

61. All public statements, press releases, social media posts, website updates, or email list-serv messages from any of you regarding the July 4, 2025 flood, the campers or counselors who died during the July 4, 2025 flood, or Camp Mystic's plans to reopen in 2026.

**RESPONSE: Defendants object to this request as overly broad and seeks information that is irrelevant, immaterial, and not reasonably calculated to lead to the discovery of admissible evidence, and to the extent that it seeks information that is equally available to Plaintiffs through publicly accessible sources.**

62. All communications between any of you and any person regarding serving as a counselor at Camp Mystic after July 4, 2025.



Copy from re:SearchTX

**RESPONSE: Defendants object to this request as overly broad and seeks information that is irrelevant, immaterial, and not reasonably calculated to lead to the discovery of admissible evidence.**

**Subject to and without waiving the foregoing objections, none.**

63. All communications with Chloe Childress and Katherine Ferruzzo related to their service as counselors at Camp Mystic.

**RESPONSE: Defendants object to this request as vague and overly broad.**

**Subject to and without waiving the foregoing objections, responsive documents will be produced.**

64. All documents provided to or received by Chloe Childress and Katherine Ferruzzo related to their service as counselors at Camp Mystic.

**RESPONSE: Plaintiffs are referred to documents produced.**

65. All records of any inspection of Camp Mystic from 2020 to present.

**RESPONSE: Defendants object to this request as overly broad and seeks information that is exempt from discovery by the attorney client privilege and work product doctrine.**

**Defendant objects to this discovery request as it is calling for disclosure of the identity, mental impressions and opinions of experts who have been informally consulted, or retained on a consulting basis, and who are not expected to be called at witnesses at the trial of this cause, and whose work product is not expected to form a basis either in oral or in part of the opinions of an expert who will be called as a witness. In addition, this request is an improper method of attempting to obtain discovery concerning expert witnesses.**

**Pursuant to Rule 195 of the Texas Rules of Civil Procedure, information concerning expert witnesses may only be made through a Request for Disclosure under Rule 194, or through depositions and reports under Rule 195 of the Texas Rules of Civil Procedure.**

66. All documents relating to reports or analysis of any consultant, engineer, or other vendor regarding Camp Mystic.

**RESPONSE: Defendant objects to this discovery request as it is calling for disclosure of the identity, mental impressions and opinions of experts who have been informally consulted, or retained on a consulting basis, and who are not expected to be called at witnesses at the trial of this cause, and whose work product is not expected to form a basis either in oral or in part of the opinions of an expert who will be called as a witness. In addition, this request is an improper method of attempting to obtain discovery concerning expert witnesses.**



Copy from re:SearchTX

**Pursuant to Rule 195 of the Texas Rules of Civil Procedure, information concerning expert witnesses may only be made through a Request for Disclosure under Rule 194, or through depositions and reports under Rule 195 of the Texas Rules of Civil Procedure. Further objecting, this request inquires as to communications between attorney and client made in confidence for the purpose of facilitating the rendition of professional legal services, all of which communications are protected from discovery by the attorney/client privilege pursuant to Texas Rules of Civil Procedure 192.3(e) and Texas Rules of Civil Evidence 503.**

67. All documents and communications with Hewitt Engineering Inc. or John Hewitt regarding Camp Mystic.

**RESPONSE: Plaintiffs are referred to documents produced.**

68. Camp Mystic's license to operate in effect on July 4, 2025.

**RESPONSE: Plaintiffs are referred to documents produced.**

69. All documents any of you received from DSHS from 2020 to present.

**RESPONSE: Defendants object to this request as overly broad. Defendants also object to this request as it seeks information that is not relevant to the resolution of any issue, fact, or claim in the pending action and is not reasonably calculated to lead to the discovery of admissible evidence. Defendants further object to this request is not narrowly tailored to avoid including tenuous information, is not proportional to the needs of this case, and constitutes an impermissible fishing expedition.**

**Subject to and without waiving the foregoing objections, Plaintiffs are referred to documents produced.**

70. All documents and communications regarding any inspection or licensure of Camp Mystic from 2020 to present.

**RESPONSE: Defendants object to this request as vague and overly broad. Defendants further object to this request is not narrowly tailored to avoid including tenuous information, is not proportional to the needs of this case, and constitutes an impermissible fishing expedition.**

**Subject to and without waiving the foregoing objections, Plaintiffs are referred to documents produced.**

71. All documents submitted by Camp Mystic to DSHS or any other entity regarding its youth camp license renewal, including your emergency plan, from 2020 to present.

**RESPONSE: Defendants object to this request as vague and overly broad. Defendants further object to this request is not narrowly tailored to avoid including tenuous information, is not proportional to the needs of this case, and constitutes an impermissible fishing expedition.**



Copy from re:SearchTX

**Subject to and without waiving the foregoing objections, Plaintiffs are referred to documents produced.**

72. All communications between any of you or between any of you and DSHS concerning the renewal of Camp Mystic's youth camp license.

**RESPONSE: Defendants object to this request as vague and overly broad. Defendants further object to this request is not narrowly tailored to avoid including tenuous information, is not proportional to the needs of this case, and constitutes an impermissible fishing expedition.**

**Subject to and without waiving the foregoing objections, Plaintiffs are referred to documents produced.**

73. All communications between any of you or with any third party discussing whether to relocate any cabin in "the Flats" portion of Camp Mystic from 2013 to present.

**RESPONSE: Defendants object to this request as seeking information that is irrelevant, immaterial, and not reasonably calculated to lead to the discovery of admissible evidence.**

**Subject to and without waiving the foregoing objections, none.**

74. All documents relating to the operationality of the loudspeaker at Camp Mystic prior to and during the July 4, 2025 flood.

**RESPONSE: Defendants object to this request as vague and overly broad.**

**Subject to the objections previously filed and without waiving the same, Defendant answers as follows:**

**None.**

75. Documents sufficient to show the precise locations, elevations, and site grades for Bubble Inn, Twins IiII, Rec Hall, the commissary, the kitchen, the nearby hill, and principal routes between them at the time of the July 4, 2025 flood, regardless of time period.

**RESPONSE: Plaintiffs are referred to documents produced.**

76. Any GPS or other saved location data reflecting the movements of Richard Eastland Sr., Edward Eastland, Glenn Juenke, Willetta Eastland, Mary Liz Eastland, Craig Althaus, Betsy Althaus, and Richard Eastland, Jr. on July 4, 2025.

**RESPONSE: Defendant objects to this discovery request as being overly broad and vague in that it fails to describe the information requested with reasonable particularity.**



Copy from re:SearchTX

**This request is not reasonably limited in time or scope and unduly burdensome. Defendant objects to this discovery request for the reason that it is seeking information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.**

77. All data and communications on Richard Eastland Sr.'s watch and cell phone, including from any weather monitoring applications, fitness applications, GPS or location services, text messages, chats, emails, and the like, from July 3, 2025, to July 4, 2025.

**RESPONSE: Defendants object to this request as overbroad in time and scope. Defendants also object to this request as it seeks information that is not relevant to the resolution of any issue, fact, or claim in the pending action and is not reasonably calculated to lead to the discovery of admissible evidence.**

**Defendants object to this request as not narrowly tailored to avoid including tenuous information, is not proportional to the needs of this case, and constitutes an impermissible fishing expedition rejected by the Texas Supreme Court.**

78. All data and communications on Edward Eastland's watch and cell phone, including from any weather monitoring applications, fitness applications, GPS or location services, text messages, chats, emails, and the like, from July 3, 2025, to July 4, 2025.

**RESPONSE: Defendants object to this request as overbroad in time and scope. Defendants also object to this request as it seeks information that is not relevant to the resolution of any issue, fact, or claim in the pending action and is not reasonably calculated to lead to the discovery of admissible evidence.**

**Defendants object to this request as not narrowly tailored to avoid including tenuous information, is not proportional to the needs of this case, and constitutes an impermissible fishing expedition rejected by the Texas Supreme Court.**

79. All data tracking the movements of any vehicle driven by Richard Eastland Sr. or Edward Eastland from noon on July 3, 2025 to 8:00 A.M. on July 4, 2025.

**RESPONSE: Defendants object to this request as overbroad in time and scope. Defendants also object to this request as it seeks information that is not relevant to the resolution of any issue, fact, or claim in the pending action and is not reasonably calculated to lead to the discovery of admissible evidence.**

**Defendants object to this request as not narrowly tailored to avoid including tenuous information, is not proportional to the needs of this case, and constitutes an impermissible fishing expedition rejected by the Texas Supreme Court.**

80. All telephone records reflecting the date, time, and phone number of any calls or text messages sent or received by you from 10:00 P.M. on July 3, 2025, to 11:59 P.M. on July 4, 2025.



Copy from re:SearchTX

**RESPONSE: Defendant objects as this request exceeds the scope of permissible discovery under Texas Rule of Civil Procedure 192.**

**Defendant objects to this discovery request as being overly broad and vague in that it fails to describe the information requested with reasonable particularity. Defendant objects to this discovery request for the reason that it is seeking information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence**

**Defendants object to this request as not narrowly tailored to avoid including tenuous information, is not proportional to the needs of this case, and constitutes an impermissible fishing expedition rejected by the Texas Supreme Court.**

81. All iCloud or other cloud-stored data reflecting communications sent or received by you from 10:00 P.M. on July 3, 2025, to July 4, 2025.

**RESPONSE: Defendant objects as this request exceeds the scope of permissible discovery under Texas Rule of Civil Procedure 192.**

**Defendant objects to this discovery request as being overly broad and vague in that it fails to describe the information requested with reasonable particularity. Defendants further object to this request is not narrowly tailored to avoid including tenuous information, is not proportional to the needs of this case, and constitutes an impermissible fishing expedition.**

82. All documents relating to your participation in the search for Cile Steward.

**RESPONSE: Although there are no documents responsive to this request, Defendants have cooperated fully with authorities during the search for Cile Steward.**

83. All photographs and videos taken of Anna Margaret Bellows, Lila Bonner, Chloe Childress, Molly DeWitt, Katherine Ferruzzo, Lainey Landry, or Blakely McCrory during the session including July 4, 2025.

**RESPONSE: Plaintiffs are referred to documents produced.**

84. All photographs and videos taken of or at Camp Mystic from July 3, 2025 at 10:00 P.M. to July 31, 2025.

**RESPONSE: Defendants object to this request as overly broad, not proportional to the needs of the case, and not reasonably limited in time or scope. Defendants further object to the extent this request seeks documents protected by the attorney-client privilege and/or work product doctrine and material prepared in anticipation of litigation.**

**Subject to and without waiving the foregoing objections, Plaintiffs are referred to documents produced.**



Copy from re:SearchTX

85. All communications between you and Nancy Clement regarding Camp Mystic from July 3, 2025 to present.

**RESPONSE: Defendants object to this request as overly broad and seeks information that is irrelevant, immaterial, and not reasonably calculated to lead to the discovery of admissible evidence.**

**Defendants object to this request as not narrowly tailored to avoid including tenuous information, is not proportional to the needs of this case, and constitutes an impermissible fishing expedition rejected by the Texas Supreme Court.**

**Subject to and without waiving the foregoing objections, responsive documents will be produced.**

86. The August, 23, 2018 email from Richard Eastland Sr. to "Matt" regarding "Old Kerr County Flood system map," as referenced in Defendants' Answer in this litigation, including attachments, and any related replies from "Matt" related to same.

**RESPONSE: Responsive documents will be produced.**

87. All documents sent or received relating to a post by Richard Eastland in a Facebook group called "Byrd Chatter" asking for information about prior flooding at Camp Mystic.

**RESPONSE: Defendants object to this request as it seeks information that is not relevant to the resolution of any issue, fact, or claim in the pending action and is not reasonably calculated to lead to the discovery of admissible evidence. Further objecting, documents responsive to this request are equally accessible to all parties.**

88. All documents and communications regarding floods at Camp Mystic before July 4, 2025.

**RESPONSE: Defendant objects to this discovery request as being overly broad and vague in that it fails to describe the information requested with reasonable particularity. This request is not reasonably limited in time or scope.**

**Subject to the objections previously filed and without waiving the same, Defendant answers as follows:**

**Documents responsive to this request are equally accessible to all parties.**

89. All documents and communications regarding efforts to mitigate flood risk at Camp Mystic, whether implemented or not.

**RESPONSE: Defendant objects to this discovery request for the reason that it seeks disclosure of the mental impressions, conclusions, opinions, or legal theories of Defendant's attorney or other representatives of Defendant working solely to assist in trial preparations,**



Copy from re:SearchTX

**which are protected from discovery by the work product privilege pursuant to Texas Rules of Civil Procedure 192.5.**



Copy from re:SearchTX

No. D-1-GN-25-009963

| | | |
|---|---|---|
| WARREN and PATRICIA BELLOWS, Individually and as Representatives of ANNA MARGARET BELLOWS, Deceased; et al., | § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| CAMP MYSTIC, LLC; et al., | § | |
| Defendants. | § | 455TH JUDICIAL DISTRICT |

**ORDER GRANTING PLAINTIFFS' FIRST MOTION TO COMPEL**

Before the Court is Plaintiffs' First Motion to Compel. Having considered the Motion, pleadings, any responses and replies, all other relevant papers, and arguments of counsel, the Court rules as follows:

The Motion is GRANTED. Defendants are ORDERED to produce all documents and information responsive to plaintiffs' requests for production and the Bellows plaintiffs' interrogatories by _____________.

SIGNED this _____ day of _______________, 2026.

______________________________________
JUDGE PRESIDING

Copy from re:SearchTX

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Sue Csizmadia on behalf of R. Yetter
Bar No. 22154200
scsizmadia@yettercoleman.com
Envelope ID: 112734454
Filing Code Description: Motion (No Fee)
Filing Description: PLAINTIFFS' FIRST MOTION TO COMPEL
Status as of 3/24/2026 12:05 PM CST

Case Contacts

| **Name** | **BarNumber** | **Email** | **TimestampSubmitted** | **Status** |
|---|---|---|---|---|
| R. PaulYetter | | pyetter@yettercoleman.com | 3/23/2026 11:51:22 AM | SENT |
| Yetter Coleman | | efile@yettercoleman.com | 3/23/2026 11:51:22 AM | SENT |
| John W.Stevenson | | jstevenson@stevensonmurray.com | 3/23/2026 11:51:22 AM | SENT |
| Laurie Nichols | | lnichols@stevensonmurray.com | 3/23/2026 11:51:22 AM | SENT |
| William RobertHand | | rhand@stevensonmurray.com | 3/23/2026 11:51:22 AM | SENT |
| Jeff Ray | | jray@raylaw.com | 3/23/2026 11:51:22 AM | SENT |
| Linda Gonzales | | lgonzales@raylaw.com | 3/23/2026 11:51:22 AM | SENT |
| Jane Ray | | jray@yettercoleman.com | 3/23/2026 11:51:22 AM | SENT |
| Justin P.Tschoepe | | jtschoepe@yettercoleman.com | 3/23/2026 11:51:22 AM | SENT |
| Christopher Freeman | | cfreeman@arnoldfreemanlaw.com | 3/23/2026 11:51:22 AM | SENT |
| J. ReidSimpson | | jrsimpson@yettercoleman.com | 3/23/2026 11:51:22 AM | SENT |
| Shannon Smith | | ssmith@yettercoleman.com | 3/23/2026 11:51:22 AM | SENT |
| A. Arnold | | arnold@arnoldfreemanlaw.com | 3/23/2026 11:51:22 AM | SENT |
| Sue Csizmadia | | scsizmadia@yettercoleman.com | 3/23/2026 11:51:22 AM | SENT |
| Abby Heath | | aheath@arnoldfreemanlaw.com | 3/23/2026 11:51:22 AM | SENT |
| Katherine Estrada | | kestrada@raylaw.com | 3/23/2026 11:51:22 AM | SENT |
| Laura Rua | | lrua@raylaw.com | 3/23/2026 11:51:22 AM | SENT |
| Larry Matthys | | lmatthys@raylaw.com | 3/23/2026 11:51:22 AM | SENT |
| Mikal Watts | | mikal@wattsllp.com | 3/23/2026 11:51:22 AM | SENT |
| Kenneth Fair | | fair@wrightclosebarger.com | 3/23/2026 11:51:22 AM | SENT |
| Tom Wright | | wright@wrightclosebarger.com | 3/23/2026 11:51:22 AM | SENT |
| Jessica Barger | | barger@wrightclosebarger.com | 3/23/2026 11:51:22 AM | SENT |

Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Sue Csizmadia on behalf of R. Yetter
Bar No. 22154200
scsizmadia@yettercoleman.com
Envelope ID: 112734454
Filing Code Description: Motion (No Fee)
Filing Description: PLAINTIFFS' FIRST MOTION TO COMPEL
Status as of 3/24/2026 12:05 PM CST

Case Contacts

| | | | | |
|---|---|---|---|---|
| Jessica Barger | | barger@wrightclosebarger.com | 3/23/2026 11:51:22 AM | SENT |
| Lynn Castagna | | lynn@texasdefense.com | 3/23/2026 11:51:22 AM | SENT |
| Suzanne Goss | | goss@wrightclosebarger.com | 3/23/2026 11:51:22 AM | SENT |
| John Stevenson, Jr. | | jstevenson@stevensonmurray.com | 3/23/2026 11:51:22 AM | SENT |
| Robert Hand | | rhand@stevensonmurray.com | 3/23/2026 11:51:22 AM | SENT |
| Richard WarrenMithoff | | rmithoff@mithofflaw.com | 3/23/2026 11:51:22 AM | SENT |
| Warner V.Hocker | | whocker@mithofflaw.com | 3/23/2026 11:51:22 AM | SENT |
| Teresa Demetriou | | TDemetriou@mithofflaw.com | 3/23/2026 11:51:22 AM | SENT |

Copy from re:SearchTX

3/24/2026 9:46 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009963
Candy Schmidt

CAUSE NO. D-1-GN-25-009963

| | | |
|---|---|---|
| WARREN and PATRICIA BELLOWS, Individually and as Representatives of ANNA MARGARET BELLOWS, Deceased; BLAKE and CAITLIN BONNER, Individually and as Representatives of LILA BONNER, Deceased; MATTHEW and WENDIE CHILDRESS, Individually and as Representatives of CHLOE CHILDRESS, Deceased; RYAN and ELIZABETH DEWITT, Individually and as Representatives of MOLLY DEWITT, Deceased; JOHN and ANDREA FERRUZZO, Individually and as Representatives of KATHERINE FERRUZZO, Deceased; BEN and NATALIE LANDRY, Individually and as Representatives of LAINEY LANDRY, Deceased; LINDSEY MCCRORY, Individually and as Representative of BLAKELY MCCRORY, Deceased. | § | IN THE DISTRICT COURT OF |
| *Plaintiffs* | § | TRAVIS COUNTY, TEXAS |
| v. | § | |
| CAMP MYSTIC, LLC; NATURAL FOUNTAINS PROPERTIES, INC.; MYSTIC CAMPS FAMILY PARTNERSHIP, LTD., MYSTIC CAMPS MANAGEMENT, LLC; GEORGE ALBRITTON EASTLAND, as Representative of the Estate of RICHARD EASTLAND, Deceased; WILLETTA EASTLAND; EDWARD EASTLAND; and MARY LIZ EASTLAND, | § | 455TH DISTRICT COURT |
| *Defendants.* | | |

**<u>DEFENDANTS' MOTION TO COMPEL ARBITRATION AND MOTION TO STAY</u>**

Defendants Camp Mystic, LLC ("Camp Mystic"), Natural Fountains Properties, Inc. ("Natural Fountains"), Mystic Camps Family Partnership, Ltd. (the "Family Partnership"), Mystic Camps Management LLC, George Albritton Eastland, as Independent Executor of the Estate of

Copy from re:SearchTX

Richard Eastland, Deceased,[1] Willetta Eastland, Edward Eastland, and Mary Liz Eastland (collectively "Defendants") file this Motion to Compel Arbitration and Motion to Stay, respectfully showing the Court the following:

## I. Introduction

This case arises from the tragic loss of Anna Margaret Bellows, Lila Bonner, Chloe Childress, Molly DeWitt, Katherine Ferruzzo, Lainey Landry, Blakely McCrory, and Mary Kate Jacobe during the July 2025 flooding of the Guadalupe River while they were attending summer camp at Camp Mystic or serving as counselors there. Several other lives were lost in the historic flood, including Camp Mystic's Director, Dick Eastland, as he was trying to save the campers. The girls' parents have asserted claims arising out of these events.

When Plaintiffs and Intervenors registered their daughters to attend camp that year, one parent for each of the girls signed a Participation Agreement as part of that registration. *See* Bellows Participation Agreement at 3 (signed by Patricia Bellows) (attached as Exhibit A-15); Bonner Participation Agreement at 3 (signed by Caitlin Bonner) (attached as Exhibit A-16); DeWitt Participation Agreement at 3 (signed by Ryan DeWitt) (attached as Exhibit A-18); Landry Participation Agreement at 3 (signed by Natalie Landry) (attached as Exhibit A-20); McRory Participation Agreement at 3 (signed by Lindsey McLeod McCrory) (attached as Exhibit A-21); Jacobe Participation Agreement at 3 (signed by Samantha Jacobe) (attached as Exhibit A-22).

Chloe Childress and Katherine Ferruzzo's parents had previously signed Participation Agreements on their behalf when they attended camp the prior year in 2024. *See* Childress

[1] Defendant George Albritton Eastland, as Independent Executor of the Estate of Richard G. Eastland, Deceased, is incorrectly named as Defendant George Albritton Eastland, as Representative of the Estate of Richard G. Eastland, Deceased.



Copy from re:SearchTX

Participation Agreement (signed by Wendie Childress) (attached as Exhibit A-17); Ferruzzo Participation Agreement (signed by Andrea Ferruzzo) (attached as Exhibit A-19).

The Participation Agreement contains an arbitration clause, requiring the arbitration of all claims that arise "out of or in connection with this Agreement." *See* Exhs. A-15–22 at 2. The arbitration clause also requires any arbitration to be conducted in accordance with the American Arbitration Association's Commercial Rules. *Id.*

When a contract contains an arbitration clause, a court must resolve two questions: (1) whether the parties entered into an arbitration agreement and (2) who decides whether the plaintiff's claims are arbitrable: an arbitrator or the court. The first question is easily resolved. Camp Mystic and Natural Fountains, and therefore their owners, members, directors, and employees, unmistakably entered into the Participation Agreement with Plaintiffs and Intervenors.

The Participation Agreement's incorporation of the AAA's rules resolves the second question. Under black letter Texas and federal law, incorporation of the AAA rules reflects unambiguous intent that the arbitrator—not the Court—must determine whether Plaintiffs' and Intervenors' claims are arbitrable. Defendants' motion to compel must therefore be granted on that basis.

Pending the outcome of arbitration, Defendants request a stay of these proceedings.

## II. <u>Background Facts</u>

As part of the registration process to attend camp at Camp Mystic, parents or legal guardians of the campers must sign a Participation Agreement. *See, generally*, Exhs. A-15–22. The Agreement highlights the various risks of attending camp, including the risk of serious injury due to floods and other camp hazards:

> Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment



Copy from re:SearchTX

> (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning) . . . all manner of other injuries or illness which, in extraordinary cases, may be serious.

Exhs. A-15–22 at 1.

The Agreement also contains an arbitration clause, which states:

> Binding Arbitration: . . .
>
> All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.
>
> The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding.
>
> This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Exhs. A-15–22 at 2.

Richard G. Eastland, Deceased, George Albritton Eastland, Willetta A. Eastland, Edward S. Eastland, and Mary E. Eastland (the "Eastlands") worked for Camp Mystic in the summer of 2025 and at all relevant times. *See* Declaration of George Albritton Eastland at ¶¶ 2-3 (attached as Exhibit A).



Copy from re:SearchTX

## III. Legal Standard

Under both the Federal Arbitration Act ("FAA") and the Texas Arbitration Act ("TAA"), when a party moves to compel arbitration, a court must resolve two related questions: (1) whether the parties entered into any arbitration agreement at all, and (2) whether the parties delegated to the arbitrator the issue of who determines a claim's arbitrability. *See IQ Prods. Co. v. WD-40 Co.*, 871 F.3d 344, 348 (5th Cir. 2017); *see also RSL Funding, LLC v. Newsome*, 569 S.W.3d 116, 120 (Tex. 2018).

"When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68 (2019) (holding that a court may not override a delegation clause even if the court thinks that the arbitrability of the claims "is wholly groundless."); *see also Robinson v. Home Owners Mgmt. Enters., Inc.*, 590 S.W.3d 518, 532 (Tex. 2019) (noting that a court has *no* discretion to deny a motion to compel arbitration that contains a delegation clause).

Because the arbitration agreement here incorporates the AAA rules, that is in effect a delegation to the arbitrator to determine arbitrability. *See TotalEnergies E&P USA, Inc. v. MP Gulf of Mex., LLC*, 667 S.W.3d 694, 711 (Tex. 2023), *reh'g denied* (June 9, 2023) ("[A]n agreement to arbitrate in accordance with the AAA or similar rules **clearly and unmistakably delegates arbitrability issues to the arbitrator**.") (emphasis added).

## IV. Argument

The Participation Agreement contains a valid arbitration clause between Plaintiffs and Intervenors and the named released and indemnified parties in the Participation Agreement, which includes Camp Mystic, Natural Fountains, and their respective owners, members, directors, and



Copy from re:SearchTX

employees. Because all of the Eastlands worked for Camp Mystic during the relevant events, Texas law permits them to invoke the arbitration clause, as well.

The Family Partnership and Mystic Camps Management LLC (collectively the "Holding Companies") and Natural Fountains are also entitled to invoke the arbitration clause under equitable estoppel principles.

**A. The FAA governs the arbitration clause**

The arbitration clause is governed by the FAA because the Participation Agreement is a written contract involving interstate commerce. *See* Exhs. A-15–22; *see also Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564, 573 (1997). When an arbitration clause falls within the FAA's scope, the FAA supplies the governing law and requires enforcement according to its terms.

Courts may presume that both the FAA and the TAA apply when an arbitration agreement does not specify which applies. *See Moody Nat'l Grapevine MT, LP v. TIC Grapevine 2, LP*, 651 S.W.3d 450, 455 (Tex. App.—Houston [14th Dist.] 2022, pet. denied). But that does not limit a movant to the TAA or require satisfaction of additional state-law requirements. A party seeking to compel arbitration may choose to invoke the FAA rather than the TAA when an arbitration agreement is silent. *See Nafta Traders, Inc. v. Quinn*, 339 S.W.3d 84, 98 n.64 (Tex. 2011) ("The TAA and the FAA may both be applicable to an agreement, absent the parties' choice of one or the other.").

Here, the Participation Agreement is in writing and governs camping activities that are open to campers across state lines. The FAA therefore applies and requires enforcement of the arbitration clause.



Copy from re:SearchTX

To the extent the TAA would impose additional requirements for personal injury claims, such as a counsel signature requirement, those requirements do not limit enforcement under the FAA. Texas courts have recognized that such provisions are preempted where they conflict with the FAA's mandate to enforce arbitration clauses according to their terms. *See In re Nexion Health at Humble, Inc.*, 173 S.W.3d 67, 69 (Tex. 2005), *as supplemented on denial of reh'g* (Oct. 14, 2005) ("The TAA interferes with the enforceability of the arbitration agreement by adding an additional requirement—the signature of a party's counsel—to arbitration agreements in personal injury cases. . . . Thus, the TAA is preempted by the FAA.").

**B. There is a valid agreement to arbitrate in the Participation Agreement**

The Participation Agreement contains a valid agreement to arbitration. Whether a valid arbitration agreement exists is, at this stage, simply a "question of contract formation only—did the parties form a valid agreement to arbitrate some set of claims." *IQ Products Co.*, 871 F.3d at 348. For this question, the only issue before the court is whether there is a valid agreement to arbitrate any possible claim; the court is *not* determining whether a plaintiff's specific claims fall within the scope of an arbitration clause. *See id.*

The Participation Agreement contains a valid arbitration clause:

> Binding Arbitration: . . .
>
> All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.
>
> . . . .



Copy from re:SearchTX

Exhs. A-15–22 at 2. The Participation Agreement is signed by one parent for each of the campers. *See* Exhs. A-15–22 at 3.

To be enforceable under the FAA, the Participation Agreement need only be in writing and affect interstate commerce. *See* 9 U.S.C.A. § 2. "The law presumes the existence of an arbitration agreement, and any doubts regarding the existence or scope of an agreement are resolved in favor of arbitration." *In re Border Steel, Inc.*, 229 S.W.3d 825, 832 (Tex. App.—El Paso 2007, no pet.). Because the Participation Agreement is in writing and affects interstate commerce, it is valid and enforceable. *See* Exhs. A-15–22; *see also Camps Newfound/Owatonna, Inc.*, 520 U.S. at 573.

**1. Camp Mystic, Natural Fountains, the Family Partnership, and the Eastlands may enforce the arbitration clause with Plaintiffs and Intervenors**

Camp Mystic, Natural Fountains, the Family Partnership, and the Eastlands are party to the arbitration clause. *See* Exhs. A-15–22 at 1-3. The Participation Agreement states that "[i]n consideration of the services of Camp Mystic, I, parent, acknowledge and agree as follows . . .". *See* Exhs. A-15–22 at 1. The agreement thereafter states that the parent agrees to indemnify and release Camp Mystic, Natural Fountains, and their respective owners, members, directors, officers, employees, contractors and volunteers. Exhs. A-15–22 at 2. For the arbitration clause, the agreement states that "[t]he parties hereto"—as defined in the release to include Camp Mystic, Natural Fountains, and their owners, members, employees, and directors—also agree to submit all claims to binding arbitration. Exhs. A-15–22 at 2.

The Eastlands are members or employees of Camp Mystic. *See* Exh. A at ¶¶ 2-3. The Family Partnership is the owner of Camp Mystic and Natural Fountains. *See* Exh. A at ¶ 5. The Participation Agreement therefore includes (1) Camp Mystic and Natural Fountains, as named



Copy from re:SearchTX

parties, (2) the Family Partnership, as the owner of Camp Mystic, and (3) the Eastlands, as members or employees of Camp Mystic, and these parties may invoke its arbitration clause.

Because one parent signed the Participation Agreements on behalf of each minor daughter, all Plaintiffs and Intervenors are bound by the arbitration agreement they consented to in the Participation Agreement. *See* Exh. A-15 (signed by Patricia Bellows); Exh. A-16 (signed by Caitlin Bonner); Exh. A-18 (signed by Ryan DeWitt); Exh. A-20 (signed by Natalie Landry); Exh. A-21 (signed by Lindsey McLeod McCrory); Exh. A-22 (signed by Samantha Jacobe); Exh. A-17 (signed by Wendie Childress); Exh. A-19 (signed by Andrea Ferruzzo).

Texas Family Code § 151.001(a)(7) grants parents comprehensive authority, including "the right to represent the child in legal action and to make other decisions of substantial legal significance concerning the child." TEX. FAM. CODE § 151.001(a)(7). The Texas Supreme Court in *Ha* established that "as a general matter, parents may sign arbitration agreements on behalf of their children" based on this statutory provision. *Ha*, 660 S.W.3d at 534. The court emphasized that "fit parents are presumed to act in their children's best interests" and have both the authority and duty to make important legal decisions for their minor children. *Id.*

Recent Texas appellate decisions have consistently held that a single parent can bind minor children to arbitration agreements. In *Pearland Urban Air, LLC v. Cerna*, the court held that an arbitration agreement signed by a mother on behalf of her minor son constituted a valid agreement binding the child, even though he did not personally sign the agreement. 693 S.W.3d 711, 716 (Tex. App.—Houston [14th Dist.] 2024), *aff'd sub nom. Cerna as Next Friend of R.W. v. Pearland Urban Air, LLC*, 714 S.W.3d 585 (Tex. 2025). Similarly, in *BFS Group LLC v. De Leon*, the court reaffirmed that "as a general matter, a parent may sign an arbitration agreement on behalf of the parent's child, and only in 'rare case[s]' is such an agreement unenforceable." No. 14-24-00548-



Copy from re:SearchTX

CV, 2025 WL 2394091, at *12 (Tex. App.—Houston [14th Dist.] Aug. 19, 2025, pet. filed) (quoting TEX. FAMILY CODE ANN. § 151.001(a)(7)).

Because one parent Plaintiff executed the Participation Agreement on behalf of each minor daughter, all parent Plaintiffs and Intervenors are bound by the arbitration agreement. *See Pearland Urban Air, LLC*, 693 S.W.3d at 716. There is therefore a valid and enforceable arbitration agreement among Camp Mystic, Natural Fountains, the Family Partnership, the Eastlands, and all Plaintiffs and Intervenors.

**2. The Eastlands, employees of Camp Mystic, may invoke the arbitration clause**

The Eastlands, as employees, agents, or representatives of Camp Mystic, are also entitled to arbitrate Plaintiffs' and Intervenors' claims under Texas law. *See* Exh. A at ¶¶ 2-3. The Austin Court of Appeals has extended arbitration clauses to all agents and employees of a signatory:

> When the principal is bound by the terms of a valid arbitration agreement, its agents, employees, and representatives are also covered by the agreement.

*SEB, Inc. v. Campbell*, No. 03-10-00375-CV, 2011 WL 749292, at *4 (Tex. App.—Austin Mar. 2, 2011, no pet.) (mem. op.); *see also Design Tech Homes of Tex., LLC v. Siemens*, No. 03-23-00735-CV, 2025 WL 62967, at *6 n.3 (Tex. App.—Austin Jan. 10, 2025, no pet.); *Ascendant Anesthesia PLLC v. Abazi*, 348 S.W.3d 454, 462 (Tex. App.—Dallas 2011, no pet.).

This is consistent with the Texas Supreme Court's conclusion that employees may invoke an employer's arbitration clause when a plaintiff's claims against the employee arise out of actions taken by the employee on behalf of the employer. *In re Merrill Lynch Tr. Co. FSB*, 235 S.W.3d 185, 190 (Tex. 2007) (noting that plaintiffs cannot avoid arbitration clauses by artfully suing individual agents of an entity with whom they've agreed to arbitrate in order to avoid arbitrating their claims.).



Copy from re:SearchTX

Plaintiffs and Intervenors have sued the Eastlands for their actions taken due to their employment with Camp Mystic. *See* Plaintiffs' Original Petition at 2-29; *see also* Intervenors' Original Petition at 7-17. Accordingly, as employees of a party to the arbitration agreement, the Eastlands are entitled to arbitrate Plaintiffs' and Intervenors' claims against them, as well. *SEB, Inc.*, 2011 WL 749292 at *4.

**3. The Holding Companies and Natural Fountains are entitled to compel arbitration under intertwined claims estoppel**

Because the Plaintiffs' claims against the Holding Companies and Natural Fountains are factually intertwined with the Participation Agreement, they may also invoke its arbitration clause. Federal law recognizes that non-signatories to an arbitration clause may compel arbitration under an intertwined claims estoppel theory, which applies when "(1) they have a close relationship with a signatory to a contract with an arbitration agreement and (2) the claims are intimately founded in and intertwined with the underlying contract obligations." *Jody James Farms, JV v. Altman Grp., Inc.*, 547 S.W.3d 624, 640 (Tex. 2018) (quotations omitted) (quoting *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 779 (2d Cir. 1995)).

While the Texas Supreme Court did not find it necessary to adopt that theory in *Jody James Farms*, the Fifth Circuit has predicted that Texas will adopt the equitable estoppel theory. *See Hays v. HCA Holdings, Inc.*, 838 F.3d 605, 610 (5th Cir. 2016). And the Court should do so here. The Holding Companies and Natural Fountains have a close relationship with Camp Mystic, and Plaintiffs' claims against them are intertwined with the Participation Agreement's underlying contractual release of claims. *See* Exh. A at ¶¶ 5-6. Under the intertwined claims estoppel theory, the Holding Companies and Natural Fountains are entitled to have Plaintiffs' claims resolved in arbitration, as well.



Copy from re:SearchTX

### C. The arbitration clause delegates the issue of arbitrability to the arbitrator by incorporating the AAA's rules

The Participation Agreement's arbitration clause requires the arbitrator, not the Court, to determine whether Plaintiffs' and Intervenors' claims are arbitrable because it incorporates the AAA's rules by reference. The Court must therefore compel this case to arbitration for that determination.

When an arbitration clause incorporates the AAA's rules by reference, this reflects unmistakable intent that the arbitrator, not the Court, must determine whether the plaintiff's claims are subject to arbitration. *See TotalEnergies E&P USA, Inc. v. MP Gulf of Mex., LLC*, 667 S.W.3d 694, 711 (Tex. 2023), *reh'g denied* (June 9, 2023) ("[A]n agreement to arbitrate in accordance with the AAA or similar rules **clearly and unmistakably delegates arbitrability issues to the arbitrator**.") (emphasis added); *see also Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012) ("[T]he express adoption of these [AAA] rules presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability.").

This is because the AAA's rules require that an arbitrator determine all threshold issues, including the arbitrability of a plaintiff's claims:

> R-7(a): The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement ***or to the arbitrability of any claim or counterclaim***.

*See* AAA's Commercial Arbitration Rules at 13 (attached as Exhibit B) (emphasis added).

The United States Supreme Court has instructed that, under the FAA, when a contract delegates the threshold issue of arbitrability to the arbitrator, a court may *not* override the clause's delegation of that issue even if the court believes that the argument that a plaintiff's claims are arbitrable is "wholly groundless":



Copy from re:SearchTX

> When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue. That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless.

*Henry Schein, Inc.*, 586 U.S. 63, 68 (2019).

Here, the Participation Agreement incorporates the AAA's Commercial Rules by reference. *See* Exhs. A-15–22 at 2 ("All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement . . . . shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association."). The clause does not merely reference the AAA's rules. Instead, it states that any dispute arising out of or in connection with the Participation Agreement "shall be determined in accordance" with those rules. *Id.* The clause's incorporation of the AAA's rules is dispositive on *who* decides whether Plaintiffs' and Intervenors' claims are arbitrable: the arbitrator, not the Court, must make that threshold determination. *See TotalEnergies E&P USA, Inc.*, 667 S.W.3d at 711.

Defendants therefore respectfully request that the Court grant this motion to compel arbitration so that the arbitrator may determine the arbitrability of Plaintiffs' and Intervenors' claims and all other jurisdictional issues, including "any objections with respect to the existence, scope, or validity of the arbitration agreement . . . ." *See* Exh. B at 13.

## V. Motion to Stay

Defendants also request that the Court stay all of the proceedings in this matter pending the outcome of arbitration. *See* 9 U.S.C. § 3; *see also* TEX. CIV. PRAC. & REM. CODE § 171.021(c).

If a court determines that a party's claims are subject to arbitration, then under both the FAA and TAA, the court must stay all proceedings on those arbitrable claims pending the outcome of the arbitration. *See* 9 U.S.C. § 3 (stating that when an issue is referrable to arbitration, a court



Copy from re:SearchTX

must stay proceedings on the issue until after the arbitration has concluded); TEX. CIV. PRAC. & REM. CODE § 171.021(c) (stating that a court is required to sign an order staying proceedings pending the outcome of arbitration); *see also Hill v. GE Power Sys., Inc.*, 282 F.3d 343, 347 (5th Cir. 2002) (FAA); *Cash Am. Int'l v. Exchange Servs.*, 83 S.W.2d 183, 186–87 (Tex. App.—Amarillo 2002, no pet.) (TAA).

If the Court grants Defendants' motion to compel arbitration, the Court is required by both the FAA and TAA to stay all proceedings pending the outcome of the arbitration. Defendants therefore respectfully request that the Court grant Defendants' motion to stay pending the outcome of the parties' arbitration.

## VI. Conclusion

Defendants Camp Mystic, LLC, Natural Fountains Properties, Inc., Mystic Camps Family Partnership, Ltd., Mystic Camps Management LLC, George Albritton Eastland, as Independent Executor of the Estate of Richard Eastland, Deceased, Willetta Eastland, Edward Eastland, and Mary Liz Eastland therefore respectfully request that the Court grant this motion to compel arbitration and stay all proceedings against Defendants pending the outcome of arbitration.



Copy from re:SearchTX

Respectfully submitted,

**RAY | PEÑA, P.C.**
9601 McAllister Freeway, Suite 901
San Antonio, Texas 78216
P: (210) 341-3554
F: (210) 341-3557

*/s/ Jeff Ray*
JEFF RAY
State Bar No. 16604400
jray@raylaw.com
*Attorney for Camp Mystic, LLC and George Albritton Eastland, as Independent Executor of the Estate of Richard Eastland, Deceased*

**WATTS LAW FIRM LLP**
110 Tributary Ranch Road
Mountain Home, Texas 78058
P: (512) 479-0500

*/s/Mikal Watts*
MIKAL WATTS
State Bar No. 20981820
mikal@wattsllp.com
*Attorney for Natural Fountains Properties, Inc.; Willetta Eastland, Mystic Camps Family Partnership, Ltd., and Mystic Camps Management, LLC*

**CASTAGNA SCOTT LLP**
1120 S. Capital of Texas Highway
Building 2, Suite 300
Austin, Texas 78746
512/329-3290
888/255-0132 fax

*/s/ Lynn S. Castagna*
LYNN S. CASTAGNA
State Bar No. 03980520
Lynn@texasdefense.com
*Attorney for Edward Eastland and Mary Liz Eastland*



Copy from re:SearchTX

**WRIGHT CLOSE BARGER & GUZMAN, LLP**
One Riverway, Suite 2200
Houston, Texas 77056
Telephone: (713) 572-4321
Facsimile: (713) 572-4320

*/s/ Thomas C. Wright*
Thomas C. Wright
State Bar No. 22059400
wright@wcbglaw.com
Jessica Z. Barger
State Bar No. 24032706
barger@wcbglaw.com
Kenneth J. Fair
State Bar No. 24007171
fair@wcbglaw.com
Joshua Fiveson
State Bar No. 24093438
jfiveson@wcbglaw.com
*Attorneys for Camp Mystic, LLC*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document was served upon all known counsel of record via electronic means in accordance with the Texas Rules of Civil Procedure on this the 24th day of March, 2026.

*/s/ Thomas C. Wright*
Thomas C. Wright



Copy from re:SearchTX

# EXHIBIT A

Copy from re:SearchTX

**DECLARATION OF GEORGE ALBRITTON EASTLAND**

My name is George Albritton Eastland. My date of birth is September 26, 1978. My address is 186 Felix Fisher Road S., Hunt, Texas 78024. I am over the age of 21 and am in all respects capable of making this declaration. In compliance with Texas Civil Practice and Remedies Code § 132.001, I declare under penalty of perjury that I have personal knowledge of the facts stated herein and declare them to be true and correct.

1. My family and I have worked for Camp Mystic, LLC ("Camp Mystic") for many years.

2. My brother and his wife are Edward Eastland ("Edward") and Mary Liz Eastland ("Mary Liz"). Edward, Mary Liz, and I were employed by Camp Mystic in 2025 when the events underlying this suit occurred. Edward, Mary Liz, and I were Directors of Camp Mystic at that time and remain Directors.

3. My mother is Willetta Eastland ("Tweety"), and my father was Richard Eastland ("Dick"). Tweety served as a Co-Executive Director of Camp Mystic with Dick in 2025 when the events underlying this suit occurred. Tweety and Dick were also managing members of Camp Mystic at that time.

4. I know William Neely Bonner, III ("Neel"). Neel is the current President of Natural Fountains Properties, Inc. and was its President in 2025 when the events underlying this suit occurred.

5. Mystic Camps Family Partnership, LTD., is the owner of Camp Mystic, LLC, and of Natural Fountains Properties, Inc.

6. Mystic Camps Management, LLC is the general partner of Mystic Camps Family Partnership, LTD.

Copy from re:SearchTX

7. Attached as Exhibit A are true and correct copies of Participation Agreements that were signed as part of campers' enrollment at Camp Mystic.

Executed in Hunt, Kerr County, Texas, on this, the 22nd day of March, 2026.

Signature: George A. Eastland

Printed Name: George Albritton Eastland



Copy from re:SearchTX

# Participation Agreement 2025

for Cile Steward, 2025 Season

Participation Agreement for Cile Steward:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Cile Steward, (Cile), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Cile.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Cile and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from the nearest hospital/emergency center if a need were to arise to receive emergency care.



Copy from re:SearchTX

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Cile, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Cile MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Cile, use interviews with and photographic images of Cile, including videotape, for its website, brochures and other, including promotional, materials.

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the



Copy from re:SearchTX

remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Cile, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Cile, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

**Signature** Catherine C. Williams
(06/15/2025)



Copy from re:SearchTX

# Participation Agreement 2025

for Eloise Peck, 2025 Season

Participation Agreement for Eloise Peck:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Eloise Peck, (Eloise), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Eloise.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Eloise and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from



Copy from re:SearchTX

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Eloise, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Eloise MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Eloise, use interviews with and photographic images of Eloise, including videotape, for its website, brochures and other, including promotional, materials.



Copy from re:SearchTX

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Eloise, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Eloise, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Missy Rogers Peck
(02/21/2025)



Copy from re:SearchTX

# Participation Agreement 2025

for Wynne Naylor, 2025 Season

Participation Agreement for Wynne Naylor:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Wynne Naylor, (Wynne), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Wynne.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Wynne and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Wynne, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Wynne MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Wynne, use interviews with and photographic images of Wynne, including videotape, for its website, brochures and other, including promotional, materials.

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Wynne, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Wynne, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Alli Naylor (04/14/2025)

# Participation Agreement 2025

for Hadley Hanna, 2025 Season

Participation Agreement for Hadley Hanna:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Hadley Hanna, (Hadley), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Hadley.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Hadley and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Hadley, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Hadley MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Hadley, use interviews with and photographic images of Hadley, including videotape, for its website, brochures and other, including promotional, materials.



Copy from re:SearchTX

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Hadley, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Hadley, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Carrie Hanna (04/13/2025)



Copy from re:SearchTX

# Participation Agreement 2025

for Virginia Hollis, 2025 Season

Participation Agreement for Virginia Hollis:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Virginia Hollis, (Virginia), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Virginia.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Virginia and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from



Copy from re:SearchTX

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Virginia, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Virginia MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Virginia, use interviews with and photographic images of Virginia, including videotape, for its website, brochures and other, including promotional, materials.

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Virginia, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Virginia, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Lacey Hollis (03/20/2025)

# Participation Agreement 2025

for Janie Hunt, 2025 Season

Participation Agreement for Janie Hunt:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Janie Hunt, (Janie), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Janie.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Janie and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Janie, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Janie MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Janie, use interviews with and photographic images of Janie, including videotape, for its website, brochures and other, including promotional, materials.

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Janie, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Janie, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Anne L Hunt (05/19/2025)



Copy from re:SearchTX

# Participation Agreement 2025

for Lucy Dillon, 2025 Season

Participation Agreement for Lucy Dillon:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Lucy Dillon, (Lucy), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Lucy.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Lucy and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from the nearest hospital/emergency center if a need were to arise to receive emergency care.



Copy from re:SearchTX

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Lucy, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Lucy MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Lucy, use interviews with and photographic images of Lucy, including videotape, for its website, brochures and other, including promotional, materials.

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the



Copy from re:SearchTX

remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Lucy, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Lucy, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Lisa Dillon (05/30/2025)

## Participation Agreement 2025

for Kellyanne Lytal, 2025 Season

Participation Agreement for Kellyanne Lytal:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Kellyanne Lytal, (Kellyanne), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Kellyanne.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Kellyanne and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Kellyanne, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Kellyanne MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Kellyanne, use interviews with and photographic images of Kellyanne, including videotape, for its website, brochures and other, including promotional, materials.


Copy from re:SearchTX

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Kellyanne, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Kellyanne, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Malorie Lytal (02/22/2025)

# Participation Agreement 2025

for Ellen Getten, 2025 Season

Participation Agreement for Ellen Getten:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Ellen Getten, (Ellen), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Ellen.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Ellen and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Ellen, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Ellen MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Ellen, use interviews with and photographic images of Ellen, including videotape, for its website, brochures and other, including promotional, materials.

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Ellen, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Ellen, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Jennifer Getten (05/30/2025)

## Participation Agreement 2025

for Linnie McCown, 2025 Season

Participation Agreement for Linnie McCown:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Linnie McCown, (Linnie), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Linnie.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Linnie and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from



Copy from re:SearchTX

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Linnie, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Linnie MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Linnie, use interviews with and photographic images of Linnie, including videotape, for its website, brochures and other, including promotional, materials.

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Linnie, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Linnie, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Callie McCown (05/31/2025)



Copy from re:SearchTX

# Participation Agreement 2025

for Abby Pohl, 2025 Season

Participation Agreement for Abby Pohl:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Abby Pohl, (Abby), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Abby.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Abby and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from the nearest hospital/emergency center if a need were to arise to receive emergency care.



Copy from re:SearchTX

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Abby, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Abby MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Abby, use interviews with and photographic images of Abby, including videotape, for its website, brochures and other, including promotional, materials.

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the



Copy from re:SearchTX

remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Abby, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Abby, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Kristin Pohl (03/24/2025)

# Participation Agreement 2025

for Margaret Sheedy, 2025 Season

Participation Agreement for Margaret Sheedy:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Margaret Sheedy, (Margaret), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Margaret.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Margaret and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from



Copy from re:SearchTX

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Margaret, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Margaret MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Margaret, use interviews with and photographic images of Margaret, including videotape, for its website, brochures and other, including promotional, materials.

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Margaret, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Margaret, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Ellen Sheedy (04/28/2025)



Copy from re:SearchTX

# Participation Agreement 2025

for Mary Stevens, 2025 Season

Participation Agreement for Mary Stevens:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Mary Stevens, (Mary), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Mary.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Mary and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from the nearest hospital/emergency center if a need were to arise to receive emergency care.



Copy from re:SearchTX

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Mary, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Mary MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Mary, use interviews with and photographic images of Mary, including videotape, for its website, brochures and other, including promotional, materials.

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the



Copy from re:SearchTX

remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Mary, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Mary, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

**Signature** Stacy Stevens (04/27/2025)



Copy from re:SearchTX

# Participation Agreement 2025

for Greta Toranzo, 2025 Season

Participation Agreement for Greta Toranzo:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Greta Toranzo, (Greta), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Greta.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Greta and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Greta, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Greta MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Greta, use interviews with and photographic images of Greta, including videotape, for its website, brochures and other, including promotional, materials.



Copy from re:SearchTX

**Greta Toranzo**, Nov 28, 2014 (11.02) Page: 3

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Greta, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Greta, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Ellen Kolpin Toranzo (05/30/2025)



Copy from re:SearchTX

# Participation Agreement 2025

for Margaret Bellows, 2025 Season

Participation Agreement for Margaret Bellows:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Margaret Bellows, (Margaret), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Margaret.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Margaret and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from



Copy from re:SearchTX

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Margaret, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Margaret MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Margaret, use interviews with and photographic images of Margaret, including videotape, for its website, brochures and other, including promotional, materials.

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Margaret, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Margaret, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Patricia Bellows
(06/20/2025)



Copy from re:SearchTX

# Participation Agreement 2025

for Lila Bonner, 2025 Season

Participation Agreement for Lila Bonner:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Lila Bonner, (Lila), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Lila.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Lila and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from the nearest hospital/emergency center if a need were to arise to receive emergency care.



Copy from re:SearchTX

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Lila, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Lila MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Lila, use interviews with and photographic images of Lila, including videotape, for its website, brochures and other, including promotional, materials.

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the

remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Lila, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Lila, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Caitlin Bonner (02/21/2025)



Copy from re:SearchTX

# Participation Agreement 2024

for Chloe Childress, 2024 Season

Participation Agreement for Chloe Childress:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Chloe Childress, (Chloe), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Chloe.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Chloe and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from



Copy from re:SearchTX

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Chloe, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Chloe MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Chloe, use interviews with and photographic images of Chloe, including videotape, for its website, brochures and other, including promotional, materials.



Copy from re:SearchTX

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Chloe, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Chloe, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

**Signature** Wendie Childress
(03/31/2024)



Copy from re:SearchTX

# Participation Agreement 2025

for Molly DeWitt, 2025 Season

Participation Agreement for Molly DeWitt:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Molly DeWitt, (Molly), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Molly.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Molly and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Molly, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Molly MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Molly, use interviews with and photographic images of Molly, including videotape, for its website, brochures and other, including promotional, materials.



Copy from re:SearchTX

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Molly, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Molly, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Ryan DeWitt (06/03/2025)



Copy from re:SearchTX

# Participation Agreement 2024

for Katherine Ferruzzo, 2024 Season

Participation Agreement for Katherine Ferruzzo:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Katherine Ferruzzo, (Katherine), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Katherine.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Katherine and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from



Copy from re:SearchTX

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Katherine, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Katherine MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Katherine, use interviews with and photographic images of Katherine, including videotape, for its website, brochures and other, including promotional, materials.



Copy from re:SearchTX

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Katherine, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Katherine, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

**Signature** Andrea Ferruzzo (04/07/2024)



Copy from re:SearchTX

# Participation Agreement 2025

for Lainey Landry, 2025 Season

Participation Agreement for Lainey Landry:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Lainey Landry, (Lainey), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Lainey.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Lainey and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from



Copy from re:SearchTX

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Lainey, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Lainey MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Lainey, use interviews with and photographic images of Lainey, including videotape, for its website, brochures and other, including promotional, materials.



Copy from re:SearchTX

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Lainey, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Lainey, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Natalie Landry (05/14/2025)

# Participation Agreement 2025

for Blakely McCrory, 2025 Season

Participation Agreement for Blakely McCrory:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Blakely McCrory, (Blakely), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Blakely.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Blakely and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from



Copy from re:SearchTX

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Blakely, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Blakely MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Blakely, use interviews with and photographic images of Blakely, including videotape, for its website, brochures and other, including promotional, materials.



Copy from re:SearchTX

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Blakely, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Blakely, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

**Signature** Lindsey McLeod McCrory
(06/09/2025)

# Participation Agreement 2025

for Mary Kate Jacobe, 2025 Season

Participation Agreement for Mary Kate Jacobe:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Mary Kate Jacobe, (Mary Kate), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Mary Kate.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Mary Kate and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from



Copy from re:SearchTX

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Mary Kate, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Mary Kate MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Mary Kate, use interviews with and photographic images of Mary Kate, including videotape, for its website, brochures and other, including promotional, materials.





Copy from re:SearchTX

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Mary Kate, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Mary Kate, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Samantha Jacobe (06/17/2025)



Copy from re:SearchTX

# EXHIBIT B

Copy from re:SearchTX

COMMERCIAL

# Commercial

## Arbitration Rules and Mediation Procedures

**Including Procedures for Large, Complex Commercial Disputes**

American Arbitration Association®

Available online at **adr.org/commercial**
Rules Amended and Effective September 1, 2022

Copy from re:SearchTX

If you would like to speak to a member of the AAA Commercial Team, please visit **https://go.adr.org/commercial-contact.html**.



Copy from re:SearchTX

# Table of Contents


Important Notice . . . . . 7

Introduction . . . . . 7

Standard Arbitration Clause . . . . . 8

Administrative Fees . . . . . 8

Mediation . . . . . 8

Large, Complex Cases . . . . . 9

Commercial Arbitration Rules . . . . . 10

R-1. Agreement of Parties* . . . . . 10
R-2. AAA, Delegation of Duties, Conduct of Parties, Administrative Review Council . . 11
R-3. National Roster of Arbitrators . . . . . 11
R-4. Filing Requirements and Procedures . . . . . 11
R-5. Answers and Counterclaims . . . . . 13
R-6. Changes of Claim . . . . . 14
R-7. Jurisdiction . . . . . 14
R-8. Consolidation and Joinder . . . . . 15
R-9. Interpretation and Application of Rules . . . . . 17
R-10. Mediation . . . . . 17
R-11. Administrative Conference . . . . . 17
R-12. Fixing of Locale . . . . . 17
R-13. Appointment from National Roster . . . . . 18
R-14. Direct Appointment by Party . . . . . 19
R-15. Appointment of Chairperson by Party-Appointed Arbitrators, Parties, or the AAA . . . . . 19
R-16. Nationality of Arbitrator . . . . . 20
R-17. Number of Arbitrators . . . . . 20
R-18. Disclosure . . . . . 20
R-19. Disqualification of Arbitrator . . . . . 21
R-20. Communication with Arbitrator . . . . . 21
R-21. Vacancies . . . . . 22
R-22. Preliminary Hearing . . . . . 22
R-23. Pre-Hearing Exchange and Production of Information . . . . . 22




Copy from re:SearchTX

R-24. Enforcement Powers of Arbitrator . . . . . 23
R-25. Date, Time, Place, and Method of Hearing . . . . . 23
R-26. Attendance at Hearing . . . . . 24
R-27. Representation . . . . . 24
R-28. Oaths . . . . . 24
R-29. Official Record of Proceedings . . . . . 24
R-30. Interpreters . . . . . 25
R-31. Postponements . . . . . 25
R-32. Arbitration in the Absence of a Party or Representative . . . . . 25
R-33. Conduct of Proceedings . . . . . 25
R-34. Dispositive Motions . . . . . 26
R-35. Evidence . . . . . 26
R-36. Evidence by Written Statements and Post-Hearing Filing of Documents or Other Evidence . . . . . 26
R-37. Inspection or Investigation . . . . . 27
R-38. Interim Measures . . . . . 27
R-39. Emergency Measures of Protection . . . . . 27
R-40. Closing of Hearing . . . . . 29
R-41. Reopening of Hearing . . . . . 29
R-42. Waiver of Rules . . . . . 29
R-43. Extensions of Time . . . . . 29
R-44. Serving of Notice and Communications . . . . . 30
R-45. Confidentiality . . . . . 30
R-46. Majority Decision . . . . . 30
R-47. Time of Award . . . . . 31
R-48. Form of Award . . . . . 31
R-49. Scope of Award . . . . . 31
R-50. Award Upon Settlement – Consent Award . . . . . 32
R-51. Delivery of Award to Parties . . . . . 32
R-52. Modification of Award . . . . . 32
R-53. Release of Documents for Judicial Proceedings . . . . . 32
R-54. Applications to Court and Exclusion of Liability . . . . . 32
R-55. Administrative Fees . . . . . 33
R-56. Expenses . . . . . 33
R-57. Neutral Arbitrator's Compensation . . . . . 33
R-58. Deposits . . . . . 34



Copy from re:SearchTX

R-59. Remedies for Nonpayment . . . 34
R-60. Sanctions . . . 35

Preliminary Hearing Procedures . . . 36
P-1. General . . . 36
P-2. Checklist . . . 36

Expedited Procedures . . . 39
E-1. Limitation on Extensions . . . 39
E-2. Changes of Claim or Counterclaim . . . 39
E-3. Serving of Notice . . . 39
E-4. Appointment and Qualifications of Arbitrator . . . 39
E-5. Discovery, Motions, and Conduct of Proceedings . . . 40
E-6. Proceedings on Documents and Procedures for the Resolution of Disputes Through Document Submission . . . 40
E-7. Date, Time, Place, and Method of Hearing . . . 41
E-8. The Hearing . . . 41
E-9. Time of Award . . . 41
E-10. Arbitrator's Compensation . . . 41

Procedures for Large, Complex Commercial Disputes . . . 42
L-1. Administrative Conference . . . 42
L-2. Arbitrators . . . 42
L-3. Management of Proceedings . . . 43

Administrative Fee Schedule . . . 43

Commercial Mediation Procedures . . . 44
M-1. Agreement of Parties* . . . 44
M-2. Initiation of Mediation . . . 44
M-3. Representation . . . 45
M-4. Appointment of the Mediator . . . 45
M-5. Mediator's Impartiality and Duty to Disclose . . . 45
M-6. Vacancies . . . 46
M-7. Duties and Responsibilities of the Mediator . . . 46
M-8. Responsibilities of the Parties . . . 47
M-9. Privacy . . . 47
M-10. Confidentiality . . . 47



Copy from re:SearchTX

M-11. No Stenographic Record . . . . . 48
M-12. Termination of Mediation . . . . . 48
M-13. Exclusion of Liability . . . . . 48
M-14. Interpretation and Application of Procedures . . . . . 48
M-15. Deposits . . . . . 49
M-16. Expenses . . . . . 49
M-17. Cost of the Mediation . . . . . 49



Copy from re:SearchTX

# Commercial Arbitration Rules and Mediation Procedures

(Including Procedures for Large, Complex Commercial Disputes)

## Important Notice

These rules and any amendment of them shall apply in the form in effect at the time the administrative filing requirements are met for a demand for arbitration or submission agreement received by the AAA®. To ensure that you have the most current information, see our web site at www.adr.org.

## Introduction

Each year, many millions of business transactions take place. Occasionally, disagreements develop over these business transactions. Many of these disputes are resolved by arbitration, the voluntary submission of a dispute to an impartial person or persons for final and binding determination. Arbitration has proven to be an effective way to resolve these disputes privately, promptly, and economically.

The American Arbitration Association® (AAA), a not-for-profit, public service organization, offers a broad range of dispute resolution services to business executives, attorneys, individuals, trade associations, unions, management, consumers, families, communities, and all levels of government. Services are available through AAA headquarters in New York and through offices located in major cities throughout the United States. Hearings may be held at locations convenient for the parties and are not limited to cities with AAA offices. In addition, the AAA serves as a center for education and training, issues specialized publications, and conducts research on various forms of alternative dispute resolution.



Copy from re:SearchTX

## Standard Arbitration Clause

The parties can provide for arbitration of future disputes by inserting the following clause into their contracts:

> *Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.*

Arbitration of existing disputes may be accomplished by use of the following:

> *We, the undersigned parties, hereby agree to submit to arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules the following Controversy: (describe briefly). We further agree that the above controversy be submitted to (one) (three) arbitrator(s). We further agree that we will faithfully observe this agreement and the rules, that we will abide by and perform any award rendered by the arbitrator(s), and that a judgment of any court having jurisdiction may be entered on the award.*

The services of the AAA are generally concluded with the transmittal of the award. Although there is voluntary compliance with the majority of awards, judgment on the award can be entered in a court having appropriate jurisdiction if necessary.

## Administrative Fees

The AAA charges a filing fee based on the amount of the claim or counterclaim. This fee information, which is included with these rules, allows the parties to exercise control over their administrative fees. The fees cover AAA administrative services; they do not cover arbitrator compensation or expenses, if any, reporting services, or any post-award charges incurred by the parties in enforcing the award.

## Mediation

Subject to the right of any party to opt out, in cases where a claim or counterclaim exceeds $100,000, the Rules provide that the parties shall mediate their dispute upon the administration of the arbitration or at any time when the arbitration is pending. In mediation, the neutral mediator assists the parties in reaching a



Copy from re:SearchTX

settlement but does not have the authority to make a binding decision or award. Mediation is administered by the AAA in accordance with its Commercial Mediation Procedures. There is no additional filing fee where parties to a pending arbitration attempt to mediate their dispute under the AAA's auspices.

Although these rules include a mediation procedure that will apply to many cases, parties may still want to incorporate mediation into their contractual dispute settlement process. Parties can do so by inserting the following mediation clause into their contract in conjunction with a standard arbitration provision:

> *If a dispute arises out of or relates to this contract, or the breach thereof, and if the dispute cannot be settled through negotiation, the parties agree first to try in good faith to settle the dispute by mediation administered by the American Arbitration Association under its Commercial Mediation Procedures before resorting to arbitration, litigation, or some other dispute resolution procedure.*

If the parties want to use a mediator to resolve an existing dispute, they can enter into the following submission agreement:

> *The parties hereby submit the following dispute to mediation administered by the American Arbitration Association under its Commercial Mediation Procedures. (The clause may also provide for the qualifications of the mediator(s), method of payment, locale of meetings, and any other item of concern to the parties.)*

## Large, Complex Cases

Unless the parties agree otherwise, the Procedures for Large, Complex Commercial Disputes, which appear in this pamphlet, will be applied to all cases administered by the AAA under the Commercial Arbitration Rules in which the disclosed claim or counterclaim of any party is at least $1,000,000 exclusive of claimed interest, arbitration fees and costs. The key features of these Procedures include:

> A highly qualified, trained Roster of Neutrals;

> A mandatory preliminary hearing with the arbitrators, which may be conducted by teleconference or other electronic means;

> Broad arbitrator authority to order and control the exchange of information, including depositions;

> A presumption that hearings will proceed on a consecutive or block basis.



Copy from re:SearchTX

# Commercial Arbitration Rules

## R-1. Agreement of Parties*

**(a)** The parties shall be deemed to have made these Rules a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association ("AAA") under its Commercial Arbitration Rules or for arbitration by the AAA of a domestic commercial dispute without specifying particular rules. These Rules and any amendment to them shall apply in the form in effect at the time the administrative requirements are met for a Demand for Arbitration or Submission Agreement received by the AAA. Any disputes regarding which AAA rules shall apply shall be decided by the AAA. The parties, by written agreement, may vary the procedures set forth in these Rules. After appointment of the arbitrator, such modifications may be made only with the consent of the arbitrator.

**(b)** Unless the parties agree or the AAA determines otherwise, the Expedited Procedures shall apply in any case in which no disclosed claim or counterclaim exceeds $100,000, exclusive of interest, attorneys' fees, and arbitration fees and costs. Parties may also agree to use these Procedures in larger cases. Unless the parties agree otherwise, these Procedures will not apply in cases involving more than two parties. The Expedited Procedures shall be applied as described in Procedures E-1 through E-10, in addition to any other portion of these Rules that is not in conflict with the Expedited Procedures.

**(c)** Unless the parties agree otherwise, the Procedures for Large, Complex Commercial Disputes shall apply to all cases in which the disclosed claim or counterclaim of any party is at least $1,000,000, exclusive of claimed interest, attorneys' fees, arbitration fees and costs. Parties may also agree to use the Procedures in cases involving claims or counterclaims under $1,000,000 or in nonmonetary cases. The Procedures for Large, Complex Commercial Disputes shall be applied as described in Procedures L-1 through L-3 in addition to any other portion of these Rules that is not in conflict with the Procedures for Large, Complex Commercial Disputes.

**(d)** Parties may, by agreement, apply the Expedited Procedures; the Procedures for Large, Complex Commercial Disputes; or the Procedures for the Resolution of Disputes Through Document Submission (Procedure E-6) to any dispute.

**(e)** All other cases shall be administered in accordance with Rules R-1 through R-60 of these Rules.

** The AAA will apply the Employment/Workplace Rules to any dispute between an individual employee or an independent contractor (working or performing as an individual and not incorporated) and a business or organization and the dispute involves work or work-related claims, including any statutory claims and including work-related claims under independent contractor agreements. Should a contract call for the Consumer Rules, and the dispute is not between a consumer and a business, the AAA has the discretion to apply the Commercial Rules and Commercial Fee schedule. (Revised 5/1/25)*

** Beginning June 1, 2021, the AAA will apply the Consumer Arbitration Fee Schedule to any dispute between an online marketplace or platform and an individual user or subscriber (using or subscribed to the service as an individual and not incorporated) and the dispute does not involve work or work-related claims.*



Copy from re:SearchTX

## R-2. AAA, Delegation of Duties, Conduct of Parties, Administrative Review Council

**(a)** When parties agree to arbitrate under these Rules, or when they provide for arbitration by the AAA and an arbitration is initiated under these Rules, they thereby authorize the AAA to administer the arbitration.

**(b)** The authority and duties of the AAA are prescribed in the agreement of the parties and in these Rules, and may be carried out through such of the AAA's representatives as it may direct. The AAA may, in its discretion, assign the administration of an arbitration to any of its offices. Arbitrations administered under these Rules shall only be administered by the AAA or by an individual or organization authorized by the AAA to do so.

**(c)** The AAA requires that parties and their representatives conduct themselves in accordance with the AAA's *Standards of Conduct for Parties and Representatives* when utilizing the AAA's services. Failure to do so may result in the AAA's declining to further administer a particular case or caseload.

**(d)** For cases proceeding under the Procedures for Large, Complex Commercial Disputes, and for other cases where the AAA, in its sole discretion, deems it appropriate, the AAA may act through its Administrative Review Council to take the following administrative actions:

**i)** determine challenges to the appointment or continuing service of an arbitrator;

**ii)** make an initial determination as to the locale of the arbitration, subject to the power of the arbitrator to make a final determination; or

**iii)** decide whether a party has met the administrative requirements to file an arbitration under these Rules.

## R-3. National Roster of Arbitrators

The AAA shall establish and maintain a National Roster of Arbitrators ("National Roster") and shall appoint arbitrators as provided in these Rules. The term "arbitrator" in these Rules refers to the arbitration panel, constituted for a particular case, whether composed of one or more arbitrators, or to an individual arbitrator, as the context requires.

## R-4. Filing Requirements and Procedures

**(a)** Filing Requirements

**i)** Arbitration under an arbitration provision in a contract shall be initiated by the initiating party ("claimant") filing with the AAA a Demand for Arbitration, the administrative filing fee, and a copy of the applicable arbitration agreement from the parties' contract which provides for arbitration. The filing fee must be paid before a matter is considered properly filed.



Copy from re:SearchTX

**ii)** Arbitration pursuant to a court order shall be initiated by the initiating party filing with the AAA a Demand for Arbitration, the administrative filing fee, and a copy of any applicable arbitration agreement from the parties' contract which provides for arbitration.

**a)** The filing party shall include a copy of the court order.

**b)** The filing fee must be paid before a matter is considered properly filed. If the court order directs that a specific party is responsible for the filing fee, it is the responsibility of the filing party to either make such payment to the AAA and seek reimbursement as directed in the court order or to make other such arrangements so that the filing fee is submitted to the AAA with the Demand.

**c)** The party filing the Demand with the AAA is the claimant and the opposing party is the respondent regardless of which party initiated the court action. Parties may request that the arbitrator alter the order of proceedings if necessary pursuant to Rule R-33.

**iii)** Parties to any existing dispute who have not previously agreed to use these Rules may commence an arbitration under these Rules by filing a written Submission Agreement and the administrative filing fee. To the extent that the parties' Submission Agreement contains any variances from these Rules, such variances should be clearly stated in the Submission Agreement.

**iv)** Information to be included with any arbitration filing includes:

**a)** the name of each party;

**b)** the address of each party and, if known, the telephone number and email address;

**c)** if applicable, the name, address, telephone number, and email address of any known representative for each party;

**d)** a statement setting forth the nature of the claim including the relief sought and the amount involved; and

**e)** the locale requested if the arbitration agreement does not specify one.

**(b)** Filing Procedures

**i)** The initiating party may file or submit a dispute to the AAA in the following manner:

**a)** through AAA WebFile®, located at www.adr.org;

**b)** by filing the complete Demand or Submission with any AAA office, regardless of the intended locale of hearing; or

**c)** by emailing the complete Demand or Submission to casefiling@adr.org, with payment to follow as directed by the AAA.

**ii)** The filing party shall simultaneously provide a copy of the Demand and any supporting documents to the opposing party.



Copy from re:SearchTX

**iii)** Any papers, notices, or process necessary or proper for the initiation of an arbitration under this Rule may be served on a party:

**a)** by mail addressed to the party or its authorized representative at their last known address;

**b)** by electronic service/email, with the prior agreement of the party being served;

**c)** by personal service; or

**d)** by any other service methods provided for under the applicable procedures of the courts of the state where the party to be served is located.

**iv)** The AAA shall provide notice to the parties (or their representatives if so named) of the receipt of a Demand or Submission when the administrative filing requirements have been satisfied. The date on which the filing requirements are satisfied shall establish the date of filing the dispute for administration. However, all disputes in connection with the AAA's determination of the date of filing may be decided by the arbitrator.

**v)** It is the responsibility of the filing party to ensure that any conditions precedent to the filing of a case are met prior to filing an arbitration, as well as any time requirements associated with the filing. Any dispute regarding whether a condition precedent has been met may be raised with the arbitrator for determination.

**vi)** The AAA has the authority to make an administrative determination whether the filing requirements set forth in this Rule have been met.

**vii)** If the filing does not satisfy the filing requirements set forth in Section (a) above, the AAA shall acknowledge to all named parties receipt of the incomplete filing, and the filing may be returned to the initiating party.

**(c)** *Authority of arbitrator.* Any decision made by the AAA regarding filing requirements and procedures shall not interfere with the arbitrator's authority to determine jurisdiction pursuant to Rule R-7.

## R-5. Answers and Counterclaims

**(a)** A respondent may file an answering statement with the AAA within 14 calendar days after notice of the filing of the Demand is sent by the AAA. The respondent shall, at the time of any such filing, send a copy of any answering statement to the claimant and to all other parties to the arbitration. If no answering statement is filed within the stated time, the respondent will be deemed to deny the claim. Failure to file an answering statement shall not operate to delay the arbitration.

**(b)** A respondent may file a counterclaim at any time after notice of the filing of the Demand is sent by the AAA, subject to the limitations set forth in Rule R-6. The respondent shall send a copy of the counterclaim to the claimant and all other parties to the arbitration. If a counterclaim is asserted, it shall include a statement setting forth the nature of the counterclaim including the relief sought and the



Copy from re:SearchTX

amount involved. The filing fee as specified in the applicable AAA Fee Schedule must be paid at the time of filing. The claimant may file an answering statement or reply in response to the counterclaim with the AAA within 14 calendar days after notice of the filing of the counterclaim is sent by the AAA.

**(c)** If the respondent alleges that a different arbitration provision is controlling, the matter will be administered in accordance with the arbitration provision submitted by the initiating party subject to a final determination by the arbitrator.

**(d)** If the counterclaim does not meet the requirements for filing a claim and the deficiency is not cured by the date specified by the AAA, it may be returned to the filing party.

## R-6. Changes of Claim

**(a)** A party may at any time prior to the close of the hearing or by any earlier date established by the arbitrator increase or decrease the amount of its claim or counterclaim. Written notice of the change of claim amount must be provided to the AAA and all parties. If the change of claim amount results in an increase in the administrative fee, the balance of the fee is due before the change of claim or counterclaim amount may be accepted by the arbitrator. After the arbitrator is appointed, however, a party may increase the amount of its claim or counterclaim, or alter its request for non-monetary relief, only with the arbitrator's consent.

**(b)** Any new or different claim or counterclaim, as opposed to an increase or decrease in the amount of a pending claim or counterclaim, shall be made in writing and filed with the AAA, and a copy shall be provided to the other party, who shall have 14 calendar days from the date of such transmittal within which to file an answer to the proposed change of claim or counterclaim with the AAA. After the arbitrator is appointed, however, no new or different claim or counterclaim may be submitted except with the arbitrator's consent.

**(c)** A party that filed a claim or counterclaim of an undisclosed or undetermined amount must specify the amount of the claim or counterclaim to the AAA, all parties, and the arbitrator at least seven calendar days prior to the commencement of the hearing or by any other date established by the arbitrator. If the disclosed amount of the claim or counterclaim results in an increased filing fee, that fee must be paid at the time the claim or counterclaim amount is disclosed. For good cause shown and with the consent of the arbitrator, a party may proceed to the hearing with an undisclosed or undetermined claim or counterclaim, provided that the final amount of the claim or counterclaim is set forth in a post-hearing brief or submission and any appropriate filing fee is paid.

## R-7. Jurisdiction

**(a)** The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim, without any need to refer such matters first to a court.



Copy from re:SearchTX

**(b)** The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.

**(c)** A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection. The arbitrator may rule on such objections as a preliminary matter or as part of the final award.

## R-8. Consolidation and Joinder

**(a)** Consolidation

- **i)** Two or more arbitrations may be consolidated if all parties to all of the arbitrations to be consolidated so agree.
- **ii)** Unless all parties agree to consolidation, the party requesting consolidation of two or more arbitrations must file with the AAA and serve on all other parties a written request for consolidation with the supporting reasons for such request within 90 days of the date the AAA determines that all administrative filing requirements were satisfied for the last-filed case that is part of the consolidation request. Such time limit may be extended by the arbitrator appointed in the first-filed case upon a showing of good cause for the late request. The other parties to the arbitrations shall provide their written responses to the consolidation request within 10 calendar days after the AAA sends notice of receipt of the request.
- **iii)** At its discretion, the AAA either may direct that the consolidation request be decided by the arbitrator appointed in the first-filed case or may appoint a consolidation arbitrator for the sole purpose of deciding the consolidation request.
- **iv)** The arbitrator deciding consolidation may order consolidation of two or more cases for all purposes or for such limited purposes and under such conditions as the arbitrator may direct.
- **v)** Absent agreement of all parties, an arbitrator appointed for the sole purpose of deciding the consolidation request shall have no further power to act, and shall be removed from the case, after the consolidation request is decided.
- **vi)** In deciding whether to consolidate, the arbitrator or consolidation arbitrator shall take into account all relevant circumstances, including:
  - **a)** the terms and compatibility of the agreements to arbitrate,
  - **b)** applicable law,
  - **c)** the timeliness of the request to consolidate and the progress already made in the arbitrations,
  - **d)** whether the arbitrations raise common issues of law and/or fact, and



Copy from re:SearchTX

**e)** whether consolidation of the arbitrations would serve the interests of justice and efficiency.

**(b)** Joinder

**i)** Additional parties may be joined to an arbitration if all parties to the arbitration and the parties proposed to be joined so agree.

**ii)** Absent such consent, all requests for joinder must be submitted to the AAA prior to the appointment of an arbitrator pursuant to these Rules or within 90 days of the date the AAA determines that all administrative filing requirements have been satisfied. The arbitrator may extend this deadline on a showing of good cause for the late request.

**iii)** If the existing parties and the parties proposed to be joined are unable to agree to the joinder of those additional parties to an ongoing arbitration, the arbitrator shall decide whether parties should be joined. If an arbitrator has not yet been appointed in the case, the AAA may appoint an arbitrator for the sole purpose of deciding the joinder request. Absent agreement of all parties, the arbitrator appointed for the sole purpose of deciding the joinder request shall have no further power to act, and shall be removed from the case, after the joinder request is decided.

**iv)** The party requesting the joinder of one or more parties to a pending arbitration must file with the AAA a written request that provides the names and contact information for such parties; the names and contact information for the parties' representatives, if known; and the supporting reasons for such request, including applicable law. The requesting party must provide a copy of the joinder request to all parties in the arbitration and all parties it seeks to join at the same time it files the request with the AAA. The other parties to the arbitration and the parties sought to be joined shall provide their written responses to the joinder request within 14 days after the AAA sends notice of receipt of the request for joinder.

**v)** The requesting party shall comply with the provisions of Rule R-4(a) as to all parties sought to be joined.

**(c)** If an arbitrator determines that separate arbitrations shall be consolidated or that the joinder of additional parties is permissible, that arbitrator may also determine:

**i)** whether any arbitrator previously appointed to an existing case that was consolidated shall remain on the newly constituted case;

**ii)** whether any arbitrator previously appointed to a case where additional parties have been joined shall remain;

**iii)** if appropriate, a process for selecting the arbitrator(s) to fill any vacancies; and

**iv)** unless agreed otherwise by the parties, the allocation among the parties of arbitrator compensation and expenses, subject to reapportionment by the arbitrator appointed to the ongoing or newly constituted case in the final award.



Copy from re:SearchTX

**(d)** The AAA may take reasonable administrative actions to accomplish any consolidation or joinder ordered by the arbitrator or as agreed to by the parties. Pending the determination on a consolidation or joinder request, the AAA shall have the authority to stay the arbitration or arbitrations impacted by the consolidation or joinder request, at its sole discretion.

## R-9. Interpretation and Application of Rules

The arbitrator shall interpret and apply these Rules insofar as they relate to the arbitrator's powers and duties. When there is more than one arbitrator and a difference arises among them concerning the meaning or application of these Rules, it shall be decided by a majority vote. If that is not possible, either an arbitrator or a party may refer the question to the AAA for final decision. All other rules shall be interpreted and applied by the AAA.

## R-10. Mediation

In all cases where a claim or counterclaim exceeds $100,000, upon the AAA's administration of the arbitration or at any time while the arbitration is pending, the parties shall mediate their dispute pursuant to the applicable provisions of the AAA's Commercial Mediation Procedures, or as otherwise agreed by the parties. Absent an agreement of the parties to the contrary, the mediation shall take place concurrently with the arbitration and shall not serve to delay the arbitration proceedings. However, any party to an arbitration may unilaterally }opt out of this Rule upon notification to the AAA and the other parties to the arbitration. The parties shall confirm the completion of any mediation or any decision to opt out of this Rule to the AAA. Unless agreed to by all parties and the mediator, the mediator shall not be appointed as an arbitrator to the case.

## R-11. Administrative Conference

At the request of any party or upon the AAA's own initiative, the AAA may conduct an administrative conference, in person, by videoconference or by telephone, with the parties and/or their representatives. The conference may address such issues as arbitrator selection, mediation of the dispute, potential exchange of information, a timetable for hearings, and any other administrative matters.

## R-12. Fixing of Locale

The parties may mutually agree on the locale where the arbitration is to be held. When the parties' arbitration agreement requires a specific locale, absent the parties' agreement to change it, or a determination by the arbitrator that



Copy from re:SearchTX

applicable law requires a different locale, the locale shall be that specified in the arbitration agreement.

Any disputes regarding the locale that are to be decided by the AAA must be submitted to the AAA and all other parties within 14 calendar days after the AAA sends notice of the filing of the Demand or by the date established by the AAA. Disputes regarding locale shall be determined in the following manner:

**(a)** When the parties' arbitration agreement is silent with respect to locale, and if the parties disagree as to the locale, the AAA shall initially determine the locale of arbitration, subject to the power of the arbitrator after appointment to make a final determination on the locale.

**(b)** If the reference to a locale in the arbitration agreement is ambiguous, and the parties are unable to agree to a specific locale, the AAA shall determine the locale, subject to the power of the arbitrator to finally determine the locale.

**(c)** If the parties' arbitration agreement specifies more than one possible locale, the filing party may select any of the specified locales at the time of filing, subject to the power of the arbitrator to finally determine the locale.

The arbitrator, at the arbitrator's sole discretion, shall have the authority to conduct special hearings for document production purposes or otherwise at other locations if reasonably necessary and beneficial to the process.

## R-13. Appointment from National Roster

If the parties have not appointed an arbitrator and have not provided any other method of appointment, the arbitrator shall be appointed in the following manner:

**(a)** The AAA shall send simultaneously to each party to the dispute an identical list of 10 (unless the AAA decides that a different number is appropriate) names of persons chosen from the National Roster. The parties are encouraged to agree to an arbitrator from the submitted list and to advise the AAA of their agreement.

**(b)** If the parties are unable to agree upon an arbitrator, each party to the dispute shall have 14 calendar days from the transmittal date in which to strike names objected to, number the remaining names in order of preference, and return the list to the AAA. At its discretion, the AAA may limit the number of strikes permitted. The parties are not required to exchange selection lists. If a party does not return the list within the time specified, all persons named therein shall be deemed acceptable to that party. From among the persons who have been approved on both lists, and in accordance with the designated order of mutual preference, the AAA shall invite the acceptance of an arbitrator to serve. If the parties fail to agree on any of the persons named, or if acceptable arbitrators are unable to act, or if



Copy from re:SearchTX

for any other reason the appointment cannot be made from the submitted lists, the AAA shall have the power to make the appointment from among other members of the National Roster without the submission of additional lists.

**(c)** Unless the parties agree otherwise, when there are two or more claimants or two or more respondents, the AAA may appoint all the arbitrators.

## R-14. Direct Appointment by Party

**(a)** If the agreement of the parties names an arbitrator or specifies a method of appointing an arbitrator, that designation or method shall be followed. If a party selects an arbitrator for appointment, it shall file the name, address, telephone number, and email address of the arbitrator with the AAA. Upon the request of any appointing party, the AAA shall submit a list of members of the National Roster from which the party may, if it so desires, make the appointment.

**(b)** Where the parties have agreed that each party is to name one arbitrator, the arbitrators so named must meet the standards of Rule R-19 with respect to impartiality and independence unless the parties have specifically agreed pursuant to Rule R-19(b) that the party-appointed arbitrators are to be non-neutral and need not meet those standards.

**(c)** If the agreement specifies a period of time within which an arbitrator shall be appointed and any party fails to make the appointment within that period, the AAA shall make the appointment.

**(d)** If no period of time is specified in the agreement, the AAA shall notify the party to make the appointment. If within 14 calendar days after such notice has been sent, an arbitrator has not been appointed by a party, the AAA shall make the appointment.

## R-15. Appointment of Chairperson by Party-Appointed Arbitrators, Parties, or the AAA

**(a)** Where there is a panel of three or more arbitrators, one arbitrator will be designated as the panel chairperson. Such designation will be according to the terms of the parties' arbitration agreement. However, if the parties' arbitration agreement does not specify how the chairperson is to be selected, the chairperson can be designated, at the AAA's discretion, by the party-appointed arbitrators, the parties, the panel, or the AAA.

**(b)** If the arbitration agreement specifies a period of time for appointment of the chairperson and no appointment is made within that period or any agreed extension, the AAA may appoint the chairperson. If no period of time is specified for appointment of the chairperson, and the party-appointed arbitrators or the parties do not make the appointment within 14 calendar days from the date of the appointment of the last party-appointed arbitrator, the AAA may appoint the chairperson.



Copy from re:SearchTX

**(c)** Absent the agreement of the parties, the chairperson shall be appointed from the National Roster, and the AAA shall furnish to the party-appointed arbitrators, in the manner provided in Rule R-13, a list selected from the National Roster, and the appointment of the chairperson shall be made as provided in that Rule.

## R-16. Nationality of Arbitrator

Where the parties are nationals of different countries, the AAA, at the request of any party or on its own initiative, may appoint as arbitrator a national of a country other than that of any of the parties. The request must be made before the time set for the appointment of the arbitrator as agreed by the parties or set by these Rules.

## R-17. Number of Arbitrators

**(a)** The parties may agree on the number of arbitrators to hear and determine the case. If the arbitration agreement does not specify the number of arbitrators or is ambiguous, and the parties do not otherwise agree, the dispute shall be heard and determined by one arbitrator, unless the AAA, in its discretion, directs that three arbitrators be appointed. A party may request three arbitrators in the Demand or Answer, which request the AAA will consider in exercising its discretion regarding the number of arbitrators appointed to the dispute.

**(b)** Use of terms such as "the arbitrator", "an arbitrator", or "the arbitrators" in the arbitration agreement, without further specifying the number of arbitrators, shall not be deemed by the AAA to reflect an agreement as to the number of arbitrators.

**(c)** Any request for a change in the number of arbitrators as a result of an increase or decrease in the amount of a claim or a new or different claim must be made to the AAA and other parties to the arbitration no later than seven calendar days after receipt of the Rule R-6-required notice of change of claim amount. If the parties are unable to agree with respect to the request for a change in the number of arbitrators, the AAA shall make that determination.

## R-18. Disclosure

**(a)** Any person appointed or to be appointed as an arbitrator, as well as the parties and their representatives, shall disclose to the AAA any circumstance likely to give rise to justifiable doubt as to the arbitrator's impartiality or independence, including any bias or any financial or personal interest in the result of the arbitration or any past or present relationship with the parties or their representatives. Such obligation shall remain in effect throughout the arbitration. Failure on the part of a party or a representative to comply with the requirements of this Rule may result in the waiver of the right to object to an arbitrator in accordance with Rule R-42.



Copy from re:SearchTX

**(b)** Upon receipt of such information from the arbitrator or another source, the AAA shall communicate the information to the parties and, if it deems it appropriate to do so, to the arbitrator and others.

**(c)** Disclosure of information pursuant to this Rule R-18 is not an indication that the arbitrator considers the disclosed circumstance likely to affect impartiality or independence.

## R-19. Disqualification of Arbitrator

**(a)** Any arbitrator shall be impartial and independent and shall perform his or her duties with diligence and in good faith, and shall be subject to disqualification for:

- **i)** partiality or lack of independence,
- **ii)** inability or refusal to perform his or her duties with diligence and in good faith, and
- **iii)** any grounds for disqualification provided by applicable law.

**(b)** The parties may agree in writing, however, that arbitrators directly appointed by a party pursuant to Rule R-14 shall be non-neutral, in which case such arbitrators need not be impartial or independent and shall not be subject to disqualification for partiality or lack of independence.

**(c)** Upon objection of a party to the continued service of an arbitrator, or on its own initiative, the AAA shall determine whether the arbitrator should be disqualified on the grounds set out above, and shall inform the parties of its decision, which decision shall be conclusive.

## R-20. Communication with Arbitrator

**(a)** No party and no one acting on behalf of any party shall communicate *ex parte* with an arbitrator or a candidate for arbitrator concerning the arbitration, except that a party, or someone acting on behalf of a party, may communicate *ex parte* with a candidate for direct appointment pursuant to Rule R-14 in order to advise the candidate of the general nature of the controversy and of the anticipated proceedings and to discuss the candidate's qualifications, availability, or independence in relation to the parties or to discuss the suitability of candidates for selection as a third arbitrator where the parties or party-designated arbitrators are to participate in that selection.

**(b)** Rule R-20(a) does not apply to arbitrators directly appointed by the parties who, pursuant to Rule R-19(b), the parties have agreed in writing are non-neutral. Where the parties have so agreed under Rule R-19(b), the AAA shall as an administrative practice suggest to the parties that they agree further that Rule R-20(a) should nonetheless apply prospectively.

**(c)** As set forth in Rule R-44, unless otherwise instructed by the AAA, in the Rules, or by the arbitrator, any documents submitted by any party to the AAA or to the arbitrator shall simultaneously be provided to the other party or parties to the arbitration.



Copy from re:SearchTX

## R-21. Vacancies

**(a)** If for any reason an arbitrator is unable or unwilling to perform the duties of the office, the AAA may, on proof satisfactory to it, declare the office vacant. Vacancies shall be filled in accordance with the applicable provisions of these Rules.

**(b)** In the event of a vacancy in a panel of neutral arbitrators after the hearings have commenced, the remaining arbitrator or arbitrators may continue with the hearing and determination of the controversy, unless the parties agree otherwise.

**(c)** In the event of the appointment of a substitute arbitrator, the panel of arbitrators shall determine in its sole discretion whether it is necessary to repeat all or part of any prior hearings.

## R-22. Preliminary Hearing

**(a)** At the discretion of the arbitrator, and depending on the size and complexity of the arbitration, a preliminary hearing should be scheduled as soon as practicable after the arbitrator has been appointed. The parties should be invited to attend the preliminary hearing along with their representatives. The preliminary hearing may be conducted in person, by video conference or by telephone.

**(b)** At the preliminary hearing, the parties and the arbitrator should be prepared to discuss and establish a procedure for the conduct of the arbitration that is appropriate to achieve a fair, efficient, and economical resolution of the dispute. Procedures P-1 and P-2 of these Rules address the issues to be considered at the preliminary hearing.

## R-23. Pre-Hearing Exchange and Production of Information

**(a)** *Authority of arbitrator.* The arbitrator shall manage any necessary exchange of information among the parties with a view to achieving an efficient and economical resolution of the dispute, while at the same time promoting equality of treatment and safeguarding each party's opportunity to fairly present its claims and defenses.

**(b)** *Documents.* The arbitrator may, on application of a party or on the arbitrator's own initiative:

**i)** require the parties to exchange documents in their possession or custody on which they intend to rely;

**ii)** require the parties to update their exchanges of the documents on which they intend to rely as such documents become known to them;

**iii)** require the parties, in response to reasonable document requests, to make available to the other party documents in the responding party's possession or custody, not otherwise readily available to the party seeking the documents, and reasonably believed by the party seeking the documents to exist and to be relevant and material to the outcome of disputed issues; and



Copy from re:SearchTX

**iv)** require the parties, when documents to be exchanged or produced are maintained in electronic form, to make such documents available in the form most convenient and economical for the party in possession of such documents, unless the arbitrator determines that there is good cause for requiring the documents to be produced in a different form. The parties should attempt to agree in advance upon, and the arbitrator may determine, reasonable search parameters to balance the need for production of electronically stored documents relevant and material to the outcome of disputed issues against the cost of locating and producing them.

## R-24. Enforcement Powers of Arbitrator

The arbitrator shall have the authority to issue any orders necessary to enforce the provisions of Rules R-22 and R-23 and any other rule or procedure and to otherwise achieve a fair, efficient and economical resolution of the case, including, without limitation:

**(a)** conditioning any exchange or production of confidential documents and information, and the admission of confidential evidence at the hearing, on appropriate orders to preserve such confidentiality;

**(b)** imposing reasonable search parameters for electronic and other documents if the parties are unable to agree;

**(c)** allocating costs of producing documentation, including electronically stored documentation;

**(d)** in the case of willful non-compliance with any order issued by the arbitrator, drawing adverse inferences, excluding evidence and other submissions, and/or making special allocations of costs or an interim award of costs arising from such non-compliance; and

**(e)** issuing any other enforcement orders which the arbitrator is empowered to issue under applicable law.

## R-25. Date, Time, Place, and Method of Hearing

The arbitrator shall set the date, time, place, and method (including video, audio or other electronic means when appropriate) for each hearing. The parties shall respond to requests for hearing dates in a timely manner, be cooperative in scheduling the earliest practicable date, and adhere to the established hearing schedule. The AAA shall send a notice of hearing to the parties at least 10 calendar days in advance of the hearing date, unless otherwise agreed by the parties.



Copy from re:SearchTX

## R-26. Attendance at Hearing

The arbitrator and the AAA shall maintain the privacy of the hearings unless the law provides to the contrary. Any person having a direct interest in the arbitration is entitled to attend hearings. The arbitrator shall otherwise have the power to require the exclusion of any witness, other than a party or other essential person, during the testimony of any other witness. It shall be discretionary with the arbitrator to determine the propriety of the attendance of any other person.

## R-27. Representation

Any party may participate without representation (*pro se*), or by counsel or any other representative of the party's choosing, unless such choice is prohibited by applicable law. A party intending to be so represented shall notify the other party and the AAA of the name, telephone number and address, and email address if available, of the representative at least seven calendar days prior to the date set for the hearing at which that person is first to appear. When such a representative initiates an arbitration or responds for a party, notice is deemed to have been given.

## R-28. Oaths

Before proceeding with the first hearing, each arbitrator may take an oath of office and, if required by law, shall do so. The arbitrator may require witnesses to testify under oath administered by any duly qualified person and, if it is required by law or requested by any party, shall do so.

## R-29. Official Record of Proceedings

**(a)** Any party desiring a transcribed record of a hearing shall make arrangements directly with a transcriber or transcription service and shall notify the arbitrator and the other parties of these arrangements at least seven calendar days in advance of the hearing. The requesting party or parties shall pay the cost of the record.

**(b)** No other means of recording any proceeding will be permitted absent the agreement of the parties or per the direction of the arbitrator.

**(c)** If the transcript or any other recording is agreed by the parties or determined by the arbitrator to be the official record of the proceeding, it must be provided to the arbitrator and made available to the other parties at the direction of the arbitrator.

**(d)** The arbitrator may resolve any disputes with regard to apportionment of the costs of the transcription or other recording.



Copy from re:SearchTX

## R-30. Interpreters

Any party wishing an interpreter shall make all arrangements directly with the interpreter and shall assume the costs of the service.

## R-31. Postponements

The arbitrator may postpone any hearing upon agreement of the parties, upon request of a party for good cause shown, or upon the arbitrator's own initiative.

## R-32. Arbitration in the Absence of a Party or Representative

Unless the law provides to the contrary, the arbitration may proceed in the absence of any party or representative who, after due notice, fails to be present or fails to obtain a postponement. An award shall not be made solely on the default of a party. The arbitrator shall require the party who is present to submit such evidence as the arbitrator may require for the making of an award.

## R-33. Conduct of Proceedings

**(a)** The claimant shall present evidence to support its claim. The respondent shall then present evidence to support its defense. Witnesses for each party shall also submit to questions from the arbitrator and the adverse party. The arbitrator has the discretion to vary this procedure, provided that the parties are treated with equality and that each party has the right to be heard and is given a fair opportunity to present its case.

**(b)** The arbitrator, exercising his or her discretion, shall conduct the proceedings with a view to expediting the resolution of the dispute and may direct the order of proof, bifurcate proceedings and direct the parties to focus their presentations on issues the decision of which could dispose of all or part of the case.

**(c)** The arbitrator may also allow for some or all of the presentation of evidence by alternative means including video, audio or other electronic means other than an in-person presentation. Such alternative means must afford a full opportunity for all parties to present any evidence that the arbitrator deems material and relevant to the resolution of the dispute and, when involving witnesses, provide an opportunity for cross-examination.

**(d)** The parties may agree to waive oral hearings in any case and may also agree to utilize the *Procedures for Resolution of Disputes Through Document Submission*, found in Procedure E-6.



Copy from re:SearchTX

## R-34. Dispositive Motions

**(a)** The arbitrator may allow the filing of and make rulings upon a dispositive motion only if the arbitrator determines the moving party has shown that the motion is likely to succeed and to dispose of or narrow the issues in the case.

**(b)** Consistent with the goal of achieving an efficient and economical resolution of the dispute, the arbitrator shall consider the time and cost associated with the briefing of a dispositive motion in deciding whether to allow any such motion.

**(c)** Fees, expenses, and compensation associated with a motion or an application to make a motion may be assessed as provided for in Rule R-49(c).

## R-35. Evidence

**(a)** The parties may offer such evidence as is relevant and material to the dispute and shall produce such evidence as the arbitrator may deem necessary to an understanding and determination of the dispute. Conformity to legal rules of evidence shall not be necessary. All evidence shall be taken in the presence of all of the arbitrators and all of the parties, except where any of the parties is absent, in default, or has waived the right to be present.

**(b)** The arbitrator shall determine the admissibility, relevance, and materiality of the evidence offered and may exclude evidence deemed by the arbitrator to be cumulative or irrelevant.

**(c)** The arbitrator shall take into account applicable principles of legal privilege, such as those involving the confidentiality of communications between a lawyer and client.

**(d)** An arbitrator or other person authorized by law to subpoena witnesses or documents may do so upon the request of any party or independently.

## R-36. Evidence by Written Statements and Post-Hearing Filing of Documents or Other Evidence

**(a)** At a date agreed upon by the parties or ordered by the arbitrator, the parties shall give written notice for any witness or expert witness who has provided a written witness statement to appear in person at the arbitration hearing for examination. If such notice is given, and the witness fails to appear, the arbitrator may disregard the written witness statement and/or expert report of the witness or make such other order as the arbitrator may consider to be just and reasonable.

**(b)** If a witness whose testimony is represented by a party to be essential is unable or unwilling to testify at the hearing, either in person or through electronic or other means, either party may request that the arbitrator order the witness to appear in person for examination before the arbitrator at a time and location where the witness is willing and able to appear voluntarily or can legally be compelled to do so. Any such order may be conditioned upon payment by the requesting party of all reasonable costs associated with such examination.



Copy from re:SearchTX

**(c)** If the parties agree or the arbitrator directs that documents or other evidence be submitted to the arbitrator after the hearing, the documents or other evidence shall be filed with the AAA for transmission to the arbitrator. All parties shall be afforded an opportunity to examine and respond to such documents or other evidence.

## R-37. Inspection or Investigation

An arbitrator finding it necessary to make an inspection or investigation in connection with the arbitration shall direct the AAA to so advise the parties. The arbitrator shall set the date and time and the AAA shall notify the parties. Any party who so desires may be present at such an inspection or investigation. In the event that one or all parties are not present at the inspection or investigation, the arbitrator shall make an oral or written report to the parties and afford them an opportunity to comment.

## R-38. Interim Measures

**(a)** The arbitrator may take whatever interim measures he or she deems necessary, including injunctive relief and measures for the protection or conservation of property and disposition of perishable goods.

**(b)** Such interim measures may take the form of an interim award, and the arbitrator may require security for the costs of such measures.

**(c)** A request for interim measures addressed by a party to a judicial authority shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate.

## R-39. Emergency Measures of Protection

**(a)** Unless the parties agree otherwise, the provisions of this Rule shall apply to arbitrations conducted under arbitration clauses or agreements entered on or after October 1, 2013. This Rule shall not apply to cases administered pursuant to the Expedited Procedures.

**(b)** A party in need of emergency relief prior to the constitution of the panel shall notify the AAA and all other parties in writing of the nature of the relief sought and the reasons why such relief is required on an emergency basis. The application shall also set forth the reasons why the party is entitled to such relief. Such notice may be given by facsimile or email or other reliable means, but must include a statement certifying that all other parties have been notified or an explanation of the steps taken in good faith to notify other parties.



Copy from re:SearchTX

**(c)** Within one business day of receipt of notice from the AAA initiating the request referenced in section (b), the AAA shall appoint a single emergency arbitrator designated to rule on emergency applications. The emergency arbitrator shall expeditiously disclose any circumstance likely, on the basis of the facts disclosed on the application, to affect such arbitrator's impartiality or independence. Any challenge to the appointment of the emergency arbitrator must be made within one business day of the communication by the AAA to the parties of the appointment of the emergency arbitrator and the circumstances disclosed.

**(d)** The emergency arbitrator shall as soon as possible, but in any event within two business days of appointment, establish a schedule for consideration of the application for emergency relief. Such a schedule shall provide a reasonable opportunity to all parties to be heard, but may provide for proceeding by telephone or video conference or on written submissions as alternatives to a formal hearing. The emergency arbitrator shall have the authority vested in the tribunal under Rule R-7, including the authority to rule on her or his own jurisdiction, and shall resolve any disputes over the applicability of this Rule R-39.

**(e)** If, after consideration, the emergency arbitrator is satisfied that the party seeking the emergency relief has shown that immediate and irreparable loss or damage shall result in the absence of emergency relief, and that such party is entitled to such relief under applicable law, the emergency arbitrator may enter an interim order or award granting the relief and stating the reason therefore.

**(f)** Any application to modify an interim award of emergency relief must be based on changed circumstances and may be made to the emergency arbitrator until the non-emergency ("merits") arbitrator is appointed; thereafter such a request shall be addressed to the merits arbitrator. The emergency arbitrator shall have no further power to act after the merits arbitrator is appointed unless the emergency arbitrator is named as the merits arbitrator or as a member of the panel.

**(g)** Any interim award of emergency relief may be conditioned on provision by the party seeking such relief for appropriate security.

**(h)** A request for interim measures addressed by a party to a judicial authority shall not be deemed incompatible with this Rule, the agreement to arbitrate or a waiver of the right to arbitrate. If the AAA is directed by a judicial authority to nominate a special master to consider and report on an application for emergency relief, the AAA shall proceed as provided in this Rule, and the references to the emergency arbitrator shall be read to mean the special master, except that the special master shall issue a report rather than an interim award.

**(i)** The costs associated with applications for emergency relief shall initially be apportioned by the emergency arbitrator or special master, subject to the power of the merits arbitrator to determine finally the apportionment of such costs. The emergency arbitrator may take into consideration whether the request for emergency relief was made in good faith.



Copy from re:SearchTX

## R-40. Closing of Hearing

**(a)** The arbitrator shall specifically inquire of all parties whether they have any further proofs to offer or witnesses to be heard. Upon receiving negative replies or if satisfied that the record is complete, the arbitrator shall declare the hearing closed.

**(b)** If documents or responses are to be filed as provided in Rule R-36, or if briefs are to be filed, the hearing shall be declared closed as of the date the arbitrator is satisfied that the record is complete, and such date shall occur no later than seven calendar days from the date of receipt of the last such submissions or hearing transcript.

**(c)** The time limit within which the arbitrator is required to make the award shall commence, in the absence of other agreements by the parties, upon the closing of the hearing. The AAA may extend the time limit for rendering of the award only in unusual and extreme circumstances.

## R-41. Reopening of Hearing

The hearing may be reopened on the arbitrator's initiative, or by the direction of the arbitrator upon application of a party, at any time before the award is made. If reopening the hearing would prevent the making of the award within the specific time agreed to by the parties in the arbitration agreement, the matter may not be reopened unless the parties agree to an extension of time. When no specific date is fixed by agreement of the parties, the arbitrator shall have 30 calendar days from the closing of the reopened hearing within which to make an award (or 14 calendar days if the case is governed by the Expedited Procedures).

## R-42. Waiver of Rules

Any party who proceeds with the arbitration after knowledge that any provision or requirement of these Rules has not been complied with and who fails to state an objection in writing shall be deemed to have waived the right to object.

## R-43. Extensions of Time

The parties may modify by mutual agreement any period of time established by these Rules or the parties' arbitration agreement. The AAA or the arbitrator may for good cause extend any period of time established by these Rules, except the time for making the award. The AAA shall notify the parties of any extension.



Copy from re:SearchTX

## R-44. Serving of Notice and Communications

**(a)** The service methods set forth in Rule R-4(b)(iii) may also be used for the delivery of any filing, notice or communication throughout the course of the arbitration proceeding.

**(b)** The AAA, the arbitrator, and the parties may also use alternative methods of communication or other platforms as directed by the AAA or as agreed by the parties or directed by the arbitrator to exchange any communication or other notice required by these Rules during the course of the arbitration.

**(c)** Unless otherwise instructed by the AAA or by the arbitrator, any party submitting any document or written communication to another party, the AAA or the arbitrator, shall simultaneously provide that material to all other participants, including the AAA.

**(d)** Failure to provide the other party with copies of communications provided to the AAA or the arbitrator may prevent the AAA or the arbitrator from acting on any requests or objections contained therein.

**(e)** The AAA may direct that any oral or written communications sent by a party or their representative shall be sent in a particular manner. The failure of a party or their representative to comply with any such direction may result in the AAA's refusal to consider the issue raised in the communication

**(f)** The AAA may initiate administrative communications with the parties or their representatives either jointly or individually.

**(g)** Any method of service on or notice to a party must be made in such a manner to provide that party with reasonable opportunity to be heard with regard to the dispute.

## R-45. Confidentiality

**(a)** Unless otherwise required by applicable law, court order, or the parties' agreement, the AAA and the arbitrator shall keep confidential all matters relating to the arbitration or the award.

**(b)** Upon the agreement of the parties or the request of any party, the arbitrator may make orders concerning the confidentiality of the arbitration proceedings or of any other matters in connection with the arbitration and may take measures for protecting trade secrets and confidential information.

## R-46. Majority Decision

**(a)** When the panel consists of more than one arbitrator, unless required by law or by the arbitration agreement or section (b) of this Rule, a majority of the arbitrators must make all decisions.

**(b)** Where there is a panel of three arbitrators, absent an objection of a party or another member of the panel, the chairperson of the panel is authorized to



Copy from re:SearchTX

resolve any disputes related to the exchange of information or procedural matters without the need to consult the full panel.

**(c)** Absent an objection of a party or another member of the panel, the chairperson may sign any order on behalf of the panel.

## R-47. Time of Award

The award shall be made promptly by the arbitrator and, unless otherwise agreed by the parties or specified by law, no later than 30 calendar days from the date of closing the hearing, or, if oral hearings have been waived, from the due date set for receipt of the parties' final statements and proofs.

## R-48. Form of Award

**(a)** Any award shall be in writing and signed by a majority of the arbitrators. Signatures may be executed in electronic or digital form. The award shall be executed in the form and manner required by law.

**(b)** The arbitrator need not render a reasoned award unless the parties request such an award in writing prior to appointment of the arbitrator or unless the arbitrator determines that a reasoned award is appropriate.

## R-49. Scope of Award

**(a)** The arbitrator may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties, including, but not limited to, specific performance of a contract.

**(b)** In addition to a final award, the arbitrator may make other decisions, including interim, interlocutory, or partial rulings, orders, and awards. In any interim, interlocutory, or partial award, the arbitrator may assess and apportion the fees, expenses, and compensation related to such award as the arbitrator determines is appropriate.

**(c)** In the final award or any order disposing of all of the case, the arbitrator shall assess the fees, expenses, and compensation provided in Rules R-55, R-56, and R-57. The arbitrator may also assess such fees, expenses, and compensation in any order or award disposing of part of the case. The arbitrator may apportion such fees, expenses, and compensation among the parties in such amounts as the arbitrator determines is appropriate.

**(d)** The award of the arbitrator may include:

- **i)** interest at such rate and from such date as the arbitrator may deem appropriate; and
- **ii)** an award of attorneys' fees if all parties have requested such an award or it is authorized by law or the parties' arbitration agreement.



Copy from re:SearchTX

## R-50. Award Upon Settlement – Consent Award

**(a)** If the parties settle their dispute during the course of the arbitration and if the parties so request, the arbitrator may set forth the terms of the settlement in a "consent award." A consent award must include an allocation of arbitration costs, including administrative fees and expenses as well as arbitrator fees and expenses as set forth in Rule R-49(c).

**(b)** The consent award shall not be released to the parties until all administrative fees and all arbitrator compensation have been paid in full.

## R-51. Delivery of Award to Parties

Parties shall accept as notice and delivery of the award the placing of the award or a true copy thereof in the mail addressed to the parties or their representatives at their last known addresses, personal or electronic service of the award, or the filing of the award in any other manner that is permitted by law.

## R-52. Modification of Award

**(a)** Within 20 calendar days after the transmittal of any award, any party, upon notice to the other parties, may request the arbitrator, through the AAA, interpret the award or correct any clerical, typographical, or computational errors in the award. The arbitrator is not empowered to re-determine the merits of any claim already decided. The other parties shall be given 10 calendar days to respond to the request. The arbitrator shall dispose of the request within 20 calendar days after transmittal by the AAA to the arbitrator of the request and any response thereto.

**(b)** If the arbitrator has established a different schedule for such requests, responses, and disposition, the arbitrator's schedule will supersede the deadlines set forth in this Rule.

## R-53. Release of Documents for Judicial Proceedings

The AAA shall, upon the written request of a party to the arbitration, furnish to the party, at its expense, copies or certified copies of any papers in the AAA's possession that are not determined by the AAA to be privileged or confidential.

## R-54. Applications to Court and Exclusion of Liability

**(a)** No judicial proceeding by a party relating to the subject matter of the arbitration shall be deemed a waiver of the party's right to arbitrate.

**(b)** Neither the AAA nor any arbitrator in a proceeding under these Rules is a necessary or proper party in any judicial proceedings relating to the arbitration or any other services provided by the AAA.



Copy from re:SearchTX

**(c)** Parties to an arbitration under these Rules shall be deemed to have consented that judgment upon the arbitration award may be entered in any federal or state court having jurisdiction thereof.

**(d)** Parties to an arbitration under these Rules shall be deemed to have consented that the AAA shall not be liable to any party in any action for damages, or injunctive or other relief, for any act or omission in connection with any arbitration administered in whole or in part by the AAA or conducted under these Rules. Parties shall also be deemed to have consented that the arbitrator shall not be liable to any party in any action for damages, or injunctive or other relief, for an act or omission in connection with any arbitration administered in whole or in part by the AAA.

**(e)** Parties to an arbitration under these Rules may not call the arbitrator, the AAA, or AAA employees as a witness in litigation or any other proceeding relating to the arbitration. The arbitrator, the AAA and AAA employees are not competent to testify as witnesses in any such proceeding.

## R-55. Administrative Fees

As a not-for-profit organization, the AAA shall prescribe administrative fees to compensate it for the cost of providing administrative services. The fee schedule in effect when the Demand is filed will apply throughout the pendency of the case. The administrative fees shall be paid initially by the party or parties making a claim or counterclaim, subject to final apportionment by the arbitrator in the award. The AAA may, in the event of extreme hardship on the part of any party, defer or reduce the administrative fees.

## R-56. Expenses

The expenses of witnesses for either side shall be paid by the party producing such witnesses. All other expenses of the arbitration, including required travel and other expenses of the arbitrator, AAA representatives, and any witness and the cost of any proof produced at the direct request of the arbitrator, shall be borne equally by the parties, unless they agree otherwise or unless the arbitrator in the award assesses such expenses or any part thereof against any specified party or parties.

## R-57. Neutral Arbitrator’s Compensation

**(a)** Arbitrators shall be compensated at a rate consistent with the arbitrator’s stated rate of compensation at the time their AAA resume is presented to the parties for consideration pursuant to Rule R-13, unless otherwise determined by the AAA. Such compensation will be consistent with the provisions of the arbitrator’s executed *Notice of Compensation Arrangements*.



Copy from re:SearchTX

**(b)** If there is disagreement concerning the terms of compensation, an appropriate rate shall be established with the arbitrator by the AAA and confirmed to the parties.

**(c)** Any arrangement for the compensation of a neutral arbitrator shall be made through the AAA and not directly between the parties and the arbitrator.

## R-58. Deposits

**(a)** The AAA will require the parties to deposit in advance of any hearings such sums of money as it deems necessary to cover the expense of the arbitration, including the arbitrator's compensation and expenses, if any, and shall render an accounting to the parties and return any unexpended balance at the conclusion of the case. A party's failure to make the requested deposits by the date established by the AAA may result in the AAA's or the arbitrator's taking any appropriate steps as set forth in Rule R-59.

**(b)** Other than in cases where the arbitrator serves for a flat fee, deposit amounts requested will be based on estimates provided by the arbitrator. The arbitrator will determine the estimated amount of deposits using the information provided by the parties with respect to the complexity of each case.

**(c)** The AAA shall request from the arbitrator an itemization or explanation for the arbitrator's request for deposits.

**(d)** The AAA will allocate the deposits requested among the parties and will establish due dates for the collection of those deposits.

## R-59. Remedies for Nonpayment

If arbitrator compensation or expenses or the AAA's administrative fees have not been paid in full, the AAA may so inform the parties so that one of them may advance the required payment.

**(a)** Upon receipt of information from the AAA that payment for administrative fees or deposits for arbitrator compensation or expense have not been paid in full, to the extent the law allows, a party may request that the arbitrator take specific measures relating to a party's non-payment. Such measures may include, but are not limited to:

**i)** limiting a party's ability to assert or pursue its claim, and

**ii)** prohibiting a non-paying party from filing any motion.

**(b)** In no event, however, shall a party be precluded from defending a claim or counterclaim.

**(c)** The arbitrator must provide the party opposing a request for such measures with the opportunity to respond prior to making any ruling regarding the same.



Copy from re:SearchTX

**(d)** In the event that the arbitrator grants any request for relief which limits any party's participation in the arbitration, the arbitrator shall require the party who is making a claim and who has made appropriate payments to submit such evidence as the arbitrator may require for the making of an award.

**(e)** Upon receipt of information from the AAA that full payments have not been received, the arbitrator, on the arbitrator's own initiative or at the request of the AAA or a party, may order the suspension of the arbitration. If no arbitrator has yet been appointed, the AAA may suspend the proceedings.

**(f)** If the arbitration has been suspended by either the AAA or the arbitrator and the parties have failed to make the full payments requested within the time provided after the suspension, the arbitrator, or the AAA if an arbitrator has not been appointed, may terminate the proceedings.

## R-60. Sanctions

**(a)** The arbitrator may, upon a party's request, order appropriate sanctions where a party fails to comply with its obligations under these Rules or with an order of the arbitrator. In the event that the arbitrator enters a sanction that limits any party's participation in the arbitration or results in an adverse determination of an issue or issues, the arbitrator shall explain that order in writing and shall require the submission of evidence and legal argument prior to making of an award. The arbitrator may not enter a default award as a sanction.

**(b)** The arbitrator must provide a party that is subject to a sanction request with the opportunity to respond prior to making any determination regarding the sanctions application.



Copy from re:SearchTX

# Preliminary Hearing Procedures

## P-1. General

**(a)** In all but the simplest cases, holding a preliminary hearing as early in the process as possible will help the parties and the arbitrator organize the proceeding in a manner that will maximize efficiency and economy, and will provide each party a fair opportunity to present its case.

**(b)** Care must be taken to avoid importing procedures from court systems, as such procedures may not be appropriate to the conduct of arbitrations as an alternative form of dispute resolution that is designed to be simpler, less expensive and more expeditious.

## P-2. Checklist

**(a)** The following checklist suggests subjects that the parties and the arbitrator should address at the preliminary hearing, in addition to any others that the parties or the arbitrator believe to be appropriate to the particular case. The items to be addressed in a particular case will depend on the size, subject matter, and complexity of the dispute, and are subject to the discretion of the arbitrator:

**i)** the possibility of other non-adjudicative methods of dispute resolution, including mediation pursuant to Rule R-10;

**ii)** whether all necessary or appropriate parties are included in the arbitration;

**iii)** whether a party will seek a more detailed statement of claims, counterclaims or defenses;

**iv)** whether there are any anticipated amendments to the parties' claims, counterclaims, or defenses;

**v)** which

- **a)** arbitration rules;
- **b)** procedural law; and
- **c)** substantive law govern the arbitration;

**vi)** issues related to cybersecurity, privacy and data protection to provide for an appropriate level of security and compliance in connection with the proceeding;

**vii)** whether there are any threshold or dispositive issues that can efficiently be decided without considering the entire case, including without limitation,

- **a)** any preconditions that must be satisfied before proceeding with the arbitration;
- **b)** whether any claim or counterclaim falls outside the arbitrator's jurisdiction or is otherwise not arbitrable;



Copy from re:SearchTX

**c)** consolidation of the claims or counterclaims with another arbitration; or

**d)** bifurcation of the proceeding.

**viii)** whether the parties will exchange documents, including electronically stored documents, on which they intend to rely in the arbitration, and/or make written requests for production of documents within defined parameters;

**ix)** whether to establish any additional procedures to obtain information that is relevant and material to the outcome of disputed issues;

**x)** how costs of any searches for requested information or documents that would result in substantial costs should be borne;

**xi)** whether any measures are required to protect confidential information;

**xii)** Whether the parties shall disclose:

**a)** whether any non-party (such as a third-party funder or an insurer) has undertaken to pay or to contribute to the cost of a party's participation in the arbitration, and if so, to identify the person or entity concerned and to describe the nature of the undertaking; and

**b)** whether any non-party (such as a funder, insurer, parent company, or ultimate beneficial owner) has an economic interest in the outcome of the arbitration, and if so, to identify the person or entity concerned and to describe the nature of the interest;

**xiii)** whether the parties intend to present evidence from expert witnesses, and if so, whether to establish a schedule for the parties to identify their experts and exchange expert reports;

**xiv)** whether, according to a schedule set by the arbitrator, the parties will:

**a)** identify all witnesses, the subject matter of their anticipated testimonies, exchange written witness statements, and determine whether written witness statements will replace direct testimony at the hearing;

**b)** exchange and pre-mark documents that each party intends to submit; and

**c)** exchange pre-hearing submissions, including exhibits;

**xv)** the date, time and place of the arbitration hearing;

**a)** whether, at the arbitration hearing,

**b)** testimony may be presented in person, in writing, by videoconference, via the internet, telephonically, or by other reasonable means;

**xvi)** there will be a stenographic transcript or other record of the proceeding and, if so, who will make arrangements to provide it;

**xvii)** whether any procedure needs to be established for the issuance of subpoenas;

**xviii)** the identification of any ongoing, related litigation or arbitration;

**xix)** whether post-hearing submissions will be filed;



Copy from re:SearchTX

**xx)** the form of the arbitration award; and

**xxi)** any other matter the arbitrator considers appropriate or a party wishes to raise.

**(b)** The arbitrator shall issue a written order memorializing decisions made and agreements reached during or following the preliminary hearing.



Copy from re:SearchTX

# Expedited Procedures

## E-1. Limitation on Extensions

**(a)** Except in extraordinary circumstances, the AAA or the arbitrator may grant a party no more than one seven-day extension of time to respond to the Demand for Arbitration or counterclaim as provided in Rule R-5.

**(b)** Any other extension requests may be granted only after consideration of Procedure E-7.

## E-2. Changes of Claim or Counterclaim

A claim or counterclaim may be increased in amount, or a new or different claim or counterclaim added, any time prior to the appointment of the arbitrator. However, after the arbitrator is appointed, no new or different claim or counterclaim may be submitted except with the arbitrator's consent. If an increased claim or counterclaim exceeds $100,000, the case will be administered under the regular Commercial Arbitration Rules unless all parties and the arbitrator agree that the case may continue to be administered under the Expedited Procedures.

## E-3. Serving of Notice

In addition to notice provided by Rule R-44, the parties shall also accept notice by telephone. Telephonic notices by the AAA shall subsequently be confirmed in writing to the parties. Should there be a failure to confirm in writing any such oral notice, the proceeding shall nevertheless be valid if notice has, in fact, been given by telephone.

## E-4. Appointment and Qualifications of Arbitrator

**(a)** The AAA shall simultaneously submit to each party an identical list of five proposed arbitrators drawn from its National Roster from which one arbitrator shall be appointed.

**(b)** The parties are encouraged to agree to an arbitrator from this list and to advise the AAA of their agreement. If the parties are unable to agree upon an arbitrator, each party may strike two names from the list and return it to the AAA within seven days from the date of the AAA's mailing to the parties. If for any reason the appointment of an arbitrator cannot be made from the list, the AAA may make the appointment from other members of the panel without the submission of additional lists.

**(c)** The parties will be given notice by the AAA of the appointment of the arbitrator, who shall be subject to disqualification for the reasons specified in Rule R-19.



Copy from re:SearchTX

The parties shall notify the AAA within seven calendar days of any objection to the arbitrator appointed. Any such objection shall be for cause and shall be confirmed in writing to the AAA with a copy to the other party or parties.

## E-5. Discovery, Motions, and Conduct of Proceedings

**(a)** At least two business days prior to the hearing, the parties shall exchange copies of all exhibits they intend to submit at the hearing. The arbitrator shall resolve disputes concerning the exchange of exhibits.

**(b)** No other discovery shall be permitted except as allowed by the arbitrator for good cause shown. If the arbitrator allows additional discovery, the AAA, in consultation with the arbitrator, may remove the case from the Expedited Procedures.

**(c)** There shall be no motions except as allowed by the arbitrator for good cause shown.

## E-6. Proceedings on Documents and Procedures for the Resolution of Disputes Through Document Submission

Where no party's claim exceeds $25,000, exclusive of interest, attorneys' fees and arbitration costs, and other cases in which the parties agree, the dispute shall be resolved by submission of documents, unless any party requests an oral hearing, or the arbitrator determines that an oral hearing is necessary. Where cases are resolved by submission of documents, the following procedures may be utilized at the agreement of the parties or the discretion of the arbitrator:

**(a)** Within 14 calendar days of confirmation of the arbitrator's appointment, the arbitrator may convene a preliminary management hearing, via conference call, video conference, or internet, to establish a fair and equitable procedure for the submission of documents, and, if the arbitrator deems appropriate, a schedule for one or more telephonic or electronic conferences.

**(b)** The arbitrator has the discretion to remove the case from the documents-only process if the arbitrator determines that an in-person hearing is necessary.

**(c)** If the parties agree to in-person hearings after a previous agreement to proceed under this Procedure, the arbitrator shall conduct such hearings. If a party seeks to have in-person hearings after agreeing to this Procedure, but there is not agreement among the parties to proceed with in-person hearings, the arbitrator shall resolve the issue after the parties have been given the opportunity to provide their respective positions on the issue.

**(d)** The arbitrator shall establish the date for either written submissions or a final telephonic or electronic conference. Such date shall operate to close the hearing and the time for the rendering of the award shall commence.

**(e)** Unless the parties have agreed to a form of award other than that set forth in Rule R-48, when the parties have agreed to resolve their dispute by this Procedure, the



Copy from re:SearchTX

arbitrator shall render the award within 14 calendar days from the date the hearing is closed.

**(f)** If the parties agree to a form of award other than that described in Rule R-48, the arbitrator shall have 30 calendar days from the date the hearing is declared closed in which to render the award.

**(g)** The award is subject to all other provisions of the regular Commercial Arbitration Rules which pertain to awards.

## E-7. Date, Time, Place, and Method of Hearing

In cases in which a hearing is to be held, the arbitrator shall set the date, time, place, and method of the hearing, to be scheduled to take place no more than 60 days after the preliminary hearing or as otherwise mutually agreed to between the parties and the arbitrator. The AAA will notify the parties in advance of the hearing date.

## E-8. The Hearing

**(a)** Absent good cause shown, the hearing shall not exceed one day. Each party shall have equal opportunity to submit its proofs and complete its case. The arbitrator shall determine the order of the hearing, and may require further submission of documents within two business days after the hearing.

**(b)** For good cause shown, the arbitrator may schedule one additional day of hearings to be completed within seven business days after the initial day of hearing or as soon as practicable as determined by the arbitrator. In cases where the hearing is scheduled to exceed one day, the AAA, in consultation with the arbitrator, may remove the case from the Expedited Procedures.

**(c)** Generally, there will be no stenographic record. Any party desiring a transcribed record of the hearing may arrange for one pursuant to the provisions of Rule R-29.

## E-9. Time of Award

Unless otherwise agreed by the parties and arbitrator, the award shall be rendered not later than 14 calendar days from the date of the closing of the hearing or, if oral hearings have been waived, from the due date established for the receipt of the parties' final statements and proofs.

## E-10. Arbitrator's Compensation

**(a)** Arbitrators will receive compensation at a rate to be suggested by the AAA regional office.

**(b)** For cases that are removed from the Expedited Procedures after the preliminary hearing is held, the arbitrator shall be compensated pursuant to Rule R-57.



Copy from re:SearchTX

# Procedures for Large, Complex Commercial Disputes

## L-1. Administrative Conference

Prior to the dissemination of a list of potential arbitrators, the AAA may, unless the parties agree otherwise, conduct an administrative conference with the parties and/or their attorneys or other representatives by conference call or video conference. The conference will take place as soon as practicable after the commencement of the arbitration. In the event the parties are unable to agree on a mutually acceptable time for the conference, the AAA may contact the parties individually to discuss the issues contemplated herein. Such administrative conference shall be conducted for the following purposes and for such additional purposes as the parties or the AAA may deem appropriate:

**(a)** to obtain additional information about the nature and magnitude of the dispute and the anticipated length of hearing and scheduling;

**(b)** to discuss the views of the parties about the technical and other qualifications of the arbitrators;

**(c)** to obtain conflicts statements from the parties; and

**(d)** to consider, with the parties, whether mediation or other non-adjudicative methods of dispute resolution might be appropriate.

## L-2. Arbitrators

**(a)** Large, complex commercial cases shall be heard and determined by either one or three arbitrators, as may be agreed upon by the parties. With the exception in paragraph (b) below, if the parties do not agree upon the number of arbitrators and a claim or counterclaim involves at least $3,000,000 then three arbitrators shall hear and determine the case; otherwise one arbitrator shall hear and determine the case.

**(b)** In cases involving the financial hardship of a party or other circumstance, the AAA at its discretion may require that only one arbitrator hear and determine the case, regardless of the amount of the claim and counterclaim.

**(c)** The AAA shall appoint the arbitrator as agreed by the parties. If they are unable to agree on a method of appointment, the AAA shall appoint arbitrators from the Large, Complex Commercial Case Panel, in the manner provided in the regular Commercial Arbitration Rules. Absent agreement of the parties, the arbitrator shall not have served as the mediator in the mediation phase of the instant proceeding.



Copy from re:SearchTX

## L-3. Management of Proceedings

**(a)** The arbitrator shall take such steps as deemed necessary or desirable to avoid delay and to achieve a fair, speedy and cost-effective resolution of a Large, Complex Commercial Dispute.

**(b)** As promptly as practicable after the selection of the arbitrator(s), a preliminary hearing shall be scheduled in accordance with Procedures P-1 and P-2 of these rules.

**(c)** The parties shall exchange copies of all exhibits they intend to submit at the hearing at least 10 calendar days prior to the hearing unless the arbitrator determines otherwise.

**(d)** The parties and the arbitrator shall address issues pertaining to the pre-hearing exchange and production of information in accordance with Rule R-23 of the AAA Commercial Rules, and the arbitrator's determinations on such issues shall be included within a scheduling order.

**(e)** The arbitrator, or any single member of the panel, shall be authorized to resolve any disputes concerning the pre-hearing exchange and production of documents and information by any reasonable means within their discretion, including, without limitation, the issuance of orders set forth in Rules R-23 and R-24 of the AAA Commercial Rules.

**(f)** In exceptional cases, at the discretion of the arbitrator, upon good cause shown and consistent with the expedited nature of arbitration, the arbitrator may order depositions to obtain the testimony of a person who may possess information determined by the arbitrator to be relevant and material to the outcome of the case. The arbitrator may allocate the cost of taking such a deposition.

**(g)** Generally, hearings will be scheduled on consecutive days or in blocks of consecutive days in order to maximize efficiency and minimize costs.

# Administrative Fee Schedule

FOR THE CURRENT ADMINISTRATIVE FEE SCHEDULE, PLEASE VISIT www.adr.org/feeschedule.



Copy from re:SearchTX

# Commercial Mediation Procedures

## M-1. Agreement of Parties*

Whenever, by stipulation or in their contract, the parties have provided for mediation or conciliation of existing or future disputes under the auspices of the American Arbitration Association or under these procedures, the parties and their representatives, unless agreed otherwise in writing, shall be deemed to have made these procedural guidelines, as amended and in effect as of the date of filing of a request for mediation, a part of their agreement and designate the AAA as the administrator of their mediation.

The parties by mutual agreement may vary any part of these procedures including, but not limited to, agreeing to conduct the mediation via telephone or other electronic or technical means.

## M-2. Initiation of Mediation

Any party or parties to a dispute may initiate mediation under the AAA's auspices by making a request for mediation to any of the AAA's regional offices or case management centers via telephone, email, regular mail or fax. Requests for mediation may also be filed online via AAA WebFile at www.adr.org.

The party initiating the mediation shall simultaneously notify the other party or parties of the request. The initiating party shall provide the following information to the AAA and the other party or parties as applicable:

**(i)** A copy of the mediation provision of the parties' contract or the parties' stipulation to mediate.

**(ii)** The names, regular mail addresses, email addresses, and telephone numbers of all parties to the dispute and representatives, if any, in the mediation.

**If a contract calls for the Commercial Mediation Procedures, and the dispute is between a consumer and a business or between an online marketplace or platform and an individual user or subscriber (using or subscribed to the service as an individual and not incorporated) and the dispute does not involve work or work-related claims, the AAA has the discretion to apply the Consumer Mediation Procedures and Consumer Fee Schedule.*

*If the dispute is between an individual employee or an independent contractor (working or performing as an individual and not incorporated) and a business or organization and the dispute involves work or work-related claims, including any statutory claims and including work-related claims under independent contractor agreements, the AAA has the discretion to apply the Employment/Workplace Mediation Procedures and Employment/Workplace Fee Schedule.*

*If a contract calls for the Consumer Mediation Procedures, and the dispute is not between a consumer and a business, the AAA has the discretion to apply the Commercial Mediation Procedures and Commercial Fee schedule*



Copy from re:SearchTX

**(iii)** A brief statement of the nature of the dispute and the relief requested.

**(iv)** Any specific qualifications the mediator should possess.

## M-3. Representation

Subject to any applicable law, any party may be represented by persons of the party's choice. The names and addresses of such persons shall be communicated in writing to all parties and to the AAA.

## M-4. Appointment of the Mediator

If the parties have not agreed to the appointment of a mediator and have not provided any other method of appointment, the mediator shall be appointed in the following manner:

**(i)** Upon receipt of a request for mediation, the AAA will send to each party a list of mediators from the AAA's Panel of Mediators. The parties are encouraged to agree to a mediator from the submitted list and to advise the AAA of their agreement.

**(ii)** If the parties are unable to agree upon a mediator, each party shall strike unacceptable names from the list, number the remaining names in order of preference, and return the list to the AAA. If a party does not return the list within the time specified, all mediators on the list shall be deemed acceptable. From among the mediators who have been mutually approved by the parties, and in accordance with the designated order of mutual preference, the AAA shall invite a mediator to serve.

**(iii)** If the parties fail to agree on any of the mediators listed, or if acceptable mediators are unable to serve, or if for any other reason the appointment cannot be made from the submitted list, the AAA shall have the authority to make the appointment from among other members of the Panel of Mediators without the submission of additional lists.

## M-5. Mediator's Impartiality and Duty to Disclose

AAA mediators are required to abide by the *Model Standards of Conduct for Mediators* in effect at the time a mediator is appointed to a case. Where there is a conflict between the *Model Standards* and any provision of these Mediation Procedures, these Mediation Procedures shall govern. The Standards require mediators to (i) decline a mediation if the mediator cannot conduct it in an impartial manner, and (ii) disclose, as soon as practicable, all actual and potential conflicts of interest that are reasonably known to the mediator and could reasonably be seen as raising a question about the mediator's impartiality.



Copy from re:SearchTX

Prior to accepting an appointment, AAA mediators are required to make a reasonable inquiry to determine whether there are any facts that a reasonable individual would consider likely to create a potential or actual conflict of interest for the mediator. AAA mediators are required to disclose any circumstance likely to create a presumption of bias or prevent a resolution of the parties' dispute within the time-frame desired by the parties. Upon receipt of such disclosures, the AAA shall immediately communicate the disclosures to the parties for their comments.

The parties may, upon receiving disclosure of actual or potential conflicts of interest of the mediator, waive such conflicts and proceed with the mediation. In the event that a party disagrees as to whether the mediator shall serve, or in the event that the mediator's conflict of interest might reasonably be viewed as undermining the integrity of the mediation, the mediator shall be replaced.

## M-6. Vacancies

If any mediator shall become unwilling or unable to serve, the AAA will appoint another mediator, unless the parties agree otherwise, in accordance with section M-4.

## M-7. Duties and Responsibilities of the Mediator

- **(i)** The mediator shall conduct the mediation based on the principle of party self-determination. Self-determination is the act of coming to a voluntary, uncoerced decision in which each party makes free and informed choices as to process and outcome.
- **(ii)** The mediator is authorized to conduct separate or *ex parte* meetings and other communications with the parties and/or their representatives, before, during, and after any scheduled mediation conference. Such communications may be conducted via telephone, in writing, via email, online, in person or otherwise.
- **(iii)** The parties are encouraged to exchange all documents pertinent to the relief requested. The mediator may request the exchange of memoranda on issues, including the underlying interests and the history of the parties' negotiations. Information that a party wishes to keep confidential may be sent to the mediator, as necessary, in a separate communication with the mediator.
- **(iv)** The mediator does not have the authority to impose a settlement on the parties but will attempt to help them reach a satisfactory resolution of their dispute. Subject to the discretion of the mediator, the mediator may make



Copy from re:SearchTX

oral or written recommendations for settlement to a party privately or, if the parties agree, to all parties jointly.

**(v)** In the event a complete settlement of all or some issues in dispute is not achieved within the scheduled mediation session(s), the mediator may continue to communicate with the parties, for a period of time, in an ongoing effort to facilitate a complete settlement.

**(vi)** The mediator is not a legal representative of any party and has no fiduciary duty to any party.

## M-8. Responsibilities of the Parties

The parties shall ensure that appropriate representatives of each party, having authority to consummate a settlement, attend the mediation conference.

Prior to and during the scheduled mediation conference session(s) the parties and their representatives shall, as appropriate to each party's circumstances, exercise their best efforts to prepare for and engage in a meaningful and productive mediation.

## M-9. Privacy

Mediation sessions and related mediation communications are private proceedings. The parties and their representatives may attend mediation sessions. Other persons may attend only with the permission of the parties and with the consent of the mediator.

## M-10. Confidentiality

Subject to applicable law or the parties' agreement, confidential information disclosed to a mediator by the parties or by other participants (witnesses) in the course of the mediation shall not be divulged by the mediator. The mediator shall maintain the confidentiality of all information obtained in the mediation, and all records, reports, or other documents received by a mediator while serving in that capacity shall be confidential.

The mediator shall not be compelled to divulge such records or to testify in regard to the mediation in any adversary proceeding or judicial forum.

The parties shall maintain the confidentiality of the mediation and shall not rely on, or introduce as evidence in any arbitral, judicial, or other proceeding the following, unless agreed to by the parties or required by applicable law:



Copy from re:SearchTX

**(i)** Views expressed or suggestions made by a party or other participant with respect to a possible settlement of the dispute;

**(ii)** Admissions made by a party or other participant in the course of the mediation proceedings;

**(iii)** Proposals made or views expressed by the mediator; or

**(iv)** The fact that a party had or had not indicated willingness to accept a proposal for settlement made by the mediator.

## M-11. No Stenographic Record

There shall be no stenographic record of the mediation process.

## M-12. Termination of Mediation

The mediation shall be terminated:

**(i)** By the execution of a settlement agreement by the parties; or

**(ii)** By a written or verbal declaration of the mediator to the effect that further efforts at mediation would not contribute to a resolution of the parties' dispute; or

**(iii)** By a written or verbal declaration of all parties to the effect that the mediation proceedings are terminated; or

**(iv)** When there has been no communication between the mediator and any party or party's representative for 21 days following the conclusion of the mediation conference.

## M-13. Exclusion of Liability

Neither the AAA nor any mediator is a necessary party in judicial proceedings relating to the mediation. Neither the AAA nor any mediator shall be liable to any party for any error, act or omission in connection with any mediation conducted under these procedures.

## M-14. Interpretation and Application of Procedures

The mediator shall interpret and apply these procedures insofar as they relate to the mediator's duties and responsibilities. All other procedures shall be interpreted and applied by the AAA.



Copy from re:SearchTX

## M-15. Deposits

Unless otherwise directed by the mediator, the AAA will require the parties to deposit in advance of the mediation conference such sums of money as it, in consultation with the mediator, deems necessary to cover the costs and expenses of the mediation and shall render an accounting to the parties and return any unexpended balance at the conclusion of the mediation.

## M-16. Expenses

All expenses of the mediation, including required traveling and other expenses or charges of the mediator, shall be borne equally by the parties unless they agree otherwise. The expenses of participants for either side shall be paid by the party requesting the attendance of such participants.

## M-17. Cost of the Mediation

FOR THE CURRENT ADMINISTRATIVE FEE SCHEDULE, PLEASE VISIT www.adr.org/feeschedule.



Copy from re:SearchTX

*© 2025 American Arbitration Association, Inc. All rights reserved. These rules are the copyrighted property of the American Arbitration Association (AAA) and are intended to be used in conjunction with the AAA's administrative services. Any unauthorized use or modification of these rules may violate copyright laws and other applicable laws. Please contact 800.778.7879 or websitemail@adr.org for additional information.*

Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Izabela Ramirez on behalf of Thomas Wright
Bar No. 22059400
ramirez@wrightclosebarger.com
Envelope ID: 112823174
Filing Code Description: Motion (No Fee)
Filing Description: DEFENDANTS' MOTION TO COMPEL ARBITRATION AND MOTION TO STAY
Status as of 3/29/2026 10:49 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| R. PaulYetter | | pyetter@yettercoleman.com | 3/24/2026 9:46:53 PM | SENT |
| Yetter Coleman | | efile@yettercoleman.com | 3/24/2026 9:46:53 PM | SENT |
| John W.Stevenson | | jstevenson@stevensonmurray.com | 3/24/2026 9:46:53 PM | SENT |
| Laurie Nichols | | lnichols@stevensonmurray.com | 3/24/2026 9:46:53 PM | SENT |
| William RobertHand | | rhand@stevensonmurray.com | 3/24/2026 9:46:53 PM | SENT |
| Jeff Ray | | jray@raylaw.com | 3/24/2026 9:46:53 PM | SENT |
| Linda Gonzales | | lgonzales@raylaw.com | 3/24/2026 9:46:53 PM | SENT |
| Jane Ray | | jray@yettercoleman.com | 3/24/2026 9:46:53 PM | SENT |
| Justin P.Tschoepe | | jtschoepe@yettercoleman.com | 3/24/2026 9:46:53 PM | SENT |
| Christopher Freeman | | cfreeman@arnoldfreemanlaw.com | 3/24/2026 9:46:53 PM | SENT |
| J. ReidSimpson | | jrsimpson@yettercoleman.com | 3/24/2026 9:46:53 PM | SENT |
| Shannon Smith | | ssmith@yettercoleman.com | 3/24/2026 9:46:53 PM | SENT |
| A. Arnold | | arnold@arnoldfreemanlaw.com | 3/24/2026 9:46:53 PM | SENT |
| Sue Csizmadia | | scsizmadia@yettercoleman.com | 3/24/2026 9:46:53 PM | SENT |
| Abby Heath | | aheath@arnoldfreemanlaw.com | 3/24/2026 9:46:53 PM | SENT |
| Katherine Estrada | | kestrada@raylaw.com | 3/24/2026 9:46:53 PM | SENT |
| Laura Rua | | lrua@raylaw.com | 3/24/2026 9:46:53 PM | SENT |
| Larry Matthys | | lmatthys@raylaw.com | 3/24/2026 9:46:53 PM | SENT |
| Mikal Watts | | mikal@wattsllp.com | 3/24/2026 9:46:53 PM | SENT |
| Kenneth Fair | | fair@wrightclosebarger.com | 3/24/2026 9:46:53 PM | SENT |
| Tom Wright | | wright@wrightclosebarger.com | 3/24/2026 9:46:53 PM | SENT |
| Jessica Barger | | barger@wrightclosebarger.com | 3/24/2026 9:46:53 PM | SENT |

Copy from re:SearchTX

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Izabela Ramirez on behalf of Thomas Wright
Bar No. 22059400
ramirez@wrightclosebarger.com
Envelope ID: 112823174
Filing Code Description: Motion (No Fee)
Filing Description: DEFENDANTS' MOTION TO COMPEL ARBITRATION AND MOTION TO STAY
Status as of 3/29/2026 10:49 AM CST

Case Contacts

| | | | | |
|---|---|---|---|---|
| Jessica Barger | | barger@wrightclosebarger.com | 3/24/2026 9:46:53 PM | SENT |
| Lynn Castagna | | lynn@texasdefense.com | 3/24/2026 9:46:53 PM | SENT |
| Suzanne Goss | | goss@wrightclosebarger.com | 3/24/2026 9:46:53 PM | SENT |
| John Stevenson, Jr. | | jstevenson@stevensonmurray.com | 3/24/2026 9:46:53 PM | SENT |
| Robert Hand | | rhand@stevensonmurray.com | 3/24/2026 9:46:53 PM | SENT |
| Richard WarrenMithoff | | rmithoff@mithofflaw.com | 3/24/2026 9:46:53 PM | SENT |
| Warner V.Hocker | | whocker@mithofflaw.com | 3/24/2026 9:46:53 PM | SENT |
| Teresa Demetriou | | TDemetriou@mithofflaw.com | 3/24/2026 9:46:53 PM | SENT |
| Joshua Fiveson | | jfiveson@wcbglaw.com | 3/24/2026 9:46:53 PM | SENT |

Copy from re:SearchTX

04/01/2026 03:34:20 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009963

**MAYA GUERRA GAMBLE**
**Judge, 459th District Court**
**Travis County Civil and Family Courts Facility, P.O. Box 1748**
**Austin, Texas 78767**
**512-854-9384**

April 1, 2026

Bradley E. Beckworth
Christina Yarnell
Nix Patterson, LLP
8701 Bee Cave Rd.
Seven Oaks East, Suite 500
Austin, TX 78746
*Via email:* bbeckworth@nixlaw.com
*Via email:* cyarnell@nixlaw.com

Mikal Watts
Watts Law Firm LLP
110 Tributary Ranch Rd.
Mountain Home, TX 78058
*Via email:* mikal@wattsllp.com

Blair Townsend
The Townsend Law Firm, LLC
50 SW Pine St., Suite 400
Portland, OR 97204
*Via email:* blair@thetownsendlawfirm.com

Jeff Ray
Ray Pena P.C.
9601 McAllister Fwy., Suite 901
San Antonio, TX 78216
*Via email:* jray@raylaw.com

Thomas C. Wright
Jessica Z. Barger
Kenneth J. Fair
Wright Close Barger & Guzman, LLP
1 Riverway, Suite 2200
Houston, TX 77056
*Via email:* wright@wrightclosebarger.com
*Via email:* barger@wrightclosebarger.com
*Via email:* fair@wrightclosebarger.com

Lynn S. Castagna
CASTAGNA SCOTT LLP
1120 S. Capital of TX Hwy, Bldg. 2, Suite 300
Austin, TX 78746
*Via email:* lynn@texasdefense.com

R. Paul Yetter
Justin P. Tschoepe
J. Reid Simpson
Shannon N. Smith
YETTER COLEMAN LLP
811 Main St., Suite 4100
Houston, TX 77002
*Via email:* pyetter@yettercoleman.com
*Via email:* jtschoepe@yettercoleman.com
*Via email:* jrsimpson@yettercoleman.com
*Via email:* ssmith@yettercoleman.com

John W. Stevenson, Jr.
W. Robert Hand
STEVENSON & MURRAY
24 Greenway Plaza, Suite 750
Houston, TX 77046
*Via email:* jstevenson@stevensonmurray.com
*Via email:* rhand@stevensonmurray.com

Copy from re:SearchTX

Kurt Arnold
J. Kyle Findley
Kala F. Sellers
John G. Grinnan
Arnold & Itkin, LLP
6009 Memorial Dr.
Houston, TX 77007
*Via email:* e-service@arnolditkin.com

Daniel C. Bitting
Ferguson Braswell Fraser Kubasta PC
4301 Westbank Dr., Bldg. A, Suite 225
Austin, TX 78746
*Via email:* dbitting@fbfk.law

Randy R. Howry
Sean E. Breen
Howry Breen & Herman, LLP
1900 Pearl St.
Austin, TX 78705
*Via email:* rhowry@howrybreen.com
*Via email:* sbreen@howrybreen.com

Jarom Tefteller
TEFTELLER LAW, PLLC
403 W. Tyler St.
Gilmer, TX 75644
*Via email:* jt@tlaw-pllc.com

Ron Armstrong, II
The Armstrong Firm, PLLC
109 Yoalana St., Suite 210
Boerne, TX 78006
*Via email:* rwaii@tafpllc.com

W. Mark Lanier
Sam E. Taylor, II
Sara E. Abston
Lanier Law Firm, PC
10940 W. Sam Houston Pkwy N., Suite 100
Houston, TX 77064
*Via email:* mark.lanier@lanierlawfirm.com
*Via email:* sam.taylow@lanierlawfirm.com
*Via email:* sara.abston@lanierlawfirm.com

**Re:**
**Cause No. D-1-GN-26-000758; Will Steward, et al v. Camp Mystic, Inc.,** et al. *in the 200th Judicial District, Travis County, Texas;*
**Cause No. D-1-GN-25-009963; Warren Bellows, et al v. Camp Mystic, Inc.,** et al. *in the 455th Judicial District, Travis County, Texas;*
**Cause No. D-1-GN-25-009976; Ellen Elizabeth Getten, et al v. Camp Mystic, Inc., et al.** *in the 459th Judicial District, Travis County, Texas*
**Cause No. D-1-GN-25-009983; Timothy Peck, et al v. Camp Mystic, Inc.,** et al.*in the 261st Judicial District, Travis County, Texas*
**Cause No. D-1-GN-25-010016; Cole Naylor, et al v. Camp Mystic, Inc., et al.** *in the 200th Judicial District, Travis County, Texas*

Dear Counsel:

Due to the nature and complexity of these cases, I have set aside a date each month when the parties may request a setting. The dates are as follows:

- Wednesday, May 13
- Wednesday, June 10
- Wednesday, July 15

Copy from re:SearchTX

- Thursday, August 13
- Thursday, September 24
- Thursday, October 22
- Monday, November 23
- Monday, December 21

Any request can be confirmed by contacting my Judicial Executive Assistant, Ms. Shannon Matusek-Steele, through an email that includes all parties to the case(s) seeking a hearing. Any motion(s) to be discussed must be provided to my office at least 2 weeks in advance. Instructions on how to provide copies of documents were provided in assignment letters that have already been provided to the parties. These hearings may be cancelled if they are unnecessary; however, I anticipate that we may need some of these days to act as a status conference of sorts and therefore request that each party arrange for at least one attorney to be available on each of these dates. Your cooperation is greatly appreciated, and I look forward to a just resolution to these cases in an efficient manner.

Very Truly Yours,

Maya Guerra Gamble
Judge, 459th District Court

cc: Velva Price, District Clerk

Copy from re:SearchTX

Filed in the District Court
Of Travis County, Texas
At 4/3/26 8:00AM JAL
Velva L. Price, District Clerk

CAUSE NO. D-1-GN-25-009963

| | | |
|---|---|---|
| WARREN BELLOWS, PATRICIA BELLOWS, BLAKE BONNER, CAITLIN BONNER, MATTHEW CHILDRESS, WENDIE CHILDRESS, RYAN DEWITT, ELIZABETH DEWITT, JOHN FERRUZZO, ANDREA FERRUZZO, NATALIE LANDRY, LINDSEY MCCRORY, WARREN BELLOWS REPRESENTATIVE OF THE ESTATE OF ANNA MARGARET BELLOWS, PATRICIA BELLOWS REPRESENTATIVE OF THE ESTATE OF ANNA MARGARET BELLOWS, BLAKE BONNER REPRESENTATIVE OF THE ESTATE OF LILA BONNER, CAITLIN BONNER REPRESENTATIVE OF THE ESTATE OF LILA BONNER, MATTHEW CHILDRESS REPRESENTATIVE OF THE ESTATE OF CHLOE CHILDRESS, WENDIE CHILDRESS REPRESENTATIVE OF THE ESTATE OF CHLOE CHILDRESS, RYAN DEWITT REPRESENTATIVE OF THE ESTATE OF MOLLY DEWITT, ELIZABETH DEWITT REPRESENTATIVE OF THE ESTATE OF MOLLY DEWITT, JOHN FERRUZZO REPRESENTATIVE OF THE ESTATE OF KATHERINE FERRUZZO, ANDREA FERRUZZO REPRESENTATIVE OF THE ESTATE OF KATHERINE FERRUZZO, BEN LANDRY, BEN LANDRY REPRESENTATIVE OF THE ESTATE OF LAINEY LANDRY, NATALIE LANDRY REPRESENTATIVE OF THE ESTATE OF NATALIE LANDRY, LINDSEY MCCRORY REPRESENTATIVE OF THE ESTATE OF BLAKELY MCCRORY | § § § § § § § § § | IN THE DISTRICT COURT OF<br><br>TRAVIS COUNTY, TEXAS<br><br>455TH JUDICIAL DISTRICT |

VS.

EDWARD EASTLAND, CAMP MYSTIC, LLC, MYSTIC CAMPS FAMILY PARTNERSHIP, LTD., MYSTIC CAMPS MANAGEMENT, LLC, GEORGE ALBRITTON EASTLAND REPRESENTATIVE OF THE ESTATE RICHARD EASTLAND, NATURAL FOUNTAINS PROPERTIES, INC.,

Copy from re:SearchTX

WILLETTA EASTLAND, MARY LIZ EASTLAND

**ORDER TRANSFERRING CASE**

ON THIS DAY, IT IS HEREBY ORDERED that the above styled and numbered case be transferred to 459TH District Court, Travis County, Texas.

SIGNED 31st day of March, 2026.

Judge LAURIE EISERLOH
455TH Judicial District Court

SIGNED 31 day of March, 2026.

Judge MAYA GUERRA GAMBLE
459TH Judicial District Court

Copy from re:SearchTX

04/09/2026 11:23:46 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009963

**CAUSE NO. D-1-GN-25-009963**

| | | |
|---|---|---|
| **WARREN and PATRICIA BELLOWS Individually and as Representatives of ANNA MARGARET BELLOWS, Deceased; BLAKE and CAITLIN BONNER, Individually and as Representatives of LILA BONNER, Deceased; MATTHEW and WENDIE CHILDRESS, Individually and as Representatives of CHLOE CHILDRESS, Deceased; RYAN and ELIZABETH DEWITT, Individually and as Representatives of MOLLY DEWITT, Deceased; JOHN and ANDREA FERRUZZO, Individually and as Representatives of KATHERINE FERRUZZO, Deceased; BEN And NATALIE LANDRY, Individually and as Representatives of LAINEY LANDRY, Deceased; LINDSEY MCCRORY, Individually and as Representative of BLAKELY MCCRORY, Deceased.** | § | **IN THE DISTRICT COURT OF** |
| **VS.** | § | **459TH DISTRICT COURT** |
| **CAMP MYSTIC, LLC, NATURAL FOUNTAINS PROPERTIES, INC.; MYSTIC CAMPS FAMILY PARTNERSHIP, LTD., MYSTIC CAMPS MANAGEMENT, LLC; GEORGE ALBRITTON EASTLAND, as Representative of the Estate of RICHARD EASTLAND, Deceased, WILLETA EASTLAND; EDWARD EASTLAND; and MARY LIZ EASTLAND Defendants.** | § | **TRAVIS COUNTY, TEXAS** |

**ORDER ALLOWING AUDIO RECORDINGS OF COURT PROCEEDINGS**

On this day, the Court considered Non-Party San Antonio Express-News' Request to Allow Audio Recording of Court Proceedings pursuant to Tex. R. Civ. Proc. 18c and Travis County Local Rule 16 ("Request"). After considering the Request and the relevant factors, the Court finds that the Request should be and is hereby GRANTED.



Copy from re:SearchTX

IT IS THEREFORE ORDERED, ADJUDGED, and DECREED that San Antonio Express-News' Request to Allow Audio Recording of Court Proceedings pursuant to Tex. R. Civ. P, 18c and Travis County Local Rule 16 is GRANTED.

IT IS FURTHER ORDERED that the San Antonio Express-News is entitled to record and broadcast all proceedings in the above-captioned lawsuit through audio[1] coverage.

The San Antonio Express-News shall be entitled to install equipment in the courtroom for the purpose of such coverage, such equipment subject to further restrictions by the Court. The use of any equipment shall not disturb the court proceedings and can be revoked by the Court at any time.

IT IS FURTHER ORDERED that should other news organizations (other stations or outlets) also solicit access to the Court for these same proceedings that a sharing agreement will be ordered.

IT IS FURTHER ORDERED all media personnel covering the proceedings will comply with applicable provisions of the Texas Rules of Civil Procedure and Travis County Local Rules.

IT IS SO ORDERED.

SIGNED on this 9th day of April 2026.

Maya Guerra Gamble
Judge Presiding

[1] Pursuant to Travis County Local Rule 16.1, "audio coverage" shall mean coverage by equipment that has the capacity to reproduce or broadcast sounds, and includes digital, tape, and cassette sound recorders, and radio and video equipment.



Copy from re:SearchTX

04/09/2026 11:22:51 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009963

**CAUSE NO. D-1-GN-25-009963**

| | | |
|---|---|---|
| **WARREN and PATRICIA BELLOWS Individually and as Representatives of ANNA MARGARET BELLOWS, Deceased; BLAKE and CAITLIN BONNER, Individually and as Representatives of LILA BONNER, Deceased; MATTHEW and WENDIE CHILDRESS, Individually and as Representatives of CHLOE CHILDRESS, Deceased; RYAN and ELIZABETH DEWITT, Individually and as Representatives of MOLLY DEWITT, Deceased; JOHN and ANDREA FERRUZZO, Individually and as Representatives of KATHERINE FERRUZZO, Deceased; BEN And NATALIE LANDRY, Individually and as Representatives of LAINEY LANDRY, Deceased; LINDSEY MCCRORY, Individually and as Representative of BLAKELY MCCRORY, Deceased.** | § | **IN THE DISTRICT COURT OF** |
| **VS.** | § | **459TH DISTRICT COURT** |
| **CAMP MYSTIC, LLC, NATURAL FOUNTAINS PROPERTIES, INC.; MYSTIC CAMPS FAMILY PARTNERSHIP, LTD., MYSTIC CAMPS MANAGEMENT, LLC; GEORGE ALBRITTON EASTLAND, as Representative of the Estate of RICHARD EASTLAND, Deceased, WILLETA EASTLAND; EDWARD EASTLAND; and MARY LIZ EASTLAND Defendants.** | § | **TRAVIS COUNTY, TEXAS** |

**ORDER ALLOWING RECORDING OF COURT PROCEEDINGS**

On this day, the Court considered Non-Party Margaret (Maisie) Frances Crow, Abigail (Abbie) Perrault, and Out of Nowhere LLC's Request to Record Proceedings Pursuant to Travis County District Court Local Rule 16 ("Request"). After considering the Request and the relevant factors, the Court finds that the Request should be and is hereby GRANTED.



Copy from re:SearchTX

IT IS THEREFORE ORDERED, ADJUDGED, and DECREED that Margaret (Maisie) Frances Crow, Abigail (Abbie) Perrault, and Out of Nowhere LLC's Request pursuant to Tex. R. Civ. P, 18c and Travis County Local Rule 16 is GRANTED.

IT IS FURTHER ORDERED that Margaret (Maisie) Frances Crow, Abigail (Abbie) Perrault, and Out of Nowhere LLC is entitled to record and broadcast all proceedings in the above-captioned lawsuits through both visual[1] coverage and audio[2] coverage.

Margaret (Maisie) Frances Crow, Abigail (Abbie) Perrault, and Out of Nowhere LLC shall be entitled to install equipment in the courtroom for the purpose of such coverage, such equipment subject to further restrictions by the Court. The use of any equipment shall not disturb the court proceedings and can be revoked by the Court at any time.

IT IS FURTHER ORDERED all media personnel covering the proceedings will comply with applicable provisions of the Texas Rules of Civil Procedure and Travis County Local Rules.

IT IS SO ORDERED.

SIGNED on this 9th day of April 2026.

Maya Guerra Gamble
Judge Presiding

[1] Pursuant to Travis County Local Rule 16.1, "visual coverage" shall mean and include coverage by equipment that has the capacity to reproduce or telecast an image and includes still and moving picture photographic equipment and video equipment.
[2] Pursuant to Travis County Local Rule 16.1, "audio coverage" shall mean coverage by equipment that has the capacity to reproduce or broadcast sounds, and includes digital, tape, and cassette sound recorders, and radio and video equipment.



Copy from re:SearchTX

04/09/2026 11:21:41 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009963

**CAUSE NO. D-1-GN-25-009963**

| | | |
|---|---|---|
| **WARREN and PATRICIA BELLOWS Individually and as Representatives of ANNA MARGARET BELLOWS, Deceased; BLAKE and CAITLIN BONNER, Individually and as Representatives of LILA BONNER, Deceased; MATTHEW and WENDIE CHILDRESS, Individually and as Representatives of CHLOE CHILDRESS, Deceased; RYAN and ELIZABETH DEWITT, Individually and as Representatives of MOLLY DEWITT, Deceased; JOHN and ANDREA FERRUZZO, Individually and as Representatives of KATHERINE FERRUZZO, Deceased; BEN And NATALIE LANDRY, Individually and as Representatives of LAINEY LANDRY, Deceased; LINDSEY MCCRORY, Individually and as Representative of BLAKELY MCCRORY, Deceased.** | § | **IN THE DISTRICT COURT OF** |
| **VS.** | § | **459TH DISTRICT COURT** |
| **CAMP MYSTIC, LLC, NATURAL FOUNTAINS PROPERTIES, INC.; MYSTIC CAMPS FAMILY PARTNERSHIP, LTD., MYSTIC CAMPS MANAGEMENT, LLC; GEORGE ALBRITTON EASTLAND, as Representative of the Estate of RICHARD EASTLAND, Deceased, WILLETA EASTLAND; EDWARD EASTLAND; and MARY LIZ EASTLAND Defendants.** | § | **TRAVIS COUNTY, TEXAS** |

**ORDER ALLOWING STILL PHOTOGRAPHY OF COURT PROCEEDINGS**

On this day, the Court considered Non-Party Austin American-Statesman's Request to Allow Still Photography of Court Proceedings pursuant to Tex. R. Civ. Proc. 18c and Travis County Local Rule 16 ("Request"). After considering the Request and the relevant factors, the Court finds that the Request should be and is hereby GRANTED.



Copy from re:SearchTX

IT IS THEREFORE ORDERED, ADJUDGED, and DECREED that Austin American-Statesman's Request to Allow Still Photography of Court Proceedings pursuant to Tex. R. Civ. P, 18c and Travis County Local Rule 16 is GRANTED.

IT IS FURTHER ORDERED that the Austin American-Statesman is entitled to record and broadcast all proceedings in the above-captioned lawsuits through visual[1] coverage.

The Austin American-Statesman shall be entitled to install equipment in the courtroom for the purpose of such coverage, such equipment subject to further restrictions by the Court. The use of any equipment shall not disturb the court proceedings and can be revoked by the Court at any time.

IT IS FURTHER ORDERED that should other news organizations (other stations or outlets) also solicit access to the Court for these same proceedings that a sharing agreement will be ordered.

IT IS FURTHER ORDERED all media personnel covering the proceedings will comply with applicable provisions of the Texas Rules of Civil Procedure and Travis County Local Rules.

IT IS SO ORDERED.

SIGNED on this 9th day of April 2026.

Maya Guerra Gamble
Judge Presiding

[1] Pursuant to Travis County Local Rule 16.1, "visual coverage" shall mean and include coverage by equipment that has the capacity to reproduce or telecast an image and includes still and moving picture photographic equipment and video equipment.



Copy from re:SearchTX

04/13/2026 04:22:05 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009963

**CAUSE NO. D-1-GN-25-009963**

| | | |
|---|---|---|
| **WARREN and PATRICIA BELLOWS Individually and as Representatives of ANNA MARGARET BELLOWS, Deceased; BLAKE and CAITLIN BONNER, Individually and as Representatives of LILA BONNER, Deceased; MATTHEW and WENDIE CHILDRESS, Individually and as Representatives of CHLOE CHILDRESS, Deceased; RYAN and ELIZABETH DEWITT, Individually and as Representatives of MOLLY DEWITT, Deceased; JOHN and ANDREA FERRUZZO, Individually and as Representatives of KATHERINE FERRUZZO, Deceased; BEN And NATALIE LANDRY, Individually and as Representatives of LAINEY LANDRY, Deceased; LINDSEY MCCRORY, Individually and as Representative of BLAKELY MCCRORY, Deceased.** | § | **IN THE DISTRICT COURT OF** |
| **VS.** | § | **459TH DISTRICT COURT** |
| **CAMP MYSTIC, LLC, NATURAL FOUNTAINS PROPERTIES, INC.; MYSTIC CAMPS FAMILY PARTNERSHIP, LTD., MYSTIC CAMPS MANAGEMENT, LLC; GEORGE ALBRITTON EASTLAND, as Representative of the Estate of RICHARD EASTLAND, Deceased, WILLETA EASTLAND; EDWARD EASTLAND; and MARY LIZ EASTLAND Defendants.** | § | **TRAVIS COUNTY, TEXAS** |

## ORDER ALLOWING RECORDING OF COURT PROCEEDINGS

On this day, the Court considered Non-Party KXAN News; Nexstar Media Group, Inc.'s Request to Record Proceedings Pursuant to Travis County District Court Local Rule 16 ("Request"). After considering the Request and the relevant factors, the Court finds that the Request should be and is hereby GRANTED.



Copy from re:SearchTX

IT IS THEREFORE ORDERED, ADJUDGED, and DECREED that KXAN News; Nexstar Media Group, Inc.'s Request pursuant to Tex. R. Civ. P, 18c and Travis County Local Rule 16 is GRANTED.

IT IS FURTHER ORDERED that KXAN News; Nexstar Media Group, Inc. is entitled to record and broadcast all proceedings in the above-captioned lawsuits through both visual[1] coverage and audio[2] coverage.

KXAN News; Nexstar Media Group, Inc.shall be entitled to install equipment in the courtroom for the purpose of such coverage, such equipment subject to further restrictions by the Court. The use of any equipment shall not disturb the court proceedings and can be revoked by the Court at any time.

IT IS FURTHER ORDERED all media personnel covering the proceedings will comply with applicable provisions of the Texas Rules of Civil Procedure and Travis County Local Rules.

IT IS SO ORDERED.

SIGNED on this 13 day of April 2026.

Maya Guerra Gamble
Judge Presiding

---

[1] Pursuant to Travis County Local Rule 16.1, "visual coverage" shall mean and include coverage by equipment that has the capacity to reproduce or telecast an image and includes still and moving picture photographic equipment and video equipment.

[2] Pursuant to Travis County Local Rule 16.1, "audio coverage" shall mean coverage by equipment that has the capacity to reproduce or broadcast sounds, and includes digital, tape, and cassette sound recorders, and radio and video equipment.



Copy from re:SearchTX

04/13/2026 04:23:23 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009963

**CAUSE NO. D-1-GN-25-009963**

| | | |
|---|---|---|
| **WARREN and PATRICIA BELLOWS Individually and as Representatives of ANNA MARGARET BELLOWS, Deceased; BLAKE and CAITLIN BONNER, Individually and as Representatives of LILA BONNER, Deceased; MATTHEW and WENDIE CHILDRESS, Individually and as Representatives of CHLOE CHILDRESS, Deceased; RYAN and ELIZABETH DEWITT, Individually and as Representatives of MOLLY DEWITT, Deceased; JOHN and ANDREA FERRUZZO, Individually and as Representatives of KATHERINE FERRUZZO, Deceased; BEN And NATALIE LANDRY, Individually and as Representatives of LAINEY LANDRY, Deceased; LINDSEY MCCRORY, Individually and as Representative of BLAKELY MCCRORY, Deceased.** | § | **IN THE DISTRICT COURT OF** |
| **VS.** | § | **459TH DISTRICT COURT** |
| **CAMP MYSTIC, LLC, NATURAL FOUNTAINS PROPERTIES, INC.; MYSTIC CAMPS FAMILY PARTNERSHIP, LTD., MYSTIC CAMPS MANAGEMENT, LLC; GEORGE ALBRITTON EASTLAND, as Representative of the Estate of RICHARD EASTLAND, Deceased, WILLETA EASTLAND; EDWARD EASTLAND; and MARY LIZ EASTLAND Defendants.** | § | **TRAVIS COUNTY, TEXAS** |

**ORDER ALLOWING RECORDING OF COURT PROCEEDINGS**

On this day, the Court considered Non-Party Dateline NBC's Request to Record Proceedings Pursuant to Travis County District Court Local Rule 16 ("Request"). After considering the Request and the relevant factors, the Court finds that the Request should be and is hereby GRANTED.



Copy from re:SearchTX

IT IS THEREFORE ORDERED, ADJUDGED, and DECREED that Dateline NBC's Request pursuant to Tex. R. Civ. P, 18c and Travis County Local Rule 16 is GRANTED.

IT IS FURTHER ORDERED that Dateline NBC is entitled to record and broadcast all proceedings in the above-captioned lawsuits through both visual[1] coverage and audio[2] coverage.

Dateline NBC shall be entitled to install equipment in the courtroom for the purpose of such coverage, such equipment subject to further restrictions by the Court. The use of any equipment shall not disturb the court proceedings and can be revoked by the Court at any time.

IT IS FURTHER ORDERED all media personnel covering the proceedings will comply with applicable provisions of the Texas Rules of Civil Procedure and Travis County Local Rules.

IT IS SO ORDERED.

SIGNED on this 13 day of April 2026.

Maya Guerra Gamble
Judge Presiding

[1] Pursuant to Travis County Local Rule 16.1, "visual coverage" shall mean and include coverage by equipment that has the capacity to reproduce or telecast an image and includes still and moving picture photographic equipment and video equipment.
[2] Pursuant to Travis County Local Rule 16.1, "audio coverage" shall mean coverage by equipment that has the capacity to reproduce or broadcast sounds, and includes digital, tape, and cassette sound recorders, and radio and video equipment.



Copy from re:SearchTX

5/6/2026 5:30 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009963
Susan Schmidt

Cause No. D-1-GN-25-009976

| | | |
|---|---|---|
| Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten, *et al.* | § | IN THE DISTRICT COURT OF |
| *Plaintiffs*, | § | TRAVIS COUNTY, TEXAS |
| v. | § | |
| Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., *et al.* | § | |
| *Defendants*. | § | 459th JUDICIAL DISTRICT |

Cause No. D-1-GN-25-009963

| | | |
|---|---|---|
| Warren and Patricia Bellows, Individually and as Representatives of Anna Margaret Bellows, Deceased, *et al.* | § | IN THE DISTRICT COURT OF |
| *Plaintiffs,* | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| Camp Mystic, LLC; *et al.*, | § | |
| *Defendants.* | § | 459th JUDICIAL DISTRICT |

## ***GETTEN* AND *BELLOWS* PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTIONS TO COMPEL ARBITRATION AND MOTIONS TO STAY**

COME NOW all Plaintiffs in the *Getten* and *Bellows* matters (collectively, "Plaintiffs") and respectfully file this response to the Defendants' motions to compel arbitration ("Motions"). For the Court's convenience, the *Getten* and *Bellows* Plaintiffs are filing a consolidated response that presents all their arguments in a single document. For the reasons set forth in this response, the Motions should be denied.

Copy from re:SearchTX

## INTRODUCTION

In an effort to evade further public exposure of the events that led to the death of 25 girls and two teenage counselors while away at summer camp, Defendants seek to prevent the litigation of Plaintiffs' suit in open court. Defendants ask this Court to order that Plaintiffs' suit be forced into private arbitration where their claims and evidence will be sequestered in closed proceedings. In support, Defendants rely on arbitration provisions that they never signed, to which most are not even parties, and which are unenforceable under Texas law. This is no small overreach.

Any motion to arbitrate personal injury claims should be treated with healthy suspicion, especially one that blatantly violates the requirements of the Texas Arbitration Act for such claims. Given the public importance of this case, that suspicion should be magnified. This Court should deny Defendants' Motions and allow these cases to be litigated in the sunlight of open court.

## BACKGROUND FACTS

Camp Mystic is a private summer camp for girls located in Hunt, Kerr County, Texas, along the Guadalupe River. The Eastland family, including the individual Eastland Defendants, has been operating the camp in the Texas Hill Country for generations.

The camp is located on acreage owned by Defendant Natural Fountains Properties, Inc. ("Natural Fountains"), a domestic corporation headquartered in Texas,[1] which leases the property to Defendant Camp Mystic, LLC,[2] a domestic LLC headquartered in Texas.[3] Camp Mystic, LLC is owned by a Texas limited partnership.[4]

---

[1] Ex. 1 [CM 001865-67]; Ex. 2 [CM 001858-61].
[2] Ex. 3 [CM 000502-11]; Ex. 4 [CM 000493-98].
[3] Ex. 4 at CM 000494.
[4] Ex. 5; Ex. 6 [CM 001869-70].



Copy from re:SearchTX

In order for a child to attend Camp Mystic, the parents or legal guardians of campers must sign a participation agreement for the camper to enroll and participate in Camp Mystic activities.[5] For the 2025 season, one parent for each child (the "Campers") executed a participation agreement on behalf of her daughter (the "Participation Agreements" or "Agreements").[6] Although it is true that the Participation Agreements were "signed as part of campers' enrollment at Camp Mystic,"[7] neither Camp Mystic nor any other Defendant actually signed those Agreements.

The Agreements set forth their purpose and memorialized the transaction that is allegedly subject to an agreement to arbitrate. They "include[d] important information about Camp Mystic activities and describe[d] certain protection sought by Camp Mystic if you or your child . . . is hurt or suffers some other loss."[8] All the Camp's activities were to take place exclusively in Texas.[9] Specifically, each Participation Agreement described Camp Mystic's environment as including "river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country."[10] Activities included "a variety of traditional camp sports and games, water activities, hiking, aerobics … arts and crafts" and "[e]quine activities include horseback riding activities, trail rides and specialty events."[11] All these activities were to occur at the Camp's premises in Hunt, Texas, and in the surrounding Texas Hill Country.[12]

---

[5] Exs. 7-17 ("Campers' Parents' Declarations") ¶¶ 4, 9; *see also* Defs.' Mots. to Compel Exs. A ("Eastland Declarations") ¶ 7. To avoid duplication, this response cites common paragraphs from multiple declarations that attest to the same facts, *e.g.*, "Campers' Parents' Declarations."

[6] *See e.g.*, Eastland Declarations Exs. A ("Participation Agreements"). Aside from the inclusion of identifying information for each Camper and each Agreement's signatory, the Participation Agreements for each of the Campers are identical.

[7] Eastland Declarations ¶ 7.

[8] Participation Agreements at 1.

[9] *See e.g.*, *id.*

[10] *Id.*

[11] *Id.*

[12] *Id.*



Copy from re:SearchTX

The Agreements provided that for any "dispute[], controvers[y] or difference[] which may arise between the parties out of or connection with this Agreement," the parties would attempt to settle the dispute "in an amicable way through discussions then mediation," and if unsuccessful, through arbitration in accordance with the AAA.[13] The Agreements also expressly stated that they "shall be governed by and construed in accordance with the laws of the State of Texas."[14]

Each Participation Agreement was executed in Texas.[15] Each of the sole signatories to the Participation Agreements—the Campers' parents—was a Texas resident at the time of execution (and remains so today).[16] No out-of-state party executed any of the Agreements at issue.[17]

Additionally, each of the Campers was a child residing in Texas at the time of her death.[18] The Campers were also Texas residents at the time their parents executed the 2025 Agreements.[19]

In short, every aspect of the Campers' enrollment in and participation at Camp Mystic, both in fact and as reflected in the Participation Agreements, occurred in Texas. That was where the Campers tragically died in July 2025 when the flooded Guadalupe River overtook the banks while the Campers slept in Camp Mystic's cabins.

Chloe Childress and Katherine Ferruzzo—two young adults who worked at Camp Mystic as counselors during the summer of 2025 (the "Counselors")—also died in the flood. Both signed employment contracts with Camp Mystic ("Employment Contract").[20] The Employment Contracts did not include any provision regarding arbitration.[21]

---

[13] *Id*. at 2.
[14] *Id*.
[15] Campers' Parents' Declarations ¶ 5.
[16] *Id*. at ¶ 3.
[17] *Id*. at ¶¶ 3, 6; *see also* Participation Agreements.
[18] Campers' Parents' Declarations ¶ 8.
[19] *Id*. at ¶ 7.
[20] Exs. 18 [CM 000520] & 19 [CM 000521-22].
[21] *Id*.



Copy from re:SearchTX

Neither Childress nor Ferruzzo signed a Participation Agreement, nor did either of the Counselor's parents sign any agreement related to their daughter's employment at Camp Mystic.[22] To the extent Defendants point to Participation Agreements signed by their parents in prior years, the parents who signed those prior agreements were Texas residents at the time,[23] as were both Childress and Ferruzzo.[24]

Determining responsibility for the tragic deaths of the Campers and Counselors is not only of vital interest to their families and Defendants. It is a matter of public importance to the citizens of the State of Texas. Defendants' suggestion that these claims should be shunted to a private, closed-door arbitration directly flouts both the Texas Arbitration Act (which governs this case) and the public interest.

## LEGAL STANDARD

Under both the Federal Arbitration Act and the Texas Arbitration Act, a party seeking to compel arbitration bears the initial burden of establishing two threshold elements: (1) the existence of a valid and enforceable arbitration agreement—that is, whether the parties entered into any arbitration agreement at all—and (2) that a specific claim falls within the scope of that agreement, which is often referred to as the "arbitrability" of a given claim. *See J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003) (citing Tex. Civ. Prac. & Rem. Code § 171.021); *Will-Drill Res., Inc. v. Samson Res. Co.,* 352 F.3d 211, 214 (5th Cir. 2003). If the trial court finds that a valid arbitration agreement exists, the burden shifts to the party opposing arbitration to raise an affirmative defense to enforcing arbitration. *Webster*, 128 S.W.3d at 227.

[22] Exs. 20-21 ("Counselors' Parents' Declarations") ¶ 16.
[23] *Id*. at ¶¶ 3, 5-6.
[24] *Id*. at ¶¶ 7-8.



Copy from re:SearchTX

## ARGUMENT

### I. The Court must first decide whether a valid arbitration agreement exists.

The threshold questions of whether an arbitration agreement exists and whether a specific claim is arbitrable are typically questions for the court. *See e.g.*, *San Antonio River Auth. v. Austin Bridge & Rd., L.P.*, 601 S.W.3d 616, 626 (Tex. 2020). Parties may delegate the second question—*i.e.*, whether a given claim must be arbitrated—to an arbitrator instead of a court,[25] but the initial question of whether an arbitration agreement actually exists can never be delegated to an arbitrator. It must be decided by a court. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019) ("To be sure, before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists."); *TotalEnergies E&P USA, Inc. v. MP Gulf of Mexico, LLC*, 667 S.W.3d 694, 720 (Tex. 2023) (same); *see also Indep. Spec. Ins. Co. v. Blossoms Montessori School Inc.*, No. 01-23-00840-CV, 2025 WL 1583577, at *3 (Tex. App.—Houston [1st Dist.] June 5, 2025, pet. denied) (delegation clause has no effect if there is no agreement to arbitrate).

Because "[a]rbitration agreements are interpreted under traditional contract principles," Defendants must first prove that "the agreement meets all requisite contract elements." *Webster*, 128 S.W.3d at 227. Policies in favor of arbitration (upon which a court may justifiably rely when determining the arbitrability of a specific claim) have no application when the Court is determining whether a valid arbitration agreement even exists; the presumption favoring arbitration "arises only after the party seeking to compel arbitration proves that a valid arbitration agreement exists." *Id.*; *see also Will-Drill Res.*, 352 F.3d at 214. Therefore, the Court must first decide whether a valid arbitration agreement exists. The answer is "no."

---

[25] *See TotalEnergies E&P USA, Inc. v. MP Gulf of Mexico, LLC,* 667 S.W.3d 694, 702, 708, 712 (Tex. 2023) (explaining that if an agreement to delegate arbitrability is "clear and unmistakable," an "arbitrator must decide whether the parties' disputes must be resolved through arbitration").



Copy from re:SearchTX

## II. There is no agreement to arbitrate between the Counselors and Camp Mystic.

As a threshold matter, there is obviously no arbitration agreement between either Counselor and any Defendant. The Counselors never signed an agreement containing an arbitration provision. The Employment Contracts that governed their employment at Camp Mystic at the time of their deaths in July 2025 contained no arbitration provisions.[26] Defendants' position is baseless.

Tellingly, Defendants wholly ignore the Employment Contracts in their Motions. Instead, Defendants rely on the arbitration provisions contained in separate Participation Agreements that the Counselors' parents had executed ***the previous year***, while the Counselors were still minors, for the purpose of enrolling them ***as campers*** for the 2024 summer season.[27] But those Agreements do not bind the Counselors' rights as ***employees*** of Camp Mystic for the 2025 summer season.[28] The claims in this litigation regarding the Counselors' deaths arise out of the events of July 2025, when the Counselors were adults and were bound only by their Employment Agreements. Thus, even if the Participation Agreements might have otherwise endured, they were superseded by the Employment Contracts. *See Cerna v. Pearland Urban Air, LLC.*, 714 S.W.3d 585, 589 (Tex. 2025) (noting that whether prior arbitration agreements were superseded is an issue for the court).

Even if the Court considered the 2024 Participation Agreements, for the reasons discussed below regarding the arbitration provisions contained in the Campers' Participation Agreements, the arbitration provisions contained in the 2024 Participation Agreements do not amount to valid arbitration agreements between the Counselors and Defendants. Thus, the Motions all fail for the same fundamental reasons. But the absurdity of Defendants' effort to compel arbitration even of the Counselors' claims underscores the lengths they are willing to go to avoid open court.

---

[26] Exs. 18 & 19.
[27] *See* Counselors' Parents' Declarations ¶¶ 9, 17; *see also* Eastland Declaration ISO *Bellows* Mot., Exs. A-17 & A-19 ("Counselors' 2024 Participation Agreements").
[28] *See* Counselors' 2024 Participation Agreements.



Copy from re:SearchTX

**III. Because the arbitration provisions are governed by the TAA and do not comply with its conditions to arbitrate personal injury claims, they are not valid arbitration agreements.**

Whether the arbitration provisions amount to valid agreements to arbitrate necessarily depends on which law—the Federal Arbitration Act or the Texas Arbitration Act—is applicable. This is a "threshold matter" for the Court. *Natgasoline LLC v. Refractory Constr. Servs., Co. LLC*, 566 S.W.3d 871, 878 (Tex. App.—Houston [14th Dist.] 2018, pet. denied).

The Agreements do not specify whether the FAA or the TAA applies, nor do they exclude application of federal law.[29] Therefore, both the FAA and the TAA may potentially be applied. *Id*. But before the FAA may be applied, Defendants must "establish [their] right to arbitrate under the Federal Arbitration Act." *Ikon Office Solutions, Inc. v. Eifert*, 2 S.W.3d 688, 696 (Tex. App.—Houston [14th Dist.] 1999, no pet.). Defendants have not established that the transactions at issue in this litigation involved interstate commerce, so the FAA does not apply. And under the TAA, the purported arbitration agreements are invalid and unenforceable.

**A. Because the transactions at issue did not involve interstate commerce "in fact," the FAA is inapplicable.**

The FAA governs an arbitration agreement only if the "transaction" at issue involves interstate commerce. 9 U.S.C.A. § 2 (a valid arbitration agreement under the FAA must be in a "contract evidencing a transaction involving commerce"). Crucially, the issue "is not whether the parties' dispute affects interstate commerce, but whether their dispute concerns a ***transaction*** that affects interstate commerce." *In re Merrill Lynch Tr. Co. FSB*, 123 S.W.3d 549, 553 (Tex. App.—San Antonio 2003, orig. proceeding) (emphasis added). Thus, it makes no difference whether—as Defendants assume to be the case—Camp Mystic is generally involved in interstate commerce. *Cf. Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 577 (1997).

---

[29] *See generally* Participation Agreements.



Copy from re:SearchTX

As the parties moving to compel arbitration, Defendants bear the burden of proving that the Participation Agreements evidence a "transaction involving commerce." *In re Nasr*, 50 S.W.3d 23, 26 (Tex. App.—Beaumont 2001, orig. proceeding.).

Interstate commerce refers to "trade, commerce, transportation, or communication among the several States." 15 U.S.C. § 78c(a)(17). Mere contemplation by a party that a transaction could involve interstate commerce does not satisfy this test. As the U.S. Supreme Court has explained, the transaction at issue must "turn out, ***in fact***, to have involved interstate commerce." *Allied-Bruce Terminix Companies, Inc. v. Dobson*, 513 U.S. 265, 277 (1995) (emphasis added).

A transaction's involvement of interstate commerce is typically shown by such contacts as the location of a party's headquarters in another state; transportation of materials across state lines; manufacture of parts in a different state; billings prepared out of state; or interstate mail and calls. *See Stewart Title Guar. Co. v. Mack*, 945 S.W.2d 330, 333 (Tex. App.—Houston [1st Dist.] 1997, writ dism'd w.o.j.). None of those out-of-state contacts is present here. The transactions at issue—the Participation Agreements—were purely intrastate. It is no accident that the Agreements state that they are governed by Texas law.[30]

First, the signatories of the Agreements and the Campers were ***all*** Texas residents:

- ***All*** signatories to the Participation Agreements are Texas residents and were Texas residents at the time they executed the Agreements.[31]
- ***All*** of the Campers were Texas residents at the time of their deaths and Texas residents at the time the Participation Agreements were executed.[32]
- ***All*** of the Campers' Participation Agreements were executed in Texas.[33]

[30] Participation Agreements at 2.
[31] Campers' Parents' Declarations ¶ 3; *see also* Counselors' Parents' Declarations ¶ 3.
[32] Campers' Parents' Declarations ¶¶ 7, 8; *see also* Counselors' Parents' Declarations ¶¶ 7-8.
[33] Campers' Parents' Declarations ¶ 5; *see also* Counselors' Parents' Declarations ¶ 5.



Copy from re:SearchTX

Second, although they are not signatories to the Participation Agreements, the Defendants are likewise ***all*** Texas residents:

- Defendant Camp Mystic, LLC, is a domestic limited liability company headquartered in Texas and owned by a Texas limited partnership.[34]

- Defendant Natural Fountains is a domestic corporation headquartered in Texas.[35]

- Defendant Mystic Camps Family Partnership, LTD ("Family Partnership"), which owns Camp Mystic, LLC and Natural Fountains,[36] is a domestic limited company headquartered in Texas.[37]

- Mystic Camps Management, LLC ("Camps Management"), which is the general partner of Family Partnership,[38] is a domestic limited liability company headquartered in Texas,[39] and all of its members are Texas residents.[40]

- Camp Mystic's directors[41]—Defendants Edward Eastland and Mary Liz Eastland—and executive director[42]—Defendant Willetta Eastland—were and are Texas residents.[43]

Finally, the Campers' enrollment in and participation at Camp Mystic occurred in Texas:

- Camp Mystic is a summer camp located in Texas.

- All camp-related activities for the Campers (including those specifically listed in the Participation Agreements) occurred solely in Texas.[44]

In sum, the Agreements were governed by Texas law, signed in Texas, by Texas residents, on behalf of Texas children, for camp activities taking place exclusively in Texas, at a camp owned and operated by Texans. Nothing in the Agreements involves interstate commerce.

---

[34] Ex. 4 at CM 000494; Exs. 5, 6.
[35] Exs. 1, 2, 22.
[36] Eastland Declarations ¶ 5.
[37] Ex. 6.
[38] Eastland Declarations ¶ 6.
[39] Exs. 6 & 23 at 1.
[40] Ex. 23 at 1-2.
[41] Eastland Declarations ¶ 2.
[42] *Id*. at ¶ 3.
[43] Ex. 4 at CM 000496; Ex. 24 at 5; Ex. 25 at 6; Ex. 26 at 6.
[44] *See supra* at p. 3; *see also* Participation Agreements; Campers' Parents' Declarations ¶ 10; Counselors' Parents' Declarations ¶ 10.



Copy from re:SearchTX

Defendants do not seriously dispute this conclusion. Their entire argument for application of the FAA (which is their burden) is contained in one sentence: "[T]he Participation Agreement is in writing and governs camping activities that are open to campers across state lines."[45] But it is irrelevant whether Camp Mystic was "open to campers across state lines" because each Agreement constituted a separate "transaction." All that matters is whether the Participation Agreements for these Campers involved interstate commerce, and Defendants know full well that this inquiry focuses on the "transaction" in question. *See Eastland v. Camp Mystic, Inc.*, No. 04-08-00675-CV, 2009 WL 260523, at *3 (Tex. App.—San Antonio Feb. 4, 2009, pet. denied) (rejecting argument that Camp Mystic, LLC's use of its trademark in interstate commerce meant that its lease of the property on which the camp sits involved interstate commerce, and holding that the FAA did not apply to the lease's arbitration agreement because the transaction at issue—Camp Mystic, LLC's lease of real property in Texas from Natural Fountains—did not affect interstate commerce). Numerous other decisions agree.[46]

The Campers' Participation Agreements did not "in fact" involve interstate commerce. *Allied-Bruce*, 513 U.S. at 277. Therefore, the FAA does not govern this case.

---

[45] *See e.g.*, *Getten* Mot. at 7; *Bellows* Mot. at 6.

[46] *See also Caballero v. Contreras*, No. 13-10-00125-CV, 2010 WL 3420527, at *3 (Tex. App.—Corpus Christi–Edinburg Aug. 31, 2010, no pet.) ("[A]ll parties involved in the suit are Texas residents, the [purchase and sale] contract was signed in Texas, and the contract was to be performed in Texas. There is no evidence in the record indicating that the parties' transaction in fact affects interstate commerce." (cleaned up)); *Chambers v. O'Quinn*, 305 S.W.3d 141, 150 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (TAA governed agreement because it "(1) [did] not relate to interstate commerce, and (2) was executed between Texas residents in Texas, to be performed in Texas"); *Lawson v. Archer*, 267 S.W.3d 376, 381 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (FAA did not apply because "the parties reside and do business in Texas. They executed the [inspection] Agreement in Texas. The inspected property is in Texas. The Agreement provides, 'This agreement shall be governed by the laws of the State of Texas.'"); *Henry v. Gonzalez*, 18 S.W.3d 684, 688 (Tex. App.—San Antonio 2000, pet. dism'd by agr.) (FAA did not apply to agreement where "all parties involved in the suit are Texas residents, the contract was signed in Texas, and the contract was to be performed in Texas, only").



Copy from re:SearchTX

### B. Under the TAA, the arbitration provisions are invalid.

The TAA provides that arbitration agreements are generally valid "so long as they are written and agreed to by the parties." *In re Polymerica, LLC*, 296 S.W.3d 74, 76 (Tex. 2009) (internal quotation marks omitted); *see also* Tex. Civ. Prac. & Rem. Code § 171.001. But when an arbitration agreement pertains to personal injuries, the TAA requires "(1) each party to the claim, on the advice of counsel, agree[] in writing to arbitrate; and (2) the agreement [be] signed by each party and each party's attorney." Tex. Civ. Prac. & Rem. Code § 171.002(a)(3), (c). Similarly, when a person enters into a contract to acquire services "in which the total consideration to be furnished by the individual is not more than $50,000," the TAA requires each party and each party's attorney to sign the arbitration agreement. *Id*. at § 171.002(a)(2), (b).

With this requirement, Section 171.002 creates a condition precedent to the formation of these types of arbitration agreements. *See e.g., Lawrence v. CDB Services, Inc.*, 16 S.W.3d 35, 43 (Tex. App.—Amarillo 2000), *aff'd*, 44 S.W.3d 544 (Tex. 2001) (citing Section 171.002 as an illustration of "the Legislature … impos[ing] restrictions on the rights of parties to make contracts" and explaining that unless it is satisfied, arbitration agreements are not "valid and enforceable"). Because "[c]ontract formation defenses—such as whether a party ever signed a contract" are "threshold issues to be decided by the court," the Court should hold that the conditions precedent of Section 171.002 were not satisfied. *RSL Funding, LLC v. Newsome*, 569 S.W.3d 116, 124-25 (Tex. 2018) (when there is a condition precedent to contract formation, a court has "an opportunity to decide at the outset" whether the condition is satisfied because it "goes to contract formation"); *In re Morgan Stanley & Co.*, 293 S.W.3d 182, 186-87 (Tex. 2009) (adopting this rule for capacity and authority to contract); *see also New Prime Inc. v. Oliveira*, 586 U.S. 105, 110-12 (2019) (applying this rationale to statutory exemptions under the FAA). Thus, under the express terms of the TAA, there is no valid agreement to arbitrate between any Plaintiff and any Defendant.



Copy from re:SearchTX

According to Defendants, the arbitration provision in each Camper's Agreement pertains to Campers' personal injuries. The provision purports to cover "[a]ll disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement."[47] Assuming Defendants' interpretation is correct, the Agreements are subject to the requirements of Section 171.002. Additionally, each Camper's family paid less than $8,500 in consideration for Camp Mystic's services, including enrollment in and participation at the camp,[48] which also makes the Agreements subject to the requirements of Section 171.002.

It is undisputed that, despite the requirements of Section 171.002, each Agreement was signed by only one party—the Campers' parents. None of the Defendants signed the Agreements, and no attorney signed the Agreements. As such, the arbitration provisions are not valid under the TAA and cannot be enforced by any of the Defendants. *See e.g.*, *In re Godt*, 28 S.W.3d 732, 739 (Tex. App.—Corpus Christi–Edinburg 2000, orig. proceeding) (holding arbitration agreement unenforceable under the TAA where signatory was not acting on the advice of counsel when she signed the agreement, and agreement was not signed by an attorney representing either party).

For this reason, Defendants' Motions to Compel should be denied.

## IV. Even if the FAA governs, Defendants have not established their entitlement to invoke the arbitration provisions.

Even if the FAA governs, Defendants have not established a valid arbitration agreement between any Plaintiff and any Defendant—none of whom signed the Participation Agreements.[49] "Whether a non-signatory can compel arbitration pursuant to an arbitration clause questions the existence of a valid arbitration clause between specific parties and is therefore a gateway matter for the court to decide." *In re Rubiola*, 334 S.W.3d 220, 224 (Tex. 2011).

[47] Participation Agreements at 2.
[48] Campers' Parents' Declarations ¶ 15; *see also* Counselors' Parents' Declarations ¶ 15.
[49] *See generally* Participation Agreements.



Copy from re:SearchTX

Whether non-signatory Defendants can compel Plaintiffs to arbitrate is a critical question. "The involvement of a non-signatory is an important distinction because a party cannot be forced to arbitrate absent a binding agreement to do so. The question is not whether [Plaintiff] agreed to arbitrate with someone, but whether a binding arbitration agreement exists between [that Plaintiff] and the [non-signatory Defendants]." *Jody James Farms, JV v. Altman Group, Inc.*, 547 S.W.3d 624, 632 (Tex. 2018). "If the agreement does not expressly identify all the parties to the agreement, the question of whether a valid arbitration clause exists between specific parties is ultimately a function of the intent of the parties, as expressed by the terms of the agreement." *Golden Age Senior Living of El Paso, LLC v. Atwood*, 486 S.W.3d 44, 47 (Tex. App.—El Paso 2016, no pet.).

Defendants have not established that they are parties to the Agreements, let alone to the arbitration provisions. As such, they have not proven that a valid and binding arbitration agreement exists between ***any*** Plaintiff and ***any*** Defendant—much less ***all*** of them.

**A. None of the Defendants is a party to the Participation Agreements.**

As a general proposition, "an arbitration clause cannot be invoked by a non-party to the arbitration contract." *G.T. Leach Builders, LLC v. Sapphire V.P.*, 458 S.W.3d 502, 524 (Tex. 2015) (internal quotation marks omitted). None of the Defendants signed the Participation Agreements, so each must "establish that they have a valid legal right to enforce [the Participation Agreement]'s arbitration agreement." *Id*. The Court must "apply ordinary principles of state contract law to determine whether there is a valid agreement to arbitrate." *Id*. (cleaned up).

For an agreement to be valid and enforceable, it must be sufficiently definite to allow a court to understand the obligations of each party. *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992). Because none of them signed the Participation Agreements, Defendants' Motions fail at this most basic level. "Typically, a party manifests its assent by signing an agreement." *Rachal v. Reitz*, 403 S.W.3d 840, 845 (Tex. 2013).



Copy from re:SearchTX

Unsurprisingly, identifying the names of contracting parties is an essential contract term. *See, e.g.*, *McCalla v. Baker's Campground, Inc.*, 416 S.W.3d 416, 418 (Tex. 2013) (holding that agreement to settle lawsuit and sell real property "contain[ed] all material terms and [was] an enforceable contract" where it included *inter alia* the identities of the transferor and transferee); *Dobson v. Metro Label Corp.*, 786 S.W.2d 63, 65 (Tex. App.—Dallas 1990, no writ) (stating that elements of a valid contract "includ[e] an identification of both the subject matter of the contract ***and the parties to the contract***") (emphasis added). The reason for this principle is self-evident: Where no counterparty signed the agreement or is otherwise identified in it, it cannot be said that "the parties executed and delivered the contract with the intent that it be ***mutual*** and binding." *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n. 21 (Tex. 2018) (emphasis added).

The arbitration provision upon which Defendants rely does not expressly name the parties who are subject to its terms. Instead, the arbitration provision only refers to "[t]he parties hereto."[50] But neither the arbitration provision nor the Participation Agreements defines the "parties hereto" or otherwise identifies who is bound to arbitrate.

In fact, the only persons expressly identified as parties to the Participation Agreements are the Campers' "Parent[s] or legal guardian[s]," who executed the Agreements and thereby "acknowledge[d] and agree[d]" to and "accept[ed] the terms and conditions of this Agreement."[51] But the Agreements do not identify any counterparties, provide signature blocks for counterparties to execute the Agreements, or include the signatures of any other person or entity. In other words, the Agreements memorialize a one-sided series of promises. If a Camper were denied attendance at Camp Mystic, who could be sued to enforce the Participation Agreement? It does not say.

---

[50] *Id*. at 2.
[51] *Id*. at 1, 3.



Copy from re:SearchTX

Although the signatory parents "acknowledge and agree" to the terms of the Agreements "[i]n consideration of the services of Camp Mystic,"[52] Camp Mystic itself is never identified as a party to the Agreements (or to the arbitration provisions), and it did ***not*** execute the Agreements. Indeed, there is no indication that "Camp Mystic" (which appears to be an assumed or trade name) is a legally cognizable entity that could enter into a contract. *See Kahn v. Imperial Airport, L.P.*, 308 S.W.3d 432, 438 (Tex. App.—Dallas 2010, no pet.) (noting "it is well-settled that a trade name has no legal existence," and holding that one who purports to enter into contract under an assumed or trade name only binds himself because there is no other legal entity to be bound).

For this reason, Defendants have not established an agreement to arbitrate between any Plaintiff and any Defendant. *See Golden Age*, 486 S.W.3d at 47 ("Because Appellants did not personally sign the arbitration agreement, there is no evidence they made an offer to [the plaintiff], or accepted one from him, to arbitrate any legally-recognized claims[.]"); *Peguero v. Freishtat*, No. 02-25-00299-CV, 2025 WL 2942405, at *21 (Tex. App.—Fort Worth Oct. 16, 2025, no pet.) (court did not abuse discretion in refusing to compel arbitration of claims against non-signatories where the arbitration clauses did not identify non-signatories "clearly enough to conclude that [arbitration clauses] reached Plaintiffs' claims against [non-signatories]"); *Sunbelt Sec., Inc. v. Mandell*, No. 01-21-00209-CV, 2023 WL 1112514, at *13-14 (Tex. App.—Houston [1st Dist.] Jan. 31, 2023, pet. denied) (affirming denial of motion to compel arbitration where agreement containing arbitration clause did not identify the parties to it); *VSR Fin. Services, Inc. v. McLendon*, 409 S.W.3d 817, 828-30 (Tex. App.—Dallas 2013, no pet.) (court did not abuse discretion in denying motions to compel arbitration where the movant was not a named party to agreements containing arbitration provision or otherwise identified as a party to those agreements).

---

[52] *Id*. at 1.



Copy from re:SearchTX

### B. The non-signatory Defendants cannot enforce the arbitration provision.

Recognizing that they cannot enforce the arbitration provision as parties to the Agreements, several non-signatory Defendants seek to compel arbitration on other grounds. All are meritless. If these Defendants wanted an enforceable right to arbitrate, they could have made themselves parties to the Participation Agreements with enforceable obligations—but they did not do so.

#### 1. "Released Parties" are not the same as "parties hereto."

First, in an effort to generate arbitration rights for Camp Mystic, LLC, Natural Fountains, Family Partnership, and William Bonner,[53] Defendants try to insert into the arbitration provision language from the wholly distinct release and indemnity provision regarding "Released Parties." This far-fetched argument is meritless.

The Participation Agreements contain a release and indemnity section providing for the "indemnif[ication], release and discharge" of certain "Released Parties."[54] This section is wholly contained in a single paragraph, entitled "Agreements of Release and Indemnity," and is set apart from the rest of the Agreement by all capital font.[55] The release and indemnity section defines "Released Parties" to include "Camp Mystic, Natural Fountain Properties, Inc., and their respective owners, members, directors, officers, employees, contractors and volunteers (individually and collectively . . . )."[56] The term "Released Party" (or "Released Parties") is used only in the release and indemnity section and nowhere else in the Agreement.[57]

---

[53] Defendants do not contend that Camps Management or the individual Eastland Defendants in their individual capacities are "Released Parties" who qualify as "parties hereto" for purposes of the arbitration provisions.
[54] Participation Agreements at 2.
[55] *Id.*
[56] *Id.*
[57] *See generally* Participation Agreements.



Copy from re:SearchTX

By contrast, the arbitration provision never employs the term "Released Parties."[58] Instead, the arbitration provision—which is set apart from the release and indemnity section by the heading, "Binding Arbitration"—uses the generic term "parties."[59] Under standard drafting conventions, that term would ordinarily refer to parties to the Participation Agreement—if any were identified. *E.g.*, *Ferguson Braswell Fraser & Kubasta, P.C. v. SAF Oilfield I, LLC*, No. 02-22-00171-CV, 2023 WL 415616, at *10 (Tex. App.—Fort Worth Jan. 26, 2023, no pet.) (noting "'parties hereto'" was a contract's "preferred phrase when limiting its reach to the signatories."). But as noted above, none of the Defendants is identified as a party to the Participation Agreements.

Texas courts presume that every word and phrase in a contract is chosen deliberately and has independent meaning. *See Webster*, 128 S.W.3d at 229. These drafters used the defined term "Released Parties" in the release and indemnity section. Had they intended the arbitration clause to extend to all "Released Parties," they would have included that term in the arbitration provision. But they did not do so, and this Court cannot rewrite the Agreements to insert terms for which the parties did not bargain.

Defendants' effort to blur the distinction between "Released Parties" and "parties hereto" is unsupported by the language of the Agreements and would render the distinction meaningless—an outcome that Texas courts cannot accept. *Natgasoline*, 566 S.W.3d at 886 ("Ignoring the uncapitalized use of 'parties' in favor of applying the defined, capitalized term would vitiate the sub-subcontract's distinction between 'Parties' and 'parties.' We decline to apply an interpretation of the sub-subcontract that would render these distinctions meaningless."). The Court should reject Defendants' unreasonable interpretation of the Participation Agreements.

---

[58] *Id*. at 2.
[59] *Id*.



Copy from re:SearchTX

### C. Defendants' reliance on the "intertwined claims estoppel theory" is invalid.

#### 1. Texas does not recognize the "intertwined claims estoppel theory," which would be preempted in any event.

Natural Fountains, Family Partnership, and Camps Management[60] contend that even if they do not qualify as "parties hereto" for purposes of the arbitration provision, they are nevertheless entitled to enforce the arbitration agreements based on an "intertwined claims estoppel theory"—a theory of judicial convenience imported wholesale from the Second Circuit Court of Appeals. Neither the Texas Supreme Court nor the Austin Court of Appeals has adopted this novel theory, and Defendants do not give a reason for this Court to do so now. *Jody James*, 547 S.W.3d at 639; *see also Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 632 (2009) (explaining that "a litigant who was not a party to the relevant arbitration agreement" may only invoke the FAA "if the relevant state contract law allows him to enforce the agreement").

Moreover, this novel theory would be preempted by the FAA. As the U.S. Supreme Court explained in *Morgan v. Sundance, Inc.*, courts analyzing arbitration agreements under the FAA may not adopt "custom-made rules[] to tilt the playing field in favor of (or against) arbitration." 596 U.S. 411, 419 (2022). The aim of the FAA is to "place [arbitration] agreements upon the same footing as other contracts." *Id*. at 418. Thus, any rule that makes an arbitration agreement not just "as enforceable as other contracts" but "more so" is preempted by federal law. *Id*.; *Jody James*, 547 S.W.3d at 639-40. The FAA's refusal to "foster[] arbitration" with rules that favor arbitration over litigation (*Morgan*, 596 U.S. at 418) is particularly germane when a court is deciding whether a valid agreement between the parties even exists, because at that phase no federal presumption in favor of arbitration applies. *See Webster*, 128 S.W.3d at 227.

---

[60] Defendants do not contend that the intertwined claims theory applies to Camp Mystic, LLC, Defendant William Bonner, or the individual Eastland Defendants in their individual capacities.



Copy from re:SearchTX

"Intertwined claims estoppel" is precisely the sort of "custom-made rule[]" that *Morgan* declares to be preempted. Far from being an ordinary rule of contract law, the theory operates ***only*** in the forum selection context on an *ad hoc*, case-by-case basis as an excuse for dragging a plaintiff into arbitration just because a non-signatory to the arbitration agreement has a "close relationship" with a signatory. *Jody James*, 547 S.W.3d at 639. And unlike direct benefits estoppel—"the only form of equitable estoppel recognized in Texas" (*Glassell Producing Co., Inc. v. Jared Res., Ltd.*, 422 S.W.3d 68, 82 (Tex. App.—Texarkana 2014, no pet.))—intertwined claims estoppel wholly ignores whether the non-signatory is "deliberately seek[ing] and obtain[ing] substantial benefits from the contract itself." *Taylor Morrison of Tex., Inc. v. Ha*, 660 S.W.3d 529, 533 (Tex. 2023) (cleaned up). The mere fact that a non-signatory may have engaged in a commercial relationship with a signatory is insufficient to demonstrate that the plaintiff consented to arbitrate its claims with that non-signatory. *See Jody James*, 547 S.W.3d at 639 ("[A]rbitration is a matter of consent, not coercion." (internal quotation marks omitted)). This "custom-made rule" cannot stand in the face of *Morgan* and it should not be adopted for the first time in Texas.

**2. Defendants cannot satisfy "intertwined claims estoppel."**

Defendants also have not established that intertwined claims estoppel would even apply to Natural Fountains, Family Partnership, or Camps Management. If adopted, this estoppel theory would permit non-signatories to compel arbitration if "(1) they have a 'close relationship' with a signatory to a contract with an arbitration agreement and (2) the claims are intimately founded in and intertwined with the underlying contract obligations." *Id*. (internal quotation marks omitted). Plaintiffs' claims against Natural Fountains, Family Partnership, and Camps Management—negligence, gross negligence, premises liability, and intentional infliction of emotional distress—sound only in tort law, not contract.



Copy from re:SearchTX

Put another way, the legal duties that Defendants breached were not "contract obligations." *See Nghiem v. Sajib*, 567 S.W.3d 718, 724 (Tex. 2019) ("[B]reach of a duty created by contract gives rise to a contract claim, whereas breach of a duty imposed by operation of law gives rise to a tort claim."). Because Plaintiffs' "claims are not rooted in the underlying . . . agreement that contains an arbitration clause, any argument premised on 'intertwined-claims' estoppel . . . fail[s]." *Black v. Diamond Offshore Drilling*, 551 S.W.3d 346, 354-55 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *see also Knox Waste Serv. v. Sherman*, No. 11-19-00407-CV, 2021 WL 4470876, at *11 (Tex. App.—Eastland Sept. 30, 2021, no pet.) (claims "sound[ing] in tort law" were not sufficiently "intertwined with the underlying contract" to trigger intertwined claims estoppel).

Further, the theory "does not apply whenever a relationship of ***any kind*** may be found among the parties to a dispute and their dispute deals with the subject matter of an arbitration contract made by one of them." *Natgasoline*, 566 S.W.3d at 888 (cleaned up; emphasis added). The required relationship must "typically involve some corporate affiliation between a signatory and non-signatory, not just a working relationship." *Jody James*, 547 S.W.3d at 640. But here, Defendants have not provided evidence to establish that any of them has a "close relationship" with another Defendant that would be sufficient to establish the intertwined claims estoppel theory. Defendants deny Plaintiffs' allegations that they are participants in a joint enterprise, and mere "independent participants in a business transaction" cannot invoke intertwined claims estoppel. *Id.* (holding that the theory would not apply to "independent and distinct entities"). Unless Defendants are prepared to admit the joint enterprise allegations, they cannot claim that a signatory to the Participation Agreements would have expected to litigate claims against non-signatory Defendants "in the same manner [she] agreed to litigate disputes with" any Defendant the Court might find to be a party to the Participation Agreements. *Id.* Defendants cannot have it both ways.



Copy from re:SearchTX

**D. Even if valid arbitration agreements existed, the Court would still need to decide whether Plaintiffs' claims against the non-signatories are arbitrable.**

Defendants maintain that if the FAA governs and the arbitration provisions are enforceable by each Defendant, the Court cannot decide the arbitrability of Plaintiffs' claims because that issue has been delegated to an arbitrator. That is not true. The delegation clause in the arbitration provision would only be effective as to any Defendant the Court found to be a party to the Participation Agreements. It would not be effective as to any non-signatory Defendant who is allowed to enforce the arbitration provision on some derivative basis.

The Texas Supreme Court holds a contract that neither "expressly provide[s] that certain non-signatories are considered parties" nor unmistakably incorporates the AAA rules "for disputes between [the plaintiff] and unspecified third parties" does not unmistakably delegate to an arbitrator the determination of whether claims against a non-signatory are arbitrable. *Jody James*, 547 S.W.3d at 631-33 (court adjudication of arbitrability is favored unless there is "clear and unmistakable evidence of the parties' intent to submit that matter to arbitration"); *see Scott v. Grim*, No. 05-23-01250-CV, 2024 WL 4532963, at *3 (Tex. App.—Dallas Oct. 21, 2024, no pet.) (explaining that under *Jody James*, "a contract that incorporates the AAA rules but is silent about arbitrating claims against non-signatories does not unmistakably delegate to the arbitrator the determination of whether such claims are subject to arbitration"). If "the parties did *not* agree to submit the arbitrability question itself to arbitration, then the court should decide that question . . . independently." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995).

It would be premature to decide whether the claims against the non-signatory Defendants fall within the scope of the arbitration provision because Defendants have not briefed that issue. *See Webster*, 128 S.W.3d at 227 (movant bears the burden of proving that a claim falls within the scope of an arbitration agreement). And if the Motions are denied, the issue will not even arise.



Copy from re:SearchTX

Nevertheless, because the Participation Agreements are "silent about arbitrating claims against non-signatories" (*Jody James*, 547 S.W.3d at 632), if the Court grants Defendants' Motions it would be necessary to consider whether Plaintiffs' claims against the non-signatory Defendants are within the scope of the arbitration provisions. *Id*. at 632-33. Plaintiffs reserve the right to address that issue, if necessary, at the appropriate time.

**E. At worst, the Participation Agreements are ambiguous and the Court should find that Plaintiffs did not agree to arbitrate with non-signatory Defendants.**

For the reasons set forth above, the Court should rule that none of the Defendants is a party to an arbitration agreement with any Plaintiff based on the unambiguous face of the Agreements. At the very least, the Participation Agreements are patently ambiguous as to whether the Campers' parents agreed to arbitrate with anyone (and if so, whom), because the identity of "parties hereto" cannot be determined from the face of the Agreements alone. In the face of such an ambiguity, "extrinsic evidence may be used to determine the intent of the parties." *Gallagher Headquarters Ranch Dev., Ltd. v. City of San Antonio*, 303 S.W.3d 700, 702 (Tex. 2010).

When the Campers' parents signed the Participation Agreements, they were not aware of the Camp's organizational structure and were unfamiliar with the Defendants who are now trying to invoke the arbitration provision to compel arbitration.[61] No one from Camp Mystic ever spoke to the parents about the arbitration provision, and nothing in the Participation Agreements indicated to the parents who (if anyone) they were agreeing to arbitrate claims against.[62] As such, if the Court finds an ambiguity and considers extrinsic evidence, it should find that Plaintiffs did not enter into an agreement to arbitrate with any of the non-signatory Defendants.

[61] Campers' Parents' Declarations ¶ 12; *see also* Counselors' Parents' Declarations ¶ 12.
[62] Campers' Parents' Declarations ¶¶ 11-13; *see also* Counselors' Parents' Declarations ¶¶ 11-13.



Copy from re:SearchTX

**V. The Court should deny Defendants' Motions to Stay.**

Even if the Court compels arbitration of Plaintiffs' claims against any Defendant, it should not stay the litigation as to the other Defendants.

First, Defendants request a stay under the TAA. Tex. Civ. Prac. & Rem. Code § 171.021(c). But when an arbitration agreement is subject to Tex. Civ. Prac. & Rem. Code § 171.002(a)(2)-(3), Chapter 171 "does not apply." Tex. Civ. Prac. & Rem. Code § 171.002(a). That is the case here, *see* pp. 12-13, *supra,* so by its express terms, the TAA stay provision "does not apply."

Second, Defendants seek a stay under the FAA, 9 U.S.C. § 3. But contrary to the Motions, the FAA does not say that a court must stay "proceedings on the issue." It simply says the court "shall . . . stay ***the trial of the action*** until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3 (emphasis added). It is grossly premature to seek a stay of "the trial of the action" at this early date in the litigation, and it would be imprudent to prejudge the various changed circumstances that might avoid the need for such a stay by the time of trial. This Court retains the discretion to grant or deny a broader stay. "That decision is one left to . . . the state trial court under applicable state procedural rules[] as a matter of its discretion to control its docket." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 21 n.23 (1983). The Court should exercise its discretion to deny the request for a stay.

Section 3 of the FAA does not mandate an automatic stay of claims against non-signatories. *See Complaint of Hornbeck Offshore (1984) Corp.*, 981 F.2d 752, 755 (5th Cir. 1993) (stating that claims involving non-signatories "are unaffected by any stay granted under § 3 [of the FAA]"). When a court relies upon its discretionary authority to stay non-arbitrable claims, the court should consider whether a stay will "unduly prejudice the parties, or create undue hardship." *Peguero*, 2025 WL 2942405, at *24 (internal quotation marks omitted). In this case, those considerations are compelling, so the Court should deny the request for a stay.



Copy from re:SearchTX

Staying Plaintiffs' claims against any of the non-signatory Defendants would undoubtedly cause substantial prejudice to Plaintiffs. Delaying the adjudication of Plaintiffs' claims would risk the degradation of critical evidence—both physical evidence at the camp and witness testimony. It would inflict emotional cruelty on grieving families who would be forced to wait for justice while a private arbitration panel adjudicates claims that might be related but might not involve the parties who should ultimately be held accountable for one of the greatest tragedies in Texas history. And it would disserve the public interest, as the citizens of Texas have a profound and legitimate public interest in seeing this case resolved in the sunlight of the Texas courts.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motions to Compel Arbitration and Motions to Stay and award Plaintiffs such other relief to which they may be entitled.

May 6, 2026

Respectfully submitted,

ARNOLD & ITKIN LLP

*/s/ J. Kyle Findley*
Kurt B. Arnold
State Bar No. 24036150
karnold@arnolditkin.com
J. Kyle Findley
State Bar No. 24076382
kfindley@arnolditkin.com
Kala F. Sellers
State Bar No. 24087519
ksellers@arnolditkin.com
John G. Grinnan
State Bar No. 24087633
jgrinnan@arnolditkin.com
6009 Memorial Drive
Houston, Texas 77007
(713) 222-3800
(713) 2220-3850 – Fax
e-service@arnolditkin.com

YETTER COLEMAN LLP

*/s/ R. Paul Yetter*
R. Paul Yetter
State Bar No. 22154200
pyetter@yettercoleman.com
Justin P. Tschoepe
State Bar No. 24079480
jtschoepe@yettercoleman.com
J. Reid Simpson
State Bar No. 24072343
jrsimpson@yettercoleman.com
Shannon N. Smith
State Bar No. 24110378
ssmith@yettercoleman.com
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000



Copy from re:SearchTX

BECK REDDEN LLP

*/s/ Russell S. Post*
Russell S. Post
State Bar No. 00797258
rpost@beckredden.com
Alyssa McDaniel
State Bar No. 24094831
amcdaniel@beckredden.com
1221 McKinney, Suite 4500
Houston, Texas 77010-2010
(713) 951-3700
(713) 951-3720 – Fax

ATTORNEYS FOR *GETTEN* PLAINTIFFS

MITHOFF LAW

*/s/ Richard Warren Mithoff*
Richard Warren Mithoff
State Bar No. 14228500
rmithoff@mithofflaw.com
Warner V. Hocker, *Of Counsel*
State Bar No. 24074422
whocker@mithofflaw.com
500 Dallas Street, Suite 3450
Houston, Texas 77002
(713) 654-1122

BECK REDDEN LLP

*/s/ Russell S. Post*
Russell S. Post
State Bar No. 00797258
rpost@beckredden.com
Alyssa McDaniel
State Bar No. 24094831
amcdaniel@beckredden.com
1221 McKinney, Suite 4500
Houston, Texas 77010-2010
(713) 951-3700
(713) 951-3720 – Fax

ATTORNEYS FOR *BELLOWS* PLAINTIFFS

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing document was served upon all known counsel of record via electronic means in accordance with the Texas Rules of Civil Procedure on this the 6th day of May, 2026.

*/s/ Russell S. Post*
Russell S. Post



Copy from re:SearchTX

# EXHIBIT 01

Copy from re:SearchTX

FILED
In the Office of the
Secretary of State of Texas

DEC 21 2012

Corporations Section

**CERTIFICATE OF AMENDMENT TO THE
ARTICLES OF INCORPORATION OF
NATURAL FOUNTAINS PROPERTIES, INC.**

Pursuant to the provisions of the Texas Business Organizations Code, the undersigned hereby certifies as follows:

**ARTICLE I.**

The name of the corporation is Natural Fountains Properties, Inc. ("Corporation"). The filing number issued by the Secretary of State of Texas for Corporation is 13315900 and Corporation's date of formation is May 31, 1956.

**ARTICLE II.**

The following amendments to the Articles of Incorporation were approved in the manner required by the Texas Business Organizations Code and the governing documents of Corporation:

A. Article Nine of the Articles of Incorporation of Corporation is hereby added to deny the shareholders a right to cumulative voting as shall read as follows:

"ARTICLE NINE

The right of cumulative voting shall not be available to each shareholder entitled to vote for election of directors."

B. Article Ten of the Articles of Incorporation of Corporation is hereby added to permit the shareholders of Corporation the right to take action by less than unanimous written consent and shall read as follows:

"ARTICLE TEN

Any action required to be taken at any annual or special meeting of the shareholders, or any action which may be taken at any annual or special meeting of the shareholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the shareholders having not less than the minimum number of votes necessary to take such action at a meeting at which the shareholders entitled to vote on the aetion were present and voted, sign a written consent or consents stating the actions taken."

C. Article Eleven of the Articles of Incorporation of Corporation is hereby added to permit a change in the required shareholder vote in connection with certain "fundamental actions" and "fundamental business transactions," as such terms are defined in the Texas Business Organizations Code and shall read as follows:

C:\Documents and Settings\Tweety.MYSTIC\Local Settings\Temporary Internet Files\OLKB1\Amend Articles of Incorp of NFP (01).doc

RECEIVED
DEC 21 2012
Secretary of State



Copy from re:SearchTX

"ARTICLE ELEVEN

The affirmative vote of the holders of a majority of the outstanding shares or, if applicable, a majority of the outstanding shares of a class or series entitled to vote on or approve any matter or action as to which the Texas Business Organizations Code (the "Code") requires a vote of two-thirds or any other specified portion of the shares will be sufficient to effect the matter or action subject to that vote, notwithstanding the vote required by the Code."

D. Article Twelve of the Articles of Incorporation of Corporation is hereby added to deny preemptive rights to the shareholders of Corporation and shall read as follows:

"ARTICLE TWELVE

Unless otherwise determined by the directors of the corporation, no holders of shares of the corporation shall be entitled as such as a matter of right to purchase or subscribe for any shares of any class which the corporation may issue or sell, whether or not exchangeable for any shares of the corporation of any class or classes and whether or not there are unissued shares authorized by the Articles of Incorporation of the corporation as originally filed, or by any amendment thereof, or out of shares of the corporation acquired by it after the issue thereof and whether issued for cash, labor done, personal property or real property, or leases thereof, nor shall a shareholder be entitled to any right of subscription to any thereof; nor, unless otherwise determined by the directors of the corporation, shall any holder of any shares of the corporation be entitled as such, as a matter of right, to purchase or subscribe for any obligation which the corporation may issue or sell that shall be convertible into or exchangeable for any shares of the corporation of any class or classes, or to which shall be attached or appended any warrant or warrants or other instrument or instruments which shall convey upon or grant the holder or holders of such obligation the right to subscribe for or purchase from the corporation any shares of any class or classes."

E. Article Thirteen of the Articles of Incorporation of Corporation is hereby added to include a limitation on liability of the directors of Corporation and shall read as follows:

"ARTICLE THIRTEEN

The directors of the corporation will not be liable to the corporation or its shareholders for monetary damages for acts or omissions that occur in the directors' capacity as directors. This article does not limit the directors' liability for acts or omissions for: (a) a breach of the duty of loyalty to the corporation or its shareholders; (b) a bad-faith breach of a director's duty to the corporation, intentional misconduct, or a knowing violation of the law; (c) a transaction from which a director received an improper benefit, whether or



Copy from re:SearchTX

not the benefit resulted from an action taken within the scope of the director's office; or (d) an act or omission for which a director's liability is expressly provided by statute. If the Code or other applicable law is amended to authorize action further eliminating or limiting the liability of directors, then the liability of a director of the corporation shall be eliminated or limited to the fullest extent permitted by the Code or other applicable law, as so amended.

Any repeal or modification of the foregoing paragraph by the shareholders shall not adversely affect any right or protection of a director existing at the time of such repeal or modification."

## ARTICLE III.

This Certificate of Amendment to the Articles of Incorporation shall become effective when it is filed by the Secretary of State of Texas.

## ARTICLE IV.

The undersigned signs this Certificate of Amendment subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

EXECUTED this 21st day of December 2012.

**NATURAL FOUNTAINS PROPERTIES, INC.,**
a Texas corporation

By: Richard G. Eastland
Richard G. Eastland, Chief Executive Officer







Copy from re:SearchTX

# EXHIBIT 02

Copy from re:SearchTX

55 5/21/56

Approved & filed in the office of the Secretary of State
This 31 day of May 1956
[signature]
Chief Charter Division

# ARTICLES OF INCORPORATION
# OF
# CAMP MYSTIC, INC.

We, the undersigned natural persons of the age of twenty-one years or more, at least two of whom are residents of the State of Texas, acting as incorporators of a corporation under the Texas Business Corporation Act, do hereby adopt the following Articles of Incorporation for such corporation:

## ARTICLE ONE

The name of the Corporation is CAMP MYSTIC, INC.

## ARTICLE TWO

The period of its duration is perpetual.

## ARTICLE THREE

The purpose or purposes for which the corporation is organizing are:

To acquire, own, operate and develop camping and outing resorts; to take over the stock and property of other companies as deemed desirable; to lease or purchase grounds and equipment necessary or advisable for the conduct of the business, and to engage in the buying and selling of merchandise; and to transact all other business incidental thereto not inconsistent with the laws;

To construct, own, lease, equip, operate, manage and maintain golf courses and country clubs, hotels and tourist courts, inns, taverns, restaurants, cafes and to give and conduct entertainment for hire and profit; to erect or repair any building or improvement, and to purchase and sell real property; to lease lands believed to contain petroleum, oils and gas, and to improve, mortgage, lease, assign and otherwise dispose of the same; to purchase or otherwise acquire and to hold, own, maintain, work, develop, sell, lease, exchange, hire, convey, mortgage, or otherwise dispose of and deal in, lands and lease holds, and any interest, estate and rights in real property; provided, however, no lands shall be purchased by said corporation in contravention of Ch. 4 of Title 32, R.C.S., as now existing or hereafter amended.





Copy from re:SearchTX

To acquire by purchase, subscription or otherwise, and to receive, hold, own, guarantee, sell, assign, exchange, transfer mortgage, pledge or otherwise dispose of or deal in and with any of the shares of the capital stock, or any voting trust certificates in respect of the shares of capital stock, scrip, warrants, rights, bonds, debentures, notes, trust receipts, and other securities, obligations, choses in action and evidence of indebtedness or interest issued or created by any corporation, joint stock companies, syndicates, associations, firms, trusts or persons, public or private, or by the government of the United States of America, or by any foreign government, or by any state, territory, province, municipality or other political subdivision or by any governmental agency, and as owner thereof to possess and exercise all the rights, powers and privileges of ownership, including the right to execute consents and vote thereon, and to do any and all acts and things necessary or advisable for the preservation, protection, improvement and enhancement in value thereof.

ARTICLE FOUR

The aggregate number of shares which the corporation shall have authority to issue is two thousand (2,000) of the par value of Five Dollars ($5.00) each.

ARTICLE FIVE

The corporation will not commence business until it has received for the issuance of its shares consideration of the value of One Thousand Dollars ($1,000.00), consisting of money, labor done or property actually received, which sum is at least equal to ten per cent (10%) of the total capitalization of said corporation and not less than $1,000.00.

ARTICLE SIX

The post office address of its initial registered office is Hunt, Texas, and the name of its initial registered agent at such address is Frank C. Harrison.



Copy from re:SearchTX

ARTICLE SEVEN

The number of directors constituting the initial board of directors is six (6), and the names and addresses of the persons who are to serve as directors until the first annual meeting of the shareholders or until their successors are elected and qualified are:

| Name | Address |
| --- | --- |
| Frank C. Harrison | Camp Mystic<br>Hunt, Texas |
| Mrs. Agnes D. Stacy | 2425 Vista Lane<br>Austin, Texas |
| W. G. Stacy, Jr. | 3713 Overbrook Lane<br>Houston, Texas |
| Mrs. Inez G. Harrison | Camp Mystic<br>Hunt, Texas |
| S. Eastland, Jr. | 2200 Gulf Bldg.<br>Houston 2, Texas |
| Mrs. Anne S. Eastland | 307 E. Cowan Drive<br>Houston 7, Texas |

ARTICLE EIGHT

The names and addresses of the incorporators are:

| Name | Address |
| --- | --- |
| Frank C. Harrison | Camp Mystic<br>Hunt, Texas |
| Mrs. Agnes D. Stacy | 2425 Vista Lane<br>Austin, Texas |
| Mrs. Anne S. Eastland | 307 E. Cowan Drive<br>Houston 7, Texas |

IN WITNESS WHEREOF, we have hereunto set our hands, this 31 day of May, 1956.

Frank C. Harrison
Frank C. Harrison

Mrs. Agnes D. Stacy
Mrs. Agnes D. Stacy

Mrs. Anne S. Eastland
Mrs. Anne S. Eastland





Copy from re:SearchTX

THE STATE OF TEXAS )
COUNTY OF )

I, Fred J Sublette, a notary public do hereby certify that on this 31 day of May, 1956, personally appeared before me FRANK C. HARRISON, who being by me first duly sworn, declared that he is the person who signed the foregoing document as incorporator, and that the statements therein contained are true.

Fred J Sublette
Notary Public
in and for
Travis County, Texas

THE STATE OF TEXAS )
COUNTY OF )

I, Fred J Sublette, a notary public do hereby certify that on this 31 day of May, 1956, personally appeared before me MRS. AGNES D. STACY, who being by me first duly sworn, declared that she is the person who signed the foregoing document as incorporator, and that the statements therein contained are true.

Fred J Sublette
Notary Public
in and for
Travis County, Texas

THE STATE OF TEXAS )
COUNTY OF )

I, Fred J Sublette, a notary public do hereby certify that on this 31 day of May, 1956, personally appeared before me MRS. ANNE S. EASTLAND, who being by me first duly sworn, declared that she is the person who signed the foregoing document as incorporator, and that the statements therein contained are true.

Fred J Sublette
Notary Public
in and for
Travis County, Texas



Copy from re:SearchTX

# EXHIBIT 03

Copy from re:SearchTX

# LEASE AGREEMENT

**THIS LEASE AGREEMENT** (this "**Lease**") is made and entered into effective as of the 1st day of January, 2019 (the "**Effective Date**"), by and between NATURAL FOUNTAINS PROPERTIES, INC., a Texas corporation ("**Landlord**"), and CAMP MYSTIC, INC., a Texas corporation ("**Tenant**") (collectively referred to herein as the "**Parties**," or each individually, as a "**Party**").

Recitals

WHEREAS, the Parties executed that certain Ground and Building Lease dated effective as of August 1, 2013 covering the Property described herein (the "**Existing Lease**");

WHEREAS, the Parties desire to enter into a new lease based upon certain material changes in circumstances;

WHEREAS, the Landlord has recently expended approximately [redacted] in substantial capital improvements to buildings, structures, appurtenances and other improvements to the Property; and

WHEREAS, the said capital improvements constitute material and substantial benefits to the Tenant, including increased revenues for Tenant's business.

IN CONSIDERATION of the foregoing as well as the mutual covenants, terms and conditions set forth herein, the Parties hereby agree as follows:

1. **TERMINATION OF EXISTING LEASE**: The Existing Lease is hereby terminated as of December 31, 2018.

2. **LEASE OF PROPERTY**: Landlord hereby leases to Tenant, and Tenant does hereby lease from Landlord, the grounds and property described on Exhibit "A", attached hereto and incorporated by reference herein, including all buildings, structures, appurtenances and improvements located thereon (the "**Improvements**") (the Improvements as well as the grounds and property described in Exhibit "A" are collectively referred to herein as the "**Property**").

3. **USE**: Tenant's use of the Property shall be for the operation of a faith based Camp for youth and, as Tenant deems appropriate, church groups and other similar uses and activities. Tenant shall use, operate and maintain Property in the same manner in which it has used, operated and maintained prior to the Effective Date. Tenant shall comply with all laws, ordinances, orders, rules, and regulations (state, federal, municipal and other governmental agencies or bodies having jurisdiction thereof) with respect to the use, condition or occupancy of the Property.

4. **TERM**: The term of this Lease (the "**Term**") shall commence on January 1, 2019 (the "**Commencement Date**"), and shall automatically renew annually on the anniversary of the Commencement Date ("Anniversary Date") unless a Party provides written notice of termination to the other Party at least ninety days prior to the next Anniversary Date or unless terminated sooner pursuant to the provisions hereof.



Copy from re:SearchTX

5. **RENT:** Tenant shall pay rent ("Rent") as follows: (i) Monthly Rent of [redacted] per month. Monthly Rent shall be due and payable in advance each month commencing on January 1, 2019 and continuing on the 1st day of each successive month thereafter during the Term and any extended Term; (ii) As additional Rent, Tenant shall, within sixty (60) days of Tenant's fiscal year-end, pay annual Rent to Landlord in an amount equal to [redacted] Tenant's net cash flow from Tenant's business operations conducted on the Property during Tenant's immediately preceding fiscal year (the "Annual Revenue Sharing Amount").

6. **UTILITIES**. Tenant shall be solely responsible for the establishment and payment of all utilities utilized by Tenant in the Premises and on the Property.

7. **TENANT IMPROVEMENTS AND ALTERATIONS**: Tenant will not make or allow to be made any material improvements, alterations or physical additions to the Property or Improvements without the prior written consent of Landlord (which consent shall not be unreasonably withheld).

8. **REPAIRS AND RE-ENTRY**: In addition to maintaining the Property and Improvements, Tenant, at its sole cost and expense throughout the Term, shall repair any damage to the Property and Improvements that is caused by Tenant or Tenant's agents, employees, vendors or invitees. If Tenant fails to make any necessary repairs or replacements required under this paragraph, Landlord may at its option make such repair or replacement, and Tenant shall repay the cost thereof to Landlord upon demand by Landlord. For the avoidance of doubt, Landlord shall not be obligated to make any repairs or replacements, or otherwise incur any costs for capital expenditures at the Property. Tenant shall not commit or allow any waste or damage to be committed on any portion of the Property or Improvements, and shall, at the termination of this Lease by lapse of time or otherwise, deliver up the Property to Landlord cleared of any personal property in as good condition as at the Commencement Date, ordinary wear and tear excepted. Upon such termination of this Lease, Landlord shall have the right to re-enter and resume possession of the Property and all Improvements.

9. **SERVICES PROVIDED BY LANDLORD**: Landlord will not provide any services to Tenant or the Improvements except for maintenance and repair of the roadways, parking lots, roofs, exterior walls, structural walls and foundations (the "**Landlord Services**"). Landlord will engage the contractors and/or service providers for the Landlord Services as Landlord deems reasonable and necessary. Any failure by Landlord to furnish the Landlord Services shall not render Landlord liable in any respect for damages to either persons (including Tenant) or property, nor be construed as eviction of Tenant, nor relieve Tenant from fulfillment of any covenant or agreement set forth in this Lease.

10. **NO ASSIGNMENT OR SUBLETTING**: Tenant shall not: (a) transfer, pledge, mortgage or assign this Lease or any interest hereunder; (b) permit any assignment of this Lease by voluntary act, operation of law or otherwise, (c) sublet the Improvements of any part thereof, or (d) permit the use of the Improvements by any parties other than Tenant or Tenant's affiliates without Landlord's consent.



Copy from re:SearchTX

11. **INSURANCE**: Tenant shall maintain a policy or policies of commercial general liability insurance covering the Improvements and Tenant's use thereof, insuring against claims for personal or bodily injury or death or property damage (including contractual indemnity and liability coverage without contractual exclusion) occurring upon, in or about the Improvements and Property. Tenant's liability insurance policy shall provide minimum protection of not less than $1,000,000.00 per occurrence for bodily injury, property damage, personal and advertising injury, $2,000,000.00 for general aggregate liability, $5,000,000.00 in umbrella coverage and such other coverage as Landlord may reasonably deem appropriate including business interruption, loss-of-income and extra-expense insurance in such amounts as will reimburse Tenant for direct or indirect loss of earnings attributable to all perils commonly insured against by prudent tenants or attributable to prevention of access to the Improvements/Property or to the Improvements/Property as a result of such perils. Tenant's insurance shall contain an endorsement that Tenant's insurance is primary and non-contributory for claims arising out of an incident or event occurring within the Improvements or on the Property. Tenant's insurance shall contain a provision naming Landlord as an additional insured and as a loss payee. Tenant shall, at Landlord's request, provide to Landlord a current certificate of insurance evidencing Tenant's compliance with this requirement. Tenant shall obtain the agreement of Tenant's insurers to notify Landlord at least thirty (30) days prior to any cancellation, modification or expiration of a liability insurance policy. All such insurance policies shall be in form and substance satisfactory to Landlord and shall be issued by companies with an A.M. Best Rating of not less than A-:VII or otherwise be acceptable to Landlord and licensed to do business in the State of Texas.

Each policy required to be provided by Tenant shall have attached thereto (a) an endorsement that such policy shall not be cancelled or materially changed without at least thirty (30) days' prior written notice to Landlord, (b) an endorsement to the effect that the insurance as to the interest of Landlord shall not be invalidated by any act or neglect of Landlord or Tenant, and (c) an endorsement that Tenant's insurance is primary and non-contributory for claims arising out of an incident or event occurring within the Improvements or on the Property. All policies of insurance, together with any endorsements reflecting the changes to the policies required to comply with this Lease, shall contain a provision naming Landlord (and any mortgagee designated by Landlord) as additional insureds.

All insurance policies required to be delivered by Tenant pursuant to this Lease shall permit releases of liability as provided herein and/or a waiver of subrogation clause as to Landlord. Tenant waives, releases and discharges Landlord and Landlord's agents, employees and contractors from all claims and demands whatsoever which Tenant may have or acquire arising out of damage to or destruction of the machinery, equipment, furniture, fixtures, personal property, and loss of use thereof occasioned by fire or other casualty, whether such claim or demand may arise because of the negligence or fault of Landlord or its agents, employees, contractors or otherwise, and Tenant agrees to look only to the insurance coverage in the event of such loss.

Tenant shall not occupy or use, nor permit any portion of the Improvements or Property demised hereunder to be occupied or used, for any business or purpose which is unlawful in part or in whole or deemed to be disreputable in any manner, or extra hazardous on account of fire, nor permit anything to be done which will in any way increase the rate of fire insurance on the Property, the Improvements or contents, and in event that, by reasons of acts of Tenant, there shall





Copy from re:SearchTX

be any increase in insurance premiums on the Property, the Improvements or contents created by Tenant's act or conduct of business, then Tenant shall pay such increase.

**12. RELEASE AND INDEMNITY: AS MATERIAL CONSIDERATION TO LANDLORD, TENANT AGREES THAT NEITHER LANDLORD NOR ANY OF ITS OWNERS, JOINT VENTURERS, MEMBERS, MANAGERS, OFFICERS, SHAREHOLDERS, DIRECTORS, PARTNERS, AGENTS, REPRESENTATIVES AND EMPLOYEES (COLLECTIVELY, THE "LANDLORD PARTIES") SHALL BE LIABLE TO TENANT FOR ANY DAMAGES TO TENANT OR TENANT'S PROPERTY FROM ANY CAUSE, AND TENANT WAIVES ALL CLAIMS AGAINST THE LANDLORD PARTIES FOR DAMAGE TO PERSONS OR PROPERTY ARISING FOR ANY REASON, EXCEPT FOR DAMAGE TO PERSONS RESULTING DIRECTLY FROM A LANDLORD PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT. WITHOUT LIMITATION OF THE FOREGOING, TENANT WAIVES ALL CLAIMS AGAINST THE LANDLORD PARTIES FOR DAMAGE TO PROPERTY THAT IS INSURED BY TENANT OR REQUIRED TO BE INSURED BY ANY POLICY OF INSURANCE TENANT IS REQUIRED TO CARRY PURSUANT TO THIS LEASE. TENANT SHALL INDEMNIFY AND HOLD THE LANDLORD PARTIES HARMLESS FROM ALL DAMAGES ARISING OUT OF ANY DAMAGE TO ANY PERSON OR PROPERTY OCCURRING IN, ON OR ABOUT THE IMPROVEMENTS OR PROPERTY OR TENANT'S USE THEREOF OR TENANT'S BREACH OF ANY TERM OF THIS LEASE. THE LANDLORD PARTIES SHALL NOT BE LIABLE TO TENANT FOR ANY LOSS OR DAMAGE, INCLUDING ANY LOST PROFIT, LOSS OF BUSINESS OR CONSEQUENTIAL DAMAGES, THAT MAY BE OCCASIONED BY OR THROUGH THE ACTS OR OMISSIONS OF OTHERS, OR FOR ANY LOSS OR DAMAGE, INCLUDING ANY LOST PROFIT, LOSS OF BUSINESS OR CONSEQUENTIAL DAMAGES, RESULTING TO TENANT OR ITS PROPERTY FROM BURST OR LEAKING WATER, SPRINKLER OR SEWER PIPES OR FROM ROOF LEAKS. TENANT SHALL FURTHER INDEMNIFY, DEFEND AND HOLD THE LANDLORD PARTIES HARMLESS FROM AND AGAINST ANY AND ALL LOSS OF RENTS OR DAMAGES, LIABILITIES, JUDGMENTS, CLAIMS, EXPENSES, PENALTIES, AND ATTORNEYS' AND CONSULTANTS' FEES ARISING OUT OF OR INVOLVING ANY HAZARDOUS SUBSTANCE BROUGHT ONTO THE IMPROVEMENTS OR PROPERTY BY OR FOR TENANT, ITS EMPLOYEES, AGENTS, CONTRACTORS, OR INVITEES. TENANT'S OBLIGATIONS SHALL INCLUDE, BUT NOT BE LIMITED TO, THE EFFECTS OF ANY CONTAMINATION OR INJURY TO PERSON, PROPERTY OR THE ENVIRONMENT CREATED OR SUFFERED BY TENANT, AND THE COST OF INVESTIGATION, REMOVAL, REMEDIATION, RESTORATION OR ABATEMENT, AND SHALL SURVIVE THE EXPIRATION OR TERMINATION OF THIS LEASE. NO TERMINATION, CANCELLATION OR RELEASE AGREEMENT ENTERED INTO BY LANDLORD AND TENANT SHALL RELEASE TENANT FROM ITS OBLIGATIONS UNDER THIS LEASE WITH RESPECT TO HAZARDOUS SUBSTANCES, UNLESS SPECIFICALLY SO AGREED BY LANDLORD IN WRITING AT THE TIME OF SUCH AGREEMENT.**



Copy from re:SearchTX

13. **ENTRY FOR REPAIRS AND INSPECTION**: Tenant shall permit Landlord and its agents, assigns and representatives the right to enter any and all parts of the Improvements and Property at all reasonable hours to inspect same or clean or make repairs or alterations or additions as Landlord deems necessary. Tenant shall properly reimburse Landlord for repairs to damage caused by Tenant or any one or more of the Tenant Parties.

14. **CASUALTY, CONDEMNATION OR OTHER LOSS**: If the Improvements or Property is so damaged by fire or other casualty that substantial alteration or reconstruction of the Improvements, will, in the reasonable judgment of Landlord, be required, or in the event that Landlord determines that insurance proceeds will be insufficient to restore the Improvements, then either Landlord or Tenant may terminate this Lease by giving written notice thereof to the other party. If the Improvements or the Property are taken or condemned in whole or in substantial part for public purposes, then (i) the Term shall at the option of either Party hereto forthwith cease and terminate and (ii) Landlord shall receive the entire award or other compensation paid in connection with such taking or condemnation.

Pursuant to this Paragraph 14, Landlord will not be liable for any inconvenience or annoyance to Tenant or injury to the business of Tenant resulting in any way from the casualty, condemnation or its repair.

Notwithstanding anything contained in this Lease to the contrary, Landlord will not be liable for damages to Tenant or any party claiming through Tenant for any injury to, or death of, any person or damage to property or for interruption or damage to business resulting from theft, fire, act of God, public enemy, injunction, riot, strike, insurrection, war, court order, requisition or order of governmental body or authority, or any other matter beyond the control of Landlord, except to the extent such damage is caused by the gross negligence or willful misconduct of Landlord.

15. **HOLDING OVER**: Any holdover by Tenant beyond a termination pursuant to the terms hereof, without the written consent of Landlord, shall constitute a tenancy-at-will and the rent (the "**Rent**") owed by Tenant shall be [redacted] per month plus the Annual Revenue Sharing Amount. In addition to any other liabilities to Landlord accruing therefrom, Tenant shall protect, defend, indemnify and hold Landlord harmless from all loss, cost (including reasonable attorneys' fees) and liability resulting from such holdover, including any claims made by any succeeding tenant founded upon a failure of Tenant to surrender the Improvements, and, if such holding over continues more than thirty (30) days, any lost profits or other consequential damages to Landlord resulting therefrom.

16. **DEFAULT BY TENANT**: The following events will be deemed to be events of default by Tenant under this Lease (each an "**Event of Default**"):

(a) Tenant fails to timely pay any Rent or any other sum(s) due under this Lease as and when due;

(b) Tenant fails to comply with any non-monetary term, provision or covenant of this Lease and such failure continues for a period of fourteen (14) days after written notice of such failure has been given to Tenant;





Copy from re:SearchTX

(c) Tenant fails to pay and release of record, or diligently contest and bond around to the satisfaction of Landlord, within ten (10) days after the filing thereof, any mechanic's lien filed against the Improvements or the Property for any worked performed, materials furnished, or obligation incurred by or at the request of Tenant;

(d) Tenant takes any action to, or notifies Landlord that Tenant intends to, file a petition under any section or chapter of the United States Bankruptcy Code, as amended from time to time, or under any similar law or statute of the United States or any state thereof; or a petition is filed against Tenant under any such statute and is not dismissed within sixty (60) days thereafter; or

(e) A receiver or trustee is appointed for Tenant's leasehold interest in the Improvements or for all or a substantial part of the assets of Tenant.

17. **<u>LANDLORD'S REMEDIES</u>**:

(a) Upon the occurrence of any Event of Default, Landlord may, at its option and without further notice to Tenant and without judicial process, in addition to all other remedies given hereunder or at law or in equity, do any one or more of the following: (i) terminate this Lease, in which event Tenant will immediately surrender possession of the Improvements and Property to Landlord; (ii) enter upon and take possession of the Improvements and Property and expel or remove Tenant therefrom, with or without having terminated this Lease; (iii) change or re-key all locks to entrances to the Improvements, and Landlord will have no obligation to give Tenant a new key to the Improvements until such Event of Default is cured; and (iv) remove from the Improvements and Property any furniture, fixtures, equipment, vehicles or other personal property of Tenant, without liability for trespass or conversion, and store such items at the sole cost of Tenant and without liability to Tenant. Any of such furniture, fixtures, equipment, vehicles or personal property not claimed within thirty (30) days from the date of removal will be deemed abandoned and Landlord may dispose of same in any lawful manner deemed appropriate by Landlord.

(b) Upon the occurrence of the Event of Default described in <u>hereinabove</u>, Tenant shall, in addition to all other remedies given hereunder or at law or in equity, pay to Landlord as liquidated damages (and not as a penalty) a fee in the amount of [redacted] (the "**<u>Removal Fee</u>**"). Tenant acknowledges and agrees that (i) the harm to Landlord caused by Tenant's failure to remove Tenant's personal property is incapable or difficult of estimation, and (ii) the amount of the Removal Fee is a reasonable estimate of the damages Landlord will suffer if Tenant fails to remove all of Tenant's personal property prior to the Termination Date.

(c) Exercise by Landlord of any one or more remedies hereunder will not constitute forfeiture or an acceptance of surrender of the Improvements and Property by Tenant. Such surrender can be effected only by the written agreement of Landlord and Tenant.

(d) If Landlord terminates this Lease by reason of an Event of Default, Tenant shall pay to Landlord the sum of (i) the cost of recovering the Improvements (including attorney's fees and costs), (ii) the unpaid Rent and Operating Expenses and all other indebtedness accrued hereunder to the date of such termination, and (iii) any other damages or relief which Landlord may be entitled to at law or in equity.



Copy from re:SearchTX

(e) If Tenant fails to make any payment, perform any obligation, or cure any default hereunder within ten (10) days after receipt of written notice thereof, Landlord, without obligation to do so and without thereby waiving such failure or default, may make such payment, perform such obligation, and/or remedy such other default for the account of Tenant (and enter the Improvements for such purpose). Tenant must pay immediately all costs, expenses and disbursements (including attorneys' fees) incurred by Landlord in taking such remedial action, plus, at the option of Landlord, interest thereon at the lesser of (i) ten percent (10%) per annum and (ii) the maximum rate permitted by applicable law.

(f) No act or thing done by Landlord or its agents during the Term shall be deemed an acceptance of a surrender of the Improvements and Property and no agreement to accept a surrender of the Improvements and Property shall be valid unless the same be made in writing and subscribed by Landlord. The receipt by Landlord of any sums due under this Lease with knowledge of the breach of any covenant contained in this Lease shall not be deemed a waiver of such breach. The receipt by Landlord of any sums due under this Lease from any assignee, subtenant or occupant of the Improvements or Property shall not be deemed a waiver of the covenant in this Lease against assignment and/or subletting or an acceptance of the assignee, subtenant or occupant as Tenant, or a release of Tenant from further observance or performance by Tenant of the covenants in this Lease. No provision of this Lease shall be deemed to have been waived by Landlord unless such waiver be in writing and signed by Landlord.

18. **NO WAIVER OF DEFAULT**: Failure of Landlord to declare any default immediately upon occurrence thereof or delay in taking action in connection therewith shall not waive such default, but Landlord shall have the right to declare any such default at any time and take such action as might be lawful or authorized hereunder, at law or in equity. Tenant shall pay all costs, attorney's fees, and expenses incurred or to be incurred in connection with the enforcement of any covenant or agreement hereof, and any action taken in connection herewith.

19. **QUIET POSSESSION**: Landlord hereby covenants that Tenant, upon the timely payment of Rent and all sums due under this Lease and performing all covenants and agreements herein contained on part of Tenant, shall and may peacefully and quietly have, hold and enjoy the Improvements hereby demised without interference from Landlord.

20. **LIMITATION ON LANDLORD'S LIABILITY**: The liability of Landlord Parties to Tenant (or any person or entity claiming by, through or under Tenant) for any default by Landlord under the terms of this Lease or any other matter relating to or arising out of the occupancy or use of the Improvements and/or other areas of the Property shall be limited to Tenant's actual direct, but not consequential, damages therefore and shall be recoverable only from the interest of Landlord in the Improvements, and no Landlord Party shall be personally liable for any deficiency. Additionally, Tenant hereby waives its statutory lien under Section 91.004 of the Texas Property Code.

21. **NO RELIANCE:** In signing this Lease, Tenant acknowledges and agrees that it has not relied on nor been induced to execute this Lease by any statement, representation, agreement or promise, oral or written, made by any Landlord Party, other than the statements expressly set forth in this Lease. Tenant expressly represents and warrants that it is relying solely upon its own judgment in executing this Lease and disclaims reliance upon any statement or representations made by any of the Landlord Parties.



Copy from re:SearchTX

22. **TRANSFER OF LANDLORD'S RIGHTS**: Landlord shall have the right to transfer and assign, in whole or in part, any or all of its rights and obligations hereunder and in the Improvements and Property. Such transfers or assignments may be made either to a corporation, limited liability company, partnership, limited partnership, limited liability partnership, trust company or other entity, or individual or group of individuals, and howsoever made are to be in all things respected and recognized by Tenant.

23. **NOTICES**: All notices and other communications given pursuant to this Lease shall be in writing and shall be (i) mailed by first class, United States Mail, postage prepaid, certified, with return receipt requested, and addressed to the Parties hereto at the address specified below, (ii) hand delivered to the intended addressee, or (iii) sent by nationally recognized overnight courier service, in each case, addressed to the parties hereto at the respective addresses set out below, or at such other address as they have theretofore specified by written notice delivered in accordance herewith. All notices sent pursuant to (i) through (iii) above shall be effective upon delivery at the address of the addressee (even if such addressee refuses delivery thereof). The Parties hereto may change their addresses by giving notice thereof to the other in conformity with this provision.

To Landlord:

Richard G. Eastland
2689 Highway 39
Hunt, Texas 78024

To Tenant:

Richard G. Eastland
2689 Highway 39
Hunt, Texas 78024

24. **GOVERNING LAW AND VENUE**: This Lease shall be construed and enforced in accordance with the laws of the State of Texas. All claims, disputes and other matters in question arising out of or relating to this Lease, or the breach thereof, shall be decided by proceedings instituted and litigated in a court of competent jurisdiction in Kerr County, Texas.

25. **BINDING EFFECT**: This Lease shall not be binding on any Party until executed by both Landlord and Tenant. This Lease shall be binding upon and inure to the benefit of Landlord and Tenant, and their respective successors and permitted assigns.

26. **ENTIRE AGREEMENT**: This Lease, together with any other documents or exhibits attached hereto, embody the entire agreement between the Parties concerning the subject matter hereof and supersedes and replaces all prior leases, conversations, proposals, negotiations, understandings and contracts, whether written or oral.

27. **AMENDMENTS**: To be effective, any amendment or modification of this Lease must be in writing and signed by Landlord and Tenant.



Copy from re:SearchTX

28. **SEVERABILITY**: If any clause or provision of this Lease is determined to be illegal, invalid or unenforceable under present or future laws effective during the Term, then and in that event, it is the intention of Parties hereto that the remainder of this Lease shall not be affected thereby, and it is also the intention of the Parties that in lieu of each clause or provision of this Lease that is illegal, invalid or unenforceable, there be added as a part of this Lease a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable. The caption of each paragraph hereof is added as a matter of convenience only and shall be considered to be of no effect in the construction of any provision or provisions of this Lease.

29. **COUNTERPARTS**: This Lease may be executed in multiple counterparts, each of which will constitute an original instrument, but all of which will constitute one and the same agreement. This Lease may be executed by electronic delivery of signatures which shall be binding on the Parties hereto, with original signatures to be delivered as soon as reasonably practical thereafter.

30. **TIME OF THE ESSENCE**: It is expressly agreed by the Parties hereto that time is of the essence under this Lease and any aspect thereof.

[Signature Page Follows]



Copy from re:SearchTX

IN WITNESS WHEREOF, the Parties hereto have executed this Lease or caused it to be executed by their duly authorized representatives as of the date first above written.

**LANDLORD:**

NATURAL FOUNTAINS PROPERTIES, INC.,
a Texas corporation

By: William N. Bonner, III
Name: WILLIAM NEELY BONNER, III
Title: PRESIDENT
Date: 2-18-19

**TENANT:**

CAMP MYSTIC, INC.,
a Texas corporation

By: Dick Eastland
Name: Dick Eastland
Title: PRESIDENT
Date: 2/18/19





Copy from re:SearchTX

# EXHIBIT 04

Copy from re:SearchTX

Corporations Section
P.O.Box 13697
Austin, Texas 78711-3697

John B. Scott
Secretary of State

# Office of the Secretary of State

## CERTIFICATE OF CONVERSION

The undersigned, as Secretary of State of Texas, hereby certifies that a filing instrument for

CAMP MYSTIC, INC.
File Number: 149273300

Converting it to

CAMP MYSTIC, LLC
File Number: 804296074

has been received in this office and has been found to conform to law. ACCORDINGLY, the undersigned, as Secretary of State, and by virtue of the authority vested in the secretary by law, hereby issues this certificate evidencing the acceptance and filing of the conversion on the date shown below.

Dated: 10/28/2021

Effective: 10/28/2021

John B. Scott
Secretary of State



Copy from re:SearchTX

Filing#:149273300 Document#:1089951340002 Filed On 10/28/2021 received by Upload

**Form 632**
**(Revised 05/11)**

Return in duplicate to:
Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
512 463-5555
FAX: 512 463-5709

**Filing Fee: See instructions**

THE STATE OF TEXAS

# Certificate of Conversion of a Corporation Converting to a Limited Liability Company

This space reserved for office use.

## Converting Entity Information

The name of the converting corporation is:

Camp Mystic, Inc.

The jurisdiction of formation of the corporation is: Texas

The date of formation of the corporation is: June 1, 1998

The file number, if any, issued to the corporation by the secretary of state, is: 0149273300

## Plan of Conversion—Alternative Statements

The corporation named above is converting to a limited liability company. The name of the limited liability company is:

Camp Mystic, LLC

The limited liability company will be formed under the laws of : Texas

☐ The plan of conversion is attached.

*If the plan of conversion is not attached, the following statements must be completed.*

☑ Instead of attaching the plan of conversion, the corporation certifies to the following statements:

A signed plan of conversion is on file at the principal place of business of the corporation, the converting entity. The address of the principal place of business of the corporation is:

| 2689 HWY 39 | HUNT | TX | | 78024 |
|---|---|---|---|---|
| *Street or Mailing Address* | *City* | *State* | *Country* | *Zip Code* |

A signed plan of conversion will be on file after the conversion at the principal place of business of the limited liability company, the converted entity. The address of the principal place of business of the limited liability company is:

| 2689 HWY 39 | HUNT | TX | | 78024 |
|---|---|---|---|---|
| *Street or Mailing Address* | *City* | *State* | *Country* | *Zip Code* |

A copy of the plan of conversion will be furnished on written request without cost by the converting entity before the conversion or by the converted entity after the conversion to any owner or member of the converting or converted entity.



Copy from re:SearchTX

## Certificate of Formation for the Converted Entity

☑ The converted entity is a Texas limited liability company. The certificate of formation of the Texas limited liability company is attached to this certificate either as an attachment or exhibit to the plan of conversion, or as an attachment or exhibit to this certificate of conversion if the plan has not been attached to the certificate of conversion.

## Approval of the Plan of Conversion

The plan of conversion has been approved as required by the laws of the jurisdiction of formation and the governing documents of the converting entity.

## Effectiveness of Filing (Select either A, B, or C.)

A. ☑ This document becomes effective when the document is accepted and filed by the secretary of state.

B. ☐ This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing. The delayed effective date is: ________________

C. ☐ This document takes effect upon the occurrence of the future event or fact, other than the passage of time. The 90th day after the date of signing is: ________________

The following event or fact will cause the document to take effect in the manner described below:

________________________________

________________________________

## Tax Certificate

☐ Attached hereto is a certificate from the comptroller of public accounts that all taxes under title 2, Tax Code, have been paid by the corporation.

☑ In lieu of providing the tax certificate, the limited liability company as the converted entity is liable for the payment of any franchise taxes.

## Execution

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument.

Date: 10/27/21

Richard G. Eastland [signature]

RICHARD G. EASTLAND, PRESIDENT

Signature and title of authorized person on behalf of the converting entity





Copy from re:SearchTX

| | | |
|---|---|---|
| **Form 205**<br>**(Revised 05/11)**<br><br>Submit in duplicate to:<br>Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>512 463-5555<br>FAX: 512 463-5709<br>**Filing Fee: $300** | THE STATE OF TEXAS<br><br>**Certificate of Formation**<br>**Limited Liability Company** | This space reserved for office use. |

## Article 1 – Entity Name and Type

The filing entity being formed is a limited liability company. The name of the entity is:

CAMP MYSTIC, LLC

The name must contain the words "limited liability company," "limited company," or an abbreviation of one of these phrases.

## Article 2 – Registered Agent and Registered Office

(See instructions. Select and complete <u>either</u> A or B and complete C.)

☐ A. The initial registered agent is an organization (cannot be entity named above) by the name of:

**OR**

☑ B. The initial registered agent is an individual resident of the state whose name is set forth below:

| RICHARD | G | EASTLAND | |
|---|---|---|---|
| *First Name* | *M.I.* | *Last Name* | *Suffix* |

C. The business address of the registered agent and the registered office address is:

| 2689 HIGHWAY 39 | HUNT | TX | 78024 |
|---|---|---|---|
| *Street Address* | *City* | *State* | *Zip Code* |

## Article 3—Governing Authority

(Select and complete <u>either</u> A or B and provide the name and address of each governing person.)

☑ A. The limited liability company will have managers. The name and address of each initial manager are set forth below.

☐ B. The limited liability company will not have managers. The company will be governed by its members, and the name and address of each initial member are set forth below.

**GOVERNING PERSON 1**

**NAME** (Enter the name of either an individual or an organization, but not both.)

**IF INDIVIDUAL**

| RICHARD | G | EASTLAND | |
|---|---|---|---|
| *First Name* | *M.I.* | *Last Name* | *Suffix* |

**OR**

**IF ORGANIZATION**

*Organization Name*

**ADDRESS**

| 2689 HIGHWAY 39 | HUNT | TX | | 78024 |
|---|---|---|---|---|
| *Street or Mailing Address* | *City* | *State* | *Country* | *Zip Code* |

| GOVERNING PERSON 2 | | | | | |
|---|---|---|---|---|---|
| NAME (Enter the name of either an individual or an organization, but not both.)<br>IF INDIVIDUAL | | | | | |
| WILLETTA | A | EASTLAND | | | |
| *First Name* | *M.I.* | *Last Name* | | | *Suffix* |
| OR<br>IF ORGANIZATION | | | | | |
| | | | | | |
| *Organization Name* | | | | | |
| ADDRESS | | | | | |
| 2689 HIGHWAY 39 | HUNT | | TX | | 78024 |
| *Street or Mailing Address* | *City* | | *State* | *Country* | *Zip Code* |

| GOVERNING PERSON 3 | | | | | |
|---|---|---|---|---|---|
| NAME (Enter the name of either an individual or an organization, but not both.)<br>IF INDIVIDUAL | | | | | |
| | | | | | |
| *First Name* | *M.I.* | *Last Name* | | | *Suffix* |
| OR<br>IF ORGANIZATION | | | | | |
| | | | | | |
| *Organization Name* | | | | | |
| ADDRESS | | | | | |
| | | | | | |
| *Street or Mailing Address* | *City* | | *State* | *Country* | *Zip Code* |

## Article 4 – Purpose

The purpose for which the company is formed is for the transaction of any and all lawful purposes for which a limited liability company may be organized under the Texas Business Organizations Code.

## Supplemental Provisions/Information

Text Area: [The attached addendum, if any, is incorporated herein by reference.]

The limited liability company is being formed pursuant to a plan of conversion. The name of the converting entity is Camp Mystic, Inc., a Texas for-profit corporation. The mailing address of the converting entity is 2689 Hwy 39, Hunt, Texas 78024. The converting entity filed its Articles of Incorporation with the Texas Secretary of State on June 1, 1998 and was issued File No. 0149273300 upon such filing.



Copy from re:SearchTX

## Organizer

The name and address of the organizer:

Esther Lee
*Name*

| 9201 N. Central Expressway, 4th Floor | Dallas | TX | 75231 |
|---|---|---|---|
| *Street or Mailing Address* | *City* | *State* | *Zip Code* |

## Effectiveness of Filing (Select either A, B, or C.)

A. ☑ This document becomes effective when the document is filed by the secretary of state.

B. ☐ This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing. The delayed effective date is: ____________________

C. ☐ This document takes effect upon the occurrence of the future event or fact, other than the passage of time. The 90th day after the date of signing is: ____________________

The following event or fact will cause the document to take effect in the manner described below:

## Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized to execute the filing instrument.

Date: 10/27/21

[signature]
Signature of organizer

Esther Lee
Printed or typed name of organizer



Copy from re:SearchTX

# EXHIBIT 05

Copy from re:SearchTX

Comptroller of Public Accounts FORM 05-102 (Rev.9-15/33)

# Texas Franchise Tax Public Information Report

*To be filed by Corporations, Limited Liability Companies (LLC), Limited Partnerships (LP), Professional Associations (PA) and Financial Institutions*

**Tcode** 13196 Franchise

Taxpayer number: 1 7 4 2 8 8 4 0 6 4 3

Report year: 2 0 2 4

***You have certain rights*** *under Chapter 552 and 559, Government Code, to review, request and correct information we have on file about you. Contact us at 1-800-252-1381.*

Taxpayer name: CAMP MYSTIC, LLC

○ Blacken circle if the mailing address has changed.

Mailing address: 2689 HIGHWAY 39

City: HUNT | State: TX | ZIP code plus 4: 78024

Secretary of State (SOS) file number or Comptroller file number: 0804296074

○ Blacken circle if there are currently no changes from previous year; if no information is displayed, complete the applicable information in Sections A, B and C.

Principal office: 2689 HIGHWAY 39, HUNT, TX, 78024

Principal place of business: 2689 HIGHWAY 39, HUNT, TX, 78024

*You must report officer, director, member, general partner and manager information as of the date you complete this report.*

1000000000015

***Please sign below!*** **This report must be signed to satisfy franchise tax requirements.**

**SECTION A** Name, title and mailing address of each officer, director, member, general partner or manager.

| Name | Title | Director | Term expiration (mm dd yy) |
|---|---|---|---|
| RICHARD G EASTLAND | PRESIDENT | ● YES | |
| Mailing address: RT 2 BOX 257 | City: HUNT | State: TX | ZIP Code: 78024 |
| WILLETTA A EASTLAND | VICE PRESIDENT | ● YES | |
| Mailing address: RT 2 BOX 257 | City: HUNT | State: TX | ZIP Code: 78024 |
| | | ○ YES | |
| Mailing address: | City: | State: | ZIP Code: |

**SECTION B** Enter information for each corporation, LLC, LP, PA or financial institution, if any, in which this entity owns an interest of 10 percent or more.

| Name of owned (subsidiary) corporation, LLC, LP, PA or financial institution | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| | | | |
| | | | |

**SECTION C** Enter information for each corporation , LLC, LP, PA or financial institution, if any, that owns an interest of 10 percent or more in this entity.

| Name of owned (parent) corporation, LLC, LP, PA or financial institution | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| MYSTIC CAMPS FAMILY PARTNERSHIP | TX | 0804281844 | 100.000 |

Registered agent and registered office currently on file *(see instructions if you need to make changes)*

Agent: RICHARD G. EASTLAND

*You must make a filing with the Secretary of State to change registered agent, registered office or general partner information.*

Office: 2689 HWY 39 | City: HUNT | State: TX | ZIP Code: 78024

The information on this form is required by Section 171.203 of the Tax Code for each corporation, LLC, LP, PA or financial institution that files a Texas Franchise Tax Report. Use additional sheets for Sections A, B and C, if necessary. The information will be available for public inspection.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer, director, member, general partner or manager and who is not currently employed by this or a related corporation, LLC, LP, PA or financial institution.

| sign here | Title | Date | Area code and phone number |
|---|---|---|---|
| RICHARD G EASTLAND | PRESIDENT | 09/01/2024 | ( 830 ) 238 - 4660 |

**Texas Comptroller Official Use Only**

VE/DE ○ PIR IND ○

Copy from re:SearchTX

# EXHIBIT 06

Copy from re:SearchTX

| Form 207 | | |
|---|---|---|
| Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>FAX: 512/463-5709<br><br>Filing Fee: $750 | **Certificate of Formation<br>Limited Partnership** | **Filed in the Office of the<br>Secretary of State of Texas<br>Filing #: 804281844 10/21/2021<br>Document #: 1088202880002<br>Image Generated Electronically<br>for Web Filing** |

## Article 1 - Entity Name and Type

The filing entity being formed is a limited partnership. The name of the entity is:

**Mystic Camps Family Partnership, Ltd.**

The name must contain the words "Limited Partnership," or "Limited," or the abbreviation "L.P.," "LP," or "Ltd." The name must not be the same as, deceptively similar to or similar to that of an existing corporate, limited liability company, or limited partnership name on file with the secretary of state. A preliminary check for "name availability" is recommended.

## Article 2 - Principal Office

The address of the principal office in the United States where records of the partnership are to be kept or made available is set forth below:

**2404 Scenic Drive, Austin, TX, USA 78703**

## Article 3 – Registered Agent and Registered Office

☐ A. The initial registered agent is an organization (cannot be limited partnership named above) by the name of:

**OR**

☑ B. The initial registered agent is an individual resident of the state whose name is set forth below:

**Name:**
**Richard G. Eastland**

C. The business address of the registered agent and the registered office address is:

**Street Address:**
**2404 Scenic Drive Austin TX 78703**

### Consent of Registered Agent

☐ A. A copy of the consent of registered agent is attached.

**OR**

☑ B. The consent of the registered agent is maintained by the entity.

## Article 4 - General Partner Information

The name and address of each general partner are as follows:

General Partner 1: (Business Name) **Mystic Camps Management, LLC**

Address: **2404 Scenic Drive Austin TX, USA 78703**

## Supplemental Provisions / Information

[The attached addendum, if any, is incorporated herein by reference.]

## Effectiveness of Filing

☑ A. This document becomes effective when the document is filed by the secretary of state.

**OR**



Copy from re:SearchTX

☐ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

## Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

Signature of General Partner 1: **Mystic Camps Management, LLC by Richard G. Eastland, Manager**

Signature of General Partner 2: **Mystic Camps Management, LLC by Willetta A. Eastland, Manager**

**FILING OFFICE COPY**



Copy from re:SearchTX

# EXHIBIT 07

Copy from re:SearchTX

CAUSE NO. D-1-GN-25-009976

| | | |
|---|---|---|
| Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten, and Jennifer Getten | § | IN THE DISTRICT COURT OF |
| *Plaintiffs,* | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III | § | |
| *Defendants.* | § | 459th JUDICIAL DISTRICT |

**DECLARATION OF JENNIFER GETTEN**

Pursuant to Section 132.001 of the Texas Civil Practice and Remedies Code, I, **Jennifer Getten**, declare under penalty of perjury that the following statements are true and correct to the best of my knowledge and belief:

1. My name is **Jennifer Getten**. My date of birth is [redacted]. I am over the age of eighteen (18), of sound mind, and fully competent to make this Declaration. I have personal knowledge of the facts stated herein, and they are true and correct.

2. I am the mother of **Ellen Getten**, who tragically died on July 4, 2025, while attending Camp Mystic in Hunt, Texas.

3. I am a resident of the State of Texas. I reside **at** [redacted]. I have continuously resided in the State of Texas at all times material to this Declaration, including on the date I signed the Camp Mystic Participation Agreement for the 2025 camp season, and I remain a resident of the State of Texas today.

4. On or about **May 30, 2025**, I signed the Camp Mystic Participation Agreement (the "Participation Agreement") for my daughter, **Ellen Getten,** to be permitted to attend Camp Mystic in 2025. **Ex. 1.** The Participation Agreement was provided to me as part of the online registration process for my daughter to attend Camp Mystic.



Copy from re:SearchTX

5. I signed the Participation Agreement while physically present in the State of Texas, in **Houston, Texas.** I did not travel outside of Texas to sign the Agreement, and I did not sign it in, from, or while located in any other state.

6. I was the sole signatory to the Participation Agreement. No representative of Camp Mystic, Natural Fountains Properties, Inc., or any other Defendant in this action signed the Agreement. No attorney signed the Participation Agreement, and I did not consult with or receive the advice of an attorney concerning the Participation Agreement, or any provisions within it, before signing it. I was further not advised to seek the counsel of an attorney prior to signing the Participation Agreement.

7. At the time I executed the Participation Agreement, my daughter, **Ellen Getten**, was a minor child residing with me in the State of Texas. My daughter's primary and only residence on the date the Agreement was signed was **3102 Reba Drive, Houston, TX 77019.** My daughter had not established a residence in any other state.

8. At the time of her death in July 2025, **Ellen Getten** was a resident of the State of Texas. **Ellen Getten** had been continuously a Texas resident from the time the Participation Agreement was signed through the date of her death.

9. It was my understanding, based on information provided to me by Camp Mystic during the enrollment process, that execution of the Participation Agreement was **a mandatory prerequisite** for my daughter's enrollment in and participation at Camp Mystic for the 2025 summer season. Camp Mystic would not have permitted **Ellen Getten** to enroll in or attend Camp Mystic without a signed Participation Agreement. I signed the Participation Agreement because I was required to do so in order for my daughter to attend Camp Mystic.

10. All activities described in the Participation Agreement and in which my daughter was to participate (including, without limitation, camp sports, water activities, hiking, arts and crafts, and horseback riding activities) were to take place at Camp Mystic's premises in Hunt, Texas. **Ellen Getten** did not travel out of the State of Texas in connection with her enrollment at, or participation in, Camp Mystic for the 2025 camp season.

11. The Participation Agreement contained a section entitled "Binding Arbitration." Ex. 1 at 2. Prior to executing the Participation Agreement, no one at Camp Mystic discussed the "Binding Arbitration" section of the Participation Agreement with me.

12. At the time I executed the Participation Agreement, I did not know what corporate entities were affiliated with Camp Mystic or how the camp was organized as a business. I did not know the name "Natural Fountains Properties, Inc." or understand it to be a party to the "Binding Arbitration" provision. I did not know what "Mystic Camps Family Partnership, Ltd." or "Mystic Camps Management, LLC" were.



Copy from re:SearchTX

13. It was not my understanding that by signing the Participation Agreement I was agreeing to arbitrate claims including claims for the death of my daughter—against Camp Mystic's corporate owners, holding companies, or individual directors, officers, or employees. The Participation Agreement was, in my understanding, a camp enrollment form, not a broad arbitration agreement covering any dispute with business entities I had never heard of.

14. The arbitration provision refers to "disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof." Ex. 1 at 2. I understood this language to refer to disputes about the terms of the Participation Agreement, such as what services Camp Mystic agreed to provide—which were listed in the Agreement as traditional camp sports and games, such as water activities, hiking, aerobics, arts, and crafts, and equine activities—or whether Camp Mystic had met its obligations under those terms. I did not understand the phrase "out of or in connection with this Agreement" to sweep in claims arising from the death of my daughter in a flood at camp. That is not what I expected from a summer camp enrollment form or what I thought I was signing.

15. The fee for **Ellen Getten** to attend Camp Mystic for the 2005 summer season was less than $8,000.00, which was paid in consideration for her attendance at the camp.

16. I make this declaration in support of Plaintiffs' Response to Defendants' Motion to Compel Arbitration and Motion to Stay.

**FURTHER DECLARANT SAYETH NOT.**

Executed on this 3 day of May 2026, in Harris County, Texas.

Jennifer Getten

**Jennifer Getten**

Copy from re:SearchTX

# EX. 01
# Participation Agreement - Getten

Copy from re:SearchTX

# Participation Agreement 2025

for Ellen Getten, 2025 Season

Participation Agreement for Ellen Getten:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Ellen Getten, (Ellen), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Ellen.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Ellen and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from

Copy from re:SearchTX

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Ellen, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Ellen MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Ellen, use interviews with and photographic images of Ellen, including videotape, for its website, brochures and other, including promotional, materials.

Copy from re:SearchTX

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Ellen, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Ellen, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Jennifer Getten (05/30/2025)

Copy from re:SearchTX

# EXHIBIT 08

Copy from re:SearchTX

CAUSE NO. D-1-GN-25-009976

| | | |
|---|---|---|
| Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten, and Jennifer Getten<br><br>*Plaintiffs,*<br><br>v.<br><br>Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III<br><br>*Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT OF<br><br>TRAVIS COUNTY, TEXAS<br><br>459th JUDICIAL DISTRICT |

---

**DECLARATION OF CALLIE MCCOWN**

---

Pursuant to Section 132.001 of the Texas Civil Practice and Remedies Code, I, **Callie McCown**, declare under penalty of perjury that the following statements are true and correct to the best of my knowledge and belief:

1. My name is **Callie McCown**. My date of birth is [redacted]. I am over the age of eighteen (18), of sound mind, and fully competent to make this Declaration. I have personal knowledge of the facts stated herein, and they are true and correct.

2. I am the mother of **Linnie McCown**, who tragically died on July 4, 2025, while attending Camp Mystic in Hunt, Texas.

3. I am a resident of the State of Texas. I reside **at** [redacted]. I have continuously resided in the State of Texas at all times material to this Declaration, including on the date I signed the Camp Mystic Participation Agreement for the 2025 camp season, and I remain a resident of the State of Texas today.

4. On or about **May 31, 2025**, I signed the Camp Mystic Participation Agreement (the "Participation Agreement") for my daughter, **Linnie McCown,** to be permitted to attend Camp Mystic in 2025. **Ex. 1.** The Participation Agreement was provided to me as part of the online registration process for my daughter to attend Camp Mystic.



Copy from re:SearchTX

5. I signed the Participation Agreement while physically present in the State of Texas, in **Austin, Texas.** I did not travel outside of Texas to sign the Agreement, and I did not sign it in, from, or while located in any other state.

6. I was the sole signatory to the Participation Agreement. No representative of Camp Mystic, Natural Fountains Properties, Inc., or any other Defendant in this action signed the Agreement. No attorney signed the Participation Agreement, and I did not consult with or receive the advice of an attorney concerning the Participation Agreement, or any provisions within it, before signing it. I was further not advised to seek the counsel of an attorney prior to signing the Participation Agreement.

7. At the time I executed the Participation Agreement, my daughter, **Linnie McCown**, was a minor child residing with me in the State of Texas. My daughter's primary and only residence on the date the Agreement was signed was **2505 Exposition Blvd., Austin, TX 78703.** My daughter had not established a residence in any other state.

8. At the time of her death in July 2025, **Linnie McCown** was a resident of the State of Texas. **Linnie McCown** had been continuously a Texas resident from the time the Participation Agreement was signed through the date of her death.

9. It was my understanding, based on information provided to me by Camp Mystic during the enrollment process, that execution of the Participation Agreement was **a mandatory prerequisite** for my daughter's enrollment in and participation at Camp Mystic for the 2025 summer season. Camp Mystic would not have permitted **Linnie McCown** to enroll in or attend Camp Mystic without a signed Participation Agreement. I signed the Participation Agreement because I was required to do so in order for my daughter to attend Camp Mystic.

10. All activities described in the Participation Agreement and in which my daughter was to participate (including, without limitation, camp sports, water activities, hiking, arts and crafts, and horseback riding activities) were to take place at Camp Mystic's premises in Hunt, Texas. **Linnie McCown** did not travel out of the State of Texas in connection with her enrollment at, or participation in, Camp Mystic for the 2025 camp season.

11. The Participation Agreement contained a section entitled "Binding Arbitration." Ex. 1 at 2. Prior to executing the Participation Agreement, no one at Camp Mystic discussed the "Binding Arbitration" section of the Participation Agreement with me.

12. At the time I executed the Participation Agreement, I did not know what corporate entities were affiliated with Camp Mystic or how the camp was organized as a business. I did not know the name "Natural Fountains Properties, Inc." or understand it to be a party to the "Binding Arbitration" provision. I did not know what "Mystic Camps Family Partnership, Ltd." or "Mystic Camps Management, LLC" were.



Copy from re:SearchTX

13. It was not my understanding that by signing the Participation Agreement I was agreeing to arbitrate claims—including claims for the death of my daughter—against Camp Mystic's corporate owners, holding companies, or individual directors, officers, or employees. The Participation Agreement was, in my understanding, a camp enrollment form, not a broad arbitration agreement covering any dispute with business entities I had never heard of.

14. The arbitration provision refers to "disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof." Ex. 1 at 2. I understood this language to refer to disputes about the terms of the Participation Agreement, such as what services Camp Mystic agreed to provide—which were listed in the Agreement as traditional camp sports and games, such as water activities, hiking, aerobics, arts, and crafts, and equine activities—or whether Camp Mystic had met its obligations under those terms. I did not understand the phrase "out of or in connection with this Agreement" to sweep in claims arising from the death of my daughter in a flood at camp. That is not what I expected from a summer camp enrollment form or what I thought I was signing.

15. The fee for **Linnie McCown** to attend Camp Mystic for the 2005 summer season was less than $8,000.00, which was paid in consideration for her attendance at the camp.

16. I make this declaration in support of Plaintiffs' Response to Defendants' Motion to Compel Arbitration and Motion to Stay.

**FURTHER DECLARANT SAYETH NOT.**

Executed on this 4 day of May 2026, in Travis County, Texas.

Callie McCown
**Callie McCown**



Copy from re:SearchTX

# EX. 01
# Participation Agreement - McCown

Copy from re:SearchTX

# Participation Agreement 2025

for Linnie McCown, 2025 Season

Participation Agreement for Linnie McCown:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Linnie McCown, (Linnie), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Linnie.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Linnie and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from

Copy from re:SearchTX

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Linnie, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Linnie MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Linnie, use interviews with and photographic images of Linnie, including videotape, for its website, brochures and other, including promotional, materials.

Copy from re:SearchTX

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Linnie, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Linnie, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Callie McCown (05/31/2025)

Copy from re:SearchTX

# EXHIBIT 09

Copy from re:SearchTX

CAUSE NO. D-1-GN-25-009976

| | | |
|---|---|---|
| Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten, and Jennifer Getten | § | IN THE DISTRICT COURT OF |
| *Plaintiffs,* | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III | § | |
| *Defendants.* | § | 459th JUDICIAL DISTRICT |

---

**DECLARATION OF KRISTIN POHL**

---

Pursuant to Section 132.001 of the Texas Civil Practice and Remedies Code, I, **Kristin Pohl**, declare under penalty of perjury that the following statements are true and correct to the best of my knowledge and belief:

1. My name is **Kristin Pohl**. My date of birth is [redacted]. I am over the age of eighteen (18), of sound mind, and fully competent to make this Declaration. I have personal knowledge of the facts stated herein, and they are true and correct.

2. I am the mother of **Abby Pohl**, who tragically died on July 4, 2025, while attending Camp Mystic in Hunt, Texas.

3. I am a resident of the State of Texas. I reside **at** [redacted] [redacted] [redacted]**,** [redacted]. I have continuously resided in the State of Texas at all times material to this Declaration, including on the date I signed the Camp Mystic Participation Agreement for the 2025 camp season, and I remain a resident of the State of Texas today.

4. On or about **March 24, 2025**, I signed the Camp Mystic Participation Agreement (the "Participation Agreement") for my daughter, **Abby Pohl,** to be permitted to attend Camp Mystic in 2025. **Ex. 1.** The Participation Agreement was provided to me as part of the online registration process for my daughter to attend Camp Mystic.



Copy from re:SearchTX

5. I signed the Participation Agreement while physically present in the State of Texas, in **Austin, Texas.** I did not travel outside of Texas to sign the Agreement, and I did not sign it in, from, or while located in any other state.

6. I was the sole signatory to the Participation Agreement. No representative of Camp Mystic, Natural Fountains Properties, Inc., or any other Defendant in this action signed the Agreement. No attorney signed the Participation Agreement, and I did not consult with or receive the advice of an attorney concerning the Participation Agreement, or any provisions within it, before signing it. I was further not advised to seek the counsel of an attorney prior to signing the Participation Agreement.

7. At the time I executed the Participation Agreement, my daughter, **Abby Pohl**, was a minor child residing with me in the State of Texas. My daughter's primary and only residence on the date the Agreement was signed was **2506 Janice Drive, Austin, TX 78703.** My daughter had not established a residence in any other state.

8. At the time of her death in July 2025, **Abby Pohl** was a resident of the State of Texas. **Abby Pohl** had been continuously a Texas resident from the time the Participation Agreement was signed through the date of her death.

9. It was my understanding, based on information provided to me by Camp Mystic during the enrollment process, that execution of the Participation Agreement was **a mandatory prerequisite** for my daughter's enrollment in and participation at Camp Mystic for the 2025 summer season. Camp Mystic would not have permitted **Abby Pohl** to enroll in or attend Camp Mystic without a signed Participation Agreement. I signed the Participation Agreement because I was required to do so in order for my daughter to attend Camp Mystic.

10. All activities described in the Participation Agreement and in which my daughter was to participate (including, without limitation, camp sports, water activities, hiking, arts and crafts, and horseback riding activities) were to take place at Camp Mystic's premises in Hunt, Texas. **Abby Pohl** did not travel out of the State of Texas in connection with her enrollment at, or participation in, Camp Mystic for the 2025 camp season.

11. The Participation Agreement contained a section entitled "Binding Arbitration." Ex. 1 at 2. Prior to executing the Participation Agreement, no one at Camp Mystic discussed the "Binding Arbitration" section of the Participation Agreement with me.

12. At the time I executed the Participation Agreement, I did not know what corporate entities were affiliated with Camp Mystic or how the camp was organized as a business. I did not know the name "Natural Fountains Properties, Inc." or understand it to be a party to the "Binding Arbitration" provision. I did not know what "Mystic Camps Family Partnership, Ltd." or "Mystic Camps Management, LLC" were.



Copy from re:SearchTX

13. It was not my understanding that by signing the Participation Agreement I was agreeing to arbitrate claims—including claims for the death of my daughter—against Camp Mystic's corporate owners, holding companies, or individual directors, officers, or employees. The Participation Agreement was, in my understanding, a camp enrollment form, not a broad arbitration agreement covering any dispute with business entities I had never heard of.

14. The arbitration provision refers to "disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof." Ex. 1 at 2. I understood this language to refer to disputes about the terms of the Participation Agreement, such as what services Camp Mystic agreed to provide—which were listed in the Agreement as traditional camp sports and games, such as water activities, hiking, aerobics, arts, and crafts, and equine activities—or whether Camp Mystic had met its obligations under those terms. I did not understand the phrase "out of or in connection with this Agreement" to sweep in claims arising from the death of my daughter in a flood at camp. That is not what I expected from a summer camp enrollment form or what I thought I was signing.

15. The fee for **Abby Pohl** to attend Camp Mystic for the 2005 summer season was less than $8,000.00, which was paid in consideration for her attendance at the camp.

16. I make this declaration in support of Plaintiffs' Response to Defendants' Motion to Compel Arbitration and Motion to Stay.

**FURTHER DECLARANT SAYETH NOT.**

Executed on this 4 day of May 2026, in Travis County, Texas.

Kim Pohl

**Kristin Pohl**



Copy from re:SearchTX

# EX. 01
# Participation Agreement - Pohl

Copy from re:SearchTX

# Participation Agreement 2025

for Abby Pohl, 2025 Season

Participation Agreement for Abby Pohl:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Abby Pohl, (Abby), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Abby.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Abby and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from the nearest hospital/emergency center if a need were to arise to receive emergency care.

Copy from re:SearchTX

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Abby, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Abby MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Abby, use interviews with and photographic images of Abby, including videotape, for its website, brochures and other, including promotional, materials.

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the

Copy from re:SearchTX

remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Abby, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Abby, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Kristin Pohl (03/24/2025)

Copy from re:SearchTX

# EXHIBIT 10

Copy from re:SearchTX

CAUSE NO. D-1-GN-25-009976

| | | |
|---|---|---|
| Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten, and Ellen Sheedy | § | IN THE DISTRICT COURT OF |
| *Plaintiffs,* | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III | § | |
| *Defendants.* | § | 459th JUDICIAL DISTRICT |

**DECLARATION OF ELLEN SHEEDY**

Pursuant to Section 132.001 of the Texas Civil Practice and Remedies Code, I, **Ellen Sheedy**, declare under penalty of perjury that the following statements are true and correct to the best of my knowledge and belief:

1. My name is **Ellen Sheedy**. My date of birth is [redacted]. I am over the age of eighteen (18), of sound mind, and fully competent to make this Declaration. I have personal knowledge of the facts stated herein, and they are true and correct.

2. I am the mother of **Margaret Sheedy**, who tragically died on July 4, 2025, while attending Camp Mystic in Hunt, Texas.

3. I am a resident of the State of Texas. I reside **at** [redacted]. I have continuously resided in the State of Texas at all times material to this Declaration, including on the date I signed the Camp Mystic Participation Agreement for the 2025 camp season, and I remain a resident of the State of Texas today.

4. On or about **April 28, 2025**, I signed the Camp Mystic Participation Agreement (the "Participation Agreement") for my daughter, **Margaret Sheedy,** to be permitted to attend Camp Mystic in 2025. **Ex. 1.** The Participation Agreement was provided to me as part of the online registration process for my daughter to attend Camp Mystic.



Copy from re:SearchTX

5. I signed the Participation Agreement while physically present in the State of Texas, in **Houston, Texas.** I did not travel outside of Texas to sign the Agreement, and I did not sign it in, from, or while located in any other state.

6. I was the sole signatory to the Participation Agreement. No representative of Camp Mystic, Natural Fountains Properties, Inc., or any other Defendant in this action signed the Agreement. No attorney signed the Participation Agreement, and I did not consult with or receive the advice of an attorney concerning the Participation Agreement, or any provisions within it, before signing it. I was further not advised to seek the counsel of an attorney prior to signing the Participation Agreement.

7. At the time I executed the Participation Agreement, my daughter, **Margaret Sheedy**, was a minor child residing with me in the State of Texas. My daughter's primary and only residence on the date the Agreement was signed was **6122 Riverview Way, Houston, TX 77056.** My daughter had not established a residence in any other state.

8. At the time of her death in July 2025, **Margaret Sheedy** was a resident of the State of Texas. **Margaret Sheedy** had been continuously a Texas resident from the time the Participation Agreement was signed through the date of her death.

9. It was my understanding, based on information provided to me by Camp Mystic during the enrollment process, that execution of the Participation Agreement was **a mandatory prerequisite** for my daughter's enrollment in and participation at Camp Mystic for the 2025 summer season. Camp Mystic would not have permitted **Margaret Sheedy** to enroll in or attend Camp Mystic without a signed Participation Agreement. I signed the Participation Agreement because I was required to do so in order for my daughter to attend Camp Mystic.

10. All activities described in the Participation Agreement and in which my daughter was to participate (including, without limitation, camp sports, water activities, hiking, arts and crafts, and horseback riding activities) were to take place at Camp Mystic's premises in Hunt, Texas. **Margaret Sheedy** did not travel out of the State of Texas in connection with her enrollment at, or participation in, Camp Mystic for the 2025 camp season.

11. The Participation Agreement contained a section entitled "Binding Arbitration." Ex. 1 at 2. Prior to executing the Participation Agreement, no one at Camp Mystic discussed the "Binding Arbitration" section of the Participation Agreement with me.

12. At the time I executed the Participation Agreement, I did not know what corporate entities were affiliated with Camp Mystic or how the camp was organized as a business. I did not know the name "Natural Fountains Properties, Inc." or understand it to be a party to the "Binding Arbitration" provision. I did not know what "Mystic Camps Family Partnership, Ltd." or "Mystic Camps Management, LLC" were.



Copy from re:SearchTX

13. It was not my understanding that by signing the Participation Agreement I was agreeing to arbitrate claims—including claims for the death of my daughter—against Camp Mystic's corporate owners, holding companies, or individual directors, officers, or employees. The Participation Agreement was, in my understanding, a camp enrollment form, not a broad arbitration agreement covering any dispute with business entities I had never heard of.

14. The arbitration provision refers to "disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof." Ex. 1 at 2. I understood this language to refer to disputes about the terms of the Participation Agreement, such as what services Camp Mystic agreed to provide—which were listed in the Agreement as traditional camp sports and games, such as water activities, hiking, aerobics, arts, and crafts, and equine activities—or whether Camp Mystic had met its obligations under those terms. I did not understand the phrase "out of or in connection with this Agreement" to sweep in claims arising from the death of my daughter in a flood at camp. That is not what I expected from a summer camp enrollment form or what I thought I was signing.

15. The fee for **Margaret Sheedy** to attend Camp Mystic for the 2005 summer season was less than $8,000.00, which was paid in consideration for her attendance at the camp.

16. I make this declaration in support of Plaintiffs' Response to Defendants' Motion to Compel Arbitration and Motion to Stay.

**FURTHER DECLARANT SAYETH NOT.**

Executed on this 4 day of May 2026, in Harris County, Texas.

Ellen Sheedy

**Ellen Sheedy**



Copy from re:SearchTX

# EX. 01
# Participation Agreement - Sheedy

Copy from re:SearchTX

# Participation Agreement 2025

for Margaret Sheedy, 2025 Season

Participation Agreement for Margaret Sheedy:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Margaret Sheedy, (Margaret), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Margaret.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Margaret and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from

Copy from re:SearchTX

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Margaret, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Margaret MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Margaret, use interviews with and photographic images of Margaret, including videotape, for its website, brochures and other, including promotional, materials.

Copy from re:SearchTX

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Margaret, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Margaret, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Ellen Sheedy (04/28/2025)

Copy from re:SearchTX

# EXHIBIT 11

Copy from re:SearchTX

CAUSE NO. D-1-GN-25-009976

| | | |
|---|---|---|
| Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten, and Jennifer Getten | § | IN THE DISTRICT COURT OF |
| *Plaintiffs,* | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III | § | |
| *Defendants.* | § | 459th JUDICIAL DISTRICT |

**DECLARATION OF STACY STEVENS**

Pursuant to Section 132.001 of the Texas Civil Practice and Remedies Code, I, **Stacy Stevens**, declare under penalty of perjury that the following statements are true and correct to the best of my knowledge and belief:

1. My name is **Stacy Stevens**. My date of birth is [redacted]. I am over the age of eighteen (18), of sound mind, and fully competent to make this Declaration. I have personal knowledge of the facts stated herein, and they are true and correct.

2. I am the mother of **Mary Stevens**, who tragically died on July 4, 2025, while attending Camp Mystic in Hunt, Texas.

3. I am a resident of the State of Texas. I reside **at** [redacted] [redacted] [redacted]**,** [redacted]. I have continuously resided in the State of Texas at all times material to this Declaration, including on the date I signed the Camp Mystic Participation Agreement for the 2025 camp season, and I remain a resident of the State of Texas today.

4. On or about **April 27, 2025**, I signed the Camp Mystic Participation Agreement (the "Participation Agreement") for my daughter, **Mary Stevens,** to be permitted to attend Camp Mystic in 2025. **Ex. 1.** The Participation Agreement was provided to me as part of the online registration process for my daughter to attend Camp Mystic.



Copy from re:SearchTX

5. I signed the Participation Agreement while physically present in the State of Texas, in **Austin, Texas.** I did not travel outside of Texas to sign the Agreement, and I did not sign it in, from, or while located in any other state.

6. I was the sole signatory to the Participation Agreement. No representative of Camp Mystic, Natural Fountains Properties, Inc., or any other Defendant in this action signed the Agreement. No attorney signed the Participation Agreement, and I did not consult with or receive the advice of an attorney concerning the Participation Agreement, or any provisions within it, before signing it. I was further not advised to seek the counsel of an attorney prior to signing the Participation Agreement.

7. At the time I executed the Participation Agreement, my daughter, **Mary Stevens**, was a minor child residing with me in the State of Texas. My daughter's primary and only residence on the date the Agreement was signed was **3022 Perry Lane, Austin, TX 78731.** My daughter had not established a residence in any other state.

8. At the time of her death in July 2025, **Mary Stevens** was a resident of the State of Texas. **Mary Stevens** had been continuously a Texas resident from the time the Participation Agreement was signed through the date of her death.

9. It was my understanding, based on information provided to me by Camp Mystic during the enrollment process, that execution of the Participation Agreement was **a mandatory prerequisite** for my daughter's enrollment in and participation at Camp Mystic for the 2025 summer season. Camp Mystic would not have permitted **Mary Stevens** to enroll in or attend Camp Mystic without a signed Participation Agreement. I signed the Participation Agreement because I was required to do so in order for my daughter to attend Camp Mystic.

10. All activities described in the Participation Agreement and in which my daughter was to participate (including, without limitation, camp sports, water activities, hiking, arts and crafts, and horseback riding activities) were to take place at Camp Mystic's premises in Hunt, Texas. **Mary Stevens** did not travel out of the State of Texas in connection with her enrollment at, or participation in, Camp Mystic for the 2025 camp season.

11. The Participation Agreement contained a section entitled "Binding Arbitration." Ex. 1 at 2. Prior to executing the Participation Agreement, no one at Camp Mystic discussed the "Binding Arbitration" section of the Participation Agreement with me.

12. At the time I executed the Participation Agreement, I did not know what corporate entities were affiliated with Camp Mystic or how the camp was organized as a business. I did not know the name "Natural Fountains Properties, Inc." or understand it to be a party to the "Binding Arbitration" provision. I did not know what "Mystic Camps Family Partnership, Ltd." or "Mystic Camps Management, LLC" were.



Copy from re:SearchTX

13. It was not my understanding that by signing the Participation Agreement I was agreeing to arbitrate claims—including claims for the death of my daughter—against Camp Mystic's corporate owners, holding companies, or individual directors, officers, or employees. The Participation Agreement was, in my understanding, a camp enrollment form, not a broad arbitration agreement covering any dispute with business entities I had never heard of.

14. The arbitration provision refers to "disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof." Ex. 1 at 2. I understood this language to refer to disputes about the terms of the Participation Agreement, such as what services Camp Mystic agreed to provide—which were listed in the Agreement as traditional camp sports and games, such as water activities, hiking, aerobics, arts, and crafts, and equine activities—or whether Camp Mystic had met its obligations under those terms. I did not understand the phrase "out of or in connection with this Agreement" to sweep in claims arising from the death of my daughter in a flood at camp. That is not what I expected from a summer camp enrollment form or what I thought I was signing.

15. The fee for **Mary Stevens** to attend Camp Mystic for the 2005 summer season was less than $8,000.00, which was paid in consideration for her attendance at the camp.

16. I make this declaration in support of Plaintiffs' Response to Defendants' Motion to Compel Arbitration and Motion to Stay.

**FURTHER DECLARANT SAYETH NOT.**

Executed on this _1__ day of May 2026, in Travis County, Texas**.**

____________________________

**Stacy Stevens**



Copy from re:SearchTX

# EX. 01
# Participation Agreement - Stevens

Copy from re:SearchTX

# Participation Agreement 2025

for Mary Stevens, 2025 Season

Participation Agreement for Mary Stevens:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Mary Stevens, (Mary), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Mary.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Mary and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from the nearest hospital/emergency center if a need were to arise to receive emergency care.

Copy from re:SearchTX

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Mary, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Mary MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Mary, use interviews with and photographic images of Mary, including videotape, for its website, brochures and other, including promotional, materials.

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the

Copy from re:SearchTX

remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Mary, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Mary, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Stacy Stevens (04/27/2025)

Copy from re:SearchTX

# EXHIBIT 12

Copy from re:SearchTX

CAUSE NO. D-1-GN-25-009976

| | | |
|---|---|---|
| Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten, and Ellen Toranzo<br><br>*Plaintiffs,* | §<br>§<br>§<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT OF |
| v. | §<br>§ | TRAVIS COUNTY, TEXAS |
| Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III<br><br>*Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | 459th JUDICIAL DISTRICT |

---

**DECLARATION OF ELLEN TORANZO**

---

Pursuant to Section 132.001 of the Texas Civil Practice and Remedies Code, I, **Ellen Toranzo**, declare under penalty of perjury that the following statements are true and correct to the best of my knowledge and belief:

1. My name is **Ellen Toranzo**. My date of birth is [redacted]. I am over the age of eighteen (18), of sound mind, and fully competent to make this Declaration. I have personal knowledge of the facts stated herein, and they are true and correct.

2. I am the mother of **Greta Toranzo**, who tragically died on July 4, 2025, while attending Camp Mystic in Hunt, Texas.

3. I am a resident of the State of Texas. I reside **at** [redacted]. I have continuously resided in the State of Texas at all times material to this Declaration, including on the date I signed the Camp Mystic Participation Agreement for the 2025 camp season, and I remain a resident of the State of Texas today.

4. On or about **May 30, 2025**, I signed the Camp Mystic Participation Agreement (the "Participation Agreement") for my daughter, **Greta Toranzo,** to be permitted to attend Camp Mystic in 2025. **Ex. 1.** The Participation Agreement was provided to me as part of the online registration process for my daughter to attend Camp Mystic.



Copy from re:SearchTX

5. I signed the Participation Agreement while physically present in the State of Texas, in **Houston, Texas.** I did not travel outside of Texas to sign the Agreement, and I did not sign it in, from, or while located in any other state.

6. I was the sole signatory to the Participation Agreement. No representative of Camp Mystic, Natural Fountains Properties, Inc., or any other Defendant in this action signed the Agreement. No attorney signed the Participation Agreement, and I did not consult with or receive the advice of an attorney concerning the Participation Agreement, or any provisions within it, before signing it. I was further not advised to seek the counsel of an attorney prior to signing the Participation Agreement.

7. At the time I executed the Participation Agreement, my daughter, **Greta Toranzo**, was a minor child residing with me in the State of Texas. My daughter's primary and only residence on the date the Agreement was signed was **6430 Cindy Lane, Houston, TX 77008.** My daughter had not established a residence in any other state.

8. At the time of her death in July 2025, **Greta Toranzo** was a resident of the State of Texas. **Greta Toranzo** had been continuously a Texas resident from the time the Participation Agreement was signed through the date of her death.

9. It was my understanding, based on information provided to me by Camp Mystic during the enrollment process, that execution of the Participation Agreement was **a mandatory prerequisite** for my daughter's enrollment in and participation at Camp Mystic for the 2025 summer season. Camp Mystic would not have permitted **Greta Toranzo** to enroll in or attend Camp Mystic without a signed Participation Agreement. I signed the Participation Agreement because I was required to do so in order for my daughter to attend Camp Mystic.

10. All activities described in the Participation Agreement and in which my daughter was to participate (including, without limitation, camp sports, water activities, hiking, arts and crafts, and horseback riding activities) were to take place at Camp Mystic's premises in Hunt, Texas. **Greta Toranzo** did not travel out of the State of Texas in connection with her enrollment at, or participation in, Camp Mystic for the 2025 camp season.

11. The Participation Agreement contained a section entitled "Binding Arbitration." Ex. 1 at 2. Prior to executing the Participation Agreement, no one at Camp Mystic discussed the "Binding Arbitration" section of the Participation Agreement with me.

12. At the time I executed the Participation Agreement, I did not know what corporate entities were affiliated with Camp Mystic or how the camp was organized as a business. I did not know the name "Natural Fountains Properties, Inc." or understand it to be a party to the "Binding Arbitration" provision. I did not know what "Mystic Camps Family Partnership, Ltd." or "Mystic Camps Management, LLC" were.



Copy from re:SearchTX

13. It was not my understanding that by signing the Participation Agreement I was agreeing to arbitrate claims—including claims for the death of my daughter—against Camp Mystic's corporate owners, holding companies, or individual directors, officers, or employees. The Participation Agreement was, in my understanding, a camp enrollment form, not a broad arbitration agreement covering any dispute with business entities I had never heard of.

14. The arbitration provision refers to "disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof." Ex. 1 at 2. I understood this language to refer to disputes about the terms of the Participation Agreement, such as what services Camp Mystic agreed to provide—which were listed in the Agreement as traditional camp sports and games, such as water activities, hiking, aerobics, arts, and crafts, and equine activities—or whether Camp Mystic had met its obligations under those terms. I did not understand the phrase "out of or in connection with this Agreement" to sweep in claims arising from the death of my daughter in a flood at camp. That is not what I expected from a summer camp enrollment form or what I thought I was signing.

15. The fee for **Greta Toranzo** to attend Camp Mystic for the 2005 summer season was less than $8,000.00, which was paid in consideration for her attendance at the camp.

16. I make this declaration in support of Plaintiffs' Response to Defendants' Motion to Compel Arbitration and Motion to Stay.

**FURTHER DECLARANT SAYETH NOT.**

Executed on this 3rd day of May 2026, in Harris County, Texas.

[signature]

**Ellen Toranzo**

Copy from re:SearchTX

# EX. 01
# Participation Agreement - Toranzo

Copy from re:SearchTX

# Participation Agreement 2025

for Greta Toranzo, 2025 Season

Participation Agreement for Greta Toranzo:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Greta Toranzo, (Greta), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Greta.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Greta and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from

Copy from re:SearchTX

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Greta, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Greta MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Greta, use interviews with and photographic images of Greta, including videotape, for its website, brochures and other, including promotional, materials.

Copy from re:SearchTX

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Greta, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Greta, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Ellen Kolpin Toranzo (05/30/2025)

Copy from re:SearchTX

# EXHIBIT 13

Copy from re:SearchTX

No. D-1-GN-25-009963

| | | |
|---|---|---|
| WARREN and PATRICIA BELLOWS, Individually and as Representatives of ANNA MARGARET BELLOWS, Deceased; et al., | § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| CAMP MYSTIC, LLC; et al., | § | |
| Defendants. | § | 459TH JUDICIAL DISTRICT |

**DECLARATION OF PATRICIA BELLOWS**

---

Pursuant to Section 132.001 of the Texas Civil Practice and Remedies Code, I, Patricia Bellows, make this declaration. My date of birth is [redacted] and my address is [redacted]. I declare under penalty of perjury that the following statements are true and correct to the best of my knowledge and belief:

1. My name is Patricia Bellows. I am over the age of eighteen (18), of sound mind, and fully competent to make this Declaration. I have personal knowledge of the facts stated herein, and they are true and correct.

2. I am the mother of Margaret Bellows, who tragically died on July 4, 2025, while attending Camp Mystic in Hunt, Texas.

3. I am a resident of the State of Texas. I reside in Harris County, Texas. I have continuously resided in the State of Texas at all times material to this Declaration, including on the date I signed the Camp Mystic Participation Agreement for the 2025 camp season, and I remain a resident of the State of Texas today.

4. On or about June 20, 2025, I signed the Camp Mystic Participation Agreement (the "Participation Agreement") for my daughter, Margaret, to be permitted to attend Camp Mystic in 2025. Ex. 1. The Participation Agreement was provided to me as part of the online registration process for my daughter to attend Camp Mystic.

5. I signed the Participation Agreement while physically present in the State of Texas, in Houston, Texas. I did not travel outside of Texas to sign the Agreement, and I did not sign it in, from, or while located in any other state.

6. I was the sole signatory to the Participation Agreement. No representative of Camp Mystic, Natural Fountains Properties, Inc., or any other Defendant in this action signed the Agreement. No attorney signed the Participation Agreement, and I did not consult with or receive the advice of an attorney concerning the Participation Agreement, or any provisions



Copy from re:SearchTX

within it, before signing it. I was further not advised to seek the counsel of an attorney prior to signing the Participation Agreement.

7. At the time I executed the Participation Agreement, my daughter, Margaret, was a minor child residing with me in the State of Texas. My daughter's primary and only residence on the date the Agreement was signed was in Harris County, Texas. My daughter had not established a residence in any other state.

8. At the time of her death in July 2025, Margaret was a resident of the State of Texas. Margaret had been continuously a Texas resident from the time the Participation Agreement was signed through the date of her death.

9. It was my understanding, based on information provided to me by Camp Mystic during the enrollment process, that execution of the Participation Agreement was a mandatory prerequisite for my daughter's enrollment in and participation at Camp Mystic for the 2025 summer season. Camp Mystic would not have permitted Margaret to enroll in or attend Camp Mystic without a signed Participation Agreement. I signed the Participation Agreement because I was required to do so in order for my daughter to attend Camp Mystic.

10. All activities described in the Participation Agreement and in which my daughter was to participate (including, without limitation, camp sports, water activities, hiking, arts and crafts, and horseback riding activities) were to take place at Camp Mystic's premises in Hunt, Texas. Margaret did not travel out of the State of Texas in connection with her enrollment at, or participation in, Camp Mystic for the 2025 camp season.

11. The Participation Agreement contained a section entitled "Binding Arbitration." Ex. 1 at 2. Prior to executing the Participation Agreement, no one at Camp Mystic discussed the "Binding Arbitration" section of the Participation Agreement with me.

12. At the time I executed the Participation Agreement, I did not know what corporate entities were affiliated with Camp Mystic or how the camp was organized as a business. I did not know the name "Natural Fountains Properties, Inc." or understand it to be a party to the "Binding Arbitration" provision. I did not know what "Mystic Camps Family Partnership, Ltd." or "Mystic Camps Management, LLC" were.

13. It was not my understanding that by signing the Participation Agreement I was agreeing to arbitrate claims—including claims for the death of my daughter—against Camp Mystic's corporate owners, holding companies, or individual directors, officers, or employees. The Participation Agreement was, in my understanding, a camp enrollment form, not a broad arbitration agreement covering any dispute with business entities I had never heard of.

14. The arbitration provision refers to "disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof." Ex. 1 at 2. I understood this language to refer to disputes about the terms of the Participation Agreement, such as what services Camp Mystic agreed to provide—which were listed in the Agreement as traditional camp sports and games, such as water activities, hiking,



Copy from re:SearchTX

aerobics, arts, and crafts, and equine activities—or whether Camp Mystic had met its obligations under those terms. I did not understand the phrase "out of or in connection with this Agreement" to sweep in claims arising from the death of my daughter in a flood at camp. That is not what I expected from a summer camp enrollment form or what I thought I was signing.

15. The fee for Margaret to attend Camp Mystic for the 2025 summer season was less than $8,500, which was paid in consideration for her attendance at the camp.

16. I make this declaration in support of Plaintiffs' Response to Defendants' Motion to Compel Arbitration and Motion to Stay.

**FURTHER DECLARANT SAYETH NOT.**

Executed on this 6th day of May 2026, in Harris County, Texas.

Patricia Bellows
Patricia Bellows (May 6, 2026 08:32:43 CDT)

**Patricia Bellows**



Copy from re:SearchTX

# Participation Agreement 2025

for Margaret Bellows, 2025 Season

Participation Agreement for Margaret Bellows:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Margaret Bellows, (Margaret), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Margaret.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Margaret and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from



Copy from re:SearchTX

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Margaret, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Margaret MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Margaret, use interviews with and photographic images of Margaret, including videotape, for its website, brochures and other, including promotional, materials.



Copy from re:SearchTX

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Margaret, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Margaret, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Patricia Bellows
(06/20/2025)



Copy from re:SearchTX

# EXHIBIT 14

Copy from re:SearchTX

No. D-1-GN-25-009963

| | | |
|---|---|---|
| WARREN and PATRICIA BELLOWS, Individually and as Representatives of ANNA MARGARET BELLOWS, Deceased; et al., | § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| CAMP MYSTIC, LLC; et al., | § | |
| Defendants. | § | 459TH JUDICIAL DISTRICT |

**DECLARATION OF CAITLIN BONNER**

---

Pursuant to Section 132.001 of the Texas Civil Practice and Remedies Code, I, Caitlin Bonner, make this declaration. My date of birth is [redacted] and my address is [redacted]. I declare under penalty of perjury that the following statements are true and correct to the best of my knowledge and belief:

1. My name is Caitlin Bonner. I am over the age of eighteen (18), of sound mind, and fully competent to make this Declaration. I have personal knowledge of the facts stated herein, and they are true and correct.

2. I am the mother of Lila Bonner, who tragically died on July 4, 2025, while attending Camp Mystic in Hunt, Texas.

3. I am a resident of the State of Texas. I reside in Dallas County, Texas. I have continuously resided in the State of Texas at all times material to this Declaration, including on the date I signed the Camp Mystic Participation Agreement for the 2025 camp season, and I remain a resident of the State of Texas today.

4. On or about February 21, 2025, I signed the Camp Mystic Participation Agreement (the "Participation Agreement") for my daughter, Lila, to be permitted to attend Camp Mystic in 2025. Ex. 1. The Participation Agreement was provided to me as part of the online registration process for my daughter to attend Camp Mystic.

5. I signed the Participation Agreement while physically present in the State of Texas, in Dallas, Texas. I did not travel outside of Texas to sign the Agreement, and I did not sign it in, from, or while located in any other state.

6. I was the sole signatory to the Participation Agreement. No representative of Camp Mystic, Natural Fountains Properties, Inc., or any other Defendant in this action signed the Agreement. No attorney signed the Participation Agreement, and I did not consult with or receive the advice of an attorney concerning the Participation Agreement, or any provisions



Copy from re:SearchTX

within it, before signing it. I was further not advised to seek the counsel of an attorney prior to signing the Participation Agreement.

7. At the time I executed the Participation Agreement, my daughter, Lila, was a minor child residing with me in the State of Texas. My daughter's primary and only residence on the date the Agreement was signed was in Dallas County, Texas. My daughter had not established a residence in any other state.

8. At the time of her death in July 2025, Lila was a resident of the State of Texas. Lila had been continuously a Texas resident from the time the Participation Agreement was signed through the date of her death.

9. It was my understanding, based on information provided to me by Camp Mystic during the enrollment process, that execution of the Participation Agreement was a mandatory prerequisite for my daughter's enrollment in and participation at Camp Mystic for the 2025 summer season. Camp Mystic would not have permitted Lila to enroll in or attend Camp Mystic without a signed Participation Agreement. I signed the Participation Agreement because I was required to do so in order for my daughter to attend Camp Mystic.

10. All activities described in the Participation Agreement and in which my daughter was to participate (including, without limitation, camp sports, water activities, hiking, arts and crafts, and horseback riding activities) were to take place at Camp Mystic's premises in Hunt, Texas. Lila did not travel out of the State of Texas in connection with her enrollment at, or participation in, Camp Mystic for the 2025 camp season.

11. The Participation Agreement contained a section entitled "Binding Arbitration." Ex. 1 at 2. Prior to executing the Participation Agreement, no one at Camp Mystic discussed the "Binding Arbitration" section of the Participation Agreement with me.

12. At the time I executed the Participation Agreement, I did not know what corporate entities were affiliated with Camp Mystic or how the camp was organized as a business. I did not know the name "Natural Fountains Properties, Inc." or understand it to be a party to the "Binding Arbitration" provision. I did not know what "Mystic Camps Family Partnership, Ltd." or "Mystic Camps Management, LLC" were.

13. It was not my understanding that by signing the Participation Agreement I was agreeing to arbitrate claims—including claims for the death of my daughter—against Camp Mystic's corporate owners, holding companies, or individual directors, officers, or employees. The Participation Agreement was, in my understanding, a camp enrollment form, not a broad arbitration agreement covering any dispute with business entities I had never heard of.

14. The arbitration provision refers to "disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof." Ex. 1 at 2. I understood this language to refer to disputes about the terms of the Participation Agreement, such as what services Camp Mystic agreed to provide—which were listed in the Agreement as traditional camp sports and games, such as water activities, hiking,



Copy from re:SearchTX

aerobics, arts, and crafts, and equine activities—or whether Camp Mystic had met its obligations under those terms. I did not understand the phrase "out of or in connection with this Agreement" to sweep in claims arising from the death of my daughter in a flood at camp. That is not what I expected from a summer camp enrollment form or what I thought I was signing.

15. The fee for Lila to attend Camp Mystic for the 2025 summer season was less than $8,500, which was paid in consideration for her attendance at the camp.

16. I make this declaration in support of Plaintiffs' Response to Defendants' Motion to Compel Arbitration and Motion to Stay.

**FURTHER DECLARANT SAYETH NOT.**

Executed on this 6th day of May 2026, in Dallas County, Texas.

*Caitlin Bonner*

**Caitlin Bonner**



Copy from re:SearchTX

# Participation Agreement 2025

for Lila Bonner, 2025 Season

Participation Agreement for Lila Bonner:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Lila Bonner, (Lila), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Lila.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Lila and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from the nearest hospital/emergency center if a need were to arise to receive emergency care.



Copy from re:SearchTX

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Lila, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Lila MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Lila, use interviews with and photographic images of Lila, including videotape, for its website, brochures and other, including promotional, materials.

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the



Copy from re:SearchTX

remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Lila, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Lila, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Caitlin Bonner (02/21/2025)



Copy from re:SearchTX

# EXHIBIT 15

Copy from re:SearchTX

No. D-1-GN-25-009963

| | | |
|---|---|---|
| WARREN and PATRICIA BELLOWS, Individually and as Representatives of ANNA MARGARET BELLOWS, Deceased; et al., | § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| CAMP MYSTIC, LLC; et al., | § | |
| Defendants. | § | 459TH JUDICIAL DISTRICT |

**DECLARATION OF RYAN DEWITT**

Pursuant to Section 132.001 of the Texas Civil Practice and Remedies Code, I, Ryan DeWitt, make this declaration. My date of birth is [redacted], and my address is [redacted]. I declare under penalty of perjury that the following statements are true and correct to the best of my knowledge and belief:

1. My name is Ryan DeWitt. I am over the age of eighteen (18), of sound mind, and fully competent to make this Declaration. I have personal knowledge of the facts stated herein, and they are true and correct.

2. I am the father of Molly DeWitt, who tragically died on July 4, 2025, while attending Camp Mystic in Hunt, Texas.

3. I am a resident of the State of Texas. I reside in Harris County, Texas. I have continuously resided in the State of Texas at all times material to this Declaration, including on the date I signed the Camp Mystic Participation Agreement for the 2025 camp season, and I remain a resident of the State of Texas today.

4. On or about June 3, 2025, I signed the Camp Mystic Participation Agreement (the "Participation Agreement") for my daughter, Molly, to be permitted to attend Camp Mystic in 2025. Ex. 1. The Participation Agreement was provided to me as part of the online registration process for my daughter to attend Camp Mystic.

5. I signed the Participation Agreement while physically present in the State of Texas, in Houston, Texas. I did not travel outside of Texas to sign the Agreement, and I did not sign it in, from, or while located in any other state.

6. I was the sole signatory to the Participation Agreement. No representative of Camp Mystic, Natural Fountains Properties, Inc., or any other Defendant in this action signed the Agreement. No attorney signed the Participation Agreement, and I did not consult with or receive the advice of an attorney concerning the Participation Agreement, or any provisions



Copy from re:SearchTX

within it, before signing it. I was further not advised to seek the counsel of an attorney prior to signing the Participation Agreement.

7. At the time I executed the Participation Agreement, my daughter, Molly, was a minor child residing with me in the State of Texas. My daughter's primary and only residence on the date the Agreement was signed was in Harris County, Texas. My daughter had not established a residence in any other state.

8. At the time of her death in July 2025, Molly was a resident of the State of Texas. Molly had been continuously a Texas resident from the time the Participation Agreement was signed through the date of her death.

9. It was my understanding, based on information provided to me by Camp Mystic during the enrollment process, that execution of the Participation Agreement was a mandatory prerequisite for my daughter's enrollment in and participation at Camp Mystic for the 2025 summer season. Camp Mystic would not have permitted Molly to enroll in or attend Camp Mystic without a signed Participation Agreement. I signed the Participation Agreement because I was required to do so in order for my daughter to attend Camp Mystic.

10. All activities described in the Participation Agreement and in which my daughter was to participate (including, without limitation, camp sports, water activities, hiking, arts and crafts, and horseback riding activities) were to take place at Camp Mystic's premises in Hunt, Texas. Molly did not travel out of the State of Texas in connection with her enrollment at, or participation in, Camp Mystic for the 2025 camp season.

11. The Participation Agreement contained a section entitled "Binding Arbitration." Ex. 1 at 2. Prior to executing the Participation Agreement, no one at Camp Mystic discussed the "Binding Arbitration" section of the Participation Agreement with me.

12. At the time I executed the Participation Agreement, I did not know what corporate entities were affiliated with Camp Mystic or how the camp was organized as a business. I did not know the name "Natural Fountains Properties, Inc." or understand it to be a party to the "Binding Arbitration" provision. I did not know what "Mystic Camps Family Partnership, Ltd." or "Mystic Camps Management, LLC" were.

13. It was not my understanding that by signing the Participation Agreement I was agreeing to arbitrate claims—including claims for the death of my daughter—against Camp Mystic's corporate owners, holding companies, or individual directors, officers, or employees. The Participation Agreement was, in my understanding, a camp enrollment form, not a broad arbitration agreement covering any dispute with business entities I had never heard of.

14. The arbitration provision refers to "disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof." Ex. 1 at 2. I understood this language to refer to disputes about the terms of the Participation Agreement, such as what services Camp Mystic agreed to provide—which were listed in the Agreement as traditional camp sports and games, such as water activities, hiking,



Copy from re:SearchTX

aerobics, arts, and crafts, and equine activities—or whether Camp Mystic had met its obligations under those terms. I did not understand the phrase "out of or in connection with this Agreement" to sweep in claims arising from the death of my daughter in a flood at camp. That is not what I expected from a summer camp enrollment form or what I thought I was signing.

15. The fee for Molly to attend Camp Mystic for the 2025 summer season was less than $8,500, which was paid in consideration for her attendance at the camp.

16. I make this declaration in support of Plaintiffs' Response to Defendants' Motion to Compel Arbitration and Motion to Stay.

**FURTHER DECLARANT SAYETH NOT.**

Executed on this 6th day of May 2026, in Harris County, Texas.

Ryan DeWitt (May 6, 2026 09:06:10 CDT)

**Ryan DeWitt**



Copy from re:SearchTX

# Participation Agreement 2025

for Molly DeWitt, 2025 Season

Participation Agreement for Molly DeWitt:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Molly DeWitt, (Molly), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Molly.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Molly and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from


Copy from re:SearchTX

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Molly, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Molly MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Molly, use interviews with and photographic images of Molly, including videotape, for its website, brochures and other, including promotional, materials.



Copy from re:SearchTX

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Molly, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Molly, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

**Signature** Ryan DeWitt (06/03/2025)



Copy from re:SearchTX

# EXHIBIT 16

Copy from re:SearchTX

No. D-1-GN-25-009963

| | | |
|---|---|---|
| WARREN and PATRICIA BELLOWS, Individually and as Representatives of ANNA MARGARET BELLOWS, Deceased; et al., | § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| CAMP MYSTIC, LLC; et al., | § | |
| Defendants. | § | 459TH JUDICIAL DISTRICT |

**DECLARATION OF NATALIE LANDRY**

Pursuant to Section 132.001 of the Texas Civil Practice and Remedies Code, I, Natalie [redacted] of birth is [redacted] and my address is [redacted]. I declare under penalty of perjury that the following statements are true and correct to the best of my knowledge and belief:

1. My name is Natalie Landry. I am over the age of eighteen (18), of sound mind, and fully competent to make this Declaration. I have personal knowledge of the facts stated herein, and they are true and correct.

2. I am the mother of Lainey Landry, who tragically died on July 4, 2025, while attending Camp Mystic in Hunt, Texas.

3. I am a resident of the State of Texas. I reside in Harris County, Texas. I have continuously resided in the State of Texas at all times material to this Declaration, including on the date I signed the Camp Mystic Participation Agreement for the 2025 camp season, and I remain a resident of the State of Texas today.

4. On or about May 14. 2025, I signed the Camp Mystic Participation Agreement (the "Participation Agreement") for my daughter, Lainey, to be permitted to attend Camp Mystic in 2025. Ex. 1. The Participation Agreement was provided to me as part of the online registration process for my daughter to attend Camp Mystic.

5. I signed the Participation Agreement while physically present in the State of Texas, in Houston, Texas. I did not travel outside of Texas to sign the Agreement, and I did not sign it in, from, or while located in any other state.

6. I was the sole signatory to the Participation Agreement. No representative of Camp Mystic, Natural Fountains Properties, Inc., or any other Defendant in this action signed the Agreement. No attorney signed the Participation Agreement, and I did not consult with or receive the advice of an attorney concerning the Participation Agreement, or any provisions



Copy from re:SearchTX

within it, before signing it. I was further not advised to seek the counsel of an attorney prior to signing the Participation Agreement.

7. At the time I executed the Participation Agreement, my daughter, Lainey, was a minor child residing with me in the State of Texas. My daughter's primary and only residence on the date the Agreement was signed was in Harris County, Texas. My daughter had not established a residence in any other state.

8. At the time of her death in July 2025, Lainey was a resident of the State of Texas. Lainey had been continuously a Texas resident from the time the Participation Agreement was signed through the date of her death.

9. It was my understanding, based on information provided to me by Camp Mystic during the enrollment process, that execution of the Participation Agreement was a mandatory prerequisite for my daughter's enrollment in and participation at Camp Mystic for the 2025 summer season. Camp Mystic would not have permitted Lainey to enroll in or attend Camp Mystic without a signed Participation Agreement. I signed the Participation Agreement because I was required to do so in order for my daughter to attend Camp Mystic.

10. All activities described in the Participation Agreement and in which my daughter was to participate (including, without limitation, camp sports, water activities, hiking, arts and crafts, and horseback riding activities) were to take place at Camp Mystic's premises in Hunt, Texas. Lainey did not travel out of the State of Texas in connection with her enrollment at, or participation in, Camp Mystic for the 2025 camp season.

11. The Participation Agreement contained a section entitled "Binding Arbitration." Ex. 1 at 2. Prior to executing the Participation Agreement, no one at Camp Mystic discussed the "Binding Arbitration" section of the Participation Agreement with me.

12. At the time I executed the Participation Agreement, I did not know what corporate entities were affiliated with Camp Mystic or how the camp was organized as a business. I did not know the name "Natural Fountains Properties, Inc." or understand it to be a party to the "Binding Arbitration" provision. I did not know what "Mystic Camps Family Partnership, Ltd." or "Mystic Camps Management, LLC" were.

13. It was not my understanding that by signing the Participation Agreement I was agreeing to arbitrate claims—including claims for the death of my daughter—against Camp Mystic's corporate owners, holding companies, or individual directors, officers, or employees. The Participation Agreement was, in my understanding, a camp enrollment form, not a broad arbitration agreement covering any dispute with business entities I had never heard of.

14. The arbitration provision refers to "disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof." Ex. 1 at 2. I understood this language to refer to disputes about the terms of the Participation Agreement, such as what services Camp Mystic agreed to provide—which were listed in the Agreement as traditional camp sports and games, such as water activities, hiking,



Copy from re:SearchTX

aerobics, arts, and crafts, and equine activities—or whether Camp Mystic had met its obligations under those terms. I did not understand the phrase "out of or in connection with this Agreement" to sweep in claims arising from the death of my daughter in a flood at camp. That is not what I expected from a summer camp enrollment form or what I thought I was signing.

15. The fee for Lainey to attend Camp Mystic for the 2025 summer season was less than $8,500, which was paid in consideration for her attendance at the camp.

16. I make this declaration in support of Plaintiffs' Response to Defendants' Motion to Compel Arbitration and Motion to Stay.

**FURTHER DECLARANT SAYETH NOT.**

Executed on this 6th day of May 2026, in Harris County, Texas.

Natalie Landry (May 6, 2026 08:50:35 CDT)

**Natalie Landry**



Copy from re:SearchTX

# Participation Agreement 2025

for Lainey Landry, 2025 Season

Participation Agreement for Lainey Landry:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Lainey Landry, (Lainey), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Lainey.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Lainey and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from



Copy from re:SearchTX

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Lainey, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Lainey MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Lainey, use interviews with and photographic images of Lainey, including videotape, for its website, brochures and other, including promotional, materials.



Copy from re:SearchTX

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Lainey, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Lainey, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

**Signature** Natalie Landry (05/14/2025)



Copy from re:SearchTX

# EXHIBIT 17

Copy from re:SearchTX

No. D-1-GN-25-009963

| | | |
|---|---|---|
| WARREN and PATRICIA BELLOWS, Individually and as Representatives of ANNA MARGARET BELLOWS, Deceased; et al., | § § § § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| CAMP MYSTIC, LLC; et al., | § § | |
| Defendants. | § | 459TH JUDICIAL DISTRICT |

## DECLARATION OF LINDSEY MCLEOD MCCRORY

Pursuant to Section 132.001 of the Texas Civil Practice and Remedies Code, I, Lindsey McLeod McCrory, make this declaration. My date of birth is [redacted], and my address is [redacted] I declare under penalty of perjury that the following statements are true and correct to the best of my knowledge and belief:

1. My name is Lindsey McLeod McCrory. I am over the age of eighteen (18), of sound mind, and fully competent to make this Declaration. I have personal knowledge of the facts stated herein, and they are true and correct.

2. I am the mother of Blakely McCrory, who tragically died on July 4, 2025, while attending Camp Mystic in Hunt, Texas.

3. I am a resident of the State of Texas. I reside in Harris County, Texas. I have continuously resided in the State of Texas at all times material to this Declaration, including on the date I signed the Camp Mystic Participation Agreement for the 2025 camp season, and I remain a resident of the State of Texas today.

4. On or about June 9, 2025, I signed the Camp Mystic Participation Agreement (the "Participation Agreement") for my daughter, Blakely, to be permitted to attend Camp Mystic in 2025. Ex. 1. The Participation Agreement was provided to me as part of the online registration process for my daughter to attend Camp Mystic.

5. I signed the Participation Agreement while physically present in the State of Texas, in Houston, Texas. I did not travel outside of Texas to sign the Agreement, and I did not sign it in, from, or while located in any other state.

6. I was the sole signatory to the Participation Agreement. No representative of Camp Mystic, Natural Fountains Properties, Inc., or any other Defendant in this action signed the Agreement. No attorney signed the Participation Agreement, and I did not consult with or receive the advice of an attorney concerning the Participation Agreement, or any provisions



Copy from re:SearchTX

within it, before signing it. I was further not advised to seek the counsel of an attorney prior to signing the Participation Agreement.

7. At the time I executed the Participation Agreement, my daughter, Blakely, was a minor child residing with me in the State of Texas. My daughter's primary and only residence on the date the Agreement was signed was in Harris County, Texas. My daughter had not established a residence in any other state.

8. At the time of her death in July 2025, Blakely was a resident of the State of Texas. Blakely had been continuously a Texas resident from the time the Participation Agreement was signed through the date of her death.

9. It was my understanding, based on information provided to me by Camp Mystic during the enrollment process, that execution of the Participation Agreement was a mandatory prerequisite for my daughter's enrollment in and participation at Camp Mystic for the 2025 summer season. Camp Mystic would not have permitted Blakely to enroll in or attend Camp Mystic without a signed Participation Agreement. I signed the Participation Agreement because I was required to do so in order for my daughter to attend Camp Mystic.

10. All activities described in the Participation Agreement and in which my daughter was to participate (including, without limitation, camp sports, water activities, hiking, arts and crafts, and horseback riding activities) were to take place at Camp Mystic's premises in Hunt, Texas. Blakely did not travel out of the State of Texas in connection with her enrollment at, or participation in, Camp Mystic for the 2025 camp season.

11. The Participation Agreement contained a section entitled "Binding Arbitration." Ex. 1 at 2. Prior to executing the Participation Agreement, no one at Camp Mystic discussed the "Binding Arbitration" section of the Participation Agreement with me.

12. At the time I executed the Participation Agreement, I did not know what corporate entities were affiliated with Camp Mystic or how the camp was organized as a business. I did not know the name "Natural Fountains Properties, Inc." or understand it to be a party to the "Binding Arbitration" provision. I did not know what "Mystic Camps Family Partnership, Ltd." or "Mystic Camps Management, LLC" were.

13. It was not my understanding that by signing the Participation Agreement I was agreeing to arbitrate claims—including claims for the death of my daughter—against Camp Mystic's corporate owners, holding companies, or individual directors, officers, or employees. The Participation Agreement was, in my understanding, a camp enrollment form, not a broad arbitration agreement covering any dispute with business entities I had never heard of.

14. The arbitration provision refers to "disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof." Ex. 1 at 2. I understood this language to refer to disputes about the terms of the Participation Agreement, such as what services Camp Mystic agreed to provide—which were listed in the Agreement as traditional camp sports and games, such as water activities, hiking,



Copy from re:SearchTX

aerobics, arts, and crafts, and equine activities—or whether Camp Mystic had met its obligations under those terms. I did not understand the phrase "out of or in connection with this Agreement" to sweep in claims arising from the death of my daughter in a flood at camp. That is not what I expected from a summer camp enrollment form or what I thought I was signing.

15. The fee for Blakely to attend Camp Mystic for the 2025 summer season was less than $8,500, which was paid in consideration for her attendance at the camp.

16. I make this declaration in support of Plaintiffs' Response to Defendants' Motion to Compel Arbitration and Motion to Stay.

**FURTHER DECLARANT SAYETH NOT.**

Executed on this 5th day of May 2026, in Harris County, Texas.

Lindsey McLeod McCrory

**Lindsey McLeod McCrory**



Copy from re:SearchTX

# Participation Agreement 2025

for Blakely McCrory, 2025 Season

Participation Agreement for Blakely McCrory:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Blakely McCrory, (Blakely), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Blakely.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Blakely and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from


Copy from re:SearchTX

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Blakely, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Blakely MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Blakely, use interviews with and photographic images of Blakely, including videotape, for its website, brochures and other, including promotional, materials.



Copy from re:SearchTX

**Blakely McCrory**, Apr 10, 2017 (8.10) Page: 3

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Blakely, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Blakely, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Lindsey McLeod McCrory
(06/09/2025)



Copy from re:SearchTX

# EXHIBIT 18

Copy from re:SearchTX

# Camp Mystic

2689 HWY 39, HUNT, TX 78024
(830) 238-4660 ~ staff@campmystic.com

EMPLOYMENT CONTRACT

| | |
|---|---|
| Employee: | Katherine Ferruzzo |
| Activity Position: | FISHING, BEAUTY, CAMPCRAFT, AEROBICS OR GOLF ETTE |

| | | | |
|---|---|---|---|
| Camp Term(s): | Counselor - 2nd, | Start Date: | 6/27/2025 |
| Salary: | $935.00 | End Date: | 7/26/2025 |

Additional Contract Terms:
The above named person indicates her whole-hearted intention to join in both letter and spirit the effort of Camp Mystic to provide the best in camping for girls.

It is agreed by both signers that this contract is valid pending favorable references. The above named person agrees not to negotiate for any other employment involving the same period of time, or to negotiate with any other camp during or before the above period of time. The above named person agrees to give permission to Camp Mystic to check their references and background.

The above named person agrees to report to camp on the designated start date and not to ask for release until the contract is complete. If, however, performance of the above named falls below reasonable expectations or below the terms of the contract or unsatisfactory references are received, the Director of the Camp reserves the right to terminate the contract, paying the pro rata for the time worked. Salaries are payable at the end of the term of employment above. Persons contracted for all summer who seek release from their contract before its expiration will be paid for the actual time worked on a pro rata part of two-thirds of the contract salary. **THE PERSON ABOVE AGREES NOT TO DISCUSS SALARY OR TERMS OF CONTRACT WITH ANY OTHER MYSTIC EMPLOYEE OTHER THAN DIRECTORS OF CAMP MYSTIC.**

Appropriate federal taxes such as social security and medicare will be withheld from the paycheck as required by the United States government.

If any unforeseen circumstances such as fire, flood, epidemic, war or government restriction should prevent the camp from running its full course, the Director reserves the right to pay a staff member the pro rata salary for time actually worked. Camp Mystic reserves the right to terminate contracts on one week's notice, should extenuating circumstances such as epidemics, fire, weather, or lack of enrollment force the camp(s) to close, and/or causes a reduction in services.

Unless otherwise noted, a staff member will live with a group of girls in a cabin and carry out teaching and activity assignments as needed in the camp schedule. The camp will make an effort to keep the activities in accord with the staff members' preferences where possible.

It is assumed the staff member is physically fit to perform the responsibilities of this contract. Camp Mystic should be notified immediately of any changes or exceptions.

Staff members agree to conform to Mystic's arbitrary standards of personal appearance. Employees must conform to Mystic's strict conduct policy. Drinking alcohol or illegal drug use is forbidden. Profanity will not be tolerated. Smoking will conform to Mystic's policy.

Every counselor is entitled to two nights and one afternoon off each week (except the first few days and closing days of camp) beginning at 12:30 PM until 1:00 AM at which time you must report immediately to your cabin. Day off schedules will be determined by the Camp at the beginning of the term to ensure that all areas and activities are sufficiently covered.

I HEREBY UNDERSTAND, AGREE TO AND ACCEPT IN FULL, THE TERMS OF THIS CONTRACT.

Katherine Ferruzzo, 10/30/2024, (168.69.135.132)



Copy from re:SearchTX

# EXHIBIT 19

Copy from re:SearchTX

# Camp Mystic

2689 HWY 39, HUNT, TX 78024
(830) 238-4660 ~ staff@campmystic.com

EMPLOYMENT CONTRACT

| | | | |
|---|---|---|---|
| Employee: | Chloe Childress | | |
| Activity Position: | FISHING, AEROBICS, TENNIS, YOGA OR DANCE ETTE | | |
| Camp Term(s): | Counselor - 2nd, | Start Date: | 6/27/2025 |
| Salary: | $935.00 | End Date: | 7/26/2025 |

Additional Contract Terms:

The above named person indicates her whole-hearted intention to join in both letter and spirit the effort of Camp Mystic to provide the best in camping for girls.

It is agreed by both signers that this contract is valid pending favorable references. The above named person agrees not to negotiate for any other employment involving the same period of time, or to negotiate with any other camp during or before the above period of time. The above named person agrees to give permission to Camp Mystic to check their references and background.

The above named person agrees to report to camp on the designated start date and not to ask for release until the contract is complete. If, however, performance of the above named falls below reasonable expectations or below the terms of the contract or unsatisfactory references are received, the Director of the Camp reserves the right to terminate the contract, paying the pro rata for the time worked. Salaries are payable at the end of the term of employment above. Persons contracted for all summer who seek release from their contract before its expiration will be paid for the actual time worked on a pro rata part of two-thirds of the contract salary. **THE PERSON ABOVE AGREES NOT TO DISCUSS SALARY OR TERMS OF CONTRACT WITH ANY OTHER MYSTIC EMPLOYEE OTHER THAN DIRECTORS OF CAMP MYSTIC.**

Appropriate federal taxes such as social security and medicare will be withheld from the paycheck as required by the United States government.

If any unforeseen circumstances such as fire, flood, epidemic, war or government restriction should prevent the camp from running its full course, the Director reserves the right to pay a staff member the pro rata salary for time actually worked. Camp Mystic reserves the right to terminate contracts on one week's notice, should extenuating circumstances such as epidemics, fire, weather, or lack of enrollment force the camp(s) to close, and/or causes a reduction in services.

Unless otherwise noted, a staff member will live with a group of girls in a cabin and carry out teaching and activity assignments as needed in the camp schedule. The camp will make an effort to keep the activities in accord with the staff members' preferences where possible.

It is assumed the staff member is physically fit to perform the responsibilities of this contract. Camp Mystic should be notified immediately of any changes or exceptions.

Close



Copy from re:SearchTX

| | | | |
|---|---|---|---|
| Camp Term(s): | Counselor - 2nd, | Start Date: | 6/27/2025 |
| Salary: | $935.00 | End Date: | 7/26/2025 |

Additional Contract Terms:

The above named person indicates her whole-hearted intention to join in both letter and spirit the effort of Camp Mystic to provide the best in camping for girls.

It is agreed by both signers that this contract is valid pending favorable references. The above named person agrees not to negotiate for any other employment involving the same period of time, or to negotiate with any other camp during or before the above period of time. The above named person agrees to give permission to Camp Mystic to check their references and background.

The above named person agrees to report to camp on the designated start date and not to ask for release until the contract is complete. If, however, performance of the above named falls below reasonable expectations or below the terms of the contract or unsatisfactory references are received, the Director of the Camp reserves the right to terminate the contract, paying the pro rata for the time worked. Salaries are payable at the end of the term of employment above. Persons contracted for all summer who seek release from their contract before its expiration will be paid for the actual time worked on a pro rata part of two-thirds of the contract salary. **THE PERSON ABOVE AGREES NOT TO DISCUSS SALARY OR TERMS OF CONTRACT WITH ANY OTHER MYSTIC EMPLOYEE OTHER THAN DIRECTORS OF CAMP MYSTIC.**

Appropriate federal taxes such as social security and medicare will be withheld from the paycheck as required by the United States government.

If any unforeseen circumstances such as fire, flood, epidemic, war or government restriction should prevent the camp from running its full course, the Director reserves the right to pay a staff member the pro rata salary for time actually worked. Camp Mystic reserves the right to terminate contracts on one week's notice, should extenuating circumstances such as epidemics, fire, weather, or lack of enrollment force the camp(s) to close, and/or causes a reduction in services.

Unless otherwise noted, a staff member will live with a group of girls in a cabin and carry out teaching and activity assignments as needed in the camp schedule. The camp will make an effort to keep the activities in accord with the staff members' preferences where possible.

It is assumed the staff member is physically fit to perform the responsibilities of this contract. Camp Mystic should be notified immediately of any changes or exceptions.

Staff members agree to conform to Mystic's arbitrary standards of personal appearance. Employees must conform to Mystic's strict conduct policy. Drinking alcohol or illegal drug use is forbidden. Profanity will not be tolerated. Smoking will conform to Mystic's policy.

Every counselor is entitled to two nights and one afternoon off each week (except the first few days and closing days of camp) beginning at 12:30 PM until 1:00 AM at which time you must report immediately to your cabin. Day off schedules will be determined by the Camp at the beginning of the term to ensure that all areas and activities are sufficiently covered.

I HEREBY UNDERSTAND, AGREE TO AND ACCEPT IN FULL, THE TERMS OF THIS CONTRACT.

Close



Copy from re:SearchTX

# EXHIBIT 20

Copy from re:SearchTX

No. D-1-GN-25-009963

| | | |
|---|---|---|
| WARREN and PATRICIA BELLOWS, Individually and as Representatives of ANNA MARGARET BELLOWS, Deceased; et al., | § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| CAMP MYSTIC, LLC; et al., | § | |
| Defendants. | § | 459TH JUDICIAL DISTRICT |

**DECLARATION OF WENDIE CHILDRESS**

---

Pursuant to Section 132.001 of the Texas Civil Practice and Remedies Code, I, Wendie Childress, make this declaration. My date of birth is [redacted], and my address is [redacted]. I declare under penalty of perjury that the following statements are true and correct to the best of my knowledge and belief:

1. My name is Wendie Childress. I am over the age of eighteen (18), of sound mind, and fully competent to make this Declaration. I have personal knowledge of the facts stated herein, and they are true and correct.

2. I am the mother of Chloe Childress, who tragically died on July 4, 2025, while serving as a counselor at Camp Mystic in Hunt, Texas.

3. I am a resident of the State of Texas. I reside in Harris County, Texas. I have continuously resided in the State of Texas at all times material to this Declaration, including on the date I signed the Camp Mystic Participation Agreement for the 2024 camp season, and I remain a resident of the State of Texas today.

4. On or about March 31, 2024, I signed the Camp Mystic Participation Agreement (the "Participation Agreement") for my daughter, Chloe**,** to be permitted to attend Camp Mystic in 2024. Ex. 1. The Participation Agreement was provided to me as part of the online registration process for my daughter to attend Camp Mystic.

5. I signed the Participation Agreement while physically present in the State of Texas, in Houston, Texas. I did not travel outside of Texas to sign the Agreement, and I did not sign it in, from, or while located in any other state.

6. I was the sole signatory to the Participation Agreement. No representative of Camp Mystic, Natural Fountains Properties, Inc., or any other Defendant in this action signed the Agreement. I did not consult with or receive the advice of an attorney concerning the



Copy from re:SearchTX

Participation Agreement, or any provisions within it, before signing it. I was further not advised to seek the counsel of an attorney prior to signing the Participation Agreement.

7. At the time I executed the Participation Agreement, my daughter, Chloe, was a minor child residing with me in the State of Texas. My daughter's primary and only residence on the date the Agreement was signed was in Harris County, Texas. My daughter had not established a residence in any other state.

8. At the time of her death in July 2025, Chloe was a resident of the State of Texas. Chloe had been continuously a Texas resident from the time the Participation Agreement was signed through the date of her death.

9. It was my understanding, based on information provided to me by Camp Mystic during the enrollment process, that execution of the Participation Agreement was a mandatory prerequisite for my daughter's enrollment in and participation at Camp Mystic for the 2024 summer season. Camp Mystic would not have permitted Chloe to enroll in or attend Camp Mystic without a signed Participation Agreement. I signed the Participation Agreement because I was required to do so in order for my daughter to attend Camp Mystic.

10. All activities described in the Participation Agreement and in which my daughter was to participate (including, without limitation, camp sports, water activities, hiking, arts and crafts, and horseback riding activities) were to take place at Camp Mystic's premises in Hunt, Texas. Chloe did not travel out of the State of Texas in connection with her enrollment at, participation in, or service as a counselor at Camp Mystic for the 2024 or 2025 camp seasons.

11. The Participation Agreement contained a section entitled "Binding Arbitration." Ex. 1 at 2. Prior to executing the Participation Agreement, no one at Camp Mystic discussed the "Binding Arbitration" section of the Participation Agreement with me.

12. At the time I executed the Participation Agreement, I did not know what corporate entities were affiliated with Camp Mystic or how the camp was organized as a business. I did not know the name "Natural Fountains Properties, Inc." or understand it to be a party to the "Binding Arbitration" provision. I did not know what "Mystic Camps Family Partnership, Ltd." or "Mystic Camps Management, LLC" were.

13. It was not my understanding that by signing the Participation Agreement I was agreeing to arbitrate claims—including claims for the death of my daughter—against Camp Mystic's corporate owners, holding companies, or individual directors, officers, or employees. The Participation Agreement was, in my understanding, a camp enrollment form, not a broad arbitration agreement covering any dispute with business entities I had never heard of.

14. The arbitration provision refers to "disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof." Ex. 1 at 2. I understood this language to refer to disputes about the terms of the Participation Agreement, such as what services Camp Mystic agreed to provide—which were listed in



Copy from re:SearchTX

the Agreement as traditional camp sports and games, such as water activities, hiking, aerobics, arts, and crafts, and equine activities—or whether Camp Mystic had met its obligations under those terms. I did not understand the phrase "out of or in connection with this Agreement" to sweep in claims arising from the death of my daughter in a flood at camp. That is not what I expected from a summer camp enrollment form or what I thought I was signing.

15. The fee for Chloe to attend Camp Mystic for the 2024 summer season was less than $8,500, which was paid in consideration for her attendance at the camp.

16. I did not sign a Participation Agreement or any other agreement related to Chloe's serving as a counselor during the 2025 camp season. It is also my understanding that Chloe did not sign a Participation Agreement for the 2025 season. Instead, it is my understanding that Chloe, on her own behalf, signed an employment agreement with Camp Mystic, which is attached as Exhibit 2.

17. Chloe was an adult at the time she signed the employment agreement for serving as a counselor in 2025. She was a minor at the time I signed the Participation Agreement on her behalf in 2024.

18. I make this declaration in support of Plaintiffs' Response to Defendants' Motion to Compel Arbitration and Motion to Stay.

**FURTHER DECLARANT SAYETH NOT.**

Executed on this 5th day of May 2026, in Harris County, Texas**.**

Wendie Childress

**Wendie Childress**



Copy from re:SearchTX

# Participation Agreement 2024

for Chloe Childress, 2024 Season

Participation Agreement for Chloe Childress:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Chloe Childress, (Chloe), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Chloe.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Chloe and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from

Copy from re:SearchTX

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Chloe, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Chloe MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Chloe, use interviews with and photographic images of Chloe, including videotape, for its website, brochures and other, including promotional, materials.

Copy from re:SearchTX

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Chloe, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Chloe, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Wendie Childress
(03/31/2024)

Copy from re:SearchTX

# Camp Mystic

2689 HWY 39, HUNT, TX 78024
(830) 238-4660 ~ staff@campmystic.com

EMPLOYMENT CONTRACT

| Employee: | Chloe Childress | | |
|---|---|---|---|
| Activity Position: | FISHING, AEROBICS, TENNIS, YOGA OR DANCE ETTE | | |
| Camp Term(s): | Counselor - 2nd, | Start Date: | 6/27/2025 |
| Salary: | $935.00 | End Date: | 7/26/2025 |

Additional Contract Terms:

The above named person indicates her whole-hearted intention to join in both letter and spirit the effort of Camp Mystic to provide the best in camping for girls.

It is agreed by both signers that this contract is valid pending favorable references. The above named person agrees not to negotiate for any other employment involving the same period of time, or to negotiate with any other camp during or before the above period of time. The above named person agrees to give permission to Camp Mystic to check their references and background.

The above named person agrees to report to camp on the designated start date and not to ask for release until the contract is complete. If, however, performance of the above named falls below reasonable expectations or below the terms of the contract or unsatisfactory references are received, the Director of the Camp reserves the right to terminate the contract, paying the pro rata for the time worked. Salaries are payable at the end of the term of employment above. Persons contracted for all summer who seek release from their contract before its expiration will be paid for the actual time worked on a pro rata part of two-thirds of the contract salary. **THE PERSON ABOVE AGREES NOT TO DISCUSS SALARY OR TERMS OF CONTRACT WITH ANY OTHER MYSTIC EMPLOYEE OTHER THAN DIRECTORS OF CAMP MYSTIC.**

Appropriate federal taxes such as social security and medicare will be withheld from the paycheck as required by the United States government.

If any unforeseen circumstances such as fire, flood, epidemic, war or government restriction should prevent the camp from running its full course, the Director reserves the right to pay a staff member the pro rata salary for time actually worked. Camp Mystic reserves the right to terminate contracts on one week's notice, should extenuating circumstances such as epidemics, fire, weather, or lack of enrollment force the camp(s) to close, and/or causes a reduction in services.

Unless otherwise noted, a staff member will live with a group of girls in a cabin and carry out teaching and activity assignments as needed in the camp schedule. The camp will make an effort to keep the activities in accord with the staff members' preferences where possible.

It is assumed the staff member is physically fit to perform the responsibilities of this contract. Camp Mystic should be notified immediately of any changes or exceptions.

Close



Copy from re:SearchTX

| | | | |
|---|---|---|---|
| Camp Term(s): | Counselor - 2nd, | Start Date: | 6/27/2025 |
| Salary: | $935.00 | End Date: | 7/26/2025 |

Additional Contract Terms:

The above named person indicates her whole-hearted intention to join in both letter and spirit the effort of Camp Mystic to provide the best in camping for girls.

It is agreed by both signers that this contract is valid pending favorable references. The above named person agrees not to negotiate for any other employment involving the same period of time, or to negotiate with any other camp during or before the above period of time. The above named person agrees to give permission to Camp Mystic to check their references and background.

The above named person agrees to report to camp on the designated start date and not to ask for release until the contract is complete. If, however, performance of the above named falls below reasonable expectations or below the terms of the contract or unsatisfactory references are received, the Director of the Camp reserves the right to terminate the contract, paying the pro rata for the time worked. Salaries are payable at the end of the term of employment above. Persons contracted for all summer who seek release from their contract before its expiration will be paid for the actual time worked on a pro rata part of two-thirds of the contract salary. **THE PERSON ABOVE AGREES NOT TO DISCUSS SALARY OR TERMS OF CONTRACT WITH ANY OTHER MYSTIC EMPLOYEE OTHER THAN DIRECTORS OF CAMP MYSTIC.**

Appropriate federal taxes such as social security and medicare will be withheld from the paycheck as required by the United States government.

If any unforeseen circumstances such as fire, flood, epidemic, war or government restriction should prevent the camp from running its full course, the Director reserves the right to pay a staff member the pro rata salary for time actually worked. Camp Mystic reserves the right to terminate contracts on one week's notice, should extenuating circumstances such as epidemics, fire, weather, or lack of enrollment force the camp(s) to close, and/or causes a reduction in services.

Unless otherwise noted, a staff member will live with a group of girls in a cabin and carry out teaching and activity assignments as needed in the camp schedule. The camp will make an effort to keep the activities in accord with the staff members' preferences where possible.

It is assumed the staff member is physically fit to perform the responsibilities of this contract. Camp Mystic should be notified immediately of any changes or exceptions.

Staff members agree to conform to Mystic's arbitrary standards of personal appearance. Employees must conform to Mystic's strict conduct policy. Drinking alcohol or illegal drug use is forbidden. Profanity will not be tolerated. Smoking will conform to Mystic's policy.

Every counselor is entitled to two nights and one afternoon off each week (except the first few days and closing days of camp) beginning at 12:30 PM until 1:00 AM at which time you must report immediately to your cabin. Day off schedules will be determined by the Camp at the beginning of the term to ensure that all areas and activities are sufficiently covered.

I HEREBY UNDERSTAND, AGREE TO AND ACCEPT IN FULL, THE TERMS OF THIS CONTRACT.

Close



Copy from re:SearchTX

# EXHIBIT 21

Copy from re:SearchTX

No. D-1-GN-25-009963

| | | |
|---|---|---|
| WARREN and PATRICIA BELLOWS, Individually and as Representatives of ANNA MARGARET BELLOWS, Deceased; et al., | § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| CAMP MYSTIC, LLC; et al., | § | |
| Defendants. | § | 459TH JUDICIAL DISTRICT |

**DECLARATION OF ANDREA FERRUZZO**

---

Pursuant to Section 132.001 of the Texas Civil Practice and Remedies Code, I, Andrea Ferruzzo, make this declaration. My date of birth is [redacted], and my address is [redacted]. I declare under penalty of perjury that the following statements are true and correct to the best of my knowledge and belief:

1. My name is Andrea Ferruzzo. I am over the age of eighteen (18), of sound mind, and fully competent to make this Declaration. I have personal knowledge of the facts stated herein, and they are true and correct.

2. I am the mother of Katherine Ferruzzo, who tragically died on July 4, 2025, while serving as a counselor at Camp Mystic in Hunt, Texas.

3. I am a resident of the State of Texas. I reside in Harris County, Texas. I have continuously resided in the State of Texas at all times material to this Declaration, including on the date I signed the Camp Mystic Participation Agreement for the 2024 camp season, and I remain a resident of the State of Texas today.

4. On or about April 7, 2024, I signed the Camp Mystic Participation Agreement (the "Participation Agreement") for my daughter, Katherine, to be permitted to attend Camp Mystic in 2024. Ex. 1. The Participation Agreement was provided to me as part of the online registration process for my daughter to attend Camp Mystic.

5. I signed the Participation Agreement while physically present in the State of Texas, in Houston, Texas. I did not travel outside of Texas to sign the Agreement, and I did not sign it in, from, or while located in any other state.

6. I was the sole signatory to the Participation Agreement. No representative of Camp Mystic, Natural Fountains Properties, Inc., or any other Defendant in this action signed the Agreement. No attorney signed the Participation Agreement, and I did not consult with or receive the advice of an attorney concerning the Participation Agreement, or any provisions



Copy from re:SearchTX

within it, before signing it. I was further not advised to seek the counsel of an attorney prior to signing the Participation Agreement.

7. At the time I executed the Participation Agreement, my daughter, Katherine, was a minor child residing with me in the State of Texas. My daughter's primary and only residence on the date the Agreement was signed was in Harris County, Texas. My daughter had not established a residence in any other state.

8. At the time of her death in July 2025, Katherine was a resident of the State of Texas. Katherine had been continuously a Texas resident from the time the Participation Agreement was signed through the date of her death.

9. It was my understanding, based on information provided to me by Camp Mystic during the enrollment process, that execution of the Participation Agreement was a mandatory prerequisite for my daughter's enrollment in and participation at Camp Mystic for the 2024 summer season. Camp Mystic would not have permitted Katherine to enroll in or attend Camp Mystic without a signed Participation Agreement. I signed the Participation Agreement because I was required to do so in order for my daughter to attend Camp Mystic.

10. All activities described in the Participation Agreement and in which my daughter was to participate (including, without limitation, camp sports, water activities, hiking, arts and crafts, and horseback riding activities) were to take place at Camp Mystic's premises in Hunt, Texas. Katherine did not travel out of the State of Texas in connection with her enrollment at, participation in, or service as a counselor at Camp Mystic for the 2024 or 2025 camp seasons.

11. The Participation Agreement contained a section entitled "Binding Arbitration." Ex. 1 at 2. Prior to executing the Participation Agreement, no one at Camp Mystic discussed the "Binding Arbitration" section of the Participation Agreement with me.

12. At the time I executed the Participation Agreement, I did not know what corporate entities were affiliated with Camp Mystic or how the camp was organized as a business. I did not know the name "Natural Fountains Properties, Inc." or understand it to be a party to the "Binding Arbitration" provision. I did not know what "Mystic Camps Family Partnership, Ltd." or "Mystic Camps Management, LLC" were.

13. It was not my understanding that by signing the Participation Agreement I was agreeing to arbitrate claims—including claims for the death of my daughter—against Camp Mystic's corporate owners, holding companies, or individual directors, officers, or employees. The Participation Agreement was, in my understanding, a camp enrollment form, not a broad arbitration agreement covering any dispute with business entities I had never heard of.

14. The arbitration provision refers to "disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof." Ex. 1 at 2. I understood this language to refer to disputes about the terms of the Participation Agreement, such as what services Camp Mystic agreed to provide—which were listed in



Copy from re:SearchTX

the Agreement as traditional camp sports and games, such as water activities, hiking, aerobics, arts, and crafts, and equine activities—or whether Camp Mystic had met its obligations under those terms. I did not understand the phrase "out of or in connection with this Agreement" to sweep in claims arising from the death of my daughter in a flood at camp. That is not what I expected from a summer camp enrollment form or what I thought I was signing.

15. The fee for Katherine to attend Camp Mystic for the 2024 summer season was less than $8,500, which was paid in consideration for her attendance at the camp.

16. I did not sign a Participation Agreement or any other agreement related to Katherine's serving as a counselor during the 2025 camp season. It is also my understanding that Katherine did not sign a Participation Agreement for the 2025 season. Instead, it is my understanding that Katherine, on her own behalf, signed an employment agreement with Camp Mystic, which is attached as Exhibit 2.

17. Katherine was an adult at the time she signed the employment agreement for serving as a counselor in 2025. She was a minor at the time I signed the Participation Agreement on her behalf in 2024.

18. I make this declaration in support of Plaintiffs' Response to Defendants' Motion to Compel Arbitration and Motion to Stay.

**FURTHER DECLARANT SAYETH NOT.**

Executed on this 5th day of May 2026, in Harris County, Texas.

Andrea Ferruzzo

**Andrea Ferruzzo**



Copy from re:SearchTX

# Participation Agreement 2024

for Katherine Ferruzzo, 2024 Season

Participation Agreement for Katherine Ferruzzo:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Katherine Ferruzzo, (Katherine), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Katherine.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Katherine and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from

Copy from re:SearchTX

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Katherine, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Katherine MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Katherine, use interviews with and photographic images of Katherine, including videotape, for its website, brochures and other, including promotional, materials.

Copy from re:SearchTX

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Katherine, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Katherine, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Andrea Ferruzzo (04/07/2024)

Copy from re:SearchTX

Ferruzzo Declaration - Exhibit 2

# Camp Mystic

2689 HWY 39, HUNT, TX 78024
(830) 238-4660 ~ staff@campmystic.com

EMPLOYMENT CONTRACT

| | |
|---|---|
| Employee: | Katherine Ferruzzo |
| Activity Position: | FISHING, BEAUTY, CAMPCRAFT, AEROBICS OR GOLF ETTE |

| | | | |
|---|---|---|---|
| Camp Term(s): | Counselor - 2nd, | Start Date: | 6/27/2025 |
| Salary: | $935.00 | End Date: | 7/26/2025 |

Additional Contract Terms:
The above named person indicates her whole-hearted intention to join in both letter and spirit the effort of Camp Mystic to provide the best in camping for girls.

It is agreed by both signers that this contract is valid pending favorable references. The above named person agrees not to negotiate for any other employment involving the same period of time, or to negotiate with any other camp during or before the above period of time. The above named person agrees to give permission to Camp Mystic to check their references and background.

The above named person agrees to report to camp on the designated start date and not to ask for release until the contract is complete. If, however, performance of the above named falls below reasonable expectations or below the terms of the contract or unsatisfactory references are received, the Director of the Camp reserves the right to terminate the contract, paying the pro rata for the time worked. Salaries are payable at the end of the term of employment above. Persons contracted for all summer who seek release from their contract before its expiration will be paid for the actual time worked on a pro rata part of two-thirds of the contract salary. **THE PERSON ABOVE AGREES NOT TO DISCUSS SALARY OR TERMS OF CONTRACT WITH ANY OTHER MYSTIC EMPLOYEE OTHER THAN DIRECTORS OF CAMP MYSTIC.**

Appropriate federal taxes such as social security and medicare will be withheld from the paycheck as required by the United States government.

If any unforeseen circumstances such as fire, flood, epidemic, war or government restriction should prevent the camp from running its full course, the Director reserves the right to pay a staff member the pro rata salary for time actually worked. Camp Mystic reserves the right to terminate contracts on one week's notice, should extenuating circumstances such as epidemics, fire, weather, or lack of enrollment force the camp(s) to close, and/or causes a reduction in services.

Unless otherwise noted, a staff member will live with a group of girls in a cabin and carry out teaching and activity assignments as needed in the camp schedule. The camp will make an effort to keep the activities in accord with the staff members' preferences where possible.

It is assumed the staff member is physically fit to perform the responsibilities of this contract. Camp Mystic should be notified immediately of any changes or exceptions.

Staff members agree to conform to Mystic's arbitrary standards of personal appearance. Employees must conform to Mystic's strict conduct policy. Drinking alcohol or illegal drug use is forbidden. Profanity will not be tolerated. Smoking will conform to Mystic's policy.

Every counselor is entitled to two nights and one afternoon off each week (except the first few days and closing days of camp) beginning at 12:30 PM until 1:00 AM at which time you must report immediately to your cabin. Day off schedules will be determined by the Camp at the beginning of the term to ensure that all areas and activities are sufficiently covered.

I HEREBY UNDERSTAND, AGREE TO AND ACCEPT IN FULL, THE TERMS OF THIS CONTRACT.

Katherine Ferruzzo, 10/30/2024, (168.69.135.132)



Copy from re:SearchTX

# EXHIBIT 22

Copy from re:SearchTX

Comptroller of Public Accounts FORM 05-102 (Rev.9-15/33)

# Texas Franchise Tax Public Information Report

*To be filed by Corporations, Limited Liability Companies (LLC), Limited Partnerships (LP), Professional Associations (PA) and Financial Institutions*

■ **Tcode** 13196 Franchise

■ Taxpayer number: 1 7 4 1 2 6 1 4 1 4 5

■ Report year: 2 0 2 5

***You have certain rights** under Chapter 552 and 559, Government Code, to review, request and correct information we have on file about you. Contact us at 1-800-252-1381.*

Taxpayer name: NATURAL FOUNTAINS PROPERTIES, INC.

■ ◯ Blacken circle if the mailing address has changed.

Mailing address: 2689 HIGHWAY 39

City: HUNT | State: TX | ZIP code plus 4: 78024

Secretary of State (SOS) file number or Comptroller file number: 0013315900

◯ Blacken circle if there are currently no changes from previous year; if no information is displayed, complete the applicable information in Sections A, B and C.

Principal office: 2689 HIGHWAY 39, HUNT, TX, 78024

Principal place of business: 2689 HIGHWAY 39, HUNT, TX, 78024

1000000000015

*You must report officer, director, member, general partner and manager information as of the date you complete this report.*

**Please sign below! This report must be signed to satisfy franchise tax requirements.**

**SECTION A** Name, title and mailing address of each officer, director, member, general partner or manager.

| Name | Title | Director | Term expiration (mm dd yy) |
|---|---|---|---|
| NEEL BONNER | PRESIDENT | ◯ YES | |
| Mailing address: 2689 HWY 39 | City: HUNT | State: TX | ZIP Code: 78024 |
| RICHARD G EASTLAND | CEO | ◯ YES | |
| Mailing address: 2689 HIGHWAY 39 | City: HUNT | State: TX | ZIP Code: 78024 |
| WILLETTA A EASTLAND | SECRETARY | ◯ YES | |
| Mailing address: 2689 HIGHWAY 39 | City: HUNT | State: TX | ZIP Code: 78024 |

**SECTION B** Enter information for each corporation, LLC, LP, PA or financial institution, if any, in which this entity owns an interest of 10 percent or more.

| Name of owned (subsidiary) corporation, LLC, LP, PA or financial institution | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| | | | |
| | | | |

**SECTION C** Enter information for each corporation , LLC, LP, PA or financial institution, if any, that owns an interest of 10 percent or more in this entity.

| Name of owned (parent) corporation, LLC, LP, PA or financial institution | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| MYSTIC CAMPS FAMILY PARTNERSHIP | TX | 0804281844 | 100.000 |

Registered agent and registered office currently on file *(see instructions if you need to make changes)*

*You must make a filing with the Secretary of State to change registered agent, registered office or general partner information.*

Agent: RICHARD G. EASTLAND

Office: 2689 HIGHWAY 39 | City: HUNT | State: TX | ZIP Code: 78024

The information on this form is required by Section 171.203 of the Tax Code for each corporation, LLC, LP, PA or financial institution that files a Texas Franchise Tax Report. Use additional sheets for Sections A, B and C, if necessary. The information will be available for public inspection.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer, director, member, general partner or manager and who is not currently employed by this or a related corporation, LLC, LP, PA or financial institution.

sign here: RICHARD G EASTLAND | Title: CEO | Date: 03/25/2025 | Area code and phone number: ( 830 ) 238 - 4660

**Texas Comptroller Official Use Only**

VE/DE ◯ PIR IND ◯

Copy from re:SearchTX

# EXHIBIT 23

Copy from re:SearchTX

# FRANCHISE TAX ACCOUNT STATUS

This record as of April 30, 2026 at 08:59:57

# MYSTIC CAMPS MANAGEMENT, LLC

| | |
|---|---|
| **Texas Taxpayer Number:** | 32081529037 |
| **Mailing Address:** | 2404 SCENIC DR<br>AUSTIN, TX 78703 - 1552 |
| **Right to Transact Business in Texas:** | ACTIVE |
| **State of Formation:** | TX |
| **SOS Registration Status (SOS status updated each business day):** | ACTIVE |
| **Effective SOS Registration Date:** | 10/18/2021 |
| **Texas SOS File Number:** | 0804275960 |
| **Registered Agent Name:** | RICHARD G. EASTLAND |
| **Registered Office Street Address:** | 2404 SCENIC DRIVE<br>AUSTIN, TX 78703 |

## Public Information Report for Year 2024

| Title | Name and Address |
|---|---|
| MEMBER | **RICHARD G EASTLAND**<br>2404 SCENIC DRIVE<br>AUSTIN, TX 78703<br>**Source:** SOS |

| | | |
|---|---|---|
| MEMBER | **WILLETTA A EASTLAND**<br>2404 SCENIC DRIVE<br>AUSTIN, TX 78703<br>**Source:** SOS | |

Information on this site is obtained from the most recent Public Information Report (PIR) submitted to the Comptroller of Public Accounts (CPA) or from the most recent PIR processed by the Secretary of State (SOS). Annual PIRs submitted to the CPA are forwarded to the SOS.

# EXHIBIT 24

Copy from re:SearchTX

CAUSE NO. D-1-GN-25-009976

| | | |
|---|---|---|
| Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten, and Jennifer Getten; Linnie Anne McCown, Deceased, by and through Michael McCown, individually and on behalf of the Estate of Linnie Anne McCown, and Callie McCown; Abby Lynn Pohl, Deceased, by and through Matthew Pohl, Individually and on behalf of the Estate of Abby Lynn Pohl, and Kristin Pohl; Margaret Gaffney Sheedy, Deceased, by and through Andrew Sheedy, individually and on behalf of the Estate of Margaret Gaffney Sheedy, and Ellen Sheedy; Mary Barrett Stevens, Deceased, by and through Johnny Stevens, individually and on behalf of the Estate of Mary Barrett Stevens, and Stacy Stevens; Greta Katherine Toranzo, Deceased, by and through Jorge Toranzo, Individually and on behalf of the Estate of Greta Katherine Toranzo, and Ellen Toranzo<br>*Plaintiffs,* | § | IN THE DISTRICT COURT OF |
| v. | § | TRAVIS COUNTY, TEXAS |
| Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III<br>*Defendants.* | § | 459TH JUDICIAL DISTRICT |

**<u>DEFENDANT EDWARD EASTLAND'S OBJECTIONS AND ANSWERS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES</u>**

To: Plaintiffs Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten, and Jennifer Getten, by and through their attorneys of record, Kurt B. Arnold, J. Kyle Findley, Kala F. Sellers, John G. Grinnan of ARNOLD & ITKIN LLP, 6009 Memorial Drive, Houston, Texas 77007.



Copy from re:SearchTX

Pursuant to Tex. R. Civ. P. 197 and subject to his Motion to Transfer Venue, Defendant Edward Eastland, makes the following Objections and Answers to the First Set of Interrogatories served by Plaintiffs Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten, and Jennifer Getten.

Respectfully submitted,

**CASTAGNA SCOTT, PLLC**
1120 S. Capital of Texas Highway
Building 2, Suite 300
Austin, Texas 78746
512/329-3290
888/255-0132 fax

By: *_/s/ Lynn S. Castagna_*
Lynn S. Castagna
State Bar No. 03980520
lynn@texasdefense.com

**ATTORNEY FOR DEFENDANT EDWARD EASTLAND**

## CERTIFICATE OF SERVICE

I certify that on this 27th day of February 2026, I electronically served a true and correct copy of the foregoing on all known counsel of record in accordance with the Texas Rules of Civil Procedure.

*_/s/ Lynn S. Castagna_*
Lynn S. Castagna



Copy from re:SearchTX

**OBJECTIONS AND ANSWERS TO FIRST SET OF INTERROGATORIES**

1. List each of your employees, owners, officers, or directors who either reside, have business, or are employed by a business in Texas, and identify the corresponding Texas address.

**RESPONSE:**
**Dick Eastland was chairman of the Board, President, and Executive Director of Camp Mystic, LLC on July 4, 2025. Willetta Eastland was Secretary and Executive Director of Camp Mystic, LLC on July 4, 2025.**

**Edward Eastland was the Vice President and Edward and Mary Liz Eastland were Directors of Camp Mystic Guadalupe River on July 4, 2025.**

2. Identify all persons who had authority or responsibility on July 4, 2025, to make decisions regarding camper safety, evacuation, suspension of activities, or emergency response, including each person's title and specific responsibilities.

**RESPONSE: Edward and Richard Eastland were the persons responsible for making the decisions that night**

3. Identify all witnesses and their corresponding address who are known to Camp Mystic Defendants to have knowledge of camp operations, safety policies, camper supervision, and the incident at issue.

**RESPONSE: Plaintiffs are referred to Camp Mystic, LLC's Initial Disclosures and any supplements thereto for identification of persons with knowledge of relevant facts.**

4. Identify each contract or agreement entered into with all named parties and third parties—or otherwise applicable to the events giving rise to this lawsuit—and state when the agreement was formalized, where it was formalized, and who was involved.

**RESPONSE: Objection. This interrogatory is overbroad, vague, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case. Defendants further object to this interrogatory because it is not narrowly tailored to avoid including tenuous information and it constitutes an impermissible fishing expedition for information that is confidential, private, and proprietary in nature.**

5. Describe all information known to you before and during July 4, 2025, concerning weather conditions, flood risk, river levels, flood watches, or warning, including when such information was received and by whom.



Copy from re:SearchTX

**RESPONSE: Objection. This interrogatory is overbroad, unduly burdensome, and attempts to require Defendant to marshal all of its available proof. In addition, it is not reasonably limited in time**

**Subject to the objections previously filed and without waiving the same, Defendant answers as follows:**

**There was a CodeRED weather warning for a flash flood warning for Highway 39 at 1:14 AM. That was not an evacuation notice or evacuation alert. There was National weather Service Flash Flood Warning issued at 3:35 AM, after evacuation efforts had already begun at Camp Mystic.**

6. Identify all sources of weather for flood information relied upon by you on July 4, 2025, including governmental agencies, alerts, forecasts, internal monitoring, or third-party services.

**RESPONSE: Defendant objects to this interrogatory as being overbroad, unduly burdensome, and an attempt to require Defendant to marshal all of its available proof. In addition, it is not reasonably limited in time**

**Subject to the objections previously filed and without waiving the same, Defendant answers as follows:**

**Richard Eastland was monitoring the weather conditions from a camp weather station, through the internet, and on cell phone apps including MyAcuRit, geoterrestrial.noa and apple.weather.**

7. Describe, in chronological order, all decisions made by you or your agents on July 4, 2025, starting from the first awareness of potential flooding.

**RESPONSE: Objection. This interrogatory is vague, overbroad, and seeks information that is not reasonably calculated to lead to admissible evidence.**

**Subject to the objections previously filed and without waiving the same, Defendant answers as follows:**

**As the rain continued to fall, and the water level began to rise, the decision was made to evacuate the cabins. The evacuation began with the cabins closest to the water and then moved away from the water. Defendants were still in the process of evacuating cabins when they were overtaken by the sudden surge of floodwaters.**

8. State whether you considered evacuation of campers on July 4, 2025 and, if so, describe who considered it, when, what factors were weighed, and why evacuation was not ordered or completed.

**RESPONSE: See answer to interrogatory #7.**



Copy from re:SearchTX

9. Describe all emergency action plans, policies, or procedures in effect on July 4, 2025 relating to flooding, severe weather, or evacuation, and explain how they were implemented that day.

**RESPONSE: See documents produced in response to requests for production.**

10. Identify all offices, mailing addresses, bank accounts, or business locations maintained by Camp Mystic Defendants, including the dates of operation and counties of operation.

**RESPONSE: Objection. This interrogatory is overbroad in time and scope, not reasonably calculated to lead to the discovery of admissible evidence, and constitutes an impermissible fishing expedition for information that is confidential, private, and proprietary in nature.**

**Subject to the objections previously filed and without waiving the same, Defendant answers as follows:**

**On July 4, 2025, Edward Eastland resided at Camp Mystic in Kerr County, Texas.**

11. Describe the training provided to staff regarding flood response, emergency evacuation, or severe weather safety prior to July 4, 2025, including when such training last occurred.

**RESPONSE: Training occurred on June 27th and June 28th, 2025. Edward and Mary Liz went over emergency procedures, counselor responsibilities, and youth protection.**

12. Describe the location of campers at the onset of flooding on July 4, 2025, including whether those locations were known or designated flood-risk areas.

**RESPONSE: Defendant objects to this discovery request on the grounds that it is vague, ambiguous and difficult to ascertain the nature of Plaintiff's request, as the term "designated flood risk areas" is not defined.**

**Subject to the objections previously filed and without waiving the same, Defendant answers as follows:**

**There were campers in each of the cabins at the Camp Mystic Guadalupe River campsite. None of the floors of any of the cabins were located within the FEMA 100-year floodplain.**

13. State the number of campers and staff present, the staff-to-camper ratios, and how campers were supervised during the flooding event.

**RESPONSE: There were 386 campers at Camp Mystic Guadalup River. There were 127 staff members. The campers were supervised by their counselors.**



Copy from re:SearchTX

14. State whether any staff member expressed concern, disagreement, or recommended evacuation of alternative safety measures, and describe the respond to any such warnings.

**RESPONSE: Defendant objects to this interrogatory in that it seeks a narrative response and attempts to limit Defendants to those facts stated in response to this interrogatory. Defendants also object to this interrogatory to the extent that it requires Defendants to marshal all of its available evidence. Further, Defendants object to this multifarious set of interrogatories improperly set up to appear as a single question.**

**Subject to the objections previously filed and without waiving the same, Defendant answers as follows:**

**There were no concerns regarding the evacuation. One of the counselors asked if she should evacuate her campers to the rec hall, and she was told to do so.**

15. Describe all communications with emergency responders, local officials, or governmental entities on July 4, 2025, regarding flooding, evacuation, or safety concerns.

**RESPONSE: Objection. This interrogatory is overbroad, unduly burdensome, harassing, and attempt to require Defendant to marshal all of its available proof. A party is not required to marshal its evidence in response to a written discovery request. This question is better suited for deposition.**

**Subject to the objections previously filed and without waiving the same, Defendant answers as follows:**

**A number of calls were made to 911, without receiving a response. In addition, Glenn Juenke attempted to contact Lee Pool regarding the flooding and was unable to reach him.**

16. Describe all communications with parents or guardians before, during, and immediately after the flooding event, including timing and content.

**RESPONSE: Objection. This interrogatory is overbroad, vague, not limited in time or scope, and attempts to require Defendant to marshal all of its available proof. A party is not required to marshal its evidence in response to a written discovery request. This question is better suited for deposition.**

**Subject to the objections previously filed and without waiving the same, Defendant answers as follows:**

**Communications with parents via calls and texts from Mary Liz began approximately**



Copy from re:SearchTX

**around 9:00 AM on July 4th. There were e-mails sent out to parents and there was group text communication**

17. Identify all insurance policies or risk assessments in effect on July 4, 2025 that addressed flooding, evacuation, or catastrophic injury risk, and describe any recommendations made pursuant to those policies.

**RESPONSE: As to insurance policies, see this defendant's Initial Disclosures. There were no risk assessments initiated by an insurance carrier that addressed flooding, evacuation, or catastrophic injury risk.**

18. Describe the actions taken by your management personnel in response to known or reported flood rusk prior to and during July 4, 2025, and identify any safety measures that were considered but not implemented.

**RESPONSE: Objection. This interrogatory is overbroad, vague, not limited in time or scope.**

**Subject to the objections previously filed and without waiving the same, Defendant answers as follows:**

**See answer to interrogatory #7.**

19. Describe your working and contractual relationship with all named parties or involved third parties, and their subsidiaries and affiliates, and state all services to be performed or potentially performed in Texas.

**RESPONSE: Objection. This interrogatory is overbroad, vague, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case. Defendants further object to this interrogatory because it is not narrowly tailored to avoid including tenuous information and it constitutes an impermissible fishing expedition for information that is confidential, private, and proprietary in nature.**

**Subject to the objections previously filed and without waiving the same, Defendant answers as follows:**

**Camp Mystic LLC was a tenant of Natural Fountains Properties Inc. Otherwise, see answer to interrogatory #1.**

20. Describe the ownership structure of Natural Fountains Properties, Inc. DBA Camp Mystic, Inc. and any named Defendants' authority to make or influence decisions regarding the property.

**RESPONSE: See Natural Fountains Properties, Inc. D/B/A Camp Mystic Inc.'s discovery responses.**



Copy from re:SearchTX

## VERIFICATION

**STATE OF TEXAS** §
§
**COUNTY OF BEXAR** §

Before me, the undersigned Notary Public, on this day personally appeared **EDWARD EASTLAND**, who, being by me duly sworn on oath deposed and said that he has read the foregoing *Defendant Edward Eastland's Objections and Answers to Plaintiffs' First Set of Interrogatories*, and, with respect to all answers, excepting those regarding persons with knowledge of relevant facts, trial witnesses, and legal contentions to which there is no verification requirement (TEX. R. CIV. P. 197.2), the answers are based on his personal knowledge and are true and correct, and are hereby signed under oath pursuant to the applicable rules of civil procedure (*see* TEX. R. CIV. P. 197.2).

[signature]

**EDWARD EASTLAND**

**SWORN AND SUBSCRIBED TO** before me on this 24th day of February, 2026, to certify which witness my hand and official seal.

[signature]

**Notary Public in and for the State of Texas**

Veronica N Sullivan
My Commission Expires
11/7/2029
Notary ID 11033954

My commission expires: ______________

Copy from re:SearchTX

# EXHIBIT 25

Copy from re:SearchTX

CAUSE NO. D-1-GN-25-009976

| | | |
|---|---|---|
| Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten, and Jennifer Getten; Linnie Anne McCown, Deceased, by and through Michael McCown, individually and on behalf of the Estate of Linnie Anne McCown, and Callie McCown; Abby Lynn Pohl, Deceased, by and through Matthew Pohl, Individually and on behalf of the Estate of Abby Lynn Pohl, and Kristin Pohl; Margaret Gaffney Sheedy, Deceased, by and through Andrew Sheedy, individually and on behalf of the Estate of Margaret Gaffney Sheedy, and Ellen Sheedy; Mary Barrett Stevens, Deceased, by and through Johnny Stevens, individually and on behalf of the Estate of Mary Barrett Stevens, and Stacy Stevens; Greta Katherine Toranzo, Deceased, by and through Jorge Toranzo, Individually and on behalf of the Estate of Greta Katherine Toranzo, and Ellen Toranzo *Plaintiffs,* | § | IN THE DISTRICT COURT OF |
| v. | § | TRAVIS COUNTY, TEXAS |
| Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III *Defendants.* | § | 459TH JUDICIAL DISTRICT |

**DEFENDANT MARY LIZ EASTLAND'S OBJECTIONS AND ANSWERS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES**

To: Plaintiffs Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten, and Jennifer Getten, by and through their attorneys of record, Kurt B. Arnold, J. Kyle Findley, Kala F. Sellers, John G. Grinnan of ARNOLD & ITKIN LLP, 6009 Memorial Drive, Houston, Texas 77007.



Copy from re:SearchTX

Pursuant to Tex. R. Civ. P. 197 and subject to her Motion to Transfer Venue, Defendant Mary Liz Eastland, makes the following objections and answers to the First Set of Interrogatories served by Plaintiffs Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten, and Jennifer Getten.

Respectfully submitted,

**CASTAGNA SCOTT, PLLC**
1120 S. Capital of Texas Highway
Building 2, Suite 300
Austin, Texas 78746
512/329-3290
888/255-0132 fax

By: *_/s/ Lynn S. Castagna_*
Lynn S. Castagna
State Bar No. 03980520
lynn@texasdefense.com

**ATTORNEY FOR DEFENDANT**
**MARY LIZ EASTLAND**

**CERTIFICATE OF SERVICE**

I certify that on February 27, 2026, I electronically served a true and correct copy of the foregoing on all known counsel of record in accordance with the Texas Rules of Civil Procedure.

*/s/ Lynn S. Castagna*
Lynn S. Castagna



Copy from re:SearchTX

**OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS**

Defendant objects to Plaintiffs' Definitions and Instructions to Plaintiffs' First Set of Interrogatories as vague, overbroad, unnecessary and beyond the scope of the Texas Rules of Civil Procedure. Subject to and without waiving any objection, Defendants will response to Plaintiffs' First Set of Interrogatories pursuant to the Texas Rules of Civil Procedure.



Copy from re:SearchTX

**OBJECTIONS AND ANSWERS TO FIRST SET OF INTERROGATORIES**

1. List each of your employees, owners, officers, or directors who either reside, have business, or are employed by a business in Texas, and identify the corresponding Texas address.

**RESPONSE: Dick Eastland was chairman of the Board, President, and Executive Director of Camp Mystic, LLC on July 4, 2025. Willetta Eastland was Secretary and Executive Director of Camp Mystic, LLC on July 4, 2025. Edward Eastland was the Vice President. Edward and Mary Liz Eastland were Directors of Camp Mystic Guadalupe River on July 4, 2025.**

2. Identify all persons who had authority or responsibility on July 4, 2025, to make decisions regarding camper safety, evacuation, suspension of activities, or emergency response, including each person's title and specific responsibilities.

**RESPONSE: Dick Eastland was the person responsible for making the decisions at Camp Mystic Guadalupe River that night.**

3. Identify all witnesses and their corresponding address who are known to Camp Mystic Defendants to have knowledge of camp operations, safety policies, camper supervision, and the incident at issue.

**RESPONSE: Plaintiffs are referred to Camp Mystic, LLC's Initial Disclosures and any supplements thereto for identification of persons with knowledge of relevant facts.**

4. Identify each contract or agreement entered into with all named parties and third parties—or otherwise applicable to the events giving rise to this lawsuit—and state when the agreement was formalized, where it was formalized, and who was involved.

**RESPONSE: Objection. This interrogatory is overbroad, vague, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case. Defendants further object to this interrogatory because it is not narrowly tailored to avoid including tenuous information and it constitutes an impermissible fishing expedition for information that is confidential, private, and proprietary in nature.**

5. Describe all information known to you before and during July 4, 2025, concerning weather conditions, flood risk, river levels, flood watches, or warning, including when such information was received and by whom.

**RESPONSE: Objection. This interrogatory is overbroad, unduly burdensome, and attempts to require Defendant to marshal all of its available proof. In addition, it is not reasonably limited in time**



Copy from re:SearchTX

6. Identify all sources of weather for flood information relied upon by you on July 4, 2025, including governmental agencies, alerts, forecasts, internal monitoring, or third-party services.

**RESPONSE: Defendant objects to this interrogatory as being overbroad, unduly burdensome, and an attempt to require Defendant to marshal all of its available proof. In addition, it is not reasonably limited in time.**

**Subject to the objections previously filed and without waiving the same, Defendant answers as follows:**

**I was monitoring the weather through The Weather Channel application on my phone.**

7. Describe, in chronological order, all decisions made by you or your agents on July 4, 2025, starting from the first awareness of potential flooding.

**RESPONSE: Objection. This interrogatory is vague, overbroad, and seeks information that is not reasonably calculated to lead to admissible evidence.**

**Subject to the objections previously filed and without waiving the same, Defendant answers as follows:**

**All decisions regarding flood evacuations were made by Dick Eastland. For further answer, Plaintiffs are referred to interrogatory answers of Camp Mystic LLC and Edward Eastland.**

8. State whether you considered evacuation of campers on July 4, 2025 and, if so, describe who considered it, when, what factors were weighed, and why evacuation was not ordered or completed.

**RESPONSE: See answer to interrogatory #7.**

9. Describe all emergency action plans, policies, or procedures in effect on July 4, 2025 relating to flooding, severe weather, or evacuation, and explain how they were implemented that day.

**RESPONSE: See documents produced in response to requests for production.**

10. Identify all offices, mailing addresses, bank accounts, or business locations maintained by Camp Mystic Defendants, including the dates of operation and counties of operation.

**RESPONSE: Objection. This interrogatory is overbroad in time and scope, not reasonably calculated to lead to the discovery of admissible evidence, and constitutes an impermissible fishing expedition for information that is confidential, private, and proprietary in nature.**



Copy from re:SearchTX

**Subject to the objections previously filed and without waiving the same, Defendant answers as follows:**

**On July 4, 2025, Mary Liz Eastland resided at Camp Mystic in Kerr County, Texas.**

11. Describe the training provided to staff regarding flood response, emergency evacuation, or severe weather safety prior to July 4, 2025, including when such training last occurred.

**RESPONSE: Training occurred on June 27th and June 28th 2025. Edward and Mary Liz went over emergency procedures, counselor responsibilities, and youth protection.**

12. Describe the location of campers at the onset of flooding on July 4, 2025, including whether those locations were known or designated flood-risk areas.

**RESPONSE: Defendant objects to this discovery request on the grounds that it is vague, ambiguous and difficult to ascertain the nature of Plaintiff's request, as the term "designated flood risk areas" is not defined.**

**Subject to the objections previously filed and without waiving the same, Defendant answers as follows:**

**There were campers in each of the cabins at the Camp Mystic Guadalupe River campsite. None of the floors of any of the cabins were located within the FEMA 100-year floodplain.**

13. State the number of campers and staff present, the staff-to-camper ratios, and how campers were supervised during the flooding event.

**RESPONSE: There were 386 campers at Camp Mystic Guadalupe River. There were 127 staff members. The campers were supervised by their counselors.**

14. State whether any staff member expressed concern, disagreement, or recommended evacuation of alternative safety measures, and describe the respond to any such warnings.

**RESPONSE: Defendants object to this interrogatory in that it seeks a narrative response and attempts to limit Defendants to those facts stated in response to this interrogatory. Defendants also object to this interrogatory to the extent that it requires Defendants to marshal all of its available evidence. Further, Defendants object to this multifarious set of interrogatories improperly set up to appear as a single question.**

**Subject to the objections previously filed and without waiving the same, Defendant answers as follows:**



Copy from re:SearchTX

**Plaintiffs are referred to the interrogatory answers of Camp Mystic, LLC and Edward Eastland.**

15. Describe all communications with emergency responders, local officials, or governmental entities on July 4, 2025, regarding flooding, evacuation, or safety concerns.

**RESPONSE: Objection. This interrogatory is overbroad, unduly burdensome, harassing, and attempt to require Defendant to marshal all of its available proof. A party is not required to marshal its evidence in response to a written discovery request. This question is better suited for deposition.**

**Subject to the objections previously filed and without waiving the same, Defendant answers as follows:**

**A number of calls were made to 911, without receiving a response. In addition, Glenn Juenke attempted to contact Lee Pool regarding the flooding and was unable to reach him.**

16. Describe all communications with parents or guardians before, during, and immediately after the flooding event, including timing and content.

**RESPONSE: Objection. This interrogatory is overbroad, vague, not limited in time or scope, and attempts to require Defendant to marshal all of its available proof. A party is not required to marshal its evidence in response to a written discovery request. This question is better suited for deposition.**

**Subject to the objections previously filed and without waiving the same, Defendant answers as follows:**

**Communications with parents via calls and texts from Mary Liz began approximately around 9:00 AM on July 4th. There were e-mails sent out to parents and there was group text communication.**

17. Identify all insurance policies or risk assessments in effect on July 4, 2025 that addressed flooding, evacuation, or catastrophic injury risk, and describe any recommendations made pursuant to those policies.

**RESPONSE: As to insurance policies, see this defendant's Initial Disclosures. There were no risk assessments initiated by an insurance carrier that addressed flooding, evacuation, or catastrophic injury risk.**

18. Describe the actions taken by your management personnel in response to known or reported flood rusk prior to and during July 4, 2025, and identify any safety measures that were considered but not implemented.



Copy from re:SearchTX

**RESPONSE: Objection. This interrogatory is overbroad, vague, not limited in time or scope.**

**Subject to the objections previously filed and without waiving the same, Defendant answers as follows:**

**See answer to interrogatory #7.**

19. Describe your working and contractual relationship with all named parties or involved third parties, and their subsidiaries and affiliates, and state all services to be performed or potentially performed in Texas.

**RESPONSE: Objection. This interrogatory is overbroad, vague, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case. Defendants further object to this interrogatory because it is not narrowly tailored to avoid including tenuous information and it constitutes an impermissible fishing expedition for information that is confidential, private, and proprietary in nature.**

20. Describe the ownership structure of Natural Fountains Properties, Inc. DBA Camp Mystic, Inc. and any named Defendants' authority to make or influence decisions regarding the property.

**RESPONSE: See Natural Fountains Properties, Inc. D/B/A Camp Mystic Inc.'s discovery responses.**



Copy from re:SearchTX

# VERIFICATION

**STATE OF TEXAS** §
§
**COUNTY OF BEXAR** §

Before me, the undersigned Notary Public, on this day personally appeared **MARY LIZ EASTLAND**, who, being by me duly sworn on oath deposed and said that she has read the foregoing *Defendant Mary Liz Eastland's Objections and Answers to Plaintiffs' First Set of Interrogatories*, and, with respect to all answers, excepting those regarding persons with knowledge of relevant facts, trial witnesses, and legal contentions to which there is no verification requirement (TEX. R. CIV. P. 197.2), the answers are based on her personal knowledge and are true and correct, and are hereby signed under oath pursuant to the applicable rules of civil procedure (*see* TEX. R. CIV. P. 197.2).

MEastland

**MARY LIZ EASTLAND**

**SWORN AND SUBSCRIBED TO** before me on this 24th day of February, 2026, to certify which witness my hand and official seal.

**Notary Public in and for the State of Texas**

Veronica N Sullivan
My Commission Expires 11/7/2029
Notary ID 11033954

My commission expires: ____________

Copy from re:SearchTX

# EXHIBIT 26

Copy from re:SearchTX

**CAUSE NO. D-1-GN-25-009976**

| | | |
|---|---|---|
| Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten, and Jennifer Getten | § | IN THE DISTRICT COURT |
| *Plaintiffs,* | § | |
| v. | § | 459TH JUDICIAL DISTRICT |
| Natural Fountains Properties, Inc. DBA Camp Mystic, Inc., Mystic Camps Family Partnership, LTD., Mystic Camps Management, LLC, Camp Mystic, LLC, Willetta Eastland, Edward Eastland, Mary Liz Eastland, Seaborn Stacy Eastland, and William Neely Bonner III | § | |
| *Defendants.* | § | TRAVIS COUNTY, TEXAS |

**DEFENDANT WILLETTA EASTLAND'S OBJECTIONS AND ANSWERS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES**

TO: Plaintiffs Ellen Elizabeth Getten, Deceased, by and through Douglas Getten, individually and on behalf of the Estate of Ellen Elizabeth Getten, and Jennifer Getten by and through their counsel of record: Kurt B. Arnold, J. Kyle Findley, Kala F. Sellers, John G. Grinnan; Arnold & Itkin LLP; 6009 Memorial Drive, Houston, Texas 77007; e-service@arnolditkin.com

Pursuant to Tex. R. Civ. P. 197 and subject to her Motion to Transfer Venue, Defendant Willetta Eastland, makes the following Objections and Answers to Plaintiffs' First Set of Interrogatories.

All the responses contained herein are based only upon such information and documents as are presently available to and specifically known to Defendant and/or counsel. Defendant reserves the right to change and/or supplement any and all responses.

Respectfully submitted,

**WATTS LAW FIRM LLP**
110 Tributary Ranch Road
Mountain Home, Texas 78058



Copy from re:SearchTX

P: (512) 479-0500

*/s/Mikal Watts*
MIKAL WATTS
State Bar No. 20981820
mikal@wattsllp.com
*Attorney for Willetta Eastland*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing instrument has been served to all counsel of record in accordance with Texas Rule of Civil Procedure 21 on February 27, 2026.

*/s/ Mikal Watts*
**MIKAL WATTS**



Copy from re:SearchTX

**OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS**

Defendant objects to Plaintiffs' Definitions and Instructions to Plaintiffs' First Set of Interrogatories as vague, overbroad, unnecessary and beyond the scope of the Texas Rules of Civil Procedure. Subject to and without waiving any objection, Defendants will response to Plaintiffs' First Set of Interrogatories pursuant to the Texas Rules of Civil Procedure.



Copy from re:SearchTX

## OBJECTIONS AND ANSWERS TO FIRST SET OF INTERROGATORIES

1. List each of your employees, owners, officers, or directors who either reside, have business, or are employed by a business in Texas, and identify the corresponding Texas address.

**RESPONSE: Willetta Eastland has no employees, owners, officers, or directors. Plaintiffs are referred to Camp Mystic, LLC's interrogatory responses.**

2. Identify all persons who had authority or responsibility on July 4, 2025, to make decisions regarding camper safety, evacuation, suspension of activities, or emergency response, including each person's title and specific responsibilities.

**RESPONSE: Dick Eastland was the person responsible for making the decisions at Camp Mystic Guadalupe River that night.**

3. Identify all witnesses and their corresponding address who are known to Camp Mystic Defendants to have knowledge of camp operations, safety policies, camper supervision, and the incident at issue.

**RESPONSE: Defendant objects to this interrogatory as vague and overly broad. In addition, it is not reasonably limited in time.**

**Subject to the objections previously filed and without waiving the same, Defendant answers as follows:**

> **Plaintiffs are referred to Camp Mystic, LLC's Initial Disclosures and any supplements thereto for identification of persons with knowledge of relevant facts.**

4. Identify each contract or agreement entered into with all named parties and third parties—or otherwise applicable to the events giving rise to this lawsuit—and state when the agreement was formalized, where it was formalized, and who was involved.

**RESPONSE: Defendant objects to this interrogatory as overbroad, vague, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case. Defendants further object to this interrogatory because it is not narrowly tailored to avoid including tenuous information and it constitutes an impermissible fishing expedition for information that is confidential, private, and proprietary in nature.**

5. Describe all information known to you before and during July 4, 2025, concerning weather conditions, flood risk, river levels, flood watches, or warning, including when such information was received and by whom.



Copy from re:SearchTX

**RESPONSE: Defendant objects to this interrogatory as overbroad, unduly burdensome, and attempts to force Defendant to marshal all of its available proof. In addition, it is not reasonably limited in time.**

6. Identify all sources of weather for flood information relied upon by you on July 4, 2025, including governmental agencies, alerts, forecasts, internal monitoring, or third-party services.

**RESPONSE: Defendant objects to this interrogatory as being overbroad, unduly burdensome, and an attempt to force Defendant to marshal all of its available proof. In addition, it is not reasonably limited in time.**

**Subject to the objections previously filed and without waiving the same, Defendant answers as follows:**

**None.**

7. Describe, in chronological order, all decisions made by you or your agents on July 4, 2025, starting from the first awareness of potential flooding.

**RESPONSE: Defendant objects to this interrogatory as vague, overbroad, and seeks information that is not reasonably calculated to lead to admissible evidence.**

**All decisions regarding flood evacuations were made by Dick Eastland. For further answer, Plaintiffs are referred to interrogatory answers of Camp Mystic LLC and Edward Eastland.**

8. State whether you considered evacuation of campers on July 4, 2025 and, if so, describe who considered it, when, what factors were weighed, and why evacuation was not ordered or completed.

**RESPONSE: No. Dick instructed me to stay put while he conducted evacuations.**

9. Describe all emergency action plans, policies, or procedures in effect on July 4, 2025 relating to flooding, severe weather, or evacuation, and explain how they were implemented that day.

**RESPONSE: See documents produced in response to requests for production.**

10. Identify all offices, mailing addresses, bank accounts, or business locations maintained by Camp Mystic Defendants, including the dates of operation and counties of operation.

**RESPONSE: Defendant objects to this interrogatory as overly broad in time, scope, and subject matter. Further objecting, this interrogatory is not reasonably calculated to lead to**



Copy from re:SearchTX

**the discovery of admissible evidence, and constitutes an impermissible fishing expedition for information that is confidential, private, and proprietary in nature.**

**Subject to the objections previously filed and without waiving the same, Defendant answers as follows:**

**On July 4, 2025, Willetta Eastland resided at Camp Mystic in Kerr County, Texas.**

11. Describe the training provided to staff regarding flood response, emergency evacuation, or severe weather safety prior to July 4, 2025, including when such training last occurred.

**RESPONSE: Training occurred on June 27th and June 28th, 2025. Edward and Mary Liz went over emergency procedures, counselor responsibilities, and youth protection.**

12. Describe the location of campers at the onset of flooding on July 4, 2025, including whether those locations were known or designated flood-risk areas.

**RESPONSE: Defendant objects to this discovery request on the grounds that it is vague, ambiguous and difficult to ascertain the nature of Plaintiff's request, as the term "designated flood risk areas" is not defined.**

**Subject to the objections previously filed and without waiving the same, Defendant answers as follows:**

**There were campers in each of the cabins at the Camp Mystic Guadalupe River campsite. None of the floors of any of the cabins were located within the FEMA 100-year floodplain.**

13. State the number of campers and staff present, the staff-to-camper ratios, and how campers were supervised during the flooding event.

**RESPONSE: There were 384 campers at Camp Mystic Guadalupe River. There were 127 staff members. The campers were supervised by their counselors.**

14. State whether any staff member expressed concern, disagreement, or recommended evacuation of alternative safety measures, and describe the respond to any such warnings.

**RESPONSE: Defendant objects to this interrogatory in that it seeks a narrative response and attempts to limit Defendant to those facts stated in response to this interrogatory. Defendants also object to this interrogatory to the extent that it requires Defendants to marshal all of its available evidence. Further, Defendants object to this multifarious set of interrogatories improperly set up to appear as a single question.**



Copy from re:SearchTX

**Subject to the objections previously filed and without waiving the same, Defendant answers as follows:**

**Plaintiffs are referred to the interrogatory answers of Camp Mystic, LLC and Edward Eastland.**

15. Describe all communications with emergency responders, local officials, or governmental entities on July 4, 2025, regarding flooding, evacuation, or safety concerns.

**RESPONSE: Defendant objects to this discovery request as being overly broad, unduly burdensome, harassing, and attempt to require Defendant to marshal all of its available proof. A party is not required to marshal its evidence in response to a written discovery request. This question is better suited for deposition.**

**Subject to the objections previously filed and without waiving the same, Defendant answers as follows:**

**None.**

16. Describe all communications with parents or guardians before, during, and immediately after the flooding event, including timing and content.

**RESPONSE: Defendant objects to this discovery request as being overly broad, vague, not limited in time or scope, and attempts to require Defendant to marshal all of its available proof. A party is not required to marshal its evidence in response to a written discovery request. This question is better suited for deposition.**

**Subject to the objections previously filed and without waiving the same, Defendant answers as follows:**

**There was a group text sent out at approximately 9:36 AM, and a mass e-mail sent out to parents after that.**

17. Identify all insurance policies or risk assessments in effect on July 4, 2025 that addressed flooding, evacuation, or catastrophic injury risk, and describe any recommendations made pursuant to those policies.

**RESPONSE: As to insurance policies, see this defendant's Initial Disclosures. There were no risk assessments initiated by an insurance carrier that addressed flooding, evacuation, or catastrophic injury risk.**

18. Describe the actions taken by your management personnel in response to known or reported flood risk prior to and during July 4, 2025, and identify any safety measures that were considered but not implemented.



Copy from re:SearchTX

**RESPONSE: Defendant objects to this discovery request as being overly broad, vague, not limited in time or scope.**

**Subject to the objections previously filed and without waiving the same, Defendant answers as follows:**

**See answer to interrogatory #7.**

19. Describe your working and contractual relationship with all named parties or involved third parties, and their subsidiaries and affiliates, and state all services to be performed or potentially performed in Texas.

**RESPONSE: This interrogatory is overbroad, vague, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case. Defendants further object to this interrogatory because it is not narrowly tailored to avoid including tenuous information and it constitutes an impermissible fishing expedition for information that is confidential, private, and proprietary in nature.**

20. Describe the ownership structure of Natural Fountains Properties, Inc. DBA Camp Mystic, Inc. and any named Defendants' authority to make or influence decisions regarding the property.

**RESPONSE: Plaintiffs are referred to Natural Fountains Properties, Inc.'s discovery responses.**



Copy from re:SearchTX

# VERIFICATION

**STATE OF TEXAS** §
§
**COUNTY OF BEXAR** §

Before me, the undersigned Notary Public, on this day personally appeared **WILLETTA EASTLAND**, who, being by me duly sworn on oath deposed and said that she has read the foregoing *Defendant Willetta Eastland's Objections and Answers to Plaintiffs' First Set of Interrogatories*, and, with respect to all answers, excepting those regarding persons with knowledge of relevant facts, trial witnesses, and legal contentions to which there is no verification requirement (TEX. R. CIV. P. 197.2), the answers are based on her personal knowledge and are true and correct, and are hereby signed under oath pursuant to the applicable rules of civil procedure (*see* TEX. R. CIV. P. 197.2).

Willetta A. Eastland
**WILLETTA EASTLAND**

**SWORN AND SUBSCRIBED TO** before me on this 24th day of February, 2026, to certify which witness my hand and official seal.

**Notary Public in and for the State of Texas**

My commission expires: ____________

Veronica N Sullivan
My Commission Expires
11/7/2029
Notary ID 11033954

Copy from re:SearchTX

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Laura Crain on behalf of Russell Post
Bar No. 797258
laura-crain-2391@ecf.pacerpro.com
Envelope ID: 114577681
Filing Code Description: Answer/Response
Filing Description: GETTEN AND BELLOWS PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO COMPEL ARBITRATION AND MOTION TO STAY
Status as of 5/7/2026 8:35 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Russell S.Post | | rpost@beckredden.com | 5/6/2026 5:30:52 PM | SENT |
| R. PaulYetter | | pyetter@yettercoleman.com | 5/6/2026 5:30:52 PM | SENT |
| Alyssa McDaniel | | amcdaniel@beckredden.com | 5/6/2026 5:30:52 PM | SENT |
| Yetter Coleman | | efile@yettercoleman.com | 5/6/2026 5:30:52 PM | SENT |
| John W.Stevenson | | jstevenson@stevensonmurray.com | 5/6/2026 5:30:52 PM | SENT |
| Laurie Nichols | | lnichols@stevensonmurray.com | 5/6/2026 5:30:52 PM | SENT |
| William RobertHand | | rhand@stevensonmurray.com | 5/6/2026 5:30:52 PM | SENT |
| Jane Ray | | jray@yettercoleman.com | 5/6/2026 5:30:52 PM | SENT |
| Justin P.Tschoepe | | jtschoepe@yettercoleman.com | 5/6/2026 5:30:52 PM | SENT |
| Christopher Freeman | | cfreeman@arnoldfreemanlaw.com | 5/6/2026 5:30:52 PM | SENT |
| J. ReidSimpson | | jrsimpson@yettercoleman.com | 5/6/2026 5:30:52 PM | SENT |
| Shannon Smith | | ssmith@yettercoleman.com | 5/6/2026 5:30:52 PM | SENT |
| A. Arnold | | arnold@arnoldfreemanlaw.com | 5/6/2026 5:30:52 PM | SENT |
| Sue Csizmadia | | scsizmadia@yettercoleman.com | 5/6/2026 5:30:52 PM | SENT |
| Abby Heath | | aheath@arnoldfreemanlaw.com | 5/6/2026 5:30:52 PM | SENT |
| Jeff Ray | | jray@raylaw.com | 5/6/2026 5:30:52 PM | SENT |
| Linda Gonzales | | lgonzales@raylaw.com | 5/6/2026 5:30:52 PM | SENT |
| Katherine Estrada | | kestrada@raylaw.com | 5/6/2026 5:30:52 PM | SENT |
| Laura Rua | | lrua@raylaw.com | 5/6/2026 5:30:52 PM | SENT |
| Larry Matthys | | lmatthys@raylaw.com | 5/6/2026 5:30:52 PM | SENT |
| Mikal Watts | | mikal@wattsllp.com | 5/6/2026 5:30:52 PM | SENT |

Copy from re:SearchTX

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Laura Crain on behalf of Russell Post
Bar No. 797258
laura-crain-2391@ecf.pacerpro.com
Envelope ID: 114577681
Filing Code Description: Answer/Response
Filing Description: GETTEN AND BELLOWS PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO COMPEL ARBITRATION AND MOTION TO STAY
Status as of 5/7/2026 8:35 AM CST

Case Contacts

| | | | | |
|---|---|---|---|---|
| Mikal Watts | | mikal@wattsllp.com | 5/6/2026 5:30:52 PM | SENT |
| Kenneth Fair | | fair@wrightclosebarger.com | 5/6/2026 5:30:52 PM | SENT |
| Tom Wright | | wright@wrightclosebarger.com | 5/6/2026 5:30:52 PM | SENT |
| Jessica Barger | | barger@wrightclosebarger.com | 5/6/2026 5:30:52 PM | SENT |
| Lynn Castagna | | lynn@texasdefense.com | 5/6/2026 5:30:52 PM | SENT |
| Suzanne Goss | | goss@wrightclosebarger.com | 5/6/2026 5:30:52 PM | SENT |
| John Stevenson, Jr. | | jstevenson@stevensonmurray.com | 5/6/2026 5:30:52 PM | SENT |
| Robert Hand | | rhand@stevensonmurray.com | 5/6/2026 5:30:52 PM | SENT |
| Richard WarrenMithoff | | rmithoff@mithofflaw.com | 5/6/2026 5:30:52 PM | SENT |
| Warner V.Hocker | | whocker@mithofflaw.com | 5/6/2026 5:30:52 PM | SENT |
| Teresa Demetriou | | TDemetriou@mithofflaw.com | 5/6/2026 5:30:52 PM | SENT |
| Tiy Lewis | | tlewis@wcbglaw.com | 5/6/2026 5:30:52 PM | SENT |
| Joshua Fiveson | | jfiveson@wcbglaw.com | 5/6/2026 5:30:52 PM | SENT |
| Tracy Stubblefield | | stubblefield@wcbglaw.com | 5/6/2026 5:30:52 PM | SENT |
| Moe Taheri | | mtaheri@wcbglaw.com | 5/6/2026 5:30:52 PM | SENT |
| Izabela Ramirez | | ramirez@wcbglaw.com | 5/6/2026 5:30:52 PM | SENT |
| Mona Reynolds | | reynolds@wcbglaw.com | 5/6/2026 5:30:52 PM | SENT |

Copy from re:SearchTX

5/6/2026 7:52 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009963
Stephanie Garza

Cause No. D-1-GN-25-009963

| | | |
|---|---|---|
| WARREN AND PATRICIA BELLOWS individually and on behalf of the estate of MARGARET BELLOWS, *et al.* | § | IN THE DISTRICT COURT OF |
| *Plaintiffs*, | § | |
| CHRISTOPHER JACOBE, individually and on behalf of the estate of MARY KATHRYN JACOBE, and SAMANTHA JORDAN | § | TRAVIS COUNTY, TEXAS |
| *Intervenors,* | § | |
| v. | § | |
| Camp Mystic, LLC., *et al.* | § | |
| *Defendants*. | § | 459th JUDICIAL DISTRICT |

**INTERVENORS' JOINDER IN GETTEN AND BELLOWS RESPONSE TO DEFENDANTS' MOTION TO COMPEL ARBITRATION AND MOTION TO STAY**

COMES NOW, Intervenors, Christopher Jacobe, individually and on behalf of the estate of Mary Kathyrn Jacobe ("Mary Kate") and Samantha Jordan (collectively "Intervenors") and files this Joinder Response to the *Getten* and *Bellows* Plaintiffs' response to Defendants' motion to compel arbitration and motion to stay. Intervenors fully adopt and join the combined *Getten* and *Bellows* Plaintiffs' response to Defendants' motion to compel arbitration and evidence attached thereto filed on May 6, 2026. In addition, and in support of the briefing offered in the *Getten/Bellows* Response, Intervenors submit the declaration of Samantha Jordan attached as Exhibit 1.[1] Accordingly, based on the arguments, briefing and evidence in the *Getten/Bellows* response, as well as the evidence attached hereto, Intervenors pray that the Court deny Defendants' motion to compel arbitration and motion to stay.

[1] Exhibit 1, Declaration of Samantha Jordan and Exhibit 1 attached thereto, Participation Agreement.

Copy from re:SearchTX

Respectfully submitted,

**STEVENSON & MURRAY**

/s/ W. Robert Hand

JOHN W. STEVENSON, JR.
State Bar No. 19196050
W. ROBERT HAND
State Bar No. 24078622
24 Greenway Plaza, Suite 750
Houston, Texas 77046
Telephone: (713) 622-3223
Facsimile: (713) 622-3224
Email: jstevenson@stevensonmurray.com
Email: rhand@stevensonmurray.com

**ATTORNEYS FOR INTERVENORS**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document was served upon all known counsel of record via electronic means in accordance with the Texas Rules of Civil Procedure on this the 6th day of May 2026.

/s/ W. Robert Hand

W. ROBERT HAND



Copy from re:SearchTX

CAUSE NO. D-1-GN-25-009963

| | | |
|---|---|---|
| CHRISTOPHER JACOBE, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF MARY KATHRYN JACOBE, DECEASED, AND SAMANTHA JORDAN | § § § § § § § | IN THE DISTRICT COURT OF |
| VS. | § § | |
| CAMP MYSTIC, LLC, MYSTIC CAMPS FAMILY PARTNERSHIP, LTD, NATURAL FOUNTAINS PROPERTIES, INC., WILLETTA EASTLAND , MYSTIC CAMPS MANAGEMENT, LLC, EDWARD EASTLAND, MARY LIZ. EASTLAND, AND THE ESTATE OF RICHARD G. EASTLAND | § § § § § § § § § | TRAVIS COUNTY, TEXAS<br><br>459TH JUDICIAL DISTRICT |

**DECLARATION OF SAMANTHA JORDAN**

Pursuant to Section 132.001 of the Texas Civil Practice and Remedies Code, I, Samantha Jordan, declare under penalty of perjury that the following statements are true and correct to the best of my knowledge and belief:

1. My name is Samantha Jordan. I am over the age of eighteen (18), of sound mind, and fully competent to make this Declaration. I have personal knowledge of the facts stated herein, and they are true and correct.

2. I am the mother of Mary Kathryn Jacobe ("Mary Kate") who tragically died on July 4, 2025, while attending Camp Mystic in Hunt, Texas.

3. I am a resident of the State of Texas. I reside at 7914 Meadowvale Dr., Houston, Texas 77063. I have continuously resided in the State of Texas at all times material to this Declaration, including on the date I signed the Camp Mystic Participation Agreement for the 2025 camp season, and I remain a resident of the State of Texas today.

4. On or about June 17, 2025, I signed the Camp Mystic Participation Agreement (the "Participation Agreement") for my daughter, Mary Kate Jacobe to be permitted to attend



EXHIBIT 1

Copy from re:SearchTX

Camp Mystic in 2025. **Ex. 1.** The Participation Agreement was provided to me as part of the online registration process for my daughter to attend Camp Mystic.

5. I signed the Participation Agreement while physically present in the State of Texas, at Houston, Texas. I did not travel outside of Texas to sign the Agreement, and I did not sign it in, from, or while located in any other state.

6. I was the sole signatory to the Participation Agreement. No representative of Camp Mystic, Natural Fountains Properties, Inc., or any other Defendant in this action signed the Agreement. No attorney signed the Participation Agreement, and I did not consult with or receive the advice of an attorney concerning the Participation Agreement, or any provisions within it, before signing it. I was further not advised to seek the counsel of an attorney prior to signing the Participation Agreement.

7. At the time I executed the Participation Agreement, my daughter, Mary Kate, was a minor child residing with me in the State of Texas. My daughter's primary and only residence on the date the Agreement was signed was 7914 Meadowvale Dr., Houston, Texas 77063. My daughter had not established a residence in any other state. My daughter was born in Texas and resided at the above address her entire life.

8. At the time of her death in July 2025, Mary Kate Jacobe was a resident of the State of Texas. Mary Kate had been continuously a Texas resident from the time the Participation Agreement was signed through the date of her death.

9. It was my understanding, based on information provided to me by Camp Mystic during the enrollment process, that execution of the Participation Agreement was **a mandatory prerequisite** for my daughter's enrollment in and participation at Camp Mystic for the 2025 summer season. Camp Mystic would not have permitted Mary Kate to enroll in or attend Camp Mystic without a signed Participation Agreement. I signed the Participation Agreement because I was required to do so in order for my daughter to attend Camp Mystic.

10. All activities described in the Participation Agreement and in which my daughter was to participate (including, without limitation, camp sports, water activities, hiking, arts and crafts, and horseback riding activities) were to take place at Camp Mystic's premises in Hunt, Texas. Mary Kate did not travel out of the State of Texas in connection with her enrollment at, or participation in, Camp Mystic for the 2025 camp season.

11. The Participation Agreement contained a section entitled "Binding Arbitration." Ex. 1 at 2. Prior to executing the Participation Agreement, no one at Camp Mystic discussed the "Binding Arbitration" section of the Participation Agreement with me.

12. At the time I executed the Participation Agreement, I did not know what corporate entities were affiliated with Camp Mystic or how the camp was organized as a business. I did not know the name "Natural Fountains Properties, Inc." or understand it to be a party to the





Copy from re:SearchTX

"Binding Arbitration" provision. I did not know what "Mystic Camps Family Partnership, Ltd." or "Mystic Camps Management, LLC" were.

13. It was not my understanding that by signing the Participation Agreement I was agreeing to arbitrate claims—including claims for the death of my daughter—against Camp Mystic's corporate owners, holding companies, or individual directors, officers, or employees. The Participation Agreement was, in my understanding, a camp enrollment form, not a broad arbitration agreement covering any dispute with business entities I had never heard of.

14. The arbitration provision refers to "disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof." Ex. 1 at 2. I understood this language to refer to disputes about the terms of the Participation Agreement, such as what services Camp Mystic agreed to provide—which were listed in the Agreement as traditional camp sports and games, such as water activities, hiking, aerobics, arts, and crafts, and equine activities—or whether Camp Mystic had met its obligations under those terms. I did not understand the phrase "out of or in connection with this Agreement" to sweep in claims arising from the death of my daughter in a flood at camp. That is not what I expected from a summer camp enrollment form or what I thought I was signing.

15. The fee for Mary Kate to attend Camp Mystic for the 2025 summer season was less than $9,000 which was paid in consideration for her attendance at the camp.

16. I make this declaration in support of Plaintiffs' Response to Defendants' Motion to Compel Arbitration and Motion to Stay.

17. I declare under penalty of perjury that the foregoing is true and correct.

**FURTHER DECLARANT SAYETH NOT.**

Executed on this 5 day of May 2026, in Harris County, Texas.

SAMANTHA JORDAN a/k/a
SAMANTHA JACOBE



EXHIBIT 1

Copy from re:SearchTX

EXHIBIT
1

# Participation Agreement 2025

for Mary Kate Jacobe, 2025 Season

Participation Agreement for Mary Kate Jacobe:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Mary Kate Jacobe, (Mary Kate), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Mary Kate.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Mary Kate and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from

Copy from re:SearchTX

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Mary Kate, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Mary Kate MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Mary Kate, use interviews with and photographic images of Mary Kate, including videotape, for its website, brochures and other, including promotional, materials.

**EXHIBIT 1**

Copy from re:SearchTX

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Mary Kate, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Mary Kate, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Samantha Jacobe (06/17/2025)

EXHIBIT 1

Copy from re:SearchTX

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

William Hand on behalf of William Hand
Bar No. 24078622
rhand@stevensonmurray.com
Envelope ID: 114580680
Filing Code Description: RESPONSE
Filing Description: INTERVENORS' JOINDER IN GETTEN AND BELLOWS RESPONSE TO DEFENDANTS' MOTION TO COMPEL ARBITRATION AND MOTION TO STAY
Status as of 5/7/2026 7:57 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Russell S.Post | | rpost@beckredden.com | 5/6/2026 7:52:12 PM | SENT |
| R. PaulYetter | | pyetter@yettercoleman.com | 5/6/2026 7:52:12 PM | SENT |
| Alyssa McDaniel | | amcdaniel@beckredden.com | 5/6/2026 7:52:12 PM | SENT |
| Yetter Coleman | | efile@yettercoleman.com | 5/6/2026 7:52:12 PM | SENT |
| John W.Stevenson | | jstevenson@stevensonmurray.com | 5/6/2026 7:52:12 PM | SENT |
| Laurie Nichols | | lnichols@stevensonmurray.com | 5/6/2026 7:52:12 PM | SENT |
| William RobertHand | | rhand@stevensonmurray.com | 5/6/2026 7:52:12 PM | SENT |
| Jane Ray | | jray@yettercoleman.com | 5/6/2026 7:52:12 PM | SENT |
| Justin P.Tschoepe | | jtschoepe@yettercoleman.com | 5/6/2026 7:52:12 PM | SENT |
| Christopher Freeman | | cfreeman@arnoldfreemanlaw.com | 5/6/2026 7:52:12 PM | SENT |
| J. ReidSimpson | | jrsimpson@yettercoleman.com | 5/6/2026 7:52:12 PM | SENT |
| Shannon Smith | | ssmith@yettercoleman.com | 5/6/2026 7:52:12 PM | SENT |
| A. Arnold | | arnold@arnoldfreemanlaw.com | 5/6/2026 7:52:12 PM | SENT |
| Sue Csizmadia | | scsizmadia@yettercoleman.com | 5/6/2026 7:52:12 PM | SENT |
| Abby Heath | | aheath@arnoldfreemanlaw.com | 5/6/2026 7:52:12 PM | SENT |
| Jeff Ray | | jray@raylaw.com | 5/6/2026 7:52:12 PM | SENT |
| Linda Gonzales | | lgonzales@raylaw.com | 5/6/2026 7:52:12 PM | SENT |
| Katherine Estrada | | kestrada@raylaw.com | 5/6/2026 7:52:12 PM | SENT |
| Laura Rua | | lrua@raylaw.com | 5/6/2026 7:52:12 PM | SENT |
| Larry Matthys | | lmatthys@raylaw.com | 5/6/2026 7:52:12 PM | SENT |
| Mikal Watts | | mikal@wattsllp.com | 5/6/2026 7:52:12 PM | SENT |

Copy from re:SearchTX

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

William Hand on behalf of William Hand
Bar No. 24078622
rhand@stevensonmurray.com
Envelope ID: 114580680
Filing Code Description: RESPONSE
Filing Description: INTERVENORS' JOINDER IN GETTEN AND BELLOWS RESPONSE TO DEFENDANTS' MOTION TO COMPEL ARBITRATION AND MOTION TO STAY
Status as of 5/7/2026 7:57 AM CST

Case Contacts

| | | | | |
|---|---|---|---|---|
| Mikal Watts | | mikal@wattsllp.com | 5/6/2026 7:52:12 PM | SENT |
| Kenneth Fair | | fair@wrightclosebarger.com | 5/6/2026 7:52:12 PM | SENT |
| Tom Wright | | wright@wrightclosebarger.com | 5/6/2026 7:52:12 PM | SENT |
| Jessica Barger | | barger@wrightclosebarger.com | 5/6/2026 7:52:12 PM | SENT |
| Lynn Castagna | | lynn@texasdefense.com | 5/6/2026 7:52:12 PM | SENT |
| Suzanne Goss | | goss@wrightclosebarger.com | 5/6/2026 7:52:12 PM | SENT |
| John Stevenson, Jr. | | jstevenson@stevensonmurray.com | 5/6/2026 7:52:12 PM | SENT |
| Robert Hand | | rhand@stevensonmurray.com | 5/6/2026 7:52:12 PM | SENT |
| Richard WarrenMithoff | | rmithoff@mithofflaw.com | 5/6/2026 7:52:12 PM | SENT |
| Warner V.Hocker | | whocker@mithofflaw.com | 5/6/2026 7:52:12 PM | SENT |
| Teresa Demetriou | | TDemetriou@mithofflaw.com | 5/6/2026 7:52:12 PM | SENT |
| Tiy Lewis | | tlewis@wcbglaw.com | 5/6/2026 7:52:12 PM | SENT |
| Joshua Fiveson | | jfiveson@wcbglaw.com | 5/6/2026 7:52:12 PM | SENT |
| Tracy Stubblefield | | stubblefield@wcbglaw.com | 5/6/2026 7:52:12 PM | SENT |
| Moe Taheri | | mtaheri@wcbglaw.com | 5/6/2026 7:52:12 PM | SENT |
| Izabela Ramirez | | ramirez@wcbglaw.com | 5/6/2026 7:52:12 PM | SENT |
| Mona Reynolds | | reynolds@wcbglaw.com | 5/6/2026 7:52:12 PM | SENT |

Copy from re:SearchTX

5/6/2026 3:43 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009963
Susan Schmidt

Cause No. D-1-GN-25-009963

| | | |
|---|---|---|
| WARREN AND PATRICIA BELLOWS individually and on behalf of the estate of MARGARET BELLOWS, *et al.* | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| CHRISTOPHER JACOBE, individually and on behalf of the estate of MARY KATHRYN JACOBE, and SAMANTHA JORDAN | § § § § | TRAVIS COUNTY, TEXAS |
| | § | |
| *Intervenors*, | § | |
| | § | |
| v. | § | |
| | § | |
| Camp Mystic, LLC., *et al.* | § | |
| | § | |
| *Defendants*. | § | 459th JUDICIAL DISTRICT |

**INTERVENORS' RESPONSE TO DEFENDANTS'**
**MOTION TO COMPEL ARBITRATION AND MOTION TO STAY**

COMES NOW, Intervenors, Christopher Jacobe, individually and on behalf of the estate of Mary Kathyrn Jacobe ("Mary Kate") and Samantha Jordan (collectively "Intervenors") and files this Response to Defendants' motion to compel arbitration. Intervenors fully adopt and join the combined *Getten* and *Bellows* Plaintiffs' response to Defendants' motion to compel arbitration and evidence attached thereto. Intervenors file their own response out of an abundance of caution and to submit the declaration of Samantha Jordan. For the reasons set forth below, and the *Getten* and *Bellows* response, Defendants' motion should be denied.

**INTRODUCTION**

In an effort to evade further public exposure of the events that led to the death of 25 girls and two teenage counselors while away at summer camp, Defendants seek to prevent the litigation of Intervenor's suit in open court. Defendants ask this Court to order that Intervenors' suit be

Copy from re:SearchTX

forced into private arbitration where their claims and evidence will be sequestered in closed proceedings. In support, Defendants rely on arbitration provisions that they never signed, to which most are not even parties, and which are unenforceable under Texas law. This is no small overreach.

Any motion to arbitrate personal injury claims should be treated with healthy suspicion, especially one that blatantly violates the requirements of the Texas Arbitration Act for such claims. Given the public importance of this case, that suspicion should be magnified. This Court should deny Defendants' motion and allow these cases to be litigated in the sunlight of open court.

## BACKGROUND FACTS

Camp Mystic is a private summer camp for girls located in Hunt, Kerry County, Texas, along the Guadalupe River. The Eastland family, including the individual Eastland Defendants, has been operating the camp in the Texas Hill Country for generations.

The camp is located on acreage owned by Defendant Natural Fountains Properties, Inc. ("Natural Fountains"), a domestic corporation headquartered in Texas,[1] which leases the property to Defendant Camp Mystic, LLC,[2] a domestic LLC also headquartered in Texas.[3] All the members of Camp Mystic, LLC are Texas residents.[4]

In order for a child to attend Camp Mystic, the parents or legal guardians of campers must sign a participation agreement for the camper to enroll and participate in Camp Mystic activities.[5]

---

[1] *See* Exhibit 7, Amendment to Articles of Incorporation for Natural Fountains Properties, Inc. (CM0001865-0001867).

[2] *See* Exhibit 6, Lease between Natural Fountains Properties, Inc. and Camp Mystic, Inc. (CM 000502-000511).

[3] *See* Exhibit 2, Certificate of Formation for Camp Mystic, LLC (CM 00496-00498)

[4] *See* Exhibit 3, Texas Franchise Tax Public Information Report for Camp Mystic, LLC; Exhibit 4, Mystic Camps Family Partnership, Ltd., and Exhibit 5, Mystic Camps Management, LLC.

[5] *See* Exhibit 1, Declaration of Samantha Jordan, at pg. 2; ¶9 and Exhibit 1 thereto participation agreement at pg. 1 Camp Mystic required Participation Agreement to be signed in order for Camper to be enrolled in and participate at camp.



Copy from re:SearchTX

For the 2025 season, one parent for each child (the "Campers") executed a participation agreement on behalf of her daughter (the "Participation Agreements" or "Agreements").[6] The Declaration of George Albritton Eastland, submitted by Defendants in support of their Motion, confirms that the Participation Agreements were "signed as part of campers' enrollment at Camp Mystic."[7] However, neither Camp Mystic nor any other Defendant in this case signed the Agreements.

The Agreements set forth their purpose and memorialized the transaction that is allegedly subject to an agreement to arbitrate. They "include[] important information about Camp Mystic activities and describe[] certain protection sought by Camp Mystic if you or your child . . . is hurt or suffers some other loss."[8] The activities contemplated by the Participation Agreements were to take place exclusively in Texas.[9]

Each Agreement describes Camp Mystic's environment as including "river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country."[10] Activities included "a variety of traditional camp sports and games, water activities, hiking, aerobics … arts and crafts" and also "[e]quine activities include horseback riding activities, trail rides and specialty events."[11] All of these activities were to occur at the Camp's premises in Hunt, Texas, and in the surrounding Texas Hill Country.[12] The Agreements note that "[c]ampers may be driven to and from those activities, and to and from local airports and medical facilities,"[13] all within the local Texas area.

---

[6] *See e.g.*, Defendants' Mot. to Compel, Ex. A ("Eastland Declaration"), Ex. A ("Participation Agreements"). Aside from the inclusion of identifying information for each Camper and each Agreement's signatory, the Agreements for each of the Campers are identical.
[7] Eastland Declaration ¶ 7.
[8] Participation Agreements at 1.
[9] *See e.g.*, *id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.*



Copy from re:SearchTX

The Agreements provide that for any "dispute[], controvers[y] or difference[] which may arise between the parties out of or connection with this Agreement," the parties would attempt to settle the dispute "in an amicable way through discussions then mediation," and if unsuccessful, through arbitration in accordance with the AAA.[14] The Agreements also expressly state that they "shall be governed by and construed in accordance with the laws of the State of Texas."[15]

The Participation Agreement at issue was executed in Texas.[16] The sole signatory to the Participation Agreement—Samantha Jordan a/k/a Samantha Jacobe, the mother of Mary Kate Jacobe—is a resident of Texas and was a resident of Texas when the Participation Agreement was signed.[17] No out-of-state party executed the Participation Agreement at issue.[18]

Additionally, Mary Kate Jacobe was a child residing in Texas at the time of her death.[19] Likewise, Mary Kate Jacobe was a Texas resident at the time her mother executed the Participation Agreement for the 2025 camp season.[20]

In short, every aspect of the Campers' enrollment in and participation at Camp Mystic, both in fact and as reflected in the Participation Agreements, occurred in Texas. That was where the Campers tragically died in July 2025 when the flooded Guadalupe River overtook the banks while the Campers slept in Camp Mystic's cabins.

Determining responsibility for the tragic deaths of the Campers is not only of vital interest to their families and the Defendants. It is a matter of public importance to the citizens of Texas.

[14] *Id*. at 2.
[15] *Id*.
[16] *See* Exhibit 1, Declaration of Samantha Jordan at pg. 2; ¶5.
[17] *Id.* at pg. 1; ¶3.
[18] *Id.* at pg. 2; ¶6.
[19] *Id.* at pg. 2; ¶8.
[20] *Id.* at pg. 2; ¶¶7-8.



Copy from re:SearchTX

Defendants' suggestion that these claims should be shunted to a private, closed-door arbitration directly flouts both the Texas Arbitration Act (which governs this case) and the public interest.

## LEGAL STANDARD

Under both the Federal Arbitration Act and the Texas Arbitration Act, a party seeking to compel arbitration bears the initial burden of establishing two threshold elements: (1) the existence of a valid, enforceable arbitration agreement—that is, whether the parties entered into any arbitration agreement at all—and (2) that a specific claim falls within the scope of that arbitration agreement, referred to as the "arbitrability" of a given claim. *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 214 (5th Cir. 2003); *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003) (citing Tex. Civ. Prac. & Rem. Code § 171.021). If the trial court finds that a valid arbitration agreement exists, the burden shifts to the party opposing arbitration to raise an affirmative defense to enforcing arbitration. *Webster*, 128 S.W.3d at 228.

## ARGUMENT

### I. The Court must first decide whether a valid arbitration agreement exists.

The threshold questions of whether an arbitration agreement exists and whether a specific claim is arbitrable are typically questions for the court. *See e.g.*, *San Antonio River Auth. v. Austin Bridge & Rd., L.P.*, 601 S.W.3d 616, 626 (Tex. 2020). Parties may delegate the second question—*i.e.*, whether a given claim must be arbitrated—to an arbitrator instead of a court,[21] but the initial question of whether an arbitration agreement actually exists can never be delegated to an arbitrator. It must be decided by a court. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019) ("To be sure, before referring a dispute to an arbitrator, the court determines whether a

[21] *See e.g.*, *TotalEnergies E&P USA, Inc. v. MP Gulf of Mexico, LLC*, 667 S.W.3d 694, 702, 708, 712 (Tex. 2023) (holding that if an agreement to delegate arbitrability is "clear and unmistakable," an "arbitrator must decide whether the parties' disputes must be resolved through arbitration").



Copy from re:SearchTX

valid arbitration agreement exists."); *Kubala*, 830 F.3d at 202; *TotalEnergies*, 667 S.W.3d at 720. And "[i]f there is no agreement to arbitrate, any delegation clause in the arbitration agreement has no effect." *Indep. Specialty Ins. Co. v. Blossoms Montessori School Inc.*, No. 01-23-00840-CV, 2025 WL 1583577, at *3 (Tex. App.—Houston [1st Dist.] June 5, 2025, pet. denied).

Because "[a]rbitration agreements are interpreted under traditional contract principles," Defendants must first prove that "the agreement meets all requisite contract elements." *Webster*, 128 S.W.3d at 227. Policies in favor of arbitration (upon which a court may rely when determining the arbitrability of a specific claim) have no application when the Court is determining whether a valid arbitration agreement exists. *Webster*, 128 S.W.3d at 227 (presumption favoring arbitration "arises only after the party seeking to compel arbitration proves that a valid arbitration agreement exists"); *see also Will-Drill Res.*, 352 F.3d at 214. Accordingly, the Court must first decide whether a valid arbitration agreement exists. The answer is "no."

## II. The arbitration provisions are governed by the TAA and do not comply with the TAA requirements for an agreement to arbitrate personal injury claims; therefore, they are not valid arbitration agreements.

Whether the arbitration provisions amount to valid agreements to arbitrate necessarily depends on which law—the Federal Arbitration Act or the Texas Arbitration Act—is applicable. This is a "threshold matter" for the Court to decide. *Natgasoline LLC v. Refractory Constr. Servs., Co. LLC*, 566 S.W.3d 871, 878 (Tex. App.—Houston [14th Dist.] 2018, pet. denied).

The Agreements do not specify whether the FAA or the TAA applies, nor do they exclude application of federal law.[22] Accordingly, both the FAA and the TAA may potentially be applied. *Id*. But before the FAA may applied, Defendants must "establish [their] right to arbitrate under the Federal Arbitration Act." *Ikon Office Solutions, Inc. v. Eifert,* 2 S.W.3d 688, 696 (Tex. App.—

[22] *See generally* Participation Agreements.



Copy from re:SearchTX

Houston [14th Dist.] 1999, no pet.) (holding that relators failed to establish that right). Failure to do so renders the FAA inapplicable.

Because Defendants have not established that any Camper's enrollment in or participation at Camp Mystic affected interstate commerce in fact, the arbitration provisions are not governed by the FAA but are instead governed solely by the TAA. And under the TAA, they are invalid.

**A. Because the transactions at issue did not involve interstate commerce, the FAA is inapplicable.**

The FAA governs an arbitration agreement only if the "transaction" at issue involves interstate commerce. 9 U.S.C.A. § 2 (a valid arbitration agreement under the FAA must be in a "contract evidencing a transaction involving commerce"). "The issue is not whether the parties' dispute affects interstate commerce, but whether their dispute concerns a ***transaction*** that affects interstate commerce." *In re Merrill Lynch Tr. Co. FSB*, 123 S.W.3d 549, 553 (Tex. App.—San Antonio 2003, orig. proceeding) (emphasis added).

As the parties moving to compel arbitration, Defendants bear the burden of proving that the Participation Agreements evidence "a transaction involving interstate commerce." *In re Nasr*, 50 S.W.3d 23, 26 (Tex. App.—Beaumont 2001, orig. proceeding.).

Interstate commerce refers to "trade, commerce, transportation, or communication among the several States." 15 U.S.C. § 78c(a)(17). Mere contemplation by a party that a transaction could involve interstate commerce does not satisfy this test. As the U.S. Supreme Court has explained, the transaction at issue must "turn out, ***in fact***, to have involved interstate commerce." *Allied-Bruce Terminix Companies, Inc. v. Dobson*, 513 U.S. 265, 266 (1995) (emphasis added).

A transaction's involvement of interstate commerce is typically shown by such contacts as the location of a party's headquarters in another state; transportation of materials across state lines; manufacture of parts in a different state; billings prepared out of state; or interstate mail and phone



Copy from re:SearchTX

calls in support of a contract. *See e.g.*, *TMI, Inc. v. Brooks*, 225 S.W.3d 783, 791 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). But none of those out-of-state contacts is evidenced here. On the contrary, the transactions at issue—the Participation Agreements—were purely intrastate. It is no accident that the Agreements provide that they are governed by Texas law.[23]

First, the signatory of the Agreement, Samantha Jordan, and her daughter, Mary Kate Jacobe were ***both*** Texas residents:

- Samantha Jordan, the sole signatory to the Participation Agreement is a Texas resident and was a Texas resident at the time she executed the Agreement.[24]
- Mary Kate Jacobe was a Texas resident at the time of her death and a Texas resident at the time the Participation Agreement was executed.[25]
- The Camper's Participation Agreements were executed in Texas.[26]

Second, although they are not signatories to the Participation Agreements, the Defendants are likewise ***all*** Texas residents:

- Defendant Camp Mystic, LLC, is a domestic limited liability company headquartered in Texas whose members are all Texas residents.[27]
- Defendant Natural Fountains is a domestic corporation headquartered in Texas.[28]
- Defendant Mystic Camps Family Partnership, LTD ("Family Partnership"), which owns Camp Mystic, LLC and Natural Fountains,[29] is a domestic limited company headquartered in Texas.[30]

---

[23] Participation Agreement at 2.
[24] *See* Exhibit 1, Declaration of Samantha Jordan at pgs. 1-2.
[25] *Id.*
[26] *Id.*
[27] *See* Exhibit 3; Exhibit 4.
[28] *See* Exhibit 7, Amendment to Articles of Incorporation for Natural Fountains Properties, Inc. (CM0001865-0001867)..
[29] Eastland Declaration ¶ 5.
[30] *See* Exhibit 4, Texas Franchise Tax Public Information Report for Mystic Camps Family Partnership, Ltd



Copy from re:SearchTX

- Mystic Camps Management, LLC ("Camps Management"), which is the general partner of Family Partnership,[31] is a domestic limited liability company headquartered in Texas,[32] and all of its members are Texas residents.[33]

- Camp Mystics' directors[34]—Defendants Edward Eastland and Mary Liz Eastland—and executive director[35]—Defendant Willetta Eastland—were and are Texas residents.[36]

Finally, the Campers' enrollment in and participation at Camp Mystic occurred in Texas:

- Camp Mystic is a summer camp located in Texas.

- All camp-related activities for the Campers (including those specifically listed in the Participation Agreements) occurred solely in Texas.[37]

In sum, the Agreements were governed by Texas law, signed in Texas, by Texas residents, on behalf of Texas children, for camp activities taking place exclusively in Texas, at a camp owned and operated by Texans. Nothing in the Agreements involves interstate commerce.

Defendants do not seriously dispute this conclusion. Their entire argument for application of the FAA (which is their burden) is contained in one sentence: "[T]he Participation Agreement is in writing and governs camping activities that are open to campers across state lines."[38] But it is irrelevant whether Camp Mystic was "open to campers across state lines" because each Agreement constituted a separate "transaction." All that matters is whether the Participation Agreements for these Campers involved interstate commerce, and Defendants know full well that this inquiry focuses on the "transaction" in question. *See Eastland v. Camp Mystic, Inc.*, No. 04-08-00675-CV,

---

[31] Eastland Declaration ¶ 6.
[32] *See* Exhibit 5
[33] *Id.*
[34] Eastland Declaration ¶ 2.
[35] *Id*. at ¶ 3.
[36] *See* Exhibit 8, Travis County Appraisal District report for 2404 Scenic Drive; Exhibit 9, Kerr County Appraisal district record for 2965 Tx Hwy. 39 listing Edward and Mary Eastland as owners.
[37] *See supra* at pg. 3.
[38] Mot. at 7.



Copy from re:SearchTX

2009 WL 260523, at *3 (Tex. App.—San Antonio Feb. 4, 2009, pet. denied) (rejecting argument that Camp Mystic, LLC's use of its trademark in interstate commerce meant that its lease of the property on which the camp sits involved interstate commerce, and holding that the FAA did not apply to the lease's arbitration agreement because the specific transaction at issue—Camp Mystic, LLC's lease of real property in Texas from Natural Fountains—did not affect interstate commerce). Numerous other decisions agree.[39]

The Campers' Participation Agreements did not "in fact" involve interstate commerce. *Allied-Bruce*, 513 U.S. at 266. Therefore, the FAA does not govern this case.

**B. Under the TAA, the arbitration provisions are invalid.**

The TAA provides that arbitration agreements are generally valid "so long as they are written and agreed to by the parties." *In re Polymerica, LLC*, 296 S.W.3d 74, 76 (Tex. 2009) (internal quotation marks omitted); *see also* Tex. Civ. Prac. & Rem. Code § 171.001. But when an arbitration agreement pertains to personal injuries, the TAA requires "(1) each party to the claim, on the advice of counsel, agree[] in writing to arbitrate; and (2) the agreement [be] signed by each party and each party's attorney." Tex. Civ. Prac. & Rem. Code § 171.002(a)(3), (c). Similarly, when a person enters into a contract to acquire services "in which the total consideration to be

[39] *See also Caballero v. Contreras*, No. 13-10-00125-CV, 2010 WL 3420527, at *3 (Tex. App.—Corpus Christi–Edinburg Aug. 31, 2010, no pet.) ("[A]ll parties involved in the suit are Texas residents, the [purchase and sale] contract was signed in Texas, and the contract was to be performed in Texas. There is no evidence in the record indicating that the parties' transaction in fact affects interstate commerce."); *Chambers v. O'Quinn*, 305 S.W.3d 141, 150 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (TAA governed agreement because it "(1) [did] not relate to interstate commerce, and (2) was executed between Texas residents in Texas, to be performed in Texas"); *Lawson v. Archer*, 267 S.W.3d 376, 381 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (FAA did not apply because "the parties reside and do business in Texas. They executed the [inspection] Agreement in Texas. The inspected property is in Texas. The Agreement provides, 'This agreement shall be governed by the laws of the State of Texas.'"); *Henry v. Gonzalez*, 18 S.W.3d 684, 688 (Tex. App.—San Antonio 2000, pet. dism'd by agr.) (FAA did not apply to agreement where "all parties involved in the suit are Texas residents, the contract was signed in Texas, and the contract was to be performed only in Texas").



Copy from re:SearchTX

furnished by the individual is not more than $50,000," the TAA requires each party and each party's attorney to sign the arbitration agreement. *Id*. at § 171.002(a)(2), (b).

With this requirement, Section 171.002 creates a condition precedent to the formation of these types of arbitration agreements. *See e.g.*, *Lawrence v. CDB Services, Inc.*, 16 S.W.3d 35, 43 (Tex. App.—Amarillo 2000), *aff'd*, 44 S.W.3d 544 (Tex. 2001) (citing Section 171.002 as an illustration of "the Legislature … impos[ing] restrictions on the rights of parties to make contracts" and explaining that absent the required signatures, agreements to arbitrate claims for personal injuries are not subject to the general provision in Section 171.001 that written agreements are "valid and enforceable"). Because "[c]ontract formation defenses—such as whether a party ever signed a contract" are "threshold issues to be decided by the court," the Court should conclude that the conditions precedent of Section 171.002 were not satisfied. *RSL Funding, LLC v. Newsome*, 569 S.W.3d 116, 124, 125 (Tex. 2018) (when there is a condition precedent to contract formation, a court has "an opportunity to decide at the outset" whether the condition was satisfied because it "goes to contract formation, which the court decides before compelling arbitration"). Therefore, there is no valid agreement to arbitrate between any Plaintiff or Intervenor and any Defendant.

According to Defendants, the arbitration provision in each Camper's Agreement pertains to Campers' personal injuries. The provision purports to cover "[a]ll disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement."[40] Assuming Defendants' interpretation is correct, the Agreements are subject to the requirements of Section 171.002. Additionally, each Camper's family paid approximately $7,000 in consideration

[40] Participation Agreements at 2.



Copy from re:SearchTX

for Camp Mystic's services, including enrollment in and participation at the camp,[41] which also makes the Agreements subject to the requirements of Section 171.002.

It is undisputed that, despite the requirements of Section 171.002, the Agreement was signed by only one party—the Camper's mother. None of the Defendants signed the Agreements, and no attorney signed the Agreements. As such, the arbitration provisions are not valid under the TAA and cannot be enforced by any of the Defendants. *See e.g.*, *In re Godt*, 28 S.W.3d 732, 739 (Tex. App.—Corpus Christi–Edinburg 2000, no pet.) (arbitration agreement unenforceable under the TAA where signatory was not acting on the advice of counsel when she signed the agreement, and agreement was not signed by an attorney representing either party).

For this reason, Defendants' Motion to Compel must be denied.

**III. Even if the FAA governs, Defendants have not established their entitlement to invoke the arbitration provisions.**

Even if the FAA governs, Defendants have not established a valid arbitration agreement between any Plaintiff or Intervenor and any Defendant—none of whom signed the Participation Agreements.[42] "Whether a non-signatory can compel arbitration pursuant to an arbitration clause questions the existence of a valid arbitration clause between specific parties and is therefore a gateway matter for the court to decide." *In re Rubiola*, 334 S.W.3d 220, 224 (Tex. 2011).

Whether non-signatory Defendants can compel Intervenors to arbitrate is a critical question. "The involvement of a non-signatory is an important distinction because a party cannot be forced to arbitrate absent a binding agreement to do so. The question is not whether [Plaintiff] agreed to arbitrate with someone, but whether a binding arbitration agreement exists between [that Plaintiff] and the [non-signatory Defendants]." *Jody James Farms, JV v. Altman Group, Inc.*, 547

---

[41] *See* Exhibit 1, Declaration of Samantha Jordan at pg. 3, ¶ 15
[42] *See generally* Participation Agreements.



Copy from re:SearchTX

S.W.3d 624, 632 (Tex. 2018). "If the agreement does not expressly identify all the parties to the agreement, the question of whether a valid arbitration clause exists between specific parties is ultimately a function of the intent of the parties, as expressed by the terms of the agreement." *Golden Age Senior Living of El Paso, LLC v. Atwood*, 486 S.W.3d 44, 47 (Tex. App.—El Paso 2016, no pet.).

Defendants have not established that they are parties to the Agreements, let alone to the arbitration provisions. As such, they have not proven that a valid and binding arbitration agreement exists between *any* Plaintiff or Intervenor and *any* Defendant—much less *all* of them.

**A. None of the Defendants is a party to the Participation Agreements.**

As a general proposition, "an arbitration clause cannot be invoked by a non-party to the arbitration contract." *G.T. Leach Builders, LLC v. Sapphire V.P.*, 458 S.W.3d 502, 524 (Tex. 2015) (internal quotation marks omitted). None of the Defendants signed the Participation Agreements, so each must "establish that they have a valid legal right to enforce [the Participation Agreement]'s arbitration agreement." *Id*.

"Ultimately, the question requires us to determine the intent of the parties, as expressed in the terms of the agreement, so we apply ordinary principles of state contract law to determine whether there is a valid agreement to arbitrate." *Id*. (cleaned up). For an agreement to be valid and enforceable under Texas law, its terms must be sufficiently definite to allow a court to understand the obligations of each party. *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992). Defendants' motion fails at this most basic level.

Unsurprisingly, identifying the names of contracting parties is an essential contract term. *See, e.g.*, *McCalla v. Baker's Campground, Inc.*, 416 S.W.3d 416, 418 (Tex. 2013) (holding that agreement to settle lawsuit and sell real property "contain[ed] all material terms and [was] an enforceable contract" where it included *inter alia* the identities of the transferor and transferee);



Copy from re:SearchTX

*Dobson v. Metro Label Corp.*, 786 S.W.2d 63, 65 (Tex. App.—Dallas 1990, no writ) (stating that elements of a valid contract "includ[e] an identification of both the subject matter of the contract ***and the parties to the contract***") (emphasis added). The reason for this principle is self-evident: Where no counterparty signed the agreement or is otherwise identified in it, it cannot be said that "the parties executed and delivered the contract with the intent that it be ***mutual*** and binding." *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 502 n. 21 (Tex. 2018) (emphasis added).

The arbitration provision upon which Defendants rely does not expressly name the parties who are subject to its terms. Instead, the arbitration provision only refers to "[t]he parties hereto."[43] But neither the arbitration provision nor the Participation Agreements defines the "parties hereto" or otherwise identifies who is bound to arbitrate.

In fact, the only persons expressly identified as parties to the Participation Agreements are the Campers' "Parent[s] or legal guardian[s]," who executed the Agreements and thereby "acknowledge[d] and agree[d]" to and "accept[ed] the terms and conditions of this Agreement."[44] But the Agreements do not identify any counterparties, provide signature blocks for counterparties to execute the Agreements, or include the signatures of any other person or entity. In other words, the Agreements memorialize a one-sided series of promises. If a Camper were denied attendance at Camp Mystic, who could be sued to enforce the Participation Agreement? No one knows.

Although the signatory parents "acknowledge and agree" to the terms of the Agreements "[i]n consideration of the services of Camp Mystic,"[45] Camp Mystic itself is never identified as a party to the Agreements (or to the arbitration provisions), and it did ***not*** execute the Agreements. Indeed, there is no indication that "Camp Mystic" (which appears to be an assumed or trade name)

---

[43] *Id*. at 2.
[44] *Id*. at 1, 3.
[45] *Id*. at 1.



Copy from re:SearchTX

is a legally cognizable entity that could enter into a contract. *See Kahn v. Imperial Airport, L.P.*, 308 S.W.3d 432, 438 (Tex. App.—Dallas 2010, no pet.) (noting "it is well-settled that a trade name has no legal existence," and holding that one who purports to enter into contract under an assumed or trade name only binds himself because there is no other legal entity to be bound).

For this reason, Defendants have not established an agreement to arbitrate between any Plaintiff or Intervenor and any Defendant. *See Golden Age*, 486 S.W.3d at 47 ("Because Appellants did not personally sign the arbitration agreement, there is no evidence they made an offer to [the plaintiff], or accepted one from him, to arbitrate any legally-recognized claims[.]"); *Peguero v. Freishtat*, No. 02-25-00299-CV, 2025 WL 2942405, at *21 (Tex. App.—Fort Worth Oct. 16, 2025, no pet.) (court did not abuse discretion in refusing to compel arbitration of claims against non-signatories where the arbitration clauses did not identify non-signatories "clearly enough to conclude that [arbitration clauses] reached Plaintiffs' claims against [non-signatories]"); *Sunbelt Sec., Inc. v. Mandell*, No. 01-21-00209-CV, 2023 WL 1112514, at *13-14 (Tex. App.—Houston [1st Dist.] Jan. 31, 2023, pet. denied) (affirming denial of motion to compel arbitration where agreement containing arbitration clause did not identify the parties to it); *VSR Fin. Services, Inc. v. McLendon*, 409 S.W.3d 817, 828-29 (Tex. App.—Dallas 2013, no pet.) (court did not abuse discretion in denying motions to compel arbitration where the movant was not a named party to agreements containing arbitration provision or otherwise identified as a party to those agreements).

**B. The non-signatory Defendants cannot enforce the arbitration provision.**

Recognizing that they cannot enforce the arbitration provision as parties to the Agreements, several non-signatory Defendants seek to compel arbitration on other grounds. All are meritless. If these Defendants wanted an enforceable right to arbitrate, they could have made themselves parties to the Participation Agreements with enforceable obligations—but they did not do so.



Copy from re:SearchTX

### 1. "Released Parties" are not the same as "parties hereto."

First, in an effort to generate arbitration rights for Camp Mystic, LLC, Natural Fountains, Family Partnership, and William Bonner,[46] Defendants try to insert into the arbitration provision language from the wholly distinct release and indemnity provision regarding "Released Parties."[47] This far-fetched argument is meritless.

The Participation Agreements contain a release and indemnity section providing for the "indemnif[ication], release and discharge" of certain "Released Parties."[48] This section is wholly contained in a single paragraph, entitled "Agreements of Release and Indemnity," and is set apart from the rest of the Agreement by all capital font.[49] The release and indemnity section defines "Released Parties" to include "Camp Mystic, Natural Fountain Properties, Inc., and their respective owners, members, directors, officers, employees, contractors and volunteers (individually and collectively . . . )."[50] The term "Released Party" (or "Released Parties") is used only in the release and indemnity section and nowhere else in the Agreement.[51]

By contrast, the arbitration provision never employs the term "Released Parties."[52] Instead, the arbitration provision—which is set apart from the release and indemnity section by the heading, "Binding Arbitration"—uses the generic term "parties."[53] Under standard drafting conventions, that term would ordinarily refer to parties to the Participation Agreement—if any were identified. *E.g.*, *Ferguson Braswell Fraser & Kubasta, P.C. v. SAF Oilfield I, LLC*, No. 02-22-00171-CV,

---

[46] Defendants do not contend that Camps Management or the individual Eastland Defendants in their individual capacities are "Released Parties" who qualify as "parties hereto" for purposes of the arbitration provisions. *See* Mot. at 8-10.
[47] *Id.*
[48] Participation Agreements at 2.
[49] *Id.*
[50] *Id.*
[51] *See generally* Participation Agreements.
[52] *Id.* at 2.
[53] *Id.*



Copy from re:SearchTX

2023 WL 415616, at *10 (Tex. App.—Fort Worth Jan. 26, 2023, no pet.) (noting "'parties hereto'" was a contract's "preferred phrase when limiting its reach to the signatories."). But as noted above, none of the Defendants is identified as a party to the Participation Agreements.

Texas courts presume that every word and phrase in a contract is chosen deliberately and has independent meaning. *See J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). Here, the drafters used the defined term "Released Parties" in the release and indemnity section. Had they intended for the arbitration provision to extend to all "Released Parties," they would have included that term in the arbitration provision. But they did not do so, and this Court cannot rewrite the Agreements to insert terms for which the parties did not bargain.

Defendants' effort to blur the distinction between "Released Parties" and "parties hereto" is unsupported by the language of the Agreements and would render the distinction meaningless—an outcome that Texas courts cannot accept. *Natgasoline*, 566 S.W.3d at 886 ("Ignoring the uncapitalized use of 'parties' in favor of applying the defined, capitalized term would vitiate the sub-subcontract's distinction between 'Parties' and 'parties.' We decline to apply an interpretation of the sub-subcontract that would render these distinctions meaningless."). The Court should reject Defendants' unreasonable interpretation of the Participation Agreements.

**C. Defendants' reliance on the "intertwined claims estoppel theory" is invalid.**

**1. Texas does not recognize the "intertwined claims estoppel theory," which would be preempted in any event.**

Natural Fountains, Family Partnership, and Camps Management[54] contend that even if they do not qualify as "parties hereto" for purposes of the arbitration provision, they are nevertheless entitled to enforce the arbitration agreements based on an "intertwined claims estoppel theory"—

[54] Defendants do not contend that the intertwined claims theory applies to Camp Mystic, LLC, Defendant William Bonner, or the individual Eastland Defendants in their individual capacities. *See* Mot. at 11-12.



Copy from re:SearchTX

a theory of judicial convenience imported wholesale from the Second Circuit Court of Appeals. Neither the Texas Supreme Court nor the Austin Court of Appeals has adopted this novel theory, and Defendants do not give a reason for this Court to do so now. *Jody James*, 547 S.W.3d at 639; *see also Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 632 (2009) (explaining that "a litigant who was not a party to the relevant arbitration agreement" may only invoke the FAA "if the relevant state contract law allows him to enforce the agreement").

Moreover, this novel theory would be preempted by the FAA. As the U.S. Supreme Court explained in *Morgan v. Sundance, Inc.*, courts analyzing arbitration agreements under the FAA may not adopt "custom-made rules[] to tilt the playing field in favor of (or against) arbitration." 596 U.S. 411, 419 (2022). The aim of the FAA is to "place [arbitration] agreements upon the same footing as other contracts." *Id*. at 418. Thus, any rule that makes an arbitration agreement not just "as enforceable as other contracts" but "more so" is preempted by federal law. *Id*.; *Jody James*, 547 S.W.3d at 639-40. The FAA's refusal to "foster[] arbitration" with rules that favor arbitration over litigation (*Morgan*, 596 U.S. at 419) is particularly germane when a court is deciding whether a valid agreement between the parties even exists, because at that phase no federal presumption in favor of arbitration applies. *See Webster*, 128 S.W.3d at 227.

"Intertwined claims estoppel" is precisely the sort of "custom-made rule[]" that *Morgan* declares to be preempted. Far from being an ordinary rule of contract law, the theory operates ***only*** in the forum selection context on an *ad hoc*, case-by-case basis as an excuse for dragging a plaintiff into arbitration just because a non-signatory to the arbitration agreement has a "close relationship" with a signatory. *Jody James*, 547 S.W.3d at 639. And unlike direct benefits estoppel—"the only form of equitable estoppel recognized in Texas" (*Glassell Producing Co., Inc. v. Jared Res., Ltd.*, 422 S.W.3d 68, 82 (Tex. App.—Texarkana 2014, no pet.))—intertwined claims estoppel wholly



Copy from re:SearchTX

ignores whether the non-signatory is "deliberately seek[ing] and obtain[ing] substantial benefits from the contract itself." *Taylor Morrison of Tex., Inc. v. Ha*, 660 S.W.3d 529, 533 (Tex. 2023) (cleaned up). The mere fact that a non-signatory may have engaged in a commercial relationship with a signatory is insufficient to demonstrate that the plaintiff consented to arbitrate its claims with that non-signatory. *See Jody James*, 547 S.W.3d at 639 ("[A]rbitration is a matter of consent, not coercion." (cleaned up)). This "custom-made rule[]" cannot stand in the face of *Morgan* and it should not be adopted for the first time in Texas.

### 2. Defendants cannot satisfy "intertwined claims estoppel."

Defendants also have not established that intertwined claims estoppel would even apply to Natural Fountains, Family Partnership, or Camps Management. If adopted, this estoppel theory would permit non-signatories to compel arbitration when "(1) they have a 'close relationship' with a signatory to a contract with an arbitration agreement and (2) the claims are intimately founded in and intertwined with the underlying contract obligations." *Jody James*, 547 S.W.3d at 639. Intervenors' claims against Natural Fountains, Family Partnership, and Camps Management—negligence, gross negligence, premises liability, and intentional infliction of emotion distress—sound only in tort law, not contract.

Put another way, the legal duties Defendants breached were not "contractual obligations." *See Nghiem v. Sajib*, 567 S.W.3d 718, 724 (Tex. 2019) ("[B]reach of a duty created by contract gives rise to a contract claim, whereas breach of a duty imposed by operation of law gives rise to a tort claim."). Because Intervenors' "claims are not rooted in the underlying agreement that contains an arbitration clause, any argument premised on 'intertwined-claims' estoppel" . . . fail[s]." *Black v. Diamond Offshore Drilling, Inc.*, 551 S.W.3d 346, 355 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *see also Knox Waste Serv. v. Sherman*, No. 11-19-00407-CV, 2021 WL 4470876, at *11 (Tex. App.—Eastland Sept. 30, 2021, no pet.) (claims "sound[ing] in tort



Copy from re:SearchTX

law" were not sufficiently "intertwined with the underlying contract" to trigger intertwined claims estoppel).

Further, the theory "does not apply whenever a relationship of ***any kind*** may be found among the parties to a dispute and their dispute deals with the subject matter of an arbitration contract made by one of them." *Natgasoline*, 566 S.W.3d at 888 (internal quotation marks omitted; emphasis added). The relationship must "typically involve some corporate affiliation between a signatory and non-signatory, not just a working relationship." *Id*. Defendants have not provided evidence to establish that any of them has a "close relationship" with another Defendant that would be sufficient to establish the intertwined claims estoppel theory. Defendants have denied Intervenors' allegations that they are participants in a joint enterprise, and "merely independent participants in a business transaction" cannot invoke intertwined claims estoppel. *Jody James*, 547 S.W.3d at 640 (holding that the theory would not apply to "independent and distinct entities"). Unless Defendants are prepared to admit the joint enterprise allegations, they cannot claim that a signatory to the Participation Agreements would have expected to litigate claims against non-signatory Defendants "in the same manner [she] agreed to litigate disputes with" any Defendant the Court might find to be a party to the Participation Agreements. *Id*. Defendants cannot have it both ways.

### D. Even if valid arbitration agreements existed, the Court would still need to decide whether Intervenors' claims against the non-signatories are arbitrable.

Defendants maintain that if the FAA governs and the arbitration provisions are enforceable by each Defendant, the Court cannot decide the arbitrability of Intervenors' claims because that issue has been delegated to an arbitrator. Mot. at 12-13. That is not true. The delegation clause in the arbitration provision would only be effective as to any Defendant the Court found to be a party



Copy from re:SearchTX

to the Participation Agreements. It would not be effective to any non-signatory Defendant who is allowed to enforce the arbitration provision on some derivative basis.

The Texas Supreme Court holds a contract that neither "expressly provide[s] that certain non-signatories are considered parties" nor unmistakably incorporates the AAA rules "for disputes between [the plaintiff] and unspecified third parties" does not unmistakably delegate to an arbitrator the determination of whether claims against a non-signatory are arbitrable. *Jody James*, 547 S.W.3d at 631, 632-33 (court adjudication of arbitrability is favored unless there is "clear and unmistakable evidence of the parties' intent to submit that matter to arbitration"); *see Scott v. Grim*, No. 05-23-01250-CV, 2024 WL 4532963, at *3 (Tex. App.—Dallas Oct. 21, 2024, no pet.) (explaining that under *Jody James*, "a contract that incorporates the AAA rules but is silent about arbitrating claims against non-signatories does not unmistakably delegate to the arbitrator the determination of whether such claims are subject to arbitration"). If "the parties did not agree to submit the arbitrability question itself to arbitration, then the court should decide that question . . . independently." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995).

It would be premature to decide whether the claims against the non-signatory Defendants fall within the scope of the arbitration provision because Defendants have not briefed that issue. *See Webster*, 128 S.W.3d at 227 (movant bears the burden of proving that a claim falls within the scope of an arbitration agreement). And if the motion is denied, the issue will not even arise.

Nevertheless, because the Participation Agreements are "silent about arbitrating claims against non-signatories" (*Jody James*, 547 S.W.3d at 632), if the Court grants Defendants' motion, it would need to decide whether Intervenors' claims against the non-signatory Defendants are within the scope of the arbitration provisions. *Jody James*, 547 S.W.3d at 632-33. Intervenors reserve the right to address that issue, if necessary, at the appropriate time.



Copy from re:SearchTX

### E. At worst, the Participation Agreements are ambiguous and the Court should find that only Camp Mystic, LLC is a counterparty to the Agreements.

For the reasons set forth above, the Court should rule that none of the Defendants is a party to an arbitration agreement with Intervenors based on the unambiguous face of the Agreements. At the very least, the Participation Agreements are patently ambiguous as to whether Samantha Jordan agreed to arbitrate with anyone (and if so, whom), because the counterparty's identity cannot be determined from the face of the Agreements alone. In the face of such an ambiguity, "extrinsic evidence may be used to determine the intent of the parties." *Gallagher Headquarters Ranch Dev., Ltd. v. City of San Antonio*, 303 S.W.3d 700, 702 (Tex. 2010).

When Intervenor Samantha Jordan signed the Participation Agreements, she was not aware of the camp's organizational structure and were unfamiliar with the Defendants who are now trying to invoke the arbitration provision to compel arbitration.[55] No one from Camp Mystic ever spoke to Samantha Jordan about the arbitration provision, and nothing in the Participation Agreement indicated to her who (if anyone) they were agreeing to arbitrate claims against.[56] As such, if the Court finds an ambiguity and considers extrinsic evidence, it should find that Samantha Jordan did not enter into an agreement to arbitrate with any of the non-signatory Defendants.

Based on this evidence, even if the arbitration provision is enforceable, the only entity that could conceivably be deemed a counterparty to the Agreements is Defendant Camp Mystic, LLC (which owns Camp Mystic[57] and presumably does business under the "Camp Mystic" trade name). No other Defendant—including William Bonner[58] and the individual Eastland Defendants acting

---

[55] *See* Exhibit 1, Declaration of Samantha Jordan at pgs. 2-3, ¶ 12
[56] *Id*. at ¶ ¶ 12-13.
[57] Eastland Declaration ¶ 5.
[58] Defendants maintain that Defendant Bonner is an employee of Natural Fountains. They do not maintain that he is an employee of Camp Mystic, LLC. *See id*. at ¶ 4. Even if Camp Mystic, LLC, is a party to the Participation Agreements, Bonner cannot invoke the arbitration provisions vis-à-vis Camp Mystic, LLC. *Golden Age Senior Living of El Paso, LLC v. Atwood,* 486 S.W.3d 44, 49



Copy from re:SearchTX

outside the scope of their employment with Camp Mystic, LLC[59]—is a party to the Agreements. If necessary, the Court should find as a factual matter that Intervenors did not agree to arbitrate any claims against those non-signatory Defendants, and should deny their motion on that basis.

**IV. The Court should deny Defendants' Motion to Stay.**

Even if the Court compels arbitration of the claims against any Defendant, it should not stay the litigation as to the other Defendants. The FAA does not mandate a stay of claims against non-signatories to an arbitration agreement. *See Complaint of Hornbeck Offshore (1984) Corp.*, 981 F.2d 752, 755 (5th Cir. 1993) (claims involving non-signatories "are unaffected by any stay granted under § 3 [of the FAA]"). When a court relies upon its discretionary authority to stay nonarbitrable claims, the court should consider whether a stay will "unduly prejudice the parties, or create undue hardship." *Peguero v. Freishtat*, No. 02-25-00299-CV, 2025 WL 2942405, at *24 (Tex. App.—Fort Worth Oct. 16, 2025, no pet.) (internal quotation marks omitted). In this case, those considerations are compelling.

Staying Intervenors' claims against any of the non-signatory Defendants would undoubtedly cause substantial prejudice to Plaintiffs and Intervenors. Delaying the adjudication of Plaintiffs' and Intervenors' claims would risk the degradation of critical evidence—both physical evidence at the camp and witness testimony. It would inflict emotional cruelty on grieving families who would be forced to wait for justice while a private arbitration panel adjudicates claims that might be related but might not involve the parties who should ultimately be held accountable for one of the greatest tragedies in Texas history. And it would disserve the public interest, as the

(Tex. App.—El Paso 2016, no pet.) (holding that "non-signatories may not rely on an arbitration agreement to compel arbitration unless they were acting on behalf of a signatory from which they derive their arbitration rights").

[59] *See id.* (denying motion to compel arbitration as to "Appellants [who] were not acting on behalf of [signatory defendant] when they allegedly engaged in the illegal conduct about which [plaintiff] complained").



Copy from re:SearchTX

citizens of Texas have a profound and legitimate public interest in seeing this case resolved in the sunlight of the Texas courts.

## CONCLUSION

For the foregoing reasons, Intervenors respectfully request that the Court deny Defendants' Motion to Compel Arbitration and Motion to Stay, and award Intervenors such other relief to which they may be entitled.

Respectfully submitted,

**STEVENSON & MURRAY**

/s/ W. Robert Hand

JOHN W. STEVENSON, JR.
State Bar No. 19196050
W. ROBERT HAND
State Bar No. 24078622
24 Greenway Plaza, Suite 750
Houston, Texas 77046
Telephone: (713) 622-3223
Facsimile: (713) 622-3224
Email: jstevenson@stevensonmurray.com
Email: rhand@stevensonmurray.com

**ATTORNEYS FOR INTERVENORS**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document was served upon all known counsel of record via electronic means in accordance with the Texas Rules of Civil Procedure on this the 6th day of May 2026.

/s/ W. Robert Hand
W. ROBERT HAND



Copy from re:SearchTX

CAUSE NO. D-1-GN-25-009963

| | | |
|---|---|---|
| CHRISTOPHER JACOBE, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF MARY KATHRYN JACOBE, DECEASED, AND SAMANTHA JORDAN | § § § § § § § | IN THE DISTRICT COURT OF |
| VS. | § § | |
| CAMP MYSTIC, LLC, MYSTIC CAMPS FAMILY PARTNERSHIP, LTD, NATURAL FOUNTAINS PROPERTIES, INC., WILLETTA EASTLAND , MYSTIC CAMPS MANAGEMENT, LLC, EDWARD EASTLAND, MARY LIZ. EASTLAND, AND THE ESTATE OF RICHARD G. EASTLAND | § § § § § § § § § | TRAVIS COUNTY, TEXAS<br><br>459TH JUDICIAL DISTRICT |

**DECLARATION OF SAMANTHA JORDAN**

Pursuant to Section 132.001 of the Texas Civil Practice and Remedies Code, I, Samantha Jordan, declare under penalty of perjury that the following statements are true and correct to the best of my knowledge and belief:

1. My name is Samantha Jordan. I am over the age of eighteen (18), of sound mind, and fully competent to make this Declaration. I have personal knowledge of the facts stated herein, and they are true and correct.

2. I am the mother of Mary Kathryn Jacobe ("Mary Kate") who tragically died on July 4, 2025, while attending Camp Mystic in Hunt, Texas.

3. I am a resident of the State of Texas. I reside at 7914 Meadowvale Dr., Houston, Texas 77063. I have continuously resided in the State of Texas at all times material to this Declaration, including on the date I signed the Camp Mystic Participation Agreement for the 2025 camp season, and I remain a resident of the State of Texas today.

4. On or about June 17, 2025, I signed the Camp Mystic Participation Agreement (the "Participation Agreement") for my daughter, Mary Kate Jacobe to be permitted to attend



EXHIBIT 1

Copy from re:SearchTX

Camp Mystic in 2025. **Ex. 1.** The Participation Agreement was provided to me as part of the online registration process for my daughter to attend Camp Mystic.

5. I signed the Participation Agreement while physically present in the State of Texas, at Houston, Texas. I did not travel outside of Texas to sign the Agreement, and I did not sign it in, from, or while located in any other state.

6. I was the sole signatory to the Participation Agreement. No representative of Camp Mystic, Natural Fountains Properties, Inc., or any other Defendant in this action signed the Agreement. No attorney signed the Participation Agreement, and I did not consult with or receive the advice of an attorney concerning the Participation Agreement, or any provisions within it, before signing it. I was further not advised to seek the counsel of an attorney prior to signing the Participation Agreement.

7. At the time I executed the Participation Agreement, my daughter, Mary Kate, was a minor child residing with me in the State of Texas. My daughter's primary and only residence on the date the Agreement was signed was 7914 Meadowvale Dr., Houston, Texas 77063. My daughter had not established a residence in any other state. My daughter was born in Texas and resided at the above address her entire life.

8. At the time of her death in July 2025, Mary Kate Jacobe was a resident of the State of Texas. Mary Kate had been continuously a Texas resident from the time the Participation Agreement was signed through the date of her death.

9. It was my understanding, based on information provided to me by Camp Mystic during the enrollment process, that execution of the Participation Agreement was **a mandatory prerequisite** for my daughter's enrollment in and participation at Camp Mystic for the 2025 summer season. Camp Mystic would not have permitted Mary Kate to enroll in or attend Camp Mystic without a signed Participation Agreement. I signed the Participation Agreement because I was required to do so in order for my daughter to attend Camp Mystic.

10. All activities described in the Participation Agreement and in which my daughter was to participate (including, without limitation, camp sports, water activities, hiking, arts and crafts, and horseback riding activities) were to take place at Camp Mystic's premises in Hunt, Texas. Mary Kate did not travel out of the State of Texas in connection with her enrollment at, or participation in, Camp Mystic for the 2025 camp season.

11. The Participation Agreement contained a section entitled "Binding Arbitration." Ex. 1 at 2. Prior to executing the Participation Agreement, no one at Camp Mystic discussed the "Binding Arbitration" section of the Participation Agreement with me.

12. At the time I executed the Participation Agreement, I did not know what corporate entities were affiliated with Camp Mystic or how the camp was organized as a business. I did not know the name "Natural Fountains Properties, Inc." or understand it to be a party to the





Copy from re:SearchTX

"Binding Arbitration" provision. I did not know what "Mystic Camps Family Partnership, Ltd." or "Mystic Camps Management, LLC" were.

13. It was not my understanding that by signing the Participation Agreement I was agreeing to arbitrate claims—including claims for the death of my daughter—against Camp Mystic's corporate owners, holding companies, or individual directors, officers, or employees. The Participation Agreement was, in my understanding, a camp enrollment form, not a broad arbitration agreement covering any dispute with business entities I had never heard of.

14. The arbitration provision refers to "disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof." Ex. 1 at 2. I understood this language to refer to disputes about the terms of the Participation Agreement, such as what services Camp Mystic agreed to provide—which were listed in the Agreement as traditional camp sports and games, such as water activities, hiking, aerobics, arts, and crafts, and equine activities—or whether Camp Mystic had met its obligations under those terms. I did not understand the phrase "out of or in connection with this Agreement" to sweep in claims arising from the death of my daughter in a flood at camp. That is not what I expected from a summer camp enrollment form or what I thought I was signing.

15. The fee for Mary Kate to attend Camp Mystic for the 2025 summer season was less than $9,000 which was paid in consideration for her attendance at the camp.

16. I make this declaration in support of Plaintiffs' Response to Defendants' Motion to Compel Arbitration and Motion to Stay.

17. I declare under penalty of perjury that the foregoing is true and correct.

**FURTHER DECLARANT SAYETH NOT.**

Executed on this 5 day of May 2026, in Harris County, Texas.

SAMANTHA JORDAN a/k/a
SAMANTHA JACOBE



EXHIBIT 1

Copy from re:SearchTX

EXHIBIT
1

# Participation Agreement 2025

for Mary Kate Jacobe, 2025 Season

Participation Agreement for Mary Kate Jacobe:

Thank you for reading this Agreement carefully. It includes important information about Camp Mystic activities and describes certain protection sought by Camp Mystic if you or your child, Mary Kate Jacobe, (Mary Kate), is hurt or suffers some other loss. The document must be signed by a parent or other legal guardian (who will be referred to as Parent) of Mary Kate.

In consideration of the services of Camp Mystic, I, Parent, acknowledge and agree as follows:

Camp Mystic is a Christian summer camp for girls.

Activities:

The activities of Camp Mystic include a variety of traditional camp sports and games, water activities, hiking, aerobics, and arts and crafts. Equine activities include horseback riding activities, trail rides and specialty events. I understand that I am encouraged to ask questions about the activities (and their risks) before signing this Agreement.

The environment of the Camp includes river frontage and rugged terrain, and plants and animals, common to the Texas Hill Country and possibly harmful. Campers may be driven to and from those activities, and to and from local airports and medical facilities, if necessary, in vehicles furnished and driven by Camp staff or persons with whom the Camp has contracted for such services. I understand that while the Camp expects to supervise and observe Campers in a manner consistent with its goals for its Campers, constant, 24/7, immediate, contact with a child is not possible or desirable. I further understand that Campers from time to time will have periods of discretionary free time, without immediate supervision.

Risks:

Camp Mystic is an adventure, designed to promote the emotional, physical, and spiritual growth of young women. As with all adventures, Campers will be exposed to certain risks. Among these risks are the following: travel by motor vehicle, exposure to the elements of nature and the environment (including uncertain terrain, the river and river frontage, heat, cold, rain, floods and lightning); trips and falls, and close personal contact and physical trauma associated with sports and other recreation; falls, bites, kicks and other risks associated with horseback riding; and errors of judgment, failure to follow instructions, and careless conduct of other campers, Camp staff and other persons with whom Camp Mystic may contract for certain services. Campers may suffer bruises, scrapes and strains, bites and stings, allergies, emotional upset and all manner of other injuries or illness which, in extraordinary cases, may be serious.

Camp Mystic is obligated by Texas law to provide to Mary Kate and Parent the following, pertaining to its equine activities: "WARNING: Under Texas Law (Chapter 87, Texas Civil Practice and Remedies Code) a farm animal professional is not liable for an injury to or death of a participant in farm animal activities resulting from the inherent risks of farm animal activities."

The risks described above are inherent to the activities of Camp Mystic; that is, they are such an integral part of its activities that, if they were eliminated, Campers would be deprived of the opportunity for the growth and development which Camp Mystic and its Campers and families expect. Other risks may be encountered, inherent and otherwise.

I also understand that Camp Mystic is a "Help-Delay" facility and thus, it is several miles from

Copy from re:SearchTX

the nearest hospital/emergency center if a need were to arise to receive emergency care.

Acknowledgment and Assumption of Risks:

I have read and understand, and have discussed with my child, Mary Kate, the Camp activities and risks described in this Agreement and in other materials provided by the Camp including activities described on the Camp's website, www.campmystic.com. She understands them and wishes to participate. I acknowledge and assume the risks and dangers described above, and all others associated with Camper's enrollment in the Camp, whether or not engaged in a supervised activity of the Camp, and on or off the Camp premises.

AGREEMENTS OF RELEASE AND INDEMNITY: I, PARENT AGREE AS FOLLOWS: I INDEMNIFY, RELEASE AND DISCHARGE (AGREEING TO MAKE NO CLAIM, AND NOT TO SUE) CAMP MYSTIC, NATURAL FOUNTAIN PROPERTIES, INC., AND THEIR RESPECTIVE OWNERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS AND VOLUNTEERS (INDIVIDUALLY AND COLLECTIVELY REFERRED TO AS RELEASED PARTIES ) WITH RESPECT TO ANY AND ALL CLAIMS OF PROPERTY DAMAGE, PERSONAL INJURY OR OTHER LOSS, WHICH I OR Mary Kate MAY SUFFER, ARISING OUT OF OR IN ANY WAY RELATED TO HER ENROLLMENT IN THE CAMP, WHETHER OR NOT ENGAGED IN A SUPERVISED ACTIVITY OF THE CAMP, AND ON OR OFF THE CAMP PREMISES. THESE AGREEMENTS OF RELEASE AND INDEMNITY INCLUDE CLAIMS CAUSED OR CLAIMED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF A RELEASED PARTY. I UNDERSTAND THAT IN SIGNING THIS AGREEMENT I SURRENDER THE RIGHT TO MAKE A CLAIM OR FILE A LAWSUIT AGAINST A RELEASED PARTY, FOR PERSONAL INJURY AND EVEN DEATH, PROPERTY DAMAGE OR OTHERWISE, EXCEPT IN CASES OF INTENTIONAL WRONGS, RECKLESSNESS OR GROSS NEGLIGENCE OF A RELEASED PARTY.

Binding Arbitration:
The parties hereto shall first try to settle any dispute arising out of or related to this Agreement in an amicable way through discussions then mediation before a mutually acceptable mediator whose name appears on the registry of names recognized by Texas courts as qualified persons for mediation assignments.

All disputes, controversies or differences which may arise between the parties out of or in connection with this Agreement or breach thereof, and which cannot be settled through discussions and mediation, shall be determined in accordance with the rules of the Commercial Arbitration Rules of the American Arbitration Association. The mediation and arbitration shall be held in Kerrville, Texas. The arbitration award shall be final and binding upon the parties hereto. Any award shall be enforceable in any court of competent Jurisdiction in the same manner as judgments. This provision to arbitrate shall survive any termination of this Agreement. The provisions of this Agreement shall remain in full force and effect pending any arbitration hereunder.

The arbitration shall be heard and determined by a single arbitrator who is a licensed attorney and who is licensed to practice and on the arbitration list before a Texas or United States District Court. Unless the parties can agree on an arbitrator, the appointing authority for the implementation of such procedure shall be the American Arbitration Association, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitrator shall be final and binding. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. All pleadings and documents of any nature submitted by the parties hereto in connection with such arbitration shall be submitted in the English language.

Enforcement of the award of the arbitrator may be obtained in any court or competent jurisdiction. The arbitrator shall designate the party or parties to bear any expenses of the arbitration, including without limitation reasonable legal and accounting fees, if any, such designation to be based to the extent possible upon the relative merits of the parties' respective cases and the manner in which the parties have conducted themselves.

Additional Provisions:
The Camp may, without compensation to me or Mary Kate, use interviews with and photographic images of Mary Kate, including videotape, for its website, brochures and other, including promotional, materials.



Copy from re:SearchTX

If any part of this agreement is found by a court of competent jurisdiction to be invalid, the remainder of the agreement nevertheless will be in full force and effect.

I, Parent or legal guardian of Mary Kate, have read and accept the terms and conditions of this Agreement, and acknowledge and agree that it shall, to the fullest extent allowed by law, be effective upon me and Mary Kate, and our respective heirs, personal representatives, estates and family members.

[X] I have read and agree to the terms and conditions above.
[] I do not give permission to my child.

Signature Samantha Jacobe (06/17/2025)

EXHIBIT 1

Copy from re:SearchTX

Corporations Section
P.O.Box 13697
Austin, Texas 78711-3697

Jane Nelson
Secretary of State

# Office of the Secretary of State

The undersigned, as Secretary of State of Texas, does hereby certify that the attached is a true and correct copy of each document on file in this office as described below:

CAMP MYSTIC, LLC
Filing Number: 804296074

| | |
|---|---|
| Certificate of Conversion | October 28, 2021 |
| Public Information Report (PIR) | December 31, 2024 |

In testimony whereof, I have hereunto signed my name officially and caused to be impressed hereon the Seal of State at my office in Austin, Texas on May 06, 2026.

Jane Nelson
Secretary of State



Copy from re:SearchTX

EXHIBIT 2

Filing#:149273300 Document#:1089951340002 Filed On 10/28/2021 received by Upload

| | | |
|---|---|---|
| **Form 632**<br>**(Revised 05/11)**<br><br>Return in duplicate to:<br>Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>512 463-5555<br>FAX: 512 463-5709<br><br>**Filing Fee: See instructions** | THE STATE OF TEXAS<br><br>**Certificate of Conversion of a Corporation Converting to a Limited Liability Company** | This space reserved for office use. |

## Converting Entity Information

The name of the converting corporation is:

Camp Mystic, Inc.

The jurisdiction of formation of the corporation is: Texas

The date of formation of the corporation is: June 1, 1998

The file number, if any, issued to the corporation by the secretary of state, is: 0149273300

## Plan of Conversion—Alternative Statements

The corporation named above is converting to a limited liability company. The name of the limited liability company is:

Camp Mystic, LLC

The limited liability company will be formed under the laws of : Texas

☐ The plan of conversion is attached.

*If the plan of conversion is not attached, the following statements must be completed.*

☑ Instead of attaching the plan of conversion, the corporation certifies to the following statements:

A signed plan of conversion is on file at the principal place of business of the corporation, the converting entity. The address of the principal place of business of the corporation is:

| 2689 HWY 39 | HUNT | TX | | 78024 |
|---|---|---|---|---|
| *Street or Mailing Address* | *City* | *State* | *Country* | *Zip Code* |

A signed plan of conversion will be on file after the conversion at the principal place of business of the limited liability company, the converted entity. The address of the principal place of business of the limited liability company is:

| 2689 HWY 39 | HUNT | TX | | 78024 |
|---|---|---|---|---|
| *Street or Mailing Address* | *City* | *State* | *Country* | *Zip Code* |

A copy of the plan of conversion will be furnished on written request without cost by the converting entity before the conversion or by the converted entity after the conversion to any owner or member of the converting or converted entity.



Copy from re:SearchTX

EXHIBIT 2

**Certificate of Formation for the Converted Entity**

☑ The converted entity is a Texas limited liability company. The certificate of formation of the Texas limited liability company is attached to this certificate either as an attachment or exhibit to the plan of conversion, or as an attachment or exhibit to this certificate of conversion if the plan has not been attached to the certificate of conversion.

**Approval of the Plan of Conversion**

The plan of conversion has been approved as required by the laws of the jurisdiction of formation and the governing documents of the converting entity.

**Effectiveness of Filing** (Select either A, B, or C.)

A. ☑ This document becomes effective when the document is accepted and filed by the secretary of state.

B. ☐ This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing. The delayed effective date is: ______________________

C. ☐ This document takes effect upon the occurrence of the future event or fact, other than the passage of time. The 90th day after the date of signing is: ______________________

The following event or fact will cause the document to take effect in the manner described below:

______________________________________________

______________________________________________

**Tax Certificate**

☐ Attached hereto is a certificate from the comptroller of public accounts that all taxes under title 2, Tax Code, have been paid by the corporation.

☑ In lieu of providing the tax certificate, the limited liability company as the converted entity is liable for the payment of any franchise taxes.

**Execution**

The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument.

Date: 10/27/21

Richard G. Eastland

RICHARD G. EASTLAND, PRESIDENT

Signature and title of authorized person on behalf of the converting entity

**Form 205**
**(Revised 05/11)**

Submit in duplicate to:
Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
512 463-5555
FAX: 512 463-5709
**Filing Fee: $300**

# Certificate of Formation
# Limited Liability Company

This space reserved for office use.

## Article 1 – Entity Name and Type

The filing entity being formed is a limited liability company. The name of the entity is:

CAMP MYSTIC, LLC

The name must contain the words "limited liability company," "limited company," or an abbreviation of one of these phrases.

## Article 2 – Registered Agent and Registered Office

(See instructions. Select and complete either A or B and complete C.)

☐ A. The initial registered agent is an organization (cannot be entity named above) by the name of:

**OR**

☑ B. The initial registered agent is an individual resident of the state whose name is set forth below:

| RICHARD | G | EASTLAND | |
|---|---|---|---|
| *First Name* | *M.I.* | *Last Name* | *Suffix* |

C. The business address of the registered agent and the registered office address is:

| 2689 HIGHWAY 39 | HUNT | TX | 78024 |
|---|---|---|---|
| *Street Address* | *City* | *State* | *Zip Code* |

## Article 3—Governing Authority

(Select and complete either A or B and provide the name and address of each governing person.)

☑ A. The limited liability company will have managers. The name and address of each initial manager are set forth below.

☐ B. The limited liability company will not have managers. The company will be governed by its members, and the name and address of each initial member are set forth below.

**GOVERNING PERSON 1**

**NAME** (Enter the name of either an individual or an organization, but not both.)

**IF INDIVIDUAL**

| RICHARD | G | EASTLAND | |
|---|---|---|---|
| *First Name* | *M.I.* | *Last Name* | *Suffix* |

**OR**

**IF ORGANIZATION**

*Organization Name*

**ADDRESS**

| 2689 HIGHWAY 39 | HUNT | TX | | 78024 |
|---|---|---|---|---|
| *Street or Mailing Address* | *City* | *State* | *Country* | *Zip Code* |



Copy from re:SearchTX

EXHIBIT 2

**GOVERNING PERSON 2**

**NAME** (Enter the name of either an individual or an organization, but not both.)

**IF INDIVIDUAL**

| WILLETTA | A | EASTLAND | |
|---|---|---|---|
| *First Name* | *M.I.* | *Last Name* | *Suffix* |

**OR**

**IF ORGANIZATION**

*Organization Name*

**ADDRESS**

| 2689 HIGHWAY 39 | HUNT | TX | | 78024 |
|---|---|---|---|---|
| *Street or Mailing Address* | *City* | *State* | *Country* | *Zip Code* |

**GOVERNING PERSON 3**

**NAME** (Enter the name of either an individual or an organization, but not both.)

**IF INDIVIDUAL**

| | | | |
|---|---|---|---|
| *First Name* | *M.I.* | *Last Name* | *Suffix* |

**OR**

**IF ORGANIZATION**

*Organization Name*

**ADDRESS**

| | | | | |
|---|---|---|---|---|
| *Street or Mailing Address* | *City* | *State* | *Country* | *Zip Code* |

## Article 4 – Purpose

The purpose for which the company is formed is for the transaction of any and all lawful purposes for which a limited liability company may be organized under the Texas Business Organizations Code.

## Supplemental Provisions/Information

Text Area: [The attached addendum, if any, is incorporated herein by reference.]

The limited liability company is being formed pursuant to a plan of conversion. The name of the converting entity is Camp Mystic, Inc., a Texas for-profit corporation. The mailing address of the converting entity is 2689 Hwy 39, Hunt, Texas 78024. The converting entity filed its Articles of Incorporation with the Texas Secretary of State on June 1, 1998 and was issued File No. 0149273300 upon such filing.



Copy from re:SearchTX

## Organizer

The name and address of the organizer:

Esther Lee
*Name*

9201 N. Central Expressway, 4th Floor | Dallas | TX | 75231
*Street or Mailing Address* | *City* | *State* | *Zip Code*

## Effectiveness of Filing (Select either A, B, or C.)

A. ☑ This document becomes effective when the document is filed by the secretary of state.

B. ☐ This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing. The delayed effective date is: ____________

C. ☐ This document takes effect upon the occurrence of the future event or fact, other than the passage of time. The 90th day after the date of signing is: ____________

The following event or fact will cause the document to take effect in the manner described below:

## Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized to execute the filing instrument.

Date: 10/27/21

[signature]
Signature of organizer

Esther Lee
Printed or typed name of organizer



Copy from re:SearchTX

EXHIBIT 2

Corporations Section
P.O.Box 13697
Austin, Texas 78711-3697

Jane Nelson
Secretary of State

# Office of the Secretary of State

The undersigned, as Secretary of State of Texas, does hereby certify that the attached is a true and correct copy of each document on file in this office as described below:

CAMP MYSTIC, LLC
Filing Number: 804296074

| | |
|---|---|
| Certificate of Conversion | October 28, 2021 |
| Public Information Report (PIR) | December 31, 2024 |

In testimony whereof, I have hereunto signed my name officially and caused to be impressed hereon the Seal of State at my office in Austin, Texas on May 06, 2026.

Jane Nelson
Secretary of State



Copy from re:SearchTX

Comptroller of Public Accounts FORM 05-102 (Rev.9-15/33)

# Texas Franchise Tax Public Information Report

*To be filed by Corporations, Limited Liability Companies (LLC), Limited Partnerships (LP), Professional Associations (PA) and Financial Institutions*

**Tcode** 13196 Franchise

| Taxpayer number | Report year |
|---|---|
| 1 7 4 2 8 8 4 0 6 4 3 | 2 0 2 4 |

***You have certain rights** under Chapter 552 and 559, Government Code, to review, request and correct information we have on file about you. Contact us at 1-800-252-1381.*

| | | | |
|---|---|---|---|
| Taxpayer name: CAMP MYSTIC, LLC | | | ◯ Blacken circle if the mailing address has changed. |
| Mailing address: 2689 HIGHWAY 39 | | | Secretary of State (SOS) file number or Comptroller file number |
| City: HUNT | State: TX | ZIP code plus 4: 78024 | 0804296074 |

◯ Blacken circle if there are currently no changes from previous year; if no information is displayed, complete the applicable information in Sections A, B and C.

| | |
|---|---|
| Principal office | 2689 HIGHWAY 39, HUNT, TX, 78024 |
| Principal place of business | 2689 HIGHWAY 39, HUNT, TX, 78024 |

1000000000015

*You must report officer, director, member, general partner and manager information as of the date you complete this report.*

*Please sign below!* **This report must be signed to satisfy franchise tax requirements.**

**SECTION A** Name, title and mailing address of each officer, director, member, general partner or manager.

| Name | Title | Director | Term expiration (m m d d y y) |
|---|---|---|---|
| RICHARD G EASTLAND | PRESIDENT | ● YES | |
| Mailing address: RT 2 BOX 257 | City: HUNT | State: TX | ZIP Code: 78024 |
| WILLETTA A EASTLAND | VICE PRESIDENT | ● YES | |
| Mailing address: RT 2 BOX 257 | City: HUNT | State: TX | ZIP Code: 78024 |
| | | ◯ YES | |
| Mailing address: | City: | State: | ZIP Code: |

**SECTION B** Enter information for each corporation, LLC, LP, PA or financial institution, if any, in which this entity owns an interest of 10 percent or more.

| Name of owned (subsidiary) corporation, LLC, LP, PA or financial institution | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| | | | |
| | | | |

**SECTION C** Enter information for each corporation, LLC, LP, PA or financial institution, if any, that owns an interest of 10 percent or more in this entity.

| Name of owned (parent) corporation, LLC, LP, PA or financial institution | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| MYSTIC CAMPS FAMILY PARTNERSHIP | TX | 0804281844 | 100.000 |

Registered agent and registered office currently on file *(see instructions if you need to make changes)*

Agent: RICHARD G. EASTLAND

*You must make a filing with the Secretary of State to change registered agent, registered office or general partner information.*

| Office | City | State | ZIP Code |
|---|---|---|---|
| 2689 HWY 39 | HUNT | TX | 78024 |

The information on this form is required by Section 171.203 of the Tax Code for each corporation, LLC, LP, PA or financial institution that files a Texas Franchise Tax Report. Use additional sheets for Sections A, B and C, if necessary. The information will be available for public inspection.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer, director, member, general partner or manager and who is not currently employed by this or a related corporation, LLC, LP, PA or financial institution.

| sign here | Title | Date | Area code and phone number |
|---|---|---|---|
| RICHARD G EASTLAND | PRESIDENT | 09/01/2024 | ( 830 ) 238 - 4660 |

**Texas Comptroller Official Use Only**

VE/DE ◯ PIR IND ◯

Corporations Section
P.O.Box 13697
Austin, Texas 78711-3697

Jane Nelson
Secretary of State

# Office of the Secretary of State

The undersigned, as Secretary of State of Texas, does hereby certify that the attached is a true and correct copy of each document on file in this office as described below:

Mystic Camps Family Partnership, Ltd.
Filing Number: 804281844

| | |
|---|---|
| Certificate of Formation | October 21, 2021 |
| Public Information Report (PIR) | December 31, 2024 |

In testimony whereof, I have hereunto signed my name officially and caused to be impressed hereon the Seal of State at my office in Austin, Texas on May 06, 2026.

Jane Nelson
Secretary of State



Copy from re:SearchTX

EXHIBIT 4

Comptroller of Public Accounts FORM 05-102 (Rev.9-15/33)

# Texas Franchise Tax Public Information Report

*To be filed by Corporations, Limited Liability Companies (LLC), Limited Partnerships (LP), Professional Associations (PA) and Financial Institutions*

**Tcode** 13196 Franchise

| Taxpayer number | Report year |
|---|---|
| 32081568621 | 2024 |

***You have certain rights** under Chapter 552 and 559, Government Code, to review, request and correct information we have on file about you. Contact us at 1-800-252-1381.*

| | | | |
|---|---|---|---|
| Taxpayer name: MYSTIC CAMPS FAMILY PARTNERSHIP LTD | | | ◯ Blacken circle if the mailing address has changed. |
| Mailing address: 2404 SCENIC DRIVE | | | Secretary of State (SOS) file number or Comptroller file number |
| City: AUSTIN | State: TX | ZIP code plus 4: 78703 | 0804281844 |

◯ Blacken circle if there are currently no changes from previous year; if no information is displayed, complete the applicable information in Sections A, B and C.

| | |
|---|---|
| Principal office | 2404 SCENIC DRIVE, AUSTIN, TX, 78703 |
| Principal place of business | 2404 SCENIC DRIVE, AUSTIN, TX, 78703 |

*You must report officer, director, member, general partner and manager information as of the date you complete this report.*

1000000000015

***Please sign below!*** **This report must be signed to satisfy franchise tax requirements.**

**SECTION A** Name, title and mailing address of each officer, director, member, general partner or manager.

| Name | Title | Director | Term expiration (mm dd yy) |
|---|---|---|---|
| MYSTIC CAMPS MANAGEMENT LL | GENERAL PARTNER | ◯ YES | |
| Mailing address: 2404 SCENIC DRIVE | City: AUSTIN | State: TX | ZIP Code: 78703 |
| Name | Title | Director ◯ YES | Term expiration |
| Mailing address | City | State | ZIP Code |
| Name | Title | Director ◯ YES | Term expiration |
| Mailing address | City | State | ZIP Code |

**SECTION B** Enter information for each corporation, LLC, LP, PA or financial institution, if any, in which this entity owns an interest of 10 percent or more.

| Name of owned (subsidiary) corporation, LLC, LP, PA or financial institution | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| CAMP MYSTIC, LLC | TX | 0804296074 | 100.000 |
| NATURAL FOUNTAINS PROPERTIES, INC | TX | 0013315900 | 100.000 |

**SECTION C** Enter information for each corporation , LLC, LP, PA or financial institution, if any, that owns an interest of 10 percent or more in this entity.

| Name of owned (parent) corporation, LLC, LP, PA or financial institution | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| | | | |

Registered agent and registered office currently on file *(see instructions if you need to make changes)*

*You must make a filing with the Secretary of State to change registered agent, registered office or general partner information.*

| | | | |
|---|---|---|---|
| Agent: RICHARD G. EASTLAND | | | |
| Office: 2404 SCENIC DRIVE | City: AUSTIN | State: TX | ZIP Code: 78703 |

The information on this form is required by Section 171.203 of the Tax Code for each corporation, LLC, LP, PA or financial institution that files a Texas Franchise Tax Report. Use additional sheets for Sections A, B and C, if necessary. The information will be available for public inspection.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer, director, member, general partner or manager and who is not currently employed by this or a related corporation, LLC, LP, PA or financial institution.

| sign here | Title | Date | Area code and phone number |
|---|---|---|---|
| RICHARD G EASTLAND | PARTNER | 09/01/2024 | ( 830 ) 238 - 4660 |

**Texas Comptroller Official Use Only**

VE/DE ◯ PIR IND ◯

Corporations Section
P.O.Box 13697
Austin, Texas 78711-3697

Jane Nelson
Secretary of State

# Office of the Secretary of State

The undersigned, as Secretary of State of Texas, does hereby certify that the attached is a true and correct copy of each document on file in this office as described below:

Mystic Camps Management, LLC
Filing Number: 804275960

| | |
|---|---|
| Certificate of Formation | October 18, 2021 |
| Public Information Report (PIR) | December 31, 2024 |

In testimony whereof, I have hereunto signed my name officially and caused to be impressed hereon the Seal of State at my office in Austin, Texas on May 06, 2026.

Jane Nelson
Secretary of State



Copy from re:SearchTX

EXHIBIT 5

Comptroller of Public Accounts FORM 05-102 (Rev.9-15/33)

# Texas Franchise Tax Public Information Report

*To be filed by Corporations, Limited Liability Companies (LLC), Limited Partnerships (LP), Professional Associations (PA) and Financial Institutions*

**Tcode** 13196 Franchise

Taxpayer number: 3 2 0 8 1 5 2 9 0 3 7

Report year: 2 0 2 4

***You have certain rights*** *under Chapter 552 and 559, Government Code, to review, request and correct information we have on file about you. Contact us at 1-800-252-1381.*

| | | | |
|---|---|---|---|
| Taxpayer name: MYSTIC CAMPS MANAGEMENT, LLC | | | ◯ Blacken circle if the mailing address has changed. |
| Mailing address: 2404 SCENIC DR | | | Secretary of State (SOS) file number or Comptroller file number |
| City: AUSTIN | State: TX | ZIP code plus 4: 78703 | 0804275960 |

◯ Blacken circle if there are currently no changes from previous year; if no information is displayed, complete the applicable information in Sections A, B and C.

| | |
|---|---|
| Principal office | 2404 SCENIC DR, AUSTIN, TX, 78703 |
| Principal place of business | 2404 SCENIC DR, AUSTIN, TX, 78703 |

1000000000015

*You must report officer, director, member, general partner and manager information as of the date you complete this report.*

*Please sign below!* **This report must be signed to satisfy franchise tax requirements.**

**SECTION A** Name, title and mailing address of each officer, director, member, general partner or manager.

| Name | Title | Director | Term expiration (mm dd yy) |
|---|---|---|---|
| RICHARD G EASTLAND | MEMBER | ◯ YES | |
| Mailing address: 2404 SCENIC DRIVE | City: AUSTIN | State: TX | ZIP Code: 78703 |
| WILLETTA A EASTLAND | MEMBER | ◯ YES | |
| Mailing address: 2404 SCENIC DRIVE | City: AUSTIN | State: TX | ZIP Code: 78703 |
| | | ◯ YES | |
| Mailing address: | City: | State: | ZIP Code: |

**SECTION B** Enter information for each corporation, LLC, LP, PA or financial institution, if any, in which this entity owns an interest of 10 percent or more.

| Name of owned (subsidiary) corporation, LLC, LP, PA or financial institution | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| | | | |
| | | | |

**SECTION C** Enter information for each corporation , LLC, LP, PA or financial institution, if any, that owns an interest of 10 percent or more in this entity.

| Name of owned (parent) corporation, LLC, LP, PA or financial institution | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| | | | |

Registered agent and registered office currently on file *(see instructions if you need to make changes)*

Agent: RICHARD G. EASTLAND

*You must make a filing with the Secretary of State to change registered agent, registered office or general partner information.*

| Office | City | State | ZIP Code |
|---|---|---|---|
| 2404 SCENIC DRIVE | AUSTIN | TX | 78703 |

The information on this form is required by Section 171.203 of the Tax Code for each corporation, LLC, LP, PA or financial institution that files a Texas Franchise Tax Report. Use additional sheets for Sections A, B and C, if necessary. The information will be available for public inspection.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer, director, member, general partner or manager and who is not currently employed by this or a related corporation, LLC, LP, PA or financial institution.

| sign here | Title | Date | Area code and phone number |
|---|---|---|---|
| RICHARD G EASTLAND | MEMBER | 09/01/2024 | ( 830 ) 238 - 4660 |

**Texas Comptroller Official Use Only**

VE/DE ◯ PIR IND ◯

# LEASE AGREEMENT

**THIS LEASE AGREEMENT** (this "**Lease**") is made and entered into effective as of the 1st day of January, 2019 (the "**Effective Date**"), by and between NATURAL FOUNTAINS PROPERTIES, INC., a Texas corporation ("**Landlord**"), and CAMP MYSTIC, INC., a Texas corporation ("**Tenant**") (collectively referred to herein as the "**Parties**," or each individually, as a "**Party**").

Recitals

WHEREAS, the Parties executed that certain Ground and Building Lease dated effective as of August 1, 2013 covering the Property described herein (the "**Existing Lease**");

WHEREAS, the Parties desire to enter into a new lease based upon certain material changes in circumstances;

WHEREAS, the Landlord has recently expended approximately [redacted] in substantial capital improvements to buildings, structures, appurtenances and other improvements to the Property; and

WHEREAS, the said capital improvements constitute material and substantial benefits to the Tenant, including increased revenues for Tenant's business.

IN CONSIDERATION of the foregoing as well as the mutual covenants, terms and conditions set forth herein, the Parties hereby agree as follows:

1. **TERMINATION OF EXISTING LEASE**: The Existing Lease is hereby terminated as of December 31, 2018.

2. **LEASE OF PROPERTY**: Landlord hereby leases to Tenant, and Tenant does hereby lease from Landlord, the grounds and property described on Exhibit "A", attached hereto and incorporated by reference herein, including all buildings, structures, appurtenances and improvements located thereon (the "**Improvements**") (the Improvements as well as the grounds and property described in Exhibit "A" are collectively referred to herein as the "**Property**").

3. **USE**: Tenant's use of the Property shall be for the operation of a faith based Camp for youth and, as Tenant deems appropriate, church groups and other similar uses and activities. Tenant shall use, operate and maintain Property in the same manner in which it has used, operated and maintained prior to the Effective Date. Tenant shall comply with all laws, ordinances, orders, rules, and regulations (state, federal, municipal and other governmental agencies or bodies having jurisdiction thereof) with respect to the use, condition or occupancy of the Property.

4. **TERM**: The term of this Lease (the "**Term**") shall commence on January 1, 2019 (the "**Commencement Date**"), and shall automatically renew annually on the anniversary of the Commencement Date ("Anniversary Date") unless a Party provides written notice of termination to the other Party at least ninety days prior to the next Anniversary Date or unless terminated sooner pursuant to the provisions hereof.





Copy from re:SearchTX

5. **RENT:** Tenant shall pay rent ("Rent") as follows: (i) Monthly Rent of [redacted] per month. Monthly Rent shall be due and payable in advance each month commencing on January 1, 2019 and continuing on the 1st day of each successive month thereafter during the Term and any extended Term; (ii) As additional Rent, Tenant shall, within sixty (60) days of Tenant's fiscal year-end, pay annual Rent to Landlord in an amount equal to [redacted] Tenant's net cash flow from Tenant's business operations conducted on the Property during Tenant's immediately preceding fiscal year (the "Annual Revenue Sharing Amount").

6. **UTILITIES**. Tenant shall be solely responsible for the establishment and payment of all utilities utilized by Tenant in the Premises and on the Property.

7. **TENANT IMPROVEMENTS AND ALTERATIONS**: Tenant will not make or allow to be made any material improvements, alterations or physical additions to the Property or Improvements without the prior written consent of Landlord (which consent shall not be unreasonably withheld).

8. **REPAIRS AND RE-ENTRY**: In addition to maintaining the Property and Improvements, Tenant, at its sole cost and expense throughout the Term, shall repair any damage to the Property and Improvements that is caused by Tenant or Tenant's agents, employees, vendors or invitees. If Tenant fails to make any necessary repairs or replacements required under this paragraph, Landlord may at its option make such repair or replacement, and Tenant shall repay the cost thereof to Landlord upon demand by Landlord. For the avoidance of doubt, Landlord shall not be obligated to make any repairs or replacements, or otherwise incur any costs for capital expenditures at the Property. Tenant shall not commit or allow any waste or damage to be committed on any portion of the Property or Improvements, and shall, at the termination of this Lease by lapse of time or otherwise, deliver up the Property to Landlord cleared of any personal property in as good condition as at the Commencement Date, ordinary wear and tear excepted. Upon such termination of this Lease, Landlord shall have the right to re-enter and resume possession of the Property and all Improvements.

9. **SERVICES PROVIDED BY LANDLORD**: Landlord will not provide any services to Tenant or the Improvements except for maintenance and repair of the roadways, parking lots, roofs, exterior walls, structural walls and foundations (the "**Landlord Services**"). Landlord will engage the contractors and/or service providers for the Landlord Services as Landlord deems reasonable and necessary. Any failure by Landlord to furnish the Landlord Services shall not render Landlord liable in any respect for damages to either persons (including Tenant) or property, nor be construed as eviction of Tenant, nor relieve Tenant from fulfillment of any covenant or agreement set forth in this Lease.

10. **NO ASSIGNMENT OR SUBLETTING**: Tenant shall not: (a) transfer, pledge, mortgage or assign this Lease or any interest hereunder; (b) permit any assignment of this Lease by voluntary act, operation of law or otherwise, (c) sublet the Improvements of any part thereof, or (d) permit the use of the Improvements by any parties other than Tenant or Tenant's affiliates without Landlord's consent.

11. **INSURANCE**: Tenant shall maintain a policy or policies of commercial general liability insurance covering the Improvements and Tenant's use thereof, insuring against claims for personal or bodily injury or death or property damage (including contractual indemnity and liability coverage without contractual exclusion) occurring upon, in or about the Improvements and Property. Tenant's liability insurance policy shall provide minimum protection of not less than $1,000,000.00 per occurrence for bodily injury, property damage, personal and advertising injury, $2,000,000.00 for general aggregate liability, $5,000,000.00 in umbrella coverage and such other coverage as Landlord may reasonably deem appropriate including business interruption, loss-of-income and extra-expense insurance in such amounts as will reimburse Tenant for direct or indirect loss of earnings attributable to all perils commonly insured against by prudent tenants or attributable to prevention of access to the Improvements/Property or to the Improvements/Property as a result of such perils. Tenant's insurance shall contain an endorsement that Tenant's insurance is primary and non-contributory for claims arising out of an incident or event occurring within the Improvements or on the Property. Tenant's insurance shall contain a provision naming Landlord as an additional insured and as a loss payee. Tenant shall, at Landlord's request, provide to Landlord a current certificate of insurance evidencing Tenant's compliance with this requirement. Tenant shall obtain the agreement of Tenant's insurers to notify Landlord at least thirty (30) days prior to any cancellation, modification or expiration of a liability insurance policy. All such insurance policies shall be in form and substance satisfactory to Landlord and shall be issued by companies with an A.M. Best Rating of not less than A-:VII or otherwise be acceptable to Landlord and licensed to do business in the State of Texas.

Each policy required to be provided by Tenant shall have attached thereto (a) an endorsement that such policy shall not be cancelled or materially changed without at least thirty (30) days' prior written notice to Landlord, (b) an endorsement to the effect that the insurance as to the interest of Landlord shall not be invalidated by any act or neglect of Landlord or Tenant, and (c) an endorsement that Tenant's insurance is primary and non-contributory for claims arising out of an incident or event occurring within the Improvements or on the Property. All policies of insurance, together with any endorsements reflecting the changes to the policies required to comply with this Lease, shall contain a provision naming Landlord (and any mortgagee designated by Landlord) as additional insureds.

All insurance policies required to be delivered by Tenant pursuant to this Lease shall permit releases of liability as provided herein and/or a waiver of subrogation clause as to Landlord. Tenant waives, releases and discharges Landlord and Landlord's agents, employees and contractors from all claims and demands whatsoever which Tenant may have or acquire arising out of damage to or destruction of the machinery, equipment, furniture, fixtures, personal property, and loss of use thereof occasioned by fire or other casualty, whether such claim or demand may arise because of the negligence or fault of Landlord or its agents, employees, contractors or otherwise, and Tenant agrees to look only to the insurance coverage in the event of such loss.

Tenant shall not occupy or use, nor permit any portion of the Improvements or Property demised hereunder to be occupied or used, for any business or purpose which is unlawful in part or in whole or deemed to be disreputable in any manner, or extra hazardous on account of fire, nor permit anything to be done which will in any way increase the rate of fire insurance on the Property, the Improvements or contents, and in event that, by reasons of acts of Tenant, there shall


Copy from re:SearchTX

be any increase in insurance premiums on the Property, the Improvements or contents created by Tenant's act or conduct of business, then Tenant shall pay such increase.

12. RELEASE AND INDEMNITY: AS MATERIAL CONSIDERATION TO LANDLORD, TENANT AGREES THAT NEITHER LANDLORD NOR ANY OF ITS OWNERS, JOINT VENTURERS, MEMBERS, MANAGERS, OFFICERS, SHAREHOLDERS, DIRECTORS, PARTNERS, AGENTS, REPRESENTATIVES AND EMPLOYEES (COLLECTIVELY, THE "LANDLORD PARTIES") SHALL BE LIABLE TO TENANT FOR ANY DAMAGES TO TENANT OR TENANT'S PROPERTY FROM ANY CAUSE, AND TENANT WAIVES ALL CLAIMS AGAINST THE LANDLORD PARTIES FOR DAMAGE TO PERSONS OR PROPERTY ARISING FOR ANY REASON, EXCEPT FOR DAMAGE TO PERSONS RESULTING DIRECTLY FROM A LANDLORD PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT. WITHOUT LIMITATION OF THE FOREGOING, TENANT WAIVES ALL CLAIMS AGAINST THE LANDLORD PARTIES FOR DAMAGE TO PROPERTY THAT IS INSURED BY TENANT OR REQUIRED TO BE INSURED BY ANY POLICY OF INSURANCE TENANT IS REQUIRED TO CARRY PURSUANT TO THIS LEASE. TENANT SHALL INDEMNIFY AND HOLD THE LANDLORD PARTIES HARMLESS FROM ALL DAMAGES ARISING OUT OF ANY DAMAGE TO ANY PERSON OR PROPERTY OCCURRING IN, ON OR ABOUT THE IMPROVEMENTS OR PROPERTY OR TENANT'S USE THEREOF OR TENANT'S BREACH OF ANY TERM OF THIS LEASE. THE LANDLORD PARTIES SHALL NOT BE LIABLE TO TENANT FOR ANY LOSS OR DAMAGE, INCLUDING ANY LOST PROFIT, LOSS OF BUSINESS OR CONSEQUENTIAL DAMAGES, THAT MAY BE OCCASIONED BY OR THROUGH THE ACTS OR OMISSIONS OF OTHERS, OR FOR ANY LOSS OR DAMAGE, INCLUDING ANY LOST PROFIT, LOSS OF BUSINESS OR CONSEQUENTIAL DAMAGES, RESULTING TO TENANT OR ITS PROPERTY FROM BURST OR LEAKING WATER, SPRINKLER OR SEWER PIPES OR FROM ROOF LEAKS. TENANT SHALL FURTHER INDEMNIFY, DEFEND AND HOLD THE LANDLORD PARTIES HARMLESS FROM AND AGAINST ANY AND ALL LOSS OF RENTS OR DAMAGES, LIABILITIES, JUDGMENTS, CLAIMS, EXPENSES, PENALTIES, AND ATTORNEYS' AND CONSULTANTS' FEES ARISING OUT OF OR INVOLVING ANY HAZARDOUS SUBSTANCE BROUGHT ONTO THE IMPROVEMENTS OR PROPERTY BY OR FOR TENANT, ITS EMPLOYEES, AGENTS, CONTRACTORS, OR INVITEES. TENANT'S OBLIGATIONS SHALL INCLUDE, BUT NOT BE LIMITED TO, THE EFFECTS OF ANY CONTAMINATION OR INJURY TO PERSON, PROPERTY OR THE ENVIRONMENT CREATED OR SUFFERED BY TENANT, AND THE COST OF INVESTIGATION, REMOVAL, REMEDIATION, RESTORATION OR ABATEMENT, AND SHALL SURVIVE THE EXPIRATION OR TERMINATION OF THIS LEASE. NO TERMINATION, CANCELLATION OR RELEASE AGREEMENT ENTERED INTO BY LANDLORD AND TENANT SHALL RELEASE TENANT FROM ITS OBLIGATIONS UNDER THIS LEASE WITH RESPECT TO HAZARDOUS SUBSTANCES, UNLESS SPECIFICALLY SO AGREED BY LANDLORD IN WRITING AT THE TIME OF SUCH AGREEMENT.





Copy from re:SearchTX

13. **<u>ENTRY FOR REPAIRS AND INSPECTION</u>**: Tenant shall permit Landlord and its agents, assigns and representatives the right to enter any and all parts of the Improvements and Property at all reasonable hours to inspect same or clean or make repairs or alterations or additions as Landlord deems necessary. Tenant shall properly reimburse Landlord for repairs to damage caused by Tenant or any one or more of the Tenant Parties.

14. **<u>CASUALTY, CONDEMNATION OR OTHER LOSS</u>**: If the Improvements or Property is so damaged by fire or other casualty that substantial alteration or reconstruction of the Improvements, will, in the reasonable judgment of Landlord, be required, or in the event that Landlord determines that insurance proceeds will be insufficient to restore the Improvements, then either Landlord or Tenant may terminate this Lease by giving written notice thereof to the other party. If the Improvements or the Property are taken or condemned in whole or in substantial part for public purposes, then (i) the Term shall at the option of either Party hereto forthwith cease and terminate and (ii) Landlord shall receive the entire award or other compensation paid in connection with such taking or condemnation.

Pursuant to this <u>Paragraph 14</u>, Landlord will not be liable for any inconvenience or annoyance to Tenant or injury to the business of Tenant resulting in any way from the casualty, condemnation or its repair.

Notwithstanding anything contained in this Lease to the contrary, Landlord will not be liable for damages to Tenant or any party claiming through Tenant for any injury to, or death of, any person or damage to property or for interruption or damage to business resulting from theft, fire, act of God, public enemy, injunction, riot, strike, insurrection, war, court order, requisition or order of governmental body or authority, or any other matter beyond the control of Landlord, except to the extent such damage is caused by the gross negligence or willful misconduct of Landlord.

15. **<u>HOLDING OVER</u>**: Any holdover by Tenant beyond a termination pursuant to the terms hereof, without the written consent of Landlord, shall constitute a tenancy-at-will and the rent (the "**<u>Rent</u>**") owed by Tenant shall be [redacted] per month plus the Annual Revenue Sharing Amount. In addition to any other liabilities to Landlord accruing therefrom, Tenant shall protect, defend, indemnify and hold Landlord harmless from all loss, cost (including reasonable attorneys' fees) and liability resulting from such holdover, including any claims made by any succeeding tenant founded upon a failure of Tenant to surrender the Improvements, and, if such holding over continues more than thirty (30) days, any lost profits or other consequential damages to Landlord resulting therefrom.

16. **<u>DEFAULT BY TENANT</u>**: The following events will be deemed to be events of default by Tenant under this Lease (each an "**<u>Event of Default</u>**"):

(a) Tenant fails to timely pay any Rent or any other sum(s) due under this Lease as and when due;

(b) Tenant fails to comply with any non-monetary term, provision or covenant of this Lease and such failure continues for a period of fourteen (14) days after written notice of such failure has been given to Tenant;




Copy from re:SearchTX

(c) Tenant fails to pay and release of record, or diligently contest and bond around to the satisfaction of Landlord, within ten (10) days after the filing thereof, any mechanic's lien filed against the Improvements or the Property for any worked performed, materials furnished, or obligation incurred by or at the request of Tenant;

(d) Tenant takes any action to, or notifies Landlord that Tenant intends to, file a petition under any section or chapter of the United States Bankruptcy Code, as amended from time to time, or under any similar law or statute of the United States or any state thereof; or a petition is filed against Tenant under any such statute and is not dismissed within sixty (60) days thereafter; or

(e) A receiver or trustee is appointed for Tenant's leasehold interest in the Improvements or for all or a substantial part of the assets of Tenant.

17. **LANDLORD'S REMEDIES**:

(a) Upon the occurrence of any Event of Default, Landlord may, at its option and without further notice to Tenant and without judicial process, in addition to all other remedies given hereunder or at law or in equity, do any one or more of the following: (i) terminate this Lease, in which event Tenant will immediately surrender possession of the Improvements and Property to Landlord; (ii) enter upon and take possession of the Improvements and Property and expel or remove Tenant therefrom, with or without having terminated this Lease; (iii) change or re-key all locks to entrances to the Improvements, and Landlord will have no obligation to give Tenant a new key to the Improvements until such Event of Default is cured; and (iv) remove from the Improvements and Property any furniture, fixtures, equipment, vehicles or other personal property of Tenant, without liability for trespass or conversion, and store such items at the sole cost of Tenant and without liability to Tenant. Any of such furniture, fixtures, equipment, vehicles or personal property not claimed within thirty (30) days from the date of removal will be deemed abandoned and Landlord may dispose of same in any lawful manner deemed appropriate by Landlord.

(b) Upon the occurrence of the Event of Default described in hereinabove, Tenant shall, in addition to all other remedies given hereunder or at law or in equity, pay to Landlord as liquidated damages (and not as a penalty) a fee in the amount of [redacted] (the "**Removal Fee**"). Tenant acknowledges and agrees that (i) the harm to Landlord caused by Tenant's failure to remove Tenant's personal property is incapable or difficult of estimation, and (ii) the amount of the Removal Fee is a reasonable estimate of the damages Landlord will suffer if Tenant fails to remove all of Tenant's personal property prior to the Termination Date.

(c) Exercise by Landlord of any one or more remedies hereunder will not constitute forfeiture or an acceptance of surrender of the Improvements and Property by Tenant. Such surrender can be effected only by the written agreement of Landlord and Tenant.

(d) If Landlord terminates this Lease by reason of an Event of Default, Tenant shall pay to Landlord the sum of (i) the cost of recovering the Improvements (including attorney's fees and costs), (ii) the unpaid Rent and Operating Expenses and all other indebtedness accrued hereunder to the date of such termination, and (iii) any other damages or relief which Landlord may be entitled to at law or in equity.


Copy from re:SearchTX

(e) If Tenant fails to make any payment, perform any obligation, or cure any default hereunder within ten (10) days after receipt of written notice thereof, Landlord, without obligation to do so and without thereby waiving such failure or default, may make such payment, perform such obligation, and/or remedy such other default for the account of Tenant (and enter the Improvements for such purpose). Tenant must pay immediately all costs, expenses and disbursements (including attorneys' fees) incurred by Landlord in taking such remedial action, plus, at the option of Landlord, interest thereon at the lesser of (i) ten percent (10%) per annum and (ii) the maximum rate permitted by applicable law.

(f) No act or thing done by Landlord or its agents during the Term shall be deemed an acceptance of a surrender of the Improvements and Property and no agreement to accept a surrender of the Improvements and Property shall be valid unless the same be made in writing and subscribed by Landlord. The receipt by Landlord of any sums due under this Lease with knowledge of the breach of any covenant contained in this Lease shall not be deemed a waiver of such breach. The receipt by Landlord of any sums due under this Lease from any assignee, subtenant or occupant of the Improvements or Property shall not be deemed a waiver of the covenant in this Lease against assignment and/or subletting or an acceptance of the assignee, subtenant or occupant as Tenant, or a release of Tenant from further observance or performance by Tenant of the covenants in this Lease. No provision of this Lease shall be deemed to have been waived by Landlord unless such waiver be in writing and signed by Landlord.

18. **NO WAIVER OF DEFAULT**: Failure of Landlord to declare any default immediately upon occurrence thereof or delay in taking action in connection therewith shall not waive such default, but Landlord shall have the right to declare any such default at any time and take such action as might be lawful or authorized hereunder, at law or in equity. Tenant shall pay all costs, attorney's fees, and expenses incurred or to be incurred in connection with the enforcement of any covenant or agreement hereof, and any action taken in connection herewith.

19. **QUIET POSSESSION**: Landlord hereby covenants that Tenant, upon the timely payment of Rent and all sums due under this Lease and performing all covenants and agreements herein contained on part of Tenant, shall and may peacefully and quietly have, hold and enjoy the Improvements hereby demised without interference from Landlord.

20. **LIMITATION ON LANDLORD'S LIABILITY**: The liability of Landlord Parties to Tenant (or any person or entity claiming by, through or under Tenant) for any default by Landlord under the terms of this Lease or any other matter relating to or arising out of the occupancy or use of the Improvements and/or other areas of the Property shall be limited to Tenant's actual direct, but not consequential, damages therefore and shall be recoverable only from the interest of Landlord in the Improvements, and no Landlord Party shall be personally liable for any deficiency. Additionally, Tenant hereby waives its statutory lien under Section 91.004 of the Texas Property Code.

21. **NO RELIANCE:** In signing this Lease, Tenant acknowledges and agrees that it has not relied on nor been induced to execute this Lease by any statement, representation, agreement or promise, oral or written, made by any Landlord Party, other than the statements expressly set forth in this Lease. Tenant expressly represents and warrants that it is relying solely upon its own judgment in executing this Lease and disclaims reliance upon any statement or representations made by any of the Landlord Parties.

22. **TRANSFER OF LANDLORD'S RIGHTS**: Landlord shall have the right to transfer and assign, in whole or in part, any or all of its rights and obligations hereunder and in the Improvements and Property. Such transfers or assignments may be made either to a corporation, limited liability company, partnership, limited partnership, limited liability partnership, trust company or other entity, or individual or group of individuals, and howsoever made are to be in all things respected and recognized by Tenant.

23. **NOTICES**: All notices and other communications given pursuant to this Lease shall be in writing and shall be (i) mailed by first class, United States Mail, postage prepaid, certified, with return receipt requested, and addressed to the Parties hereto at the address specified below, (ii) hand delivered to the intended addressee, or (iii) sent by nationally recognized overnight courier service, in each case, addressed to the parties hereto at the respective addresses set out below, or at such other address as they have theretofore specified by written notice delivered in accordance herewith. All notices sent pursuant to (i) through (iii) above shall be effective upon delivery at the address of the addressee (even if such addressee refuses delivery thereof). The Parties hereto may change their addresses by giving notice thereof to the other in conformity with this provision.

To Landlord:

Richard G. Eastland
2689 Highway 39
Hunt, Texas 78024

To Tenant:

Richard G. Eastland
2689 Highway 39
Hunt, Texas 78024

24. **GOVERNING LAW AND VENUE**: This Lease shall be construed and enforced in accordance with the laws of the State of Texas. All claims, disputes and other matters in question arising out of or relating to this Lease, or the breach thereof, shall be decided by proceedings instituted and litigated in a court of competent jurisdiction in Kerr County, Texas.

25. **BINDING EFFECT**: This Lease shall not be binding on any Party until executed by both Landlord and Tenant. This Lease shall be binding upon and inure to the benefit of Landlord and Tenant, and their respective successors and permitted assigns.

26. **ENTIRE AGREEMENT**: This Lease, together with any other documents or exhibits attached hereto, embody the entire agreement between the Parties concerning the subject matter hereof and supersedes and replaces all prior leases, conversations, proposals, negotiations, understandings and contracts, whether written or oral.

27. **AMENDMENTS**: To be effective, any amendment or modification of this Lease must be in writing and signed by Landlord and Tenant.


Copy from re:SearchTX

28. **SEVERABILITY**: If any clause or provision of this Lease is determined to be illegal, invalid or unenforceable under present or future laws effective during the Term, then and in that event, it is the intention of Parties hereto that the remainder of this Lease shall not be affected thereby, and it is also the intention of the Parties that in lieu of each clause or provision of this Lease that is illegal, invalid or unenforceable, there be added as a part of this Lease a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable. The caption of each paragraph hereof is added as a matter of convenience only and shall be considered to be of no effect in the construction of any provision or provisions of this Lease.

29. **COUNTERPARTS**: This Lease may be executed in multiple counterparts, each of which will constitute an original instrument, but all of which will constitute one and the same agreement. This Lease may be executed by electronic delivery of signatures which shall be binding on the Parties hereto, with original signatures to be delivered as soon as reasonably practical thereafter.

30. **TIME OF THE ESSENCE**: It is expressly agreed by the Parties hereto that time is of the essence under this Lease and any aspect thereof.

[Signature Page Follows]


Copy from re:SearchTX

IN WITNESS WHEREOF, the Parties hereto have executed this Lease or caused it to be executed by their duly authorized representatives as of the date first above written.

**LANDLORD:**

NATURAL FOUNTAINS PROPERTIES, INC.,
a Texas corporation

By: William N. Bonner, III
Name: WILLIAM NEELY BONNER, III
Title: PRESIDENT
Date: 2-18-19

**TENANT:**

CAMP MYSTIC, INC.,
a Texas corporation

By: Dick Eastland
Name: Dick Eastland
Title: PRESIDENT
Date: 2/18/19

FILED
In the Office of the
Secretary of State of Texas

DEC 2 1 2012

Corporations Section

# CERTIFICATE OF AMENDMENT TO THE ARTICLES OF INCORPORATION OF NATURAL FOUNTAINS PROPERTIES, INC.

Pursuant to the provisions of the Texas Business Organizations Code, the undersigned hereby certifies as follows:

## ARTICLE I.

The name of the corporation is Natural Fountains Properties, Inc. ("Corporation"). The filing number issued by the Secretary of State of Texas for Corporation is 13315900 and Corporation's date of formation is May 31, 1956.

## ARTICLE II.

The following amendments to the Articles of Incorporation were approved in the manner required by the Texas Business Organizations Code and the governing documents of Corporation:

A. Article Nine of the Articles of Incorporation of Corporation is hereby added to deny the shareholders a right to cumulative voting as shall read as follows:

"ARTICLE NINE

The right of cumulative voting shall not be available to each shareholder entitled to vote for election of directors."

B. Article Ten of the Articles of Incorporation of Corporation is hereby added to permit the shareholders of Corporation the right to take action by less than unanimous written consent and shall read as follows:

"ARTICLE TEN

Any action required to be taken at any annual or special meeting of the shareholders, or any action which may be taken at any annual or special meeting of the shareholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the shareholders having not less than the minimum number of votes necessary to take such action at a meeting at which the shareholders entitled to vote on the aetion were present and voted, sign a written consent or consents stating the actions taken."

C. Article Eleven of the Articles of Incorporation of Corporation is hereby added to permit a change in the required shareholder vote in connection with certain "fundamental actions" and "fundamental business transactions," as such terms are defined in the Texas Business Organizations Code and shall read as follows:



RECEIVED
DEC 2 1 2012
Secretary of State



Copy from re:SearchTX

EXHIBIT 7

"ARTICLE ELEVEN

The affirmative vote of the holders of a majority of the outstanding shares or, if applicable, a majority of the outstanding shares of a class or series entitled to vote on or approve any matter or action as to which the Texas Business Organizations Code (the "Code") requires a vote of two-thirds or any other specified portion of the shares will be sufficient to effect the matter or action subject to that vote, notwithstanding the vote required by the Code."

D. Article Twelve of the Articles of Incorporation of Corporation is hereby added to deny preemptive rights to the shareholders of Corporation and shall read as follows:

"ARTICLE TWELVE

Unless otherwise determined by the directors of the corporation, no holders of shares of the corporation shall be entitled as such as a matter of right to purchase or subscribe for any shares of any class which the corporation may issue or sell, whether or not exchangeable for any shares of the corporation of any class or classes and whether or not there are unissued shares authorized by the Articles of Incorporation of the corporation as originally filed, or by any amendment thereof, or out of shares of the corporation acquired by it after the issue thereof and whether issued for cash, labor done, personal property or real property, or leases thereof, nor shall a shareholder be entitled to any right of subscription to any thereof; nor, unless otherwise determined by the directors of the corporation, shall any holder of any shares of the corporation be entitled as such, as a matter of right, to purchase or subscribe for any obligation which the corporation may issue or sell that shall be convertible into or exchangeable for any shares of the corporation of any class or classes, or to which shall be attached or appended any warrant or warrants or other instrument or instruments which shall convey upon or grant the holder or holders of such obligation the right to subscribe for or purchase from the corporation any shares of any class or classes."

E. Article Thirteen of the Articles of Incorporation of Corporation is hereby added to include a limitation on liability of the directors of Corporation and shall read as follows:

"ARTICLE THIRTEEN

The directors of the corporation will not be liable to the corporation or its shareholders for monetary damages for acts or omissions that occur in the directors' capacity as directors. This article does not limit the directors' liability for acts or omissions for: (a) a breach of the duty of loyalty to the corporation or its shareholders; (b) a bad-faith breach of a director's duty to the corporation, intentional misconduct, or a knowing violation of the law; (c) a transaction from which a director received an improper benefit, whether or



Copy from re:SearchTX

not the benefit resulted from an action taken within the scope of the director's office; or (d) an act or omission for which a director's liability is expressly provided by statute. If the Code or other applicable law is amended to authorize action further eliminating or limiting the liability of directors, then the liability of a director of the corporation shall be eliminated or limited to the fullest extent permitted by the Code or other applicable law, as so amended.

Any repeal or modification of the foregoing paragraph by the shareholders shall not adversely affect any right or protection of a director existing at the time of such repeal or modification."

**ARTICLE III.**

This Certificate of Amendment to the Articles of Incorporation shall become effective when it is filed by the Secretary of State of Texas.

**ARTICLE IV.**

The undersigned signs this Certificate of Amendment subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

EXECUTED this 21st day of December 2012.

**NATURAL FOUNTAINS PROPERTIES, INC.,**
a Texas corporation

By: Richard G. Eastland
Richard G. Eastland, Chief Executive Officer







Copy from re:SearchTX

# PID 119577 | 2404 SCENIC DR

Property Summary Report | 2025
Online Services | Travis Central Appraisal District

## GENERAL INFO

### ACCOUNT

Property ID: 119577
Geographic ID: 0119080101
Type: R
Zoning: SF3
Agent:
Legal Description: ABS 313 SUR 8 GILBERT D J ACR .2980
Property Use:

### LOCATION

Address: 2404 SCENIC DR, AUSTIN TX 78703

Market Area:
Market Area CD: X1000WF
Map ID: 011808

### PROTEST

Protest Status:
Informal Date:
Formal Date:

### OWNER

Name: EASTLAND RICHARD G 2023 FAMILY TRUST &
Secondary Name: WILLETTA A EASTLAND 2023 EXEMPTION TRUST
Mailing Address: 2404 SCENIC DR AUSTIN TX 78703-1552

Owner ID: 1964260
% Ownership: 100.000000
Exemptions: HS - Homestead,OTHER

## VALUES

### CURRENT VALUES

| | |
|---|---|
| Land Homesite: | $4,794,000 |
| Land Non-Homesite: | $0 |
| Special Use Land Market: | $0 |
| Total Land: | $4,794,000 |
| Improvement Homesite: | $637,418 |
| Improvement Non-Homesite: | $0 |
| Total Improvement: | $637,418 |
| Market: | $5,431,418 |
| Special Use Exclusion (-): | $0 |
| Appraised: | $5,431,418 |
| Value Limitation Adjustment (-): | $2,990,198 |
| Net Appraised: | $2,441,220 |

### VALUE HISTORY




### VALUE HISTORY

| Year | Land Market | Improvement | Special Use Exclusion | Appraised | Value Limitation Adj (-) | Net Appraised |
|---|---|---|---|---|---|---|
| 2026 | $4,794,000 | $630,998 | $0 | $5,424,998 | $0 | $5,424,998 |
| 2025 | $4,794,000 | $637,418 | $0 | $5,431,418 | $2,990,198 | $2,441,220 |
| 2024 | $1,997,500 | $221,791 | $0 | $2,219,291 | $0 | $2,219,291 |
| 2023 | $1,997,500 | $421,382 | $0 | $2,418,882 | $0 | $2,418,882 |
| 2022 | $1,997,500 | $391,648 | $0 | $2,389,148 | $0 | $2,389,148 |



EXHIBIT 8

Copy from re:SearchTX

## TAXING UNITS

| Unit | Description | Tax Rate | Net Appraised | Taxable Value |
|---|---|---|---|---|
| 01 | AUSTIN ISD | 0.925200 | $2,441,220 | $2,216,220 |
| 02 | CITY OF AUSTIN | 0.524017 | $2,441,220 | $1,760,976 |
| 03 | TRAVIS COUNTY | 0.375845 | $2,441,220 | $1,809,756 |
| 0A | TRAVIS CENTRAL APP DIST | 0.000000 | $2,441,220 | $2,441,220 |
| 2J | TRAVIS COUNTY HEALTHCARE DISTRICT | 0.118023 | $2,441,220 | $1,767,776 |
| 68 | AUSTIN COMM COLL DIST | 0.103400 | $2,441,220 | $2,341,808 |

| | |
|---|---|
| Total Tax Rate: | 2.046485 |
| Estimated Taxes with Current Exemptions: | $40,742.46 |
| Estimated Taxes Without Exemptions: | $49,959.2 |

DO NOT PAY FROM THIS ESTIMATE. This is only an estimate provided for informational purposes and may not include any special assessments that may also be collected. Please contact the tax office for actual amounts.

## IMPROVEMENT

Improvement #1: 1 FAM DWELLING Improvement Value: $637,418 Main Area: 3,927
State Code: A1 Description: 1 FAM DWELLING Gross Building Area: 11,355

| Type | Description | Class CD | Exterior Wall | Number of Units | EFF Year Built | Year | SQFT |
|---|---|---|---|---|---|---|---|
| 1ST | 1st Floor | R4 | | 0 | 1988 | 1988 | 3,079 |
| FBSMT | Finished Basement | R4 | | 0 | 1988 | 1988 | 848 |
| 604 | POOL RES CONC | R4 | | 0 | 1988 | 1988 | 1 |
| 041 | GARAGE ATT 1ST F | R4 | | 0 | 1988 | 1988 | 632 |
| 631 | PORCH CLOS UNFIN | R4 | | 0 | 1988 | 1988 | 491 |
| 011 | PORCH OPEN 1ST F | R4 | | 0 | 1988 | 1988 | 813 |
| 011 | PORCH OPEN 1ST F | R4 | | 0 | 1988 | 1988 | 733 |
| 095 | HVAC RESIDENTIAL | R4 | | 0 | 1988 | 1988 | 3,927 |
| 599 | MASONRY TRIM FV | F-V | | 1 | 1988 | 1988 | 1 |
| 612 | TERRACE UNCOVERD | R4 | | 0 | 1988 | 1988 | 639 |
| 011 | PORCH OPEN 1ST F | R4 | | 0 | 1988 | 1988 | 110 |
| 011 | PORCH OPEN 1ST F | R4 | | 0 | 1988 | 1988 | 77 |
| 251 | BATHROOM | R4 | | 0 | 1988 | 1988 | 4 |

**Improvement Features**

FBSMT Floor Factor: FBSMT, Grade Factor: A, Shape Factor: I
1ST Foundation: SLAB, Floor Factor: 1ST, Roof Style: HIP, Roof Covering: METAL, Grade Factor: A, Shape Factor: I

## LAND

| Land | Description | Acres | SQFT | Cost per SQFT | Market Value | Special Use Value |
|---|---|---|---|---|---|---|
| LAND | Land | 0.2978 | 12,972 | $369.57 | $4,794,000 | $0 |

## DEED HISTORY

| Deed Date | Type | Description | Grantor/Seller | Grantee/Buyer | Book ID | Volume | Page | Instrument |
|---|---|---|---|---|---|---|---|---|
| 3/5/26 | WD | WARRANTY DEED | EASTLAND RICHARD G 2023 | 2404 SCENIC LLC | | | | 2026024326 |



EXHIBIT 8

Copy from re:SearchTX

| Deed Date | Type | Description | Grantor/Seller | Grantee/Buyer | Book ID | Volume | Page | Instrument |
|---|---|---|---|---|---|---|---|---|
| 1/20/23 | WD | WARRANTY DEED | EASTLAND RICHARD G 2023 | EASTLAND RICHARD G 2023 | | | | 2023007246 |
| 1/20/23 | WD | WARRANTY DEED | EASTLAND RICHARD G & | EASTLAND RICHARD G 2023 | | | | 2023007245 |
| 7/15/05 | SW | SPECIAL WARRANTY | EASTLAND S STACY & | EASTLAND RICHARD G & | | | | 2005129790 TR |
| 1/20/05 | SW | SPECIAL WARRANTY | SPEARS ANNE EASTLAND | EASTLAND S STACY & | | | | 2005129789 TR |
| 1/18/97 | SW | SPECIAL WARRANTY | EASTLAND S STACY & NANCY E | SPEARS ANNE EASTLAND | | 12987 | 00374 | |
| 1/17/92 | ED | EXECUTOR DEED | EASTLAND ANNE MORGAN STACY | EASTLAND S STACY & NANCY E | | 12987 | 00371 | |
| 1/17/92 | SW | SPECIAL WARRANTY | EASTLAND ANNE MORGAN STACY | EASTLAND ANNE MORGAN STACY | | 11614 | 00335 | |
| 3/22/89 | ED | EXECUTOR DEED | SPEARS ANNE EASTLAND | EASTLAND ANNE MORGAN STACY | | 10907 | 00794 | |
| 1/18/92 | SW | SPECIAL WARRANTY | FARRON STELLA REV TRUST % INTE | SPEARS ANNE EASTLAND | | 12987 | 00377 | |
| 5/7/85 | WD | WARRANTY DEED | FARRON STELLA I F | FARRON STELLA REV TRUST % INTE | | 09154 | 00347 | |
| 5/7/85 | WD | WARRANTY DEED | FARRON STELLA REV TRUST % INTE | INTERFIRST BANK AUSTIN NA TRS | | 09154 | 00347 | |
| 5/7/85 | WD | WARRANTY DEED | | FARRON STELLA REV TRUST % INTE | | 09154 | 00347 | |
| 5/7/85 | WD | WARRANTY DEED | WEIDLEIN THELMA | | | 09154 | 00347 | |
| 12/16/40 | WD | WARRANTY DEED | MARSH CHARLES E | WEIDLEIN THELMA | | 00660 | 00294 | |
| | WD | WARRANTY DEED | | MARSH CHARLES E | | 00539 | 00577 | |



EXHIBIT 8

Copy from re:SearchTX

# PROPERTY TAX TRANSPARENCY

The information below reflects appraisal district records for the property specified and captures the property's condition as of January 1 of the tax year selected. All information in this report is as of the report date April 7, 2025. Your local appraisal district may update these records as the tax year progresses.

*Please check your appraisal district's website for the most up-to-date market value and exemptions information on this property.*

*Please check your tax office's website for the most up-to-date tax rate and tax amount information on this property.*

## PROPERTY INFORMATION

| | | | |
|---|---|---|---|
| Property ID | 119577 | | |
| Tax Year | 2025 | | |
| Report Date | May 5, 2026 | | |
| Property Address | 2404 SCENIC DR, AUSTIN TX 78703 | Legal Description | ABS 313 SUR 8 GILBERT D J ACR .2980 |
| Appraisal District | Travis Central Appraisal District<br>P.O. Box 149012<br>Austin, Texas 78714-9012<br><br>(512) 834-9317<br>www.traviscad.org | Tax Office | CELIA ISRAEL<br>P O BOX 1748<br><br>AUSTIN, TX 78767<br>(512) 854-9473<br>HTTPS://TAX-OFFICE. |
| Tax Entities | AUSTIN ISD<br>CITY OF AUSTIN<br>TRAVIS COUNTY<br>TRAVIS CENTRAL APP DIST<br>TRAVIS COUNTY HEALTHCARE DISTRICT<br>AUSTIN COMM COLL DIST | | |
| Property Characteristics | [x] Residential<br>[ ] Commercial<br>[ ] Business Personal Property<br>[ ] Mobile Home<br>[ ] Under Construction / Incomplete | | |
| Exemptions as of January 1 | Homestead<br>OTHER | | |

## 2024 PROPERTY TAXES

| | |
|---|---|
| 2024 Market Value | $2,219,291 |
| 2024 Net Appraised Value | $2,219,291 |
| 2024 Total Tax Bill | $37,073.28 |

*The property's 2024 tax bill would have been the following without any exemptions: $43,982.22*



EXHIBIT 8

Copy from re:SearchTX

## 2025 PROPERTY TAX PREVIEW

| | |
|---|---|
| 2025 Market Value | $5,431,418 |
| 2025 Net Appraised Value | $2,441,220 |

Your local appraisal district determines a property's market value as of January 1 of each year. In April, the owner will receive a Notice of Appraised Value with market value and exemption information. If you disagree with your property's market value, you can file a protest before May 15 of each year. If you do not receive the Notice of Appraised Value or the values listed above are unavailable, you can find the property's information on the appraisal district's website, usually in mid-April of each

An estimate of this property's 2025 property tax bill will be available in August at **travistaxes.com**. This estimate will be based on the property's market value, exemptions, and tax rates proposed by local taxing entities.

## EXEMPTION STATUS

The following exemptions were on the property as of January 1 and are expected to remain on the property for the calculation of the year's property tax bill:

**Homestead**

The following exemptions were on the property as of January 1, but may be transferred to another property for the property tax year, if the January 1 owner chooses to do so:

**OTHER**

**IMPORTANT:** If the property is sold to new ownership in 2025, **all exemptions** will be removed as of January 1, 2026.

Removing exemptions from a property will change the net value used to calculate property tax bills. This may result in a new owner facing a higher property tax bill than the previous owner would have received.

New owners may be eligible for a general residence homestead exemption if they own and reside on a property. Exemptions are also available for disabled veterans, seniors over the age of 65, people with qualifying disabilities, and some surviving spouses. To learn more about homestead exemptions and how to apply, please visit traviscad.org/homesteadexemptions.



EXHIBIT 8

Copy from re:SearchTX

# Kerr CAD Property Search

## Property Details

| | | | |
|---|---|---|---|
| **Account** | | | |
| **Property ID:** | 31753 | **Geographic ID:** 5030-0000-042010 | |
| **Type:** | R | **Zoning:** | |
| **Property Use:** | | | |
| **Location** | | | |
| **Situs Address:** | 2965 HWY 39 TX | | |
| **Map ID:** | S5030 | **Mapsco:** | |
| **Legal Description:** | MARYMEADE (1 & 2) LOT 42,43,44,45, PT 41 | | |
| **Abstract/Subdivision:** | S5030 | | |
| **Neighborhood:** | (S5030) MARYMEADE | | |
| **Owner** | | | |
| **Owner ID:** | 616201 | | |
| **Name:** | EASTLAND, EDWARD STACY & MARY | | |
| **Agent:** | | | |
| **Mailing Address:** | 2965 HIGHWAY 39<br>HUNT, TX 78024 | | |
| **% Ownership:** | 100.0% | | |
| **Exemptions:** | For privacy reasons not all exemptions are shown online. | | |

## Property Values

| | |
|---|---|
| **Improvement Homesite Value:** | $572,883 (+) |
| **Improvement Non-Homesite Value:** | $0 (+) |
| **Land Homesite Value:** | $50,000 (+) |
| **Land Non-Homesite Value:** | $0 (+) |
| **Agricultural Market Valuation:** | $0 (+) |
| **Market Value:** | $622,883 (=) |
| **Agricultural Value Loss:** | $0 (-) |
| **Appraised Value:** | $622,883 (=) |
| **HS Cap Loss:** | $0 (-) |
| **Circuit Breaker:** | $0 (-) |



EXHIBIT 9

Copy from re:SearchTX

| | |
|---|---|
| **Assessed Value:** | $622,883 |
| **Ag Use Value:** | $0 |

**2025 values are certified.**

Information provided for research purposes only. Legal descriptions and acreage amounts are for Appraisal District use only and should be verified prior to using for legal purpose and or documents. Please contact the Appraisal District to verify all information for accuracy.

## Property Taxing Jurisdiction

**Owner:** EASTLAND, EDWARD STACY & MARY **%Ownership:** 100.0%

| Entity | Description | Tax Rate | Market Value | Taxable Value | Estimated Tax | Freeze Ceiling |
|---|---|---|---|---|---|---|
| GKR | KERR COUNTY | 0.381400 | $622,883 | $622,883 | $2,375.68 | |
| RLT | LATERAL ROADS | 0.021000 | $622,883 | $622,883 | $130.81 | |
| SHN | HUNT I.S.D. | 0.731600 | $622,883 | $622,883 | $4,557.01 | |
| UGR | UPPER GUADALUPE RIVER AUTHORITY | 0.011170 | $622,883 | $622,883 | $69.58 | |
| WHU | HEADWATERS GROUNDWATER CONSERVATION DISTRICT | 0.006573 | $622,883 | $622,883 | $40.94 | |
| CAD | CENTRAL APPRAISAL DISTRICT | 0.000000 | $622,883 | $622,883 | $0.00 | |
| FD4 | KERR CO EMERG SERV DIST #4 | 0.013169 | $622,883 | $622,883 | $82.03 | |

**Total Tax Rate:** 1.164912

**Estimated Taxes With Exemptions:** $7,256.05

**Estimated Taxes Without Exemptions:** $7,256.05



EXHIBIT 9

Copy from re:SearchTX

## Property Improvement - Building

**Type:** Residential **Living Area:** 1894.0 sqft **Value:** $572,883

| Type | Description | Class CD | Year Built | SQFT |
|---|---|---|---|---|
| MA | | F6 | 1990 | 1696 |
| CP | conv code CP | F6 | 2001 | 480 |
| SP | ACAD CONV CODE: SP | F6 | 2001 | 224 |
| STG | ACAD CONV CODE: STG | F6 | 2001 | 168 |
| PO | ACAD CONV CODE: PO | F6 | 2001 | 352 |
| MAA | ACAD CONV CODE: MAA | F6 | 2001 | 198 |
| DGE | ACAD CONV CODE: DGE | F6 | 0 | 1140 |

## Property Land

| Type | Description | Acreage | Sqft | Eff Front | Eff Depth | Market Value | Prod. Value |
|---|---|---|---|---|---|---|---|
| A1 | A1 | 1.18 | 51,531.48 | 51.00 | 1.00 | $10,000 | $0 |
| A1 | A1 | | | 51.00 | | $10,000 | $0 |
| A1 | A1 | | | 51.00 | | $10,000 | $0 |
| A1 | A1 | | | 51.00 | | $10,000 | $0 |
| A1 | A1 | | | 24.98 | | $10,000 | $0 |



EXHIBIT 9

Copy from re:SearchTX

## Property Roll Value History

| Year | Improvements | Land Market | Ag Valuation | Appraised | HS Cap Loss | Assessed |
|---|---|---|---|---|---|---|
| 2025 | $572,883 | $50,000 | $0 | $622,883 | $0 | $622,883 |
| 2024 | $521,130 | $50,000 | $0 | $571,130 | $0 | $571,130 |
| 2023 | $521,130 | $50,000 | $0 | $571,130 | $0 | $571,130 |
| 2022 | $487,162 | $50,000 | $0 | $537,162 | $0 | $537,162 |
| 2021 | $320,792 | $50,000 | $0 | $370,792 | $36,791 | $334,001 |
| 2020 | $291,635 | $50,000 | $0 | $341,635 | $37,998 | $303,637 |
| 2019 | $243,034 | $33,000 | $0 | $276,034 | $0 | $276,034 |
| 2018 | $243,034 | $33,000 | $0 | $276,034 | $0 | $276,034 |
| 2017 | $181,828 | $33,000 | $0 | $214,828 | $0 | $214,828 |

## Property Deed History

| Deed Date | Type | Description | Grantor | Grantee | Volume | Page | Number |
|---|---|---|---|---|---|---|---|
| 12/28/2021 | WDVL | Warranty Deed With Vendors Lien | SCROGGIN, BRENDA M & DAVID (LIFE ESTATE) | EASTLAND, EDWARD STACY & MARY | 21-11600 | | 21-11600 |
| 4/9/2018 | WD | Warranty Deed | MANAK, BRENDA | SCROGGIN, BRENDA M, TTE | 18-02124 | 2124 | |
| 2/21/2012 | PROBATE | Probate | MANAK, JOE & BRENDA | MANAK, BRENDA | CAUSE #24860 | PROBATE | 0000 |
| 4/27/2001 | WDVL | Warranty Deed With Vendors Lien | MARSHALL, JOHN C & | MANAK, JOE & BRENDA | 1120 | 0214 | 0 |
| 12/15/1997 | WDVL | Warranty Deed With Vendors Lien | BAKER, WILLIAM F & | MARSHALL, JOHN C & | 928 | 585 | 0 |
| 9/3/1996 | QD | Quit Claim Deed | BAKER, WILLIAM F | BAKER, WILLIAM F & | 865 | 723 | 0 |



EXHIBIT 9

Copy from re:SearchTX

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Laurie Nichols on behalf of William Hand
Bar No. 24078622
lnichols@stevensonmurray.com
Envelope ID: 114568254
Filing Code Description: RESPONSE
Filing Description: INTERVENORS' RESPONSE TO DEFENDANTS' MOTION TO COMPEL ARBITRATION AND MOTION TO STAY
Status as of 5/6/2026 3:59 PM CST

Associated Case Party: WARREN BELLOWS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Russell S.Post | | rpost@beckredden.com | 5/6/2026 3:43:21 PM | SENT |
| R. PaulYetter | | pyetter@yettercoleman.com | 5/6/2026 3:43:21 PM | SENT |
| Alyssa McDaniel | | amcdaniel@beckredden.com | 5/6/2026 3:43:21 PM | SENT |
| Yetter Coleman | | efile@yettercoleman.com | 5/6/2026 3:43:21 PM | SENT |
| Jane Ray | | jray@yettercoleman.com | 5/6/2026 3:43:21 PM | SENT |
| Justin P.Tschoepe | | jtschoepe@yettercoleman.com | 5/6/2026 3:43:21 PM | SENT |
| Sue Csizmadia | | scsizmadia@yettercoleman.com | 5/6/2026 3:43:21 PM | SENT |
| J. ReidSimpson | | jrsimpson@yettercoleman.com | 5/6/2026 3:43:21 PM | SENT |
| Shannon Smith | | ssmith@yettercoleman.com | 5/6/2026 3:43:21 PM | SENT |
| Richard WarrenMithoff | | rmithoff@mithofflaw.com | 5/6/2026 3:43:21 PM | SENT |
| Warner V.Hocker | | whocker@mithofflaw.com | 5/6/2026 3:43:21 PM | SENT |
| Teresa Demetriou | | TDemetriou@mithofflaw.com | 5/6/2026 3:43:21 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| John W.Stevenson | | jstevenson@stevensonmurray.com | 5/6/2026 3:43:21 PM | SENT |
| Laurie Nichols | | lnichols@stevensonmurray.com | 5/6/2026 3:43:21 PM | SENT |
| William RobertHand | | rhand@stevensonmurray.com | 5/6/2026 3:43:21 PM | SENT |
| Abby Heath | | aheath@arnoldfreemanlaw.com | 5/6/2026 3:43:21 PM | SENT |
| Christopher Freeman | | cfreeman@arnoldfreemanlaw.com | 5/6/2026 3:43:21 PM | SENT |
| A. Arnold | | arnold@arnoldfreemanlaw.com | 5/6/2026 3:43:21 PM | SENT |

Copy from re:SearchTX

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Laurie Nichols on behalf of William Hand
Bar No. 24078622
lnichols@stevensonmurray.com
Envelope ID: 114568254
Filing Code Description: RESPONSE
Filing Description: INTERVENORS' RESPONSE TO DEFENDANTS' MOTION TO COMPEL ARBITRATION AND MOTION TO STAY
Status as of 5/6/2026 3:59 PM CST

Case Contacts

| | | | | |
|---|---|---|---|---|
| A. Arnold | | arnold@arnoldfreemanlaw.com | 5/6/2026 3:43:21 PM | SENT |
| Tiy Lewis | | tlewis@wcbglaw.com | 5/6/2026 3:43:21 PM | SENT |
| Joshua Fiveson | | jfiveson@wcbglaw.com | 5/6/2026 3:43:21 PM | SENT |
| Tracy Stubblefield | | stubblefield@wcbglaw.com | 5/6/2026 3:43:21 PM | SENT |
| Moe Taheri | | mtaheri@wcbglaw.com | 5/6/2026 3:43:21 PM | SENT |
| Izabela Ramirez | | ramirez@wcbglaw.com | 5/6/2026 3:43:21 PM | SENT |

Associated Case Party: CAMP MYSTIC, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jeff Ray | | jray@raylaw.com | 5/6/2026 3:43:21 PM | SENT |
| Linda Gonzales | | lgonzales@raylaw.com | 5/6/2026 3:43:21 PM | SENT |
| Katherine Estrada | | kestrada@raylaw.com | 5/6/2026 3:43:21 PM | SENT |
| Laura Rua | | lrua@raylaw.com | 5/6/2026 3:43:21 PM | SENT |
| Larry Matthys | | lmatthys@raylaw.com | 5/6/2026 3:43:21 PM | SENT |
| Mikal Watts | | mikal@wattsllp.com | 5/6/2026 3:43:21 PM | SENT |
| Kenneth Fair | | fair@wrightclosebarger.com | 5/6/2026 3:43:21 PM | SENT |
| Tom Wright | | wright@wrightclosebarger.com | 5/6/2026 3:43:21 PM | SENT |
| Jessica Barger | | barger@wrightclosebarger.com | 5/6/2026 3:43:21 PM | SENT |
| Lynn Castagna | | lynn@texasdefense.com | 5/6/2026 3:43:21 PM | SENT |
| Suzanne Goss | | goss@wrightclosebarger.com | 5/6/2026 3:43:21 PM | SENT |

Associated Case Party: CHRISTOPHER JACOBE

Copy from re:SearchTX

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Laurie Nichols on behalf of William Hand
Bar No. 24078622
lnichols@stevensonmurray.com
Envelope ID: 114568254
Filing Code Description: RESPONSE
Filing Description: INTERVENORS' RESPONSE TO DEFENDANTS' MOTION TO COMPEL ARBITRATION AND MOTION TO STAY
Status as of 5/6/2026 3:59 PM CST

Associated Case Party: CHRISTOPHER JACOBE

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| John Stevenson, Jr. | | jstevenson@stevensonmurray.com | 5/6/2026 3:43:21 PM | SENT |
| Robert Hand | | rhand@stevensonmurray.com | 5/6/2026 3:43:21 PM | SENT |

Copy from re:SearchTX

5/6/2026 4:14 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-009963
Norma Ybarra

**CAUSE NO. D-1-GN-25-009963**

| | |
|---|---|
| Warren and Patricia BELLOWS, et al. | IN THE DISTRICT COURT OF |
| v. | TRAVIS COUNTY, TEXAS |
| CAMP MYSTIC, LLC et al. | 459TH DISTRICT COURT |

**CAUSE NO. D-1-GN-25-009976**

| | |
|---|---|
| Ellen Elizabeth GETTEN, et al. | IN THE DISTRICT COURT OF |
| v. | TRAVIS COUNTY, TEXAS |
| NATURAL FOUNTAINS PROPERTIES, INC., et al. | 459th JUDICIAL DISTRICT |

**CAUSE NO. D-1-GN-25-009983**

| | |
|---|---|
| Eloise “Lulu” PECK, et al. | IN THE DISTRICT COURT OF |
| v. | 459th JUDICIAL DISTRICT |
| CAMP MYSTIC, LLC, et al. | TRAVIS COUNTY, TEXAS |

**CAUSE NO. D-1-GN-25-010016**

| | |
|---|---|
| Cole and Allison NAYLOR, et al. | IN THE DISTRICT COURT OF |
| v. | 459th JUDICIAL DISTRICT |
| CAMP MYSTIC, LLC, et al. | TRAVIS COUNTY, TEXAS |

**CAUSE NO. D-1-GN-26-000758**

| | |
|---|---|
| Will and Cici STEWARD, et al. | IN THE DISTRICT COURT OF |
| v. | 459th JUDICIAL DISTRICT |
| CAMP MYSTIC, LLC, et al. | TRAVIS COUNTY, TEXAS |

Copy from re:SearchTX

**NOTICE OF FILING OF AFFIDAVITS**
**IN SUPPORT OF MOTIONS TO COMPEL ARBITRATION**

Please take note that Defendants in the above-styled cases are filing the attached affidavits of Shauna Callahan and Edward Eastland in support of their Motions to Compel Arbitration filed on or about March 24, 2026.

Respectfully submitted,

**WATTS LAW FIRM LLP**
110 Tributary Ranch Road
Mountain Home, Texas 78058
P: (512) 479-0500

*/s/ Mikal Watts*
MIKAL WATTS
State Bar No. 20981820
mikal@wattsllp.com
*Attorney for Natural Fountains Properties, Inc.; Willetta Eastland, Individually and as Secretary of Natural Fountains Properties, Inc.; Mystic Camps Family Partnership, Ltd., and Mystic Camps Management, LLC*

**RAY | PEÑA, P.C.**

9601 McAllister Freeway, Suite 901
San Antonio, Texas 78216
P: (210) 341-3554
F: (210) 341-3557

*/s/ Jeff Ray*
JEFF RAY
State Bar No. 16604400
jray@raylaw.com
*Attorney for Camp Mystic, LLC and George Albritton Eastland, as Independent Executor of the Estate of Richard Eastland, Deceased*

Copy from re:SearchTX

**CASTAGNA SCOTT LLP**
1120 S. Capital of Texas Highway
Building 2, Suite 300
Austin, Texas 78746
512/329-3290
888/255-0132 fax

*/s/ Lynn S. Castagna*
LYNN S. CASTAGNA
State Bar No. 03980520
Lynn@texasdefense.com
*Attorney for Edward Eastland, Mary Liz Eastland, and William Neely Bonner III*

**WRIGHT CLOSE BARGER & GUZMAN, LLP**
One Riverway, Suite 2200
Houston, Texas 77056
Telephone: (713) 572-4321
Facsimile: (713) 572-4320

*/s/ Kenneth J. Fair*
Thomas C. Wright
State Bar No. 22059400
wright@wcbglaw.com
Jessica Z. Barger
State Bar No. 24032706
barger@wcbglaw.com
Kenneth J. Fair
State Bar No. 24007171
fair@wcbglaw.com
Joshua Fiveson
State Bar No. 24093438
jfiveson@wcbglaw.com
*Attorneys for Camp Mystic, LLC*

Copy from re:SearchTX

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing document was served upon all known counsel of record via electronic means in accordance with the Texas Rules of Civil Procedure on this day, May 6, 2026.

*/s/ Kenneth J. Fair*
Kenneth J. Fair

Copy from re:SearchTX

**EXHIBIT A**

# AFFIDAVIT OF SHAUNA CALLAHAN (CUSTODIAN OF RECORDS — CAMPMINDER, LLC)

STATE OF COLORADO §
§
COUNTY OF BOULDER §

Before me, the undersigned notary public, on this day personally appeared Shauna Callahan, a person whose identity is known to me. After I administered an oath to Affiant, Affiant testified as follows:

## I. PERSONAL BACKGROUND AND QUALIFICATIONS

1. My name is Shauna Callahan. I am over the age of twenty-one (21) years, am of sound mind, have personal knowledge of the facts stated in this affidavit, and am in all respects competent to make this affidavit. I reside in Boulder County, Colorado.

2. I am employed by Campminder, LLC ("Campminder") as Chief Financial Officer. In that capacity, I serve as the Custodian of Records for Campminder and am familiar with the manner in which its records are created, stored, retrieved, and maintained, by virtue of my duties and responsibilities. Campminder's principal place of business is in Boulder County, Colorado.

## II. CAMPMINDER'S BUSINESS OPERATIONS

3. Campminder, LLC is a software and data-services company that provides web-based camp management services to summer camps and similar organizations throughout the United States. These services include facilitating the enrollment of campers and the electronic execution of required enrollment documents—such as participation agreements, health forms, and permission forms—by parents or legal guardians through Campminder's secure, web-based platform.

4. Camp Mystic, LLC ("Camp Mystic") is a client of Campminder. As part of Camp Mystic's camper enrollment process, Camp Mystic either uploads an enrollment document into the Campminder platform or creates an enrollment document within the Campminder platform, and parents or legal guardians of enrolled campers are required to review and electronically execute those enrollment documents—including a Participation Agreement—through Campminder's platform before their child may attend camp.



Copy from re:SearchTX